**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| KERRY LEE THOMAS, | |
| Plaintiff, | |
| v. | Case No. 4:23-cv-00662 |
| ROBERT JOHNSON,<br>ERIC M. BRUSS,<br>WAYNE SCHULTZ,<br>and THE ESTATE OF ROBERT JOHNSON, | |
| Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT ERIC BRUSS'S AND WAYNE SCHULTZ'S JOINT MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

NATURE AND STAGE OF THE PROCEEDING .................................................................. 1

STATEMENT OF ISSUES ................................................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

LEGAL STANDARD ....................................................................................................... 5

ARGUMENT ................................................................................................................. 7

I.    Mr. Thomas Plausibly Alleges That Defendants Bruss and Schultz Violated His Right to
Be Free of Unconstitutionally Excessive Force. ......................................................... 7

II.   Siccing an Attack Dog on Mr. Thomas, Who Had Been Lying Prone on the Ground With
His Arms Outstretched in Surrender for Nearly Three Minutes, Violated His Clearly
Established Constitutional Rights. ............................................................................ 13

III.  Defendants' Failure to Intervene to Stop a Fellow Officer from Siccing an Attack Dog
on Mr. Thomas, Who Had Been Lying Prone on the Ground With His Arms Outstretched in
Surrender for Nearly Three Minutes, Violated Mr. Thomas's Clearly Established
Constitutional Rights. ............................................................................................ 16

IV.   Even if the Court Finds that Defendants Did Not Violate Mr. Thomas's Clearly
Established Constitutional Rights, the Original and Still-Controlling Text of Section 1983
Precludes the Defense of Qualified Immunity. ........................................................... 18

ii

A.   The Original Version of Section 1983 Contained a "Notwithstanding Clause" That Eliminated Qualified Immunity Yet Was Erroneously Omitted from Today's U.S. Code. . 18

B.   The Removal of the Notwithstanding Clause in the Revised Statutes of 1874 Did Not Change the Substance of the Law. ......................................................................... 23

**CONCLUSION** ........................................................................................................ **25**

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) ........................................................ 28

*Aguirre v. City of San Antonio*, 995 F.3d 395 (5th Cir. 2021) ................................. 13, 18

*Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001) ......................................................... 14

*Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) .......................................................... 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................ 12

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ................................. 25

*Baxter v. Harris*, No. 15-6412, 2016 WL 11517046 (6th Cir. Aug. 30, 2016) ..................... 20, 24

*Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161 (5th Cir. 1999) ......................... 13, 19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................ 12

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) ........................................................... 28

*Briscoe v. Lahue*, 460 U.S. 325 (1983) ............................................................................. 26

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ................................................................. 26

*Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008) ................................................................... 21

*Chacon v. Copeland*, 103 F. Supp. 3d 827 (W.D. Tex. 2015) ................................. 16, 18

*Chesser v. Sparks*, 248 F.3d 1117 (11th Cir. 2001) ......................................................... 14

*Civil Rights Cases*, 109 U.S. 3 (1883) .............................................................................. 31

*Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016) ..................................................... 15, 20, 21, 22

*Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018) ........................................... 18

*Dawe v. Rogers*, No. 8:09–cv–620–T–30AEP, 2009 WL 2579359 (M.D. Fla. Aug. 18, 2009) .. 24

*Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006) ............................................................... 13

*Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012) .............................................. 17, 23, 24

*Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857 (S.D. Ind. 2006) .............................. 24

iv

*Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004) ............................................................. 14

*Graham v. Connor*, 490 U.S. 386 (1989) ...................................................................................... 14

*Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305 (5th Cir. 2002) ............... 12

*Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995) .............................................................................. 17

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................................................. 26

*Harris-Billups v. Anderson*, 555 F. Supp. 3d 1328 (N.D. Ga. 2021) ............................................ 15

*Heckford v. City of Pasadena*, No. 4:20-CV-04366, 2022 WL 209747 (S.D. Tex. Jan. 21, 2022) ............................................................................................................................. 13

*Helm v. Rainbow City*, 989 F.3d 1265 (11th Cir. 2021) .............................................................. 17

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................................................... 22

*Imbler v. Pachtman*, 424 U.S. 409 (1976) .................................................................................. 26

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) ............................................................... 31, 32

*Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020) ................................................................... 13, 18

*Keammerer v. Eldridge*, No. 2:20-cv-376-PPS-JPK, 2021 WL 4893585 (N.D. Ind. Oct. 20, 2021) ............................................................................................................................. 24

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018) .................................................................................. 26

*Landry v. Cypress Fairbanks ISD*, No. 4:17-CV-3004, 2018 WL 3436971 (S.D. Tex. Jul. 17, 2018) .................................................................................................................... 12

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ....................................................... 13

*Malone v. City of Fort Worth*, No. 4:09–CV–634–Y, 2014 WL 5781001 (N.D. Tex. Nov. 6, 2014) .................................................................................................................... 24

*McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004) ................................................................. 13, 14

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) ........................................................................... 29

*Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30 (1983) ............................................................................................................................. 25

*Overton v. Hicks*, No. 1:06-cv-1513-DFH-JMS, 2008 WL 2518229 (S.D. Ind. June 17, 2008) . 24

*Pearson v. Callahan*, 555 U.S. 223 (2009) .................................................................................. 13

v

*Peterson v. Jensen*, 371 F.3d 1199 (10th Cir. 2004)................................................ 13

*Pierson v. Ray*, 386 U.S. 547 (1967) ................................................................. 25, 26

*Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) ............................ 24

*Procunier v. Navarette*, 434 U.S. 555 (1978) .......................................................... 26

*Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013) ................................................. 12

*Saenz v. G4S Secure Sols. (USA), Inc.*, 224 F. Supp. 3d 477 (W.D. Tex. 2016)......... 14

*Stephan v. United States*, 319 U.S. 423 (1943)........................................................ 30

*Strother v. Lucas*, 37 U.S. (12 Pet.) 410 (1838)...................................................... 28

*Taylor v. Riojas*, 141 S. Ct. 52 (2020) ...................................................... 13, 22, 23

*Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021).................................................. 17, 21

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439 (1993).......... 29

*United States v. Texas*, 507 U.S. 529 (1993) .......................................................... 25

*United States v. Welden*, 377 U.S. 95 (1964)...................................................... 29, 31

*Villarreal v. City of Laredo, Texas*, 17 F.4th 532 (5th Cir. 2021) ............................ 22

*Watt v. Alaska*, 451 U.S. 259 (1981)....................................................................... 31

*Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015).................................................. 13

*Western Union Telegraph Co. v. Call Pub. Co.*, 181 U.S. 92 (1901).......................... 28

*Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834)................................................... 28, 30

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)........................................... 26

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)................................................................. 26

**Statutes**

1 U.S.C. § 112............................................................................................................ 29

