Case 4:23-cv-00662   Document 24   Filed on 08/15/23 in TXSD   Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
August 15, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| KERRY LEE THOMAS, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL CASE NO. H-23-662 |
| § | |
| ROBERT JOHNSON, ERIC M. BRUSS, § | |
| WAYNE SCHULTZ, and THE ESTATE § | |
| OF ROBERT JOHNSON, § | |
| § | |
| Defendants. § | |

**MEMORANDUM AND OPINION**

On February 22, 2021, Robert Johnson, at the time a sergeant in the Harris County Constable's Office, ordered his police dog to attack Kerry Lee Thomas. While the dog attacked Thomas, Eric Bruss and Wayne Schultz, a deputy and a sergeant in the same office, stood by. Thomas sued Bruss, Schultz, and Johnson's estate for allegedly violating Thomas's constitutional right to be free from excessive force. Bruss and Schultz have moved to dismiss Thomas's complaint against them, arguing that they are not liable for failing to intervene and stop Johnson's allegedly unconstitutional use of force. (Docket Entry No. 15). The officers also raise the defense of qualified immunity.

Based on the complaint, the parties' briefs and arguments, and the relevant law, the court denies the motion. The reasons are as follows.

**I.      The Video from Sgt. Johnson's Camera and the Complaint Allegations**

   **A.      The Video**

Thomas attaches video from Johnson's body camera to his complaint. (Docket Entry No. 1-2). A court may "consider documents [or other materials] attached to the Rule 12(b)(6) motion that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Allen v.*

*Hays*, 812 F. App'x. 185, 189 (5th Cir. 2020) (emphasis omitted) (quoting reference omitted). When the material in question is video footage of the event at issue, the district court "should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe [the plaintiff's] account." *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018); *see also Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013) (citing *Scott v. Harris*, 550 U.S. 372, 374–76, 378–81 (2007)). A court may discount the complaint allegations in favor of video footage only when it "blatantly contradict[s]" the plaintiff's well-pleaded factual allegations. *Ramirez*, 716 F.3d at 375; *Griffin v. City of Sugar Land*, No. 4:18-cv-3121, 2019 WL 175098, at *6 (S.D. Tex. Jan. 11, 2019) (adopting the video depiction over the complaint allegations when the video showed the plaintiff violating a city ordinance, clearly contradicting his complaint allegation that the arresting officers lacked probable cause to arrest him), *aff'd*, 787 F. App'x 244 (5th Cir. 2019) (per curiam).

The video opens in the interior of Johnson's moving squad car. Johnson expresses irritation at a "dumb bitch" apparently blocking his path. The radio dispatcher informs him of a noise complaint involving a black male suspect wearing a "brown shirt over black pants and white shoes" and another black male with "unknown clothing description. (Docket Entry No. 1-2 (video) at 19:20:00).[1] Johnson radios back, stating he is "about 30 seconds out," and asks the dispatcher to let him know of any updates. (*Id.* at 19:20:30). The dispatcher says, "Updated reporting has his weapon out." (*Id.* at 19:20:47). Johnson asks, "Are the suspects still there? If they're not still there, tell him to put away his weapon." (*Id.* at 19:20:52). The dispatcher responds, "The suspects are still at that location in front of the address." (*Id.* at 19:21:20). Approximately 30 seconds later,

---

[1] Times refer to the start of the quoted language or described event, are approximate, and are taken from the timestamp in the upper-left corner of the video frame.

Johnson arrives. He stops his car, immediately opens the door, and shouts, "Put your hands up, now! Put your fucking hands up, both of you! Driver, put your hands up! Put your hands up! Do not move!" (*Id.* at 19:21:54).

