**In the Matter Of:**

*KERRY LEE THOMAS vs*

*ERIC M. BRUSS*

---

*WAYNE SCHULTZ*

*April 02, 2024*

---



1

```
 1                UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   KERRY LEE THOMAS,              )
                                    )
 4          Plaintiff,             )
                                    )
 5   v.                             )
                                    )Case No. 4:23-cv-00662
 6   ERIC M. BRUSS; WAYNE SCHULTZ;  )
     and KEITH MORRIS, in his       )
 7   capacity as Temporary Defendant )
     Administrator of the Estate of )
 8   Robert Johnson,                )
                                    )
 9          Defendants.            )

10


11          ********************************
              REMOTE VIDEOTAPED DEPOSITION OF
12                    WAYNE SCHULTZ
                     April 2, 2024
13          ********************************

14


15          WAYNE SCHULTZ, produced as a witness at the

16   instance of the Plaintiff, was duly sworn and

17   deposed in the above-styled and numbered cause on

18   April 2, 2024, from 9:18 a.m. to 6:22 p.m. CST,

19   stenographically reported remotely, pursuant to

20   the Federal Rules of Civil Procedure and the

21   provisions stated on the record.

22


23
          Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24                        Texas CSR 9306
                          California CSR 14407
25                        Illinois CSR 084.004659
```

2

1                     A P P E A R A N C E S

2    (all attendees appearing via remote videoconference)

3

4    REPRESENTING THE PLAINTIFF:

5     Ms. Shirley LaVarco
      Ms. Brittany Francis
6     CIVIL RIGHTS CORPS
      1601 Connecticut Avenue, NW, Suite 800
7     Washington, DC  20009
      (202) 844-4975
8     shirley@civilrightscorps.org
      brittany@civilrightscorps.org
9

10   REPRESENTING THE DEFENDANTS, ERIC M. BRUSS and
     WAYNE SCHULTZ:
11
      Ms. Celena Vinson
12    Ms. Katie Vestal
      THOMPSON & HORTON, LLP
13    3200 Southwest Freeway, Suite 2000
      Houston, Texas  77027
14    (713) 554-6767
      cvinson@thompsonhorton.com
15    kvestal@thompsonhorton.com

16

17   THE VIDEOGRAPHER/VIDEOCONFERENCE TECHNICIAN:

18    Mr. Deane Carstensen

19
     ALSO PRESENT:
20
      Ms. Cassidy Kristal-Cohen, paralegal
21

22

23

24

25

3

INDEX

PAGE

EXAMINATION BY MS. LaVARCO....................... 8


EXHIBITS

NUMBER          DESCRIPTION                       PAGE

Exhibit 6       Internal Affairs confidential file;

                Bates BRUSS & SCHULTZ 002342

                through 002390...................... 214

Exhibit 7       Traffic record;

                Bates BRUSS & SCHULTZ 001609......... 216

Exhibit 8       Text messages;

                Bates BRUSS & SCHULTZ 000118

                through 000129...................... 224

Exhibit 9       Supervisor responsibility

                procedures; Bates BRUSS & SCHULTZ

                002354.............................. 275

Exhibit 10      Body camera footage, starting time

                stamp 19:59:39...................... 327

Exhibit 11      Body camera footage, starting time

                stamp 19:43:19...................... 342

4

```
 1                      EXHIBITS

 2    NUMBER          DESCRIPTION                    PAGE

 3    Exhibit 12     Body camera footage, starting time

 4                   stamp 19:52:04...................... 345

 5    Exhibit 13     Body camera footage, starting time

 6                   stamp 19:24:58...................... 350

 7    Exhibit 14     Body camera footage, starting time

 8                   stamp 19:29:30...................... 381

 9

10

11                PREVIOUSLY MARKED EXHIBITS

12    NUMBER          DESCRIPTION                    PAGE

13    Exhibit 1      Precinct 1 use of force policy;

14                   Bates BRUSS & SCHULTZ 001992through

15                   002014............................. 383

16    Exhibit 3      Body camera footage, starting time

17                   stamp 19:18:40...................... 334

18

19

20

21

22

23

24

25
```

5

                    PROCEEDINGS

1        (On the record at 9:18 a.m. CST)

2        THE VIDEOGRAPHER:  Okay.  We are

3    now on the record.  My name is Deane

4    Carstensen.  I'm the videographer

5    representing Lexitas.

6        This is a video deposition for the

7    United States District Court for the

8    Southern District of Texas, Houston

9    Division.  Today's date is April 2nd,

10   2024.  The time right now is 9:18 a.m.

11   Central Daylight Time.

12       This deposition is being held

13   remotely in the matter of Kerry Lee Thomas

14   versus Eric M. Bruss, Wayne Schultz, and

15   Keith Morris, in his capacity as temporary

16   defendant administrator of the estate of

17   Robert Johnson, Case Number 4:23-cv-00662.

18       The deponent today is Wayne

19   Schultz.

20       Would all counsel please identify

21   themselves and state who you represent,

22   beginning with the questioning attorney.

23       MS. LaVARCO:  Shirley LaVarco for

24   plaintiff, Kerry Lee Thomas.

6

1          MS. FRANCIS:  Brittany Francis for

2    plaintiff, Kerry Lee Thomas.

3          MS. VINSON:  Celena Vinson for

4    Wayne Schultz.

5          MS. VESTAL:  Katie Vestal for Wayne

6    Schultz.

7          THE VIDEOGRAPHER:  Thank you.

8          Our court reporter today is Becky

9    Graziano, who will now swear in the

10   witness.

11          (Witness duly sworn.)

12          MS. LaVARCO:  I'd like to begin by

13   quickly placing on the record that

14   plaintiff's counsel proposed a few

15   stipulations in advance of this

16   deposition.  Defendants' counsel has not

17   agreed to them.

18          The stipulations are as follows:

19   One, neither Defendant Schultz nor his

20   counsel shall disable their video,

21   obstruct, or evade the view of their web

22   camera without notice and explanation to

23   plaintiff and his counsel.

24          Two, to the extent persons other

25   than counsel or the deponent are present

7

1    for the deposition, such persons shall not

2    disable their video, obstruct, or evade

3    the view of their web camera without

4    notice and explanation to the parties and

5    their counsel.

6           Three, Defendant Schultz may not

7    confer with his counsel -- whether

8    verbally, nonverbally, electronically, or

9    otherwise -- during questioning or at any

10   time other than during agreed-upon breaks,

11   except about whether to assert a

12   privilege.  The basis for any such

13   privilege shall be clearly stated for the

14   record in the manner described in

15   Rule 26(b)(5) of the Federal Rules of

16   Civil Procedure.

17          In accordance with the parties' --

18   four, in accordance with the parties'

19   agreed-upon protocols during Defendant

20   Bruss' deposition, Defendant Schultz and

21   his counsel will permit plaintiff's

22   counsel to finish her line of questioning

23   before taking a break.

24          Five, Defendant Schultz may not

25   confer -- whether verbally, nonverbally,

8

1        electronically, or otherwise -- with any

2        person other than counsel about the

3        deposition from the time the deposition

4        begins until it concludes.

5                Again, counsel for Mr. Schultz has

6        not agreed to these stipulations, and the

7        parties have agreed that we are taking the

8        deposition pursuant to the Federal Rules

9        of Civil Procedure.

10               Can you confirm that on the record,

11       Ms. Vinson?

12               MS. VINSON:  We agree to follow the

13       Rules of Civil Procedure, yes.

14               MS. LaVARCO:  Thank you.

15                     WAYNE SCHULTZ,

16    being first duly sworn, testified as follows:

17                     EXAMINATION

18   BY MS. LaVARCO:

19    Q     Mr. Schultz, it's good to see you again.

20   My name is Shirley LaVarco and I'll be taking your

21   deposition today.

22    A     Good morning, ma'am.

23    Q     Can you please state your full name for

24   the record?

25    A     Wayne Robert Schultz.

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

9

1    Q      Schultz is S-c-h-u-l-t-z?

2    A      That is correct, ma'am.

3    Q      Thank you.

4           And you're here today represented by

5    counsel?

6    A      Yes, ma'am.

7    Q      Is that Celena Vinson and Katie Vestal?

8    A      It is.

9    Q      Is anyone else present with you today?

10   A      No, ma'am.

11   Q      For Defendant Bruss' deposition, both you

12   and Carl Shaw took turns joining us.  Is anyone

13   else planning on joining us today?

14   A      I don't believe so, ma'am.

15   Q      Have you ever been deposed before,

16   Mr. Schultz?

17   A      No, ma'am.

18   Q      I'd like to go over a few ground rules for

19   this deposition so that we can all have the same

20   understanding.

21          Does that sound fair?

22   A      Yes, ma'am.

23   Q      In this deposition, I'll be asking you

24   questions.  My questions and your answers will be

25   recorded by the court reporter, Ms. Graziano.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

10

```
 1          Do you understand that you need to
 2   speak up and to answer so the reporter can -- so
 3   the court reporter can hear you when you give your
 4   answers?
 5    A     I do.
 6    Q     Do you understand that the court reporter
 7   won't be able to record a nod, a shake of your
 8   head, or a grunt?
 9    A     Yes, I do.
10    Q     You understand that you've just taken an
11   oath to tell the truth, and even though we're in
12   this informal setting over Zoom today, that oath
13   that you've taken has the same force and effect as
14   the oath you would take in front of a judge and a
15   jury?
16    A     I do.
17    Q     Just a couple of housekeeping items.
18          Do you have any other electronic
19   devices on you today other than the computer that
20   you're using for the Zoom?
21    A     I do not.
22    Q     Do you have any other applications open on
23   the computer?
24    A     I do not.
25    Q     Do you understand that you're not meant to
```

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

11

1    confer with counsel or any other person during

2    questioning, including during breaks, about the

3    deposition except with respect to a matter of

4    privilege?

5     A      Yes.

6     Q      Do you understand that you're not meant to

7    communicate with counsel or any other person by

8    phone or electronic communications except with

9    respect to a matter of privilege with your

10   counsel?

11    A      I do.

12    Q      Do you understand that includes both

13   verbal communications and nonverbal signals?

14    A      Yes.

15    Q      Thank you.

16    A      You're welcome.

17    Q      Mr. Schultz, is there any reason why you

18   can't testify truthfully and accurately here

19   today?

20    A      No, ma'am.

21    Q      Have you consumed alcohol within the last

22   24 hours?

23    A      I have not.

24    Q      Have you taken any drugs within the last

25   24 hours?

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

12

1    A      No, ma'am.

2    Q      Are you aware of any physical condition

3    that would affect your ability to testify

4    truthfully and accurately here today?

5    A      No, ma'am.

6    Q      Are you aware of any mental condition that

7    would affect your ability to testify truthfully

8    and accurately here today?

9    A      No, ma'am.

10   Q      Are you taking any medications that would

11   affect your ability to testify truthfully and

12   accurately here today?

13   A      No, ma'am.

14   Q      Are there any medications that you should

15   have taken today that you failed to take which

16   would affect your ability to testify truthfully

17   and accurately here today?

18   A      No, ma'am.

19   Q      Is there any other reason why you cannot

20   testify truthfully and accurately here today?

21   A      No, ma'am.

22   Q      At the end of your deposition, you'll

23   receive a transcript and have an opportunity to

24   review it with counsel and make any changes that

25   you need to.  If you make any substantive changes,

13

```
1   such as changing a "yes" answer to a "no" answer,

2   I am allowed to comment on that later in the

3   proceedings, as it speaks to your credibility.

4              Do you understand that?

5    A     Yes, ma'am.

6    Q     I'd ask that you give verbal responses.

7   As I've mentioned, gestures aren't captured on the

8   transcript.

9              I'd ask that only one person speak

10  to -- speak at a time.

11             We can take breaks as needed for any

12  of the parties, but I would ask that I be

13  permitted to finish my question or line of

14  questioning first.

15             Does that sound okay?

16   A     Yes, ma'am.

17   Q     I ask that you wait for me to finish a

18  question before answering and that you do so

19  verbally.

20             Periodically throughout the

21  deposition, your attorney will object.  You're

22  required to answer my question unless your

23  attorney instructs you not to answer.

24             Do you understand that?

25   A     I do, yes, ma'am.
```

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

14

1   Q      If I ask a question that you don't

2   understand, will you let me know so that I can

3   reframe it so that you do understand?

4   A      I will.

5   Q      If you don't hear a question, will you let

6   me know?

7   A      Yes, ma'am, I will.

8   Q      And if my question is unclear in any way,

9   will you let me know?

10   A      I certainly will, yes, ma'am.

11   Q      If you don't know the answer to my

12   question, will you say so?

13   A      Of course.

14   Q      If there's something that might help you

15   remember the answer to my question or refresh your

16   recollection, will you let me know what that

17   something is?

18   A      Yes, ma'am.

19   Q      If you refresh your memory with a document

20   or recording to answer any of my questions, will

21   you tell me that you've done so and also let me

22   know which document or recording that was?

23   A      Yes, ma'am.

24   Q      As the deposition proceeds today, if you

25   start thinking back to something you said earlier

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

15

1    in the deposition and you realize you made a

2    mistake, you weren't clear, you left something

3    out, or for any reason -- any other reason you'd

4    like to go back and talk about an area of

5    questioning again, will you let me know?

6     A      Yes, ma'am.

7     Q      We can do that even if we've moved on to

8    another area, and I'll come back and ask you more

9    questions about that first area.

10            Do you understand?

11    A      Yes, I do.

12            And I'm going to apologize.  I'm going

13   to be clearing my throat.  The weather got bad

14   here so I'm fighting a little bit of a cold coming

15   on.

16    Q      That's totally fine --

17    A      Okay.

18    Q      -- as long as it doesn't affect your

19   ability to answer truthfully and accurately today.

20    A      No, ma'am.  Not at all.

21    Q      Has anything I've said so far been unclear

22   or objectionable to you?

23    A      No, ma'am.  Nope.  We're good.

24    Q      Okay.  What did you do to prepare for

25   today's deposition?

16

1  A    I had some meetings with my attorney.

2  Q    Which attorneys?

3  A    With Katie and with Celena.

4  Q    Did you meet with any other attorneys?

5  A    I did not.

6  Q    How many -- about how many meetings did

7  you have with Celena and Katie?

8  A    Maybe two.

9  Q    How long were those meetings?

10  A    Hour, hour and a half, two hours.

11  Q    When did they take place?

12  A    Oh, one last week and one a couple months

13  ago.

14  Q    Did you prepare again this morning with

15  your attorneys?

16  A    No, ma'am.

17  Q    Have you met or spoke with anyone from

18  Precinct 1 at the Harris County Constable's Office

19  to help prepare you for this deposition?

20  A    No, ma'am.

21  Q    Have you met or spoke with anyone from

22  your union, if you're a member of the union?

23  A    No.

24  Q    Have you met or spoke with anyone from

25  your current job to help you prepare for this

KERRY LEE THOMAS vs                                        Wayne Schultz
ERIC M. BRUSS

17

1   deposition?

2    A      No, ma'am.

3    Q      Have you discussed this deposition with

4   anyone other than your attorneys?

5    A      No, ma'am.

6    Q      Did you review any documents to help you

7   prepare for this deposition?

8    A      I went over my report a little bit.

9    Q      Did you review any other documents?

10   A      I did not.

11   Q      Did you review any video or audio

12  recordings to help you prepare for the deposition?

13   A      I did.

14   Q      Which videos or audio recordings are

15  those?

16   A      The video from my body cam.

17   Q      Did you also review your dash cam footage?

18   A      I did not.

19   Q      Did you review any other body camera

20  footage?

21   A      I -- there was some that we went over just

22  briefly.  I believe Bruss' -- over Eric Bruss'.

23   Q      Anyone else's body camera footage that you

24  reviewed?

25   A      I don't recall.  No, ma'am.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

18

1   Q      Any other audio footage that you reviewed?

2   A      No, ma'am.

3   Q      Any other dash camera footage that you

4   reviewed?

5   A      No, ma'am.

6   Q      Did you review any photos to help you

7   prepare for this deposition?

8   A      I did not.

9   Q      Is there anything else I haven't mentioned

10  in terms of documents, photographs, or other --

11  other records that you reviewed to help you

12  prepare?

13  A      I believe I looked at the call log, the --

14  the call log, which -- the radio log, which

15  documented when people arrived on scene, when they

16  got dispatched to scene, that thing.

17  Q      Understood.

18         Is that the CAD report?

19  A      I believe it's called the "CAD report,"

20  yes, ma'am.

21  Q      Okay.  Any other documents?

22  A      No, ma'am.

23  Q      Have you ever gone by any other names,

24  nicknames, or aliases?

25  A      No, ma'am.

19

1    Q      Where do you currently work?

2    A      I currently work for a company called EPS

3    in -- oh, my gosh.  Don't tell them I said this --

4    Electronic Protection Systems.

5    Q      What sort of company is that?

6    A      It does alarms, home automation, video

7    surveillance.  That type of stuff.

8    Q      And what kind of work do you do for them?

9    A      Sales.

10   Q      How long have you worked for that company?

11   A      Three months.

12   Q      Do you remember when you started there?

13   A      I don't remember the exact date.

14   Q      Have you taken a leave of absence from

15   that job of any kind at any point since starting

16   it?

17   A      Not really.  It's sales, so I kind of make

18   my own schedule.

19   Q      Approximately how many hours do you work

20   in a given week?

21   A      Oh, goodness.  I could work anywhere from

22   80 to 20 -- or 20 to 80, whichever way you want to

23   look at it.

24   Q      What kind of equipment are you selling?

25   A      Just equipment based on alarm -- alarm

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

20

1   detail stuff.

2   Q      Have you ever been asked to resign from

3   that job?

4   A      No, ma'am.

5   Q      What's your title?

6   A      I am a territory manager.

7   Q      What does "territory" refer to?

8   A      Just the area that I'm assigned to that I

9   manage.

10  Q      Do you mean a geographic area?

11  A      Yes, ma'am.

12  Q      Have you had any other titles at EPS?

13  A      No.  Not yet.

14  Q      Who is your supervisor at EPS?

15  A      Yvonne Hinds.

16  Q      Can you spell that name for me?

17  A      Y-v-o-n-n-e; Hinds, H-i-n-d-s.

18  Q      Has anyone else supervised you at EPS?

19  A      No.

20  Q      Did you take any time off between starting

21  work at EPS and your previous job?

22  A      EPS is my -- oh, yes, I did.  I'm sorry.

23  I misunderstood the question, then I -- it clicked

24  in my head.

25  Q      Okay.  So you took some time off before

21

```
1    you started?

2     A     I took a -- I took a little bit of time

3    off, yes, ma'am.

4     Q     About how much time?

5     A     About four months.

6     Q     Did you work at all during that four

7    months?

8     A     Not very much, no.

9     Q     But you worked some?

10    A     Just a little bit here and there.

11    Q     What sort of work did you do --

12    A     Stuff for my mom.  Just stuff for the

13   family type of stuff.

14    Q     Were you compensated for that work?

15    A     Depends on how you look at that.  She gave

16   me food.

17    Q     And what sort of work was that?

18    A     I just -- she -- my mom is -- since my dad

19   passed away, she's ridden to a chair, so I go over

20   and do chores.  I do the lawn.  I do the -- take

21   care of the pool, take care of the dog, cook for

22   her.  That type of stuff.  Kind of like a

23   caregiver.

24    Q     Understood.

25           Did you work for anyone other than
```

22

```
 1   family during -- during the three or four months

 2   before you started working at --

 3    A     I did.  I had a brief stint at a company

 4   called Vacations To Go, where I sold packages to

 5   cruise lines.  I was there for maybe three weeks.

 6   It just wasn't for me.

 7    Q     Why wasn't it for you?

 8    A     I don't know.  I guess because people were

 9   having fun and I wasn't getting to, so...

10    Q     How did you leave that job?

11    A     I just ended up taking a leave of absence.

12   I was going to go back to it, but I just didn't.

13    Q     Were you asked to take a leave of absence?

14    A     No, I was not.

15    Q     Did you work anywhere else during those

16   four months?

17    A     I did not.

18    Q     And prior to -- prior to that period,

19   where you just did a little bit of work here and

20   there, what was your job before that?

21    A     When I was at Precinct 1?  Is that what

22   you're asking me?  I'm not -- I --

23    Q     I'm trying to -- apologies.

24          I'm trying to proceeding sort of

25   chronologically to the job you have now to the job
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

23

1  before that and the job before that.  So --

2   A      The job before that would have been

3  Precinct 1.

4   Q      You didn't work at another precinct after

5  Precinct 1?

6   A      Precinct -- yes.  I did work at Precinct 6

7  for a week.

8   Q      You worked at Precinct 6 just for a week?

9   A      One week, yes.

10   Q      When was that?

11   A      Oh, July -- middle of July to a week

12  after.  It was about seven days.  Something like

13  that.

14   Q      In July of 2023?

15   A      Yes.  Yes.

16   Q      Who was your supervisor there?

17   A      Oh, my goodness.  I don't even know if I

18  was there long enough.

19          I guess I would just say Silvia

20  Trevino, the constable.  I never really got

21  assigned a supervisor.

22   Q      What did you do during that week?

23   A      Twiddled my thumbs.  I -- they never

24  assigned me anywhere because I had time that I

25  needed to take off from Precinct 1.  So I had to

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

24

1   burn some time, so I -- even though I had a badge

2   and an ID, I wasn't assigned anywhere, and then

3   she released me of duty, actually, because of this

4   case.

5       Q       How did that come about, that you were

6   released of duty?

7       A       She just called me and said this wasn't

8   over with.  She couldn't have me working there

9   right now.

10      Q       And by "this case," you mean the case that

11  you're being deposed for today?

12      A       That is the one.

13      Q       Did she say anything else?

14      A       No, ma'am.

15      Q       When you said that you had some time to

16  take off during Precinct 1, did you mean rollover

17  paid time off or something to that effect?

18      A       Yes.  My compensatory time was high and

19  they didn't like it that high at that agency, so

20  they had me burn a week, 40 hours.

21      Q       Precinct 6 didn't like your compensatory

22  time and asked you --

23      A       Yeah.  They have a -- they have a set

24  amount of time they like their deputies to have in

25  case a hurricane or something like that comes up,

25

1  then they don't go over and end up having to pay

2  overtime.

3   Q     How did you respond when the constable at

4  Precinct 6 asked you to leave?

5   A     Well, I wasn't happy about it, but I --

6  you know, what was I going to do?  She didn't want

7  me there and I wasn't going to fight about it.

8   Q     Did you talk to her about it other than

9  that phone call?

10   A     Nope.

11   Q     Did you talk to anybody else at Precinct 6

12  about it other than that phone call?

13   A     Nope.

14   Q     What about any of your former colleagues

15  at Precinct 1?  Did you talk to any of them about

16  being asked to leave Precinct 6?

17   A     No.

18   Q     For the week that you were at Precinct 6,

19  what was your rank or title?

20   A     Deputy.

21   Q     Did you take any time off in between being

22  hired at Precinct 6 and your previous job?

23   A     Yes.

24   Q     How much time?

25   A     I don't -- I don't recall.

26

1    Q      Do you recall an approximate number of

2    months?

3    A      A couple months.  Like I'd said earlier, a

4    couple months.  Three months.  Something in that

5    neighborhood.

6    Q      During those three months before you

7    worked at Precinct 6, did you have any other jobs

8    or side hustles?

9    A      "Side hustles"?  What does that mean?

10   Q      It might mean the sort of work that you

11   did for your mom, for example, or --

12   A      Okay.

13   Q      -- any self-employment.

14   A      I just -- no.  I don't believe so, no.

15   Q      So you didn't work at all for those --

16   A      I just took a little time -- a little time

17   off.

18   Q      Okay.  Did you stay in town during that

19   time?

20   A      I left town, I came back; I left town, I

21   came back.  I went on a cruise.

22   Q      Where did you go when you left town?

23   A      Miami.

24   Q      Anywhere else?

25   A      Galveston.

27

1    Q      Anywhere else?

2    A      Nope.

3    Q      Okay.  And before Precinct 6, where did

4  you work?

5    A      Precinct 1.

6    Q      How long did you work at Precinct 1?

7    A      About three years.

8    Q      When were you hired from Precinct 1?

9    A      On September 11th of 2020.

10   Q      Did you ever take a leave of absence of

11  any kind while you were employed at Precinct 1?

12   A      I did not.

13   Q      Do you remember the date you terminated

14  your employment with Precinct 1?

15   A      I want to say it was July 6th, but don't

16  quote me on that.  I think it was July 6th.

17   Q      July 6th of 2023?

18   A      Yes.

19   Q      What was the last rank that you held at

20  Precinct 1?

21   A      Sergeant.

22   Q      How long did you hold that rank?

23   A      About two-and-a-half years.

24   Q      What were your duties as a sergeant at

25  Precinct 1?

28

1    A      Just patrol, supervising some of the

2    deputies on my shift, on night shift.

3    Q      Approximately how many deputies did you

4    supervise?

5    A      I think we had 22 or 24 on the shift, and

6    it was split up between myself and another

7    sergeant.  But we supervised all of them.

8    Q      Were they in any special units or have any

9    areas of specialization?

10   A      Nope.  Just generic police work.

11   Q      Understood.

12          Where did you work before Precinct 1?

13   A      I worked for the Harris County Sheriff's

14   Office.

15   Q      How long did you work for the Harris

16   County Sheriff's Office?

17   A      Four-and-a-half years.

18   Q      Why did you leave the sheriff's office?

19   A      To take a position with Precinct 1 and get

20   back into supervision.

21   Q      Did you ever take a leave of absence while

22   you were with the sheriff's office?

23   A      I did not.

24   Q      What was the last rank or title you held

25   at the sheriff's office?

29

1    A      I was a homicide detective.

2    Q      What other ranks or titles did you hold?

3    A      That was it.

4    Q      Did you hold any title -- ranks or titles

5    other than sergeant at Precinct 1?

6    A      I was a corporal and a deputy.

7    Q      What were your duties at the Harris County

8    Sheriff's Office as a homicide detective?

9    A      Investigating murders.

10   Q      Did you take any time off between your

11   work at the Harris County Sheriff's Office and

12   your work at Precinct 1 at the constable's office?

13   A      I did not.

14   Q      Have you worked any part-time jobs that

15   you haven't mentioned?

16   A      Part-time as in, like, the

17   moonlighting-type jobs that cops work?  Is that

18   what you're talking about?  Yes.

19   Q      What moonlighting jobs have you worked?

20   A      I worked at a company called Axiom, which

21   is who's building the new space station.  I was

22   security for their exterior building.  And I

23   worked for AT&T as security inside one of their

24   facilities in Humble, and I worked the Shell Open.

25   I worked the Houston Rodeo.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

30

1          There might be some other -- I mean,

2    we would take stuff every once in a while, but I

3    just -- I can't recall, but -- oh, and I worked

4    Stetsons Nightlife.  That was one of the ones I

5    worked also.

6    Q      Did you work at Axiom while you were

7    employed at the sheriff's office or while you were

8    employed at Precinct 1?

9    A      Precinct 1.

10   Q      What about at Houston Rodeo?

11   A      Sheriff's office and Precinct 1.

12   Q      Shell Open?

13   A      I don't think I ever worked the Shell Open

14   for the sheriff's office.  Only for Precinct 1.

15   Q      What is Shell Open?

16   A      It's a golf tournament that is played here

17   in Houston.

18   Q      When did you work at Stetsons Nightlife?

19   A      Oh, wow.  I worked there for about four

20   years.  I worked Saturday nights -- or Friday

21   nights?  I can't remember.  Working the kids that

22   come in there and try to keep them from drinking

23   and stuff.

24   Q      What do you mean by "kids"?

25   A      Kids under 21.  18- to 21-year-olds that

31

1   come in there and sometimes the young kids that

2   weren't even 18 and have to ID them and stuff,

3   make sure that they didn't get in any kind of

4   trouble.

5   Q      Before the Harris County Sheriff's Office,

6   where did you work?

7   A      Harris County Precinct 4 Constable's

8   Office.

9   Q      How long did you work for Precinct 4?

10  A      I started my career there in 1991, and I

11  bounced back and forth between there and the

12  Brazos County Sheriff's Office a couple of times

13  because I went into business with my parents, and

14  had moved up to Bryan-College Station for a stint,

15  for about two-and-a-half years, but came back,

16  went to work for the Houston Community College

17  Police Department, worked there for a year in '99.

18          And then in 2000, I went back to

19  Precinct 4, when Ron Hickman took over, and I was

20  there until 2016.

21  Q      How long did you work at Precinct 4?

22  A      I mean, off and on, from '91 to '16,

23  whatever -- how many years that -- I don't -- I'm

24  not good at math.  I can put murderers in jail,

25  but I'm not real good at math.

32

1    Q      The dates are fine with me.

2    A      Thank you.

3    Q      And you said you were going back before

4    Precinct 4 and where?

5    A      The Brazos County's Sheriff's Office up in

6    Bryan-College Station.

7    Q      When did you first work for the Brazos

8    County Sheriff's Office?

9    A      I want to say in '97.

10   Q      Did you ever take of any -- did you ever

11   take a leave of absence of any kind while you were

12   employed with Precinct 4?

13   A      I didn't take a leave of absence until

14   this last July.  I've been solid ever since.

15   Q      Okay.  What ranks or titles did you hold

16   at Precinct 4?

17   A      I was a deputy, a corporal, a sergeant, a

18   lieutenant, and a captain.

19   Q      Was captain the last title you held?

20   A      Yes, ma'am.

21   Q      What ranks or titles did you hold at the

22   Brazos County Sheriff's Office?

23   A      Deputy.

24   Q      Exclusively deputy?

25   A      Yes, ma'am.

33

```
 1   Q      Did you work for Brazos and Precinct 4

 2   simultaneously?

 3   A      No.  No.  I would drop one and get the

 4   other, like, the same day.

 5   Q      What ranks or titles did you hold at the

 6   Houston Community College Police Department?

 7   A      Officer, I think is what their rank was.

 8   Q      No other ranks?

 9   A      No, ma'am.

10   Q      Do you remember the years that you worked

11   there?

12   A      Which one?

13   Q      The Houston Community College Police

14   Department.

15   A      I want to say I was there from

16   September of '99 to September of 2000.

17   Q      Why did you jump around between so many

18   police departments?

19   A      It sounds like I jumped around, but I was

20   just trying to take care of my parents.  And at

21   the time, I didn't know who was going to win the

22   election when I came back to Houston, so I took

23   the job at Houston Community College, just waiting

24   to see who was going to be the boss at Precinct 4.

25   And when Ron Hickman ended up winning, I went back
```

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

34

```
1   over.

2    Q     Were you ever asked to resign from any

3   job?

4    A     Just the last one I had, the Precinct 1.

5    Q     Were you ever fired from any job?

6    A     Never.

7    Q     Have you ever resigned for a job -- from a

8   job because if you didn't resign, you might have

9   been fired instead?

10   A     Only the -- Precinct 1.

11   Q     Have you ever received a discharge from a

12  law enforcement agency below honorable, such as

13  general or dishonorable?

14   A     Only from Precinct 1.

15   Q     You said at one point you were worried

16  about who your boss would be.  What were you

17  worried about specifically?

18   A     I wasn't worried.  I just wanted to work

19  for a certain person.

20   Q     Who did you want to work for?

21   A     Ron Hickman.

22   Q     Why did you want to work for Ron?

23   A     He's a good man, full of integrity.

24   Q     Did you find your previous employer not to

25  be a good man?
```

35

```
 1    A      No.  Everyone's been good.

 2              MS. VINSON:  Object to form.

 3   BY MS. LaVARCO:

 4    Q      Where did you grow up, Mr. Schultz?

 5    A      Humble, Texas.

 6    Q      Have you worked for any law enforcement

 7   agency you haven't mentioned yet?

 8    A      Yes.  I was at -- well, I didn't work

 9   there very long.  It was Harris County Precinct 3

10   Constable's Office, and I held a reserve

11   commission there for, like, five months, but I --

12   I never even put on a uniform there.  But it will

13   show up on my records.

14    Q      What's a "reserve commission"?

15    A      It just means you're nonpaid.  They pick

16   up your commission to be a police officer.  But I

17   never even got uniforms from there, but it does

18   show up on my records.

19    Q      Why was it so short-lived?

20    A      Because I wanted to be full-time, so I

21   took a full-time position back in Precinct 4.

22    Q      Okay.  Have you lived in Texas all your

23   life?

24    A      No, ma'am.

25    Q      Where else have you lived?
```

36

```
 1    A     Upstate New York.

 2    Q     Where upstate?

 3    A     Rochester.

 4    Q     What did you do when you were in

 5  Rochester?

 6    A     I was a kid.  I played being a kid.

 7    Q     Did you grow up in Rochester or between

 8  Rochester --

 9    A     No, ma'am.  I've been in Texas since 1977.

10  I was born in '70, so I was only up there about

11  seven years.

12    Q     So you were born in Rochester?

13    A     I was born in Albion.

14    Q     Where is Albion?

15    A     A-l-b-i-o-n.

16          It's just going towards Niagara Falls

17  from Rochester.

18    Q     I see.

19          Did you live anywhere else other than

20  the Rochester area in New York and in Texas?

21    A     No.  I mean, I've stayed places, but no,

22  I've never lived anywhere else.

23    Q     What do you mean by "stayed places"?

24    A     When you go on vacation and it just ends

25  up taking six months to come home.
```

37

```
 1   Q      Where did you take a vacation for six

 2   months?

 3   A      I went to Colorado for a little bit.  My

 4   family had a motel up there in Salida, Colorado.

 5   I stayed up there for a little bit.

 6          It was when I was a teenager.  A long

 7   time ago.

 8   Q      I see.

 9          Did you ever have any extended

10   vacations or leaves like that as an adult?

11   A      Unfortunately, no.  Still waiting.
```

38





39

25    Q       What did your parents do for a living when

KERRY LEE THOMAS vs                                            Wayne Schultz
ERIC M. BRUSS

40

1   you were growing up?

2    A      They owned a bridal shop.

3    Q      Where was that?

4    A      Humble, H-u-m-b-l-e.

5    Q      Humble, Texas?

6    A      Yes, ma'am.

7    Q      Have you ever been arrested before,

8   Mr. Schultz?

9    A      I have.

10    Q      When have you been arrested before?

11    A      Criminal mischief.

12    Q      What were the circumstances of that

13   arrest?

14    A      I stole a pumpkin.

15    Q      Where did you steal a pumpkin from?

16    A      Front yard of someone's house when I was

17   19.

18    Q      Were you convicted?

19    A      No.  I did -- well, I did deferred

20   adjudication.  I paid a fine.  So, yeah, I was

21   convicted.  I'm a big, bad criminal.

22    Q      Pumpkin-stealing criminal?

23    A      Yes.

24    Q      Have you ever been arrested other than for

25   the criminal mischief charge?

41

```
 1   A      No, ma'am.

 2   Q      Have you ever been accused of domestic

 3   violence?

 4   A      No, ma'am.

 5   Q      Have you ever been accused of harassment?

 6   A      No.

 7   Q      Assault?

 8   A      No.

 9   Q      Stalking?

10   A      No.

11   Q      Sexual assault?

12   A      No.

13   Q      Do you have any tattoos, Mr. Schultz?

14   A      I do.

15   Q      What tattoos do you have?

16   A      I just have tattoos of sharks and -- just

17   tattoos that I like the colors of.

18   Q      What other tattoos, apart from sharks, do

19   you have?

20   A      I have some tattoos of, like, the

21   Archangel Michael and the knights of the Templar

22   and a samurai warrior.

23   Q      What are the knights of the Templar?

24   A      I don't know.  They're some religious

25   group from back in the Crusader days.  I just
```

42

1    liked the tattoo.  I thought it looked cool.

2    Q     So you didn't know what it was before you

3    got the tattoo?

4    A     I knew the -- I knew the history of them,

5    but I didn't know -- I mean, it really has no

6    symbolism to me other than I liked the way it

7    looked.

8    Q     What's the history that you knew?

9    A     I just knew from the Crusaders.  I had

10   seen movies about it.

11   Q     Any other tattoos?

12   A     I have a bulldog.

13   Q     Are you a member of any organizations or

14   associations?

15   A     No.

16   Q     Are you a member of any sports teams?

17   A     Like do I play sports?  Like am I a

18   football player?  I don't understand the question.

19   Q     Are you a member of any sports clubs?

20   A     Oh, no.  No.

21   Q     Neighborhood associations?

22   A     No, ma'am.

23   Q     Nothing like that you can think of?

24   A     No.

25   Q     What's the significance of your bulldog

Wayne Schultz

43

1   tattoo?

2    A      It represents my father.  He was a Marine.

3    Q      Why does that represent your father?

4    A      Because their mascot is a bulldog.

5    Q      And what about the shark tattoo?  Any

6   symbolism behind that?

7    A      I love sharks.

8    Q      What do you love about sharks?

9    A      Their resilience to adapt to anything, and

10   that they are the longest-living animal on the

11   planet, almost --

12   Q      Fair enough.

13   A      -- at least according to Google.

14   Q      Can you tell me about your law enforcement

15   training, Mr. Schultz?

16   A      What do you want to know about it?

17              MS. VINSON:  Object to form.

18              THE WITNESS:  Could you be more

19       specific?  I have a lot of law enforcement

20       training.

21   BY MS. LaVARCO:

22   Q      Do you know approximately how many hours

23   of law enforcement training you have?

24   A      Over 4,000.

25   Q      Have you ever received training in the use

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

44

```
 1   of force?

 2    A      I have.

 3    Q      While at Precinct 1?

 4    A      Yes.

 5    Q      What kind of training in the use of force

 6   did you receive at Precinct 1?

 7    A      I went to an update training on use of

 8   force down at our training facility downtown for

 9   Precinct 1.  It was just an update on bringing

10   stuff back into the use of force continuum stuff.

11    Q      Were you ever a prison guard?

12    A      No.

13            No, ma'am.  Sorry.  That just sounded

14   funny when you said that.

15            No, ma'am, I've never been a prison

16   guard.

17    Q      Have you ever worked for a corrections

18   department?

19    A      I was a jailer when I was a deputy with

20   Brazos County.  So I did work inside the jail

21   facility there for a short period of time.

22    Q      When was that?

23    A      '90 -- 1998.  It's been a minute.

24    Q      Were you also a detention officer in the

25   Harris County Sheriff's Office jail?
```

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

45

1    A      Never.

2    Q      Do you have any tattoos on your chest?

3    A      I do not.

4    Q      Back to your use of force training at

5    Precinct 1, other than the update you mentioned,

6    what other use of force training did you receive

7    there?

8    A      That was the only -- the update was the

9    only thing I had gone through use of force

10   training as far as formal training.

11   Q      How many hours is that?

12   A      Oh, I want to say it was 24, but I'm not

13   positive.

14   Q      Did it take place over the course of

15   consecutive days or...

16   A      Yes, it did.

17   Q      Did you receive any training at Precinct 1

18   about report writing?

19   A      No.  I gave training about report writing.

20   Q      What about civilian interactions?  Did you

21   receive any training on that at Precinct 1?

22   A      As far as?

23   Q      Civilian interactions generally.

24   A      Like just talking to the public?  I don't

25   understand the question.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

46

1    Q      Okay.  While employed at Precinct 1, did

2    you receive any training on civilian interactions

3    during patrol duties?

4    A      Well, we receive training on, like,

5    de-escalation.  Is that what you're going with

6    that?  Like --

7    Q      Yes.  Can you tell me about your

8    de-escalation training?

9    A      Just went to training that -- on how to

10   diffuse a situation without having to use force,

11   without having to put your hands on people,

12   actually talking to people and listening to what

13   they have to say versus going hands-on.

14   Q      How long was that training?

15   A      Oh, I want to say it was a 40-hour course.

16   Q      And what de-escalation tactics did you

17   learn in that course?

18   A      Verbal judo.  That's the main thing.

19   Talking to people.

20   Q      Did you learn anything about the

21   proportional use of force?

22   A      The -- in my civilian training?  No.

23   Q      Did you learn anything about the

24   proportional use of force in other training

25   contexts?

47

1   A      I don't know what "proportional use of

2   force" is.  I've never heard that before.  What

3   does that mean?

4   Q      Assessing the appropriate level of force

5   to use given the circumstance and how you're

6   observing --

7   A      Yes.  What we call that is a "use of force

8   continuum," and yes.

9   Q      I see.

10          And how does a use of force continuum

11  relate to your de-escalation training?

12  A      Well, just -- it's all about presence,

13  command presence, having actual knowledge when

14  you're talking to people, and being able to -- I

15  mean, the first thing is verbal, verbal

16  communication before going to anything aggressive

17  with hands-on or with lethal force.

18  Q      What comes after verbal communication on

19  the spectrum?

20  A      As far as the continuum?

21  Q      Yes.

22  A      After verbal?

23          Verbal would come -- would come with

24  soft-hand techniques.

25  Q      What are "soft-hand techniques"?

48

1    A      Using what -- like a come-along, something

2    to do with a wrist lock.  Something that as soon

3    as you let it go, it's not going to hurt anybody

4    anymore.

5    Q      I see.

6            What's a "come-along"?

7    A      I don't even -- it's been so long.

8            Like using a -- it's using the wrist

9    in a gooseneck type to where they can't get out of

10   a lock and you can actually have them come with

11   you to a patrol car and securely put them in there

12   for their safety.

13   Q      I see.

14           And what's the next level of

15   escalation on the continuum after soft-hand?

16   A      It would be hard-hands, to where you're

17   actually using force.  And less lethal, they fall

18   under the same.  Less lethal is, like, pepper

19   spray or a Taser.

20   Q      And does your de-escalation training teach

21   you to use hard-hand techniques before less-lethal

22   options?

23   A      No.  I never learned any -- any use of

24   force techniques in de-escalation.  I don't know

25   if you were confused on that or if I was confused

49

1   in how I said that to you.

2    Q      In your use of force training in general

3   or in any other training context.

4    A      Ask me the question again, please.

5    Q      Sure.

6           On the use of force continuum, you

7   have hard-hand training and then higher on the use

8   of force continuum are less-lethal options; is

9   that correct?

10   A      No.  They're the same level.

11  Hard-hands --

12   Q      I see.

13   A      I prefer -- any time I was using something

14  like that, I would rather go to less lethal,

15  because I don't want to use hard-hands because

16  I -- you can hurt people using hard-hands.  So I

17  would prefer to use less lethal.

18   Q      What are the less-lethal options?

19   A      Pepper spray and Taser.  I carried a

20  Taser.  I did not have pepper spray.  It's been a

21  long time since I've carried pepper spray.

22   Q      Are there any less-lethal options on this

23  continuum?

24   A      Not to my knowledge.

25   Q      Is a K-9 a less-lethal option?

50

```
 1    A       K-9 -- I don't know where a K-9 falls on

 2    it.  I'm not a K-9 handler.

 3    Q       Okay.  And in your training and

 4    experience, hard-hand techniques are more likely

 5    to cause injury to someone than the use of a Taser

 6    or pepper spray?

 7    A       Absolutely.

 8    Q       Did you receive any firearms training

 9    during your law enforcement career?

10    A       A bunch.

11    Q       About how many hours or how many courses?

12    A       I couldn't even tell you.  I'm a firearms

13    instructor.  I did a lot of firearms training.  A

14    lot.

15    Q       You said so far that you've been an

16    instructor with respect to report writing and also

17    with respect to firearms; correct?

18    A       Yes.

19    Q       Any other areas in which you've been an

20    instructor?

21    A       Yes.

22    Q       What are those areas?

23    A       I am an alert instructor, which is active

24    shooter.  I am a video camera instructor.  I am a

25    riot control instructor.
```

51

1           Those are the big ones that stick out.

2    Q    Anything else you can remember about

3    your --

4    A    Not at this time.

5           MS. VINSON:  Object to form.

6           Just pause a little so that I have

7        time.

8           THE WITNESS:  Uh-huh.

9           MS. VINSON:  We can't talk over

10       each other.

11          MS. LaVARCO:  Ms. Vinson, what did

12       you just say?  I didn't quite hear you.

13          MS. VINSON:  I told him to pause so

14       we don't talk over each other.

15          MS. LaVARCO:  Okay.

16          MS. VINSON:  And I objected to

17       form, I hope.  I think the court reporter

18       got that.

19          Can you-all not hear me?  Katie

20       just said my -- I'm not audible.  No?

21          MS. LaVARCO:  You're audible now.

22       You just weren't for a moment, I think --

23          MS. VINSON:  Okay.

24          MS. LaVARCO:  -- when you told

25       Mr. Schultz to wait until you finished

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

52

1        speaking.  That's the only thing I didn't

2        hear, I presume.

3    BY MS. LaVARCO:

4     Q       Mr. Schultz, what topics do your report

5    writing trainings cover?

6     A       The basic police responses -- I'm sorry,

7    excuse me -- responding to burglaries, responding

8    to robberies, what information you need to get

9    from victims, what information you need to get

10   from suspects or defendants.  That type of stuff.

11   Property, when you have property crime.

12    Q       Does it cover documentation of the use of

13   force?

14    A       Of course.

15    Q       When you're instructing people about how

16   to write reports, do you instruct them to consult

17   with the other officers on the scene before

18   writing their reports?

19    A       No.  I don't instruct them to do that.

20    Q       Is that common practice --

21    A       No.

22    Q       -- to consult with other officers on the

23   scene before writing reports?

24    A       No.

25    Q       Is it common practice when reviewing

53

1   drafts of reports to consult other officers' draft

2   reports?

3              MS. VINSON:  Object to speculation.

4              THE WITNESS:  No.

5   BY MS. LaVARCO:

6    Q     In your experience as a law enforcement

7   trainer on report writing, is it common practice

8   or best practice to consult with other officers?

9              MS. VINSON:  Object to speculation.

10             THE WITNESS:  Yeah, I said "no" the

11      first time you asked that.  No.

12   BY MS. LaVARCO:

13   Q     Did you receive any training on ethics in

14   law enforcement?

15   A     Yes.

16   Q     What topics did your ethics training

17   cover?

18   A     I don't recall.

19   Q     Did you receive training on tactical

20   trauma care?

21   A     Yes.

22   Q     What does that entail?

23   A     The main thing I got on tactical trauma

24   care was the use of tourniquets, and basically

25   blood goes 'round and 'round, air goes in and out.

54

1    If anything is away from that, it's a bad day for

2    whoever we're dealing with.  And my thing is to

3    preserve life, so I got very well versed in the

4    utilization of tourniquets.

5     Q      Any other big takeaways from your tactical

6    trauma care training?

7     A      No.

8             MS. VINSON:  Object to form.

9    BY MS. LaVARCO:

10    Q      Did you receive trainings on arrest,

11   search, and seizure?

12    A      Yes.

13    Q      Have you given trainings on arrest,

14   search, and seizure?

15    A      No.

16    Q      Have you received crisis intervention

17   trainings?

18    A      I have.

19    Q      What does that entail?

20    A      Learning how to deal with individuals that

21   are suffering from mental crisis.

22    Q      What tactics did you learn in that

23   training about responding to individuals who are

24   suffering mental health crisis?

25    A      The main thing I got out of that course

KERRY LEE THOMAS vs                                           Wayne Schultz
ERIC M. BRUSS

55

1   was de-escalation, how to cope with people that --

2   and bring them down to a level that makes it

3   easier to deal with them so you can get them help.

4    Q      What tactics do you use to bring them down

5   to a level that makes it easier to deal with them?

6    A      I talk to people.  That's all I do.  I

7   talk to people.

8    Q      Did your de-escalation training related to

9   people who are experiencing mental health crisis

10  differ from your other de-escalation training?

11   A      Every situation's going to be different,

12  so that answer is yes.

13              Let me rephrase.  The question was:

14  Did my training differ from dealing with regular

15  citizens to dealing with someone in crisis?

16   Q      Yes, that's right.

17   A      Is that your question?

18              I believe that falls on the individual

19  officer on how he actually deals with the

20  situation based on who he's dealing with.

21   Q      Were you given tips or recommended tactics

22  specific to responding to people in mental health

23  crisis?

24   A      Tips?  No.  I mean, of course -- I mean,

25  you're going to take away something from training

KERRY LEE THOMAS vs
ERIC M. BRUSS
Wayne Schultz

56

1    every time you're involved in training, and

2    anything I could take away from training that

3    would assist me in keeping someone from getting

4    hurt, I wanted that takeaway.  But to -- something

5    that actually jumps out that I can give you right

6    now, no.

7     Q     Do any recommended tactics jump out

8    specific to people in mental health crisis?

9     A     Like what type of --

10              MS. VINSON:  Object to form.

11              THE WITNESS:  Like --

12              MS. VINSON:  Just give me a minute.

13              THE WITNESS:  I'm sorry.  Yes,

14        ma'am.

15              Like what type of tactic are you

16        referring to?

17   BY MS. LaVARCO:

18     Q     Any tactics that your instructors in your

19   training about dealing with people in a mental

20   health crisis.

21     A     I guess not -- and I don't mean to sound

22   weird, but when you keep referring to "tactics,"

23   "tactics" to me sounds like hands-on, sounds like

24   moving around a room, sounds like defensive.

25              When I think of de-escalation

57

1   training, I think of what takeaways I took away as

2   far as mentally, what I can use with my brain, not

3   what I can use with my hands.

4    Q       I don't mean to refer exclusively to

5   hand -- hands-on tactics.

6    A       Yeah.

7    Q       So I can ask the question again.

8    A       Yes, ma'am.

9    Q       What approaches or methods did you --

10   A       Okay.

11   Q       -- learn in your de-escalation training

12  about dealing with people with mental health

13  crises?

14   A       Yeah.  The main thing I took away, again,

15  was basically -- I don't want to say putting

16  yourself in their -- in their shoes, but you've

17  got to -- you've got to understand that they're

18  not dealing with the mental capacity that they

19  need to be dealing with.  So if -- you got to get

20  on their level a little bit and just have a --

21  have compassion for what they're dealing with.

22   Q       Did your training tell you that the same

23  tactics or that the same methods or approaches are

24  useful for people who are under the influence of

25  drugs or alcohol?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

58

1    A      The training did not say that.

2    Q      Has that been your experience, even if the

3    training hasn't said it?

4    A      I've been a police officer 32 years and

5    I've seen so many different scenarios, I can't

6    answer that question fairly.

7    Q      Would you say that you have an area of

8    specialization as a law enforcement officer?

9    A      My specialization is I feel that I am a

10   very well-rounded police officer.  The old saying

11   "jack-of-all-trades, master of none," you ever

12   heard that before?

13   Q      Yes.

14   A      Okay.  That's kind of me.  I think I'm a

15   little good at everything, but not the best at

16   anything.

17          Does that make sense?

18   Q      That makes sense.

19          Does Precinct 1 have policies specific

20   to working with people who were in mental health

21   crisis?

22   A      I would assume they do.

23   Q      But you don't recall policies at

24   Precinct 1?

25   A      No.  I don't recall that policy.

KERRY LEE THOMAS vs                                        Wayne Schultz
ERIC M. BRUSS

59

1    Q      Did Precinct 1 have policies specific to

2    working with people with developmental or

3    cognitive issues?

4     A      I would assume they do.

5     Q      Did you ever read those policies?

6     A      I did not.

7     Q      Did you ever read the Precinct 1 policy

8    specific to working with people who were in mental

9    health crisis?

10    A      I -- okay.  Let me rephrase back to the

11   question you just asked.

12    Q      Sure.

13    A      At one time, I read every single policy

14   there.  When I first got hired there, we were

15   required to.  But do I recall what the policy

16   said?  No, I do not.

17    Q      Did you read the policies again

18   periodically or only when you just came on?

19    A      I read them from time to time when I had

20   rookies in the car with me, when I had people that

21   I was training.

22    Q      Did you read them at regular intervals,

23   other than when you were training rookies?

24    A      No, I did not.

25    Q      How were you notified of updates to

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

60

1    changes in policy at Precinct 1?

2    A      We got them through an email system.

3    Through Outlook.

4            I did read those when they came

5    through.

6    Q      Do you have any certifications as a law

7    enforcement officer?

8    A      Like what?  What kind of certificates?

9    Q      Any sort of -- any sort of certification.

10   A      No.  Just -- just certified police

11   officer.

12           MS. VINSON:  Shirley, can we take a

13       break soon, please?

14           MS. LaVARCO:  Sure.  We can take a

15       break.  How long do you want, Celena?

16       Five minutes, is that good?

17           MS. VINSON:  That's fine.

18           MS. LaVARCO:  Okay.

19           THE VIDEOGRAPHER:  We are now going

20       off the record.  The time is 10:15.

21         (Recess from 10:15 a.m. to 10:22 a.m.)

22           THE VIDEOGRAPHER:  Okay.  And we

23       are now back on the record.  The time is

24       10:22.

25

61

1    BY MS. LaVARCO:

2    Q      Mr. Schultz, how do you keep up with the

3    latest developments in law enforcement?

4    A      Through the Texas Commission on Law

5    Enforcement training.  Just the standard training

6    that we're required to take every couple of years.

7    Q      How do you keep up with the applicable law

8    in the law enforcement context?

9    A      There is a legislative update we have to

10   take every session, and that's how I keep up with

11   it.

12   Q      Legislative update every two years through

13   TCOLE?

14   A      Yes, ma'am.

15   Q      What does the TCOLE training cover, apart

16   from the legislative update?

17   A      As far as -- that's the only thing I'm

18   required -- that and I think cultural diversity is

19   the other one that I'm required to take now.

20   Because I'm a master peace officer, I've got all

21   the training that I need, so I don't have to take

22   a lot of the other stuff that younger officers

23   have to take.  I just have to meet my 40 hours

24   every four years.

25   Q      And what topics do those trainings cover?

62

1    A       Which -- which trainings?

2    Q       Which topics do the TCOLE trainings cover?

3    A       I guess I'm not understanding.  The

4    TCOLE -- are you saying which -- I don't

5    understand the question.

6            Because we talked about legislative

7    update I have to take and cultural diversity that

8    I have to take.

9    Q       Right.

10   A       What else are you talking about?

11   Q       What topics does the legislative update

12   cover?

13   A       Oh, it can be a gamut of anything to do

14   with Texas law:  Education Code, all the way to

15   Transportation Code to Penal Code, Code of

16   Criminal Procedures.  It just depends on what the

17   updates in that law are for that legislative year.

18   Q       You said that you take TCOLE training

19   every couple of years; is that right?  Or you did

20   take TCOLE training while you worked --

21   A       When I was full-time, I took a lot of

22   training, yes, I did.

23   Q       Is that only legislative updates and

24   cultural diversity training?

25   A       No, ma'am.

KERRY LEE THOMAS vs                                Wayne Schultz
ERIC M. BRUSS

63

1    Q      What other trainings did that entail?

2    A      A gamut of training.  I've taken -- I

3    think the last thing I took was -- there was

4    training in less lethal to deploy for riot

5    control.  I actually was trained on what's called

6    a 40-millimeter, and it's a munition that deploys

7    [audio interference].

8            (Reporter clarification.)

9            THE WITNESS:  It's a munition that

10       deploys gas, like to disperse riots.

11   BY MS. LaVARCO:

12   Q      Any other topics covered?

13   A      Not in that particular training.

14          Like I've taken so much training.

15   My -- I've got training records that has all that

16   stuff on it.

17   Q      Would your TCOLE training records cover

18   any trainings that you took by third-party

19   entities outside of Texas?

20   A      I don't take training by third-party

21   entities.  If it doesn't count towards TCOLE, I

22   don't take it.

23   Q      You subscribed -- do you subscribe to any

24   law enforcement publications?

25   A      No, ma'am, I haven't.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

64

1    Q       Have you ever subscribed to any?

2    A       I have -- no, I haven't.

3    Q       Did you subscribe to any law enforcement

4    newsletters?

5    A       No.

6    Q       Are you a member of any Facebook groups

7    for law enforcement officers?

8    A       No.

9    Q       Have you ever been?

10   A       No.

11   Q       Are you a member of any LinkedIn groups

12   for law enforcement officers?

13   A       No.

14   Q       Have you ever been?

15   A       No.

16   Q       Do you follow any Instagram accounts

17   related to law enforcement?

18   A       No.  No.

19   Q       Do you watch any YouTube channels related

20   to law enforcement?

21   A       No.

22   Q       Do you engage with any other social media

23   related to law enforcement?

24   A       No.

25              MS. VINSON:  Object to form.

65

```
 1   BY MS. LaVARCO:

 2    Q      Do you use any other social media

 3   platforms to keep up with updates on law

 4   enforcement?

 5    A      No.

 6    Q      Do you use any other social media

 7   platforms to communicate with other law

 8   enforcement officers?

 9    A      No.

10           What is --

11    Q      Apart from -- I'm sorry.  Did you need a

12   moment?

13    A      I'm sorry.  Something came up on the

14   computer.  One second.

15           MS. VINSON:  It's just a pop-up

16       from my browser.

17           THE WITNESS:  I just wanted to make

18       sure it wasn't going to shut down on me.

19           MS. VINSON:  Okay.

20           THE WITNESS:  Okay.

21   BY MS. LaVARCO:

22    Q      Okay.  Was the pop-up a communication from

23   counsel or any other person about the deposition?

24    A      No, ma'am.  Not at all.

25    Q      Will you let me know if that happens?
```

66

```
 1    A      Absolutely.

 2    Q      Thank you.

 3           Apart from your experience as a

 4   trainer, have you done any other speaking

 5   engagements related to law enforcement?

 6    A      I have.

 7    Q      What sort of speaking engagements?

 8    A      I used to speak at rotary clubs and

 9   chamber of commerce meetings when I was a

10   lieutenant and a captain with Harris County

11   Precinct 4.

12    Q      What would you speak to them about?

13    A      Just issues with safety and stuff going on

14   in the community.

15    Q      What sort of things were going on in the

16   community?

17    A      Burglaries, uprising, cars being stolen,

18   how to secure their items and make sure that they

19   didn't lose their items or their lives.

20    Q      Any other speaking engagements related to

21   your career as a law enforcement officer?

22    A      Not that come to mind.

23    Q      Have you made any other public appearances

24   related to your law enforcement career?

25    A      No.
```

67

 1    Q      For example, have you spoken on a radio

 2    show or a podcast?

 3    A      Okay.  No.  No.

 4             I didn't know if you think this face

 5    is one of the faces that's, like, famous, but...

 6    Q      Have you ever worked as a law enforcement

 7    consultant in any capacity?

 8    A      No.

 9    Q      Have you ever done any kind of consulting

10    work?

11    A      No.

12    Q      Have you ever been self-employed?

13    A      I mean I guess I'm self-employed when I

14    work my side jobs.  But other than that, no.

15    Q      Have you ever owned a small business?

16    A      No.

17    Q      Have you ever been qualified as an expert

18    in a civil case?

19    A      No.

20    Q      Have you ever been qualified as an expert

21    in a criminal case?

22    A      No.

23    Q      Have you ever been a member of any union?

24    A      Yes.

25    Q      Are you currently a member of a union?

68

```
 1   A      No.

 2   Q      What was the last union you were a member

 3   of?

 4   A      The Harris County Deputies' union, I

 5   believe is what it's called.

 6   Q      How long were you a member of that union?

 7   A      Oh, I don't know.  Five years.

 8   Q      Were you a member of that union only while

 9   you were employed with Precinct 1?

10   A      No.  I was a member while I was with the

11   sheriff's office also, and I think Precinct 4 as

12   well.

13   Q      Precinct 6 as well for that short time?

14   A      I think I was with COPS then, Coalition of

15   Police and Sheriffs.

16   Q      Was your employment at Precinct 6 the only

17   time you were a member of the COPS union?

18   A      No.  I had been a member of them for a

19   long time.  I think I held both of them at the

20   same time, actually.

21   Q      Do you remember when you first became a

22   member of the COPS union, or approximately when?

23   A      I do not.

24   Q      Apart from the COPS union, the Harris

25   County Deputies' union, have you ever been a
```

1    member of any other union?

2     A      No, ma'am.

3     Q      Have you ever served on any union

4    committees?

5     A      No, ma'am.

6     Q      Have your -- any of your unions provided

7    legal services?

8     A      To me?

9     Q      Yes.

10    A      No.

11    Q      Did you ever receive legal representation

12   through any of your unions?

13    A      No.

14    Q      Did you receive other types of advice

15   through your union membership?

16             MS. VINSON:  Object to form.

17             THE WITNESS:  No.

18   BY MS. LaVARCO:

19    Q      Have you ever filed a grievance with a

20   union?

21    A      No.

22    Q      Have you ever filed a grievance with any

23   of your employers?

24    A      No.

25    Q      Have you ever filed any kind of internal

70

1   complaint with any of your employers?

2    A      No.

3    Q      What kind of support did the Harris County

4   Deputies' union provide you?

5    A      As far as?  Support for what?

6    Q      What are the benefits of joining the

7   Harris County Deputies' union?

8    A      You get a --

9              MS. VINSON:  Object to form.

10             THE WITNESS:  I got a calendar from

11        them.  That was really all I ever got from

12        them.

13   BY MS. LaVARCO:

14    Q      You never received anything else of value,

15   monetary or otherwise?

16    A      No.

17    Q      Why did you join the Harris County

18   Deputies' union?

19    A      It's what the old-timers told us to do

20   when we were young.

21    Q      Did you receive any kind of support from

22   the COPS union?

23    A      No.

24    Q      Why did you join the COPS union?

25    A      It was what everybody did.

71

```
1   Q      Why did everybody do it?

2   A      Don't know.

3          MS. VINSON:  Object to form.

4          THE WITNESS:  I didn't ask.

5   BY MS. LaVARCO:

6   Q      Have you ever sought guidance or support

7   from union personnel related to your duties as a

8   law enforcement officer?

9   A      No, ma'am.  Didn't need it.

10  Q      Have you ever sought guidance/support from

11  any union personnel related to misconduct

12  allegations?

13  A      No.

14  Q      Did the Harris County Deputies' union ever

15  get involved in misconduct allegations against its

16  members?

17         MS. VINSON:  Object to form.

18         THE WITNESS:  I don't know.

19  BY MS. LaVARCO:

20  Q      Did the Harris County Constables

21  Association ever get involved in misconduct

22  allegations against you?

23  A      I don't know what that organization is you

24  just said.

25  Q      Did the Harris County Deputies' union ever
```

KERRY LEE THOMAS vs                                      Wayne Schultz
ERIC M. BRUSS

1   get --

2    A      Oh.

3    Q      -- involved in misconduct allegations

4   against you?

5    A      No.  Other than this case, I've never

6   been in anything like this, so...

7    Q      Have any of the unions you've been a

8   member of been involved in this case?

9    A      No.

10   Q      How did you first become aware of this

11  lawsuit?

12   A      I believe I received a call from our

13  chief.

14   Q      Who was that?

15   A      Lofton Harrison.

16   Q      What did Lofton Harrison say on that call?

17   A      He said that I was going to be receiving

18  an email in reference to the incident that we're

19  talking about right now.

20   Q      Did he say anything else?

21   A      I don't recall.  It was a long time ago.

22   Q      Did you say anything to him?

23   A      About what?

24   Q      Did you say anything to him when he

25  notified you that you were being sued?

73

1    A      No.   I mean, I don't recall the

2    conversation.   I'm sure we had a casual

3    conversation, but I have no idea what we said back

4    then.

5    Q      Did this lawsuit come as a surprise to

6    you?

7    A      Absolutely.

8    Q      Why did it come as a surprise to you?

9    A      Based on the allegations, I just didn't

10   feel like it met what they were saying I did.

11   Q      So you didn't anticipate that you would be

12   sued?

13   A      No, ma'am.

14   Q      Is the COPS union aware of this lawsuit,

15   to your knowledge?

16   A      I have no idea.

17   Q      Is the Harris County Deputies' union aware

18   of this lawsuit, to your knowledge?

19   A      I have no idea.

20   Q      Have you ever been involved in a civil

21   lawsuit before?

22   A      I have not.

23   Q      After your call with Chief Harrison

24   alerting you to this lawsuit, did you ultimately

25   get that email from him?

KERRY LEE THOMAS vs                                        Wayne Schultz
ERIC M. BRUSS

74

```
 1   A      I did.

 2   Q      Did you respond to the email?

 3   A      No.

 4   Q      What did the email say?

 5   A      I don't recall.

 6   Q      Is there anything that would help refresh

 7   your recollection of that?

 8   A      If someone had the email.

 9   Q      Do you have the email on your phone or any

10   other device?

11   A      No.

12   Q      Did you receive any other emails about

13   this lawsuit?

14   A      No, not to my knowledge.  Not that I

15   recall, anyway.

16   Q      Did you receive any other emails from

17   anyone at Precinct 1 about this lawsuit?

18   A      Not that I can recall.

19   Q      Did you receive any text messages from

20   anyone at Precinct 1 about this lawsuit?

21   A      Myself and Eric Bruss had texted back and

22   forth a little bit.

23   Q      Did you text anyone else about this

24   lawsuit from Precinct 1?

25   A      No.
```

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

75

```
1    Q      Did you text anyone else about this

2    lawsuit in general?

3    A      No.

4    Q      Were you ever a defendant in a civil

5    lawsuit before?

6    A      No.

7    Q      Has anyone ever sent you a demand letter

8    related to allegations against you but never

9    followed up with a lawsuit?

10   A      No.

11   Q      To your knowledge, has anyone ever sent a

12   demand letter to any of your employers related to

13   allegations against you?

14   A      No.

15   Q      Were you ever a plaintiff in a lawsuit?

16   A      No.

17   Q      Have you ever been to small claims court?

18   A      Yes.

19   Q      What for?

20   A      I rented a house -- oh, my gosh -- back in

21   2000, and I can't remember -- it was over rent,

22   because the homeowner had given us a faulty home.

23   It was when I was with Nicole.  And I actually

24   think I went through the shower, ended up in

25   another room, and I told him I wasn't going to pay
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

76

1   the rent until he fixed the shower and he ended up

2   taking me to small claims court.

3    Q     How did that case resolve?

4    A     I don't recall.  I really don't.  I think

5   I had to pay the rent, which is kind of --

6    Q     After falling through the shower, you

7   still had to pay the rent?

8    A     Yeah, it kind of stunk, yeah.  I think I

9   had to pay the rent.  I was, like, "Dang it."

10   Q     Any other instances where you've been to

11  small claims court?

12   A     Nope.  That was the best one ever.  Fall

13  through the shower.

14   Q     Any other instances in which you've been

15  in any other type of court --

16   A     No.

17   Q     -- apart from your duties as a law

18  enforcement officer?

19   A     Oh, yeah.  I've been to court several

20  times as a police officer.

21   Q     Was that to appear as a witness as a

22  police officer?

23   A     Yes, ma'am.

24   Q     Did you appear as a witness in other

25  people's criminal prosecutions?

77

```
1    A      As a police officer that was on scene?

2  Yes.

3    Q      Have you ever appeared as a witness in a

4  lawsuit unrelated to your career as a law

5  enforcement officer?

6    A      No.

7    Q      Have you ever reported a fellow officer

8  for misconduct?

9    A      No.

10   Q      Have you ever informally reported another

11 officer for misconduct?

12           MS. VINSON:  Object to form.

13           THE WITNESS:  No.

14 BY MS. LaVARCO:

15   Q      Have you ever complained to personnel at a

16 law enforcement agency about a fellow officer's

17 conduct?

18   A      No.

19   Q      Have you ever been asked to submit an

20 affidavit or declaration related to a lawsuit,

21 even if you were not a party?

22   A      No.

23   Q      Have you ever been asked to testify at a

24 deposition before?

25   A      No.
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

78

1    Q      Have you ever been asked to testify at a

2    civil trial before?

3    A      I want to say "yes" on that one.  I want

4    to say "yes."  I think there was a family violence

5    situation I was involved in where I made an arrest

6    on an individual, and then they -- civilly I ended

7    up in that court testifying as a witness for the

8    victim.  I think.  If I recall correctly.

9           It's been a minute.  It was probably

10   back in the early 2000s.

11   Q      Where were you employed at that time?

12   A      Harris County Precinct 4.

13          I think it was something to do with

14   the children, and it ended up in civil court over

15   a custody battle.  Yes.  Yes.

16   Q      So it was in family court?

17   A      Family court, yes.

18   Q      I see.

19          Any other instances in which you've

20   been asked to testify at a civil trial?

21   A      No, ma'am.  Pretty plain Jane.

22   Q      About how many times would you say you've

23   testified at criminal trials?

24   A      Gosh, you would think a lot with the

25   amount of work that I've done, but 20 maybe.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

79

1    Q      Do any of those instances stand out in

2    your memory?

3    A      No.  It's just work.

4    Q      At the time of the incident giving rise to

5    this litigation, were you familiar with

6    Precinct 1's use of force policy?

7    A      Yes.

8    Q      Are you still familiar with Precinct 1's

9    use of force policy?

10   A      I haven't looked at it in a minute.  It

11   could have changed.  I have no idea.

12   Q      What can you tell me about Precinct 1's

13   use of force policy when you last looked at it?

14           MS. VINSON:  Object to form.

15           THE WITNESS:  I really don't have

16       an answer to that.  I -- it's -- the use

17       of force policy was put in place to

18       actually mitigate the use of force.

19   BY MS. LaVARCO:

20   Q      How did it mitigate the use of force,

21   Precinct 1's use of force policy?

22   A      Well, by actually putting in a -- that --

23   the force continuum, by actually putting that in

24   place and putting it into policy, making sure the

25   deputies were aware of other tactics than going to

80

```
1   certain things that could hurt people.

2              However, on the flip side of that, we

3   didn't want deputies not to use force that was

4   necessary to where if they didn't employ force,

5   they would end up being injured as well.

6    Q     In suspect apprehension context, can you

7   define what "resistance" means?

8    A     As far as someone not complying -- I mean,

9   the main source of resistance is if I put my hands

10  on you to put handcuffs on you and you pull away

11  or you start to try and strike me, that sort of

12  thing, that would be the most common type of

13  resistance.

14             But other types of resistance are

15  people that won't comply with directives, people

16  that are failing to respond.  But they're

17  communicating with you, they're just not doing

18  what you're asking them to do.  That is resistance

19  as well.

20   Q     Is noncompliance the same as resistance?

21   A     To a degree, absolutely.

22   Q     To what degree?

23   A     To the degree of they're not doing what

24  you asked them to do, so they're interfering with

25  your duties of actually completing the task to
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

81

1   diffuse the situation and get the situation under

2   control.

3    Q      Are there specific categories of

4   resistance in Precinct 1's use of force policy?

5    A      Not to my knowledge.

6    Q      Are there specific categories of

7   resistance in your training and experience as a

8   law enforcement otherwise?

9    A      No.

10   Q      Is there a difference between passive

11  resistance and active resistance?

12   A      I believe so.

13   Q      What's the difference between passive

14  resistance and active resistance?

15   A      I believe passive resistance, there's no

16  force being employed; and active resistance,

17  someone is actively trying to get away, actively

18  putting hands on you, pushing your hands off of

19  them.  That type of stuff.

20   Q      So would you say that evading is active

21  resistance?

22   A      I would say evading is evading.

23   Q      Evading is not a type of resistance?

24   A      No.  Evading is evading.  It's a whole

25  different category.

82

1  Q      Are you familiar with something called

2  "assaultive resistance"?

3  A      I am not.  Educate me.

4  Q      You're here to educate me, Mr. Schultz.

5  A      Oh, yeah.  That's right.  Sorry.

6  Q      That's quite all right.

7          Can verbal noncompliance ever be

8  considered active resistance?

9  A      I don't think -- I don't think -- ask me

10  that again.  Verbal noncompliance could be active

11  resistance?  I think you're actively resisting,

12  but I don't think you're resisting in a forceful

13  nature.  So I guess -- I mean, by definition,

14  yeah, maybe.

15          Is that even an answer?  Am I even

16  answering you?

17  Q      Are you answering my question to the best

18  of your ability?

19  A      Yes, ma'am, I am.

20  Q      Okay.  Can you define "active resistance"

21  for me again?

22  A      I -- and I know where you're going with

23  this, because of what I just said.  But "active

24  resistance," to me, is you're actively resisting.

25          Now, back to what I said earlier, I

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

83

1   said that active resistance would be putting your

2   hands on somebody, placing -- getting your hands

3   off.  But are you actively resisting if you're not

4   complying?  By definition, I think so.

5              So does -- did I just give you two

6   different answers to the same question?  I don't

7   mean to, but I guess the scenario flipped when you

8   asked me the different question.  My apologies.

9    Q     That's all right.

10   A     I do believe there's a big difference.

11  Yes, absolutely.

12   Q     Does active resistance require physical

13  acts by the person who's resisting?

14   A     Based on what I just told you, I don't

15  believe so.

16   Q     What kinds of force are available to law

17  enforcement officers at Precinct 1?

18              MS. VINSON:  Object to form.

19              THE WITNESS:  I mean, your force is

20       having a uniform that's clean and pressed

21       and looks good.  That's command presence.

22       That force is available to you.

23  BY MS. LaVARCO:

24   Q     In your experience as a law enforcement

25  officer at Precinct 1, what kinds of force were

84

```
 1   available to you?

 2    A      I thought I was answering that.

 3           So are you asking what implements were

 4   available to me, like my Taser?  Like an ASP

 5   baton?

 6    Q      A Taser is an example.

 7    A      Okay.  Yeah, I mean, I carried an

 8   ASP baton as well, which is a collapsible baton.

 9   I carried that on myself as well, which is

10   considered less lethal.  But that wasn't issued by

11   Precinct 1.  That was something that I purchased

12   on my own.

13           And the Taser was provided to me by

14   Precinct 1, and -- yeah.

15    Q      What is an "ASP baton"?

16    A      It is a collapsible baton that you can

17   carry on your belt and have at your -- I never

18   used it to hit anybody.  I used it to break

19   windows out of cars if I needed to get someone out

20   of a car.

21    Q      Are officers permitted to purchase their

22   own weapons or equipment for being on duty?

23    A      Absolutely.  The gun I carried every day

24   was purchased by me.

25    Q      Are there any restrictions on the type of
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

85

1   weapons that you were allowed to purchase and use

2   while on duty at Precinct 1?

3    A      Yes, there are.

4    Q      What were those restrictions?

5    A      On what type of weapons?

6    Q      On any type of weapon that you might have

7   purchased.

8    A      So you want restrictions on my firearm, on

9   my baton, on handcuffs?  Or are you just asking on

10   the firearm?

11    Q      Firearm, baton, and handcuffs.  Let's take

12   them in turn.

13    A      Okay.  So as far as your firearm, it had

14   to be at least a 380-caliber.  It could not have a

15   barrel that exceeded six inches, and it could not

16   be larger than a 44-caliber, and the barrel could

17   not be smaller than 2 inches.

18    Q      And the --

19    A      Baton -- I'm sorry.

20    Q      Yes.

21    A      As far as --

22    Q      I was going to ask you to proceed to

23   baton.

24    A      Yes, ma'am.

25            The collapsible baton had to be of a

86

1   brand that was -- it had to be ASP, which is the

2   only -- to my knowledge, they're the only one who

3   make the collapsible baton.  It could not be over

4   26 inches or under -- don't quote me.  I think

5   it's 16 inches is the smallest one.  And the

6   largest is 26.  And it had to be of -- it had to

7   have a clip that actually functioned inside the

8   housing that screwed on the top of the baton.

9            Handcuffs had to be well maintained,

10  and they really weren't concerned about brand as

11  far as -- unless they were -- I mean, as far as --

12  as long as -- not as far as -- as long as they

13  were functioning properly, the teeth were all in

14  order, and they were in compliance with standard

15  handcuffing.

16  Q    Were any weapons off-limits to you to

17  purchase as a law enforcement officer --

18  A    Yes.

19  Q    -- in Precinct 1?

20  A    Yes.

21  Q    Which weapons were off-limits?

22  A    Fully automatic weapons, shotguns with

23  barrels that exceeded 20 inches, silencers.  They

24  frown upon us carrying silencers on your weapons.

25  Suppressors.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

87

1    Q     Were any type of equipment off-limits to

2    you to purchase for your use on duty as a law

3    enforcement officer at Precinct 1?

4              MS. VINSON:  Object to form.

5              THE WITNESS:  Okay.  I was waiting

6         for that.

7              I really don't -- I wouldn't know

8         how to answer that, because I don't know

9         what I would want that I didn't have.  I

10        mean, bazookas -- I guess we couldn't

11        carry bazookas.  I couldn't buy a bazooka

12        or a rocket launcher.

13   BY MS. LaVARCO:

14   Q     What equipment were you required to

15   purchase?

16   A     My handgun, my handcuffs, boots,

17   underwear, undershirt, magazines.

18   Q     Is there a written policy with respect to

19   the purchase of weapons and equipment --

20   A     Yes.

21   Q     -- at Precinct 1?

22   A     Yes.

23   Q     Did Precinct 1 provide any of these

24   weapons and equipment?

25   A     Only thing I was provided to by Precinct 1

KERRY LEE THOMAS vs                              Wayne Schultz
ERIC M. BRUSS

88

1    was a Taser and a body camera.

2    Q       And before I think you referred to an ASP

3    baton?

4    A       I did.

5    Q       Is that the collapsible baton?

6    A       Yes, ma'am.

7    Q       Okay.  Were any of the weapons that you

8    were equipped with at Precinct 1 equipped with

9    lasers?

10   A       Lasers, yes.  The Taser that I carried --

11   the original Taser I carried had one laser.  The

12   one I ended up with before I left had two lasers.

13   Q       The Taser that you were using on the date

14   of the incident giving rise to this litigation --

15   so on February 22nd, 2021, -- did that have one or

16   two lasers?

17   A       It had two.

18   Q       What colors were those lasers?

19   A       Red and green, just like Christmas.  My

20   favorite holiday.

21   Q       Did the different lasers have different

22   uses?

23   A       No?  Yes?

24           So what the two lasers did is they

25   separate the belt line so it doesn't hurt the

89

1    victim -- or the victim -- the suspect if they're

2    fleeing or something like that.  It allows a good

3    separation to where you actually get a good charge

4    and not hurt the individual as much as it could if

5    it was the other way.

6              So the red and green -- I don't know

7    if -- and I'm sure we're going to talk about my

8    video here shortly, but you'll see in my video I

9    actually flick my wrist, and it changes the

10   separation of the red and green laser.  And what

11   that does is determines whether I'm far away or

12   close to who might be being tased.

13             And I can see by your look that you

14   are confused.  I will -- I will attempt to clarify

15   as much as possible.

16    Q     I appreciate that.  I am not very familiar

17   with Tasers.

18    A     Yes, ma'am.

19    Q     Could you educate me a little bit more on

20   that?

21    A     Sure.

22             So the red laser, I believe, is --

23   and, again, this is me refreshing back.  I believe

24   the red laser is the primary one, and the green is

25   the one that separates the belt line.

90

1              So what we try to do is put one of the

2     probes above the belt, and one probe below the

3     belt, and that gives the best chance of getting a

4     full charge on the deployment of the Taser.

5      Q      And by "below the belt" and "above the

6     belt," do you mean the waistline of the person who

7     you're --

8      A      The waistline, yes.

9      Q      The waistline of the person who is to be

10    tased?

11     A      Is to be tased, yes.  Hopefully not, but

12    yeah.

13     Q      Okay.  Is it ever appropriate to direct

14    the laser at a suspect's head?

15     A      No.  No.  Never.

16     Q      Is it ever appropriate to direct it in the

17    eyes or the face of the suspect?

18     A      No.  In fact, we're taught not to do that.

19     Q      Is there a policy that covers that, to

20    your knowledge?

21     A      In the training.  I don't believe -- I

22    don't know if it will be in policy.  But in

23    training, they do cover that.

24     Q      Why are you taught not to direct the laser

25    at a suspect's head, eyes, or face?

91

1   A      Well, I mean, they actually made pointing

2   lasers against the law in Texas because it can

3   hurt the retinas.  It can actually cause damage to

4   the eye.  And you don't want to tase someone in

5   the face.  That would be absolutely horrible.

6            That makes me cringe just thinking of

7   being tased in the face.  I've been tased many

8   times.

9   Q      Were you tased exclusively in a training

10  context?

11  A      Only in a training context, yes.

12  Q      I assume you weren't tased in the eyes or

13  the face?

14  A      Oh, my gosh, no.  That makes me want to

15  throw up just thinking about it.

16  Q      Does pointing a laser at someone's head,

17  eyes, or face also risk causing disorientation?

18  A      I don't know that answer.

19  Q      In your experience, is it likely to make a

20  suspect more fearful if you point the laser on

21  their head, eyes, or face?

22  A      I would say no.  Because if it's on their

23  head, chances of them seeing it are real slim.

24  When it's on the chest, they see it.  They look

25  down, they're, like, "Oh, okay."

92

```
 1   Q      Is it ever appropriate to direct the Taser

 2   at a suspect's chest?

 3   A      Absolutely.

 4   Q      In your training and experience, where is

 5   the optimal place?

 6   A      The back.

 7   Q      The optimal place to direct the Taser

 8   prongs is at a suspect's back?

 9   A      Yup.  Butt cheek and upper back.  That's

10   the best.

11   Q      And what if you don't have access to their

12   back or butt cheek?

13   A      You deploy it towards the front.  You

14   always want to --

15   Q      On the front -- sorry.  Go ahead.

16   A      Yeah.  You always want to have it to where

17   it's optimal.  I don't want to hurt anybody, but I

18   don't want them to continue doing what they're

19   doing that's causing me to deploy my Taser either.

20           So on the front, you're going to

21   separate the belt line, like I said before.  The

22   best place is in the stomach and in the upper

23   thigh.  I'd rather have it away from the heart.

24   Q      I appreciate this education.  Thank you,

25   Mr. Schultz.
```

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

93

1   A      Sure.

2   Q      What factors should law enforcement

3   officers consider, in your training and

4   experience, before using force on a suspect?

5   A      What is the force being deployed on us

6   versus how we need to respond to the deploy -- to

7   the force being deployed back on the person

8   deploying the force originally.

9   Q      So to restate, you're saying that one of

10  the factors before using force on a suspect is

11  whether the suspect is deploying any force on

12  you --

13  A      Well, no.

14  Q      -- or other officers?

15  A      Well, even if it's noncompliance, we're

16  allowed to -- like I'm telling someone, "Step out

17  of the -- step out of the room.  Step out of the

18  room.  If you don't do it, I'm going to tase you.

19  Step out of the room.  If you don't comply, I'm

20  going to tase you."  I'll give them multiple

21  attempts to not get tased, but chances of them

22  getting hurt are way greater if I go hands-on than

23  if I tase them.

24  Q      Are there any other factors other than the

25  suspect's resistance or noncompliance that come

94

1   into play when deciding whether to use force?

2    A     Yes.  Absolutely.  What is my backdrop?

3   Who could be hurt other than the suspect if I

4   deploy that force?

5    Q     Is age a factor in determining whether to

6   use force on a suspect?

7    A     I'm going to say yes.  But that's me

8   personally.  I'm not going to tase a 75-year-old

9   lady, because I'm pretty sure I could get her to

10  comply -- and, I mean, there might be some really

11  strong 75-year-old ladies out there.  But I'm a

12  pretty big old boy, and I think I can handle a

13  75-year-old lady without having to deploy a Taser

14  on her.

15   Q     So would you say that physical body size

16  is also a factor in deciding whether to use force

17  against a suspect?

18   A     I think so.  Sure.

19          There's been many a time I could have

20  tased someone and I chose not to, and I would have

21  been justified tasing them, but I chose to just go

22  hands-on and they were easily taken into custody

23  without any incident.

24   Q     To be clear, the questions that I'm asking

25  in this line are with respect to the use of any

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

95

1    kind of force, not just the use of a Taser.  You

2    understand that; right?

3    A       Oh, I didn't.  So --

4    Q       Okay.

5    A       No.

6    Q       Okay.  So I'll ask the question again.

7    A       Are we going back to the beginning?

8    Q       Not the very beginning.

9    A       Okay.  So this is any force?

10   Q       Yes.

11   A       Okay.

12   Q       So what factors do law enforcement

13   officers consider before using force on a suspect?

14   A       I would say -- again, it depends on what

15   force is being employed -- or deployed on you.  If

16   I've got someone just being verbally aggressive

17   and not complying with me asking him to comply, I

18   might try a hard-hand technique first before I go

19   to a Taser.

20   Q       Does your training teach you to employ a

21   hard-hand technique?

22   A       Absolutely it does.

23   Q       Does -- I just want to make sure I get it

24   right for the record.

25               So does your training for -- does your

96

1  training teach you to employ a hard-hand technique

2  before, for example, a Taser or any of the other

3  less-lethal weapons before employing force?

4   A     I'm going to -- I'm going to make this

5  super simple for you.  My training says use what

6  force is necessary to complete the task.  So

7  that -- I could go straight to lethal force as

8  soon as I get out of a car.  If someone's shooting

9  at me, I'm not going to sit there and say, "Let me

10 use my hands.  Now let me try and tase you.  Now

11 let me try and pepper spray you.  Let me try and

12 hit with you my baton" while you're throwing, you

13 know, rounds of ammunition at me.

14            So it just -- it just depends on the

15 situation.  So I can use what force is necessary

16 to effect the arrest and diffuse the situation.

17  Q     Are there -- go ahead.

18  A     Yeah, I'm sorry.  There --

19            MS. VINSON:  You've got to let --

20      you cannot talk over one another.

21            THE WITNESS:  Sorry.  I'm sorry.

22            MS. VINSON:  So let her finish the

23      question and then answer.

24            THE WITNESS:  Yes, ma'am.

25            You're getting me in trouble,

97

1        Shirley.

2    BY MS. LaVARCO:

3     Q     Why don't you go ahead and finish what you

4    were about to say.

5     A     Well, now I don't remember what I was

6    going to say.  No, I'm just kidding.

7              So ultimately it depends on the

8    actions of the individual on what force I -- what

9    force I'm going to deploy.  I have learned over my

10   32 years of doing the career that I was able to

11   de-escalate with just talking to people way more

12   than I was ever needing to put hands on people.

13   Ever.

14    Q     Understood.

15              So does the continuum use of force

16   that we were talking about earlier today, does

17   that tell you to use the least amount of force

18   required to effect the arrest or to control the

19   situation?

20    A     They actually teach you in training that

21   you may use one force above whatever they are

22   using against you.  That's what I was always

23   taught.  So --

24    Q     So --

25    A     -- if you're punching me in the face, I'm

98

```
 1   going to use less lethal.  If they take my Taser,

 2   I might use lethal against them if they try to

 3   deploy my Taser against me.

 4    Q     Okay.  So with that understanding, if

 5   somebody's verbally noncomplying or verbally

 6   resisting, what would be the next step for you in

 7   terms of what force you would use?

 8    A     I would attempt to talk first, and then I

 9   would probably grab my Taser and say, "If you

10   don't comply, I'm going to tase you."

11             Depending on -- I mean, am I at a

12   shoplifter, or am I at a burglary where I just

13   caught the guy in the back room of a house and

14   he's failing to comply?  Am I on a traffic stop

15   and I want the person out because I smell

16   marijuana and I -- and he's failing to get out of

17   the car and now I got a risk of him driving away?

18             There's 97 million scenarios that we

19   can go over, and I won't know unless I'm in that

20   situation how I'm going to employ force.

21    Q     Understood.

22             So going back to the factors that law

23   enforcement should consider before using force on

24   a suspect, you named the level of resistance or

25   force that the suspect is exhibiting towards law
```

99

1    enforcement officers.  You also named potentially

2    gender, age, and body size; is that right?

3     A      Yes.

4            I never -- I don't think we talked

5    about gender -- oh, maybe I did when I made the

6    75-year-old a female.  Okay.  I'm with you.  I'll

7    give you that.  Yes.

8     Q      Only if you want to.

9     A      Yes.  Yes.  Yes.

10    Q      Okay.  And you referred specifically in

11    your example to a 75-year-old woman.  What about

12    young age?  Is that a factor in deciding whether

13    to use forces against a suspect?

14    A      Again, it depends.  I can't answer that

15    fairly until -- I mean, am I seeing the person?  I

16    can have a 16-year-old that's six-foot-two,

17    350 pounds, and if he's throwing me around the

18    front yard, I'm going to tase him.

19    Q      So body size is more of a factor than age?

20    A      Sure.

21            MS. VINSON:  Object to form.

22            THE WITNESS:  Sorry.

23   BY MS. LaVARCO:

24    Q      Is disability a factor in deciding whether

25    to use force on a suspect?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

                                                            100

1    A      I would say yes.

2    Q      Is perceived or suspected disability a

3    factor in deciding whether to use force on a

4    suspect?

5    A      Like if I perceive that someone is

6    handicapped or if I perceive that someone is

7    disabled?  How would I perceive that without

8    actually seeing that they're disabled?  I'm

9    confused.

10   Q      Sure.

11          So sometimes people have disabilities

12   that are very clear because they're using a

13   wheelchair or perhaps on crutches.

14   A      Okay.

15   Q      There are other instances where you might

16   guess that a person has a disability, but you're

17   not sure.

18   A      Help me --

19   Q      In both instances -- I'm sorry?

20   A      Help me guess what disability I can guess.

21   Q      If you expect -- if you perceive, for

22   example, that somebody has cognitive processing

23   issues, is that a factor in determining whether to

24   use force against them?

25   A      So if I'm understanding your question

101

1   correctly, you're saying that let's say I arrive

2   on scene, I see a male who has been called in as

3   being destructive, breaking windows out of a

4   house, and now I meet him in the front yard.  Am I

5   to suspect that he might have a mental illness

6   or -- is that what you're saying?

7    Q     I -- what would you do in that situation

8   that you just described?

9    A     If he comes at me, it's -- I'm not going

10  to have time to say, "Hey, are you mentally

11  challenged and are you in crisis?"  I'm going to

12  have to act with whatever force is necessary to

13  take that individual into custody at that time.

14   Q     And what if you perceive that he has

15  either a mental illness or cognitive processing

16  delays, but he's meeting you only with verbal

17  noncompliance or he's just failing to comply with

18  orders?

19            MS. VINSON:  Object to form.

20            You may answer.

21            THE WITNESS:  I would say -- and

22        I've actually been in a situation like

23        this, but I did have knowledge -- I had

24        dealt with the individual before.  And I

25        had -- had it been someone that did not

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

102

1       have the issues that this young man had, I

2       know I would have went either hands-on or

3       Taser way faster.

4              But this individual, I knew was not

5       processing the information that was coming

6       out of my mouth.  I knew it because I had

7       dealt with him before, and I was able to

8       talk to him and I talked him down off the

9       ledge that he was imagining in his head,

10      and I was able to talk him into the back

11      of my car without putting any handcuffs on

12      him.

13             So the situation just -- it changes

14      every single time.  This is the one job

15      that I don't think you can ever say is

16      exactly the same every time you deal with

17      it.

18   BY MS. LaVARCO:

19    Q     Understood.  That's helpful.

20             So if you received training on -- have

21   you received training on recognizing signs of

22   possible mental illness?

23    A     Yes.

24    Q     What sort of training did you receive on

25   that?

103

1    A      It's covered in the crisis intervention.

2    Q      And what signs were you taught could be --

3    I'll rephrase.

4           What signs, according to that training

5    on crisis intervention, put you on notice that

6    somebody might have a mental illness?

7    A      So the specific -- were you saying

8    something else?

9    Q      No.

10   A      Because I keep getting in trouble for

11   talking over you.

12          So the specific thing -- the specific

13   things you would look for are are they talking to

14   themselves, are they not making eye contact with

15   you.  There's ways to tell -- and that was one of

16   the things that I dealt with in training.

17          But I've also been around a lot of the

18   mental -- people that we deal with down in our

19   downtown complex with Precinct 1, and I had to

20   deal with a lot of -- I believe they called them

21   "consumers" now, is the political correct

22   terminology for someone that's in crisis, but

23   people that are talking to themselves.  And -- I

24   had a guy throw feces at me one time.  That was

25   pretty easy to determine that he was in crisis,

KERRY LEE THOMAS vs                                      Wayne Schultz
ERIC M. BRUSS

1    because I don't think that's something normally

2    someone normal would do.

3                But, yeah, just the way they act,

4    their mannerisms.  Because someone could be in

5    crisis, but someone could also be having a

6    diabetic episode.  So, I mean, there's -- and

7    epilepsy.  There's so many different variables to

8    put into place, I can't pinpoint one thing.  But

9    they did tell us to look for certain signs of --

10   especially people talking to themselves, talking

11   back to the person that's talking to them, when

12   they're not making any contact with you.

13    Q     What do you mean by "when they're not

14   making any contact with you"?

15    A     Making eye contact with you.

16    Q     Oh, "making eye contact with you."  Okay.

17    A     Right.

18    Q     Were you taught to look out for signs that

19   somebody was in medical crisis before using force

20   on a suspect?

21    A     Are you referring to, like, epilepsy?

22   Diabetes?  Sure.

23    Q     Those are examples; yes.

24    A     Sure.

25    Q     And what signs were you taught to -- that

105

1    could put you on notice that somebody's in medical

2    crisis?

3     A      The -- someone being lethargic, not being

4    real aware of their surroundings.  Stuff like

5    that.

6     Q      Is being slow to respond to orders a

7    potential sign that somebody's in medical crisis?

8              MS. VINSON:  Object to speculation.

9    BY MS. LaVARCO:

10    Q      In your training and experience, is being

11    slow to respond to orders a sign that somebody is

12    in medical crisis?

13              MS. VINSON:  Object to speculation.

14              THE WITNESS:  In my experience, the

15         majority of the time that I dealt with

16         someone like that was due to intoxication

17         of some sort, not due to medical crisis.

18         Whether they were on drugs, whether they

19         were on alcohol, whether they were on

20         marijuana was almost exclusively what I

21         was dealing with when someone was failing

22         to respond to me in an appropriate manner.

23    BY MS. LaVARCO:

24    Q      When you suspect that somebody's

25    intoxicated, whether through alcohol or other

106

1   substances, how do you de-escalate the situation

2   so that you don't have to use force or you need to

3   use only the least amount of force necessary?

4    A      That is a great question, and I don't even

5   know how to answer it.  I've taken so many drunk

6   drivers into custody that I can't tell you one

7   that was exactly the same, but, you know, a lot of

8   times --

9               THE WITNESS:  Is it good?  It's

10          beeping at me.  Is it good?

11              MS. VINSON:  Yes.

12              THE WITNESS:  Oh.

13              A lot of times -- you have

14          different levels of people that are

15          intoxicated, whether it's on marijuana,

16          whether it's on drugs, or whether it's on

17          alcohol, and you have your friendly people

18          that are real easy to deal with, and you

19          got people that want to bust out the

20          window of your patrol car, kick your cage

21          out, fight with you.

22              So, yeah, I mean, you're trained to

23          deal with the situation based on the

24          circumstances that are afforded to you at

25          that time.

107

1   BY MS. LaVARCO:

2    Q     And you described, sort of, two extreme

3   scenarios:  People who are friendly drunks, for

4   example, on the one end of the spectrum, and

5   people who are breaking out your windows because

6   they're drunk, on the other end of the spectrum;

7   right?

8    A     Right.

9    Q     So what about the people in the middle

10  who, for example, are not being aggressive with

11  you, but are perhaps slow to respond to your

12  orders?

13   A     I treat them with a --

14           MS. VINSON:  Object to form.

15           THE WITNESS:  I treat them with a

16      little bit of leniency.

17  BY MS. LaVARCO:

18   Q     What do you mean by "leniency"?

19   A     Well, for instance, if I know how

20  intoxicated they are -- or if I suspect I know how

21  intoxicated they are, I might give them a little

22  more leeway to going hands-on than I normally

23  would.  But, on the same token, those people that

24  are being cool in the middle of the road, I've

25  seen escalate in the blink of an eye into the guy

KERRY LEE THOMAS vs                                              Wayne Schultz
ERIC M. BRUSS

108

1    that's fighting me and I'm fighting for my life in

2    the middle of a -- you know, a highway in Texas.

3     Q      How do you respond if a suspect is

4    insulting you?

5     A      "Wow.  That's just rude."  But I got

6    pretty thick skin, so I just deal with it.

7     Q      How do you deal with it?

8     A      Just -- just do my job.  I'll do the

9    whole, "Okay, well" -- I've done the whole "Sticks

10   and stones may break my bones, but names will

11   never hurt me," you know, kind of stuff.

12    Q      So does a suspect insulting you impact

13   your decision to use force?

14    A      No.  They're just being, you know, meany

15   heads.

16    Q      So if a suspect is irritating you in some

17   other way, does that impact your decision to use

18   force?

19    A      How am I irritated?  I chose this job --

20   or that job.  I'm not doing it right now.  But I

21   chose that job.  I chose it because I loved it,

22   and I didn't care what people said.  I was still

23   going to do my job the way it needed to be done.

24    Q      Why did you love the job?

25    A      Because I got to help people.  I helped

109

1   way -- so many people.  So many people.

2    Q      Is there a difference between an insult

3   and a threat in a suspect apprehension context?

4    A      Absolutely.

5    Q      How do you tell the difference between an

6   insult and a threat in a suspect apprehension

7   context?

8    A      Well, if someone calls me a "fat pig,

9   oink, oink," they're just being insulting.  But if

10  they say, "You fat pig.  I'm going to kill your

11  family later," that's pretty much a threat.  I've

12  had them both.

13   Q      Is there something in the middle that's a,

14  sort of, gray line between an insult and a threat

15  in a suspect apprehension context?

16   A      You tell me.

17   Q      No.  You're here to tell me.

18   A      I don't have an answer for that.  What

19  would be a middle of the road of that?

20   Q      You never encounter suspects who are doing

21  something, either telling you that they're going

22  to blow your brains out or tell you that you're a

23  "fat pig, oink, oink"?

24          MS. VINSON:  Object to form.

25          THE WITNESS:  My short answer is

KERRY LEE THOMAS vs                              Wayne Schultz
ERIC M. BRUSS

110

1        yes, I've had people in between that

2        spectrum.  I've had all kinds of names

3        called to me, and I've had all kinds of

4        threats about being blown up and my family

5        killed.

6    BY MS. LaVARCO:

7     Q      Has somebody -- has a suspect ever told

8    you to watch out, for example, or, "Watch what

9    you're doing there"?

10    A      I've had people say, "This ain't the last

11   time you're going to see me or my family."

12    Q      Do you consider that a threat?

13    A      100 percent.

14    Q      Does that sort of threat impact your

15   decision to use force in the moment?

16    A      No.  No.

17    Q      What about if someone is -- what about if

18   a suspect is saying that something that you

19   politically disagree with.  Does that impact your

20   decision to use force?

21    A      Regular people in my life don't make that

22   decision for me.  So, no, a suspect is not going

23   to influence me politically.

24    Q      Does a suspect's expressed political views

25   impact your decision to use force?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

111

1    A      Like if they love Trump or love -- don't

2    love Trump?

3    Q      For example, yes.

4    A      No, it doesn't.

5    Q      Are there any kinds of force off the table

6    when you're faced only with passive resistance?

7    A      Explain.

8    Q      Are there any types of force that are off

9    the table when you're faced only with

10   noncompliance with orders?

11              MS. VINSON:  Object to form.

12              THE WITNESS:  Yeah, that seemed

13       like the exact same question.

14              What would be force that goes -- I

15       don't think there's any force that's ever

16       off the table until the situation's over

17       with.

18   BY MS. LaVARCO:

19   Q      Can verbal resistance ever justify the

20   discharge of a Taser?

21   A      Yes.

22   Q      In what circumstances?

23   A      If they're noncompliant.

24   Q      Even in the absence of physical force?

25   A      Yes.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

112

```
1    Q      Can verbal resistance ever justify the

2    discharge of a firearm?

3    A      No.

4    Q      Can verbal resistance ever justify you

5    brandishing a firearm?

6    A      Yes.

7    Q      In what circumstances?

8           MS. VINSON:  Object to form.

9           THE WITNESS:  If I'm saying, "Come

10          over here.  Get out of the closet.  Get on

11          the ground," and they fail to do it, I'll

12          pull my weapon out, because I don't know

13          what's in there.  Me knowing -- me not

14          knowing allows me to pull my weapon out

15          for my safety.

16          But I'm indexed, making sure that

17          I'm not going to shoot anyone that does

18          not -- I don't want to say that doesn't

19          need to be shot, because that would sound

20          bad.  No one needs to be shot.  Right?

21          Anyway...

22   BY MS. LaVARCO:

23   Q      Can verbal resistance ever justify

24   unleashing a K-9 on a suspect?

25   A      I wouldn't know that answer.
```

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

113

1    Q      You didn't receive any training on what

2    kind of resistance justifies unleashing a K-9 on a

3    suspect while you were employed with Precinct 1?

4    A      No.

5    Q      Is force ever justified while a suspect is

6    in a prone position?

7    A      Sure.

8    Q      In what circumstances?

9              MS. VINSON:  Object to form.

10             THE WITNESS:  If -- again, if the

11         person's being noncompliant and we're

12         giving verbal instructions for them to

13         comply and they choose not to comply, it's

14         going to depend a lot on what type of call

15         we're on, what was the nature of the call,

16         what were we responding to, and what's the

17         threat level.

18             This day and age -- I mean, I've

19         been doing the job a long time, and it was

20         bad, you know, when we started in the '90s

21         and to this day, in my opinion, everyone

22         has a gun until I prove they don't have a

23         gun.  So I don't -- until I know me and

24         all the people around me are safe and that

25         person's not complying, I don't know if

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

114

1        they have a weapon.  I don't know if they

2        can hurt anybody.  I will use what force

3        is necessary to diffuse that and make sure

4        no one gets hurt.  Hopefully not the

5        suspect either.

6   BY MS. LaVARCO:

7    Q      Does your training teach you to assume

8   that everyone is armed until you learn otherwise?

9    A      My training doesn't, but my circumstances

10  over the years I've done that job has made my

11  mental acuity say, "You know what?  They've got a

12  gun until they don't have a gun."

13   Q      If a suspect is in a prone position with

14  their hands stretched out so that you can see

15  their hands are empty, is force justified just

16  because they're not complying with orders?

17              MS. VINSON:  Object to form.

18              THE WITNESS:  That's going to

19        depend on the circumstances, depend on the

20        lighting, depend on the angle, what can I

21        see?  Can I see both hands?  Do I have a

22        good angle of approach?  Do I have cover?

23        How quick is it to go from arms spread out

24        to reaching under you and brandishing a

25        firearm and putting rounds downrange?

                                                                    115

1    BY MS. LaVARCO:

2     Q     So in that same scenario we're describing,

3    if you assume that you have a good view of the

4    suspect, who's prone on the ground and you can see

5    their hands, the lighting conditions are good, is

6    force justified just because they are not

7    complying with orders?

8     A     My --

9              MS. VINSON:  Object to form.

10             THE WITNESS:  My answer is yes,

11        force is justified.  Would I employ force?

12        I don't know.

13   BY MS. LaVARCO:

14    Q     What kind of force is justified in that

15   circumstance?

16             MS. VINSON:  Object to form.

17             THE WITNESS:  One level above what

18        they're using.  If they're being

19        noncompliant, we can use a less-lethal

20        device or we can go to soft-hands.

21   BY MS. LaVARCO:

22    Q     Is force ever justified while a suspect is

23   already subdued?

24    A     No.

25             Well, okay.  I'm going to rephrase.

116

1    Because people still have legs.  And once they're

2    handcuffed behind their back, I don't know,

3    there's some Bruce Lee or Chuck Norris people out

4    there that might be able to do some crazy stuff to

5    me.

6            So if someone's kicking me,

7    punching -- or and spitting on me and all that

8    kind of stuff, I might use a little bit of

9    soft-hand techniques and put them in something

10   like maybe a hobble that can get their feet

11   restrained.  Absolutely.

12    Q     Is a "hobble" a feet restraint?

13    A     Yes.

14    Q     Is that shackles or is it something else?

15   I'm not familiar?

16    A     A "hobble" is a -- it's a nylon

17   rope-looking device that secures the feet to the

18   base of the car to where they can't kick anymore.

19    Q     I see.

20            What does it mean for a suspect to be

21   subdued?

22    A     "Subdued"?

23    Q     Yes.

24    A     I don't know.  That's a -- I say taken

25   into custody.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

117

1   Q      What does it mean for a suspect to be

2   taken into custody?

3    A      It means they have handcuffs on them and

4   the situation has been diffused and is no longer

5   ongoing.

6    Q      So a suspect is never in custody before

7   they're handcuffed?

8    A      No.

9           I lost a good friend to that.

10   Q      My condolences for that.

11   A      Thank you.

12   Q      Would it be objectively reasonable to

13   release a K-9 on a suspect while they're lying

14   still?

15          MS. VINSON:  Object to form.

16          THE WITNESS:  I can't answer that

17      question.

18   BY MS. LaVARCO:

19   Q      When you're giving orders to a suspect,

20   based on your training and experience, how do you

21   know that they understand your orders?

22          MS. VINSON:  Object to form.

23          THE WITNESS:  I would know if

24      they're speaking or if I heard them speak.

25      Because in our day and age, we deal with a

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

118

1          lot of people that don't speak the

2          language that I speak.  So I come across a

3          lot of people that speak Spanish and

4          Vietnamese, and unfortunately they don't

5          understand what I'm saying.

6    BY MS. LaVARCO:

7     Q      Are there other signs other than a

8    language barrier that someone might not understand

9    your orders?

10    A      I mean, just people that are under the

11   influence and maybe have had a little bit too much

12   of some kind of recreational something they

13   shouldn't have in their body.

14    Q      What are the signs that a suspect might be

15   confused by your orders?

16             MS. VINSON:  Object to form.

17             THE WITNESS:  Signs that they would

18       be confused?  I really don't -- maybe

19       they're not -- I really don't know.

20   BY MS. LaVARCO:

21    Q      In your training and experience, do

22   suspects ever move more slowly out of fear?

23    A      "Slowly out of fear"?

24             MS. VINSON:  I'm going to object.

25       It calls for speculation.

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

                                                                    119

1              THE WITNESS:  Yeah, I really don't

2        know how to answer that.  I don't know if

3        I've ever had anyone respond slowly out of

4        fear.  They normally respond fast out of

5        fear, and it's normally me watching their

6        heels kick up as they're running away from

7        me.

8    BY MS. LaVARCO:

9     Q      If someone is responding slowly to your

10   orders, does that necessarily mean they pose a

11   threat?

12    A      No.

13    Q      In your training and experience, do black

14   suspects sometimes move more slowly out of fear?

15             MS. VINSON:  Object to form.

16             THE WITNESS:  What?  What?

17             MS. VINSON:  It's improper and it

18        calls for speculation.

19             THE WITNESS:  I don't -- I don't

20        see color.  I see good and bad.

21   BY MS. LaVARCO:

22    Q      Have you ever realized during an

23   interaction with a suspect that they've been

24   confused by your orders?

25    A      Sure.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

                                                              120

1    Q      What does that look like?  How did you

2    know that they were confused?

3    A      I can give you a perfect example of that.

4           We use what's called a "funnel

5    technique," generally, when we take people into

6    custody, especially if we're getting them out of a

7    car or something like that.  And I'm going to use

8    my voice, and I'll -- you know, I'll tell the

9    suspect, "With your right hand, reach across your

10   body.  Open the door.  Open the door to the car.

11   Step out.  Face away from my voice.  Take two

12   steps to the left.  Keep your hands in the air.

13   With your right hand, reach the collar of your

14   shirt.  Pull it up.  Turn all the way around.

15   Turn all the way around.  Do it now.  Do it now."

16          Okay?  So there's a lot of times when

17   I'm giving those type of commands that people get

18   confused.

19   Q      What do you do when you realize they're

20   confused in response to them?

21   A      I redirect them.  And it's almost -- I've

22   got a pretty stern voice, and people -- I haven't

23   had a lot of problems with that.  But once they're

24   back on task -- and if they take a couple of

25   incorrect steps, or if they don't go all the way

121

1   around and I'm saying, "Turn all the way around.

2   No, all the way around.  Keep going.  Do it now,"

3   stuff like that, they'll normally comply.

4           But, sure.  Sure, they can -- you

5   know, in that type of situation, they might be to

6   where they're not hearing me correctly.

7   Q       So is it fair to say you would take things

8   more slowly if you think that a suspect might be

9   confused?

10  A       No.

11  Q       And in those circumstances where you're

12  describing where you're giving orders such as

13  "turn around, move a little to your left," that

14  sort -- that sort of thing, how do you know that

15  they're confused?

16  A       How do I know they're confused?  If I say,

17  "Move to the left," and they move to the right.

18  If I say, "Turn around," and they hit a knee.  If

19  I say, "Move back to the sound of my voice," and

20  they get back in the car.

21  Q       So that tells you that they're confused --

22  how do you tell the difference between them being

23  confused and them just not wanting to comply?

24          MS. VINSON:  Object to speculation.

25          THE WITNESS:  I -- I don't until

122

1        it's over with.

2    BY MS. LaVARCO:

3     Q      In a suspect apprehension context, if a

4    suspect is moving slowly, does that pose a threat

5    to the public?

6     A      No.

7              MS. VINSON:   Object to speculation.

8    BY MS. LaVARCO:

9     Q      If there are multiple officers on a scene,

10   which as I understand there often is, how do you

11   decide who gives orders to who?

12    A      You go based off of the senior-ranking

13   person a lot of times.  Or generally whoever's on

14   scene first is going to have complete control of

15   the scene because they've got all the information.

16    Q      So does that person typically instruct the

17   people who arrive after who they should give

18   orders to or whether they should give orders?

19    A      Depends on the situation.  A lot of times,

20   it's -- it's like an amoeba.  It's constantly

21   growing once you get there, and you really don't

22   know which way it's going to go.  So we go based

23   off of our experience on what's happening and what

24   needs to happen next based on the resources that

25   we get at that time.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

123

1   Q      Is there ever an issue with cross talk to

2   suspects if there are multiple officers on a

3   scene?

4   A      Yes.

5   Q      How do those issues show up?

6           MS. VINSON:  Object to form.

7           THE WITNESS:  With -- with me -- I

8       mean, you'll hear me on a scene say, "Hey,

9       stop.  I got it.  I got it," because I

10      don't want that confusion for the suspect.

11  BY MS. LaVARCO:

12   Q      Right.

13   A      Again, I've got a real loud, commanding

14  voice.  A lot of times I take lead as being the

15  guy who has the big, controlling voice.  But if

16  someone's got it and they've got it handled and

17  I've got a little female there with a big, strong

18  voice and she's all over it, I ain't got no

19  problem with that.  I'll be reserved and just be

20  support for that officer.

21   Q      And in your experience, when there are

22  multiple officers and multiple suspects on the

23  scene, how do you prevent against confusion about

24  which officers are giving orders to which suspect?

25   A      You ever heard of a "poop sandwich"?

KERRY LEE THOMAS vs                                         Wayne Schultz
ERIC M. BRUSS

124

1    Q      I have not.

2    A      Okay.  Well, when you have a poop sandwich

3    and you have a bunch of friends there, you just

4    eat it one bite at a time.  So when you got a lot

5    of components and a lot of moving stuff on a

6    scene, you just let it start -- it's like peeling

7    an onion.  Take it one layer at a time.

8            You got to be slow and methodical and

9    do it the right way, but the slow and methodical

10   could look very, very fast, if someone watches a

11   video of it, based on what is the -- what are the

12   actions from the people we're dealing with?  What

13   is the time frame?  How long before we start

14   losing evidence?  How long before people start

15   coming out of their houses and now I've got other

16   people in danger?

17           So there's a multitude of factors that

18   come into place every single time I unass a patrol

19   car.

20   Q      So in the poop sandwich analogy that you

21   just gave --

22   A      Poop sandwich.  You like that?  Yeah.

23   Q      -- you said you take it one bite at a

24   time --

25   A      One bite at a time.

125

1   Q       -- and that was in my response to the --

2   in response to my question about --

3   A       Well, I said invite a lot of friends.  So

4   if all my friends are there, we all get a bite of

5   the poop sandwich.

6   Q       Okay.

7   A       Does that make sense?

8   Q       So I'll try to make sense of it at some

9   point.

10  A       Okay.  You got it.

11  Q       So this analogy where you say "one bite at

12  a time," right, for the poop sandwich or whatever

13  it is that you like to eat --

14  A       Well, I don't like to eat that, just so

15  you know.

16  Q       Okay.  So "one bite at a time."  Does that

17  mean that one person gives orders to one suspect

18  until that suspect is brought into compliance, and

19  then another officer gives orders to the other

20  suspect?

21  A       Again, it depends on the situation.  You

22  could have -- let's say I've got three suspects in

23  a car, and they're all getting out at the same

24  time.  They're all doing the same thing.  You

25  could have three officers -- you could have six

KERRY LEE THOMAS vs                                      Wayne Schultz
ERIC M. BRUSS

126

1    officers on scene.  Two are giving orders to one,

2    two are giving orders to another, and two are

3    giving orders to a third.  It just depends on the

4    totality of the circumstance.

5              If I've got passive people on the

6    scene and everybody's passive and complying, then

7    we -- one at a time.  That's that poop sandwich,

8    one at a time.  But sometimes you can't eat the

9    sandwich.

10   Q    What's an example of one bite of the

11   sandwich that you might take to control the scene?

12             MS. VINSON:  Object to form.

13             THE WITNESS:  Taking a -- making

14        sure you've got an approach -- one of the

15        things is making sure that all your

16        officers are in a position to where

17        they're safe to give orders.  That's one

18        thing.

19   BY MS. LaVARCO:

20   Q    Any other bites, as examples?

21             MS. VINSON:  Object to form.

22             THE WITNESS:  Yes.  Making sure

23        that you're to where they can actually

24        hear you.  Because I don't want to be five

25        houses away giving instructions to someone

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

127

1        when I don't know if they can hear me or

2        not.

3   BY MS. LaVARCO:

4    Q     Any other things that you might do to

5   control the situation?

6    A     I would make sure that there are people

7   not coming into the scene.  I would make sure I've

8   got officers established to where we don't have

9   additional incidents happening at the same time

10  and we don't have people that are putting

11  themselves in harm's way not knowing that they are

12  putting themselves in harm's way.

13   Q     What else?

14   A     That's all I can think of.  It's a lot of

15  sandwich.

16   Q     It is a lot of sandwich.

17   A     I'm going to need Brittany to put on some

18  glasses.  You're the only one that doesn't have

19  glasses.  If you can do that, I'd appreciate it.

20         MS. VINSON:  I'm undercover.

21         MS. LaVARCO:  Brittany does look

22      good in glasses, in my humble opinion.

23         THE WITNESS:  I didn't know who she

24      was because last time she had glasses on.

25

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

128

```
 1    BY MS. LaVARCO:
 2     Q     What are the signs that someone might be
 3    armed with a firearm?
 4              MS. VINSON:  Object to form.
 5              THE WITNESS:  Great question.  You
 6          tell me.  I know that I'm supposed to be
 7          educating you, but...
 8              I don't know.  When you're first
 9          approaching someone, a bulge in the pants,
10          furtive movements, trying to adjust their
11          waistline to where -- maybe they've got a
12          Beretta 92, like Mel Gibson carried in
13          "Lethal Weapon" and it's slipping down
14          their pants.  A multitude of things.
15              But, again, I have found a
16          Beretta 25 in a guy's butt crack.  So did
17          I know that gun was in his butt crack?
18          Nope.  Not until I searched him.
19    BY MS. LaVARCO:
20     Q     Does some type of clothing allow you to
21    conceal a firearm more easily, in your training
22    and experience?
23     A     Sure.
24     Q     What types of clothing allow you to
25    conceal a firearm more easily?
```

129

1    A      Big, bulky clothing.  I've found a lot of

2   small-caliber firearms in sweatpants with big

3   pockets.  Coats, sweaters, fanny packs.

4    Q     Is it easier to carry a firearm on your

5   person if you're wearing sweatpants or if you're

6   wearing jeans?

7                MS. VINSON:  Object to form.

8                THE WITNESS:  Easier?  I've got a

9        little gun that clips on my sweatpants

10       just fine and it will go on my jeans just

11       fine too.  It's the exact same.

12   BY MS. LaVARCO:

13   Q     What about without a clip?

14               MS. VINSON:  Object to form.

15               THE WITNESS:  Without a clip, that

16       gun would fall down my pants.

17   BY MS. LaVARCO:

18   Q     If you were wearing sweatpants?

19   A      If I was wearing sweats, yeah, it would

20   not be -- I mean, I still could do it, but it's

21   way easier with a clip on it.

22   Q     In most instances in which you've

23   apprehended a suspect who had a firearm, did they

24   have a clip?

25   A      A clip?  You mean a clip to carry the gun

130

1    on their waistband?

2     Q      Yes.

3     A      I would say 99 percent of the time, they

4    did not have a clip.

5     Q      So would you say in most of those

6    instances that it would be harder for them to

7    conceal a weapon if they were wearing sweatpants

8    because they would fall down?

9     A      I --

10                MS. VINSON:  Let her finish.

11                Object to form.

12                THE WITNESS:  I have found several

13        that have holsters that are little, small

14        holsters that are clips that clip to the

15        band that clip to the sweatpants, and I've

16        found a multitude of suspects with

17        sweatpants with guns like that.

18    BY MS. LaVARCO:

19     Q      So you said in about 99 percent of the

20    time, they don't have clips?

21     A      Right.

22     Q      How often would you say suspects have

23    holsters, in your training and experience?

24                MS. VINSON:  Object to form.

25                THE WITNESS:  50/50.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

131

 1  BY MS. LaVARCO:

 2   Q     Is it a crime to carry or possess a

 3  firearm in Texas?

 4   A     It depends on your record.  We're an open

 5  carry state.

 6   Q     What do you mean by that?

 7   A     That means you can -- you can carry a

 8  firearm like the Old West nowadays.  But if you

 9  have a criminal background, you cannot.

10   Q     How do you know if someone who's carrying

11  a weapon has a criminal background?

12   A     That is a great question.  Don't we have

13  good legislature here in Texas?

14   Q     You tell me.

15   A     I can't answer that question.  I can't

16  look at someone and say, "Oh, he's a felon because

17  he's got tattoos on his face," because that causes

18  for what?  Me profiling somebody or something to

19  that nature?  No.

20         So, ultimately, if I see someone with

21  a gun, unless I have reason to say, "Hey, why do

22  you have a gun," can I really identify him?  Texas

23  doesn't give us that fortitude.

24   Q     I see.

25         Do you have a duty to render medical

132

1  aid when a suspect's been injured during an

2  apprehension?

3   A     Sure, I do.

4   Q     What does that duty entail?

5   A     That's just me saying I'm going to go up

6  there and provide whatever first aid I can.  We

7  don't have a -- there's no policy for it.  That's

8  just us having good moral turpitude.

9   Q     Do you carry a first aid kit with you?

10   A     Yes, I do.

11         Well, I did in my patrol car.  I think

12  I've got one in my personal vehicle.  Yeah.

13   Q     In a suspect apprehension context, would

14  somebody's -- when a suspect has been injured, do

15  you wait for emergency medical technicians to

16  arrive, or do you start administrating aid right

17  away?

18   A     It depends on the severity of the wound.

19  If someone's bleeding out, I'm going to go high.

20  Because if not, they could die.  So I'm going to

21  make sure I go high up on their arm.  I'll put my

22  tourniquet that I carry.

23         And when I was on -- I carried a

24  trauma kit -- I was the guy that had -- if there

25  was -- because I was an active shooter instructor,

133

1   I had what's called a "go bag," and in that go

2   bag, I had a lot of extra medical supplies.

3              And if I deployed my own, I would then

4   get another one for me or if there was multiple --

5   I normally had five tourniquets on me at all

6   times.  God forbid I ever had to be in a situation

7   where I needed to use five tourniquets.

8   Q      Uh-huh.  So if a suspect in an

9   apprehension context has a deep puncture wound, is

10  that the kind of situation where you would start

11  administrating aid, or do you wait for an EMT?

12  A      It depends on where the wound is.  I mean,

13  if it struck an artery, I'm absolutely going to

14  employ a tourniquet or some type of life-saving

15  measure, even if I got to stick my finger in it.

16  I've done it.

17  Q      What if the puncture wound is on the leg?

18  A      Well, what part of the leg?  Is it in the

19  femoral artery?  Is it in the calf?  Is it in the

20  tibia?  Is it in the groin?  What part?

21  Q      So do you have training on the placement

22  of arteries throughout the human being?

23  A      I do.  I do.

24  Q      And you employ that training when deciding

25  whether to administer aid?

134

1    A      No.  I'm going to administer aid in any

2    way I can.  I'm going to make them feel

3    comfortable.  I'm going to make sure that if it

4    needs to be elevated, they elevate it.  If it

5    needs to be packed, I'm going to pack it.  And if

6    it needs a tourniquet, I'm going to tourniquet it.

7            If it's someone that's just got a

8    little flesh wound and -- you know, no, I probably

9    won't do anything with it but wait on medical

10   attention to get there.

11   Q      Do you ever administer aid to -- or have

12   you ever administered aid to K-9 bite victims?

13   A      No.

14   Q      Have you ever participated in any K-9

15   training?

16   A      Yes.

17   Q      In what context did you participate in K-9

18   training?

19   A      I was a decoy back in the '90s -- '93,

20   '94, '95, somewhere in that area.  And I actually

21   would go out and wear the sleeve and let the dogs

22   bite me and stuff.

23   Q      What's a "decoy," in that context?

24   A      I was the guy that ran into the woods and

25   hid under the tree limbs and the dog came and

135

1   found me.  I hid in a dryer once.  I couldn't do

2   that now.  I'm way too big.

3    Q     Did you have any role in the K-9 training

4   apart from being the decoy?

5    A     No.

6    Q     Did you participate in the lectures during

7   those K-9 trainings?

8    A     "Lectures"?  What kind of lectures?

9    Q     For example, during a K-9 training that

10  you participated in, was there a trainer who was

11  advising trainees on the use of the K-9s?

12   A     No.  These were -- no.  These were

13  specific -- and I'm sorry.  I didn't mean to talk

14  over you.

15            These were specifically -- I don't

16  even know what to call them -- active trainings.

17  Like, they were trainings to where it was all

18  physical.  There was no classroom.

19   Q     Okay.  So during those meetings --

20   A     We would all meet in a park and go let the

21  dog find us.  We did it for -- I also helped hide,

22  like, explosives and narcotics.  That kind of

23  stuff.

24   Q     What law enforcement agency were you

25  employed with at that time?

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

                                                                    136

1    A       Precinct 4.

2    Q       Of the constable's office in Harris

3    County?

4    A       Yes, ma'am.

5    Q       Have you worked closely with K-9 handlers

6    throughout your law enforcement career?

7    A       I've -- I mean, I've been involved with a

8    lot of scenes where K-9s were deployed, but I

9    was -- any time a K-9 was deployed, we had

10   helicopters too, so...

11   Q       What do you mean you "had helicopters

12   too"?

13   A       Air support.  Have air support come out.

14   So I didn't fly helicopters and I didn't handle

15   dogs, but I wanted them on my scenes to help me

16   catch bad guys.

17   Q       Have you ever supervised any K-9 handlers?

18   A       No.

19           Well -- okay.  In a K-9 capacity or in

20   a deputy capacity?

21   Q       In any capacity.

22   A       Yes.  Because I had K-9 handlers on my

23   shift when I was a sergeant, and I had K-9

24   handlers when I was supervisor at Precinct 4 that

25   just happened to fall under my chain of command,

137

1    but I wasn't responsible for them in a K-9

2    capacity.  Only in a deputy-to-supervisor ratio.

3     Q      Were you responsible for reviewing those

4    K-9 officers' use of force reports?

5     A      Never.  That was all handled by K-9.  Any

6    time anything dealt with K-9, it was specifically

7    handled by K-9 supervisors.

8     Q      Understood.

9              In your training and experience, what

10   factors should be considered before responding

11   with a K-9 in a patrol context?

12              MS. VINSON:  Object to form.

13              THE WITNESS:  Well, I don't know

14        how to answer that.  I mean, a lot of

15        times with Precinct 1, the K-9 handlers

16        were deputies, not just K-9 handlers.  But

17        when I worked for the sheriff's office,

18        the K-9 handlers were only K-9 handlers.

19        They didn't respond to calls.  They only

20        responded to K-9 deployable incidents.

21              So I really can't answer that

22        question.

23   BY MS. LaVARCO:

24    Q      What's a "K-9 deployable incident"?

25    A      To where, let's say, we got a suspect on

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

138

1    the ground that's running, and air support's

2    en route.  The next thing I want -- I want K-9 and

3    I want air support to catch bad guys.

4     Q      Is air support available in every K-9

5    deployment at Precinct 1?

6     A      Unless they couldn't fly, they were

7    available for us.  But I was talking more on

8    the -- you asked about K-9 deployable incidents,

9    and I did this (indicating).  So that was more

10   with the -- with the sheriff's office.

11              The sheriff's office is the big -- is

12   the big brother.  So they're 3,500 police officers

13   versus Precinct 1's like 300 police officers.  So

14   they got all the big toys, the helicopters, the

15   SWAT teams, the dive teams, bomb squad, all the

16   fun stuff you see on TV.

17    Q      So in K-9 deployable incidents in

18   Precinct 1, the Harris County Sheriff's Office

19   would typically be involved to provide air

20   support?

21    A      No.  Generally almost 90 percent of the

22   time, it was DPS, our state police because they

23   fly out of our area.

24    Q      I see.

25    A      And then a lot of times, HPD Fox, which is

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

139

1   the Houston Police Department, their air support,

2   depending on what part of town we were in.

3              But, yes, the sheriff's department did

4   deploy theirs as well.  We had a lot of incidents

5   on night shift.

6   Q      I would imagine.

7   A      Uh-huh.

8   Q      So in K-9 deployable incidents, what other

9   agencies, apart from the constable's office, would

10  be involved?

11  A      Just whatever air support and then us.

12  Q      I see.

13             So no other types of support from the

14  sheriff's office or from HPD Fox?

15  A      Well, the only other time is if -- let's

16  say we didn't have a K-9 available.  I would

17  utilize a K-9 from Houston Police or I would use a

18  K-9 from the sheriff's office or Precinct 1.

19  Q      How would -- how would you get in touch

20  with the Houston Police or the sheriff's office to

21  utilize one of their K-9s?

22  A      With a mighty fine radio.

23  Q      At Precinct 1, who decided when to send

24  out a -- who decided when to send out a K-9-unit?

25             MS. VINSON:  Object to form.

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

140

1             THE WITNESS:  Yeah.  That depends

2        on the incident.  I mean, a lot of

3        times -- let's say a car chase kicked off,

4        right, and it's on the toll road, and now

5        I've got guys that are chasing bad guys

6        that are throwing guns out of the car,

7        narcotics are coming out of the car.

8             If I'm the sergeant responding to

9        that scene, the first two things I say

10       when I respond to that scene is I'll say,

11       "8156, get air support and I need K-9

12       en route to this call."

13            Because what I want -- and that's

14       for the safety of the people that are

15       fleeing as much as it is for the safety of

16       the officers.

17   BY MS. LaVARCO:

18    Q      Understood.

19            So is it true at Precinct 1 that any

20   responding officer can request K-9 support?

21    A      No.  K-9 or supervision.  That's it.

22            So if you're a K-9 handler, you can

23   deploy yourself.  If you're a supervisor, you can

24   deploy K-9.  But a deputy can't say, "Hey,

25   1 Nora 67, I'm going to go ahead and I need K-9 on

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

141

1    this scene."

2                Well, then 8156 better say, "8156, I'm

3    clear on this transmission.  You can deploy K-9 on

4    to that scene."

5    Q     Got it.

6    A     You tracking?

7    Q     I think so.

8    A     Cool.

9    Q     How is using a K-9 different from using

10   other kinds of force?

11   A     I wouldn't be able to --

12                MS. VINSON:  Object to form.

13                THE WITNESS:  I wouldn't be able to

14        answer that.

15   BY MS. LaVARCO:

16   Q     How is using a K-9 different from using a

17   Taser?

18                MS. VINSON:  Object to form.

19                THE WITNESS:  How do I answer that?

20        Using a dog -- I don't know.  That's a

21        dog.  It's an animal.  Using a Taser -- I

22        know how to use a Taser.  I don't know how

23        to use a dog.  So I can't answer that.

24                I know how to use my dogs at home.

25

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

                                                              142

 1   BY MS. LaVARCO:

 2    Q      You have dogs at home?

 3    A      I used to.  I don't anymore.

 4    Q      Would you say that either a Taser or a K-9

 5   is more likely to cause severe injury to a

 6   suspect?

 7            MS. VINSON:  Object to form.

 8            THE WITNESS:  Is the question

 9       you're asking which is more likely to

10       cause injury to a suspect?

11   BY MS. LaVARCO:

12    Q      Yes.  That's right.

13    A      I would say without a doubt the K-9 would

14   cause more damage, depending on what the suspect

15   is doing when the apprehension is made.

16    Q      Would you say that a Taser is more

17   predictable than a K-9?

18            MS. VINSON:  Object to form.

19            THE WITNESS:  That's -- again,

20       that's hard for me to answer.  I'm not a

21       handler.

22   BY MS. LaVARCO:

23    Q      Would you say that one or the other has

24   more room for error?

25            MS. VINSON:  Object to form.

143

```
1              THE WITNESS:  I don't know.  I

2       mean, I -- I haven't seen a lot of

3       problems with K-9s, but I've seen problems

4       with Taser deployments.

5   BY MS. LaVARCO:

6    Q     Did you receive any training at all at

7   Precinct 1 about when it's appropriate to use a

8   K-9?

9    A     No.  That's for handlers.  I'm not a

10  handler.

11   Q     I see.  So only K-9 handlers receive K-9

12  training?

13   A     Right.

14   Q     Did you receive any training about what to

15  do when a K-9 isn't following instructions?

16   A     No.

17   Q     Based on your observations in the patrol

18  context, is a police K-9 bite worse than a

19  domestic dog bite?

20              MS. VINSON:  Object to form.

21              THE WITNESS:  I'm going to say no.

22       Because I've seen some horrific bites from

23       civilian dogs.  I've seen -- well, I had a

24       dog that killed one -- a person that was a

25       domestic dog from next door, came across
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

                                                                    144

1          and killed the neighbor.  And that was --

2          that was a gross -- that was one of my

3          homicide calls.  It was disgusting.

4    BY MS. LaVARCO:

5     Q     Do you know if K-9s are trained to bite

6    particular body parts at Precinct 1?

7               MS. VINSON:  Object to form.

8               THE WITNESS:  Again, I don't -- I

9          don't know anything about the K-9

10         training.

11   BY MS. LaVARCO:

12    Q     In your observations in K-9 deployments,

13   how can you be sure that a dog's not going to bite

14   someone's face?

15              MS. VINSON:  Object to form.

16              THE WITNESS:  I can't be sure of

17         that.  I have no idea.

18   BY MS. LaVARCO:

19    Q     Have you ever seen a K-9 bite someone's

20   face?

21    A     No, I have not.

22    Q     Have you ever seen a K-9 bite someone's

23   neck or chest?

24    A     No, I have not.

25    Q     Have you ever seen a K-9 bite someone's

145

```
 1   genitals?

 2    A      Ew.  But no.

 3              In a movie.

 4    Q      Is a K-9 capable of causing fatal

 5   injuries?

 6    A      Yeah.  I would say yes.

 7    Q      Have you ever seen that happen?

 8    A      No.

 9    Q      Have you ever heard about a K-9 causing

10   fatal injuries?

11    A      No.

12              Just to be clear, every time you say

13   "K-9," I assume you are saying a police K-9.

14    Q      Yes.

15    A      Not -- not c-a-n-i-n-e, which is all dogs,

16   but K-9?

17    Q      Yes.  No.

18    A      Okay.

19    Q      I appreciate that clarification.

20    A      Okay.

21    Q      Yes.  That's correct.  And you've been

22   answering questions --

23    A      Okay.

24    Q      -- with respect to the letter K-9 --

25    A      Yes.
```

146

1   Q       -- as in a K-9 used in a police context?

2   A       One of the -- yes, ma'am.  Yes, ma'am.

3   Q       Okay.  Did you receive any training on how

4   to protect suspects during a K-9 apprehension?

5   A       No.

6   Q       Were you offered any training on how to

7   protect yourself in the face of a K-9 who's not

8   following instructions?

9   A       I will answer this like this:  I was never

10  offered training, like formal training, but I've

11  had every K-9 handler I've been around say, "stay

12  behind me.  Don't get in front of me and the dog,"

13  because the dog will look at me as being bad guy.

14  Q       Is the -- does the K-9 tend to look at

15  whoever's in front of it as the bad guy or the

16  suspect?

17  A       I think what they tend to do is --

18          MS. VINSON:  Object to form.

19          Go ahead.

20          THE WITNESS:  I think what they

21      tend to do is track what they're dealing

22      with, and unless they're on an actual

23      track to where they're looking for a

24      scent, I think it's very easy to be

25      distracted by someone getting in front of

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

147

1          them, and then that bite could go to

2          whoever the person is that intervenes

3          between the K-9 deployment and who they're

4          attempting to actually apprehend.

5     BY MS. LaVARCO:

6      Q      I see.

7             So have you ever seen a K-9 bite a

8     bystander who wasn't a suspect?

9      A      Yes.

10     Q      In what circumstances have you seen that

11    happen?

12     A      It was a burglary scene, and the dog was

13    released on the bad guy.  A guy was out working on

14    a mobile home, ducked under the mobile home, and

15    the dog went under the mobile home and mauled that

16    civilian.

17     Q      Any other instances in which you've seen

18    that happen?

19     A      No.  That was the main one that sticks out

20    in my head.

21     Q      Have you ever seen a K-9 bite a law

22    enforcement officer outside of the training

23    context?

24     A      Oh, yeah.

25     Q      What did that look like?

148

1   A       Horrible.

2   Q       What happened?

3   A       Almost caught the femoral artery, because

4   the individual attempted to take the person into

5   custody at the same time the K-9 was released, and

6   the dog transferred bite and bit the -- it was a

7   female deputy -- bit her inside leg and missed her

8   femoral artery by about a quarter inch.

9   Q       Was that female deputy a K-9 handler?

10  A       She was.

11  Q       Was she the handler for that K-9 that bit

12  her?

13  A       She was not.

14  Q       Have you seen a K-9 bite any other police

15  officer?

16  A       Yes.

17  Q       What other circumstances?

18  A       You talked about the groin.  Biting in the

19  groin.  I had a -- we were on a -- I want to say

20  we were tracking a -- we had, like, about eight

21  guys with AK-47s shoot at us up around the north

22  side of Houston, and of course we chased them.

23  That's what we do.  People shoot at us, we chase

24  them.

25              And we chased them into this wooded

149

1  area, and we had two K-9s, we had air support

2  above -- in fact, we had two helicopters that day,

3  and we all went into the woods after these guys

4  with machine guns.  And one of the deputies

5  decided to get in front of the other deputy to

6  take one of the bad guys into custody, and the dog

7  transfer bit -- didn't bite the suspect, but bit

8  the officer in his genital area.

9   Q      Was that officer the handler or someone

10  else?

11   A      It was an officer that was being dumb and

12  got in the way of the K-9.

13   Q      I see.

14          Any other instances in which you've

15  seen a K-9 bite another officer?

16   A      Nothing to talk about.

17   Q      You can't remember any?

18   A      No.

19   Q      Okay.

20          MS. VINSON:  Can we take a break

21      soon?  Maybe lunch?

22          MS. LaVARCO:  Yeah.  Let me check

23      with Brittany real quick on when we want

24      to take lunch.  Just give me a sec.

25          I think I've only got about five or

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

150

1    six more questions in this section.  Can

2    we get through those and then we can take

3    an hour for lunch?  Does that work?

4            MS. VINSON:  Yeah.  We --

5            THE WITNESS:  Whoa.

6            MS. VINSON:  Sorry.  We don't --

7            MS. LaVARCO:  Oh, you unmuted.

8            MS. VINSON:  We don't need an hour,

9    but if you-all want an hour, that's fine.

10   But we just talked.  We'd be fine with

11   30 minutes.  But yeah.

12           MS. LaVARCO:  Okay.  I think we'll

13   take an hour, if that's okay.  Let's do

14   that.  Thanks.

15           Okay.  Let me finish this up.

16           THE WITNESS:  It's bugging me that

17   the squares keep moving when we mute and

18   unmute.  Because you were over to the left

19   of me, and now you're over there.

20           Okay.

21           MS. LaVARCO:  Keeping you on your

22   toes.

23           THE WITNESS:  Good.  Good.

24           MS. LaVARCO:  You're doing the same

25   for me, so...

                                                           151

 1                    THE WITNESS:  Yup.  That's what I

 2        do, ma'am.

 3    BY MS. LaVARCO:

 4     Q     What is the minimum level of resistance

 5    that justifies releasing a K-9 to bite a suspect?

 6                    MS. VINSON:  Object to form.

 7                    THE WITNESS:  I can't answer that.

 8    BY MS. LaVARCO:

 9     Q     Because you don't know?

10     A     I don't know.

11     Q     Does it matter what the suspected crime is

12    before unleashing a K-9 to bite a suspect?

13                    MS. VINSON:  Object to form.

14                    THE WITNESS:  That -- I would have

15        to know the circumstances.  And, again,

16        I'm not a K-9 handler.  I really don't

17        know that answer.

18    BY MS. LaVARCO:

19     Q     Based on your observations and experience

20    as a law enforcement officer who's worked with K-9

21    handlers, what makes a K-9 handler effective?

22                    MS. VINSON:  Object to form.

23                    THE WITNESS:  I've always gone off

24        being a supervisor and I didn't like bad

25        guys getting away.  I always thought an

152

```
 1          effective K-9 handler is one that caught
 2          bad guys.  That was it.  That was me.
 3   BY MS. LaVARCO:
 4    Q      Any other qualities that makes someone
 5   effective as a K-9 handler?
 6    A      People that communicated well and got
 7   along with other deputies.
 8    Q      Would you say that it's important for a
 9   K-9 handler to be patient?
10    A      At times.
11    Q      What times is it important for a K-9
12   handler to be patient?
13               MS. VINSON:  Object to form.
14               THE WITNESS:  We've talked about
15          this whole time about every incident is
16          different.  There's a multitude of
17          variables that come into play every single
18          time we get out of a patrol car.  I can't
19          answer that objective -- or subjectively.
20               Did I say that right?  Did I ask
21          that right?
22   BY MS. LaVARCO:
23    Q      Is it important for a K-9 handler to be
24   emotionally stable?
25    A      I would say yes.
```

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

153

1   Q      How important is it for a K-9 handler to

2   be emotionally stable?

3              MS. VINSON:  Object to form.

4              THE WITNESS:  I think in -- if

5         you -- in order for you to connect with

6         that dog, you've got to have some type of

7         sensibility that you're actually --

8         although, I mean, some of them get a

9         little -- they maybe connect too much with

10        their dogs sometimes.  But that's them,

11        not me.

12  BY MS. LaVARCO:

13   Q      What do you mean by they "connect too much

14  with their dogs"?

15   A      When -- you know, post -- post taking

16  someone into custody, when they do the whole get

17  happy with the dog and they're hugging them and

18  rubbing them and giving them toys and I'm like,

19  "What the hell?"  But it's -- I'm not a K-9

20  handler.  Maybe I wasn't affectionate enough to be

21  a dog handler.

22   Q      So how important is it for a K-9 handler

23  to be emotionally stable?

24              MS. VINSON:  Object to form.

25              THE WITNESS:  I can't answer that.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

154

1    BY MS. LaVARCO:

2     Q      Is it important for a K-9 handler to be

3    professional?

4     A      Sure.  All police officers should be

5    professional, no matter what your role.

6     Q      Is it more important for a K-9 handler to

7    be professional?

8     A      No.  It's equally important to all people

9    that wear the badge and carry a gun.

10    Q      What does it mean to be professional for a

11   law enforcement officer?

12    A     Act --

13              MS. VINSON:  Object to form.

14              THE WITNESS:  Act with integrity.

15        You know, integrity to me is doing the

16        right thing no matter if someone's

17        watching you or not.  That's what it means

18        to be professional.

19              Carry yourself at a higher -- I

20        don't want to say we're above the public,

21        because we're not.  We are the public.  We

22        just put on uniforms.  I don't put my

23        pants on any different than Brittany does.

24        I mean, maybe.  I don't know.

25              But it's just kind of one of those

155

1          things that to be professional is carrying

2          yourself with a demeanor that shows that

3          you care about what you're doing, and also

4          that you have respect for what you're

5          doing and the people that you involve

6          yourself with on a daily basis.

7    BY MS. LaVARCO:

8     Q      Is it important for a K-9 handler to be

9    ethical?

10    A      Yes.

11    Q      Why is it important for a K-9 handler to

12   be ethical?

13    A      I think it's important for everybody to be

14   ethical.  I don't care what -- you-all should be

15   ethical.  I should be ethical.  Everybody should

16   be ethical.  It's all important.

17    Q      How important is it for a K-9 handler to

18   be ethical?

19    A      As important --

20            MS. VINSON:  Object to form.

21            THE WITNESS:  As important as it is

22        for me to be ethical as not being a

23        K-9 handler.

24   BY MS. LaVARCO:

25    Q      What makes an ethical law enforcement

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

156

1    officer, specifically?

2              MS. VINSON:   Object to form.

3              THE WITNESS:   I really don't know

4         how to answer that.   Having good

5         character, making sure that you have good

6         morals, and you do the right thing.

7    BY MS. LaVARCO:

8     Q     How many K-9 handlers did you work with at

9    Precinct 1?

10    A     Five.

11             Now, they all rotated.   Two was my

12   primary that were on my shift.

13    Q     Who were the K-9 handlers on your shift?

14    A     I had Madison Sperry.   Eric Bruss was one

15   of my handlers when I was a corporal on second

16   shift.   Robert Johnson was a handler, but he

17   wasn't my handler.   I was his subordinate.

18   Courtney -- I can't remember Courtney's last name.

19   And then the girl that got bit, I can't remember

20   her name either.   But those were the five.

21             Lori?   I don't remember.

22    Q     Was Robert Johnson an effective

23   K-9 handler?

24    A     He was.

25    Q     Would you describe Robert Johnson as

157

1   patient?

2    A     At times.

3    Q     Would you describe Robert Johnson as

4   patient in a patrol context?

5    A     Yeah.  When he needed to be patient, he

6   was patient.

7    Q     Would you describe Robert Johnson as

8   emotionally stable?

9    A     Yes.  The Robert Johnson I knew, yes.

10   Q     Did you later come to find out that he was

11  not emotionally stable?

12   A     I -- well, I don't know if he was

13  emotionally unstable, but he did some stuff that I

14  wouldn't approve of.

15   Q     When did you find out about the stuff that

16  you wouldn't have approved of?

17   A     When he shot himself.

18   Q     That's when you first found out that he

19  did stuff you wouldn't have approved of?

20   A     Yup.  I was in San Antonio and got a phone

21  call from my lieutenant.

22   Q     Who was your lieutenant?

23   A     Scott Boyce.

24   Q     Would you describe Robert Johnson as

25  professional?

KERRY LEE THOMAS vs                                      Wayne Schultz
ERIC M. BRUSS

                                                                158

1    A      Yes.

2    Q      Would you describe Robert Johnson as

3    ethical?

4    A      Yes.

5             MS. LaVARCO:  Okay.  I think we can

6        take a break now.  I'm sure the folks want

7        to eat lunch.

8             MS. VINSON:  We'll come back at

9        1:00?

10            THE VIDEOGRAPHER:  We are now --

11            MS. LaVARCO:  Can we come back at

12       2:05?  Is that fine?

13            MS. VINSON:  Sorry, not --

14            THE WITNESS:  You're in New York.

15       We're going to come back 1:00.

16            MS. LaVARCO:  Yes.  Yes.  You come

17       back at 1:05, you come back at 2:05.  Make

18       sense?

19            THE WITNESS:  Yes.  Perfect.

20            MS. VINSON:  Got it.

21            THE VIDEOGRAPHER:  We are now going

22       off the record.  The time is 12:04 p.m.

23          (Recess from 12:04 p.m. to 1:07 p.m.)

24            THE VIDEOGRAPHER:  We are now on

25       the record.  The time is 1:07 p.m.

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

159

1   BY MS. LaVARCO:

2    Q     Welcome back, Mr. Schultz.

3    A     Glad to have you.

4    Q     Can I ask:  During the break, did your

5   lawyers give you any feedback on your answers to

6   my questions?

7    A     No.

8    Q     During the break, did your lawyers give

9   you advice on how to answer my questions going

10  forward?

11   A     No.

12            MS. VINSON:  Shirley --

13            THE WITNESS:  What?

14            MS. LaVARCO:  Thank you.

15            MS. VINSON:  I'm going to object to

16       the improper questions about

17       attorney-client privileged information.

18  BY MS. LaVARCO:

19   Q     Mr. Schultz, did you receive any training

20  on the duty to intervene while you were employed

21  with Precinct 1?

22   A     I didn't catch what your -- the middle of

23  that question was.  Ask me that again.

24   Q     Okay.  Did you receive any training on the

25  duty to intervene when you were employed with

160

1    Precinct 1?

2    A      On the duty to intervene?  Is that what

3    you're -- you're breaking up right when the

4    keyword comes on.

5    Q      Oh, okay.  Let me see if I --

6    A      I think you said --

7                MS. VINSON:  Hold on.  Hold on.

8                THE WITNESS:  Okay.

9                MS. VINSON:  It feels like that

10        one's breaking up, but mine's not.

11               THE REPORTER:  Yeah, I can hear it

12        fine, for what it's worth.

13               THE WITNESS:  Okay.  Try it again,

14        Shirley.

15               MS. VINSON:  Let me plug in the

16        charger over here now.  Maybe that will

17        help.

18               MS. LaVARCO:  Okay.  I can wait for

19        you guys to get situated over there and

20        then we'll try again.  I definitely want

21        you to be able to hear me, Mr. Schultz.  I

22        don't want you to have to struggle.

23               THE WITNESS:  I am ready.  Try it

24        again.

25

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

161

1   BY MS. LaVARCO:

2    Q     Okay.  Did you receive any training on the

3   duty to intervene while you were employed with

4   Precinct 1?

5    A     No.

6    Q     Are you familiar with Precinct 1's policy

7   on the duty to intervene?

8    A     I've -- if there is a policy on it, I'm

9   sure I've read it.  But no.

10   Q     Do you know whether there is a policy on

11  the duty to intervene at Precinct 1?

12   A     I do not.

13   Q     Do you know what the duty to intervene is?

14   A     I do not.

15   Q     Have you received any training at all on

16  the duty to intervene during your time as a law

17  enforcement officer?

18   A     Not as a primary training, no.

19   Q     Has the duty to intervene been a topic in

20  any other training during your time as a law

21  enforcement officer?

22   A     Nothing that's standing out in my head,

23  no.

24   Q     Have you received any training on what to

25  do when you see another law enforcement officer

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

162

1   using excessive force?

2    A      So something came out with Precinct 1

3   probably a year before I left.  There was a new

4   policy that came out, and it was about basically

5   tattling on other agencies if you saw something

6   that was excessive.  But I believe it applied to

7   our agency as well, but we had no training on it.

8    Q      What do you mean by "tattling on other

9   agencies"?

10   A      Well, like if I was in the area of Houston

11  Police Department, and I saw a Houston police

12  officer roughing someone up or being overly

13  aggressive or using more force than was necessary,

14  it's our duty, as Texas peace officers, now to

15  report it.

16          Not -- it didn't say anything about

17  intervening.  I think that's just common sense,

18  depending on the officer.  But, no, the

19  intervening was never a part of any training.

20   Q      What did you think about that policy that

21  required you to report when other -- when members

22  of other law enforcement agencies were using more

23  force than necessary?

24   A      I think that's great.  I think if people

25  are doing the wrong thing, they need to be -- it

KERRY LEE THOMAS vs                                        Wayne Schultz
ERIC M. BRUSS

163

1    needs to be documented and it needs to be

2    addressed.  100 percent.

3     Q     Did that policy also require you to report

4    when officers from your same agency were using

5    force that you thought was excessive?

6     A     Yes, ma'am.

7     Q     Was that policy put in place before or

8    after the incident giving rise to this litigation,

9    so before or after February 2021?

10             MS. VINSON:  Object to form.

11             THE WITNESS:  And after.

12   BY MS. LaVARCO:

13    Q     After.

14             Do you know approximately when?  What

15   month or year?

16    A     I do not.

17    Q     Do you remember whether that was part of a

18   proposed countywide use of force policy?

19    A     I can't recall if it was countywide or if

20   it was state legislature that came out.  I can't

21   recall.

22    Q     Do you know what the policy was called?

23    A     I do not.

24    Q     How did you learn about the policy?

25    A     It was sent in an email.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

164

1   Q      Who sent the email?

2   A      Don't recall.

3   Q      Was it sent in an email to your Precinct 1

4   email address?

5   A      Yes, ma'am.

6   Q      Does the -- did the policy apply

7   regardless of whether the officer committing

8   excessive force is your superior?

9   A      It didn't address who it was.  It just

10  said "another officer."

11  Q      Did the policy address whether you should

12  report an officer for fabricating evidence?

13  A      No.

14  Q      Do any Precinct 1 policies address whether

15  you should report another officer who you believe

16  to have fabricated evidence?

17          MS. VINSON:  Object to form.

18          THE WITNESS:  I don't know.  I

19      would say yes.  That just makes common

20      sense to me.

21  BY MS. LaVARCO:

22  Q      Have you ever reported another officer for

23  using force that you thought was excessive?

24  A      No.

25  Q      Have you ever reported another officer for

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

165

1   using language that you thought was inappropriate

2   or foul?

3    A      No.

4    Q      Have you ever reported another law

5   enforcement officer for any reason at all?

6    A       No.  It depends on how you look at that.

7   I was a supervisor that handled those complaints

8   from other people that came in.  So I had to

9   address them on a board and go forward with them.

10  So --

11   Q      What was --

12   A      Like for policy violations during a

13  pursuit or policy violations during a use of force

14  or policy violations during a crash, I was the

15  supervisor over that when I was a lieutenant at

16  Precinct 4.

17   Q      I see.

18            Does Precinct 1 policy require you to

19  step in when you see a fellow officer using

20  excessive force?

21   A      I can't -- I don't know.  Me, I would.

22  But I don't know that answer.

23   Q      And that board that you sat on, you said

24  you sat on that board during Precinct 4 and you

25  conducted -- or while you were employed with

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

166

1    Precinct 4 and you conducted use of force reviews?

2    A      Uh-huh.

3    Q      Is that accurate?

4    A      Yes.

5    Q      What were your other responsibilities on

6    that board?

7    A      What was that?

8    Q      What were your other responsibilities on

9    that board?

10   A      All I was was just a mediator.  I was a

11   mediator.

12   Q      What is a mediator's role on that board?

13   A      So oversee everyone else when they were

14   done with their investigation.  I was just the

15   person that was overseeing that it was being

16   justly investigated.

17   Q      How did you ensure that it was being

18   justly investigated?

19   A      Just making sure they were following

20   policy.

21   Q      Making sure that the investigators were

22   following policy or making sure that the people

23   who had reports against them were following

24   policy?

25   A      Both.

167

1   Q      How long did you serve on that board?

2   A      Oh, I promoted up again.  Probably a year.

3   Q      What do you mean by you "promoted up

4   again"?

5   A      When I made captain, I wasn't on it

6   anymore.

7   Q      I see.

8          So what rank did you hold while you

9   were on that board?

10  A      Lieutenant.

11  Q      And what was the name of that board?

12  A      "The Use of Force Board."

13  Q      Is there a similar board at Precinct 1?

14  A      Don't know.

15  Q      Has anyone ever tried to stop you from

16  violating department policy?

17  A      No.

18  Q      Has anyone ever tried to stop you from

19  violating the law?

20  A      Maybe I was speeding once and my wife told

21  me to stop speeding.

22  Q      Any other instances?

23  A      No.

24  Q      When you were serving as a mediator on the

25  use of force review board, did you ever have to

KERRY LEE THOMAS vs                                                Wayne Schultz
ERIC M. BRUSS

168

1    evaluate whether an officer should have intervened

2    to stop excessive force?

3     A      I don't recall.  I'm trying to think.

4    There was a bunch.

5              No.

6     Q      About how many use of force reviews would

7    you say that you conducted while you were a member

8    of that board?

9     A      There wasn't as many as you would think.

10   Maybe 20 of them.  Maybe.

11    Q      And how are use of force -- uses of force

12   referred for investigation to the board?

13    A      Just to make sure the policy was followed

14   and the use of force was actually necessary during

15   the arrest.

16    Q      Was it automatically referred?

17    A      Was it what?

18    Q      How did complaints make it to the use of

19   force review board?

20    A      Okay.  It wasn't complaints.  It was any

21   time use of force was employed, it had to go to a

22   board to make sure it was justifiable force.  It

23   wasn't anything from citizens complaining.

24   Anything with that would have been going to

25   internal affairs.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

169

1   Q      I see.

2          So any reported use of force was

3   automatically referred to the use of force review

4   board?

5   A      Correct.

6   Q      Have you ever sat in any other board in

7   which you were asked to review other officers' use

8   of force?

9   A      No.

10  Q      What materials did the board consider when

11  making their determinations about whether force

12  was appropriate?

13  A      Ask me that again.  Sorry.

14  Q      When deciding whether the use of force was

15  appropriate in the board you served on, what

16  materials did the board consider?

17  A      They considered the report, the bodycam

18  footage, and the footage from the arbitrator, the

19  dash cam.

20  Q      During those investigations, were

21  witnesses consulted?

22  A      If need be, yes.

23  Q      Civilian witnesses were consulted?

24  A      If they needed to be.  But if it got to

25  where civilians needed to be involved, it was

170

1    going to internal affairs.

2     Q     Of the 20 or so complaints that you say --

3    sorry.  I'll rephrase.

4              Of the 20 or so instances in which you

5    were asked to evaluate whether a use of force was

6    appropriate, on how many occasions was the use of

7    force found inappropriate?

8     A     Not one.

9     Q     On that board, did you refer to precinct

10   policy in deciding whether the use of force was

11   appropriate?

12    A     Policy and the law.

13    Q     How did -- how did members of the board

14   come to understand the law and what was

15   appropriate?

16    A     By reading it.

17    Q     What forms of law would they read?

18    A     Code of Criminal Procedures, Penal Code,

19   and policy.

20    Q     Would they read case law?

21    A     No.

22    Q     Would they read memoranda describing case

23   law?

24    A     No.

25    Q     Would they consult any other materials to

171

1    understand what the law required with respect to

2    the use of force?

3     A      No.

4     Q      Did you receive any training in advance of

5    sitting on this board?

6     A      No.  I was just lucky to be the lieutenant

7    that got assigned to it.

8     Q      When you say "lucky," do you mean it

9    genuinely, or are you being sarcastic?

10    A      No.  I enjoyed it.  I enjoyed seeing what

11   they were doing out there.

12    Q      I see.

13    A      Sorry if I sounded sarcastic.

14    Q      Oh, no, you didn't.  I just wanted to

15   understand, because tone's a little bit difficult

16   sometimes over Zoom.

17    A      Sure.

18    Q      And if I look away for a moment, it's

19   because my brain is not all-knowing and full of

20   capacity, so it's not that I don't want to look at

21   your face.

22    A      Okay.

23    Q      Can you tell me your current cell phone

24   number?

25    A      Yes.  ███████████

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

172

1    Q       And how long have you had that number?

2    A       Oh, six months.  Seven months.

3    Q       Why did you change your phone number?

4    A       Just decided -- my wife and I decided to

5    change our numbers.

6    Q       How come?

7    A       No reason.

8    Q       Were people contacting you that you'd

9    prefer not contact -- contacted you?

10   A       We'll say -- yeah.  We'll say some of my

11   past came up and it was better to change my phone

12   number.

13   Q       What from your past came up?

14   A       Just personal stuff.

15   Q       I apologize if this is personal, but I

16   have to ask:  What sort of personal stuff came up

17   that required you to change your phone number?

18   A       I was waiting on that.

19           MS. VINSON:  I mean, if it's

20       confidential and you don't need to talk to

21       me because you don't feel like you should

22       answer it, we can take a break.

23           THE WITNESS:  No, it was just, I

24       guess, like, ex --

25           MS. VINSON:  Especially if it

1      relates to your wife or something that's

2      not related to this case, they don't get

3      to know everything and anything that's

4      personal and confidential.  So there are

5      boundaries.

6  BY MS. LaVARCO:

7   Q    Do you want to say in general terms,

8  Mr. Schultz?  Would you feel comfortable with

9  that?

10   A    Let's just say ████████████████████

████████████████████████████████████████████

██████████  and we decided to change our numbers

13  collectively.

14   Q    Understood.

15      Was there any other factor that led

16  you to change your phone number?

17   A    No.

18   Q    Do you currently have any other phone

19  numbers?

20   A    I have a work phone number.

21   Q    What's your work phone number?

22   A    That's a great question.

23      I don't -- I don't know.

24  ████████████████  I think.

25      MS. LaVARCO:  Ms. Vinson, would you

174

1         be willing to verify Mr. Schultz's phone

2         numbers after the deposition?

3               MS. VINSON:  Sure.

4               MS. LaVARCO:  Thank you.

5               THE WITNESS:  I'm pretty sure

6         that's it.

7    BY MS. LaVARCO:

8     Q      And is that for your current sales gig?

9     A      It is my current sales gig, yes.

10    Q      And what about at your -- phone number

11   before the current sales gig?  Where were you

12   employed then, again?  Can you remind me?

13    A      Before -- what you mean, with the

14   Vacations To Go place?  I didn't have a phone

15   number.

16    Q      Yeah.  And then before that, immediately

17   before that, were you with Precinct 1 or were you

18   somewhere else?

19    A      That was when I was at Precinct 6 for that

20   week.

21    Q      Right.

22    A      Then Precinct 1, and I didn't have a cell

23   phone there.  I had --

24    Q      You didn't --

25    A      -- a personal cell phone, but not a work

1    phone.

2    Q       Okay.  You had your personal cell phone at

3    both Precinct 6 and Precinct 1?

4    A       Yes.

5    Q       And you did not have a work phone at

6    Precinct 1?

7    A       I did not.  I didn't become cool until I

8    started working for EPS.

9    Q       And you didn't have a work phone at

10   Precinct 6 either?

11   A       I did not.

12   Q       And before you changed your cell phone

13   number about six months ago, what was your number

14   before that?

15   A       ████████████████

16   Q       Do you know approximately how long you had

17   that number?

18   A       Eons.  Probably longer than you've been

19   alive.

20   Q       Okay.

21   A       Just kidding.

22   Q       And what cell phone provider do you

23   currently use?

24   A       AT&T.

25   Q       Have you used AT&T for the entire time

176

1   since you changed your number six months ago?

2    A      I think I've grown -- yeah.  I think I

3   started with Nextel, it became Sprint, and it

4   became AT&T, and I've been with them forever.

5    Q      Okay.  Nextel to Sprint to AT&T.  Is that

6   all for the number ending in ███?

7    A      No.  ███.

8    Q      Okay.  So the one ending --

9    A      I've only had the ███ for six months.

10   Q      And which providers did you use for the

11  8354?

12   A      Only AT&T.

13   Q      Only AT&T.  Okay.

14          And then just so I understand, the

15  number ending in ███, the one that you had for

16  eons, you were with Sprint?

17   A      See, you're not paying attention.  You're

18  not paying attention.  So I'm going to help you

19  because you're not paying attention.

20   Q      I appreciate it.

21   A      So that is my work phone number that you

22  just gave, the 888.

23   Q      Okay.

24   A      I haven't had that for eons.  ███ I've

25  had for eons.

177

1  Q       And your phone provider is with the phone

2  number ending in ███?

3  A       Yes.  That's the AT&T eons phone number.

4  Q       "The AT&T eons phone number"?

5  A       There you go.

6  Q       And at some point, you also had Sprint

7  and --

8  A       They've all been the same provider, just

9  one bought out the next.

10  Q       I see.

11          And what phone provider is the work

12  phone that you currently have ending in ███?

13  A       That is a great question.  I don't know.

14  Q       Does your job provide you with that

15  phone --

16  A       Yes.

17  Q       -- or did you purchase it yourself?

18  A       No.  They provide it to me.

19  Q       What kind of phone is it?

20  A       I think -- I think it's AT&T also.

21          It's an iPhone.

22  Q       Do you know what model?

23  A       It's like a 3.  It's like the best money

24  can buy.

25  Q       And what about your current personal phone

178

1    number?  What model phone do you have?

2     A     It's a Galaxy S22.

3     Q     And have you had the Galaxy S22 since you

4    changed your number to that?

5     A     Yeah.  I've had that phone a pretty good

6    long time.

7     Q     So since you got that number, the 8354

8    number about 6 months ago, you've had the Galaxy

9    S22?

10    A     Yes.

11    Q     And what about before you changed your

12   phone number?  What phone did you have then?

13    A     Galaxy S22.

14    Q     How long have you had the Galaxy S22?

15    A     Like two-and-a-half years.  Almost three

16   years.

17    Q     Have you had any other phone numbers

18   between now and February 2021?

19    A     No.

20    Q     Do you have any of your old phones that

21   are no longer in use?

22    A     No.  Not --

23    Q     What did you do with your old phones?

24    A     I probably threw them out.  No reason to

25   keep them.

KERRY LEE THOMAS vs                                              Wayne Schultz
ERIC M. BRUSS

179

1              I might have traded in the last one.

2   I think I traded in the last one.

3    Q     Do you remember when that was?

4    A     I have no idea.  I'm old.

5    Q     But something like more than -- what did

6   you say -- you've had this Galaxy phone for

7   two-and-a-half years?

8    A     Uh-huh.

9    Q     So maybe --

10   A     About that time.

11   Q     Okay.  And what was the phone that you

12   traded in?

13   A     That's a great question.  I don't know.

14   S20 --

15   Q     Do you remember --

16   A     S20 maybe.  S -- I don't --

17   Q     And that's another Galaxy?

18   A     I've always -- yeah.  It's always been

19   Google -- or not Google.  Android.

20   Q     Android.  Okay.

21   A     I'm not a real fan of iPhones.

22   Q     I'm with you.

23              Do you use a landline?

24   A     No.  How barbaric.

25   Q     Have you used a landline at any point

180

1    within the last, say, five or six years?

2     A      No.   The last time I used a landline, it

3    went like this (indicating).

4     Q       Do you currently use a business phone

5    apart from the ███ number?

6     A       No.   No.

7     Q       Do you use an application called "Facebook

8    Messenger"?

9     A       I haven't in a long time.

10    Q       Why did you stop using it?

11    A       I got rid of Facebook.

12    Q       When did you get rid of Facebook?

13    A       A year and a half ago-ish.

14    Q       Why did you decide to get rid of Facebook

15   a year and a half ago?

16    A       Just a lot of drama on Facebook.   People

17   just don't know how to just keep to themselves.

18             Whoops.   You're frozen.

19    Q       Oh, can you see me now?

20    A       Everybody's frozen but me.

21             MS. LaVARCO:   Celena, are you able

22        to see us?   Because we can see you.

23             THE VIDEOGRAPHER:   Nothing is

24        frozen on my end.   Do you want to give it

25        a moment or go off the record?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

181

```
 1            MS. LaVARCO:  It says over here
 2      your internet connection is unstable,
 3      so --
 4            THE WITNESS:  Okay.
 5            MS. VINSON:  Can you-all hear me
 6      now?
 7            THE VIDEOGRAPHER:  Yes, ma'am.
 8            MS. LaVARCO:  We can hear you.
 9            MS. VINSON:  It just had a message
10      that said our internet connection is
11      unstable, so maybe it was us.  But, yeah,
12      you were frozen.
13            THE WITNESS:  We're good now.
14            MS. LaVARCO:  We're good now?
15      Okay.
16            MS. VINSON:  I think we're good.
17            THE WITNESS:  You switched spots.
18      You and Celena switched spots is throwing
19      me off.
20            MS. LaVARCO:  Musical chairs.
21      Okay.  If we have tech issues again, let
22      me know and we'll go off the record for a
23      couple of minutes.
24   BY MS. LaVARCO:
25    Q    So you said you deleted Facebook about a
```

182

1    year and a half ago because there was a lot of

2    drama?

3     A      Just a lot -- yeah.  People posting stuff

4    that I didn't care about.  I was just like -- I

5    didn't need that, so I'm getting too old to...

6     Q      What kind of stuff were they posting?

7     A      Huh?

8     Q      What kind of stuff do you not need?

9     A      Everything.  I just want stuff about my

10   family.

11    Q      I see.

12            Have you ever used Snapchat?

13    A      Yes.

14    Q      Do you currently use Snapchat?

15    A      I don't currently use it, but I think I'm

16   still available on it.  I haven't had it installed

17   on my phone in probably a year or so.  But I don't

18   think I ever logged off of it.

19    Q      Do you recall your handle or username?

20    A      My handle?  Like "Maverick"?

21            I think it's -- I think it's

22   ███████████."

23    Q      Do you use Instagram?

24    A      Yes.

25    Q      Do you currently use Instagram?

1    A       No.

2    Q       When did you stop using Instagram?

3    A       About the same time I stopped using

4  Facebook.

5    Q       For the same reasons you stopped using

6  Facebook or for other reasons?

7    A       Same.

8    Q       What was your username on Instagram?

9    A       ████████████████████

10   Q       Did you disable your Instagram and

11 Facebook accounts before or after this lawsuit was

12 filed?

13   A       Oh, after.  Because a year and a half --

14 we filed this how long ago now?  I don't know that

15 answer.  I didn't do it -- how long has it been?

16 When did we file this?  Remind me.

17   Q       Did you -- would you say that -- did you

18 delete Facebook about sometime last year?

19   A       Yes -- no.  It was in '22.

20   Q       '22?

21   A       Uh-huh.

22   Q       What was your Facebook username?

23   A       Oh, ████████████  I think.

24   Q       You didn't use your last name?

25   A       No.  Why would I do that?

1    Q      What email address did you use for

2  Facebook?

3    A      I want to say it was the badshark -- my

4  Gmail account.  ███████████

5    Q      What's your --

6    A      ████████████████

7    Q      What other email addresses do you have?

8    A      That's it.

9    Q      You don't have a Yahoo account?

10   A      No.

11   Q      AOL?

12   A      AOL?  AOL, is that old?

13          No.

14   Q      And I hope I'm not about to offend you,

15  but do you have a Hotmail account?

16   A      That does offend me, and I'm done with

17  this interview.

18          No.  No, I don't have a Hotmail

19  account, and I don't have MySpace either, if

20  you're fixing to go there too.

21   Q      You know, I wasn't even -- I wasn't even

22  going to go to MySpace.

23   A      You know that MySpace, Facebook, and

24  Twitter are all about to merge together.  But

25  we'll talk about that later.

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

185

```
1    Q      I'll have to hear what you think about
2  that.
3              Do you use Twitter?
4    A      No.  No.  That's way too much talking.
5    Q      Do you use Twitter as rebranded as X?
6    A      Oh, I didn't even know it rebranded as X.
7  No.
8    Q      Okay.  Have you ever used Twitter?
9    A      No.
10   Q      Do you use YouTube?
11   A      Define using YouTube.  I watch funny stuff
12 on it.
13   Q      Do you watch funny stuff on it with your
14 Gmail account, I guess then?
15   A      Oh, no.
16   Q      Is that right?
17   A      No.  I do watch a lot of how-to videos on
18 YouTube, like how to fix my toilet, how to paint
19 my garden.  You know.
20   Q      How to eat a poop sandwich.  Yes?
21   A      How to eat a poop sandwich.  I'm glad you
22 remembered that, Shirley.
23   Q      How could I forget?
24   A      I'm very upset Brittany didn't put her
25 glasses on after we talked about it, but that's
```

KERRY LEE THOMAS vs                                      Wayne Schultz
ERIC M. BRUSS

186

1   cool.

2    Q      Do you use TikTok, Mr. Schultz?

3    A      I used to have TikTok, and when I went to

4   homicide with the sheriff's office, they made me

5   get rid of it.

6    Q      Why did they make you get rid of it?

7    A      I have no idea.  They did not want us on

8   TikTok.

9    Q      What was your username with TikTok?

10   A      Oh, I have -- I couldn't even tell you.

11  It's been four years.  I couldn't even tell you

12  what it was.

13   Q      Did you post your own videos on TikTok?

14   A      I posted some videos.

15   Q      What were they about?

16   A      The funny stuff that they do when you

17  mimic something.  The one where the guy's falling

18  and he goes (indicating).  That one.  You know,

19  just funny stuff.

20   Q      Did you -- did you post about being a law

21  enforcement officer on TikTok?

22   A      I don't recall if I did or not.  Maybe.  I

23  might have been in uniform in one of the ones I

24  did.  I think I did a "Bad Boys" one, yeah.  It

25  probably happened.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

187

1    Q      Some sort of musical enactment?

2    A      Do what?

3    Q      Some sort of musical enactment?  Is that

4  what you mean?

5    A      No.  It's where they -- I guess you do a

6  mirror image of TikTok when they do it kind of

7  thing.  I don't know what it is.

8    Q      Do you use a messaging app called

9  "Signal"?

10   A      Never heard of it.

11   Q      Have you ever used iCloud?

12   A      No.

13   Q      Do you use Google Drive?

14   A      I don't even know what that is.

15   Q      Do you back up your photos on your Android

16  phone?

17   A      Unfortunately, no.  If you can teach me

18  that after this is over, let me know.

19   Q      Have you ever backed up your photos on

20  your Android phone?

21   A      I don't think so.  I don't know how to do

22  it.

23   Q      You didn't have a child or a stepchild to

24  help you?

25   A      Maybe I need to.

KERRY LEE THOMAS vs                                      Wayne Schultz
ERIC M. BRUSS

188

1   Q      When you changed phones, did your contacts

2   migrate from one phone to the next?

3   A      Yes.

4   Q      When you changed phones, did your messages

5   migrate from one phone to the next?

6   A      Yes.

7   Q      Do you use WhatsApp?

8   A      I have used WhatsApp in the past.

9   Q      Why did you stop using WhatsApp?

10  A      I got out of the unit that I was in that I

11  used it for.

12  Q      What unit was that?

13  A      Special response group.

14  Q      Was that at Precinct 1?

15  A      That was at the sheriff's office.

16  Q      Did you use WhatsApp with Precinct 1?

17  A      No.

18  Q      Did other deputies use WhatsApp at

19  Precinct 1, to your knowledge?

20  A      I don't know.

21  Q      Do you use Reddit?

22  A      I don't -- what is Reddit?

23  Q      No need if you don't know what Reddit is.

24  A      Okay.

25  Q      It's a messaging forum.

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

189

1    A      Oh, okay.

2    Q      Are there any other instant messaging

3    applications that you use?

4    A      No.

5    Q      Do you access your text messages on a web

6    browser?

7    A      No.  No.

8    Q      Do you have a tablet or an iPad?

9    A      No.

10   Q      Have you ever accessed messages on a

11   tablet or iPad?

12   A      No.

13   Q      What electronic communication devices did

14   you use at Precinct 1?

15   A      The computer at work, the computer in the

16   car, and that was it.

17   Q      Is anybody assigned a phone number for

18   work at Precinct 1?

19   A      Maybe command staff.  I don't know that

20   answer.

21   Q      Did you ever take notes by hand at

22   Precinct 1?

23   A      Maybe when I was taking reports.  I had a

24   form that I would fill out stuff on, but I had so

25   many rookies they normally took the reports.

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

190

1    Q      Sounds like a very compassionate

2    supervisor, giving them all the paperwork.

3    A      That sounded like sarcasm, Shirley.

4    Q      Did it?

5    A      A little bit, yeah.  Brittany thought so

6    too.

7    Q      I apologize.

8    A      Look at that big smile on Brittany's face.

9    Q      Did you use any other online forums or

10   groups?

11   A      For -- no.  I don't even need to ask what

12   for what.  No.

13   Q      Okay.  Can you explain to me your duties

14   at Precinct 1 with respect to writing reports?

15             MS. VINSON:  Object to form.

16             THE WITNESS:  Gather information

17       and put the appropriate information into

18       the report in a report form.

19   BY MS. LaVARCO:

20   Q      Is it important to be complete when

21   writing reports?

22   A      Certainly it is.

23   Q      Is it important to be accurate when

24   writing reports?

25   A      Very accurate.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

191

1    Q      Why is it important to be complete and

2    accurate when writing reports?

3    A      Well, that goes back to what you asked me

4    about earlier with ethics and morals and

5    integrity.  If I don't have that, if I'm not

6    putting the right stuff in there and I'm just

7    fabricating information or omitting information,

8    then I'm not doing what I swore to do as a police

9    officer.

10   Q      What was your process for writing reports

11   when you worked at Precinct 1?

12   A      What was my what?

13   Q      Your process?

14   A      "Process."  I thought you said "progses,"

15   and I didn't understand.  I was like -- what was

16   my process?

17          You know, arrive on scene, determine

18   what's happening, make sure there's no -- no

19   situations still ongoing, and then gather the

20   information, talk to witnesses, talk to the

21   victims, talk to the suspects.

22          Once I have all the information

23   together, gather information that I had from the

24   initial call, recall information that I had from

25   dispatch airing information out over the radio,

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

192

1    and placing all that information inside of a

2    document in our report writing system.

3     Q      Did you typically write your reports while

4    you were still on the scene?

5     A      Sometimes I would -- it depends on what

6    kind of call it was.  If it was a burglary or a

7    robbery -- or not a robbery.  A burglary or

8    criminal mischief, something that's kind of -- I

9    know burglary sounds bad, but it's kind of a

10   low-key thing because it's past tense, it's

11   already happened.  I would, a lot of times, write

12   my report there so it was done before I went to

13   the next call, yes.

14            But if something was in progress,

15   there was a lot of moving parts, a lot of things

16   going on, I would refer to bodycam later to

17   document information and write it while I was at

18   the station and I could have a clear mind and not

19   have a lot of scattered stuff going around on the

20   scene.

21    Q      When you were writing reports at

22   Precinct 1, did you document only your firsthand

23   observations or did you also document things that

24   other officers told you?

25    A      If I had said anything about another

KERRY LEE THOMAS vs                          Wayne Schultz
ERIC M. BRUSS

193

1    officer, I would put in the report "refer to their

2    report" or "refer to their supplement."

3     Q      So you wouldn't include details in a

4    report that you didn't personally observe or hear?

5     A      No, ma'am.

6            Well, let me rephrase.  Let me pull

7    back on that.

8            There -- yes.  If there was something

9    that I felt was pertinent to my charge or to what

10   I was doing, I would put a -- maybe a synopsis of

11   what they did to kind of relate to what I needed

12   to relate to for the charge, and then I would say

13   "refer to their supplement for any additional

14   info."

15    Q      Would you do anything to indicate those

16   weren't your firsthand observations?

17    A      By -- yeah.  I would say that that deputy

18   did X or -- yes.

19    Q      In your experience, is it customary to

20   confer with other officers on -- who are on the

21   scene while you're writing your reports?

22    A      Is it customary to refer to other

23   deputies?  Yeah.  Especially if I'm -- like

24   there's times where I, as a field training

25   officer, would respond with a rookie with a

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

194

1    training officer.  And once we got there, because

2    we were the ones that had the new guy with us, I'd

3    gather information from other people and have that

4    rookie gather information from other people so we

5    could make sure that the report was accurate.

6              But then I would follow up and talk to

7    the people they had talked to to get additional

8    information to make sure their accounts were

9    accurate.

10   Q     When you were employed at Precinct 1, who

11   was responsible for reviewing your reports?

12   A     Scott Boyce.  Lieutenant Scott Boyce.

13            Prior to that was Sergeant Robert

14   Johnson.  But when I made sergeant, it was Scott

15   Boyce.

16   Q     When did you make --

17   A     But -- sorry.

18   Q     No.  Go ahead and finish.

19   A     Johnson was my direct supervisor when I

20   first got hired.

21   Q     I see.

22            And did Johnson remain your direct

23   supervisor until he died?

24   A     No.  Because I promoted about six months

25   before that.

KERRY LEE THOMAS vs                                           Wayne Schultz
ERIC M. BRUSS

195

1    Q      I see.

2    A      So we were the same rank when he -- when

3    he shot himself.

4    Q      Okay.  And immediately after that, when

5    you were promoted, you reported to Scott Boyce?

6    A      Correct.

7    Q      Aside from the lawsuit that brought you

8    here today, has anyone accused you of fabricating

9    a written report?

10   A      No.

11   Q      Has anyone accused you of omitting

12   important details from a written report?

13   A      No.

14   Q      Mr. Schultz, I want to ask you about what

15   kind of training you've received about racial bias

16   at Precinct 1.

17           Did you receive training at Precinct 1

18   about racial bias?

19   A      I don't believe I did at Precinct 1.

20   Q      You didn't receive any training about

21   racial bias during the entire time you were

22   employed by Precinct 1?

23   A      Not by Precinct 1.

24   Q      Did you receive training about racial bias

25   from another entity while you were employed by

196

1    Precinct 1?

2     A      We don't call it "racial bias."  We call

3    it "racial profiling."  It's something that we

4    have to take courses in and cultural diversity,

5    and I did take those courses.

6     Q      I see.

7             About how many hours were those

8    courses?

9     A      Oh, I don't recall.  24 hours maybe.  I

10   know one of the classes is 8 hours, and I think

11   the other one is 16.

12    Q      Who put on the racial bias trainings?

13    A      It was TCOLE training.

14    Q      How often were you required to take racial

15   profile training by TCOLE?

16    A      I want to say it's every cycle now.  I'm

17   not -- I'm not positive.

18    Q      What's a "cycle"?

19    A      Every two years.

20    Q      Have you ever received any training on

21   implicit bias?

22    A      I don't even know what that is.

23    Q      Are you aware, Mr. Schultz, that K-9s were

24   used to catch runaway slaves during emancipation?

25    A      I am not aware of that.

KERRY LEE THOMAS vs                                       Wayne Schultz
ERIC M. BRUSS

197

1    Q      Did you become aware of that after we

2    filed this lawsuit?

3    A      Did I become aware of the -- yeah.  The

4    information you-all provided us?  Yes.

5    Q      Did you do any additional reading --

6    A      No.

7    Q      -- on that history?

8    A      No.

9    Q      Are you aware that K-9s were used against

10   prisoners in Nazi Germany?

11            MS. VINSON:  I'm going to object to

12        this line of questioning that assumes

13        facts not in evidence and testimony not in

14        evidence.

15            THE WITNESS:  Does that mean I

16        still answer?

17            MS. VINSON:  You can answer.

18            THE WITNESS:  Oh, my answer is no.

19   BY MS. LaVARCO:

20   Q      Have you read anything about the use of

21   K-9s in Nazi Germany?

22   A      No.

23   Q      What does the phrase "Black Lives Matter"

24   mean, Mr. Schultz?

25            MS. VINSON:  Object to form.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

198

```
 1              THE WITNESS:  It just means that

 2       people of -- the minorities are saying

 3       that their lives matter as much as anybody

 4       else's, and I agree.  Everybody's lives

 5       matter.

 6  BY MS. LaVARCO:

 7   Q     What does the phrase "all lives matter"

 8  mean to you?

 9              MS. VINSON:  Object to form.

10              THE WITNESS:  It means exactly

11       that.  All lives matter.

12  BY MS. LaVARCO:

13   Q     When someone says "Black Lives Matter," do

14  you ever feel threatened?

15   A     No.

16   Q     When someone says "all lives matter," do

17  you ever feel threatened?

18   A     No.

19   Q     Is it common to refer to adult men as

20  "boy" in the law enforcement context?

21              MS. VINSON:  Object to form; calls

22       for speculation.

23              THE WITNESS:  I have no idea.

24  BY MS. LaVARCO:

25   Q     Have you heard fellow officers in the law
```

199

1    enforcement context refer to adult men as "boy"?

2     A      I have not.

3     Q      To your knowledge, did Precinct 1 deputies

4    receive all of their training in-house?

5     A      They do not.

6              MS. VINSON:  Object to form.

7              THE WITNESS:  Sorry.

8              They do not.

9    BY MS. LaVARCO:

10    Q      Apart from TCOLE, where else did

11   Precinct 1 deputies receive training from?

12             MS. VINSON:  Object to form.

13             THE WITNESS:  I don't know where

14        they go, but they don't have to get

15        training just in-house.

16   BY MS. LaVARCO:

17    Q      Where else did you receive training from,

18   apart from TCOLE, when you were employed with

19   Precinct 1?

20    A      Harris County Sheriff's Office and

21   Precinct 1.  Those are the main places.  And

22   TCOLE.

23    Q      Anywhere else?

24    A      Not while I was at Precinct 1.

25    Q      What about when you were at other

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

200

1    precincts of the constable's office?

2    A     Yes.

3    Q     Where else?

4    A     Sam Houston State University, Texas A&M

5    University, Texas Woman's University.

6    Q     Was there a particular program in any of

7    those universities where you received training?

8    A     No.  It was just leadership stuff I was

9    taking.

10   Q     Was that for a particular program or

11   certificate?

12   A     No.

13   Q     Why did you decide to take that training?

14   A     You said was it for a particular program?

15   Q     Uh-huh.

16   A     Yes.  It was called LEMIT.  It's the Law

17   Enforcement Management Institute of Texas.

18   Q     And what did that training entail --

19   A     Leadership --

20   Q     -- in the law enforcement --

21   A     Leadership training.

22   Q     What does leadership training in a law

23   enforcement mean, to your knowledge?

24   A     It's learning more the business side

25   versus the actual law enforcement side.  It's

201

1    actually learning how to do business finance, how

2    to get into payroll, that sort of thing, and

3    getting into speaking, what's your -- what's your

4    qualities and traits are to assist you as a leader

5    in the community to help bring the community and

6    law enforcement together as a team.

7     Q     And during your law enforcement career, in

8    total, were there other entities where you

9    received training from?

10    A       No.

11    Q     Are you familiar with someone by the name

12   of Dennis Benigno?

13    A       Doesn't ring a bell.

14    Q       Tom Rizzo?

15    A       No.

16    Q       Shawn Pardazi?

17    A       No.

18    Q       Kenny Williams?

19    A       No.

20    Q       Scott Kivet?

21    A       No.

22    Q       Sean Barnette?

23    A       I know a Barnett, but I don't think his

24   first name is Sean.

25    Q       Do you know someone named Nick Jerman?

202

```
 1    A      No.

 2    Q      Tommy Brooks?

 3    A      No.

 4    Q      Just a few more.

 5           Brad Gilmore?

 6    A      No.

 7    Q      Rob Ferreiro?

 8    A      No.

 9    Q      Zach Miller?

10    A      It sounds like a country band guy.  But

11  no.

12    Q      "A country band guy"?

13    A      Oh, that's Zac Brown.  Sorry.  Sorry.

14    Q      That's okay.

15           Are you familiar with a police

16  training company called "Street Cop"?

17    A      No.

18    Q      What about "New Jersey Criminal

19  Interdiction"?

20    A      No.

21    Q      Have you ever attended any law enforcement

22  training events or conferences in Atlantic City?

23    A      No.  Sounds fun.

24    Q      Are you familiar with the warrior mindset

25  approach to law enforcement?
```

203

1    A       No.

2    Q       Are you familiar with someone by the name

3    of Colonel Grossman?

4    A       No.

5    Q       Have you read any books or magazines about

6    law enforcement tactics?

7    A       No.

8    Q       Have you written any publications about

9    law enforcement?

10   A       No.

11   Q       Have you ever been accused of misconduct

12   while employed with any law enforcement agency?

13   A       No.

14   Q       Have you ever been accused of excessive

15   force while employed with a law enforcement

16   agency?

17   A       No.

18   Q       Have you been accused of fabricating

19   evidence?

20   A       No.

21   Q       Has a civilian ever filed a complaint

22   against you, to your knowledge?

23   A       I think I have one incident where -- I

24   don't think it was formalized.  I ran a stop sign

25   in my patrol car, and the guy complained on me,

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

204

1    and I got written up.  But I don't think it was

2    formalized.  That's the only thing I can think of,

3    off the top of my head.

4              I was going to a call, but I should

5    have stopped.  My bad.

6    Q    Was a written write-up the only outcome of

7    that?

8    A    No.  It wasn't even a written write-up.

9    It was written counseling.  And, yes, that was all

10   that came of it.

11             Well, and my sergeant told me to stop

12   running stop signs.

13   Q    That sounds fair.

14             Any other times where you've gotten in

15   trouble at work?

16   A    No.

17   Q    Have you ever received a verbal reprimand

18   at work?

19   A    Yes.

20   Q    When?

21   A    I don't know.  I don't remember.  I just

22   remember I got one.

23             Never got one in Precinct 1.  Never

24   got one at the sheriff's office.  Definitely at

25   Precinct 4.  I think I didn't shave once.  And now

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

205

```
1   you notice I don't like to shave, so it stuck with

2   me.  I think I got a verbal reprimand for not

3   being groomed correctly.

4    Q      Were you ever verbally reprimanded for any

5   other reason?

6    A      Not that I can recall.

7    Q      Have you ever been accused of harassment?

8    A      No.

9    Q      Were you ever suspended from a law

10  enforcement job?

11   A      No.

12   Q      When working security, have you ever had

13  to get physical?

14   A      Security?  I've never been a security

15  officer.

16   Q      I might be remembering the instances --

17  your moonlighting gigs.  I'm mischaracterizing

18  those --

19   A      Oh, oh, oh.

20   Q      -- as security.  Were they not security

21  jobs?

22   A      They were -- we're still police officers,

23  but -- yeah.  I see where you're going with that.

24          I don't -- honestly, I don't like to

25  work when I'm working that kind of stuff.  So, no,
```

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

206

1   I can't recall a time where I've gotten physical

2   with anybody.  And I worked a place that probably

3   could have got physical with that nightclub, but

4   it never happened.

5    Q      Have you ever had a work performance

6   review cite poor or inadequate performance?

7    A      So I had a review one time when I went to

8   the sheriff's office from a sergeant that was new.

9   He didn't know me yet, and he gave me a 21 out of

10   30, which is low for me.  But everyone after that

11   was 28s and 30s, so --

12    Q      Any other -- oh, sorry.  Go ahead.

13    A      That's the only time I can remember having

14   a low score.

15    Q      What about in the narrative portions of

16   your performance review?  Have you had any listed

17   areas for improvement or something to that effect?

18    A      I don't -- I don't believe so.  That big

19   thing of stuff you-all got says how awesome I was.

20    Q      Have you ever been demoted?

21    A      No.

22    Q      Have your duties ever been changed because

23   of allegations of misconduct?

24    A      Never.

25    Q      Have you ever been put on desk duty?

KERRY LEE THOMAS vs                                            Wayne Schultz
ERIC M. BRUSS

207

```
1    A      No.  Not as a punishment, no.

2    Q      Have you ever been put on probation?

3    A      No.

4    Q      Administrative leave?

5    A      No.

6    Q      Have you ever been involved in an internal

7    affairs investigation?

8    A      Yes.

9    Q      When was that?

10   A      Well, the one at Precinct 1 was

11   May of '23, and then the -- I had one at the

12   sheriff's office -- it was in '17 -- I can't

13   remember what month.  November of '17, I think.

14   Q      So the one at Precinct 1 in '23, what was

15   that for?

16   A      That was for a lie that they did saying

17   that I had a GPS jammer plugged into my patrol

18   car.

19   Q      And what actually happened?

20   A      I had a GPS jammer in the back of my

21   patrol car.

22   Q      Why do you think they lied?

23   A      I have no idea.

24   Q      Would you ever have your GPS jammer

25   plugged into your patrol car?
```

208

```
 1   A      No.

 2   Q      Why did you have it in your car in the

 3   first place?

 4   A      There's a bunch of stuff I had from a

 5   previous agency.

 6   Q      Were you worried about your wife tracking

 7   you?

 8   A      Why would I worry about that?

 9   Q      Did you ever plug in your GPS jammer while

10   you were working for any other agency?

11   A      Yes.

12   Q      Did you ever plug it into your patrol car

13   while you were working for another agency?

14   A      Yes.

15   Q      What agency was that?

16   A      The Harris County Sheriff's Office.

17   Q      Why did you plug it in there then?

18   A      To mask my speed.

19   Q      Did it work?

20   A      Yup.

21   Q      Were you ever found out for it?

22   A      Was I ever what?

23   Q      Found out for it at the Harris County

24   Sheriff's Office.

25   A      Well, my supervisor knew about it, so yup.
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

209

1    Q      Were you disciplined for it?

2    A      Nope.

3    Q      Why did you want to mask your speed?

4    A      I was heading to events that needed my

5    attention quickly when I was with special response

6    group, and we didn't want the cameras going off.

7    Q      Which cameras?

8    A      The dash cams.

9    Q      So you were authorized to use this GPS

10   jammer?

11   A      Authorized by who?

12   Q      Were you authorized by your supervisor to

13   use the GPS jammer at the Harris County Sheriff's

14   Office?

15   A      Let's just say it was a policy violation

16   doing what I was doing, but I was given it by a

17   supervisor to do it.

18   Q      Your supervisor instructed you to use --

19   do it even though it was a policy violation?

20   A      Something like that.

21   Q      What do you mean by "something like that"?

22   A      Well, it's exactly that.  You know exactly

23   what I'm saying.

24   Q      I think I know what you're saying, but I

25   need to have it for the record.

210

1    A      Okay.

2    Q      So I hope you --

3    A      Ask me the question and I'll give you the

4    answer.

5    Q      So it was a violation of Harris County

6    Sheriff's Office policy to use a GPS jammer, but

7    your supervisor instructed you to do it anyway?

8    A      The supervisor didn't instruct me to do

9    it.  The supervisor provided me with the tool, and

10   I used it.  The supervisor had no play in what I

11   was doing.

12   Q      Who was the supervisor?

13   A      I'm not going to give that information

14   out.

15   Q      You have to answer the question.

16   A      Huh-uh.

17   Q      The supervisor knew you were using it?

18   A      I never told him I used it.

19   Q      Didn't you say earlier that he knew you

20   were using it?

21   A      He knew I possessed it and he knew why he

22   gave it to me to use it, but I never told him I

23   used it.

24   Q      So he knew you possessed it, and he knew

25   that he gave it to you to use it to mask your

211

1    speed even though he knew it was a violation of

2    policy; is that correct?

3     A      Yes.

4     Q      Are there any other law enforcement

5    agencies or instances in which you've used your

6    GPS jammer on duty?

7     A      No.

8     Q      Why did you stop using your GPS jammer

9    when you got to Precinct 1?

10    A      I wasn't assigned to a unit where I needed

11   it, and I wish I wouldn't have used it where I

12   did.

13               MS. LaVARCO:  Cassidy, I'm going to

14        ask you to enter an exhibit if you go to

15        where my cursor is.

16               Cassidy is our paralegal,

17        Mr. Schultz.

18               THE WITNESS:  Okeydoke.

19               MS. LaVARCO:  I think she's wearing

20        glasses today, but she's not on camera.

21               THE WITNESS:  She's not one of the

22        cool ones.

23               MS. VINSON:  Sorry.  What are we

24        doing?  We're waiting on an exhibit.

25               MS. LaVARCO:  Yeah, that's right.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

212

1   BY MS. LaVARCO:

2    Q      But while we're waiting on that,

3   Mr. Schultz, the IAD investigation at Precinct 1,

4   did you feel that it was a fair investigation?

5    A      No.

6    Q      Who did you feel like was responsible for

7   lying about you?

8    A      I can't remember his name, but he was one

9   of the technicians.

10   Q      Were you surprised that it was recommended

11  you be terminated?

12   A      Yes.

13   Q      Why were you surprised?

14   A      I didn't -- well, because I took a

15  polygraph and passed the polygraph that I was

16  telling the truth, and they still -- well, they

17  didn't terminate me.  They allowed me to resign,

18  but they still had me go away.

19          What are we looking at?  Half of a

20  document?

21   Q      There we go.  There's the other half.

22   A      Okay.

23          MS. LaVARCO:  So, Cassidy, can you

24      control-F for the word "wife"?  I think

25      it's on Page 20 of the PDF.

213

1          Can you Zoom in a bit?

2          THE WITNESS:  I see it.  I did say

3     that.

4          So ask me your question.

5   BY MS. LaVARCO:

6    Q     So it says here that:  "Deputy Schultz

7   stated the reason he was -- he has the device is

8   that he and his wife had been causing trouble --

9   or had been having trouble.  She had been tracking

10  him through the Life360 and causing problems.

11  Deputy Schultz stated that he had had the device

12  for at least five or six years, and while it has

13  been in and out of the vehicles he has been

14  assigned to many times, it had never been plugged

15  into any port or any county-issued vehicle while

16  at Precinct 1."

17   A     Correct.

18   Q     Do you remember saying that to the IAD

19  investigator?

20   A     Absolutely.

21   Q     And do you recognize this as the IAD --

22   A     I do.

23   Q     -- file from that investigation?

24   A     I do.

25          MS. LaVARCO:  I'm going to have

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

214

1        Cassidy mark this as -- I think we're at

2        Exhibit 6.  These were continuing the

3        exhibits from Mr. Bruss' deposition.

4              (Schultz Exhibit 6 marked.)

5   BY MS. LaVARCO:

6    Q      And can you tell me more about why you

7   used the device to block your wife from tracking

8   you?

9    A      I was just using it in my personal car so

10  she couldn't track my apps at the time.

11   Q      What apps was she trying to track?

12   A      That 360 app.

13   Q      So you transferred the GPS jammer between

14  your personal car and between your patrol car?

15   A      Uh-huh.  I had a go-bag that went in and

16  out of my front seat of my patrol car into my

17  front seat of my personal car.

18   Q      Got it.

19              And I believe in this file it also

20  refers to an iPhone that you had in the back of

21  your patrol car.

22              Do you recall that?

23   A      I do.

24   Q      Who was the iPhone for?

25   A      It was for me.  It was a gift from my wife

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

215

1    to me.

2     Q      Did you say you hadn't used an iPhone

3    before?

4     A      Yeah.  I still haven't, except my work

5    one.  That phone has never been activated.  It is

6    in a closet at our house right now.

7     Q      "That phone," you mean the one your wife

8    gifted you that was in your patrol car?

9     A      Yes.

10    Q      And then you said "except your work one."

11   Do you mean you used an iPhone for work?

12    A      The work phone I told you about earlier is

13   an iPhone.

14    Q      The work phone for your current job is an

15   iPhone?

16    A      Yes.

17    Q      Got it.

18            Do you use that phone for personal

19   business sometimes?

20    A      No.

21    Q      Does your wife ever call you on that

22   phone?

23    A      No.

24    Q      Does anyone else from your personal life

25   ever call you on that phone?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

216

1    A       My mother has it for emergency purposes.

2              MS. LaVARCO:   Okay, Cassidy.   You

3        can go ahead and take that down.   Thank

4        you.

5              Okay.   Cassidy, can you open up the

6        exhibit I'm about to link for you as well?

7        I think this will be Exhibit 7.

8           (Schultz Exhibit 7 marked.)

9              MS. LaVARCO:   Becky, while we're

10       waiting on that, can you give us our

11       running time on the record?

12             THE REPORTER:   Yes.   We're at

13       3 hours, 37 minutes.

14             MS. LaVARCO:   Thank you.

15             Can you scroll to the top, Cassidy?

16   BY MS. LaVARCO:

17   Q      We're entering this as an exhibit.   We

18   understand it to be your application, Mr. Schultz,

19   to work at Precinct 1 of the Harris County

20   Constable's Office.

21             Do you recognize this document as

22   such?

23   A       I do.

24   Q      And on this application, when asked if

25   you've ever been named in an IAD investigation,

217

1   you wrote:  "IAD investigation alleging

2   inappropriate conduct while teaching a class at

3   HCSO.  Complaint unfounded."

4    A     Yes.

5              MS. VINSON:  Can you show me where

6        you're --

7              THE WITNESS:  It's all the way at

8        the bottom of the slide.

9              MS. LaVARCO:  Yes.

10             MS. VINSON:  Oh, we cannot -- I

11       don't think we can see that.

12             THE WITNESS:  There.

13             MS. VINSON:  Oh, there it is.

14       Okay.

15             MS. LaVARCO:  No worries.

16   BY MS. LaVARCO:

17    Q     Is that what that says?

18    A     Uh-huh.  It is, yes.

19    Q     When did that incident take place?

20    A     That was the one I told you about in

21   November of '17.

22    Q     And what was the allegation?

23    A     The constable of Precinct 4 alleged that I

24   spoke ill of him in an open forum during a class

25   that I was teaching at the Harris County Sheriff's

KERRY LEE THOMAS vs                                      Wayne Schultz
ERIC M. BRUSS

218

1   Academy.

2   Q      Did you speak ill of him in an open forum?

3   A      I didn't -- no, ma'am, I did not.

4   Q      Why did he accuse you of that?

5   A      Because -- I don't know.  Someone in there

6   said I did, I guess.  I have no idea.

7   Q      Did he twist something you actually said?

8   A      No.  I don't believe so at all.

9   Q      What specifically did they say you said?

10  A      I don't recall.

11  Q      Do you know who submitted the complaint?

12  A      I do not.  It was an anonymous complaint.

13  Q      What class were you teaching?

14  A      Oh, Superion, which is the computer-aided

15  dispatching system that does report entry for all

16  of Harris County.

17  Q      Did they do a full internal affairs

18  investigation for this complaint?

19  A      They did.  100 percent.

20  Q      Who interviewed you for that

21  investigation?

22  A      Oh, I don't remember his name.  A bald

23  guy.  Oh, goodness.  It's been a minute.  I can't

24  remember his name.

25  Q      How long did the investigation last before

219

1    they deemed it unfounded?

2     A      About a week.

3     Q      And on what basis was it found to be

4    unfounded?

5     A      Well, they interviewed every single person

6    in that -- in both the classes I taught, and not

7    one person said I said anything derogatory or

8    inappropriate about the constable at Precinct 4.

9     Q      Did it affect your relationship with the

10   constable at Precinct 4?

11    A      My relationship was not a relationship

12   with the constable at Precinct 4.  I don't know

13   why he did it.

14    Q      I'm sorry.  Can you explain what you mean?

15    A      My answer is no.

16    Q      It didn't affect your relationship with

17   the constable --

18    A      It didn't.

19    Q      -- at Precinct 4?

20    A      No, ma'am.

21    Q      Were you required to complete any

22   additional training as a result of the complaint?

23    A      No.  It was unfounded.

24    Q      Were you ever a part of any other IAD

25   investigation?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

220

1   A      No.

2   Q      Not at any law enforcement agency?

3   A      Not that I can recall, no.

4          MS. LaVARCO:  Okay.  Cassidy, you

5      can pull the exhibit down.

6   BY MS. LaVARCO:

7   Q      Mr. Schultz, what's your relationship like

8   with Eric Bruss?

9   A      We were okay.  When we were on the same

10  shift together, we were friends.  But since I went

11  to nights and he was on evenings, I haven't --

12  Eric and I really don't talk that much.  In fact,

13  since this happened, we don't talk at all.

14  Q      I apologize.  I realize, per the previous

15  line of questioning, I neglected to name the

16  exhibit number.

17         MS. LaVARCO:  Cassidy, can you let

18      me know what exhibit number that was for

19      the IAD complaint?  No, not -- sorry.  Not

20      for the IAD complaint.  For Mr. Schultz's

21      application to Precinct 1.

22         THE WITNESS:  That was 7.

23         MS. LaVARCO:  Is that right,

24      Cassidy, it was 7?  I know I said 7.

25         MS. KRISTAL-COHEN:  It is, yes.

221

```
1              MS. LaVARCO:  I just don't know

2         whether I got it right.

3              THE WITNESS:  I was paying

4         attention.

5              MS. KRISTAL-COHEN:  Yes.

6         Exhibit 7.

7              MS. LaVARCO:  Okay.  Thank you.

8    BY MS. LaVARCO:

9     Q     And I'm sorry.  You said you and Eric

10   Bruss used to talk more before this lawsuit was

11   filed?

12    A     When we were on the shift together, yeah.

13   We'd eat lunch together and stuff.  But ever since

14   this was filed, I just haven't talked to him.

15    Q     Why not?

16    A     No reason to.  I don't work there anymore.

17    Q     Were you friends when you were at

18   Precinct 1 with Eric Bruss?

19    A     I'd consider him a friend.

20    Q     You didn't want to keep up the friendship

21   after you left Precinct 1?

22    A     Just right now, with all this stuff going

23   on, I just have no desire to have any friends

24   outside of my family.

25    Q     By "all this stuff going on," do you mean
```

222

1   this lawsuit?

2    A     Absolutely this lawsuit.

3    Q     Is there anything else going on that makes

4   you not want to have contact with friends and

5   people outside of your family?

6    A     No.  I like my family a lot.

7    Q     How long did you and Eric Bruss know each

8   other?

9    A     I mean, we still know each other.  So --

10  September of '20, I was on shift with him.  So

11  from then to now.

12   Q     How often would you work together while

13  you were at Precinct 1?

14   A     Probably about four months.

15   Q     Oh, sorry.  I meant how often did you work

16  with him.  Did you work with him on a daily basis?

17  A weekly basis?

18   A     Yeah.  We were on the same schedule.  We

19  had the same days off, so we worked together a

20  lot.

21   Q     So you were often deployed to the same

22  scenes together?

23   A     Often, yes.

24   Q     When was the last time you saw Mr. Bruss?

25   A     At the depo you-all had for him the other

223

1    day.

2    Q       And what about before that?

3    A       I hadn't seen Eric since July maybe.

4    Q       In what context did you see Mr. Bruss in

5    July of last year?

6    A       In passing.  He was coming off evenings, I

7    was going on nights.  Shook hands.  "How you

8    doing, buddy" kind of stuff.

9    Q       When was the last time you spoke with

10   Mr. Bruss?

11   A       Tues- -- when we had the deposition the

12   other day.

13   Q       And what about before that?

14   A       Same.  I thought I just answered these two

15   questions.  Am I having déjà vu?

16   Q       I don't think so.

17   A       Oh, okay.  I'm just making sure.  It might

18   have been the fajitas.

19   Q       I'd like to enter another exhibit which

20   are a series of text messages that you and

21   Mr. Bruss produced in discovery.

22   A       Okay.

23              MS. LaVARCO:  Cassidy, can you go

24        ahead and share this and also let us know

25        what exhibit number you're marking it as?

224

```
1              MS. KRISTAL-COHEN:  This will be

2       marked as Exhibit 8.

3              MS. LaVARCO:  Thank you.

4              Can you-all see that okay?

5              THE WITNESS:  Yup.

6         (Schultz Exhibit 8 marked.)

7   BY MS. LaVARCO:

8    Q     Do these appear to be the text messages

9   between you and Mr. Bruss?

10   A     Yes.

11   Q     So at the beginning of this exchange, you

12   say:  "I don't really feel like talking, bro."

13   A     Yeah.  He must have called me.

14   Q     Was that --

15   A     He must have called me and I texted him,

16   "I don't feel like talking."

17   Q     I see.

18              Did other text messages precede that

19   one?

20   A     No.

21   Q     Was that the first time that Mr. Bruss

22   texted you?

23   A     No.  We had texted before.

24   Q     Had he texted you about the lawsuit

25   before?
```

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

225

1    A      There had been a little bit back and

2    forth, but not very much.

3    Q      Do you know how long after the lawsuit was

4    filed you had some back-and-forth with Eric Bruss?

5    A      I would assume almost immediately after it

6    was filed.  After we got information that it was

7    filed.

8    Q      What were you referring to when you said,

9    quote:  "I'm sure you heard by now and it's true."

10   A      That I was let go.

11   Q      That you were let go from Precinct 1?

12   A      Yup.

13          MS. LaVARCO:  Cassidy, can you

14      scroll to the next page?

15          THE WITNESS:  Man, my belly.  Can

16      you hear that?

17          MS. LaVARCO:  I didn't hear it.

18          THE WITNESS:  My belly keeps

19      (descriptive sound).  If you-all hear it,

20      that's me.

21          MS. LaVARCO:  Okay.

22   BY MS. LaVARCO:

23   Q      So then I see that on July 20th, Mr. Bruss

24   texted you and said:  "Just checking on ya,

25   brother."

226

```
 1              Was that the start of that

 2   communication?

 3    A       Yes.

 4    Q       Did he try to call you first?

 5    A       I don't recall.  I don't -- maybe.  I

 6   don't think so.  I think he just texted me.

 7    Q       And in response you said:  "Just waiting

 8   for the dust to settle."

 9              What did you mean by that?

10    A       Well, it was -- I was in turmoil with why

11   I was let go, what was going on, who was calling

12   who, who was reaching out to the media, who was,

13   you know, jacking with my life for whatever

14   reason.  Just waiting for all that to stop.  I

15   didn't want any of that to start affecting my

16   family.  I'm a big boy.  I can handle it.

17    Q       Understood.

18              So who was jacking up your life at the

19   time?

20    A       Oh, just -- I don't know.  Still don't.

21    Q       So you said that people were making calls,

22   talking about you, that sort of thing.  Did you

23   have any suspicions about --

24    A       I had no -- no.  I had suspicions that

25   people were doing it, but no.
```

227

```
 1    Q      Was there anybody at the precinct that you

 2   didn't get along with?

 3    A      No.  I thought I got along with everybody.

 4   I guess I was wrong, huh?

 5    Q      So what were your suspicions about who was

 6   talking about you?

 7    A      Just --

 8             MS. VINSON:  I'm going to object.

 9        It calls for speculation.

10             MS. LaVARCO:  Mr. Schultz said that

11        he had suspicions.

12   BY MS. LaVARCO:

13    Q      Mr. Schultz, you said you had suspicions.

14   What were those suspicions?

15    A      I just suspected someone was out to get

16   me.  I have no idea who it was and I have no idea

17   why.  Because I did nothing wrong.

18    Q      And what did you mean when you said you

19   were waiting for people to leave you alone?

20    A      I mean --

21    Q      Who wouldn't leave you alone?

22    A      Everyone --

23             MS. VINSON:  Let me object again,

24        Shirley.  You-all were the ones contacting

25        the media.  That's what he's referring to.
```

KERRY LEE THOMAS vs                                      Wayne Schultz
ERIC M. BRUSS

228

1    So you're --

2          MS. LaVARCO:  I --

3          MS. VINSON:  You're implying and

4    trying to elicit that there's somebody out

5    there that is mad at him or some

6    wrongdoing, but it was you-all.  So this

7    line of questioning --

8          MS. LaVARCO:  Ms. Vinson --

9          MS. VINSON:  -- is improper.

10         MS. LaVARCO:  -- your suggestive

11   questioning is extremely improper.

12   Mr. Schultz was --

13         MS. VINSON:  Your subjective

14   questioning is extremely improper.

15         MS. LaVARCO:  You are not permitted

16   to make speaking objections.

17         MS. FRANCIS:  You cannot testify.

18         MS. LaVARCO:  Yes, you are now

19   testifying.

20         MS. VINSON:  I'm objecting to your

21   questions about why --

22         MS. LaVARCO:  You are entitled to

23   object to my questions.  Unless you're

24   instructing the witness to answer -- not

25   to answer because it's a matter of

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

229

1    privilege, then he needs to answer my

2    questions.

3         Your objections will be reserved

4    for the record.  You can litigate later

5    about whether or not his answers are

6    responsive.

7         He was suggesting that people at

8    the precinct were talking about him.  He

9    was suggesting that there were people he

10   thought were his friends.  He did not

11   refer to me at all.  He did not refer to

12   our conversations with the media at all.

13   You suggested to him the answer.  You're

14   improperly influencing the witness --

15        MS. VINSON:  Okay.  You are

16   improperly stating --

17        MS. LaVARCO:  -- and I really wish

18   that you would stop doing that.

19        MS. VINSON:  -- his testimony and

20   the evidence.  That's not what that says.

21   But okay.  You have my objection.

22        MS. LaVARCO:  And you have my

23   objection, and I hope that you will stop

24   improperly influencing the witness.

25

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

230

1   BY MS. LaVARCO:

2    Q      Who would not leave you alone,

3   Mr. Schultz?

4    A      Just everybody calling me and checking on

5   me.  And I just didn't want to talk to anybody.

6    Q      Who was calling you and checking on you?

7    A      Just people -- you know, friends from the

8   police department.

9    Q      From Precinct 1 --

10   A      Yes.

11   Q      -- of the constable's office?

12   A      Yes, ma'am.

13   Q      And who are those friends?

14   A      Just buddies of mine.  I really

15  wouldn't -- I don't want to get them involved in

16  this.

17   Q     I understand you don't want to get them

18  involved.  But I'm sorry, Mr. Schultz, you do have

19  to answer the question.

20   A      Aaron Venegas was one of the main ones,

21  and then Madison Sperry called, Alex Palizo

22  called, Jimmie Cook, a guy named Duke Lechane.

23           There was numbers of others that I

24  didn't answer.

25   Q      Who didn't you answer?

231

1    A      Just -- I don't recall.  I don't recall

2    who they were.

3    Q      Did the people you just named call you to

4    express sympathy?

5    A      Yes.

6    Q      Did they call you to ask questions about

7    what happened?

8    A      No.  Just checking on me.

9    Q      What did you mean when you said that you

10   were waiting for people to "quit being jealous"?

11   A      I don't know.  I read that, and I've been

12   trying to think of what I meant when I said that.

13   Give me a second.

14   Q      No problem.

15   A      I think there was some speculation what I

16   was talking about that I was going to -- that the

17   training lieutenant was going to be leaving, and

18   there was big rumors that he wanted me to take

19   over, and I think there was someone that wanted

20   that slot -- I don't know who that someone was,

21   but someone that wanted that slot and they were

22   being jealous and maybe I thought that's where

23   that was coming from.  A lot of the stuff I

24   thought was merely hypothesis, in my mind.

25   Q      Did anyone else suggest that it might have

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

232

1   been that someone wanted your spot as lieutenant

2   or the spot you were going for as lieutenant?

3    A      No.

4    Q      What made you think that someone wanted

5   your spot?

6    A      I don't know.  Just -- I guess when you

7   walk into a room and you can feel the temperature

8   different than the last time you were in the room.

9   Just a feeling I got.  One of those gut feelings.

10   Q      Who was in the room when you walked in and

11   you felt the temperature was different?

12   A      No, no, no.  No, no, no.  This is in a

13   training environment.  There was probably, I don't

14   know, probably 30 or 40 people in there.  But

15   normally when I'd walk in the room, they'd be

16   like, "Oh, Wayne, what's up," you know, high fives

17   and stuff, "what's going on," and it just was

18   nothing.  So...

19   Q      Was there anyone in particular who you

20   felt was treating you differently?

21   A      No.  And I never felt -- and that's the

22   oddity to this whole thing, is that no one ever

23   really treated me different, and I never felt like

24   anyone was treating me, like, with disrespect or

25   anything.  I think it was just a temperature

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

233

1   change.  It was just -- maybe it was my time.  I

2   don't know.

3    Q      Did you feel that it was related to the

4   GPS-blocking investigation?

5    A      I -- yes.  Because they had put it out in

6   a big company email -- or a department-wide email,

7   and then people found out it was me, and I think

8   people just looked at me differently because of

9   the way I held myself there as being one of the

10  role models, and now here I am looking at a

11  boo-boo head.

12   Q      I see.

13   A      Uh-huh.

14   Q      Do you think the temperature also changed

15  in response to this lawsuit?

16   A      No.  I think the GPS thing had a way worse

17  deal than this.

18   Q      I see.

19          What "news deal" was Bruss referring

20  to?  And we may have -- oh, no.  It's at the

21  bottom of this page that we're looking at.

22   A      Let me see.  I can't see it.  Oh --

23          MS. VINSON:  I'm going to object to

24      speculation.

25          THE WITNESS:  People -- I mean, I

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

234

1        don't know if it was you.  I don't know

2        who it was.  I don't know who said

3        anything to the news -- to the media.  I

4        left it alone because I didn't want it to

5        consume me.

6               I heard a -- I heard a deal on

7        "Candid Camera" once, and it said, "Man,

8        I'm just not going to let people rent

9        space in my head."  So I'm not going to

10       let people rent space in my head.  If

11       people want me to look bad, then they're

12       going to try and make me look bad.  It's

13       up to the other people to judge whether or

14       not I am that person that they're making

15       me out to be.

16               But in the response to that, you

17       know, whoever went talking to the media,

18       talking trash about whatever they found

19       out, whether it was accurate or not, they

20       did it, they posted a story on it, and

21       here we are.

22    BY MS. LaVARCO:

23     Q     Did you also find it irresponsible, like

24    Bruss did?

25     A     I wish -- I don't know if "completely

235

1   irresponsible and hurtful" is what I would have

2   used, but I wish there would have been more

3   fact-finding before people talked to the media.

4              MS. LaVARCO:  Can you scroll to the

5        next page, Cassidy?  Thank you.

6   BY MS. LaVARCO:

7    Q     So you said, Mr. Schultz:  "My new

8   constable is being extremely supportive and has my

9   back so far"; is that right?

10   A     Yeah.  At this text, she did.  She changed

11  her mind, though, because of you-all, I think.

12   Q     Did you say "because of you-all, I think"?

13   A     I said "because of you-all, I think."

14   Q     And how was she supportive initially?

15   A     She was super cool.  She -- real nice

16  lady.  Super nice lady.  Liked my experience.

17  Liked what I had to bring to the table for that

18  agency, which was really coming out of a dark age

19  and coming into a better sense of training and

20  getting their guys in a better place.

21              And then she said -- hey, you know, I

22  gave her everything.  I told her everything.  I

23  told her about this lawsuit.  I told her about

24  everything.  And then all of a sudden, it was

25  like, "Well, did they ever do an investigation on

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

236

```
 1   this?"
 2              I said, "No, ma'am."  I said, "They
 3   did a use of force thing."
 4              Well -- and then all of a sudden, she
 5   let me go.  I don't -- to this day, I have no
 6   justification of why she said we were going to
 7   part ways.
 8              But in Harris County with the
 9   constable's agencies, it's an at-will employer.
10   And they really -- especially one week in, she
11   didn't need to give me a reason.  So I tipped my
12   hat, and I rode off into the sunset.
13    Q     And you said that you let her know before
14   you took the job about this lawsuit, your new
15   constable?
16    A     Absolutely.  Yes, ma'am.
17    Q     How did you -- how did you let her know?
18    A     I told her in person exactly about it --
19    Q     Did you put it in your application --
20    A     -- that there was a lawsuit.  I didn't
21   tell her particulars about it, but I did -- just
22   told her that I was being sued in reference to a
23   use of force at my agency involving a dog bite.
24    Q     Did you put it in your --
25    A     What she got out of that, I didn't give
```

237

1   her any more information than that.  If she dug or

2   talked to Constable Rosen, I don't know what she

3   did.  But she definitely found out more about it

4   than I gave her.

5    Q      How do you know she found out more about

6   it?

7    A      Because she let me go.

8    Q      Did you --

9    A      I could be wrong.  She might not have

10   found nothing out about it and then just decided

11   to let me go.

12   Q      Did you put this information in your

13   written application to Precinct 6?

14   A      I don't -- I don't believe I did.  I'm not

15   positive.  I don't believe I did.

16   Q      Would the application have asked you to

17   disclose whether there were --

18   A      No.  Not on a personal lawsuit.  It would

19   have come up in maybe an interview, but I was --

20   Q      No --

21   A      -- when I met with her.

22   Q      What did Bruss mean when he said that it

23   "was not a fair and accurate representation," or

24   what did you understand him to mean at the time?

25         MS. VINSON:  Object to form; calls

238

```
 1        for speculation.

 2             THE WITNESS:  I think he knows my

 3        character better than that and knows that

 4        it wasn't an accurate representation of

 5        who I am.

 6   BY MS. LaVARCO:

 7    Q     How do you think Bruss would describe your

 8   character?

 9             MS. VINSON:  Object to form.

10             THE WITNESS:  I think he'd say that

11        I'm a fair individual and I am full of

12        integrity and I treat law enforcement as

13        if I'm the sole person that represents the

14        badge that interacts with the community.

15        That's just what we did.  It's what I did.

16             MS. LaVARCO:  Cassidy, can you

17        scroll to the next page?  Thank you.

18   BY MS. LaVARCO:

19    Q     So do you see on Thursday, July 27th, Eric

20   Bruss reached out to you again and said:  "Just

21   checking on you," because he "saw the latest news

22   about you resigning from Precinct 6"?

23    A     Yeah.  I don't think I called him.

24    Q     Did you ever return his messages?

25    A     I don't think -- I don't think I did.  I
```

239

1    don't think I did.  I might have, but I don't -- I

2    don't remember talking to him after he sent that.

3              MS. LaVARCO:  Could you go to the

4        next page, Cassidy?

5    BY MS. LaVARCO:

6     Q     So in these messages, Mr. Bruss --

7    Mr. Bruss shared a "Houston Chronicle" article

8    with you, which gives an update on the lawsuit

9    that you're here about today, and that article

10   says:  "Harris County Precinct 1 spokesman Jeff

11   McShan says Bruss and the other officers were

12   cleared of any wrongdoing after an investigation."

13             Did you read that article?

14    A     I tried to.  Bruss paraphrased it for me,

15   because I did call him in reference to this, and I

16   couldn't get the article to open up.  And I have

17   no idea where it came from.  I don't know where

18   the investigation was.  So I don't know why they

19   would have conducted an investigation post the use

20   of force ruling.  I don't know.

21    Q     Did they clear you of any wrongdoing at

22   the time of the article, to your knowledge?

23    A     I wasn't employed there at the time.

24    Q     But did they clear you of any wrongdoing?

25   My understanding is that if there's a complaint

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

240

1    against an officer and they no longer work with

2    the agency, they'll still complete the

3    investigation.

4     A     Well, I -- no one --

5              MS. VINSON:  Object to form.

6              THE WITNESS:  Yeah, let's just say

7         no one contacted me and said, "Hey, we

8         conducted an investigation.  You've been

9         cleared of all wrongdoings."

10   BY MS. LaVARCO:

11    Q     Understood.

12    A     The only way I got that information was

13   from Bruss and this article -- and -- well, him

14   paraphrasing and telling me what it said.

15    Q     I see.

16              Bruss also says, when he shares the

17   article:  "At least the department stood up."

18              Do you see that?

19    A     Yes.

20    Q     Had the department not stood up for you

21   with respect to this lawsuit beforehand?

22    A     I don't know --

23              MS. VINSON:  Object to form.

24              THE WITNESS:  Yeah, I don't know

25         where that's coming from.  Yeah, they were

241

1          behind us from the get-go, from the jump.

2    BY MS. LaVARCO:

3      Q      How do you know --

4      A      And even though I'm not there, they still

5    are.

6      Q      How did you know they were behind you?

7      A      At what point?

8      Q      When the lawsuit was filed and in the

9    months afterwards.

10     A      Well, they just said that they were going

11   to get with the county attorney's office and have

12   representation for us.

13     Q      Did they tell you that they had your back?

14     A      I don't know if they ever said that they

15   had our back, but I think they said they were

16   going to get us the help that we needed for the

17   lawsuit.

18     Q      Did they tell you that in an email?  On

19   the phone?

20     A      I think I received that from Chief

21   Harrison.  It might have been from Shaw.  I know

22   one of them called me and talked to me for a

23   minute and said that they were going to have --

24   they were sending it to the county attorney's

25   office and that they were going to represent us.

KERRY LEE THOMAS vs                                        Wayne Schultz
ERIC M. BRUSS

242

1    Q      Did they say anything to you about whether

2    they thought the allegations were fair?

3    A      No.  We didn't talk about it.  We didn't

4    discuss it.

5              MS. VINSON:  Counsel, I'm going to

6         need to take a break soon.

7              MS. LaVARCO:  Okay.  We'll finish

8         up the -- this exhibit and then we can

9         take a break.

10             Can you go to the next page,

11        Cassidy?

12   BY MS. LaVARCO:

13   Q      So it looks like on August 8th,

14   Mr. Schultz, you texted Mr. Bruss:  "Any word on

15   our case"; is that right?

16   A      Uh-huh.  Yes.

17   Q      Did you not communicate with Ms. Vinson

18   directly about the lawsuit?

19   A      Yeah.  We have talked.

20             MS. VINSON:  Object -- it's an

21        inappropriate question.

22   BY MS. LaVARCO:

23   Q      Did Bruss typically relay messages from

24   Ms. Vinson to you about the lawsuit?

25   A      No.

243

```
1    Q      Did he ever relay messages to you from

2    your lawyers about the lawsuit?

3    A      Yeah.  We had talked about stuff.

4    Q      By that, do you mean your lawyers would

5    tell Mr. Bruss something and then Mr. Bruss would

6    tell you?

7    A      No.  He would just say that he talked to

8    Celena, and then I would talk to --

9              MS. VINSON:  Okay.  Just -- caution

10        you, do not say anything about our

11        conversations.

12             THE WITNESS:  Right.

13             MS. VINSON:  Okay?

14             THE WITNESS:  Right.

15   BY MS. LaVARCO:

16    Q      I am only asking about your conversations

17   with Mr. Bruss.

18    A      Okay.

19             MS. VINSON:  But if they include

20        what I said, don't testify about it.

21             THE WITNESS:  Oh, okay.

22   BY MS. LaVARCO:

23    Q      Okay.  So as I understand it, Mr. Bruss

24   would contact you and tell you about -- without

25   saying anything about the substance -- his
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

244

1    conversations with Ms. Vinson; is that right?

2     A     No.

3     Q     So what would he tell you?  Why would you

4    ask each other for updates?

5     A     Well, he would just say that he had a

6    conversation.

7     Q     Would he tell you what he spoke to her

8    about without saying what he spoke to her about?

9     A     I don't recall us having big-depth

10   conversations about it.

11              MS. LaVARCO:  Sorry.  I need to

12        address the court reporter briefly.

13              Becky, when Ms. Vinson was speaking

14        to Mr. Schultz about whether or not this

15        was a matter of privilege, were you able

16        to hear what she said?  She was

17        whispering.

18          (Court reporter discussion off the

19           record.)

20              MS. LaVARCO:  Okay.  Going forward,

21        Ms. Vinson, can you speak up when you're

22        going to be speaking on the record?

23              MS. VINSON:  Sure.

24              MS. LaVARCO:  Thanks.

25

245

1   BY MS. LaVARCO:

2    Q     Do you ever copy other people on emails to

3   your attorneys other than Mr. Bruss?

4    A     I don't believe so, no.

5    Q     When you've met or spoken with any of your

6   attorneys in the past, was anyone other than

7   Mr. Bruss there?

8    A     No.  Just my attorneys.

9           MS. LaVARCO:  Okay.  Can you scroll

10       to the next page, Cassidy?

11  BY MS. LaVARCO:

12   Q     So do you see that Mr. Bruss was telling

13  you about a conversation he had with an internal

14  affairs investigator and you said:  "Well, that's

15  great.  They need to let shit go."

16           Is that right?

17   A     Yes.  I mean --

18   Q     Who is "they"?

19   A     -- I typed that.

20           Probably the department at that time

21  for my stuff -- I don't know.  Hang on.  I'm

22  reading this other text.

23   Q     Okay.  Take your time.

24   A     Thank you.

25           I was probably talking about letting

246

1    this lawsuit go.

2     Q      I see.

3             And then on August 10th, do you see

4    you said:  "I think there may be some fuckery

5    going on"?

6     A      It doesn't sound like me, but that's

7    definitely my text.  So, yeah, I said it.

8     Q      What were you referring to?

9     A      I don't know.  Maybe the stuff going on

10   with you-all to us or thinking how this could

11   possibly be something that I'd be involved in when

12   I felt like I did my job.  I don't know.

13    Q      Why would you have texted Mr. Bruss out of

14   the blue?  I think this was a couple of days after

15   the last text message exchange.

16    A      August 10th.  What was going on

17   August 10th?

18             I don't know.  Can we scroll down?

19    Q      Sure.

20    A      Oh, of course.  There must have been a

21   phone call there.

22    Q      I see.  A phone call before or after

23   "there may have been some fuckery going on"?

24    A      Probably after I would have sent that

25   text, I would have guessed that Eric called me.

247

1    Q      And do you see that -- this is Page 8 of

2    the exhibit -- and the bottom of the text message,

3    "I think there may be some fuckery going on," is

4    sort of cut off.

5    A      Uh-huh.

6    Q      And then when we scroll to the next page,

7    Page 9 of the exhibit, we don't see the bottom of

8    the text message that was cut off, and it just

9    picks up on a conversation that happened on

10   August 16th --

11   A      Yes.  The 16th.

12   Q      -- so eight days later.

13   A      Okay.  I thought it was the 10th to the

14   16th.  But it might have been the 8th.

15   Q      Okay.

16   A      That's cool.

17   Q      Were text messages missing or do they

18   appear to be missing?

19   A      No.  No.  They don't appear to be missing.

20   Q      Would you still have your --

21   A      There --

22   Q      Sorry.  Go ahead.

23   A      No.  I do not have any of my stuff.

24   Q      You don't have what stuff?

25   A      You were going to ask me if I still have

248

```
 1  my text messages between me and Eric?

 2   Q     Right.

 3   A     I do not.  No.

 4   Q     Okay.  And you got -- remind me.  You got

 5  a new phone, you said, about six months ago?

 6   A     Uh-huh.

 7   Q     So you didn't make an effort to preserve

 8  any communications that might come up for this

 9  lawsuit --

10   A     I didn't.

11   Q     -- when you changed phones?

12   A     I did not.

13   Q     Did you think to do that?

14   A     I did not.

15   Q     Were you instructed by your attorney to do

16  that?

17   A     I was not.

18   Q     So the next text message on Page 9 of the

19  exhibit, you're -- you say:  "I'm in class.

20  Everything good."

21          Did Bruss try to call you then?

22   A     Must have.

23   Q     Was that the start of that text message

24  exchange?

25   A     Uh-huh.  Yes.
```

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

249

1    Q      Okay.  And what class were you in?

2    A      I don't recall.

3    Q      Would it have been some sort of law

4    enforcement training class?

5    A      Yeah.  That's the only classes I normally

6    take.

7                 Oh, no, no, no.  Maybe I was at

8    Vacations To Go.  I don't know.  I had a little

9    training class there.

10   Q      Have you ever hung out with Mr. Bruss

11   outside of work?

12   A      No.

13   Q      Not even when you worked at Precinct 1?

14   A      What do you mean?

15   Q      When you worked at Precinct 1, did you see

16   Mr. Bruss outside of work hours?

17   A      The only time I knew Eric Bruss was at

18   Precinct 1.  So "no" is still my answer.

19   Q      So you didn't see him outside of work

20   hours?  I just want to make sure I understand.

21              MS. VINSON:  Asked and answered.

22   BY MS. LaVARCO:

23   Q      Can you answer the question?

24   A      I worked a side job with him, but I did

25   not -- nothing outside of being in uniform

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

250

1   together.

2   Q     What side job did you work with him?

3   A     There was an off-road park we worked

4   called Xtreme Off Road.  I think I worked it a

5   couple times with him.

6   Q     Did you work there as a law enforcement

7   officer?

8   A     Uh-huh.

9            MS. VINSON:  Say "yes" or "no."

10           THE WITNESS:  Yes.

11  BY MS. LaVARCO:

12  Q     And what did you do there?

13  A     "Security," as you like to call it.

14  Q     I'm happy to use the term you like.  I

15  just don't know what it is.

16  A     Well, that makes it easy.  We'll call it

17  security.

18  Q     Okay.  Okay.  What would you call it if I

19  hadn't called it "security"?

20  A     I'm going to call it "security."

21  Q     Okay.  So later on August 16th -- oh,

22  sorry.  Just a moment.

23           How long did you and Mr. Bruss work

24  together at Xtreme Off Road?

25  A     Over a course of two or three months,

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

251

1    probably a few times.

2    Q      A few times in total, or a few times per

3    week?

4    A      No.  In total.  In total.

5    Q      How many hours on each of those occasions?

6    A      I would normally -- he would come in and I

7    would be leaving.  Maybe a couple hours.

8            MS. VINSON:  Shirley, we've been

9        going about an hour and a half.  Are you

10       almost done with this exhibit?  I'm going

11       to have to --

12           MS. LaVARCO:  Yeah.  We're almost

13       done with this exhibit.  I just want to

14       get through it.  Thank you.  I appreciate

15       it.

16   BY MS. LaVARCO:

17   Q      How did you and Mr. Bruss wind up working

18   there together at Xtreme Off Road?

19           MS. VINSON:  This does not have to

20       do with the exhibit.  If you can focus on

21       that, and then we'll take a break.

22           MS. LaVARCO:  That's fine.  I'll

23       ask the question about Xtreme Off Road

24       when we get back.

25

252

```
1   BY MS. LaVARCO:

2    Q     So later on August 16th, you say -- where

3   is this?

4              MS. LaVARCO:  Can you go to the

5         next page, Cassidy?  So we're at Page 10.

6              Keep going.

7   BY MS. LaVARCO:

8    Q     So this is Page 11 now.  At the very

9   bottom, it says:  "Harris County Sheriff's Office

10  has a deputy down, shot during a traffic stop."

11             Bruss said that to you?

12   A     Uh-huh.  Yes.

13   Q     Why would he update you on that?

14   A     I used to patrol District 2 for the

15  sheriff's office.

16   Q     During the time of this text message, you

17  patrolled District 2 for the sheriff's office?

18   A     No, but I -- that was where all my beat

19  mates were when I was with the sheriff's office.

20   Q     And Bruss knew that, so he wanted you

21  to -- he wanted to let you know in case any of

22  your beat mates had been injured?

23   A     Yes.

24   Q     Did you often use text messages to

25  communicate about work with Mr. Bruss?
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

253

1    A      On occasion, yes.

2    Q      Did you use text messages to communicate

3    with Mr. Bruss about responding to a scene?

4    A      No.  We would use -- like, if we were both

5    going to a scene together?

6    Q      Yeah.

7    A      No.  No.  We didn't have time for that.

8    We would use the radio.

9    Q      I see.

10          Did you use any other formal

11   communications to communicate with him about

12   responding to a scene together?

13   A      Maybe the MDT in the car, the mobile data

14   terminal.

15   Q      I see.

16          MS. VINSON:  All right.  I'm going

17      to have to --

18          MS. LaVARCO:  Okay.  We can -- I

19      was just going to say, we're good.  We can

20      take a break.

21          MS. VINSON:  Okay.

22          THE VIDEOGRAPHER:  We are now going

23      off the record.  The time is 2:46 p.m.

24          (Recess from 2:46 p.m. to 2:59 p.m.)

25          THE VIDEOGRAPHER:  We are now back

254

1           on the record.  The time is 2:59 p.m.

2    BY MS. LaVARCO:

3     Q      Mr. Schultz, earlier you were telling me

4    that you worked with Eric Bruss while you were at

5    Precinct 1 at a place called Xtreme Off Road?

6     A      Uh-huh.  Yes.

7     Q      And you said you worked there on a handful

8    of occasions together?

9     A      Yes.

10    Q      And how long were each of those shifts?

11    A      I might have been there five hours, and

12   then he was there maybe eight hours, and we maybe

13   interacted about two hours.

14    Q      And how did it come about that you both

15   came to work there together?

16    A      Just -- it was one of the extra jobs that

17   came up available.

18    Q      Did he let you know about the job?

19    A      I let him know about it.  I was already

20   working there.

21    Q      I see.

22           Did you let anyone else know about the

23   job opportunity?

24    A      No.

25    Q      Why did you let Mr. Bruss know?

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

255

1   A      I was a fill-in.  So they already had

2   plenty of work there.

3            Oh, why did I let Eric?

4   Q      Uh-huh.

5   A      I think just on shift one day, they were

6   looking for someone to cover.

7   Q      I see.

8            So earlier when I was asking you about

9   your phone numbers, I was trying to get your work

10  phone numbers straight from your previous two

11  phone numbers.  You said that your texts and your

12  contacts transferred when you got a new phone;

13  right?

14  A      Yes.

15  Q      So you do have all of your messages on

16  this new phone?

17  A      No.  I don't -- I don't keep my

18  conversations, so I delete my conversations a lot.

19  Q      I see.

20            So you have a -- you delete your

21  conversations with some regularity?

22  A      Yes.

23  Q      So you deleted text messages with

24  Mr. Bruss, for example?

25  A      Yes.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

256

1   Q       Did you delete text messages with

2   Mr. Bruss before you got a new phone?

3   A       I'm sure I did, yes.

4   Q       Did you do it manually?

5   A       Yes.

6           If you mean from the device itself,

7   yes.

8   Q       Right.

9   A       Yes.

10  Q       And did you delete conversations with

11  Mr. Bruss after you got the new phone?

12  A       Yes.  I don't have any conversations with

13  myself and Eric on the phone right now.

14  Q       I see.

15          So did you lose any messages without

16  deleting them when you transferred phones?

17          Did you only lose messages because you

18  deleted them when you changed phone numbers?

19  A       Yeah.  I didn't lose them.  I got rid of

20  them.

21  Q       I see.  Okay.

22          Did you keep some messages and not

23  others?

24  A       No.  No.  I just -- I delete the feed.

25  Q       What's "the feed"?

257

1   A       Like if it says Eric Bruss and then it

2   will say Aaron Venegas, and then it will say John

3   Stamos, I'll click each one individually, and

4   delete it to where it's not -- because I don't

5   like a whole lot of texts that I got to go

6   through.  That's just me.

7   Q       What --

8   A       That's back to all that social media

9   stuff.  I just don't do it.

10  Q       When did you start that practice?

11  A       Probably when I first started using a cell

12  phone.

13          Well, not the -- I used to use that

14  brick cell phone when it first came out.  You-all

15  probably don't know about those.  But ever since

16  I've had smartphones, I don't keep all my texts.

17  Q       I see.

███████████████████████████████████████████

██████████████████████████████

20  A       What do you want --

21          MS. VINSON:  Object to form.

██████████████████████████████████████████

██████████████████████████

████████████████████

██████████████████████████████████

258



259



260



261



262



263

1    Q      Are you retired now?

2    A      I am retired.

3    Q      When did you retire?

4    A      In July -- August.  I retired in August.

5    Q      August 2023?

6    A      Uh-huh.

████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

████████████

█████████████████

██████████████████████████████████████

███████████████

█████████████████████████████████

████████████████████████████████████████

███████████████

████████████████████████████████████████

███████████████

20            Are you indemnified by anybody?

21   A      No.

22   Q      Were you ever indemnified?

23   A      No.

24   Q      Are you insured for law enforcement

25   misconduct?

264

```
 1    A      No.

 2    Q      To your knowledge, does Harris County

 3   insure -- have an insurance policy covering law

 4   enforcement officers?

 5    A      I don't know.

 6    Q      Did you ever have any insurance for

 7   misconduct through your union?

 8    A      No.

 9    Q      Did you ever have any insurance at all

10   through your union?

11    A      No.

12    Q      Sorry.

13           How long did you work alongside Robert

14   Johnson?

15    A      Four months.

16    Q      When did you stop working with him?

17    A      When I promoted to night shift.

18    Q      And after that, you didn't work with him

19   at all?

20    A      No, ma'am.

21    Q      How did you first meet him?

22    A      I met him when I walked into the patrol

23   station my first day.  He shook my hand, said,

24   "You're assigned to me."

25    Q      What was he like as a supervisor?
```

265

1    A      He was -- he was stern, but he was fair.

2   He liked that I had a lot of knowledge and a lot

3   of experience, and he used me in a capacity that

4   helped a lot of the newer deputies on the -- on

5   the streets.

6              But he was -- he was a -- he was a

7   working sergeant.  He liked to go out and patrol

8   and answer calls with us and that kind of stuff

9   instead of sitting in the office.

10   Q      I see.  So in that way, he was different

11  than other sergeants at Precinct 1?

12              MS. VINSON:  Object to form.

13              THE WITNESS:  I should say he was

14        different than the other sergeant on that

15        shift that liked to sit in the office a

16        lot.

17  BY MS. LaVARCO:

18   Q      Understood.

19              During those four months, how closely

20  did you work with him?

21   A      Same as Bruss.  We were the -- it was a

22  short -- the shift only had, like, five or six

23  guys on the north side, so we all -- we all worked

24  pretty tightly together responding to calls.

25   Q      How many -- how many nights a week?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

266

1    A     He was off -- I want to say he was off

2    Sunday and Mondays -- or Friday -- I can't

3    remember.  I think I worked with him three days a

4    week.

5    Q     How frequently would you say you were

6    deployed to the same scenes as Robert Johnson?

7    A     I would say often.

8    Q     Is that a weekly basis?  More than once a

9    week?

10   A     At least once a week we were on a scene

11   together.

12   Q     Was he someone that you enjoyed working

13   with?

14   A     I did enjoy working with him.

15   Q     Why?

16   A     Just a -- I liked to talk to him.  He had

17   good stories.  I just wish I knew who he was

18   outside of who he was.  I don't think I'd have got

19   to know him the way I did.

20   Q     What kind of stories did he have?

21   A     Oh, just stories about when -- he used to

22   work for the sheriff's office as well before he

23   went to Precinct 1, and he would talk about

24   arrests he had made in District 3, which was a

25   real heavy narcotics area, methamphetamine area.

KERRY LEE THOMAS vs                                     Wayne Schultz
ERIC M. BRUSS

1    He would just talk a lot about the stuff that he

2    did when he was with the sheriff's office.

3     Q      Was there ever any friction in your

4    relationship with Robert Johnson?

5     A      Never.

6     Q      Would you say that he was easy to work

7    with?

8     A      I felt he was easy to work with, yes.

9     Q      Were you ever afraid of Robert Johnson?

10    A      No.  I'm a big dude too.

11    Q      Would you say that you looked up to Robert

12   Johnson during the time you worked together?

13    A      I wouldn't say I looked up to him, but I

14   respected him as a supervisor and as a peer.

15    Q      Would you say that you considered Robert

16   Johnson a role model?

17    A      To me?  No.

18    Q      Did you think Robert Johnson was a role --

19   a role model for less experienced deputies?

20    A      Yes.

21           MS. VINSON:  Object to form.

22           THE WITNESS:  Yes, I would.

23   BY MS. LaVARCO:

24    Q      Did you feel any differently about that

25   after his death?

KERRY LEE THOMAS vs                                        Wayne Schultz
ERIC M. BRUSS

268

1    A       Did I feel any differently about people

2   looking up to him?

3    Q       Whether he was a role model -- yeah.

4    A       I don't like when people live lies and

5   present themselves as one way, then you find out

6   they're another way.

7                So did -- honestly, to answer your

8   question, no, because I didn't think about how

9   people thought of him.  I thought about what he

10  did and how it made me feel that I was actually

11  close to the guy, you know, as far as -- as a work

12  peer.

13   Q       What did he do exactly?

14   A       What do you mean?

15   Q       You just said you felt differently about

16  what he did.

17   A       Oh, about with the pedophile stuff that he

18  ended up shooting himself over.  I don't know a

19  whole lot about that.  I didn't dig into that

20  case.

21   Q       Had you been on the scene with Mr. Johnson

22  during a K-9 deployment before the incident

23  related to this litigation?

24   A       Yes.

25   Q       How often were you on the scene with

269

1   Robert Johnson during a K-9 deployment?

2    A      Rough, four times.  Maybe five.

3    Q      And when I say "K-9 deployment," I mean

4   that the dog was unleashed on a suspect.  Is that

5   also what you mean?

6    A      Oh, no.  I meant just like -- I used to --

7   I tracked for him a couple of times.  I ran cover

8   for him.  So in other words, I was the guy with

9   the rifle while he was looking for a bad guy in a

10  wooded area.  I did that a couple of times for

11  him.

12            As far as him unleashing the dog or

13  releasing the dog, I can only think of one other

14  time where he released a dog on a suspect.

15   Q      When was that?

16   A      I don't recall the dates and times.  I

17  know we were both getting off, and he had a car --

18  a vehicle that he was chasing on 45 southbound,

19  and we ended up in a big old chase.  I called the

20  chase.  And when it was over with, the guy

21  wouldn't get out of the truck, and he released the

22  dog on the driver on that one.

23   Q      Did you feel that it was justified to

24  release the dog on the driver in that

25  circumstance?

270

1   A      I really don't have enough information to

2   know if it was justified or not.  I was on the

3   other side of the car covering the passenger side.

4   Q      Oh, so you didn't see it happen?

5   A      I did not.

6   Q      How would you describe Robert Johnson's

7   temperament?

8   A      He had a good temperament.  He was jovial.

9   Q      Would you say that he had a short fuse?

10  A      Describe a "short fuse."

11  Q      Was he prone to get agitated or angry more

12  easily than other people?

13          MS. VINSON:  Object to form.

14          THE WITNESS:  I never saw it.  He

15      looked like a guy that could, but I never

16      saw him do it.

17  BY MS. LaVARCO:

18  Q      In what way did he look like a guy that

19  was quick to anger?

20  A      He looked like Braun Strowman from WWE.

21  He's a big, old, like -- you know.

22  Q      Who was Robert Johnson close to?

23          MS. VINSON:  Object to form.

24          THE WITNESS:  Close in what way?

25      Like as work buddies or work partners?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

271

```
 1   BY MS. LaVARCO:

 2    Q     Yeah.  To your knowledge, who was Robert

 3   Johnson close to among colleagues at Precinct 1?

 4              MS. VINSON:  Objection; form.

 5              THE WITNESS:  Mike Medina probably

 6        was the closest with him, and that was his

 7        partner sergeant -- they were the two

 8        sergeants that ran evenings.

 9           (Discussion off the record.)

10              THE WITNESS:  I'm putting in a

11        mint.

12   BY MS. LaVARCO:

13    Q     Okay.  Thank you.  I appreciate you saying

14   that for the record.

15    A     I want to make sure I can -- yeah.

16              For the record, I am putting in a

17   mint.  It is a Life Saver.

18    Q     I do like a good pun.

19    A     Yes.  Oh, now I'm going to be smacking.  I

20   can feel it already.  Sorry.

21    Q     You mean smacking your lips.  I'll put

22   that for the record so we don't get to think that

23   you're planning on smacking anybody here.

24    A     Oh, my gosh, Shirley.

25    Q     So was Mike Medina also a K-9 handler?
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

272

```
 1    A      No, ma'am.

 2    Q      Who else was Robert Johnson close with at

 3   the precinct, to your knowledge?

 4    A      That was -- that was the main one.  He --

 5   when he got off duty, he was gone, and he

 6   was -- you know, he'd come in and use his K-9

 7   time.  He didn't really -- I mean, he associated

 8   with me until I went to the other shift.

 9              But him and Mike both came from

10   District 3, from the sheriff's office, so they

11   were pretty close.

12    Q      Apart from you and Mike, he didn't really

13   associate with other people at the precinct?

14    A      No.  No.  No.  He did.

15              MS. VINSON:  Object to form; asked

16        and answered; calls for speculation.

17   BY MS. LaVARCO:

18    Q      You can go ahead and answer.

19    A      Yes.

20    Q      Yes, he wasn't really close to other

21   people besides Mike and you?

22    A      Ask that question --

23    Q      I'm sorry.  You said "yes."  Do you mean

24   yes, Robert Johnson was not really close to other

25   people at the precinct besides you and Mike
```

273

1  Medina?

2          MS. VINSON:  Objection; calls for

3      speculation; asked and answered.

4          THE WITNESS:  And, no, I thought

5      you had asked -- I'm sorry.  I'm trying

6      not to sneeze.

7          I thought you had asked was he

8      close to anyone else at the precinct.  And

9      he was close with people.  He just

10     wasn't -- they wasn't going out drinking

11     beers and hanging out.

12  BY MS. LaVARCO:

13   Q    Sure.

14   A    And he would eat lunch with us, but he

15  always brought his own lunch.

16   Q    Did he go out drinking beers with Mike

17  Medina?

18   A    I have no idea.

19          MS. VINSON:  Objection; calls for

20     speculation.

21          THE WITNESS:  And I still have no

22     idea.

23  BY MS. LaVARCO:

24   Q    Did you go out for beers with Robert

25  Johnson sometimes?

274

1    A      I did not.

2    Q      Were there people at the precinct, to your

3    knowledge, that Robert Johnson didn't get along

4    with?

5              MS. VINSON:  Objection; calls for

6         speculation.

7              THE WITNESS:  No.

8    BY MS. LaVARCO:

9    Q      Based on your observations, did Robert

10   Johnson appear to have control over his K-9?

11   A      Yes.

12   Q      Were there instances you observed in which

13   Robert Johnson didn't have control over his K-9?

14   A      No.

15   Q      Was Robert Johnson's demeanor on

16   February 22nd, 2021, his typical demeanor at work?

17   A      Yes.

18             MS. VINSON:  Object to form.

19             THE WITNESS:  Sorry.

20   BY MS. LaVARCO:

21   Q      Did you trust Robert Johnson's judgment?

22   A      Yes.

23   Q      At any point during the time you worked

24   with Robert Johnson, did you observe any changes

25   in mood or behavior?

275

1   A      No.

2   Q      With respect to the allegations against

3   Robert Johnson that he sexually abused children,

4   were there ever any rumors circulating, to your

5   knowledge, to that effect?

6   A      No.  Zero.

7   Q      To your knowledge, who else was involved

8   in Robert Johnson's alleged abuse -- sexual abuse

9   of children?

10               MS. VINSON:  Object to form.

11               THE WITNESS:  I honestly don't

12        know.

13               MS. LaVARCO:  I'm going to ask

14        Cassidy to enter another exhibit.  And

15        also let me know which exhibit this is,

16        Cassidy.

17               MS. KRISTAL-COHEN:  This will be

18        Exhibit 9.

19               MS. LaVARCO:  Exhibit 9?

20               MS. KRISTAL-COHEN:  Yes.

21               MS. LaVARCO:  Thank you.

22          (Schultz Exhibit 9 marked.)

23   BY MS. LaVARCO:

24   Q      So this is Exhibit 9, which is an excerpt

25   of a supervisor responsibility policy from

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

276

1    Precinct 1, which was included in your IAD file

2    for the GPS jammer allegations, Mr. Schultz.

3              Do you recognize this?

4     A      Yes, ma'am.

5     Q      And do you agree with the way that I've

6    represented it?

7     A      Yes.

8     Q      Do you see that it says that:  "Precinct 1

9    supervisors are expected to serve as role models

10   whose behavior is to be emulated."

11             And then later in the paragraph, it

12   says:  "All supervisors are expected to conduct

13   themselves in a professional manner while on duty

14   or while engaged in any other Constable Precinct 1

15   or law enforcement-related activity"?

16    A      Yes.

17    Q      Does this accurately describe Robert

18   Johnson?

19    A      The man I knew, yes.

20    Q      Does your answer to that question change,

21   given what you know about the circumstances of his

22   death?

23    A      No.

24    Q      Even knowing what you know about the

25   allegations against him, you would still say that

277

```
 1    he was a professional?

 2     A      As conducting himself in a law enforcement

 3    capacity, 100 percent yes.

 4     Q      So you're not aware of the allegations

 5    that he used his position to commit child sexual

 6    abuse?

 7     A      I was not aware of that.

 8     Q      To your knowledge, were other personnel at

 9    Precinct 1 afraid of Robert Johnson?

10              MS. VINSON:  Objection; form.

11              THE WITNESS:  No.

12    BY MS. LaVARCO:

13     Q      To your knowledge, did he have bad blood

14    with anyone else at the precinct?

15              MS. VINSON:  Object to form.

16              THE WITNESS:  No.

17              MS. LaVARCO:  Okay.  We can pull

18        the exhibit down, Cassidy.  Thank you.

19              THE WITNESS:  I'm trying to hurry

20        up my mint.

21              Can you hear that?  Oh, my God.

22        You-all didn't hear that one?  My stomach.

23              MS. LaVARCO:  No.

24              THE WITNESS:  Oh, my goodness.

25              MS. LaVARCO:  Your stomach is
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

278

1        growling?

2                THE WITNESS:  Yeah.  And I'm not

3        hungry, so you know what that means.

4                MS. LaVARCO:  Let us know if you

5        want to take a break.  We can do that

6        before this next session as opposed to the

7        middle of it.

8                THE WITNESS:  We're good.  We're

9        good.

10               MS. LaVARCO:  You sure?

11               THE WITNESS:  Yes, ma'am.

12               MS. LaVARCO:  Okay.

13               THE WITNESS:  Let's get 'er done.

14   BY MS. LaVARCO:

15    Q     Okay.  So moving to the allegations

16   underlying this lawsuit, can you tell me, in your

17   own words, what happened around 9:15 p.m. on

18   February 22nd, 2021, from beginning to end?

19               MS. VINSON:  Object to form.

20               THE WITNESS:  We were dispatched to

21       a weapons disturbance.  I don't have notes

22       in front of me, so I can't give you the

23       address or anything, but I know you-all

24       have that.  So I'm going to give you kind

25       of a "Reader's Digest" version, if that's

279

1   okay.

2           And we had information that there

3   was a weapon involved, and there was a

4   fight that was ensuing in the street.

5   Responded to that location.

6           Sergeant Johnson -- when I

7   arrived -- I arrived about four minutes

8   after Sergeant Johnson was already on

9   scene, and I had a rookie with me,

10  Nathaniel Vital was my rookie that was

11  with me.  And he -- I told him to go over

12  with Corporal Bruss.  I went over to the

13  opposite side with Sergeant Johnson, and I

14  took up a position -- I let

15  Sergeant Johnson know that I was behind

16  him.

17          Sergeant Johnson already had his

18  dog out.  I don't know what he saw that I

19  didn't see, but in front of me I saw a man

20  that was prone on the -- if you're inside

21  the car, he was on the passenger side of

22  the vehicle on the grassy area.  I took a

23  little bit of a tactical position.  I

24  deployed my Taser -- not deployed it.  I

25  unholstered it and put it kind of in the

280

1    direction of -- Mr. Thomas, is who I was

2    dealing with at that time.

3           I believe I heard sergeant -- or

4    Bruss was doing something on the other

5    side.  And I didn't want to take my eyes

6    off of Mr. Thomas, so I -- but I could

7    hear that Bruss was doing something with

8    the other male.

9           So there was some back-and-forth

10   between Vital, Tuzun, and Bruss over on

11   the opposite side of the Tahoe that I was

12   with with Sergeant Johnson, and they

13   were -- at the end of the day, what they

14   were doing was taking Mr. Gray into

15   custody.  Took him into custody -- or

16   detained him, rather, because at this

17   point we really didn't know what we had.

18   We just know that they said, "These were

19   the guys," and we were going to detain

20   them until we knew we had no weapons and

21   no one was going to get hurt.

22          I stayed in that position.  I asked

23   Sergeant Johnson -- I told him I was

24   there, asked him what he needed, what he

25   needed me to do.  That's when he got Jeck

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

281

```
1    in between him, and started giving

2    commands, was giving commands.

3           So then I started giving commands

4    to Thomas, tell him to "get up, do it

5    now."  Because what I wanted to do was

6    bring him to us.  I didn't want to go --

7    because we hadn't cleared the car yet.  So

8    I didn't know if there was an additional

9    suspect in the car.  I didn't know if he

10   had weapons on him.

11          So like I said earlier in this

12   interview -- or in this deposition, I want

13   to get him out, I want to put their hands

14   up, I want them to lift their shirt up,

15   and I want them to turn around, make sure

16   I don't see anything in the waistband, and

17   then keep their hands up.

18          This is what I was attempting to

19   get Mr. Thomas to do.  He refused to

20   comply.  Johnson, I believe at that time,

21   was saying, "If you don't comply we're

22   going to -- I'm going to release the dog."

23          Jeck was barking.  And I know at

24   one time Mr. Thomas lifted his head up and

25   looked towards us, and a lot of those
```

282

```
1   times in those instances, they're looking

2   to flee or they're looking to see if they

3   have an opportunity, where's their target

4   if they're going to shoot somebody.

5        So at that time, I'm still on

6   heightened alert.  I trained my Taser

7   laser on him, and I think there's -- that

8   was when I talked about there was a part

9   where I flicked my wrist to make the Taser

10  longer range.  It was in short range.

11  Because generally if we tase someone,

12  they're short range.

13       But he was a pretty good mile --

14  not a mile, but he was a little bit away.

15  Probably about 20 feet-ish, right at the

16  end of my range.

17       So that's when Sergeant Johnson

18  released the -- released Jeck.  Jeck went

19  over and put a bite on him.  I kept --

20  Johnson went up and there was a new

21  thing -- I didn't -- it was a new thing

22  that the handler had to take the person

23  into custody instead of someone else,

24  because I guess there had been some

25  transfer bites at other agencies where the
```

283

1   dog went from the suspect to another

2   police officer that was trying to

3   apprehend the suspect.

4       And I guess they're trained -- this

5   is merely me just thinking outside the

6   box, but I think they're trained not to

7   bite their handler.  So he actually got on

8   top of Mr. Thomas and was able to take him

9   into custody.

10      I guess, you know, the dog was

11  still on the bite.  He was trying to get

12  his arms behind his back, and eventually I

13  think Bruss came over after the other guy

14  was secured and he cleared the car, to my

15  knowledge.

16      And eventually, Thomas was -- I

17  could see that he had injuries.  He was in

18  custody -- or at least detained, had a

19  pretty good dog bite.  I believe -- was it

20  on his left shoulder, I think, somewhere

21  in that area.  I could see that there was

22  blood, so I immediately called for a

23  medical -- for EMS to make the scene for a

24  dog bite so I could get medical attention

25  for him.

284

1          I think at that point, I got with

2    Vital.  I went and got -- I think I went

3    and got my fingerprint reader because I

4    wanted to identify the people that were

5    there.  Got with Vital to make sure we

6    started getting information documented.

7          And then I went over to the -- I

8    want to say I went over to the homeowner's

9    garage and he was already talking with

10   Sergeant Johnson, and that's when I was,

11   like, "Well, where did we get that there

12   was a gun?  Where did we get that there

13   was a fight?"

14         And that's when I learned that

15   there was a fight between -- it was Gray

16   and Thomas, and it looked like a fight but

17   it looked like -- I think Gray was trying

18   to pull Thomas into the car so they could

19   leave.  And that's when they made it sound

20   like it was a fight and that's the

21   information they gave to dispatch, that I

22   later ended up putting in my report.

23         So from there, I got the

24   information from the homeowner, found out

25   that it was something to do with a cell

285

1  phone that they thought was there but

2  there was a trespassing the night before.

3  They told him not to come back out on the

4  property.  That's when I learned that the

5  homeowner was actually the person that had

6  the weapon, not the suspects that were out

7  on the street.

8       So I made sure that that weapon was

9  secure, which I think we had already found

10  out through dispatch, and -- and then I

11  went and called the district attorney.  At

12  that point, I knew I had trespass, but I

13  thought I also had an interfering with the

14  duties of public servant based on just him

15  not complying and making us work a little

16  bit to get him in custody.

17       So I ran it all down to the DA's

18  office, and I believe they took

19  criminal -- or criminal trespass on both

20  individuals.

21       I made sure I needed -- I needed

22  Thomas to get medical attention, so I made

23  sure the DA's office was okay with me

24  doing a 2B warrant on him so he could go

25  get medical attention, and then I took

286

1          Gray into custody and processed him.

2     BY MS. LaVARCO:

3      Q      So you said at the beginning that what you

4     wanted was for Mr. Thomas to stand up, put his

5     hands up, lift his shirt, and turn around so that

6     you could make sure that nothing was in his

7     waistband?

8      A      Yes.

9      Q      Is that what you would have done if you

10    would have arrived first?

11     A      I don't -- I can't answer that.  I don't

12    know.  I don't know what Johnson saw when he got

13    there.  I don't know what his circumstance was

14    when he arrived, and there was a four-minute

15    interval between the time he arrived on scene and

16    had stuff going on versus the time -- compared to

17    the time I got there.

18     Q      What about if you had arrived and you saw

19    the same thing that you actually did see, which

20    was Mr. Thomas prone on the ground?

21     A      That would have been weird if I just saw a

22    dude --

23              MS. VINSON:  Object to form.

24              THE WITNESS:  Yeah, sorry.  Sorry,

25        sorry, sorry.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

287

```
 1              MS. VINSON:  Okay.  You need to let

 2       me put my objections on the record --

 3              THE WITNESS:  Yes, ma'am.

 4              MS. VINSON:  -- okay, and then

 5       answer the question.

 6              THE WITNESS:  Okay.

 7              MS. VINSON:  Give me time.  Thank

 8       you.

 9              Object to form.

10   BY MS. LaVARCO:

11    Q     What about if Mr. Thomas was in the car

12   when you arrived?  What would you have done if you

13   were the first to arrive?

14              MS. VINSON:  Object to form.

15              THE WITNESS:  Is he in the driver's

16       seat or the passenger's seat?

17   BY MS. LaVARCO:

18    Q     The passenger's seat?

19    A     And he's just sitting there doing nothing?

20    Q     Yes.

21    A     And I'm still -- I'm still arriving on a

22   possible weapons disturbance?

23    Q     Yes.  All of the other circumstances are

24   the same.

25    A     I would have waited for backup.  I would
```

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

288

1    have gave some commands from my vehicle.  I would

2    have called him out of the car at gunpoint -- not

3    at Taser point -- and I would have brought him

4    back to me with a backup unit to take him into

5    custody.

6     Q      And you would have brought him back to you

7    in the manner you described where you asked him to

8    get out of the car, you asked him to put his hands

9    up, you ask him to lift his shirt so you could

10   make sure that nothing was in the waistband, and

11   then have him walk towards you?

12    A      I would have him turn around away from me

13   and walk backwards to my voice.

14    Q      Okay.  And everything else that I said was

15   accurate?

16    A     Yeah.

17           MS. VINSON:  Object to form.

18           THE WITNESS:  Yes.

19   BY MS. LaVARCO:

20    Q     I can ask it again.

21    A      Yeah.

22    Q     Just so I'm sure and I don't misstate your

23   testimony.

24           MS. VINSON:  Object to form.

25           Go ahead.

289

1    BY MS. LaVARCO:

2     Q      So if you arrived and Mr. Thomas was

3    sitting in the passenger's seat and it was a

4    possible weapons disturbance, you would ask -- you

5    would order Mr. Thomas to get out of the car, you

6    would ask him to put his hands up, you would ask

7    him to lift his shirt and have him turn around so

8    that you could be sure nothing was in his

9    waistband, you would ask him to walk backwards

10   towards you, and then you would take him into

11   custody; is that right?

12    A      Yes.

13    Q      Is that essentially what they did with

14   Mr. Gray on the other side, to your knowledge?

15    A      I don't know.  I didn't see what they did

16   on the other side.

17    Q      Where did you get information that there

18   might have been a gun?

19    A      From dispatch when they initially put the

20   call out.

21    Q      What specifically did dispatch say?

22    A      I don't recall exactly.

23    Q      Do you recall the gist of it?

24    A      That there was a weapon involved and

25   someone had a weapon.

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

290

```
1    Q      Do you recall who dispatch said had the
2    weapon?
3    A      I do not.
4    Q      Did you have any reason to think that it
5    was Mr. Thomas or Mr. Gray who had the weapon?
6    A      Yes.
7    Q      What reason did you have to think that?
8    A      When they said that they were fighting in
9    the streets, I didn't know who was fighting at
10   that time.  And even if they were giving me
11   information that the homeowner had a weapon, I
12   didn't know whether the suspects had weapons as
13   well.
14   Q      Did anybody ask over dispatch -- did you
15   hear anyone ask over dispatch whether it was the
16   suspects or the homeowners who had the weapon?
17   A      I seem to recall Bruss -- I want to say
18   Bruss asked over the air, and they did advise that
19   the homeowner did have a weapon.  But that still
20   didn't confirm whether or not the suspects had a
21   weapon also.
22   Q      Did you hear anyone ask for confirmation
23   about whether the suspects had a weapon?
24   A      Yes, and the only positive information
25   they had was that the homeowner did have a weapon.
```

291

1    Q     So there was no positive information from

2    dispatch, to your recollection, that the suspects

3    also had a weapon?

4    A     Nope.  Just like the other millions of

5    calls we were on.  We don't know until we get

6    there.

7    Q     And by "positive information," you mean

8    what?

9    A     It was confirmed that the homeowner had a

10   weapon by the homeowner.  We hadn't talked to --

11   Q     Was there any --

12   A     -- the suspects yet.

13   Q     I'm sorry.  What did you say?

14   A     We had not talked to the suspects yet, so

15   I did not know if they were armed or not.

16   Q     Did dispatch suggest to anyone, to your

17   recollection, that the suspects might have had a

18   weapon?

19   A     It -- to me, the way the call went out, it

20   was perceived to me that the aggression was on the

21   suspects' side.

22   Q     Meaning that the aggression -- that the

23   suspects were being aggressive?

24   A     Right.  Right.  Why else would the

25   homeowner pull a weapon on them?

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

292

```
 1   Q     Who specifically said that the two,

 2   quote/unquote, suspects were fighting?

 3   A     The homeowner.  The male.  I don't

 4   remember his name.

 5   Q     And did you hear that over dispatch

 6   personally?

 7   A     No.  I heard it over a bodycam after I

 8   reviewed my bodycam.  And he had said it on the

 9   scene.

10   Q     After the K-9 was unleashed --

11   A     Right.

12   Q     -- on Mr. Thomas?

13   A     Right, right, right.

14   Q     But you didn't hear it on the dispatch?

15   A     I didn't hear -- that they were fighting?

16   Q     Yeah.

17   A     No.  They did say people were fighting in

18   the streets over dispatch.

19   Q     And you heard that?

20   A     Yes.

21   Q     Do you remember anything else dispatch

22   said?

23   A     No.

24   Q     What's a 2B1?

25   A     A 2B warrant.  Is that what you asked?
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

293

1    Q       Oh, is that what it is, a 2B warrant?

2    A       Yes.  It's a warrant for the arrest of the

3    individual.

4    Q       And you said you asked for a 2B warrant on

5    Mr. Thomas, but you asked that Mr. Gray be taken

6    to jail immediately?

7    A       I took Mr. Gray to jail immediately.  I

8    didn't have to ask for that.

9    Q       And why did you suggest that a warrant

10   should be placed on Mr. Thomas as opposed to

11   taking him into custody after he was treated at

12   the hospital?

13   A       I felt like I -- he -- honestly, he had

14   been bit by a dog, he was coming down from

15   whatever he was on, and I just felt it was better

16   for him and his mental well-being to relax, go

17   home, get stitched up or whatever you were going

18   to do, and then you know you got a warrant, turn

19   yourself in at a later date when you're in better

20   shape.

21   Q       So by that point, you didn't feel like he

22   was a danger to be kept out of custody?

23   A       No.

24   Q       In your experience at Precinct 1, when

25   somebody is injured during an apprehension and

294

1    have to be taken -- and has to be taken to the

2    hospital, do you typically go for a 2B warrant or

3    do you typically take them into custody after

4    they're treated?

5     A      Typically go for a 2B warrant.

6     Q      To your knowledge, who pays for the

7    medical treatment if somebody is taken into

8    custody immediately after being injured?

9             MS. VINSON:  Object to form.

10            THE WITNESS:  I have no idea.

11   BY MS. LaVARCO:

12    Q      To your knowledge, the rookie that was

13   with you, Nathaniel Vital, did he have his

14   body-worn camera footage on?

15    A      I don't -- I don't -- I can't recall if he

16   did or not.

17    Q      Do you recall what --

18    A      I don't remember -- we were getting

19   cameras issued late to the rookies, and I don't

20   remember how long he had been with me at that

21   time.

22    Q      Are deputies always required to have their

23   body-worn camera footage on when they're

24   responding to a scene?

25    A      If they have one, yes.

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

295

1    Q      But you don't recall whether Vital had

2    one?

3    A      I don't recall if he had one.

4    Q      Is that part of a written policy that

5    deputies, if they had one, should have a -- their

6    body-worn camera footage on when responding to a

7    scene?

8    A      The policy, I believe, states any time

9    they're interacting with the public or if there is

10   a possibility of something escalating, it must be

11   activated.

12   Q      Do you recall the name or number of that

13   policy?

14   A      No, I do not.  It would be under

15   "Body-Worn Camera Policy."

16          So I guess I did recall the name.

17   Look at me go.

18   Q      You said that when you first arrived and

19   you positioned yourself behind Robert Johnson, you

20   saw Mr. Thomas prone on the ground; correct?

21   A      Yes.

22   Q      Could you see his hands?

23   A      I believe I could see his right hand.  I

24   don't recall being able to see his left hand just

25   because of where I was positioned.

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

296

1    Q      Didn't you say that you were trying to

2   keep very focused on Mr. Thomas and not pay

3   attention to what was happening on the other side

4   of the scene?

5    A      I think it was the lighting.  But, yes, I

6   was very focused on only Thomas.

7    Q      The lighting conditions were not optimal

8   to be able to see Mr. Thomas?

9    A      The lighting conditions were just not

10  optimal for that one arm.  I had good -- I had

11  good lighting on the other side.

12   Q      Given that this was a weapons disturbance,

13  did you -- did you try to ascertain whether

14  Mr. Thomas had anything in his hands upon arrival?

15   A      Johnson had a better advantage, and he

16  hadn't released the dog, and there had been no

17  shots fired.  So I just went off of Johnson's lead

18  at that point.

19   Q      Do you think you could have seen

20  Mr. Thomas' hands clearly if you had stepped, for

21  example, a couple of feet to one side?

22   A      Yes, but I would have been stepping into

23  the dog.

24   Q      Wasn't the dog positioned in front of you

25  as opposed to the side?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

297

```
1    A       No.  The dog -- well, yes, but I then --

2    Johnson's tall.  I wouldn't have been able to see

3    over Johnson, and he had his door open.

4    Q       Dispatch told you that there were two

5    suspects on the scene; is that correct?

6    A       Yes.  Yes.

7    Q       Do you recall a description for those

8    suspects?

9    A       Not without looking at notes.

10   Q       Did you have a specific reason to think

11   that there were -- might be someone else in the

12   car?

13   A       Just -- only because we hadn't cleared it,

14   yes.

15   Q       Does your training teach you to assume

16   that there's always potentially someone else in

17   the car?

18   A       Yes.

19   Q       Did you say that Mr. Thomas refused to

20   comply with orders?

21   A       Would I say or did I say?

22   Q       Did you say that.

23   A       Did I say that?  Yes.

24   Q       Which orders did he refuse to comply with?

25   A       When I was asking him to get up, stand up,
```

298

1    get off the ground.  All that.

2     Q     And just to be clear, all of those are you

3    repeat -- all of these examples that you just gave

4    are repeating the same order; right?  He was on

5    the ground in a prone position, and you were

6    trying to get him to stand up from that prone

7    position?

8     A     Correct.

9     Q     Was Johnson also ordering him to get off

10   the ground?

11    A     No.  I took him -- I took command of the

12   commands at that point.

13    Q     So Johnson didn't give any orders for

14   Mr. Thomas to get off the ground?

15    A     I -- I don't know what he did prior to me

16   getting there, but I -- and I don't know what -- I

17   don't think he did once I started giving commands.

18          I did say if -- I think he said, "If

19   you don't get up, I'm going to release the dog."

20   That's the only thing I can remember.

21    Q     Are there any other ways that you observed

22   Mr. Thomas refuse to comply with orders, apart

23   from not getting off the ground immediately?

24    A     No.

25    Q     You said something about a new thing -- I

299

1    think you were referring to a policy -- that the

2    handler has to be the person to take a dog bite

3    victim or a suspect apprehended with a K-9 into

4    custody; is that correct?

5     A     I don't know if it's a policy.  It was

6    something that was told to me by Johnson.  And

7    since he was the sergeant over K-9, I believed he

8    was accurate in that.

9     Q     When --

10    A     I never saw an actual written policy in

11   reference to it.

12    Q     When did Johnson tell you that?

13    A     I don't know if it was like -- I don't

14   know.  It might have been a week before then.

15    Q     So did Johnson talk to you about his K-9

16   duties?

17    A     No.

18    Q     So how did this new practice -- I won't

19   call it a policy -- come up, that the handler has

20   to be the person to take a suspect into custody?

21    A     I want to say we took -- there was another

22   person -- it wasn't a dog bite, but it was a dog

23   apprehension.  And I don't remember -- I think we

24   were on the scene with the sheriff's office,

25   actually, and there -- it was their dog handler,

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

300

```
 1   and that's when he had said after the fact, he

 2   said, "Hey, we now -- we mount our guys and we

 3   take them into custody after we -- if there's a

 4   bite."

 5    Q     Did he say that directly to you or did he

 6   say that to a group of people he supervised?

 7    A     It was just me.

 8    Q     Did you communicate with Robert Johnson by

 9   email for work?

10    A     No.

11    Q     Did you communicate with him by text

12   message?

13    A     We had texted a few times.  Not much.

14    Q     Would you talk on the phone sometimes with

15   Robert Johnson?

16    A     Yes.

17    Q     How would you describe the scene when you

18   arrived?

19    A     I think I was the last car there.  So I

20   saw vehicles positioned, saw the lights, saw the

21   car, and I saw Johnson.  I would say it looked

22   like -- I don't want to call it "normal," but it

23   looked like things were going the way they needed

24   to go, and we just needed to start, like I said

25   earlier, peeling the onion apart.
```

301

1    Q      Can you remind me what you mean by

2    "peeling the onion apart"?

3    A      When we talked about the poop sandwich.

4    Q      Okay.  How would you describe Robert

5    Johnson's temperament when you arrived on the

6    scene?

7    A      He seemed -- he seemed normal.  He was

8    trying to get Jeck -- Jeck was spinning around a

9    little bit, and he wanted to get Jeck in control

10   to where he -- he had it -- he had Jeck trained on

11   the suspect, on Thomas.

12   Q      What do you mean that "Jeck was spinning

13   around"?

14   A      Sometimes when they get out, if they've

15   been in the truck a while, they -- they'll spin

16   around.  They want to -- they get excited.  The

17   dogs get excited to work.  So whether he's going

18   to get a ball, whether he's going to get to chase

19   a bad guy -- or a suspect, rather -- into the

20   wooded area, whether he's going to get to --

21   whatever, they get excited and sometimes the

22   handler has got to calm them down.  And I could

23   tell Johnson had calmed him down.

24   Q      Did you see Johnson struggle with Jeck at

25   all?

302

1    A      I wouldn't call it "struggle."  Jeck was

2   just a real strong dog, no matter how big Johnson

3   was.  So I think he was just putting him in check

4   and putting him where he needed to be.

5    Q      So it took a moment or so, but Johnson was

6   working to control Jeck?

7    A      I think he -- yeah.  He got him in between

8   his legs and where he needed to be pretty quick.

9    Q      Was Jeck still struggling to get away or

10  to get towards the suspect?

11   A      Once I saw him move Jeck into position, I

12  couldn't see past the door, so I couldn't see what

13  was going on from there.

14   Q      What do you mean by "position"?

15   A      And where I -- where I told you, back by

16  his legs to where he was ready to deploy him if he

17  needed to.

18   Q      To your knowledge, is that the standard

19  position, to have a dog ready to -- for

20  deployment?

21   A      I don't know.

22   Q      Would you say that Mr. Thomas was

23  resisting apprehension?

24   A      Passively, yes.

25   Q      Would you say that he was resisting

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

303

1   apprehension verbally?

2    A     He was mumbling some stuff.  I can't

3   recall what it was.  So I -- I don't know.  I

4   don't have an answer to that.

5    Q     Was Mr. Thomas resisting apprehension

6   physically in any way?

7    A     No.

8    Q     Did you personally take any steps to slow

9   down or stabilize the situation?

10    A     When I was giving verbal commands in a

11   loud, authoritative voice, that was me doing

12   exactly that.

13    Q     Did you see anyone else take steps to slow

14   down or stabilize the situation?

15    A     I was really concentrating on my side of

16   the car and on Thomas and make -- I don't -- I

17   don't want to get bit by the dog either, so I want

18   to make sure I know where the dog is at all times

19   too.

20    Q     What did you hope that your loud,

21   authoritative verbal commands would achieve?

22    A     I would have hoped he would have got up

23   and been detained so we could have found out what

24   the situation was.  And he might have gone home.

25   I don't know.

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

304

1    Q     Could you have asked Robert Johnson to

2    slow down?

3    A     If I felt he was overdoing it, could I

4    have?  Yes.

5    Q     Did you feel he was overdoing it?

6    A     I did not.

7    Q     Could you have told Robert Johnson that it

8    wasn't necessary to release his K-9 on Mr. Thomas?

9    A     No.  I don't have that experience.  No.

10   Q     Did you have the opportunity to tell

11   Robert Johnson that it wasn't necessary to release

12   his K-9?

13   A     No.

14   Q     Did the fact that he was your supervisor

15   prevent you from telling Robert Johnson to -- that

16   it wasn't necessary to release his K-9?

17   A     No.

18   Q     Could you have suggested that Robert

19   Johnson take other steps to try to de-escalate

20   before releasing his K-9?

21   A     Are you asking could I have suggested?

22   Q     Yes.

23   A     Is that what you said?  No.

24   Q     Why couldn't you have suggested he do

25   that?

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

305

1    A       That was his scene, not mine, and he was

2    the K-9 handler.  At that point, I had no reason

3    to believe he was doing anything he didn't need to

4    be doing.

5    Q       Could you have suggested that the dog be

6    used to clear the vehicle first while you kept

7    your eyes on Mr. Thomas?

8    A       That's not the way we do it.  No.

9    Q       After the K-9 was unleashed on Mr. Thomas,

10   could you have directed Robert Johnson to remove

11   the dog?

12   A       Could I have?

13   Q       Uh-huh.

14   A       I don't really -- I couldn't -- Robert's a

15   big guy.  I couldn't see what was going on.  I was

16   on the other side of him.  I honestly couldn't see

17   the bite from where I was positioned.

18   Q       Could you have moved to see what was going

19   on?

20   A       Sure.

21   Q       Why didn't you move to see what was going

22   on?

23   A       I did, about the time they were getting

24   him off and Bruss was talking to him at that

25   point.

306

1   Q      So could you have directed Robert Johnson

2   to remove his dog at that point?

3   A      No.

4   Q      Why couldn't you have?

5   A      It didn't -- I didn't know what he was

6   dealing with, and I didn't see anything that was

7   over the top at that point.  So he had complete

8   control of what was going on.  That was his scene,

9   his dog, his deployment.

10  Q      Bruss cleared the car while the dog was

11  still on Mr. Thomas; correct?

12  A      I don't know.

13  Q      Could you have called another supervisor

14  to try to prevent Robert Johnson from unleashing

15  his dog?

16  A      No.

17  Q      Did you feel it was appropriate to release

18  the K-9 at the time that Robert Johnson unleashed

19  it?

20  A      I don't have the knowledge to answer that.

21  Q      So you can't say whether or not it was

22  appropriate?

23  A      I cannot.

24  Q      What information were you missing to help

25  you understand whether it was appropriate for

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

307

1   Robert Johnson to unleash the K-9 when he did?

2    A     I'm not a K-9 handler.  I don't know what

3   he saw.  I don't know what his parameters were

4   that gave him the motivation to release the dog.

5   I don't know any of that stuff, so...

6    Q     Do you think -- do you think that if you

7   had had training on -- specific to K-9s at

8   Precinct 1, that that would have been enough

9   information for you to decide whether it was

10  appropriate or not for Johnson to release the K-9?

11             MS. VINSON:  Object to form.

12             THE WITNESS:  I can't answer that.

13  BY MS. LaVARCO:

14   Q     Could you have asked or suggested that

15  Robert Johnson at any point remove the dog from

16  the bite?

17   A     If you're asking could I have, yes,

18  absolutely I could have.

19   Q     And why didn't you?

20   A     I had no reason to.

21   Q     Because you thought it was appropriate?

22   A     I didn't know what was appropriate.  I

23  didn't have a reason to release that dog.  It was

24  not my responsibility.

25   Q     You said earlier that you were afraid the

308

1   dog might attack you; is that right?

2    A      I don't know if I used the term "afraid,"

3   but I see where you're going.  Go ahead.

4    Q      You said, I think, specifically, something

5   to the effect of you didn't want to get too close

6   to the dog because you didn't want the dog to bite

7   you.  Is that --

8    A      That might be more of what I would have

9   said, yes.

10   Q      Were you always cautious around K-9s?

11   A      Yes.

12   Q      Did you have reason to be particularly

13  cautious around Johnson's K-9?

14   A      No.  All K-9s -- I respect -- I respect

15  what they're capable of, and I want them to be

16  able to work to minimize any kind of damage to

17  anybody, including the suspect.

18   Q      When you are working with K-9 handlers at

19  Precinct 1, do you feel you have a duty to

20  intervene in the face of excessive force?

21   A      Yes.

22   Q      When you're working with K-9 handlers, do

23  you feel like you have a duty to intervene if you

24  see a dog deployed against a suspect when it's not

25  objectively reasonable to use that kind of force?

309

1     A      I don't have the knowledge to know if it

2   is objectively reasonable due to me not being a

3   K-9 handler.  I don't know what they see that

4   allows them to release the dog.

5     Q      You don't have enough information -- or

6   you didn't have enough information when you were

7   working with K-9 handlers to understand whether

8   excessive force was occurring?

9              MS. VINSON:  Object to form.

10             THE WITNESS:  I don't -- I feel

11        like I just answered this.  I'm not a

12        K-9 handler.  So if they released the

13        dog -- I mean, if a dog is trying to tear

14        someone's throat out, I think I would try

15        and intervene.  But if the dog's on an arm

16        bite for, like, 15 seconds and the handler

17        is there, I don't know what "excessive" is

18        when it comes to that.

19   BY MS. LaVARCO:

20    Q      So except in extreme circumstances, when

21   you're working with a K-9 handler, you didn't feel

22   you had the information to independently assess

23   whether or not the K-9 should have been released?

24    A      No.

25             MS. VINSON:  Object to form.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

310

1              THE WITNESS:  Sorry.

2    BY MS. LaVARCO:

3     Q      When you are working with the K-9 handler,

4    do you feel you can't independently assess whether

5    the dog should be released?

6                   MS. VINSON:  Object to form; asked

7          and answered.

8                   THE WITNESS:  You're asking me if I

9          subjectively know if the dog can be

10         released or not?

11   BY MS. LaVARCO:

12    Q      If it's excessive force, whether or not

13   the dog can be released.

14                  MS. VINSON:  Objection; asked and

15         answered.

16                  THE WITNESS:  Yeah, I don't know

17         what the "excessive force" is.  You'd have

18         to give me a scenario.

19   BY MS. LaVARCO:

20    Q      You've said a few times that you can't

21   assess whether or not force was excessive in this

22   circumstance because you weren't trained as a

23   K-9 handler; is that right?

24    A      Yes.

25    Q      So you can't speak to whether it's

311

```
 1   appropriate to release a K-9 on a suspect in all

 2   circumstances; is that correct?

 3              MS. VINSON:  Object to form; asked

 4        and answered.

 5              Shirley, this is maybe the seventh

 6        time you've asked this same question.

 7        Let's move on.

 8   BY MS. LaVARCO:

 9    Q     Is that correct, Mr. Schultz?

10    A     Yes.

11    Q     Were you afraid for your life when you

12   arrived on the scene?

13    A     On a weapons disturbance, you're always

14   going to have a little bit of the hairs standing

15   up on the back of your neck, wondering if you're

16   going to catch a round from someone.  So I always

17   fear for my life when I'm out working.

18    Q     When you arrived on the scene and you saw

19   Mr. Thomas prone on the ground and you understood

20   that Bruss was in the process of taking Mr. Gray

21   into custody, did you fear for your life at that

22   point?

23    A     No.

24    Q     Was there a specific point after you

25   arrived during which you feared for your life?
```

312

```
 1    A      No.

 2    Q      Did you fear serious bodily harm at any

 3   point?

 4    A      I don't know how to answer that.  I mean,

 5   any situation can turn into the one that ends your

 6   life.

 7    Q      But you didn't observe anything

 8   specifically that made you fear serious bodily

 9   harm after you arrived on the scene?

10          MS. VINSON:  Object to form.

11          THE WITNESS:  No.  But I didn't

12       know was there a third party?  Was there

13       someone in the -- you know, in the house

14       that we didn't know about?  Was there

15       someone behind a tree?

16          So I call it my "spidey senses."

17       They still tingle until everything is

18       under control.

19   BY MS. LaVARCO:

20    Q      Based on your observations, what made the

21   situation so urgent that you couldn't wait longer

22   for Mr. Thomas to get off the ground?

23    A      That wasn't my call.  That was Johnson's

24   call.

25    Q      Did you see Mr. Johnson -- did you see
```

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

313

1   Robert Johnson straddling Mr. Thomas?

2    A      Yes.

3    Q      Did you think that that was appropriate?

4    A      I had seen him do it before, so I thought

5   that that was what he did.

6    Q      Did you think it was necessary?

7    A      To restrict movement and to try and

8   control the dog at the same time, I really can't

9   answer that.  I mean, it looked like he was doing

10  what he knew what to do, so...

11   Q      Could you have used the K-9 to clear the

12  vehicle and then approached Mr. Thomas from the

13  rear?

14              MS. VINSON:  Objection; asked and

15       answered.

16              THE WITNESS:  No.

17  BY MS. LaVARCO:

18   Q      Why not?

19   A      I don't like -- this is one thing I do and

20  all the guys that were there on the scene are the

21  same way.  I like the known, not the unknown.  So

22  if I bring them to me, the known is now with me,

23  and now I can go up and clear the car once they're

24  safely secured in patrol cars.

25   Q      Why didn't anyone speak with the

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

314

1    homeowners first, to your knowledge, before

2    Johnson unleashed the dog?

3               MS. VINSON:  Object to form.

4               THE WITNESS:  The scene wasn't

5         under control.  So we needed to deal with

6         what was -- at this point, what we thought

7         the aggression was or what the call was

8         about was the people that we, at this

9         time, still thought we had a possible

10        armed suspect in the street that was just

11        involved in a fight, to our knowledge,

12        with the homeowner.

13              We didn't know that -- we later

14        found out that the fight was between the

15        two of them and it really wasn't a fight.

16        It just looked like a fight.

17              So the direction was on the problem

18        at hand.  I knew the homeowners weren't

19        going to go anywhere.  I'm sure everyone

20        thought the same thing, but I don't know.

21        That's me speculating myself.

22   BY MS. LaVARCO:

23    Q     Did you see any acts of aggression from

24   Mr. Thomas or from Mr. Gray before the dog was

25   released?

315

1   A      Acts of aggression?  No.

2   Q      Did you observe any sudden movements from

3   Mr. Thomas before Johnson unleashed his dog?

4   A      No.

5   Q      Did you observe anything in Mr. Thomas'

6   waistband before Johnson released his dog?

7   A      No.

8   Q      Did you observe anything resembling a

9   weapon or that you thought might have been a

10  weapon on Mr. Thomas before Johnson released his

11  dog?

12  A      No.

13  Q      Did you ever find a weapon on Mr. Thomas?

14  A      No.

15  Q      Did you ever find a weapon on Mr. Gray?

16  A      No.

17  Q      Did you ever find a weapon in the car?

18  A      No.

19  Q      At the time Johnson released his dog, as I

20  understand it, you were on the scene, Robert

21  Johnson was on the scene, Nathaniel Vital, Eric

22  Bruss, and Asli -- is that how you say her name?

23  A      Asli.

24  Q      Asli --

25  A      Asli Tu- --

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

316

1    Q       -- Asli Tuzun?

2    A       Tuzun.

3    Q       Was anyone else on the scene from the

4    constable's office?

5    A       Later, lieutenant -- I can't remember his

6    name.  There was a lieutenant that made the scene.

7    I can't remember the name.

8    Q       Moncrief, perhaps?

9    A       Yes, Moncrief.

10   Q       But Moncrief arrived after?

11   A       Way after, yeah.

12   Q       Was anybody else other than the people I

13   named on the scene before Johnson released the

14   dog?

15   A       No.

16   Q       Given that you had five officers on the

17   scene before Johnson released the dog and two

18   suspects, why not have one of those people --

19   perhaps Vital -- go and speak with the homeowners

20   to get more information?

21   A       The more officers that are involved in the

22   actual custody or detention of the individuals,

23   the less chance of a likelihood of someone getting

24   hurt.

25   Q       But didn't you say earlier that the

317

1    information you had was that the homeowners had a

2    weapon and you didn't have any positive

3    information about whether the, quote/unquote,

4    suspects had a weapon?

5     A      Yes.

6     Q      So why not first secure the homeowners'

7    weapon?

8     A      Do I need to say again the same exact

9    thing I already said?

10              MS. VINSON:  Objection; asked and

11         answered.

12   BY MS. LaVARCO:

13    Q      Can you answer the question?

14    A      Ask me the question again.

15    Q      So why not secure the homeowners' weapon

16   when you knew they had a weapon and you didn't

17   have positive information that Mr. Thomas or

18   Mr. Gray had a weapon?

19              MS. VINSON:  Object to form.

20              THE WITNESS:  The dispatcher

21         provided us information that the homeowner

22         secured their own weapon.  So based on

23         that information, we -- I wanted to use

24         all the resources to take the two

25         individuals into custody, or at least

318

1        detain them.  And once the scene was under

2        control, then I would go talk with the

3        homeowners.

4    BY MS. LaVARCO:

5      Q     Understood.

6              MS. LaVARCO:  I think we're ready

7        to take a break now.  Does that work for

8        you-all?

9              MS. VINSON:  Sounds great.

10             MS. LaVARCO:  Okay.  What do we

11       say, 10, 15 minutes?

12             MS. VINSON:  Ten.  Let's come

13       back -- well, let's come back at 4:20.

14       13 minutes.

15             MS. LaVARCO:  That's fine.  Yeah.

16             And, Becky, can you let us know how

17       much time we have on the record so far?

18             THE REPORTER:  Yes.  We're on the

19       five hours, 22 minutes.

20             MS. LaVARCO:  Thank you.

21             THE VIDEOGRAPHER:  We are now going

22       off the record.  The time is 4:07 p.m.

23         (Recess from 4:07 p.m. to 4:24 p.m.)

24             THE VIDEOGRAPHER:  Okay.  We are

25       now back on the record.  The time is

319

```
 1        4:24 p.m.

 2   BY MS. LaVARCO:

 3    Q      Mr. Schultz, I'd like to turn to what

 4   happened in the aftermath of the K-9 deployment in

 5   the case.

 6    A      Yes, ma'am.

 7    Q      Who called the assistant district attorney

 8   to try to file charges against Mr. Thomas and

 9   Mr. Gray?

10    A      Yes.

11    Q      That was you?

12    A      Oh, yes.  Yes, that was me.

13    Q      Okay.  Sorry.  I had said "who."

14    A      Oh, my bad.  I thought you said "you."

15    Q      And who did -- who did you speak to?

16    A      Oh, was it ADA Jordan?  I don't remember.

17   I don't recall without looking at my report.

18    Q      Okay.  Do you -- can you tell me what you

19   said in that conversation with the ADA?

20    A      I just gave him the facts of the case.  I

21   told him the charges I was looking for.  There was

22   a lot of explanation due to the circumstances

23   surrounding the case.

24            I knew I had a trespass based on the

25   information with them being there the night
```

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

320

1    before, and then coming back after he told them

2    not to come back on the property again.  But it

3    was the interference with the duties of a public

4    servant that they were on the fence about, whether

5    or not they would take the charge, and ultimately

6    they took the two charges on the trespass.

7     Q     Two charges on the trespass, so they

8    didn't take the interference charge?

9     A     They did not, no.  The -- one each on

10   Gray -- one on Gray, one on Thomas.

11    Q     One on each of them for trespass?

12    A     Yes.

13    Q     And why didn't the DA want to take the

14   interference charge?

15            MS. VINSON:  Object to form.

16            THE WITNESS:  I -- I really don't

17       know.

18   BY MS. LaVARCO:

19    Q     What did the DA tell you about why he

20   didn't want to take the interference charge?

21    A     I think they just said, "We'll take the

22   other," and that was it.

23    Q     He didn't give you any explanation?

24    A     No.  Sometimes they don't.  They just say

25   they'll take this and that's it.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

321

1    Q       Had you talked to the ADA in the past?

2    A       I have.

3    Q       Did you have a good working relationship

4  with him?

5    A       Yeah.  I had no problem with that.

6            And at the end of the day, they're --

7  they're there for guidance for us regardless.  I

8  thought I had the charge based on the information

9  I had.  He didn't feel it was as good as I did.  I

10 didn't have a problem with it.

11   Q       Is criminal trespass a misdemeanor?

12   A       It is.

13   Q       And in what circumstances are you allowed

14 to make an arrest for a misdemeanor?

15   A       Ask me that again.

16   Q       In what circumstances are you allowed to

17 make an arrest for a misdemeanor?

18   A       Any time they commit a crime and I can

19 prove the evidence that they committed that crime.

20   Q       Do you have to personally observe the

21 misdemeanor?

22   A       No.  No.  So long as the facts are there

23 and I have evidence to support it, it's...

24   Q       Did anything else come up in your

25 conversation with the ADA?

322

1   A      I don't recall.

2   Q      Was your factual account to the ADA more

3   or less the same factual account that you gave me?

4   A      Yes.

5   Q      Did you talk to the ADA again after the

6   phone call on the scene?

7   A      I don't believe I did.  I think I actually

8   asked him if I could do the 2B warrant at that

9   time when I talked to him at -- because I knew

10  Thomas was transporting.

11  Q      Transporting to the hospital?

12  A      Yes.

13  Q      Did you talk to any other prosecutors

14  about Mr. Gray?

15  A      No.

16  Q      What about when the criminal complaint was

17  filed against Mr. Thomas?  Did you speak with the

18  prosecutor then?

19  A      No.

20  Q      Did you file an affidavit in support of

21  that criminal complaint?

22  A      Yes.

23  Q      How did you deliver the affidavit to the

24  district attorney's office?

25  A      The new way was via email.  They had an

323

1    email -- ever since COVID, they didn't want a

2    bunch of deputies downtown anymore doing the

3    warrants, so they had an email relay that went one

4    way, came back another way, and then went back

5    again.

6     Q      What do you mean by "went one way, came

7    back"?

8     A      In other words, I sent the email with the

9    charges, they sent it back for me to sign, I sent

10   it back, they sent me back the warrant.

11    Q      I see.

12            Were there any follow-up

13   communications after the warrant over email --

14    A      No.

15    Q      -- with the prosecutor?

16    A      No.

17    Q      Did they contact you -- did the

18   prosecutor's office contact you again as they

19   proceeded with the prosecution against Mr. Thomas?

20    A      No.

21    Q      Did they contact you again as they

22   proceeded with the prosecution against Mr. Gray?

23    A      No.

24    Q      To your knowledge, did they contact any of

25   the other deputies on the scene as they proceeded

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

324

1    with the prosecutions against Mr. Thomas and

2    Mr. Gray?

3     A      It's not standard procedure, so I would

4    say no.

5            MS. LaVARCO:  Okay.  I'd like to

6       enter another exhibit, which is a video

7       file.  So rather than screen sharing, what

8       we're going to do is we're using the same

9       Google Drive folder that we used for Eric

10      Bruss' deposition a couple of weeks ago.

11      I'll drop the link to it so everyone has

12      it handy into the chat here.

13            And then --

14            THE WITNESS:  Click on it?

15            MS. LaVARCO:  Yeah.

16            And then, Cassidy, can you put as

17      Exhibit 10 the video file?  I'll give it

18      to you.

19            THE WITNESS:  Open it up?

20            MS. LaVARCO:  Hang on.  The exhibit

21      I'm looking at is not in there yet.

22            THE WITNESS:  Mine is loading.

23            I did it again.  I can't stop

24      myself from whistling.

25            MS. LaVARCO:  Oh, whistling?

325

1          MS. VINSON:  Okay.  Hold on.

2          What are we doing, Shirley?  I'm

3     confused.  What are you asking?  Let me

4     click it.

5          MS. LaVARCO:  Sorry.  We can just

6     hang on a moment.  What I've asked -- I've

7     just shared the link to the exhibit

8     folder.  I've asked Cassidy --

9          Cassidy, you're on; right?

10          MS. KRISTAL-COHEN:  Yeah.  I'm

11     here.  I think the video is just loading.

12          MS. LaVARCO:  Okay.  Okay.  So we

13     just need a minute.

14          And I think, Cassidy, if you didn't

15     do this already, you can add it as a

16     shortcut so that it will load more

17     quickly.

18          Okay.  I see it in my folder now.

19     If you refresh.

20          Do you see the video?  It should be

21     marked as Exhibit 10 in that folder that

22     you're looking at if you click on

23     Exhibit 10.

24          MS. VINSON:  It's asking me to sign

25     in to my Google Drive.

326

1          Are you-all trying to play a video?

2          MS. LaVARCO:  Yeah, we're asking --

3     we're going to -- I don't think that we

4     can screen share the video.  So if you

5     need to sign in to Google Drive, maybe we

6     can take a moment to do that.

7          I also just dropped the link to the

8     Google -- to the video directly.

9          MS. VINSON:  Let me try that.  I

10    don't know what my Google Drive password

11    is.

12         MS. VESTAL:  I also do not have

13    access without logging in, even when you

14    send the link.

15         MS. LaVARCO:  With the link in the

16    chat?

17         MS. VESTAL:  Correct.

18         MS. LaVARCO:  Okay.  Can we go off

19    the record for a moment and we'll deal

20    with this tech issue?  Because we're going

21    to have a few more.

22         Okay.  Great.  Thank you.

23         THE VIDEOGRAPHER:  We are now going

24    off the record.  The time is 4:33.

25       (Recess from 4:33 p.m. to 4:46 p.m.)

327

1          THE VIDEOGRAPHER:  We are now back

2      on the record.  The time is 4:46 p.m.

3            (Schultz Exhibit 10 marked.)

4   BY MS. LaVARCO:

5    Q      Mr. Schultz, I've entered Exhibit 10,

6   which is approximately a five-minute clip from

7   your body-worn camera footage that captures your

8   conversation with the assistant district attorney

9   about the charges filed against Mr. Thomas and

10  Mr. Gray.

11            I'd like you to watch the first

12  30 seconds of that video to refresh your memory of

13  the first 30 seconds of that conversation, and let

14  me know when you've finished.

15   A      Okay.  Give me a second.

16   Q      Thank you.

17   A      I'm muting you.

18            All right.  I watched 30 seconds.

19   Q      Thank you.

20   A      Okay.

21   Q      So during those 30 seconds, you told the

22  ADA that it looked like Mr. Thomas and Mr. Gray

23  were going to run; correct?

24   A      Yes.

25   Q      And then you also told the DA that they

328

1  chose not to run because the dog was barking;

2  correct?

3   A     Yes.

4   Q     When exactly did it look to you like

5  Mr. Thomas was going to run?

6   A     That was information based on information

7  I got from Sergeant Johnson.  I never saw that.

8   Q     I see.

9          And is it customary, when you're

10  calling the ADA to file charges, that you relay

11  information that you didn't personally observe?

12   A     Yes.

13   Q     So you never saw Mr. Thomas look like he

14  was going to run from -- at any point after you

15  arrived on the scene?

16   A     Only when he got -- when he raised his

17  head up to look where he was at when I was giving

18  him commands and Johnson was giving him commands.

19          My head looks shiny.  Sorry.  Easily

20  distracted.

21   Q     You also say:  "The one kid ends up

22  getting bit by the K-9 because he won't comply.

23  He doesn't do anything.  Won't get up.  Won't do

24  anything, but he's talking to us."

25          And you say that Mr. Thomas said:

329

1    "'No, I ain't doing that.  I ain't doing that.'

2    So, you know, my sergeant released the dog on him

3    and he ended up getting bit."

4              Did you say that?

5    A     I didn't get that far yet.  We only did

6    30 seconds, as requested.

7    Q     Let's see.

8    A     Do I need to do a minute?

9              We're at 31 seconds exactly.

10   Q     And what is the time stamp at the top left

11   of the video say?

12   A     02/22/2021 at 8:00 with 10 seconds.

13   Q     Is it 20:04:10?

14   A     Nope 20:00:10.

15   Q     Oh, I see.

16   A     You're 4 minutes ahead of me.

17   Q     I see.  Okay.

18              Can you jump ahead to the mark for

19   20:04:10?

20   A     Sure.  It's almost going to be at the end

21   of the video.

22   Q     Yeah.  It's a short 5-minute video.

23              So watch about 30 seconds there and

24   let me know when you're done.

25   A     Okay.  Be right back.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

330

1          Okay.  There was nothing about -- it

2     was me talking -- basically wrapping it up and

3     talking about the 2B warrant and me taking Gray in

4     and letting Thomas go to the hospital and that he

5     accepted the trespasses.  There was nothing about

6     what you're talking about on there.

7     Q     Nothing about Mr. Thomas failing to

8     comply?

9     A     No.

10    Q     Do you recall telling the ADA that

11    Mr. Thomas didn't comply?

12    A     Yes.

13    Q     What specifically did Mr. Thomas not

14    comply with?

15    A     When he chose not to get up to my commands

16    for him to get up.

17    Q     Is it possible that Mr. Thomas just didn't

18    realize you were directing your orders at him?

19    A     No.

20          MS. VINSON:  Object to form.

21    BY MS. LaVARCO:

22    Q     Did you consider the possibility that

23    Mr. Thomas just didn't realize you were talking to

24    him?

25    A     No.

331

1    Q      Isn't it true that multiple people were

2   giving commands at the same time?

3    A      No.

4    Q      Did you consider whether Mr. Thomas was

5   confused?

6    A      No.

7   ███          ████████████████████████████████

    ██  ██████████████

    ██  ██    ████

    ██  ██    ██████████████████████████████████

    ██  ████████████████████████████████

    ██  ██    ████

    ██  ██    ██████████████████████████████████████

    ██  ██████████████████████████████████████████

    ██  ████████

    ██  ██    ████

17   Q      Did you hear Mr. Thomas refuse to get up

18  off the ground verbally?

19   A      In what manner?

20   Q      Did you hear him say anything in response

21  to the order to get off the ground?

22   A      I don't recall.

23   Q      Can you go approximately to the mark of

24  20 -- 20:03:00 and watch about a minute?

25   A      Sure.

332

1    Q       Thank you.

2    A       Sure.

3            I'm back.

4    Q       During that portion of the video, at

5    approximately the 20:03 mark, did you say that

6    Mr. Thomas wouldn't get up, wouldn't do anything,

7    and that he was talking to you?

8    A       Yes, I did.

9    Q       Did you tell the ADA that Mr. Thomas said

10   in response to your order to get up, "No.  I ain't

11   doing that.  I ain't doing that"?

12   A       Yes, I did.

13   Q       Did you personally hear Mr. Thomas say

14   that?

15   A       I would assume I did.

16   Q       If you did hear him say that, did you ask

17   him why he was saying he wouldn't get off the

18   ground?

19   A       That's not the time to ask why.  It's the

20   time to make him do.

21   Q       Even though he was prone on the ground and

22   you could see his hands?

23   A       Yeah.  He needed to get up.

24   Q       Why was it so urgent that he get up, given

25   that Mr. Gray was already in custody?

333

```
 1   A     We were still --

 2              MS. VINSON:  Objection; asked and

 3        answered.

 4              THE WITNESS:  We were still dealing

 5        with a weapons disturbance.

 6   BY MS. LaVARCO:

 7   Q     Had the car been cleared at that point

 8   already?

 9              MS. VINSON:  Objection; asked and

10        answered.

11              THE WITNESS:  I don't -- I don't

12        recall.

13   BY MS. LaVARCO:

14   Q      Is it possible -- did it occur to you at

15   the time that Mr. Thomas was afraid to move

16   because he had weapons aimed on him?

17              MS. VINSON:  Objection; calls for

18        speculation.

19              THE WITNESS:  No.

20   BY MS. LaVARCO:

21   Q     Did it occur to you that Mr. Thomas may

22   have had a physical injury that made it difficult

23   for him to get off the ground?

24              MS. VINSON:  Objection; asked and

25        answered; and form.
```

334

```
 1                THE WITNESS:  No.

 2                MS. LaVARCO:  I've not asked that

 3        question before.

 4           (Bruss Exhibit 3 tendered.)

 5                MS. LaVARCO:  Okay.  I'd like to go

 6        to the video marked as Exhibit 3, which we

 7        first entered as an exhibit in Eric Bruss'

 8        deposition.  I believe it should be in the

 9        Box folder as well.

10                (Discussion off the record.)

11   BY MS. LaVARCO:

12    Q     So this is an excerpt -- or this is Robert

13   Johnson's body-worn camera footage.

14    A     Okay.

15    Q     Does that appear to be what you see on

16   your screen?

17    A     It doesn't say whose it is, but it does

18   show to be a body camera.

19    Q     Okay.  Can you go to the time stamp of --

20   and go by the time stamp on the top left.  Go to

21   the time stamp of 19:40:40, and then stop at

22   19:41:06.  So it's about 30 seconds or so.

23    A     41:06?

24                MS. VINSON:  Wait.

25                THE WITNESS:  We're having
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

335

1    technical difficulties.

2          MS. VINSON:  Let me press "play."

3          You're going to have to mute that

4    because --

5          THE WITNESS:  I'm muting you for

6    just a second.

7          MS. LaVARCO:  Okay.  I put the time

8    stamps that I want you to look at in the

9    chat as well.

10         THE WITNESS:  It's buffering and

11   won't let it play.

12         MS. VINSON:  Yeah.  It won't let us

13   go that far ahead.

14         Start it over.

15         THE WITNESS:  We're starting over.

16         MS. LaVARCO:  Okay.  We'll give it

17   another minute.

18         THE WITNESS:  It is buffering.

19   Buffering.  Buffering.

20         MS. VINSON:  Oh, wait.  It moved.

21         THE WITNESS:  Oh, it moved.

22         MS. VINSON:  What are the times?

23         MS. LaVARCO:  They're in the chat.

24   19:40:40, and then stop at 19:41:06.

25         MS. VINSON:  I think we're almost

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

336

1          there.

2                   THE WITNESS:  Okay.

3     BY MS. LaVARCO:

4      Q      So now that you've watched that clip, can

5     you confirm that that was Robert Johnson's

6     body-worn camera footage?

7      A      Yes.  Well, it was his voice.  Yes.

8      Q      So Johnson, who -- was the one who said:

9     "The way he was acting, dude, I didn't want to be

10    suckered in"?

11     A      Yes.

12     Q      And what did you understand Johnson to

13    mean by that at the time?

14     A      Like, if he was to approach him, maybe he

15    was playing to where he had a weapon and he didn't

16    want to be in his area to where the -- where

17    Thomas could deploy a weapon on him, is the way I

18    understood it.

19     Q      And then you said:  "I hate that, because

20    there's nothing I can do when you're -- when

21    you're like that."

22              You said that to Johnson; correct?

23     A      Right.  Yes.

24     Q      And what did you mean when you told Robert

25    Johnson, there's nothing you can do when he's like

KERRY LEE THOMAS vs                                            Wayne Schultz
ERIC M. BRUSS

337

1   that?

2    A      If there -- what I was getting at is if he

3   had a weapon, Johnson would have been in between

4   me and him had there been any gunfire.  So when

5   he's on that mount like that, it's hard for me to

6   do anything to assist him until the guy's in

7   custody.

8    Q      You weren't referring to before Johnson

9   released the dog?

10   A      I don't believe I was.

11   Q      Did you also say:  "Because I know your

12  dog's going to go after me and I was just letting

13  you do your thing"?

14   A      I did say that.

15   Q      And what did you mean by that?

16   A      For me to get -- I didn't want to get in

17  the way of the dog.

18   Q      Why not?

19   A      Because I would get bit, and that would

20  probably hurt.

21   Q      And what did you mean by "just letting

22  Johnson do his thing"?

23   A      The K-9 handler has got the scene.  The

24  K-9 handler does his job.

25   Q      So you should never prevent the

338

```
1   K-9 handler from doing his job?

2              MS. VINSON:  Object to form.

3              THE WITNESS:  At that -- no.

4       During this one, no.

5   BY MS. LaVARCO:

6    Q     Do you feel comfortable intervening in K-9

7   deployments?

8    A     Like getting in between the dog and the

9   suspect?

10   Q     Intervening in any way, whether verbally

11  or physically.

12   A     Well, I can't control his dog, so I'm

13  going to say no, I don't feel comfortable

14  intervening.

15   Q     Do you feel comfortable intervening to ask

16  the K-9 handler to control their dog?

17   A     I wouldn't have a problem with that if it

18  needed to be addressed.  You might get a, "Dude,

19  control your dog," or, "Dude, check your dog."

20   Q     So why didn't you say that here?

21   A     I didn't feel --

22             MS. VINSON:  Object to form; asked

23       and answered.

24             THE WITNESS:  I didn't feel it was

25       necessary.  Johnson had it.
```

1    BY MS. LaVARCO:

2     Q      What do you mean by "Johnson had it"?

3     A      Johnson was in control.  Johnson was in

4    control of his dog.  Johnson was in control of the

5    suspect.  Johnson had everything.

6     Q      And you thought all of Johnson's actions

7    were appropriate in that deployment?

8                MS. VINSON:  Object to form.

9                THE WITNESS:  Yes.

10   BY MS. LaVARCO:

11    Q      I'm just checking the time stamps I gave

12   you.

340

15  A       At that time, I --

16              MS. VINSON:  Object to form.

17              THE WITNESS:  At that time, I

18      didn't have the information.  I was still

19      working it out.

20  BY MS. LaVARCO:

21  Q       But you didn't consider it?

22              MS. VINSON:  Object to form; asked

23      and answered.

24              THE WITNESS:  I did not.

25              MS. LaVARCO:  Okay.  I'd like to go

341

1    to the next exhibit.  Let me see if it's

2    in the Box folder yet.

3          Yes.  Where is it?

4          Did you-all say that you were able

5    to view Google Drive links at this point?

6          MS. VINSON:  No.

7          MS. LaVARCO:  Was it just because

8    the other one was too long to buffer?

9          MS. VINSON:  It keeps saying

10   "access denied."

11         MS. LaVARCO:  Okay.  Deane, I'm

12   going to drop this link in the chat and

13   ask you to put it in the Box folder.

14         MS. VINSON:  I have Exhibit 4 in

15   here.  That's not what you want?

16         MS. LaVARCO:  No.

17         THE VIDEOGRAPHER:  I've requested

18   access to the latest.

19         MS. LaVARCO:  Okay.  Brittany, can

20   you give him access?

21         MS. FRANCIS:  I'm sorry.  I don't

22   see a request for access on this latest

23   link.

24         MS. KRISTAL-COHEN:  I just shared

25   access, so we should be good to go.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

                                                            342

1          THE VIDEOGRAPHER:  It's downloading

2    now and it will be up on Box momentarily.

3          MS. LaVARCO:  Thank you.

4          THE VIDEOGRAPHER:  That is now

5    ready.

6        (Schultz Exhibit 11 marked.)

7          MS. LaVARCO:  Okay.  It should be

8    just a 20-second clip from Robert

9    Johnson's body-worn camera footage.  So

10   can you just watch it in its entirety and

11   let me know when you're finished?

12         THE WITNESS:  Going in.

13         MS. LaVARCO:  Thanks.

14         THE WITNESS:  We don't see it yet.

15   It --

16         MS. LaVARCO:  Can you hit

17   "refresh"?

18         MS. VINSON:  Yeah.  There it is.

19         THE WITNESS:  There you go.  All

20   right.  We'll be right back.

21         MS. VINSON:  So the short clip or

22   the long clip?

23         MS. LaVARCO:  Short clip.

24         THE WITNESS:  All right.  We'll be

25   right back.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

343

1           MS. LaVARCO:  And while we're doing

2      that, which exhibit number are we up to?

3      Deane, do you know?

4           THE VIDEOGRAPHER:  I was just

5      looking back in my notes.  This should be

6      either 11 or 12.  I believe it's 11, but I

7      would need confirmation.

8           MS. LaVARCO:  Okay.  Yeah, I don't

9      think we reserve -- referred to an

10     Exhibit 11 yet, so I think it's

11     Exhibit 11.

12          THE WITNESS:  When you-all are

13     talking, I can't hear.  Sorry.

14          MS. LaVARCO:  Oh, apologies.  We'll

15     be quiet and you can go ahead and listen

16     again.

17          THE WITNESS:  Thank you.

18          All right.

19  BY MS. LaVARCO:

20   Q     So was that a clip from Robert Johnson's

21  body-worn camera footage?

22   A     Appeared to be, yes.

23   Q     Who did Johnson appear to be talking to in

24  that clip?

25   A     My only guess would be

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

344

1   Lieutenant Moncrief.

2   Q      What did Johnson say to Moncrief?

3   A      Stated that it was a generic dog bite,

4   wanted to know if he was still sitting.  I don't

5   know if that meant asking if he was at dinner or

6   whatnot, but -- and then asked him if he was

7   making it up there.

8   Q      Did Johnson say specifically that it was

9   "just a generic dog bite for refusal"?

10  A      Yes, he did.

11  Q      What do you understand that to mean?

12  A      I have --

13          MS. VINSON:  Objection; form.

14          THE WITNESS:  I have no idea.

15  BY MS. LaVARCO:

16  Q      Did it appear to be -- in your experience,

17  was this a generic K-9 apprehension?

18  A      I don't know what a "generic K-9

19  apprehension" is.

20  Q      Was there anything unusual, based on your

21  observations, about this K-9 apprehension, as

22  compared to other K-9 apprehensions you've

23  observed?

24  A      No.

25          MS. LaVARCO:  Okay.  Next clip

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

345

```
 1    should be Exhibit 11.  I'm dropping it

 2    here.

 3          Oh, sorry.  This is Exhibit 12.

 4    Excuse me.

 5       (Schultz Exhibit 12 marked.)

 6          MS. VINSON:  Is this a long clip?

 7          MS. LaVARCO:  No.

 8          Deane, have you requested access?

 9          THE VIDEOGRAPHER:  Yes, ma'am.

10          MS. VINSON:  Becky, how much time

11    have they used?

12          THE REPORTER:  5 hours, 58 minutes.

13          MS. FRANCIS:  I just want to

14    confirm, Deane, do you have access now?

15          THE VIDEOGRAPHER:  Not yet, no.

16          MS. FRANCIS:  Cassidy, can you give

17    him access?  I'm not seeing your request

18    on my end.

19          MS. KRISTAL-COHEN:  I'm not seeing

20    a request on my end.

21          MS. LaVARCO:  Deane, can you just

22    give us your email address in the chat and

23    we can give you access directly so you

24    don't have to request it?

25          MS. FRANCIS:  Okay, Deane.  I gave
```

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

346

```
 1        you access.  Let me know if that worked.

 2              THE VIDEOGRAPHER:  Yes.  That just

 3        worked, and uploading now.

 4              There we go.  Thank you for your

 5        patience, everyone.

 6              MS. LaVARCO:  Thanks for your help.

 7              THE WITNESS:  Sure enough.

 8   BY MS. LaVARCO:

 9    Q      Okay.  Go ahead and watch this clip, which

10   is just another short clip from Robert Johnson's

11   body-worn camera footage.

12    A      Okeydoke.  Be right back.

13              Okay.

14    Q      So is that another clip from Robert

15   Johnson's body-worn camera footage?

16    A      Sounds like it, yes.

17    Q      Who is Johnson talking to in that clip?

18    A      I --

19              MS. VINSON:  Object to form.

20              THE WITNESS:  I actually have no

21        idea.

22   BY MS. LaVARCO:

23    Q      You don't recognize their voice?

24    A      I did not.

25    Q      Who else was on the scene other than the
```

347

1    officers that you've named so far?

2     A      Just Moncrief.

3     Q      Just Moncrief, and nobody else responded

4    after the dog was unleashed?

5     A      I don't believe so, no.

6     Q      What about somebody who's last name is

7    Ontiveros Rivera?  Did they come to the scene or

8    they met you somewhere else?

9     A      I don't -- I think he went to the hospital

10   to check on Thomas.  I don't think he ever made

11   the scene.

12    Q      Would you recognize Moncrief's voice?

13    A      I didn't recognize that voice to be

14   Moncrief or Ontiveros.

15    Q      Would you recognize Moncrief's voice if

16   you heard it?

17    A      Yes.

18    Q      Would you recognize Ontiveros' voice if

19   you heard it?

20    A      Definitely, yes.

21    Q      And you would recognize the voice of

22   anyone who was on the scene who you have mentioned

23   so far?

24    A      I believe so.  I would, yeah.

25    Q      And that was nobody that you know of?

348

1    A      It didn't sound familiar to me.

2    Q      Okay.

3    A      It sounded like someone was whispering,

4    though, so I don't know.

5    Q      And someone asked Robert Johnson how his

6    dog is doing, correct, in Exhibit 12?

7    A      Yes.

8    Q      And does Robert Johnson say, quote,

9    "full"?

10   A      That's what he says.

11   Q      And does -- but does he then say, quote,

12   "satisfied"?

13   A      That's what he says, yes.

14   Q      What do you make of that?

15   A      I have no idea.

16   Q      Is it fair that Robert Johnson was saying

17   that his dog was "full" and "satisfied" after

18   chewing on Mr. Thomas' arm?

19            MS. VINSON:  Object to form.

20            THE WITNESS:  I really can't answer

21       that.  I don't know what he was talking

22       about.  He might have just fed the dog.  I

23       don't know.

24   BY MS. LaVARCO:

25   Q      Did you hear the other person laugh?

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

349

1   A      Actually, I didn't.  It was real low.

2   Q      Did you perceive it as a joke?

3          MS. VINSON:  Object to form.

4          THE WITNESS:  It sounded like

5      someone might have been kidding around a

6      little bit.

7   BY MS. LaVARCO:

8   Q      And was the time approximately 7:50 p.m.?

9   A      Yes.  Yes.  I don't -- I don't --

10         MS. VINSON:  If you can answer

11     that.

12         THE WITNESS:  I don't know.

13  BY MS. LaVARCO:

14  Q      What's the time stamp on the video where,

15  it ends?

16  A      I don't know.  I don't see --

17         MS. VINSON:  We don't have the

18     video up anymore.

19  BY MS. LaVARCO:

20  Q      Can you pull it up?

21  A      At the end of the video, it is 19:52 --

22  oh, it won't go.  It looks like 19:52 and

23  15 seconds -- or 19:52 -- yeah.  19:52.

24  Q      So Johnson would have still been on the

25  scene after deploying the K-9 on Mr. Thomas?

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

350

1    A      Yes.

2    Q      So it's likely that the "full" and

3    "satisfied" response was with respect to the K-9

4    deployment?

5              MS. VINSON:  Object to form.

6              THE WITNESS:  That's --

7              MS. VINSON:  Asked and answered.

8         He said he doesn't know.

9              THE WITNESS:  I still don't know.

10             MS. LaVARCO:  Okay.  We are going

11        to move to Exhibit 13, which is already in

12        the Box folder.  It is labeled currently

13        "Schultz BWC Long Clip."

14          (Schultz Exhibit 13 marked.)

15   BY MS. LaVARCO:

16   Q      And let me know when you've got it up.

17   A      I've got that -- oh, we've got it up.

18   Q      Thank you.

19             Can you play approximately the first

20   55 seconds of that footage and hit pause at the

21   19:25:53 time stamp?  And I'll put that in the

22   chat so you have it as reference.  I put range

23   19:24:58, which is when the video starts, to

24   19:25:53.

25   A      Okay.  We'll be right back.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

351

1          Okay.

2    Q     And was that a clip from your body-worn

3    camera footage on February 22nd, 2021?

4    A     It was.

5    Q     Does Exhibit 13 show you arriving on the

6    scene and positioning yourself right behind Robert

7    Johnson and his K-9?

8    A     Not right behind, but behind him and over

9    to the left, yes.

10   Q     Approximately how far from Robert Johnson?

11   A     10 feet.  8 feet.

12   Q     Does it look like it showed Robert Johnson

13   struggling to control his K-9?

14   A     I wouldn't say "struggling," but he is

15   getting his K-9 in deployment ready.

16   Q     Was the K-9 yanking away from the leash?

17   A     I don't believe he had him on a leash.

18   Q     Was he yanking away from Robert Johnson's

19   grip on its collar?

20   A     I don't know if he was yanking away.  I

21   think he was trying to spin around.  So it didn't

22   look like he was yanking away from me --

23   Q     Did it look like --

24   A     -- or not from me, but from Johnson.

25   Q     Did it look like the K-9 was trying to

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

352

1  spin around?  Is that what you said?

2   A    Yes.

3   Q    "Spin around" meaning to face who?

4   A    I think they just -- like I said earlier,

5  they get excited when they get out of the truck,

6  and he knows he's in the work environment.  I

7  think he was just hyped up, excited.

8   Q    Excited to participate -- did it appear

9  that the K-9 was excited to potentially apprehend

10  a suspect?

11          MS. VINSON:  Object to speculation

12     of what the K-9 was thinking.

13          THE WITNESS:  Yeah.  I don't know

14     what the dog was thinking.

15  BY MS. LaVARCO:

16   Q    But based on your observation that he

17  appeared "hyped up," did it appear that he was

18  hyped up because he's excited to work, as you

19  said?

20          MS. VINSON:  Object to speculation

21     on why the K-9 was doing what he was

22     doing.

23          THE WITNESS:  Yeah, I would guess

24     he was -- he was wanting to work.

25

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

353

```
 1   BY MS. LaVARCO:

 2    Q      Did you hear Eric Bruss using profanity in

 3   that clip?

 4    A      I actually did not hear Bruss using

 5   profanity in that clip.

 6    Q      Did you hear anyone use the word

 7   "motherfucker"?

 8    A      I -- in that clip, I did not.

 9    Q      Does the exhibit show that you had a clear

10   view of Mr. Thomas?

11    A      I had a good view, yes.

12    Q      Does Exhibit 13 show that you had a good

13   view of Mr. Thomas' hands?

14    A      The camera shows that I have a good

15   view -- really good view of the right half of his

16   body.

17    Q      And what about the left half of his body?

18   Can you see his hands?

19    A      I can see.  There's a shadow still, like I

20   was talking about earlier.

21    Q      Can you drag the cursor to the time stamp

22   at 19:25:43 and tell me if you have a clear view

23   of Mr. Thomas' hands?

24    A      Because that one hand is on the curb, that

25   was probably where I was having the problem with
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

354

1   really identifying that hand on the left side of

2   his body.

3    Q      Did you think at that moment that

4   Mr. Thomas had a weapon in that hand?

5    A      He could have had a weapon in the fold of

6   the concrete, absolutely.

7    Q      Did you think that at the time?

8    A      Probably.

9    Q      Why didn't you alert Robert Johnson that

10  you believed Mr. Thomas to have a weapon in his

11  hand?

12   A      We all believed Johnson [sic] to have a

13  weapon at that time until we proved he did not

14  have a weapon.  I did not need to reconvey that.

15   Q      But wasn't that just based on the general

16  advice that you assume everybody is armed until

17  you prove otherwise?

18   A      No.  We had information that it was an

19  armed suspect call when it originally went out.

20   Q      But if you specifically believe you see a

21  weapon in a suspect's hand, isn't that something

22  that you would want to warn other deputies --

23   A      If I'm --

24   Q      -- on the scene about?

25   A      If I would have seen a gun, I would have

355

1    yelled "gun."  I did not see a gun, but I did not

2    see a clear hand either.

3     Q     Is Mr. Thomas in the prone position?

4     A     Yes.

5     Q     Is the prone position a threatening or a

6    nonthreatening position for a suspect to take?

7     A     Depends on the suspect.

8             MS. VINSON:  Object to form.

9    BY MS. LaVARCO:

10    Q     In your training and experience, is a

11   prone position a threatening position for a

12   suspect to take?

13    A     I had a suspect in a prone position on one

14   of my buddies jump up and kill him, so yes.

15    Q     Generally, a prone position is a

16   threatening position for a suspect to take.  Is

17   that your testimony?

18             MS. VINSON:  Object to form.

19             THE WITNESS:  I don't use

20        "generally," because every situation is

21        different.

22   BY MS. LaVARCO:

23    Q     If you were training an officer on whether

24   or not they -- whether or not force is

25   appropriate, would you tell them that a prone

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

356

1    position is a threatening position for a suspect

2    to take?

3    A      I would tell them until they're in

4    custody, anything can happen.

5    Q      Would you tell them that a prone position

6    is a threatening position for a suspect to take?

7    A      Yeah.  I would tell them from a prone

8    position -- I would tell them the story I just

9    told you, that you could be killed from the prone

10   position.  Until that person's in custody, do not

11   put your guard down.  Absolutely.

12   Q      Is a prone position a more or a less

13   threatening position than a standing posture?

14   A      Less.

15   Q      Is a prone position a more or less

16   threatening position than a seated posture?

17   A      They'd be about the same.

18   Q      If somebody's sitting on the ground

19   upright facing you, you would feel just about as

20   threatened if they were facedown on the ground?

21   A      If they were seated on the curb, I would

22   feel more threatened by the person in the prone

23   position.  It's easier to push up from a pushup

24   position than it is to get up from your butt.  So

25   the prone would be more aggressive than sitting.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

357

1    Q      Does this video clip show that you aimed a

2  weapon on Mr. Thomas?

3    A      I aimed a conducted energy weapon at him,

4  yes.

5    Q      Is that a Taser?

6    A      That is a Taser.

7    Q      Was the Taser equipped with a laser?

8    A      It was equipped with two lasers.

9    Q      Where were the lasers aimed?

10   A      Just in his general direction.

11   Q      Were they aimed around Mr. Thomas' head?

12   A      They were aimed in his head area, but I

13  was trying to hit towards his back area.

14   Q      But it did circle around his head, the

15  laser?

16   A      Yes.

17   Q      Can you play approximately the next

18  40 seconds of footage and stop at the 19:26:33

19  time stamp?

20   A      Sure.  Be right back.

21   Q      I will -- I'll put the range in the chat,

22  which is 19:25:53 to 19:26:33.

23   A      Okeydoke.

24   Q      Can you briefly tell me what you saw in

25  those 40 seconds of footage?

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

358

```
 1   A      It sounded like Bruss -- is that still on?

 2          It sounded like Bruss was giving

 3   orders on the other side to Gray.

 4   Q      Did Bruss take Gray into custody?

 5   A      I don't know.  I think him and Tuzun did.

 6   Q      Did you say, "Bruss, you taking him to

 7   you"?

 8   A      Did I say that?

 9   Q      Yes.

10   A      No, I did not.

11   Q      Was that you who said, quote, "I still got

12   this one"?

13   A      Yes.  Right at the end of that clip, yes.

14   Q      And what did you mean by that?

15   A      That I had him covered still.

16   Q      "Him" who?

17   A      Thomas.

18   Q      And what was Mr. Thomas doing at that

19   point?

20   A      He was still on the ground, awaiting our

21   orders on the other side.

22   Q      Prone on the ground?

23   A      Yes.

24   Q      Was he moving at all?

25   A      Yeah.  He lifted his head up at one time.
```

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

359

```
 1    I asked him to look away from us.

 2    Q      Did he lift his head?

 3    A      Yes.

 4    Q      He lifted his head during those

 5    40 seconds, or at some point later?

 6    A      No.  During that 40 seconds.

 7    Q      After Mr. Gray was arrested, was it fair

 8    to say that the scene was more secure at that

 9    point than it had been prior to Mr. Gray's arrest?

10    A      No.

11    Q      Why wasn't it fair to say that?

12    A      I still had a suspect that was not in

13    custody, and I still had not cleared a car.

14    Q      Isn't a scene more secure once you've

15    secured at -- once you've had at least one suspect

16    in custody?

17    A      Lord, no.

18    Q      So even though you had one suspect in

19    custody and handcuffed without incident or without

20    force being needed to be used, that didn't change

21    your assessment of the threat level at all?

22    A      It could have -- it could have increased

23    the threat level, because now their buddy's not in

24    the way, and if there is someone lying in wait

25    with a weapon inside the car, now they can go
```

360

1    ahead and shoot at us without thinking they're

2    going to hit their buddy.  So no, ma'am.

3     Q      Did you have any reason to think that

4    Mr. Thomas was going to shoot at you?

5     A      I didn't know who was in the car.

6     Q      Did you have a specific reason to think

7    that someone else was in the car?

8     A      I've already told you, someone's always in

9    the car until I prove they're not in the car.

10    Q      So that's a general rule and not based on

11    specific facts on the scene?

12    A      Correct.

13    Q      And you said to Mr. Thomas, "I'll get

14    him" -- you said on the scene, "I'll get him";

15    correct?

16    A      "I'll get him"?  I don't remember saying

17    "I'll get him," but -- is that what I said?  Sure.

18    Q      That's what's captured on the footage.

19    A      Okay.

20    Q      So then you gave the initial orders for

21    Mr. Thomas to stand up from the prone position?

22    A      Correct.

23    Q      And how did he respond to that order

24    initially?

25    A      He refused to comply.

361

1    Q      Refused how?

2    A      By not doing what I asked him to do.

3    Q      Did he respond to the order at all

4    initially?

5    A      Not on this portion of the video.

6    Q      So he just laid there in the same prone

7    position that he was in prior to you giving the

8    order?

9    A      Yes.

10   Q      Without moving?

11   A      He moved his head.

12   Q      Did you address him by "you in the gray"?

13   A      I did.

14          Again, that wasn't in this portion of

15   the video you just asked me to watch, but I do

16   remember calling him out by the color of his

17   clothing.

18   Q      Can you tell me at exactly which time

19   stamp Mr. Thomas lifted his head?  I'll give you a

20   minute to scroll through it.

21   A      Sure.  Yeah.  Hang on a second.

22   Q      If it's helpful, I have it as the 19:27:05

23   time stamp when Mr. Thomas lifts his head.

24   A      (Indicating.)

25          MS. LaVARCO:  Mr. Schultz has given

362

```
1          a thumbs-up.

2                    THE WITNESS:  We're back.

3     BY MS. LaVARCO:

4      Q      Did you see Mr. Thomas lift his head at

5     approximately the 19:07 -- sorry -- the 19:27:05

6     time stamp?

7      A      Yes.  And I will make a correction in my

8     earlier -- that was me that said, "Bruss, you're

9     taking him to HQ."

10     Q      Got it.  Thank you.

11            And Mr. Thomas lifted his head

12     immediately after Robert Johnson gave the warning

13     that he would release the dog?

14     A      Right.

15     Q      And what did you understand why Mr. Thomas

16     lifting his head in response to the warning?

17     A      I think he wanted to see directionally

18     where he was at and what his surroundings were and

19     where we were.

20     Q      Why do you think he wanted to see that?

21     A      That's what the people do when we're

22     trying to take them to custody.  They look for a

23     way to get away, they look to see how many -- if

24     they're outnumbered, and if there actually is

25     something that could hurt them that could come
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

363

1    after that.

2     Q      So you proceeded to Mr. Thomas, in part,

3    assessing whether the situation was safe for him

4    to stand up?

5     A      No.  I was perceiving him to see if the

6    situation was something that he could flee from or

7    if he needed to comply with.

8     Q      And that was the first instance in which

9    Mr. Thomas lifted his head from the prone position

10   since you arrived on the scene?

11    A      I believe that's correct.

12    Q      So did it occur to you that prior to that,

13   Mr. Thomas simply had not registered that the

14   orders to stand up were being directed at him as

15   opposed to directed at Mr. Gray?

16              MS. VINSON:  Object to form.

17              THE WITNESS:  No.  That never

18        occurred to me.

19   BY MS. LaVARCO:

20    Q      Okay.  I'd like you to play another

21   15 seconds of footage.  I will put the range in

22   the chat and read it aloud for the court reporter.

23   The range is 19:27:09 to 19:27:24.

24    A      All right.  We'll be right back.

25    Q      Thank you.

364

1              If you can pause the video

2    specifically at the moment you see Johnson release

3    his dog, not the time it engages with Mr. Thomas,

4    but at the time he releases it.

5     A      Okay.

6     Q      We can't hear you.

7     A      Yeah.  We're back.  We're back.

8              MS. VINSON:  Were we supposed to

9         stop at 24 or before 24?

10             MS. LaVARCO:  I had said 24

11        initially, but now I would like to know

12        the time stamp at which Johnson released

13        his dog based on your observation on the

14        footage.

15             THE WITNESS:  21 to -- right at 21

16        to 22.  21 to 22 is when they -- when he

17        released the dog.

18    BY MS. LaVARCO:

19     Q      So at approximately 19:27:21 or 19:27:22?

20     A      Yes.

21     Q      And we previously agreed that Mr. Thomas

22    lifted his head at approximately the 19:27:08

23    mark, so that would be approximately 15 seconds

24    between the time he lifted his head from the prone

25    position and the time Robert Johnson unleashed his

365

```
 1   K-9 on Mr. Thomas?

 2             MS. VINSON:  Object to form;

 3       misstates the testimony.

 4             THE WITNESS:  Okay.  Yes.

 5   BY MS. LaVARCO:

 6    Q     Does that sound right to you?  Is that

 7   what you observed, that there were approximately

 8   15 seconds that passed between the time Mr. Thomas

 9   lifted his head from the prone position and the

10   time that Robert Johnson unleashed the dog?

11    A     Yes.

12    Q     Is that enough time for a suspect to

13   comply with an order to stand up from a prone

14   position?

15    A     Yes.

16    Q     Do you ever have trouble getting off the

17   ground when you're laying on the floor?

18    A     Oh, I'm big.  Yes, sometimes I do.

19    Q     So it could take you a little longer

20   because of your size or physical stature?

21    A     Right.  But I would start moving.  People

22   would see me moving.

23    Q     Did Mr. Thomas start moving once he lifted

24   his head?

25    A     No.
```

366

```
 1    Q      So the only movement he took before

 2   Johnson unleashed the dog was lifting his head

 3   from the prone position?

 4    A      No.  He was doing something with his feet,

 5   but he wasn't bringing a knee up to get up and he

 6   wasn't putting his arms in the pushup position to

 7   push himself up.

 8    Q      Was he -- was he saying anything?

 9    A      You just completely broke up during that

10   whole thing.

11    Q      That's okay.

12    A      Try again.

13    Q      Was Mr. Thomas saying anything after he

14   lifted his head before Johnson unleashed the dog?

15    A      (Moving head side to side.)

16    Q      You didn't hear him say, "I ain't doing

17   that"?

18    A      You are -- you are frozen.

19    Q      Oh, no.

20    A      You are frozen and -- hang on.  My

21   connection is unstable.  Stand by.

22           MS. VINSON:  I think if we put the

23       charger in, maybe that will help.

24           Did you-all -- did we freeze on

25       your end?
```

367

```
 1              MS. LaVARCO:  No.  We can hear you.

 2      Can you hear us?

 3              MS. VINSON:  Yeah, that's better.

 4              THE WITNESS:  I -- I can hear you.

 5              MS. VINSON:  I put the charger in.

 6      I think that helps.

 7              MS. LaVARCO:  Okay.

 8              MS. VINSON:  It's an old computer.

 9              MS. LaVARCO:  Are we good now?

10              THE WITNESS:  You-all are all

11      frozen except for me.  I can watch myself.

12              MS. LaVARCO:  Okay.  Becky, given

13      that we're almost out of time, can you

14      pause the footage -- I'm sorry.  Could --

15      we're okay?  I was going to suggest we go

16      off the record if they're having some

17      tech- --

18              THE WITNESS:  We're good to go.

19      Yup.

20              MS. LaVARCO:  Okay.  Great.

21              THE WITNESS:  Nope.  I got you.

22      You're good.

23              MS. LaVARCO:  Great.

24  BY MS. LaVARCO:

25   Q      So can you play the rest of the footage
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

368

1    until the clip ends at 19:24:58 and let me know

2    when you're finished?

3     A      Yes.

4              MS. VINSON:  All right.  Which --

5          I'm sorry.  Which video clip?

6              MS. LaVARCO:  The same one we were

7          just on, "Schultz Long BWC Clip."

8              THE WITNESS:  Okay.  We're in it.

9              MS. VINSON:  It starts at 19:24:58;

10         is that right?

11             MS. LaVARCO:  Yes.

12             THE WITNESS:  And where do you want

13         us to play it to?

14   BY MS. LaVARCO:

15    Q      Until the end.  But let me -- from the

16   moment Johnson -- hold on.  Let me pull it back

17   up.

18             So do this range that I'm about to put

19   in the chat:  19:27:24 to 19:28:04.  It's about

20   40 seconds.

21    A      All right.  We're looking at it now.

22    Q      Thank you.

23    A      Okay.

24    Q      Okay.  And I apologize if I asked this

25   question before.  I'm not sure that I got an

369

```
 1   answer.

 2            So did Mr. Thomas say anything in the

 3   previous clip of the footage when he was asked to

 4   get up off the ground?

 5   A      I believe he said, "I'm not doing that."

 6   Q      You heard --

 7   A      It was real -- it was real muffled.

 8   Q      Did you understand what he said at the

 9   time?

10   A      No.

11   Q      Did you think to ask him what he was

12   saying if you couldn't hear him well enough?

13   A      I was giving super verbal loud commands.

14   He heard me.

15   Q      Okay.  With respect to the clip that you

16   just watched beginning at 19:27:24 through the end

17   of exhibit -- of the exhibit, what happened in

18   those about 40 seconds?

19            MS. VINSON:  Object to form.

20            THE WITNESS:  Johnson was taking

21      him into custody.

22   BY MS. LaVARCO:

23   Q      After Johnson released his K-9 on

24   Mr. Thomas, were you standing nearby?

25   A      Yes.
```

370

1   Q     And what were you doing?

2   A     I was holding cover.

3   Q     Holding cover how?

4   A     By having my Taser out and waiting for --

5  to see if there was going to be any kind of

6  movement with weapons or anything from the

7  suspect.

8   Q     And did you have a clear view of

9  Mr. Thomas and Johnson?

10   A     Yes.  I had a real clear view of Johnson,

11  not as clear of Thomas due to Johnson's size.

12   Q     Did Mr. Thomas appear to be a threat at

13  that point while Johnson was straddling

14  Mr. Thomas?

15   A     I don't believe he was a threat at that

16  time.

17   Q     At that moment, could you have asked

18  Johnson to call off the K-9 so that it wouldn't

19  have continued to maul Mr. Thomas?

20   A     That wasn't my call to make.

21         MS. VINSON:  Object to form; asked

22    and answered.

23  BY MS. LaVARCO:

24   Q     Didn't Eric Bruss have more experience

25  with K-9s than you did, given that he was a K-9

371

1   handler himself?

2    A      Yes.

3    Q      Could you have asked for Eric Bruss' help

4   in getting the dog off of Mr. Thomas?

5    A      Again, I wasn't going to make that call.

6   Johnson was in control -- complete control of what

7   was going on.

8    Q      Could you have, though?

9    A      I had no reason to.

10   Q      But you could have if you thought you had

11  a reason to?

12   A      If there was a reason, yes, I could have

13  said something.  I would have said something to

14  Johnson had there been a reason to.  There was not

15  a reason to, so there was no reason to talk to

16  Bruss about something I wasn't going to talk to

17  Johnson about either.

18   Q      And you were pointing your Taser at

19  Mr. Thomas while he was being mauled by the K-9

20  with Johnson on his back?

21   A      No.  I had him in the prone position, in

22  the Sul position.  Down south.  It's in south.

23   Q      What does that mean?

24   A      I had it to where it was at the ready, but

25  it was not in -- it was not aimed at him at that

372

1   time.

2    Q      I see.

3           Were you afraid in that moment?

4    A      No.

5    Q      Why did you put your Taser away while

6   Johnson was still on Mr. Thomas with the dog?

7    A      I didn't.

8    Q      Can you go to 19:27:40 in the video?

9    A      Uh-huh.

10   Q      That's the time stamp I have you putting

11  your Taser away shortly after Eric Bruss stated

12  that the vehicle had been cleared.

13          MS. VINSON:  Object to form.

14          THE WITNESS:  We're going back in.

15  BY MS. LaVARCO:

16   Q      Thank you.

17   A      I don't remember holstering my Taser until

18  he was done.

19          MS. VINSON:  So what number?

20          THE WITNESS:  19:27 -- what was it?

21      19:27 what?

22  BY MS. LaVARCO:

23   Q     19:27:40.  And I thought I had put it in

24  the chat, but I didn't.

25   A      I don't see it.  All right.  We'll be

373

```
 1   back.

 2             I stand corrected.  I holstered at the

 3   time you said.

 4    Q      You holstered your Taser at approximately

 5   19:27:40?

 6    A      Right.  Yes.

 7    Q      And at that time, Johnson was still

 8   straddled on Mr. Thomas' back and the K-9 was

 9   still biting Mr. Thomas?

10    A      Yes.

11    Q      Why did you holster your Taser then?

12    A      So I could go hands-on if I needed to.

13    Q      Was it because Eric Bruss had said that he

14   cleared the vehicle?

15    A      That was another reason.  But yeah.  I

16   didn't want to tase another one of the deputies or

17   the sergeant, so I holstered in that instance to

18   where I -- if I needed to assist Sergeant Johnson,

19   I could assist him with my hands.

20    Q      So the perceived -- the level of threat

21   you perceived no longer justified you having your

22   Taser out?

23    A      Correct.

24    Q      And you stood by at the ready in case you

25   needed to assist Johnson with your hands?
```

374

1    A      Yes.

2    Q      So that entire time you perceived no

3   threat from Mr. Thomas, as you said before, and

4   Bruss had already cleared the vehicle, indicating

5   that there were no other suspects to be found?

6    A      I don't understand.  Are you asking me if

7   I said earlier that I felt threatened at this

8   time?

9    Q      Oh, earlier you said that Bruss -- that

10  you did not feel threatened by Mr. Thomas while

11  Johnson was straddling him.

12   A      Correct.

13   Q      So you perceived no threat from Mr. Thomas

14  while Johnson was on his back, and then you knew

15  that any threat from the vehicle had been cleared

16  because Bruss cleared the vehicle; correct?

17   A      Correct.

18            MS. VINSON:  Object to form.

19            THE WITNESS:  Correct.

20  BY MS. LaVARCO:

21   Q      And you simply stood by and watched?

22            MS. VINSON:  Object to form.

23            THE WITNESS:  Stood by and watched

24      what?

25

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

375

1  BY MS. LaVARCO:

2   Q      Did you simply stand by and watch Johnson

3  continue to straddle Mr. Thomas with the K-9

4  biting him?

5   A      I waited until Thomas was in custody, and

6  I was probably scanning the scene.  You can't see

7  my head moving.

8   Q      But you didn't do anything physically

9  during that time?

10   A      No, ma'am, I did not.

11   Q      After -- after the vehicle had been

12  cleared and Mr. Thomas had Johnson on his back and

13  the K-9 mauling him, was continuing to allow the

14  K-9 to attack him a reasonable use of force, based

15  on your training and experience and what you

16  observed at the time?

17   A      Again, it's a K-9 issue.  I don't deal

18  with the K-9s.

19   Q      So you don't know whether it was an

20  objectively reasonable use of force to allow the

21  K-9 to continue mauling Mr. Thomas even after

22  there was no perceived threat?

23           MS. VINSON:  Object to form.

24           THE WITNESS:  I don't know if he

25      was mauling him.  I know he was holding

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

376

```
1         him in place.
2    BY MS. LaVARCO:
3     Q     Didn't the dog yank on Mr. Thomas' arm?
4     A     Well, at the time, Mr. Thomas was using
5    his arm to resist, but probably because he was
6    being bit by a dog.
7     Q     Is it fair to say that Mr. Thomas was
8    incapacitated by Johnson's body weight and the
9    dog's force?
10              MS. VINSON:  Object to form.
11              THE WITNESS:  Is it fair to say he
12         was?  Depends on little wiry guys that you
13         fought in the past.  Little wiry guys get
14         out -- can go in between your legs and get
15         out from underneath you.
16    BY MS. LaVARCO:
17     Q     So you had no reason to think that it
18    wasn't unreasonable to continue letting the dog
19    bite Mr. Thomas?
20     A     At that time, no, ma'am, I did not.
21     Q     Did you hear Eric Bruss say, quote, "As
22    soon as he handcuffs you, he'll get the dog off of
23    you"?
24     A     I do recall hearing that, yes.
25     Q     And you said earlier that's the proper
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

377

1    protocol, to wait until a suspect is in handcuffs

2    before removing a K-9 from the bite?

3     A     Right.

4     Q     Did you also hear Eric Bruss tell

5    Mr. Thomas to, quote, "Stop moving around," while

6    the K-9 was tearing at Mr. Thomas' arm?

7              MS. VINSON:  Object to form.

8              THE WITNESS:  I did hear Eric Bruss

9        say that, yes.

10   BY MS. LaVARCO:

11    Q     Did it appear to you that Mr. Thomas was

12   in pain?

13    A     I can imagine that wouldn't feel very

14   good, but I don't -- I don't know if he was in

15   pain or not.

16    Q     In your training and experience or your

17   observations of K-9 apprehensions, is it easy for

18   a suspect to lay perfectly still while they're

19   being bitten by a K-9?

20              MS. VINSON:  Object to form.

21              THE WITNESS:  I would say no.

22   BY MS. LaVARCO:

23    Q     So is the order from Eric Bruss to, quote,

24   "stop moving around" one that's rational?

25    A     I mean, it was given.  And if Thomas could

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

378

1   have stopped, he should have stopped.  But, again,

2   like you said, is it -- is it rational?  I don't

3   know that answer.

4               MS. VINSON:  Object to form.

5   BY MS. LaVARCO:

6    Q     Did you think he could have stopped --

7               MS. VINSON:  Object to form.

8   BY MS. LaVARCO:

9    Q     -- moving around?

10   A     I don't know.

11   Q     After the K-9 was taking off -- taken off

12   of the bite from Mr. Thomas' arm, did it go back

13   in for another bite?

14   A     I don't recall seeing that, but I think

15   Johnson was able to get him under control pretty

16   fast.

17   Q     Do you recall seeing whether or not it

18   tried to bite Mr. Thomas' pant leg?

19   A     I don't recall that.

20   Q     After the K-9 was taken off of Mr. Thomas,

21   did Johnson shout, quote, "Good boy"?

22   A     I do recall that, yes.

23   Q     Did Johnson make other sounds celebrating

24   the attack?

25   A     I hear those guys get hoopity-hoppity when

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

379

1    they're celebrating their dogs.  I don't really

2    pay no attention to it.

3     Q     By "those guys," do you mean K-9 handlers?

4     A     I do.

5     Q     And what do you mean by "hoopity-hoppity"?

6     A     When they're like, "Oh, good boy.  Good

7    boy.  Good boy."  Yeah, that's what I mean.

8    Hoopity-hoppity.

9     Q     Is -- based on your observations, did

10   Robert Johnson treat K-9 apprehensions as an

11   opportunity to train his K-9?

12             MS. VINSON:  Object to form.

13             THE WITNESS:  I can't answer that.

14   BY MS. LaVARCO:

15    Q     Why not?

16    A     I'm not Robert Johnson.

17             MS. VINSON:  Object to form.

18   BY MS. LaVARCO:

19    Q     Did Eric Bruss join in the cheers or the,

20   quote, "hoopity-hoppity," as you put it?

21    A     I don't recall if he did or not.  They

22   normally don't praise each other's dogs.

23    Q     K-9 handlers don't normally praise each

24   other's dogs, you said?

25    A     Correct.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

380

1    Q      Is there any law enforcement purpose for

2    praising a dog after a suspect apprehension?

3              MS. VINSON:  Object to form.

4              THE WITNESS:  I have no idea.

5              MS. LaVARCO:  Becky, can we get a

6         time check?

7              THE REPORTER:  6 hours, 45 minutes.

8              MS. LaVARCO:  Okay.  Can we take a

9         quick five-minute break, I'll get

10        reoriented, and then we can wrap it up?

11             MS. VINSON:  Five minutes.  We'll

12        be back on at 6:05.

13             MS. LaVARCO:  Cool.  Thanks.

14             THE VIDEOGRAPHER:  We are now going

15        off the record.  The time is 6:00 p.m.

16          (Recess from 6:00 p.m. to 6:05 p.m.)

17             THE VIDEOGRAPHER:  We are now back

18        on the record.  The time is 6:05.

19             MS. LaVARCO:  I'd like to introduce

20        Exhibit Number 14, which is another clip

21        from your body-worn camera footage,

22        Mr. Schultz --

23             THE WITNESS:  Okay.

24             MS. LaVARCO:  -- from shortly after

25        the time Robert Johnson pulled his K-9 off

381

1        of Mr. Thomas.  It's in the Box folder

2        already.  It's "Schultz BWC Short Clip

3        19:29:30 to 19:29:41."

4             (Schultz Exhibit 14 marked.)

5   BY MS. LaVARCO:

6    Q     Do you see it there?

7    A     Yeah.  Just the whole clip?

8    Q     Yes.  It's only about ten seconds, so you

9   can just play it in its entirety and let me know

10  when you're done.

11   A     Going in now.

12   Q     Thank you.

13   A     Go ahead.

14   Q     Was the -- that you asking Robert Johnson

15  if he was all right?

16   A     Yes.

17   Q     And this was a clip from your body-worn

18  camera footage; correct?

19   A     Yes.

20   Q     Why did you ask Johnson if he was all

21  right?

22   A     He was on the ground.  The -- I didn't

23  know if the dog got him, if there was a scuffle,

24  if there was anything that hurt him on his

25  knuckles on the concrete, anything like that.

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

382

1   Q      Did he appear to have injured his hand?

2   A      I think he did.  I think we determined

3   that was from Jeck spinning around in his hand,

4   though.

5   Q      I see.

6          And Bruss was in the background

7   saying, quote, "He's just playing possum"; is that

8   correct?

9   A      I actually thought that was Johnson that

10  said that, but I did hear someone say that.

11  Q      Okay.  And they were referring to

12  Mr. Thomas; correct?

13  A      Yes.

14  Q      And what does it mean to "play possum"?

15          MS. VINSON:  Object to form.

16          THE WITNESS:  I can give you a --

17       my interpretation of it.  Because possums,

18       when they are being attacked or when

19       someone's coming after them, they'll lay

20       down and play dead, and it's just -- they

21       call it "playing possum," like he didn't

22       want to get up, acted like we weren't

23       there is the way I interpreted it.

24  BY MS. LaVARCO:

25  Q      I see.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

383

1           Did you think Mr. Thomas was playing

2     possum?

3      A     No.  I thought he heard us.

4      Q     Was that you who said, quote, "All he had

5     to do was get the fuck up"?

6      A     That was me that said that.

7      Q     And what did you mean by that?

8      A     If he would have got up and complied with

9     my directions, turned around, came to me, he would

10    have never got bit.

11     Q     Okay.  I would like to go to Exhibit 1.

12           MS. LaVARCO:  Cassidy, you can go

13        ahead and share that one on the screen

14        because it's not a video exhibit.  I think

15        we're through with those, finally.

16           (Bruss Exhibit 1 tendered.)

17           MS. LaVARCO:  Can you zoom in a

18        bit?

19    BY MS. LaVARCO:

20     Q     Mr. Schultz, do you recognize this as

21    Precinct 1's use of force policy?

22     A     Yes.

23     Q     Have you read and reviewed Precinct 1's

24    use of force policy before?

25     A     I have.

384

1    Q      And at the time of Mr. Thomas'

2    apprehension, had you read it and were familiar

3    with it?

4    A      I had read it, yes.

5              MS. LaVARCO:  Cassidy, can you go

6         to Page 23 of the document?

7    BY MS. LaVARCO:

8    Q      Have you seen this image before,

9    Mr. Schultz?

10   A      Yeah.  It was new right before I left.

11   Yes.

12             MS. LaVARCO:  Can you go to the

13        bottom of the page, Cassidy?

14   BY MS. LaVARCO:

15   Q      Do you see that this policy states the

16   last revised date was February 2021?

17   A      Yes.

18   Q      So given that the K-9 apprehension in this

19   case took place in February 2021, this would have

20   been the operative policy at the time?

21   A      Yes.  That makes sense.

22             MS. LaVARCO:  Okay.  Can you go

23        back to the image, Cassidy?

24             And I'd like to state for the

25        record that the immediately preceding

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

385

1        version in July 2020 had the exact same

2        image.

3    BY MS. LaVARCO:

4     Q      So do you see on the top right box the

5    "Individual" -- I'll start again.

6              So the image -- can you describe to me

7    what this image is?

8     A      Which one?

9     Q      The image with a deputy standing and the

10   words "resistive," "cooperative,"

11   "life-threatening, serious bodily injury," and

12   "assaultive/high risk."

13             What is this image?

14    A      It's going to be what force can be

15   utilized based on the situation.

16    Q      And do you see on the top right corner, it

17   says "assaultive/high risk" --

18    A      I do.

19    Q      -- and it shows what types of force can be

20   utilized when a suspect's exhibiting assaultive or

21   high-risk actions?

22    A      I do.

23    Q      And do you see that that "K-9" is on that

24   list?

25    A      I do see that.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

386

1    Q      Do you see under -- where it says

2    "Individual's Actions" with a label "resistive"?

3    A      Yes.

4    Q      Is "K-9" on the list of acceptable uses of

5    force for a suspect whose actions are resistive?

6    A      I do not see it there.

7    Q      So does that tell you that this policy

8    indicates that the use of force -- the use of K-9

9    to apprehend a suspect is appropriate when a

10   suspect is exhibiting assaultive or high-risk

11   behavior?

12              MS. VINSON:  Object to form.

13              THE WITNESS:  I would -- I would

14         say this is a guideline, and there's going

15         to be times where, based on the K-9

16         handler's knowledge, they're going to be

17         able to use something above what is on the

18         guideline.

19   BY MS. LaVARCO:

20   Q      Were you trained on this image?

21   A      I want to say yes.

22              I don't believe I was trained on this

23   image.  My image was much different when I went

24   through the original use of force training.  And

25   this was -- like I said, this was adopted later

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

387

1   when we all had to go through use of force

2   training is when I saw it and really became

3   familiar with it.

4    Q      So you weren't aware -- to your knowledge,

5   this image only represents a guideline about the

6   permissible uses of force in response to different

7   types of suspect behaviors; is that correct?

8    A      Yes.

9    Q      And these are not mandatory?

10   A      No.

11            MS. LaVARCO:  Cassidy, can you

12        control-F for the statement:  "Peace

13        officer's shall only use physical force

14        when no other viable option"?

15   BY MS. LaVARCO:

16   Q      Do you see, Mr. Schultz, that the policy

17   says:  "Peace officers shall only use physical

18   force when no other viable option is reasonably

19   available for resolving an incident without using

20   force" --

21   A      I do see it.

22   Q      -- "and when no -- other nonphysical

23   options have proven ineffective"?

24            MS. VINSON:  Object to form.

25            THE WITNESS:  Yes.

KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

388

1    BY MS. LaVARCO:

2    Q       Were there any other viable options before

3    releasing the K-9 on Mr. Thomas?

4    A       At that point, I could have tased him.

5    But, again, that would have put me in close

6    proximity of the vehicle, and Johnson released his

7    dog.  So I did not -- I did not have another

8    viable option.

9    Q       Did Johnson have another viable option?

10               MS. VINSON:  Object to form.

11               THE WITNESS:  I believe Johnson did

12       have another viable option.

13   BY MS. LaVARCO:

14   Q       What other viable option do you believe

15   Johnson had?

16   A       He could have went to Taser, but he would

17   have had to put his dog up, and he's not going to

18   tase someone with the dog in his hand.  I already

19   had Taser cover.  So I don't think the option was

20   available, but the option was there.

21   Q       Could Johnson have suggested that you use

22   your Taser rather than Johnson deploying his dog?

23   A       Yes, he could have.

24   Q       But he didn't?

25   A       He did not.

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

389

1    Q      Did you expect for Johnson to release his

2    dog in the moment that he did?

3    A      I -- when the dog got released, I just

4    followed up on it.

5              MS. LaVARCO:  Cassidy, can you

6         control-F for the words "regardless of

7         rank"?

8    BY MS. LaVARCO:

9    Q      Mr. Schultz, could you just read the first

10   sentence of that highlighted paragraph for me?

11   A      "Any officer present and observing another

12   officer, regardless of rank, using force that is

13   clearly beyond that which is objectively

14   reasonable under the circumstances shall, when in

15   a position to do so, safely intervene to prevent

16   the use of excessive force."

17   Q      Were you aware of this policy about the

18   duty to intervene?

19   A      Yes, I was.

20   Q      Were you aware that it applied regardless

21   of rank?

22   A      I remember reading it now that I just

23   reread it, yes.

24              MS. LaVARCO:  Cassidy, can you

25         search for "any failure to intervene."

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

390

```
 1    BY MS. LaVARCO:

 2     Q      Can you read the sentence that's partially

 3    highlighted?

 4     A      "Any failure to intervene and/or failure

 5    to report improper use of force shall be grounds

 6    for discipline up to and including termination."

 7     Q      So you understand this policy to require

 8    you to intervene if you observe another officer

 9    using excessive force?

10     A      I understand it says if I can safely

11    intervene, I shall.

12     Q      Was it safe for you to ask Robert Johnson

13    to slow down?

14     A      Once he released the dog, no.

15     Q      Was it safe for you to ask Robert Johnson

16    to slow down before he unleashed the dog?

17     A      At that point, he wasn't speeding up.  He

18    wasn't doing anything fast.  That's the way I saw

19    him operate.

20     Q      So you thought -- did you think there was

21    likely to be more time before Johnson unleashed

22    the dog?

23     A      Possibly.

24     Q      Would you have given more time for

25    Mr. Thomas to comply before tasing him if Johnson
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

391

1   had not unleashed the dog first?

2    A      Potentially, yeah.

3              MS. LaVARCO:  Cassidy, you can pull

4        the exhibit down.

5   BY MS. LaVARCO:

6    Q      Were you aware that Mr. Thomas called 911

7   the day after he was bitten by the K-9, saying

8   that he felt suicidal?

9    A      I was not aware of that.

10   Q      Have you read Robert Johnson's report at

11  any point?

12   A      I did not.

13   Q      Now that you've took a closer look at the

14  use of force policy, do you think Mr. Johnson

15  should have done anything differently?

16   A      I can't answer that.  I'm not in Robert

17  Johnson's head.

18   Q      If you were conduct -- if you were

19  conducting a use of force review, as you did, for

20  example, on that commission you were telling me

21  about earlier and you had this evidence in front

22  of you -- you had the policy -- the use of force

23  policy, and you had the body-worn camera

24  footage -- would you -- do you feel that Robert

25  Johnson should have done anything differently in

392

1   light of that?

2              MS. VINSON:  Object to form.

3              THE WITNESS:  He might have waited

4       a little bit longer.  Maybe a couple

5       seconds.  A few seconds more.

6   BY MS. LaVARCO:

7    Q     Is there anything else he could have done

8   before releasing the K-9?

9              MS. VINSON:  Object to form.

10             THE WITNESS:  I mean, the guy

11      needed to get up.  We didn't have anything

12      on the car.  That was the biggest problem,

13      was the -- having to navigate the car.  So

14      I -- no.

15  BY MS. LaVARCO:

16   Q     Do you feel you could have done anything

17  differently having now read the use of force and

18  the duty to intervene policy?

19   A     Honestly, I did not have a good Taser shot

20  on him.  I was using the Taser more for

21  intimidation than I was to actually deploy the

22  weapon.  I wouldn't have deployed my Taser the way

23  I had him.

24   Q     Would you have done anything else

25  differently?

393

```
 1    A      Probably not.  And only because the dog

 2   was there.  Had the dog not been there, I might

 3   have approached and had someone flank the car.

 4   But because the dog was there, the dog was the

 5   primary use -- the primary thing we were using.

 6              MS. VINSON:  Guys, time's up.

 7              MS. LaVARCO:  Just one more

 8       question.

 9   BY MS. LaVARCO:

10    Q      What does it mean to "flank the car"?

11    A      To have someone on the other side to where

12   there's no way possible that someone was behind

13   the car and could be a threat to us.

14    Q      I see.

15              And that's what you would have done if

16   the K-9 weren't there?

17              MS. VINSON:  We're done.  You got

18       seven hours.  We're exhausted.  Sorry.

19              MS. LaVARCO:  Just "yes" or "no,"

20       please.

21              MS. VINSON:  No.  That's the last

22       question.  You're out of time, Shirley.

23              MS. LaVARCO:  You also had some

24       technical difficulties.  It's literally

25       taking more time to argue about this than
```

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

394

1    for him to answer the question.

2         MS. VINSON:  Shirley, we are not

3    going to go past seven hours.  You're

4    entitled to seven hours, and we're not

5    going a single --

6         MS. FRANCIS:  Can we have the

7    court --

8         MS. LaVARCO:  We had to argue

9    about -- we had to argue about you

10   influencing the witness.  I am asking a

11   final yes-or-no question.

12        MS. VINSON:  That's what happens in

13   a deposition.  We have disagreements.

14        MS. LaVARCO:  I had --

15        MS. VINSON:  Good night, y'all.

16        Can we --

17        MS. LaVARCO:  I had one final

18   question.  It was a "yes" or "no."

19        THE WITNESS:  I don't even remember

20   the question.

21        MS. VINSON:  You're not answering

22   it.  We're done.

23        MS. LaVARCO:  You're instructing

24   the witness not to answer the question.

25        MS. VINSON:  What --

395

```
 1            MS. LaVARCO:  Brittany, can --

 2            MS. VINSON:  Hey, what time is it,

 3     Becky?  I mean, how many --

 4            MS. FRANCIS:  You should have asked

 5     that before you interrupted, Celena.

 6            MS. VINSON:  How many -- no.  I

 7     want it on the record that we're still

 8     talking right now, and it --

 9            MS. LaVARCO:  We didn't have to

10     still be talking.  Mr. Schultz could have

11     answered "yes" or "no," and that could

12     have been it.

13            MS. VINSON:  Becky, can you tell us

14     the time, please?

15            THE REPORTER:  7 hours, 1 minute.

16            MS. VINSON:  Yeah.  All right.

17     Bye, y'all.

18            MS. LaVARCO:  And what was the time

19     when -- what was the time when Ms. Vinson

20     interrupted?

21            THE REPORTER:  It was right at

22     seven hours.

23            MS. VINSON:  Good night.

24            MS. LaVARCO:  Can we get --

25
```

KERRY LEE THOMAS vs                                          Wayne Schultz
ERIC M. BRUSS

396

1    BY MS. LaVARCO:

2     Q      Mr. Schultz, can you answer the yes-or-no

3    question?

4               MS. VINSON:  No.

5          (Ms. Vinson and Mr. Schultz exited the

6           remote proceedings.)

7               THE VIDEOGRAPHER:  They have left

8        the meeting.

9               MS. FRANCIS:  Okay.

10               MS. LaVARCO:  Okay.  We can go off

11        the record.

12               MS. FRANCIS:  Thank you.

13               THE VIDEOGRAPHER:  This concludes

14        today's deposition.  We are going off the

15        record at 6:22 p.m.

16          (Off the record at 6:22 p.m. CST)

17

18

19

20

21

22

23

24

25

397

1                    UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
2                        HOUSTON DIVISION

3    KERRY LEE THOMAS,              )
                                    )
4          Plaintiffs,              )
                                    )
5    v.                             )
                                    )Case No. 4:23-cv-00662
6    ERIC M. BRUSS; WAYNE SHULTZ; and )
     KEITH MORRIS, in his capacity as )
7    Temporary Defendant            )
     Administrator of the Estate of )
8    Robert Johnson,                )
                                    )
9          Defendants.              )

10

                     REPORTER'S CERTIFICATION
11            REMOTE VIDEOTAPED DEPOSITION OF
                       WAYNE SCHULTZ
12                    April 2, 2024

13        I, Rebecca A. Graziano, Certified Shorthand

14    Reporter in and for the States of Texas,

15    California, and Illinois, hereby certify to the

16    following:

17        That the witness, WAYNE SCHULTZ, was duly

18    sworn and that the transcript of the oral

19    deposition is a true record of the testimony given

20    by the witness;

21        I further certify that pursuant to FRCP Rule

22    30(f)(1) that the signature of the deponent:

23        ____ was requested by the deponent or a

24    party before the completion of the deposition and

25    returned within 30 days from date of receipt of

KERRY LEE THOMAS vs                                    Wayne Schultz
ERIC M. BRUSS

398

1    the transcript.  If returned, the attached Changes

2    and Signature Page contains any changes and the

3    reasons therefor.

4        ____ was not requested by the deponent or a

5    party before the completion of the deposition.

6        I further certify that I am neither attorney

7    nor counsel for, related to, nor employed by any

8    of the parties to the action in which this

9    testimony was taken.

10       Further, I am not a relative or employee of

11   any attorney of record in this cause, nor do I

12   have a financial interest in the action.

13

14                Certified on April 12, 2024

15

16

17   _____
     Rebecca A. Graziano, CSR, RMR, CRR
18   Texas CSR 9306
     Expiration:  07/31/24
19   California CSR 14407
     Expiration:  09/30/24
20   Illinois CSR 084.004659
     Expiration:  05/31/25
21

22

23

24

25















KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz

















KERRY LEE THOMAS vs
ERIC M. BRUSS

Wayne Schultz









