1 U.S.C. § 204(a) ....................................................................................................... 29

42 U.S.C. § 1983................................................................................... 7, 9, 31, 32

Pub. L. 96-170, § 1, 93 Stat. 1284 (1979)................................................................. 31

Pub. L. 104-317....................................................................................................... 31

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................................... 7, 13

**Other Authorities**

*The Federal Statutes—Their History and Use*, Ralph H. Dwan & Ernest R. Feidler, 22 Minn. L. Rev. 1008 (1938) ..................................................................................... 30

*Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018) ................................................... 26

*Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201 (2023) ................ 25, 27, 29, 31

*The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797......................................... 26

## NATURE AND STAGE OF THE PROCEEDING

On February 22, 2023, Plaintiff Kerry Lee Thomas filed a Complaint against three officers of the Harris County Constable's Office (Precinct 1) under 42 U.S.C. § 1983: Robert Johnson, Eric M. Bruss, and Wayne Schultz. ECF No. 1 ("Complaint"). The Complaint alleges that Defendants violated Mr. Thomas's Fourth and Fourteenth Amendment right to be free from excessive force when Defendants unleashed an attack dog on Mr. Thomas and then lied to justify their misconduct. On May 26, 2023, Defendants Bruss and Schultz filed a joint Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. ECF No. 11 ("Motion"). In their Motion, Defendants also invoke qualified immunity. Mr. Thomas now files this Opposition to Defendants' Motion to Dismiss and requests an opportunity for oral argument.

## STATEMENT OF ISSUES

1. Whether the Complaint states a plausible claim upon which relief can be granted. The Court considers this issue *de novo.*

2. Whether the Complaint states a plausible claim that Defendants violated a clearly established federal right. The Court considers this issue *de novo.*

3. Whether the Civil Rights Act of 1871 abrogated common law immunities, including qualified immunity. The Court considers this issue *de novo.*

## SUMMARY OF ARGUMENT

Plaintiff Kerry Lee Thomas brings this civil rights lawsuit against three officers of the Harris County Constable's Office (Precinct 1) who subjected him to a violent, traumatic, and unprovoked dog attack and then lied to justify their misconduct. In their joint Motion to Dismiss, Defendants Eric M. Bruss and Wayne Schultz shrug off Mr. Thomas's detailed factual account as "unsupported, conclusory allegations" that fail to state a valid claim for relief. Defs.' Bruss &

1

Schultz Mot. Dismiss ("Mot'n") 1, ECF No. 15. In so doing, they ignore a multitude of specific factual allegations that they cannot rebut.

Defendants contend that the body worn camera footage appended to Mr. Thomas's Complaint contradicts his allegations. To the contrary, the footage corroborates most of Mr. Thomas's allegations, and those allegations it does not corroborate, it simply does not encompass—it does not *contradict* any of them. Defendants' motion also relies on the very statements that Mr. Thomas alleges were lies to cover up their misconduct. Even if Defendants' self-serving statements were truthful (they are not), Defendants' participation in—and failure to stop—the dog attack, still renders them liable for violating Mr. Thomas's constitutional rights.

Defendants next argue that they lacked a reasonable opportunity to intervene and that, regardless, they are entitled to qualified immunity because any constitutional duty to intervene in these circumstances was not clearly established. But Mr. Thomas's Complaint states a valid claim for failure to intervene. Defendants' arguments to the contrary rely on fact-intensive questions inappropriate for resolution on a motion to dismiss. Further, binding precedent clearly establishes that Defendants' failure to intervene when their fellow officer sicced a highly agitated attack dog on a prostate Mr. Thomas violated his constitutional rights. For these reasons, Defendants' Motion to Dismiss should be denied.

The Court should also reject Defendants' invocation of qualified immunity because recent scholarship has brought to light a crucial fact: The original text of the 1871 Civil Rights Act (now codified as 42 U.S.C. § 1983) contained a "Notwithstanding Clause" that expressly eliminated common law immunities, including qualified immunity. The clause provided that government officials who violate a person's constitutional rights "shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be

liable . . . ." Exhibit A (emphasis indicates erroneously omitted language). The Notwithstanding Clause was erroneously omitted from the text of the first statutory compilation in 1874, but Congress never intended to override or alter it. *See infra*, Section IV.B. As such, it still has the force of law, and it explicitly precludes state actors from evading liability for constitutional violations by raising common law qualified immunity defenses.

## FACTUAL BACKGROUND

On February 22, 2021, at approximately 7:15 p.m., Robert Johnson of the Harris County Constable's Office (Precinct 1) responded to a complaint that two men were making noise outside of a home. Compl. ¶ 18, ECF No. 1. Kerry Lee Thomas had been sitting in the passenger seat of a PT Cruiser with his friend, Rapheal Gray, in the driver's seat. *Id.* ¶ 21. Upon Johnson's arrival, Mr. Thomas immediately exited the car and stood with his hands high up in the air and empty, facing Johnson. *Id.* ¶ 23. Neither Mr. Thomas nor Mr. Gray had a weapon. ¶ 28. Neither Mr. Thomas nor Mr. Gray made any attempt to run or resist. *Id.* Johnson continued shouting commands as he retrieved his attack dog from the backseat of his car and aimed his gun at Mr. Thomas. *Id.* ¶¶ 24–25.

Moments later, Defendant Eric M. Bruss arrived, followed by Defendant Wayne Schultz. *Id.* ¶ 26. All three officers unholstered their weapons and aimed them at the two men, who were unarmed and made no attempt to run or resist. *Id.* ¶¶ 26–28. Defendants proceeded to "g[i]ve a series of conflicting commands that would have been confusing to any reasonable person, let alone one facing a snarling dog and multiple armed officers, ready to shoot." *Id.* ¶ 29. Mr. Thomas nonetheless did his best to follow their orders, slowly lowering himself face down on the ground, where he remained throughout the encounter. *Id.* ¶¶ 29–48. Mr. Gray also remained prone on the ground, with his hands outstretched and empty. *See id.* ¶ 35; Compl. Ex. 1 at

approximately 19:24:15, ECF No. 1-2. Johnson nonetheless continued to rile up his panting dog, yanking at its leash while shouting at an already-prostrate Mr. Thomas to "fucking try me" and "try me, motherfucker!" *Id.* ¶¶ 31–35.

At Johnson's direction, Bruss and another officer took Mr. Gray into custody without incident. *Id.* ¶ 36. Schultz then ordered Mr. Thomas to "step up" from his prone position. *Id.* ¶ 37. It took Mr. Thomas a few seconds to register that this command was being directed at him, because until that point he had been receiving orders primarily from Johnson. *Id.* ¶ 38. When Johnson joined in Schultz's commands, threatening to release the dog, Mr. Thomas lifted his head from the ground. *Id.* ¶ 39. Just seconds later, Johnson released his attack dog. *Id.* ¶ 40.