At this point, Thomas is visible on the camera. He is standing behind the driver's side door of a dark red or maroon car and has his hands up. (*Id.* at 19:22:10). The distance between Thomas and Johnson appears to be approximately two car lengths. Johnson says, "Driver put your—stay in the car! Stay in the car!" (*Id.*). Johnson turns to let out his dog from his car's back seat. (*Id.* at 19:22:14). Johnson shines his gun and flashlight at Thomas. Johnson says, "Get your ass back in the car! Have a seat!" (*Id.* at 19:22:21). The dog is plainly excited and appears to struggle against Johnson's grip on its collar. Johnson shouts, "Get back in the car and have seat, or else I'm gonna sic my dog at you!" (*Id.* at 19:22:27). A man, presumably Thomas, begins to say, "I don't want to—" before Johnson cuts him off and again shouts, "Stay in the car!" Thomas asks, "Are you gonna shoot me?" (*Id.* at 19:22:38).

At this point, the car's driver has opened the door and appears to be stepping out of the car. Johnson shouts again, "Stay in the car! Get in the fucking car now!" (*Id.* at 19:22:31). In response, the driver appears to sit back down in the car. (*Id.* at 19:22:34). Throughout, the dog is whining and lunging toward the suspects. Johnson radios, "He's not complying. Suspect's saying, '[words unclear, might be "they want to"] die, shoot him.'" (*Id.* at 19:22: 43). Johnson shouts again: "Get back in the car, now." (*Id.* at 19:22:50). Then, about a second later, "Driver, stay in the vehicle!" (*Id.* at 19:22:51). The driver, a man wearing what appears to be a blue plaid shirt, has stepped out of the car, but retreats into the car when Johnson orders him to stay in the car. (*Id.*). Johnson shouts, "Do not get out again." (*Id.* at 19:22:54).

During this time, Thomas has not moved.  He is still standing behind the open passenger's side door, standing with his hands outstretched in the air:



Although his pose is calm and steady, Thomas's voice has become more agitated, but it is difficult to pick out his precise words because of the dog's loud whining.  (*Id.* at 19:22:57).  At approximately 19:23:00, Thomas says, "Kill me, bro!  I don't wanna be here on Earth!"  He says more words that are difficult to understand.  He then says, "Please, just take me away from Earth!" (*Id.* at 19:23:12).  Thomas's next words are obscured by crosstalk.  Johnson again shouts at the driver, ordering him to "keep his fucking hands up."  (*Id.* at 19:23:15).  Thomas says something unclear about Jesus, and then begins to shout repeatedly, "All lives matter!" (*Id.* at 19:23:25).

While Thomas shouts "all lives matter," Johnson addresses Bruss, telling him, "Driver's not complying."  (*Id.* at 19:23:35).  Johnson then shouts, "Stop fucking reaching!"  The video recording resolution is grainy and does not show what the driver is doing, but Thomas has not moved his arms.  Thomas shouts, "I'm reaching in the air! I'm reaching to God!" (*Id.* at 19:23:39).  Johnson says, twice, "Let's get the passenger first." (*Id.* at 19:23:42).  The second time, he adds:

4

"I'll let you give the command, ok?" Johnson shouts, "Driver, stay inside! Stay in the fucking car!" (*Id.* at 19:23:52).

As Johnson is shouting orders at the driver, the dog (which is still frantically whining) jumps up in front of Johnson's camera and appears to put its paws on the hood of the squad car. As the dog gets off the hood of the car, Johnson appears to lower his pistol, placing it across his body, slightly obscuring the camera but leaving Thomas visible. Another officer's voice tells the driver, "Walk towards me." Johnson raises his weapon again and points it at Thomas, who has begun moving from behind the door into a position adjacent to it, but not any closer to Johnson. (*Id.* at 19:24:03). Johnson commands, "Passenger, stop!" Thomas stops, and shouts, "Kill me!" (*Id.* at 19:24:19).

While Johnson has his weapon and flashlight pointed at Thomas, who has not moved, Bruss gives commands to the driver, who is out of the car with his hands up and complying with Bruss's commands. Bruss orders the driver to "lay down on the ground!" The driver responds by laying down on the ground. Bruss shouts, "If you try anything funny, you're getting dog bit." (*Id.* at 19:24:23). Bruss tells the now-prone driver, "Put your hands out to your sides," which the driver does. (*Id.* at 19:24:27). Bruss then tells Johnson, "I've got the driver." (*Id.* at 19:24:31).