The dog charged at Mr. Thomas and sunk its teeth deep into his right arm, pulling and tearing at his flesh as he cried out in pain. *Id.* ¶ 41. Rather than order the dog to release its bite, Johnson continued to taunt Mr. Thomas, stating, "You think we're fucking around, don't you?" *Id.* ¶ 42. Johnson made no effort to restrain the dog, instead climbing on top of Mr. Thomas and ordering him to put his hands behind his back. *Id.* ¶ 45. Only after Mr. Thomas was handcuffed did Johnson begin to remove the dog from Mr. Thomas's mangled arm. *Id.* ¶ 47. Even so, he allowed the dog to lunge at Mr. Thomas once again and latch onto his pant leg before removing the dog for good. *Id.*

Just steps away, fellow officers Eric M. Bruss and Wayne Schultz stood watching. *Id.* ¶¶ 2, 9, 43–44, 48, 51, 75–76, 78–79; *see id.* ¶¶ 26–48. Despite having ample opportunity to intervene throughout the incident, neither Bruss nor Schultz made any effort to restrain Johnson or his dog at any point during the encounter. *Id.* ¶¶ 2, 9, 51, 75–76 78–79; *see id.* ¶¶ 26–48. They did not direct Johnson to remove his dog. They did not pull the dog off of Mr. Thomas. They took no steps to intervene in the ongoing dog attack at all. *Id.*

4

Johnson immediately began celebrating the attack by laughing and cheering. *Id.* ¶ 3, 49. He later joked with a fellow officer that his dog was now "full" and "satisfied." *Id.* Bruss and Schultz acquiesced in Johnson's gleeful show of force by aiming a gun at Mr. Thomas, taunting and threatening him, and lying to cover up the attack. *Id.* ¶¶ 2, 3, 26–27, 43, 49, 51-56, 76, 79. Bruss made multiple false statements, claiming verbally and in a written report that dispatch had advised that "the suspects also had firearms." *Id.* ¶¶ 53–54. Similarly, Schultz lied to an Assistant District Attorney in an attempt to pin a false "interference" charge on Mr. Thomas, falsely claiming that Mr. Thomas disobeyed orders and looked like he was going to run. *Id.* ¶ 55.

While Defendants rushed to cover up their attack, Mr. Thomas was in such pain that he needed to be repeatedly assured by medical personnel that his arm remained attached to his body. *Id.* ¶ 61. Defendants' attack left Mr. Thomas with severe lacerations, puncture wounds, permanent scarring, persistent muscle damage, and other impairments to his right arm. *Id.* ¶¶ 6, 65. Due to his injuries, Mr. Thomas was unable to return to construction work and provide for his three daughters. *Id.* ¶ 66. The attack also caused Mr. Thomas severe and lasting emotional and psychological harm. *Id.* ¶¶ 7, 60, 65–69. Mr. Thomas is tormented by nightmares and other manifestations of post-traumatic stress. *Id.* ¶ 68. He now lives in fear of the very people who are tasked with protecting us from violence. *Id.* ¶ 69.

## LEGAL STANDARD

When ruling on a motion to dismiss for failure to state a claim, a court must take all well-pleaded factual allegations as true and construe those facts in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). A complaint need only allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility

'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged.'" *Landry v. Cypress Fairbanks ISD*, No. 4:17-CV-3004, 2018 WL 3436971, at *3 (S.D. Tex. Jul. 17, 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A court is also entitled to consider any exhibits attached to the complaint, including video evidence. *Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013). However, it may reject the plaintiff's version of the facts at the pleading stage only if a video exhibit "blatantly contradict[s]" and "utterly discredit[s]" his allegations, such that "no reasonable jury" could believe the plaintiff's account. *Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020); *Aguirre v. City of San Antonio*, 995 F.3d 395, 411 (5th Cir. 2021). Indeed, dismissal is not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999). Thus, "[m]otions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted).

Moreover, a government official who asserts qualified immunity is shielded from liability "unless the plaintiff (1) alleges facts sufficient to 'make out a violation of a constitutional right,' and (2) shows that the constitutional right 'was clearly established at the time of [the official's] alleged misconduct.'" *Heckford v. City of Pasadena*, No. 4:20-CV-04366, 2022 WL 209747, at *3 (S.D. Tex. Jan. 21, 2022) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Still, "[t]he law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Easter v. Powell*, 467 F.3d

459, 465 (5th Cir. 2006); *see also Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (reversing grant of qualified immunity even absent factually similar precedent).

"[I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015); *see also McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004) (stating that a qualified immunity defense "faces a formidable hurdle" when advanced in a Rule 12(b)(6) motion); *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) (stating that a district could should not grant a Rule 12(b)(6) motion on qualified immunity grounds "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim"); *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal." (citation omitted)); *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001) (noting that "qualified immunity is typically addressed at the summary judgment stage"). As such, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *Saenz v. G4S Secure Sols. (USA), Inc.*, 224 F. Supp. 3d 477, 481 (W.D. Tex. 2016) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2nd Cir. 2004)).

## ARGUMENT

### I.     Mr. Thomas Plausibly Alleges That Defendants Bruss and Schultz Violated His Right to Be Free of Unconstitutionally Excessive Force.

To make out a claim of excessive force in violation of the Fourth Amendment, a plaintiff must show: (1) he suffered an injury; (2) the injury was caused directly and only by a use of force that was clearly excessive; and (3) the excessiveness of the force was clearly unreasonable. *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004). Of course, a court must afford "careful attention to the facts and circumstances of each particular case, including the severity of

7

the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Bruss and Schultz have not contested that the dog attack violated Mr. Thomas's right to be free of excessive force. Nor could they, as the Complaint satisfies all three elements. Mr. Thomas suffered such severe injuries from the dog attack that he believed his right arm had been torn off. Compl. ¶ 61. He had to be repeatedly assured by medical personnel that his arm remained attached to his body. *Id.* Mr. Thomas suffered permanent scarring, persistent muscle damage, and other impairments to his dominant arm. *Id.* ¶ 65. Due to his injuries, Mr. Thomas was unable to return to construction work and provide for his three daughters. *Id.* ¶¶ 6, 66. The dog attack also caused Mr. Thomas severe and lasting emotional and psychological harm. *Id.* ¶¶ 65–69. He is tormented by nightmares and other manifestations of post-traumatic stress. *Id.* ¶ 68. And he now lives in fear of the very people tasked with protecting us from violence. *Id.* ¶ 69.