At this point, Johnson shouts at Thomas, "Go to the ground. Go to the ground, now! Keep your arms away from your thighs." (*Id.* at 19:24:33). Thomas complies. The driver is still prone with his arms outstretched, but his head is slightly raised. Bruss tells him to put his head down and stop moving, although the driver is not moving. Bruss yells, "This isn't a game my man. This is how bad things happen. You need to comply with what I'm telling you to do. We've been told you've got a gun. Until we determine that you don't, this is what's going to happen. You're going to follow my directions." (*Id.* at 19:24:53).

5

The dog is still agitated and whining loudly. Johnson says to the dog, "Watch him, watch him!" (*Id.* at 19:25:11). Thomas has not moved. Bruss tells the driver he will be bitten unless he places his hands at his sides. The driver's hands appear to be in front of him. (*Id.* at 19:25:28). Johnson shouts, "Put your fucking hands to your sides, now!" (*Id.* at 19:25:34). The dog lunges, pulling Johnson forward. (*Id.* at 19:25:36). Johnson says, "Fucking do it! Try me, try me, motherfucker!" (*Id.*). The dog then struggles further, turning Johnson away from both suspects and to the side of his own squad car before, after a few seconds, Johnson regains his position facing the suspects' car. (*Id.* at 19:25:42).

Johnson directs Bruss to take the driver into custody. The driver complies with Bruss's instructions; he stands, turns away from the officers, and walks backwards until he is finally directed to get on his knees in front of Bruss and Schultz. The dog lunges toward the suspects. (*Id.* at 19:26:40). Thomas has not said anything further throughout this process and remains prone on the ground with his arms outstretched. Bruss shouts, "You in the gray [Johnson], step up now!" (*Id.* at 19:27:06). He repeats himself. Johnson shouts, "This is your last chance, or I'm gonna send the dog after you." (*Id.* at 19:27:11). Thomas begins to raise his head. The officers repeat themselves. Thomas appears to move his lower body slightly. (*Id.* at 19:27:16). Johnson shouts, "Last warning or I'm gonna send the dog." (*Id.* at 19:27:20). A few seconds later, Johnson lets the dog go. The dog immediately races to Thomas, who is still face down on the ground, and latches onto his arm. (*Id.* at 19:27:25). Johnson approaches, yelling, "Think you're fucking around, don't you." Although Thomas's arm is in the dog's clamped jaws, Johnson commands him to put his hands behind his back. Johnson succeeds in cuffing Thomas and a few seconds later gets the dog to release the bite. Johnson orders the now-handcuffed Thomas to "roll onto your

6

stomach; you ain't seen nothing yet," compliments the dog, and gives a jubilant cry before the video ends. (*Id.* at 19:28:13).

Apart from exclamations of pain at being bitten, Thomas says nothing from the time he is told to get on the ground until the end of the video, approximately four minutes, which is about two-thirds the of the entire confrontation.

### B. The Complaint

The complaint allegations with respect to the video fairly describe what it shows. Several allegations contain statements and acts that took place before and after the events recorded on the video.

Thomas alleges that the officers responded to "a dispatch report of two men making noise outside of a home." (Docket Entry No. 1 (Compl.) ¶ 18). The dispatcher stated that the caller, not Thomas or the driver, "had his weapon out." (*Id.* ¶ 19).

Thomas alleges that the dog bite left him with "severe lacerations, puncture wounds, permanent scarring, persistent muscle damage, and other impairments to his right arm," in addition to mental and emotional damage. (*Id.* ¶¶ 6–7).

After Thomas was taken into custody, the officers made a report of the encounter. Thomas alleges that Bruss and Schultz lied in their reports by stating that they were informed that the suspects—not the caller—had a gun. (*Id.* ¶¶ 53–54). Schultz asked an Assistant District Attorney to charge Thomas with interference because "Mr. Thomas was not compliant and looked like he was going to run." (*Id.* ¶ 55).

### II. The Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to

7

relief." FED. R. CIV. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

### III.   Analysis

The court does not understand the reason for commanding a police dog to bite and severely injure a suspect, the subject of a noise complaint, who had been compliant, prone, and visibly unarmed for four minutes. But the question posed by the defendants'[2] motion is not whether

---

[2] As used in this opinion, "defendants" refers to Bruss and Schultz.