Moreover, the Complaint plausibly alleges that no reasonable officer could conclude that unleashing an attack dog on Mr. Thomas was justified where he was unarmed; compliant with orders; had his hands outstretched and visible throughout the entire encounter; made no sudden movements; and made no attempt to flee, resist arrest, or harm Johnson or any other person. ¶¶ 23, 28, 30–31, 35, 72. Nor could any reasonable officer conclude that it was reasonable to allow the dog to continue tearing at Mr. Thomas's flesh for approximately 43 seconds as he cried out in pain, with his arms behind his back and Johnson perched on top of him. ¶¶ 45–47.

Defendants assert that the several seconds it took Mr. Thomas to respond to the order to get up from his prone position amounted to resistance. Mot'n at 8–9; *see* Compl. ¶¶ 37 n.29, 39

8

n.32. It didn't. *See Cooper v. Brown*, 844 F.3d 517, 525 (5th Cir. 2016) (rejecting defendant-officer's suggestion that plaintiff's failure to raise his hands in the precise manner ordered amounted to resistance, considering the officer could see plaintiff's hands and ample precedent acknowledged the difficulty of complying with orders when being mauled by an attack dog or otherwise subjected to a show of force). Even had the officers' commands been clear and consistent, taking several seconds to react is not only reasonable but necessary to avoid provoking a lethal response to any sudden movements. *See, e.g.*, *Harris-Billups v. Anderson*, 555 F. Supp. 3d 1328, 1333 (N.D. Ga. 2021) (holding that defendant-officer was justified in shooting plaintiff who "suddenly move[d] his arm down towards his torso, clutching his abdomen in pain"); *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) (holding that defendant-officer was justified in shooting unarmed plaintiff three times when plaintiff reached into his pocket to turn off his Walkman radio). Indeed, Mr. Thomas had just such a fear. Compl. ¶¶ 29–31, 37–39. A seconds-long pause does not constitute "resistance" that would justify a dog attack.

Moreover, the officers' commands were far from clear and consistent—they were confusing and conflicting. Compl. ¶¶ 37–40 ("Given that Mr. Thomas had, until that point, been receiving orders primarily from Defendant Johnson, it took him a few seconds to register that this command was directed at him. During those few seconds, he stayed prone on the ground, with his arms remaining outstretched and still. . . . Upon hearing Defendant Johnson's voice, Mr. Thomas lifted his head from the ground. Defendant Johnson [then] released his attack dog."); *see also id.* ¶ 30 (explaining that Mr. Thomas asked, "Me?" to confirm Defendants were speaking to him and not Mr. Gray when they ordered him to get on the ground); Compl. Ex. 1 at approximately 19:23:50 to 19:24:06 (evidencing Mr. Thomas's and Mr. Gray's confusion about which orders were being directed at each of them as Johnson and Bruss shouted for them to "stay

9

in the fucking car!", "walk towards us!", and "stop!" in a span of seconds). The confusing and conflicting nature of Defendants' commands further undermine their mischaracterization of Mr. Thomas's measured response time as constituting "resistance" that might justify the dog attack that followed. S*ee Chacon v. Copeland*, 103 F. Supp. 3d 827 (W.D. Tex. 2015) (denying officer's summary judgment motion where a jury could have found that the officer's commands were "confusing and conflicting," thus negating any claim that force was necessary to overcome the plaintiff's purported resistance).

Defendants next contend that they did not have an opportunity to intervene and so are not liable. Mot'n at 9. But they did and they are. The Fourth Amendment requires law enforcement officers to not only refrain from using excessive force themselves, but also to intervene when another officer uses unconstitutionally excessive force. To state a claim for failure to intervene a plaintiff must allege that the bystander officer: (1) was aware of the constitutional violation; (2) present at the scene of the violation; (3) had a reasonable opportunity to prevent the harm; but (4) nonetheless, failed to act. *Timpa v. Dillard*, 20 F.4th 1020, 1038–39 (5th Cir. 2021). The Complaint plausibly alleges all four elements. Bruss and Schultz stood just steps away when Johnson released his attack dog on Mr. Thomas and were not just aware of, but encouraged and assisted, what was happening. Because the tests for both excessive force and qualified immunity ask what a "reasonable officer" would know, Bruss and Schultz were just as well positioned as Johnson to recognize that unleashing the dog violated Mr. Thomas's constitutional rights.[1]

Defendants' own actions confirm their knowledge. *See Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (holding bystander officer who "stood by and laughed" and "yelled

---

[1] *See Helm v. Rainbow City*, 989 F.3d 1265, 1278 (11th Cir. 2021) ("[I]n cases where the use of force is declared clearly unconstitutional, the officers that failed to intervene are 'no more entitled to qualified immunity than [the officer using force].'") (quoting *Edwards v. Shanley*, 666 F.3d 1289, 1298 (11th Cir. 2012) (alteration in original)).

encouragement" supported an inference of acquiescence in the principal officer's use of excessive force); Compl. ¶ 42–43 (Schultz aimed a gun on Mr. Thomas as Johnson threatened him, even as the dog tore into Mr. Thomas's flesh); *id.* ¶ 48 (Bruss commanded Mr. Thomas to roll over onto his stomach as Johnson continued to threaten him).

Defendants' self-serving statements after the attack provide further evidence of their consciousness of guilt. As alleged in the Complaint, dispatch specifically stated multiple times that it was the caller who was armed—not the suspects. *Id.* ¶ 54.[2] But neither Bruss nor Schultz made any mention of this fact in their written reports. *Id.* Indeed, Bruss fabricated a conversation with dispatch in a written report, falsely claiming that dispatch said "the suspects also had firearms." *Id.* ¶ 53. Likewise, Schultz lied to an Assistant District Attorney in an attempt to pin a false "interference" charge on Mr. Thomas, falsely stating that Mr. Thomas was not complying with orders and that he looked like he was going to run. *Id.* ¶ 55.

Defendants misconstrue the pleading standard when they argue that because Mr. Thomas's video exhibit does not "substantiate" some of his allegations, it therefore "contradicts" them. *See* Mot'n at 8. At this stage, the Court may reject the facts as alleged by the plaintiff only if a video exhibit "blatantly contradict[s]" and "utterly discredit[s]" his allegations, such that "no reasonable jury" could believe the plaintiff's account. *Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020); *Aguirre v. City of San Antonio*, 995 F.3d 395, 411 (5th Cir. 2021). Exhibit 1

---

[2] Even if Defendants *were* acting on a reasonable belief that Mr. Thomas and his friend were armed, that would not justify siccing an attack dog on a person who was lying face down on the ground, with his arms outstretched and empty, as he had been for nearly three minutes. Compl. ¶¶ 30–40. *See also Chacon v. Copeland*, 103 F. Supp. 3d 827, 833 (W.D. Tex. 2015) (holding sufficient triable evidence existed to find that defendant officer knew that the plaintiff was not the one who was armed, despite the report of a gun, and that defendant-officer's claim he did not hear the information on the radio that would have disabused him of this purported misunderstanding was a credibility question for the jury). Either way, whether defendants harbored such a belief is a factual question that should be answered at trial.

affirmatively corroborates the great majority of Mr. Thomas's allegations. Submitting evidence that substantiates some of a plaintiff's allegations does not somehow shift the burden for plaintiffs to substantiate all of them. *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018) ("[T]he standard imposed by the Supreme Court is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account.").