Johnson used excessive force. Rather, it is whether Thomas may hold Bruss and Schultz liable for not stopping or attempt to prevent Johnson's actions.

### A.     The Excessive Force Bystander Liability Claim

To show potential bystander liability for excessive force, a plaintiff must show that the bystander officers "knew a fellow officer was violating an individual's constitutional rights." *Joseph ex rel. Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020). This requires a showing that the "fellow officer" plausibly violated that individual's rights. Here, Thomas alleges that Johnson violated his Fourth Amendment right to be free from excessive police force. To make out a claim of excessive force in violation of the Fourth Amendment, a plaintiff must show: (1) he suffered an injury; (2) the injury was caused directly and only by a use of force that was clearly excessive; and (3) the excessiveness of the force was clearly unreasonable. *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).

Johnson used excessive force. Thomas posed no threat to the officers. He was not resisting arrest. Neither he nor the other suspect were trying to flee. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (identifying factors used to assess whether an officer used excessive force); *Joseph*, 981 F.3d at 332 (recounting *Graham* factors). Johnson alleges that he was severely injured, both physically and mentally, because of the use of force. Even if the court was to agree with the defendants' contention that Thomas's slowness in responding to the command to stand up from a prone position with his arms held away from his body amounted to "resistance," that would not license the use of force shown here. *See Joseph*, 981 F.3d at 333 ("As to a passively resisting suspect, an officer does not take measured and ascending action by 'immediately resort[ing] to taser and nightstick without attempting to use physical skill, negotiation, or even commands.'" (quoting *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012))); *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) (stating that "force is not justified" for passive resistance); *Cooper v.*

*Brown*, 844 F.3d 517, 523 (5th Cir. 2016) (a suspect who placed both his hands on his head rather than raise them as the officer commanded could "hardly be characterized as 'active resistance'").

Johnson waited only seconds between the time he commanded Thomas to stand and the time he released his dog. Thomas had been compliant before this request. *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018). "[W]e have consistently held that a suspect does not pose an immediate threat where he unambiguously surrenders by, for example, placing his hands in the air and complying with the officers' commands."). Throughout the encounter, which involved two visibly unarmed suspects (suspected of making excessive noise), Johnson used aggressive and threatening language. There was no effort to negotiate or calm the situation by any of the officers. Thomas was in the process of complying with Johnson's orders, trying to stand up from a prone position with his hands away from his thighs with his arms outstretched. Johnson escalated the situation by repeated shouted threats to release the clearly agitated animal that was struggling to attack. *See Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (a jury could find an unreasonable use of force when, during a traffic stop, the officer engaged in little negotiation before breaking the driver's window and dragging her from the car.).

It is irrelevant that the force here was delivered by a trained police dog rather than an officer's weapon. *Newman*, 703 F.3d at 763 ("Qualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel."). Johnson released the dog on a person suspected of a nonviolent offense, with no visible access to a weapon, who was not resisting arrest or attempting to flee, and who was trying to comply with Johnson's order to stand up. Johnson allowed the dog to continue to bite Thomas even after he was clearly incapacitated. Although, in certain situations, allowing a dog to hold a suspect throughout the handcuffing process might be justified, the video and complaint allegations do not

describe such a situation. *Cooper*, 844 F.3d at 523 (an officer's failure to command a dog to release its hold of a nonviolent, unarmed suspect and instead prolonging the hold through the handcuffing process is excessive force and objectively unreasonable.); *cf. Escobar*, 895 F.3d at 394 (it was not objectively unreasonable to allow a dog to continue biting a person suspected of a violent crime with a visible weapon within reach).

The defendants argue that the video shows no evidence of the alleged constitutional violation or contradicts the complaint allegations. The court disagrees. The fact that Bruss tells the driver—incorrectly—that he had been informed that the driver had a gun does not contradict the allegation that the dispatcher told the deputies that the complainant—not the suspects—was armed. The complaint alleges, and the video shows, only that the dispatcher told Johnson that the caller had a gun. The video does not contradict the complaint allegations. The driver's initial noncompliance with commands to remain in the car does not, on the allegations and video presented here, affect the analysis with respect to Thomas.