 Here, the video does not "blatantly contradict" any of Mr. Thomas's allegations. That the video footage captures Defendant Bruss lying about the information from dispatch does not make his lies true. *Contra* Mot'n at 8 ("Bruss can be heard on the video informing the suspects that the deputies were told they had a gun and until they confirmed otherwise, they would be operating on the assumption that they were armed. . . . Because Plaintiff's conclusory allegations are contradicted by facts appearing in the exhibit attached to his complaint, the Court is not required to accept the allegations as true."). As alleged in the Complaint and confirmed by Exhibit 1, the dispatcher specifically stated that it was the caller who was armed. Compl. ¶ 19. And, as alleged in the Complaint and supported by Exhibit 1, the dispatcher never stated that the suspects were also armed. *Id.* Far from undermining Mr. Thomas's allegations that Defendants knowingly violated his constitutional rights, the Defendants' falsehoods support them.

Defendants argue that they lacked a reasonable opportunity to intervene because of the "short time frame" and because Mr. Thomas "does not allege that Bruss or Schultz had the ability to give any command to Johnson's dog or otherwise control Johnson's dog." Mot'n at 9. But these arguments ignore the clear and specific allegations in the Complaint and instead raise fact-intensive questions inappropriate for resolution on a motion to dismiss. *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999) (explaining that dismissal is not proper

"unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). As explained above, the Complaint expressly alleges that Bruss—himself a trained attack dog handler—and Schultz, both armed officers standing just steps away from Johnson and his attack dog, had ample opportunity to intervene. Compl. ¶¶ 2, 43, 48, 51. n.42, 75–76, 78–79. Neither Bruss nor Schultz "made any verbal or physical attempt to restrain" them. *Id.* ¶ 51. Nor did they take any other action to stop or discourage it. *See, e.g.*, *Baxter v. Harris*, No. 15-6412, 2016 WL 11517046, at *2 (6th Cir. Aug. 30, 2016) (plaintiff plausibly alleged bystander officer "had the opportunity to intervene, given his proximity to [the plaintiff], and the means to prevent the harm from occurring either by instructing [the dog handler] not to release the animal or by restraining the animal himself until [the dog handler] could command it to stop"). Instead, as Johnson riled up his panting dog, Bruss and Schultz joined in the show of force by aiming a gun at Mr. Thomas, taunting him, and levying threats of their own. *Id.* ¶¶ 2, 51. Even as Mr. Thomas writhed in pain, with the dog yanking at his right arm and Johnson perched on his back, Bruss and Schultz did nothing to stop the attack. *Id.* ¶¶ 43, 45, 48, 51. Despite having ample opportunities to intervene, they did not. Thus, they are liable.

## II.  Siccing an Attack Dog on Mr. Thomas, Who Had Been Lying Prone on the Ground With His Arms Outstretched in Surrender for Nearly Three Minutes, Violated His Clearly Established Constitutional Rights.

Long before Defendants' attack on Mr. Thomas, the Fifth Circuit held it to be "clearly established" that "subjecting a compliant and non-threatening arrestee to a lengthy dog attack [is] objectively unreasonable" under the Fourth Amendment. *See, e.g.*, *Cooper v. Brown*, 844 F.3d 517, 524–25 (5th Cir. 2016). In *Cooper*, police pulled over Jacob Cooper on suspicion of a DUI. *Id.* at 521. After submitting to a breathalyzer, Mr. Cooper ran away and hid in a small fenced area between two houses. *Id.* The officer who pulled over Mr. Cooper called for backup. *Id.*

Responding to this call, Officer Brown pursued Mr. Cooper with his police dog. *Id.* Police did not know whether or not Mr. Cooper was armed. *Id.* The dog found Mr. Cooper in his hiding place and bit him on the leg. *Id.* Following the initial bite, the dog continued biting Mr. Cooper for another one to two minutes, during which Mr. Cooper made no attempt to flee or fight back. *Id.* Brown testified that he ordered Mr. Cooper to show his hands and submit to arrest, that he could see Mr. Cooper's hands, and that he could see Mr. Cooper had no weapon. *Id.* Only after handcuffing him did the officer order the dog to release its bite. *Id.*

The Fifth Circuit affirmed denial of summary judgment for the officer, holding that the officer's use of force was unreasonable and excessive in violation of the Fourth Amendment and that this was clearly established. *Id.* at 524–25. Applying the first *Graham* factor, the Court considered DUI to be a serious offense. *Id.* at 522. Nonetheless, it found that factor significantly outweighed by the other two *Graham* factors: whether Mr. Cooper posed a threat to the safety of officers or others and whether Mr. Cooper was actively resisting arrest or attempting to flee. *Id.* at 522–24. As to the second factor, there was no evidence that Mr. Cooper was violent. *Id.* at 522–223. As to the third factor, although Mr. Cooper had fled after being pulled over, he was no longer actively resisting or attempting to flee at the time the officer released his dog. *Id.* at 523. The Fifth Circuit concluded: "Our caselaw makes certain that once an arrestee stops resisting, the degree of force an officer can employ is reduced." *Id.* at 524. The Court pointed to its prior holding in *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008), that "it was objectively unreasonable for an officer to slam an arrestee's face into a nearby vehicle when the arrestee 'was not resisting or attempting to flee.'" *Id.* at 524–25. *See also Timpa v. Dillard*, 20 F.4th 1020, 1034-35 (5th Cir. 2021) ("Within the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is

objectively unreasonable. . . . We have reaffirmed again and again that this principle applies with obvious clarity to a variety of tools of force because the '[l]awfulness of force . . . does not depend on the precise instrument used to apply it.'" (citations omitted)).

In this case, Defendants' violation of clearly established law is even starker than in *Cooper*, 844 F.3d 517. In *Cooper*, the plaintiff was suspected of a "DUI, [which] is a serious offense." *Id.* at 522. Here, Mr. Thomas was suspected merely of "making noise." Compl. ¶ 18. In *Cooper*, the plaintiff originally fled and hid from police. 844 F.3d at 521. Here, Mr. Thomas did neither. Compl. ¶ 23. Like the plaintiff in *Cooper*, Mr. Thomas never gave any indication that he was in any way violent or posed any threat to the safety of the officers or others. Compl. ¶¶ 23, 28, 30–31, 35, 72. And, as in *Cooper*, Mr. Thomas was not resisting or attempting to flee when Defendants allowed a dog to attack him. *Id.* ¶¶ 28, 31, 35, 37–40. That Mr. Thomas moved more slowly to avoid making any sudden movements, for fear that Defendants might shoot him, did not constitute resistance. *See* Section I, *supra*. Indeed, he had his hands in the air from the moment Defendants arrived and had been prone on the ground for nearly three minutes, with his arms outstretched and visible, when Johnson unleashed the dog. Compl. ¶¶ 23, 30, 35, 38–40.'