The defendants' arguments in their reply that the video "utterly discredit[s]" the complaint allegations is unavailing. (*See* Docket Entry No. 17 at 3–4). First, another officer is clearly visible holding a weapon. (*See* Docket Entry No. 1-2 (video) at 19:24:04). As stated above, the video does not discredit the allegation that the dispatcher told Johnson that the caller was armed. That the dispatcher "sa[id] nothing about Thomas or [the driver]" is part of the context that includes the absence of any visible weapon accessible to them and Thomas's compliance with the orders to keep his arms away from his body. Thomas has pleaded a constitutional violation for excessive force. The defendants' argument that Thomas's shouts of "kill me" and "all lives matter" contradict the allegation that Thomas "did nothing that could be construed as threatening and gave no indication, verbal or nonverbal, that he intended to flee or resist," neglects the particular facts

11

alleged and the video evidence. Thomas's words were not accompanied by threating movements or any motion toward the officers. Additionally, the dog was released after Thomas had been silently laying on the ground—as he was instructed to do—for several minutes. Finally, Bruss and Schultz were at the scene throughout. That they are at times not visible in the video does not mean they were not "steps away" from Johnson. Nothing is "utterly discredited" by the video; at most, the defendants point to aspects of the complaint and video that may warrant further factual development.

Bystander officers such as Bruss and Schultz are "liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph*, 981 F.3d at 343. Bruss and Schultz were present when and where the alleged constitutional violation took place, and they failed to act to attempt to prevent the injury to Thomas that Johnson was threatening to inflict.

The factual allegations showing that Johnson plausibly violated Thomas's rights sufficiently allege that Bruss and Schultz knew that Johnson was violating Thomas's rights. They saw what Johnson saw. *Cf. White v. Calvert*, 2021 WL 6112791 (S.D. Tex. Dec. 27, 2021) (a police dog handler could not be held liable for the initial dog bite when the handler could not see the suspect, and an officer in the presence of the suspect had called for the dog because he feared that the suspect was armed). Bruss also threatened to release the dog on the driver. Bruss and Schultz made no attempt to deescalate the situation, even after the driver had been taken into custody and Thomas was lying face down on the ground. They had the opportunity to tell Johnson that they would help handcuff Thomas and that he did not need to carry out his threats to release the dog. They knew that Johnson was repeatedly threatening to use the dog against a suspect who

12

had at most been too slow to stand up from a prone position when ordered to do so. Once the dog had been released, neither Bruss nor Schultz told Johnson to order the dog released in the seconds. Any of these actions may have prevented or at least lessened the injury caused by Johnson's release of the dog.

The inferences arising from the complaint allegations and video plausibly state a claim for bystander liability against Bruss and Schultz.

**B.     Qualified Immunity**

Thomas attacks the doctrine of qualified immunity, arguing that recent scholarship forecloses its continued application. The court must reject this invitation to ignore established circuit and Supreme Court precedent.

Until recently, scholarly discussions and criticisms of the modern doctrine focused on its lack of textual foundation and scope compared to its common law antecedents. *See generally, e.g.*, Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 STAN. L. REV. 1337 (2021); Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 NOTRE DAME L. REV. 1853 (2018); William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L REV. 45 (2018). Many—from a variety of perspectives—have also attacked the doctrine on the ground that it appears to sanction state officials' abuses of power. *See generally, e.g.*, Lisa Needham, *Disgusting Grants of Qualified Immunity: Not Just for Cops Anymore!*, BALLS & STRIKES (July 14, 2022), https://ballsandstrikes.org/legal-culture/qualified-immunity-teachers-not-just-for-cops/ (last visited July 31, 2023); Jay Schweikert, *Qualified Immunity: A Legal, Practical, and Moral Failure*, CATO INST. (Sept. 14, 2020), https://www.cato.org/policy-analysis/qualified-immunity-legal-practical-moral-failure; Brief of Alliance Defending Freedom & American Civil Liberties Union et al. as Amicus Curiae Supporting Petitioner, *Allah v. Milling*, 139 S. Ct. 49 (2018) (Mem.) (No. 17-8654).