Further, although *Cooper, Bush*, and *Timpa* are independently sufficient to defeat a qualified immunity challenge, even without those cases, Defendants' conduct here was so "patently obvious a violation of the Constitution [that they are] not entitled to qualified immunity." *Villarreal v. City of Laredo, Texas*, 17 F.4th 532, 540 (5th Cir. 2021) (citing *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)). Indeed, *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020), reversed the Fifth Circuit's grant of summary judgment to defendants based on qualified immunity even absent close precedent because "no reasonable [] officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible. . . .").

15

It is clearly established that siccing a dog on a person who posed no threat, made no attempt to flee or resist, and remained prone on the ground for nearly three minutes with his arms outstretched and visible violates clearly established constitutional rights. As such, Defendants are not entitled to qualified immunity and their Motion to Dismiss should be denied.

III.   **Defendants' Failure to Intervene to Stop a Fellow Officer from Siccing an Attack Dog on Mr. Thomas, Who Had Been Lying Prone on the Ground With His Arms Outstretched in Surrender for Nearly Three Minutes, Violated Mr. Thomas's Clearly Established Constitutional Rights.**

Bruss and Schultz declare that even if Johnson violated Mr. Thomas's constitutional rights, they are entitled to qualified immunity because "Plaintiff . . . cannot identify a case in the Fifth Circuit or other circuits that applies bystander liability in the context [at hand]." Mot'n at 10. On the contrary, ample case law supports a finding that Bruss and Schultz are not entitled to qualified immunity for their role in the attack on Mr. Thomas.

As an initial matter, Mr. Thomas does not have to identify a case that applies bystander liability specifically in the context of an unconstitutional dog attack. Because the test for qualified immunity asks what a "reasonable officer" would know, all officers are equally positioned to know whether conduct violates the constitution and whether they have an obligation to refrain from or intervene against such conduct. *See Edwards v. Shanley*, 666 F.3d 1289, 1298 (11th Cir. 2012) (holding that officer who failed to protect plaintiff from unconstitutionally excessive force was "no more entitled to" qualified immunity than officer who exerted the force himself). As such, the Fifth Circuit's decisions in *Timpa*, *Cooper*, *Bush* give fair warning—to the extent any precedential warning is even necessary on such egregious facts, *see Taylor*, 141 S. Ct. at 53—that failing to intervene when Johnson sicced his attack dog on a prostrate Mr. Thomas violated the Constitution.

Nonetheless, numerous courts have found bystanders liable when another officer siccs an attack dog on a suspect without just cause. For example, in *Edwards v. Shanley*, the Eleventh Circuit reversed a district court's grant of qualified immunity to an officer who "made no effort to intervene" when his fellow officer unleashed an attack dog on the subject of a traffic stop. 666 F.3d at 1298. The plaintiff alleged that, although he fled into a wooded area after being pulled over, by the time the officers approached him he was "lying on his stomach with his hands exposed." *Id.* at 1293. When the officers ordered him to show his hands, he "made no movement" "because his hands were already visible." *Id.* Instead, he shouted, "You got me. I only ran because of my license." *Id.* On these facts, the court found that the force used was not only excessive but also "gratuitous and sadistic" and that the bystander officer was "no more entitled to qualified immunity than [the dog's handler]." *Id.* at 1298.[3]

Likewise, in *Fidler v. City of Indianapolis*, a court denied qualified immunity to both a dog handler and a bystander officer for subjecting the plaintiff to a dog attack after he had already put his hands up and surrendered. 428 F. Supp. 2d 857 (S.D. Ind. 2006). *Accord, Malone v. City of Fort Worth*, No. 4:09–CV–634–Y, 2014 WL 5781001 (N.D. Tex. Nov. 6, 2014) (denying summary judgment to four officers who failed to intervene to protect a suspect from an unjustified dog attack); *Baxter v. Harris*, No. 15-6412, 2016 WL 11517046 (6th Cir. Aug. 30, 2016) (affirming district court's denial of bystander defendant's motion to dismiss on similar grounds); *Keammerer v. Eldridge*, No. 2:20-cv-376-PPS-JPK, 2021 WL 4893585 (N.D. Ind. Oct. 20, 2021) (denying motion to dismiss on similar grounds); *Dawe v. Rogers*, No. 8:09–cv–620–T–30AEP, 2009 WL 2579359 (M.D. Fla. Aug. 18, 2009) (same); *Overton v. Hicks*, No. 1:06-cv-

---

[3] The Eleventh Circuit has also found both principal and bystander liability in a case where an attack dog was permitted to maul a burglary suspect for two minutes, which it characterized as an "eternity." *Edwards v. Shanley*, 666 F.3d 1289, 1297 (11th Cir. 2012) (discussing *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000)).

1513-DFH-JMS, 2008 WL 2518229, at *7 (S.D. Ind. June 17, 2008) (holding that while officer

was entitled to summary judgment on failure to intervene claim with respect to initial release of

dog, second dog attack was excessive considering plaintiff was standing "dazed and confused"

outside of his car while officers shouted to get on the ground). Here, officers were steps away for

the entirety of the dog attack. Any one of the courses of action proposed above in Section I,

*supra* would have taken no more than an instant. Instead, they did nothing. Bruss and Shultz are

liable for their failure to intervene and prevent the violation of Mr. Thomas's constitutional

rights.

IV.   **Even if the Court Finds that Defendants Did Not Violate Mr. Thomas's Clearly
      Established Constitutional Rights, the Original and Still-Controlling Text of Section
      1983 Precludes the Defense of Qualified Immunity.[4]**

   A.   *The Original Version of Section 1983 Contained a "Notwithstanding Clause" That
        Eliminated Qualified Immunity Yet Was Erroneously Omitted from Today's U.S.
        Code.*

When Congress passes new legislation, it "does not write upon a clean slate." *United*

*States v. Texas*, 507 U.S. 529, 534 (1993). Rather, it legislates against a backdrop of established

"common-law adjudicatory principles." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S.

104, 108 (1991). When Congress crafts a new law, it can either retain or reject the "long-

established and familiar principles" in the common law. *United States v. Texas*, 507 U.S. at 534.