Justices and judges—including in this circuit—have found the doctrine troubling. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (criticizing "a one-sided approach to qualified immunity [that] transforms the doctrine into an absolute shield for law enforcement officers"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *Zadeh v. Robinson*, 928 F.3d 457, 480–81 (5th Cir. 2019) (Willet, J., concurring in part) ("Indeed, it's curious how this entrenched, judge-created doctrine excuses constitutional violations by limiting the statute Congress passed to redress constitutional violations.").

Thomas's brief in opposition points to another, more recent, attack on the qualified immunity doctrine: the discovery that the original text of what became § 1983, passed as part of the Ku Klux Klan Act of 1871, contained a clause stating that officials may be held liable for civil rights violations "any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding." (Docket Entry No. 16 at 20 (quoting Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871))); *see also* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CALIF. L. REV. 201 (2023).

Thomas argues that the notwithstanding clause should be interpreted in accordance with the original statute's original public meaning, which should have resulted, with respect to § 1983 claims, in the abrogation of the common law immunities that form the basis of contemporary qualified immunity jurisprudence. (Docket Entry No. 16 at 22). But this court is bound by both circuit and Supreme Court precedent; "however seismic the implications of this lost-text research . . . [, the court] cannot overrule the Supreme Court." *Rogers v. Jarrett*, 63 F.4th 971, 981 (5th Cir. 2023) (Willet, J., concurring) (summarizing the historical argument in Professor Reinert's

article, *Qualified Immunity's Flawed Foundation*). "Only that Court can definitively grapple with § 1983's enacted text and decide whether it means what it says—and what, if anything, that means for § 1983 immunity jurisprudence." *Id.* This court is bound by current law and must wait for the justices to turn from their occasional criticisms of the allegedly atextual and ahistorical doctrine to its abrogation or modification to entertain Thomas's argument.

Precedent requires the court to determine whether the clearly established law placed the officers on notice that their actions violated Thomas's constitutional rights. The court believes that the many decisions from the Fifth Circuit, cited above, offered ample notice to the officers that it is unconstitutional to use physical force sufficient to severely injure a suspect when that suspect is compliant or has been at most passively resisting. The circuit has also been clear that the exact means of inflicting the force need not be identical for officers to be on notice that their actions violate clearly established law. Bruss and Schultz had sufficient notice that instructing a police dog to attack a person suspected of making excessive noise, lying on the ground, with his hands extended before him and without visible access to any weapon, violated that person's constitutional rights.

The defendants point to cases they argue show otherwise. These cases are distinguishable. In *White v. Calvert*, the court confronted a situation in which two police officers pursued a fleeing suspect, the plaintiff, White. 2021 WL 6112791, at *1. One officer, Brown, asked the other officer, Calvert, to release his dog to capture the suspect, who had hidden in a backyard shed. *Id.* "[I]mmediately before" Calvert released the dog, White alleged that Brown saw that White was laying prostrate on the shed floor with his hands his back, no longer fleeing or evading arrest. *Id.* He nonetheless called for Calvert to release his dog, which Calvert did. *Id.* at *5. The dog bit the suspect at least twice, only the second time in the presence of Calvert. Although Calvert attempted

15

to get the dog to release its hold, the dog held on for about a minute and a half. *Id.* The suspect, White, sued the officers for using excessive force. On a motion for summary judgment, the court held that Calvert's initial decision to release the dog—at Brown's request—was not objectively unreasonable. *Id.* at *10. The court continued, with respect to the second bite,

> A jury could find that Officer Calvert directed and allowed the dog to continue biting after Calvert had already determined that White was no longer a threat. A jury could alternatively find that Officer Calvert took rapid steps to remove the dog after figuring out that its teeth were stuck in White's sleeve. Based on the disputed facts, the court cannot make the choice.

*Id.* at *11. The court held that White's claim for excessive force for the second bite could proceed with respect to Brown, stating that:

> White does not simply allege that Officer Brown should have intervened and prevented Officer Calvert from using excessive force. He alleges that Officer Brown incited or provoked Officer Calvert to unwittingly use excessive force by requesting canine assistance despite knowing that White was no longer either a flight risk or armed.