Courts assume that Congress has chosen to retain the common law unless the text of the statute

says otherwise. *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va.*,

---

[4] This section relies on the recent scholarship of Professor Alexander A. Reinert, as reflected in
his article *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201 (2023), as well as
the briefing of the Institute for Justice, as reflected in its amicus brief in the currently pending
U.S. Supreme Court case *Health and Hospital Corporation of Marion County v. Talevski*, 21-
806,        available        at        https://www.supremecourt.gov/DocketPDF/21/21-
806/238607/20220923085926238_21-
806%20Amicus%20Brief%20of%20Institute%20for%20Justice.pdf.

464 U.S. 30, 35–36 (1983).

The statute at issue here is Section 1983. Starting in 1967, the Supreme Court has assumed that Congress intended to retain common law principles in actions under Section 1983. *Pierson v. Ray*, 386 U.S. 547, 557 (1967) ("We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983"). In *Pierson*, the Supreme Court reviewed the version of Section 1983 found in the U.S. Code, *id.* at 548 n.1, and concluded that the "legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities," *id.* at 554. Accordingly, the Court granted defendants a "defense of good faith and probable cause" that existed in Mississippi's common law. *Id.* at 557.

That assumed-to-be-incorporated "good faith" defense evolved into the modern doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 806–07 (1982) ("As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.").[5] And with each step along the path of qualified immunity, the Supreme Court has explicitly relied on the supposed silence

---

[5] More recent scholarship has cast doubt on whether there actually was any generally available defense of good faith for constitutional claims or common law torts in 1871. *See* William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 55–57 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1801–02 & nn.24–26 (2018). And there is a growing cross-ideological body of criticism of the doctrine generally. *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870 (2017) (Thomas, J., concurring in part and concurring in the judgment) (noting his "growing concern with our qualified immunity jurisprudence"); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (criticizing the Court's "one-sided approach to qualified immunity [which] transforms the doctrine into an absolute shield for law enforcement"). This brief does not rely on such doubt.

of Section 1983 to ground the doctrine.[6]

But the Supreme Court was wrong when it assumed that Congress intended to incorporate the common law in Section 1983; the version of Section 1983 the Court looked at—the U.S. Code—omits key language originally passed by Congress. The original text of the statute was reflected in the Statutes at Large. That original version was longer than its contemporary U.S. Code counterpart. Rather than having just two relevant clauses, the original text had three. The first and third clauses are largely the same today as they were in 1871:

> That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall . . . be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress[.]

Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871).

The original statute, however, contained "additional significant text" where the ellipsis appears above—"[i]n between the words 'shall' and 'be liable.'" *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201, 235 (2023). That clause said that government officials "shall, **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding**, be liable" under the statute. Ku Klux Klan

---

[6] *See, e.g.*, *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (holding that "[c]ertain immunities were so well established in 1871" that "Congress would have specifically . . . provided had it wished to abolish them."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (relying on the presumption that the 42nd Congress "likely intended" for the common law to apply); *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) ("[W]e find no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions."); *Procunier v. Navarette*, 434 U.S. 555, 561 (1978) ("Although the Court has recognized that in enacting § 1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials."); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) ("The decision in *Tenney* established that s 1983 is to be read in harmony with general principles of tort immunities and defenses, rather than in derogation of them."). For a more thorough treatment of the evolution of the doctrine of qualified immunity, see Reinert, *supra*, at 234 et seq.

Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added). That language appears in a copy of the Civil Rights Act of 1871, certified by the National Archives and Records Administration on August 19, 2022. *See* Exhibit A at page 2 of 8, lines 7-9 of the paragraph beginning, "Be it Enacted. . . ."

To determine what the long-forgotten "Notwithstanding Clause" means,[7] this Court should look to the "ordinary public meaning" of the Notwithstanding Clause "at the time of its enactment." *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). Accordingly, the Court should evaluate two key phrases: (1) "custom[ ] or usage of the State," and (2) "to the contrary notwithstanding." As understood by the 42nd Congress, a "usage or custom" was the common law itself. *Strother v. Lucas*, 37 U.S. (12 Pet.) 410, 437 (1838). Whether a rule was established by "usage" or through "custom," it existed by "a common right, which means a right by common law." *Id.*; *see also Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 659 (1834) ("The judicial decisions, the usages and customs of the respective states" established the "common law . . . in each [state]."); *Western Union Telegraph Co. v. Call Pub. Co.*, 181 U.S. 92, 102 (1901) (citing Black's Law Dictionary for proposition that common law springs from "usages and customs").[8]

---

[7] The Supreme Court has never analyzed the meaning of this language. When it has acknowledged it at all, it has assumed that it is immaterial. For example, Justice Brennan's concurrence and dissent in *Adickes v. S. H. Kress & Co.*, "assumes" that the differences are immaterial. 398 U.S. 144, 203 n.15 (1970) ("For purposes of this opinion I assume that the linguistic differences between the original § 1 and present § 1983 are immaterial.").

[8] The legislative history of Section 1983 confirms this common understanding of "custom and usage" from 1871. For example, "Senator Allen G. Thurman, speaking in opposition to Section 1 of the 1871 Act (what is now Section 1983), clearly understood that 'custom or usage' was equivalent to 'common law.'" Reinert, 111 Calif. L. Rev. at 235. In fact, while expressing his concern over "how comprehensive [the statute's] language is," Senator Thurman was alarmed that an official could be liable for any "deprivation under color of law," which, in his words, included any "'custom or usage' which has become common law." Cong. Globe, 42d Cong., 1st Sess., App. 217 (1871) (available online at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=100/llcg100.db&recNum=354). So Senator Thurman,

The original text of Section 1983 also said that officials will be liable for constitutional violations "notwithstanding" any "contrary" common law principles. The ordinary public meaning of "notwithstanding" remains the same today as it was for the 42nd Congress in 1871. *See Bryan A. Garner, Garner's Modern English Usage* 635 (4th ed. 2016) ("This usage [of notwithstanding] has been constant from the 1300s to the present day."). "Notwithstanding" means "[w]ithout opposition, prevention, or obstruction from," or "in spite of." Complete Dictionary of the English Language 894 (Webster's 1886)[9]; *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (explaining that the ordinary meaning of "notwithstanding" is "in spite of" or "without opposition, prevention or obstruction from"). Many contemporaneous dictionaries confirm this meaning. *See, e.g.*, *Etymological Dictionary of the English Language* 344 (Chambers's 1874) ("not standing against or opposing; nevertheless.");[10] 2 A New Dictionary of the English Language 1351 (1837) ("Not opposing, resisting, hindering, preventing.").[11] This plain-English understanding of the "Notwithstanding Clause" is consistent with the context. As Reinert observes, some of "the very same people who served in the rebel army were also serving as judges in southern states. It would have been passing strange, then, for the very same Congress to permit liability under Section 1983 to be limited by judge-made law created by state court judges." Reinert, 111 Calif. L. Rev. at 239.

In short: the Notwithstanding Clause means that the common law does not prevent persons from being held liable under Section 1983. *See id.* at 236 ("Its implications are

---

understood that when the 42nd Congress used the phrase "custom[ ] or usage of the State," it meant the common law of each state.

[9] Available online at https://archive.org/details/websterscomplete00webs/page/894/mode/2up?view=theater.

[10] Available online at https://i2i.org/wp-content/uploads/2017/11/1874_Chambers_Etymological.pdf.

[11] Available online at https://babel.hathitrust.org/cgi/pt?id=chi.73004154&view=1up&seq=175.

unambiguous: state law immunity doctrine, however framed, has no place in Section 1983.").

   B. *The Removal of the Notwithstanding Clause in the Revised Statutes of 1874 Did Not Change the Substance of the Law.*

In determining what a law says, the current edition of the United States Code is "prima facie" evidence of the text of the law. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) (citing 1 U.S.C. § 204(a)). But it is the original Statutes at Large that provide the actual "legal evidence of laws." *Id.* (quoting 1 U.S.C. § 112; *see also United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("the Code cannot prevail over the Statutes at Large when the two are inconsistent.") (quoting *Stephan v. United States*, 319 U.S. 423, 426 (1943)).

Relevant here, shortly after the 42nd Congress passed the Ku Klux Klan Act of 1871, the 43rd Congress compiled the Revised Statutes of 1874. Before the Revised Statutes, the country lacked an official compilation of federal laws. To address this, "President Andrew Johnson appointed a commission to revise, simplify, arrange, and consolidate all statutes of the United States." Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 L. Library J. 213, 218 (2020) (internal quotation marks omitted). At its core, this compilation was organizational in design—just putting all existing federal laws in the same place for the first time.

But after years of trying, Congress wasn't satisfied with the results. Ralph H. Dwan & Ernest R. Feidler, *The Federal Statutes—Their History and Use*, 22 Minn. L. Rev. 1008, 1013 (1938). It hired Thomas Jefferson Durant, a lawyer not involved in the initial drafting, to comb through the proposed revisions. 2 Cong. Rec. 646 (1874). Congress tasked Durant to strike out any provision that substantively changed the law, but to keep "mere changes of phraseology not affecting the meaning of the law." *Id.* at 646, 648. Congress intended "to preserve absolute identity of meaning" in the law. 2 Cong. Rec. 4220 (1874) (Sen. Conkling). Indeed, as one

representative stressed, "We have not attempted to change the law, in a single word or letter, so as to make a different reading or different sense." 2 Cong. Rec. 129 (1873). Rather, when a change was made, that change, "however minute," was simply meant to miniaturize and condense the law. 2 Cong. Rec. 4220 (1874). This was true for omissions, too, which the 43rd Congress viewed as a necessary tool "to strike out the obsolete parts and to condense and consolidate." 2 Cong. Rec. 129 (1873). Such omissions did not, however, substantively change the law.

Durant's revisions were passed by the 43rd Congress as the Revised Statutes in 1874, which later became the U.S. Code. But because the explicit intent of Congress was to not change the substantive provisions of the law, omitting the Notwithstanding Clause in 1874 did not alter the 42nd Congress's decision to abrogate the common law from Section 1983. *See United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) (when Congress decides to "revis[e] and consolidat[e] the laws," it does not change the effect of the law unless Congress explicitly says so).

This approach matches the Court's presumption against implicit statutory changes. When Congress wants to repeal or change some part of a statute, it must do so with "clear and manifest" intent. *See Watt v. Alaska*, 451 U.S. 259, 266–67 (1981). In other words, to incorporate the common law back into Section 1983, the Revised Statues would have needed to include some form of positive text about the common law. *See* Reinert, 111 Calif. L. Rev. at 236 (explaining that the removal of the Notwithstanding Clause was "not the product of any positive lawmaking"). But that addition to the text never happened.[12] The Revised Statutes did not

---

[12] There have been only two amendments to 42 U.S.C. § 1983 over the course of the 152 years since its enactment. The first amendment, Pub. L. 96-170, § 1, 93 Stat. 1284 (1979), made certain that the District of Columbia was covered by 42 U.S.C. § 1983. The second amendment, Pub. L. 104-317, tit. III, § 309(c), 110 Stat. 3847, 3853 (1996) addresses the availability of injunctive relief in cases against judicial officers.

mention the common law. Nor did the 43rd Congress include language indicating that it was reversing the 42nd Congress's decision to excise the common law from Section 1983.

It makes sense, then, that the U.S. Supreme Court has already viewed the omission of two other Notwithstanding Clauses from other civil rights statutes as non-substantive changes to the law. *See Jones v. Alfred H. Mayer Co*., 392 U.S. 409, 422 (1968); *The Civil Rights Cases*, 109 U.S. 3, 16–17 (1883). In *Jones*, for example, the Supreme Court viewed the omission of another Notwithstanding Clause—in Section 1982— as a non-substantive change. *Jones*, 392 U.S. at 422 n.29. The Court recognized that the Section 1982 Notwithstanding Clause was "obviously inserted" to "emphasiz[e] the supremacy of the 1866 statute over inconsistent state or local laws." *Id*. And later, when "[i]t was deleted" in the Revised Statutes, the Court presumed the omission was just a decision to remove perceived "surplusage." *Id*.

So, too, with Section 1983. The 1871 Congress was explicit in legislating that persons can be held liable for Section 1983 violations in spite of any common law doctrines to the contrary. The omission of that language in 1874 did not change the impact of the law. The doctrine of qualified immunity rests on the presumption that the 1871 statute was silent about the common law. But the statute was not silent—it explicitly rejected any common law defenses. Because the original text of the statute shows that the presumption was wrongly applied, this Court should deny the application of qualified immunity here.

## CONCLUSION

For the foregoing reasons, Plaintiff Kerry Lee Thomas respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted this 9th Day of June, 2023,

/s/ Shirley LaVarco
Shirley LaVarco (*pro hac vice*)*
shirley@civilrightscorps.org
Brittany Francis (*pro hac vice*)†
brittany@civilrightscorps.org
Jeffrey D. Stein (Texas Bar No. 24124197; S.D. Tex. Bar No. 3600520)‡
jeff@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Telephone: (202) 844-4975
* Admitted to practice in the District of Columbia (Bar No. 90005167).
† Admitted to practice in New York (Bar No. 5337555) and the District of Columbia (Newly Admitted and Awaiting Bar No.).
‡ Attorney-in-Charge.

**CERTIFICATE OF SERVICE**

I certify that on June 9, 2023, a true and correct copy of this document was properly served on counsel of record via electronic filing in accordance with the United States District Court for the Southern District of Texas Procedures for Electronic Filing.

*/s/ Jeffrey D. Stein*
Jeffrey D. Stein

27