*Id.* at *11. The court observed that:

> While White may not have had any visible weapon in his hands, Brown had an objectively reasonable basis to fear that White was still armed. The record, particularly the video evidence, shows that it was dark. The only source of light was from the officers' flashlights. Officer Brown thought that White might be armed from his initial encounter with White and had conveyed that concern to other officers earlier in the night. Officer Brown had just seen White take two and a half hours of drastic measures to escape arrest.

*Id.* at *14. The court found that Brown had no reason to believe that the dog would bite White for an unreasonable period of time. *Id.* at *15. Based on the record before it, the court granted the motion with respect to Brown on the basis of qualified immunity. *Id.* at *18.

The posture of this case is different—a motion to dismiss, not a motion for summary judgment. So too are the facts. The video does not contradict the complaint allegations. No discovery has been conducted that would allow the court to understand what Bruss and Schultz

believed about the situation. Here, Thomas had not fled and had not hidden himself in a dark location; in fact, he is illuminated by Johnson's flashlight and car lights throughout.

The other case to which the defendants point also does not help them. There, a woman found a stranger, Deshotels, in her garage. *Deshotels v. Marshall*, 454 F. App'x 262, 263 (5th Cir. 2011). After she asked whether he was looking for her husband, Deshotels left the garage. *Id.* at 264. Alarmed, the woman went back into the house and called for her husband, who told her to call the police. *Id.* The husband, a trained martial artist, then decided it would be a good idea to pursue Deshotels and choke him unconscious. *Id.* Officers arrived and Deshotels, who had regained consciousness, fled. *Id.* The officers pursued and tackled Deshotels. *Id.* at 264. Because Deshotels was physically resisting arrest, an officer, O'Rourke, tased him for five seconds, and then again, before Deshotels stopped resisting and was handcuffed. *Id.* After Deshotels was restrained, officers observed that he looked poorly and was a "dead weight." *Id.* at 265. The officers removed the handcuffs, put Deshotels on his back, and waited for an ambulance to arrive. *Id.* 265. An officer and a responding EMT testified that an officer was attempting to move Deshotels's tongue with a pen in an effort to prevent obstruction of his airway. *Id.* A pathologist found that Deshotels had a considerably elevated blood-alcohol level, and concluded that the combination of Deshotels's intoxication, the chokehold, and the pressure on his abdomen during the struggle with officers caused him to choke to death on his own vomit. *Id.*

The court ruled that the bystander officers could not be held liable for failing to prevent O'Rourke's application of the taser to Deshotels, because "the officers could have reasonably believed that they were not required to intervene and prevent O'Rourke's alleged use of excessive force." *Id.* at 269.

Again, the situation in *Deshotels* differs markedly from that confronted by Bruss and Schultz. The use of a taser to subdue a noncompliant burglary suspect who is actively resisting arrest is vastly different from the release of a police dog to bite a nonresistant person suspected of making excessive noise, who was lying prone on the ground. Furthermore, the officers in *Deshotels* had no reason to know that one complainant was a trained martial artist who had already choked Deshotels unconscious and thereby contributed to his death. Here, Bruss and Schultz witnessed all relevant events.

Qualified immunity operates to protect officers from liability in the reasonable performance their duties. Thomas's complaint and the video from Johnson show that Bruss and Schultz's failure to do anything to prevent an allegedly unjustified use of force was arguably objectively unreasonable.

The court will not dismiss the claims against Bruss and Schultz at this time. They may raise the defense again on a motion for summary judgment.

### IV.     Conclusion

The motion to dismiss is denied. (Docket Entry No. 15). In ruling on the motion to dismiss, the court considered the arguments raised in the proffered surreply. (Docket Entry No. 18-1). The motion for leave to file a surreply is accordingly granted. (Docket Entry No. 18). The parties will appear before the court by Zoom on **August 24, 2023, at 11:00 a.m**. A Zoom link will be sent separately.

SIGNED on August 15, 2023, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge