**In the Matter Of:**

*THOMAS v*

*BRUSS*

---

*ERIC BRUSS*

*March 20, 2024*

---



1

```
 1              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   HOUSTON DIVISION

 3
   KERRY LEE THOMAS,              *
 4                                *
                Plaintiff,        *
 5                                *
   v.                             *  Case No. 4:23-cv-00662
 6                                *
   ERIC M. BRUSS, WAYNE SHULTZ,   *
 7  and KEITH MORRIS, in his      *
    capacity as Temporary Defendant *
 8  Administrator of the Estate of *
    Robert Johnson,               *
 9                                *
                Defendants.       *
10

11          ***********************************
12              THE ORAL VIDEOTAPED
                   DEPOSITION OF
13                  ERIC M. BRUSS
                  MARCH 20, 2024
14          ***********************************

15

16     ORAL VIDEOTAPED DEPOSITION OF ERIC M. BRUSS,

17  produced as a witness at the instance of the PLAINTIFF,

18  and duly sworn, was taken in the above-styled and

19  numbered cause on the 20th of March, 2024, from

20  10:16 a.m. to 7:59 p.m., before Debbie Boothe, CSR, in

21  and for the State of Texas, reported by machine

22  shorthand at a Conference Room at 9600 Long Point Road,

23  Houston, Texas 77055, pursuant to the Federal Rules of

24  Civil Procedure and the provisions stated in the record

25  or attached hereto.
```

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

2

```
 1                    A P P E A R A N C E S

 2
    FOR THE PLAINTIFF:
 3
              Ms. Shirley LaVarco
 4            Ms. Brittany Francis
              Civil Rights Corps
 5            1601 Connecticut Avenue NW, Suite 800
              Washington, D.C.  20009
 6            (202) 844-4975
              shirley@civilrightscorps.org
 7            brittany@civilrightscorps.org

 8
    FOR THE DEFENDANTS:
 9
              Ms. Celena Vinson
10            Ms. Kathryn Vestal
              Thompson & Horton, LLP
11            3200 Southwest Freeway
              Houston, Texas  77027
12            (713) 554-6742
              cvinson@thompsonhorton.com
13            kvestal@thompsonhorton.com

14
    THE VIDEOGRAPHER:
15
              Mr. Jose Carranza
16            Lexitas-Premier VIP

17
    OTHER APPEARANCES:
18
              Mr. Wayne Schultz
19            Mr. Carl Shaw

20
                    *   *   *   *   *   *
21

22

23

24

25
```

3

```
1                         INDEX

2

3  WITNESS:  ERIC M. BRUSS

4                                             PAGE

5  Appearances                                   2

6  Examination by Ms. Shirley LaVarco            6

7       10:16 a.m. - 11:13 a.m.

8       11:26 a.m. - 11:37 a.m.

9       11:38 a.m. - 12:33 p.m.

10      12:41 p.m. - 12:55 p.m.

11      2:04 p.m. - 3:19 p.m.

12      3:28 p.m. - 3:33 p.m.

13      3:44 p.m. - 4:55 p.m.

14      5:11 p.m. - 6:10 p.m.

15      6:21 p.m. - 7:01 p.m.

16      7:15 p.m. - 7:55 p.m.

17 Examination by Ms. Celena Vinson            298

18       7:55 p.m. - 7:56 p.m.

19 Further Examination by Ms. Shirley LaVarco   301

20      7:59 p.m. - 7:59 p.m.

21 Changes and Signature                       302

22 Reporter's Certificate                      304

23

24                  *   *   *   *   *   *

25
```

4

1    REPORTER'S NOTE:  All quotations from exhibits are

2  reflected in the manner in which they were read into the

3  record and do not necessarily denote an exact quote from

4  the document.

5                         EXHIBIT INDEX

6  NUMBER        DESCRIPTION                         PAGE

7  Exhibit 1     Harris County Constable's Office

8                Precinct One Use of Force Policy #500

9                Revision Dates:  February 28, 2013,

10               July 2014, March 2019, December 2019,

11               July 2020 and February 2021

12               (Bates BRUSS&SCHULTZ 001992 - 002014)   205

13 Exhibit 2     Communications Event Report

14               Event ID:  2021-0582057, 2/22/21

15               (Bates BRUSS&SCHULTZ 000013 - 000017)   217

16 Exhibit 3     Bodycam Footage of Robert Johnson

17               2/22/21                                221

18 Exhibit 4     Bodycam Footage of Eric M. Bruss

19               2/22/21                                236

20 Exhibit 5     VCA Spring Animal Hospital Medical

21               Records of Jeck

22               (No Bates Numbers)                     275

23

24                    *   *   *   *   *   *

25

5

1              THE VIDEOGRAPHER:  We are now on the

2   record.  My name is Jose Carranza.  I am the

3   videographer representing Lexitas.  This is a video

4   deposition for the United States District Court for the

5   Southern District of Texas Houston Division.  Today's

6   date is March 20, 2024, and the time is

7   10:16 a.m. Central Daylight time.

8              This -- this deposition is being held at

9   9600 Long Point Road, Houston, Texas 77055, in the

10  matter of Kerry Lee Thomas vs. Eric M. Bruss, et al.

11  The case number is 4:23-cv-0062.  The deponent is

12  Eric M. Bruss.

13             Would all counsel please identify

14  themselves.

15             MS. LaVARCO:  Shirley LaVarco, counsel for

16  Plaintiff Kerry Lee Thomas.

17             MS. FRANCIS:  Brittany Francis, counsel for

18  Plaintiff Kerry Lee Thomas.

19             MS. VINSON:  Celena Vinson representing

20  Eric Bruss.

21             MS. VESTAL:  Kathryn Vestal also

22  representing Eric Bruss.

23

24

25

6

1                      ERIC M. BRUSS,

2    having been first duly sworn, testified as follows:

3                      EXAMINATION

4    QUESTIONS BY MS. SHIRLEY LaVARCO:

5         Q.  Morning, Mr. Bruss.

6         A.  Good morning, ma'am.

7         Q.  My name is Shirley LaVarco, and I'll be taking

8    your deposition today.

9         A.  Okay.

10        Q.  Can you please state and spell your full name

11   for the record.

12        A.  Sure.  It's Eric Michael Bruss, E-R-I-C,

13   B-R-U-S-S.

14        Q.  And you're here represented by counsel?

15        A.  I am.

16        Q.  Have you ever been deposed before?

17        A.  I have.

18        Q.  So I assume that your attorney, then, gave you

19   some instructions about the protocol and obligations?

20        A.  Yes.

21        Q.  Is it okay if we go over some ground rules for

22   this deposition so that we can all be on the same page?

23        A.  Absolutely.

24        Q.  Great.

25             So in this deposition I'll be asking you

1   questions.  My questions and your answers will be

2   recorded by Ms. Boothe, the court reporter, as well as

3   by the videographer.  You understand that you need to

4   speak up and answer so that the reporter can hear you

5   when you give your answers?

6       A.  Yes.

7       Q.  You understand that the court reporter won't be

8   able to record a nod, a shake of your head or a grunt.

9   Do you understand that?

10      A.  Sure.

11      Q.  You've taken an oath to tell the truth, and

12  even though we're in this setting outside of court, that

13  oath you've taken has the same force and effect as the

14  oath you would take in front of a judge and a jury.  Do

15  you understand that?

16      A.  Absolutely.

17      Q.  In terms of some housekeeping items, I'd like

18  to ask that you turn off or silence your phone and any

19  other devices.

20      A.  It's been done.  Yes, ma'am.

21      Q.  You don't have a computer in front of you?

22      A.  No, ma'am.

23      Q.  You understand that you are not permitted to

24  confer with counsel or any other person during

25  questioning?

8

```
 1     A.  Okay.

 2          MS. VINSON:  Unless -- if you believe you

 3   need to inquire of something personal or confidential.

 4          THE WITNESS:  Received.

 5     Q.  (BY MS. LaVARCO) About a matter of privilege,

 6   exclusively about a matter of privilege; you understand

 7   that?

 8     A.  Okay.

 9     Q.  You understand that you're not allowed to

10   confer with anybody electronically by phone and you're

11   not permitted to confer with counsel through verbal or

12   nonverbal communications while I'm asking you questions?

13     A.  Sure.

14     Q.  Is there any reason why you can't testify

15   truthfully and accurately here today?

16     A.  Absolutely not.

17     Q.  Any reason that you can't give your best

18   testimony today?

19     A.  Absolutely not.

20     Q.  Have you consumed any alcohol within the last

21   24 hours?

22     A.  No.

23     Q.  Have you consumed any drugs or illicit

24   substances within the last 24 hours?

25     A.  Absolutely not.
```

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

9

1       Q.   Are you aware of any physical condition that

2    would affect your ability to testify truthfully and

3    accurately here today?

4       A.   No.   I feel under the weather, but it wouldn't

5    affect the truth.

6       Q.   And would it affect your accuracy or the

7    completeness of your answers?

8       A.   No.

9       Q.   Do you agree that if at any point you feel as

10   though your physical condition is going to affect the

11   accuracy or completeness of your answers you will notify

12   us?

13      A.   Absolutely.

14      Q.   Are you aware of any mental coni -- condition

15   that would affect your ability to testify truthfully and

16   accurately here today?

17      A.   No.

18      Q.   If you become aware of such a condition at any

19   point during the deposition, will you notify us?

20      A.   I will let you know.

21      Q.   Are you taking any medications that affect your

22   ability to testify truthfully and accurately today?

23      A.   No.

24      Q.   Are there any medications that you should have

25   taken but that you did not take that affect your ability

10

```
 1   to testify truthfully and accurately?

 2        A.   No.

 3        Q.   At the end of the deposition, you will receive

 4   a transcript, and you'll have an opportunity to review

 5   it with your counsel and make any changes that you need

 6   to.  If you make any substantive changes, such as

 7   changing a yes answer to a no answer or otherwise

 8   changing your substance of your answer, I'm allowed to

 9   comment on that later as it will go to your credibility.

10   Do you understand that?

11        A.   Sure.

12        Q.   For the sake of the court reporter, I ask that

13   only one person speak at a time.

14             We can take breaks at any point that you

15   want and at any point that anyone else in the room

16   needs, but I will ask that I be permitted to finish my

17   question or line of questioning before you step out.

18   Does that sound okay?

19        A.   Sure.

20        Q.   Before answering any of my questions, I ask

21   that you wait for me to finish the entire question.

22        A.   Sure.

23        Q.   Without -- you understand that you're not meant

24   to disclose the content of any of your discussions with

25   your attorney regardless of what I ask you?
```

11

1      A.   I'm not clear on that tray.  Can you --

2      Q.   Sure.

3      A.   -- repeat that for me?

4      Q.   Please don't disclose the content of your

5   discussions with your attorney.

6      A.   Right.

7      Q.   I may ask you about what discussions you've

8   engaged in with your attorney; for example, how long you

9   conferred with your attorney, about which documents but

10  not about the content of the discussions.

11     A.   Absolutely.

12     Q.   Thank you.

13          Your attorney will object throughout the

14  deposition periodically.  Unless your attorney instructs

15  you not to answer a question, you're required to answer

16  my question.  Do you understand that?

17     A.   Sure.

18     Q.   If I ask you a question that you don't

19  understand, will you let me know, and I will make an

20  effort to reframe it so that you do understand?

21     A.   Yes, ma'am.

22     Q.   If you don't hear a question, will you let me

23  know so that I can repeat it?

24     A.   Yes, ma'am.

25     Q.   If it's unclear in any way, will you let me

12

1  know?

2      A.  Yes.

3      Q.  If you don't know the answer to my question,

4  will you say so?

5      A.  Yes.

6      Q.  If there's any -- any document or any other

7  thing that might help you remember the answer to my

8  question or otherwise refresh your memory, will you let

9  me know?

10     A.  I will.

11     Q.  If I ask you a question and you know the answer

12  only because your recollection was refre -- refreshed

13  by a document or recording, will you tell me the answer

14  and also tell me the document that refreshed your

15  recording [sic].

16          MS. VINSON:  Objection.  Object to form.

17          You can answer.

18     A.  Yes.

19     Q.  (BY MS. LaVARCO) If you reflect your -- if you

20  use a document to refresh your recollection at any

21  point, will you let me know?

22     A.  Yes.

23     Q.  Will you let me know which document you used to

24  reflect -- ref -- refresh your recollection?

25     A.  Yes.

13

1        Q.   As we proceed with the deposition today, if you

2    start thinking back to something that you said in an

3    earlier point and you realize you -- you made a mistake,

4    will you agree to tell me so that we can go back?

5        A.   Oh, absolutely.

6        Q.   And that that applies whether you left

7    something out, whether you think that you weren't clear

8    or you think at any point later on you're going to want

9    to go back to your answers?

10            MS. VINSON:  Objection, form.

11       A.   Yes.

12       Q.   (BY MS. LaVARCO) Do you understand that even if

13   we've moved on to another answer -- another area of

14   questioning you can always come back to a previous -- a

15   previous area of questioning?

16            MS. VINSON:  Objection, form.

17       A.   Yes, I understand.

18       Q.   (BY MS. LaVARCO) What did you do to prepare for

19   today's deposition?

20       A.   I spoke to my attorney.  I'm sorry.  For

21   clarification, you mean since I was served with this

22   lawsuit or -- or --

23       Q.   Anything that you did --

24       A.   -- like in --

25       Q.   -- in preparation for --

14

```
1        A.  Oh, I've --

2        Q.  -- the deposition.

3        A.  I've reviewed the report.  I've reviewed

4   videos, and --

5        Q.  Who did --

6        A.  -- I spoke to my attorney.

7        Q.  You spoke with your attorney, Ms. Vinson?

8        A.  Both of my attorneys, and an additional

9   attorney from the union.

10       Q.  You spoke with an attorney from the union.

11  What's the name of the attorney from the union?

12       A.  Greg Cagle.

13       Q.  Can you spell that for the record?

14       A.  C-A-G-L-E.

15       Q.  How many times did you speak with your

16  attorneys in advance of this deposition -- or let me

17  rephrase that.

18            When did you begin preparing for this

19  deposition in earnest?

20       A.  A few weeks ago maybe.

21       Q.  How many times since a few weeks ago have you

22  spoken with any of your attorneys?

23       A.  Twice.

24       Q.  How long were those conversations?

25       A.  Maybe an hour.
```

15

1    Q.  So you had --

2    A.  Maybe a little bit longer.

3    Q.  Can you tell me about each of those

4 conversations.  One of them was with Ms. Vinson; is that

5 correct?

6         MS. VINSON:  You know he can't tell you

7 about the conversations with his attorneys.

8         MS. LaVARCO:  I'm asking about how long

9 were the conversations.

10         MS. VINSON:  Oh.

11    A.  Oh, maybe an hour.  Maybe an hour.

12    Q.  (BY MS. LaVARCO) You had an hour-long

13 conversation with Ms. Vinson to prepare; is that

14 correct?

15    A.  It might have been -- it might have been

16 longer.  It might have been an hour and a half.  I'm --

17 I'm not sure.

18    Q.  Did it take place in person or over Zoom?

19    A.  Zoom?  No, I -- I don't even know how to use

20 that.  So --

21    Q.  So it took place in person?

22    A.  It was in person and a few phone calls.

23    Q.  A few phone calls in addition to the hour-long

24 conversation in person?

25    A.  Correct.

16

1      Q.   Was Ms. Vestal present for those conversations?

2      A.   Just today's.

3      Q.   Just this morning?

4      A.   This morning, yeah.

5      Q.   Was your union attorney present for any of

6   those conversations?

7      A.   No.   No.

8      Q.   Did you meet with anyone else other than your

9   attorneys or speak with an -- did you meet with anyone

10   else other than your attorneys to prepare for the

11   deposition?

12      A.   Maybe command staff at the department advising

13   that I was going to be off today doing the deposition

14   and making sure they didn't have anything additional for

15   me.

16      Q.   Who among the command staff?

17      A.   I spoke to Chief Harrison yesterday advising

18   him that I had the deposition scheduled for today.   We

19   didn't really discuss the case, but I relayed it to him.

20   And yesterday I spoke to Chief Shaw and his -- I believe

21   it's his assistant, asking if there was any -- anything

22   additional that I needed before attending the

23   deposition.

24      Q.   Is that Carl Shaw?

25      A.   It is.

17

1        Q.   Do you know the name of his assistant?

2        A.   I don't remember what her name is.

3        Q.   Okay.   Anybody else among command staff that

4   you spoke with?

5        A.   No.

6        Q.   Any other union personnel?

7        A.   No.

8        Q.   Any fellow officers or former fellow officers?

9        A.   No.

10       Q.   Did you speak with Mr. Schultz about the

11   deposition?

12       A.   I have not spoken to Mr. Schultz about the

13   deposition at all.   Other than this morning greeting him

14   in the parking lot, I haven't seen or talked to him in a

15   long time.

16       Q.   Can you tell me about the materials that you

17   reviewed in advance of the deposition you said?

18       A.   The report and --

19       Q.   Do you mean the incident report?

20       A.   The incident report.   The -- the video.

21       Q.   The body camera footage?

22       A.   I watched bodycam and in-car.   Um-hum.

23       Q.   Did you watch all of the body camera footage

24   for each of the officers present on the scene?

25       A.   No, I didn't.   I have in the past, but I didn't

18

1   in preparation for this deposition.

2        Q.  You watched only your body camera footage?

3        A.  Yeah.  And I didn't watch it in totality.  I

4   just kind of went through a couple things.

5        Q.  Is there anything -- any other documents or

6   materials that you reviewed?

7        A.  Maybe the call slip, the -- the -- the

8   call-for-service slip that was part of the packet.

9        Q.  Can you describe the call-for-service slip?

10       A.  Yeah, it's the -- it's the radio log.  It -- it

11  gives the notes and the times and the location and the

12  pertinent unit numbers and things like that.

13       Q.  Is that also called the CAD report?

14       A.  Correct.

15       Q.  Mr. Bruss, have you ever gone by any other

16  names?

17       A.  No.  I'm sure I've been called some other

18  names; but, no --

19       Q.  Any --

20       A.  -- officially not.

21       Q.  -- any nicknames?

22       A.  Back a long, long time ago I had a nickname

23  Doc.

24       Q.  Why did you get that nickname?

25       A.  I was a medic in the Army, and it was a common,

1   you know, term of endearment.

2       Q.  Have you met with anyone from the County's

3   attorney's office to help you prepare for the

4   deposition?

5       A.  No one from the County Attorney's office aside

6   from my attorneys.

7       Q.  Have you spoken with Jim Butt in preparation

8   for the deposition?

9       A.  I don't know who that is.

10      Q.  Okay.  Do you have any other aliases that you

11  use online or elsewhere?

12      A.  No.

13      Q.  Mr. Bruss, I want to ask you about your work

14  history, both with respect to law enforcement and

15  non-law enforcement.

16      A.  Sure.

17      Q.  Can you walk me through your work history

18  starting with your first job?

19      A.  Oh, wow.  I'm 51 years old.  So this is going

20  to take a second.  I think my first job was when I was

21  15 years old.  I worked at Hardie's.  I think it's a --

22  they don't have it here in Texas, but it -- I think it

23  was a Carl's Jr.

24      Q.  Are you from Minnesota?

25      A.  I am, correct.  So I worked there when I was

20

1    15 years old.

2        Q.  And after Hardie's?

3        A.  I worked at a movie rental place probably

4    during the summer months, maybe when I was 16.  When I

5    turned 17, I enlisted in the United States Army on the

6    delayed entry.  And while I was waiting to go to basic

7    training, I worked at a Subway because I liked their

8    sandwiches.  So I worked at the Subway for a short time.

9    Those were all very short times just because of, you

10   know, summer months or school or -- or what have you.

11                I went into the United States Army and went

12   to basic training, and then I went to advanced

13   individual training to be a combat medical specialist.

14   So basic training was at Fort Bliss, Texas, and AIT was

15   at Fort Sam Houston, Texas.

16                From there I returned and was in college,

17   and I didn't have a job while I was in college.

18       Q.  Where did you go to college?

19       A.  I went to Inver Hills Community College.

20       Q.  Where is that located?

21       A.  That's in Mendota Heights -- or, I'm sorry,

22   Inver Grove Heights, Minnesota.  I lived there on the

23   campus.

24       Q.  What did you study there?

25       A.  Criminal justice.

1    Q.  Did you earn a degree?

2    A.  I did not.  I went back in the military active

3  duty.

4    Q.  Why did you decide not to finish your degree?

5    A.  Well, we were -- we were at war.  So I felt

6  that was where my place was going to be on active duty

7  for them to decide where I was going to go.

8    Q.  Can you tell me about your military service?

9    A.  Sure.  Aside from the basic training, the AIT,

10  I -- when I went -- I was a -- I was in the reserves

11  initially.  So I guess that would be counted as a job

12  because I did have drill weekends once a month where I

13  was compensated, and I went and trained.  And then I

14  went active duty, and I went to Fort Leonard Wood,

15  Missouri, for an outprocessing for deployment where I

16  got my shots and all the other stuff and made sure

17  everything was -- your will and all that is up to date.

18           And then I deployed to the Second Infantry

19  Division on the DMZ in Korea where I was a combat medic.

20  And I did a little over a year in Korea, and then I came

21  back and was assigned to Fitzsimons Army Medical Center

22  in Denver, Colorado.  And I completed my career, my

23  military service there.

24    Q.  When was that that you completed your military

25  service?

1        A.   In 1994.

2        Q.   And how long had you served at that point?

3        A.   About four years with reserve time, three years

4    active duty.

5        Q.   Can you tell me about your medic training?

6        A.   Sure.  At Fort Sam Houston they trained combat

7    medics to assist and treat those that are wounded in

8    combat, along with some additional tasks of

9    immunizations and things like that.  But I learned how

10   to do suturing and do IVs and stop bleeding, treat for

11   shock and manage, you know, whatever medical emergency

12   might come about.  At the same time I earned my national

13   registry emer -- EMT, emergency medical technician.

14       Q.   Have you found that training valuable in your

15   career as a law enforcement officer?

16       A.   Absolutely.

17       Q.   Can you tell me more as to how so?

18       A.   Sure.  There's been numerous occasions

19   throughout my career where my medical training has

20   assisted me in providing lifesaving efforts to a person.

21   I mean, I've -- I've put many tourniquets on people.

22   I've stopped bleeding on many people.  I've addressed

23   overdoses.  I've done CPR.  I've revived people.  I've

24   lost some people.

25       Q.   Have there been other aspects of your military

23

1  training that have informed your practices as a law

2  enforcement officer?

3      A.  I would say the discipline that you earn and

4  the pride you -- that's instilled with you that you're

5  working for something bigger than yourself.  Instead of

6  being selfish and being self-centered, you're working

7  towards a team goal.  And your partners are your

8  partners.  They're valuable.  And there's a camaraderie

9  that develops that even after you leave the military it

10  stays with you.

11      Q.  Would you say that you felt a camaraderie

12  similar to that with your fellow law enforcement

13  officers?

14      A.  Yeah, a lot of them, sure.

15      Q.  Have you felt that camaraderie with

16  Mr. Schultz?

17      A.  Sure.  When I worked with -- with Wayne, I did.

18      Q.  Have you felt that camaraderie with

19  Mr. Johnson?

20      A.  Yeah, I did.

21      Q.  So you've told me so far about your military

22  career.  Can you tell me when you entered law

23  enforcement?

24      A.  Sure.  When I got back from active duty, I took

25  a job -- I interviewed for a job and was -- and got the

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

24

1  job as a community service officer with the Hastings

2  Police Department in Minnesota.  And that was -- the job

3  was almost like an intern almost.  You're paid, but I

4  did, you know, squad car checks and equipment checks and

5  I ran papers to and from different locations.  And --

6  and it was a part-time job.  I had part-time hours, no

7  benefits.

8            And I had a job working as a bouncer at a

9  local club.  That was again part-time.  There was no

10  full-time, no benefits.

11            So I was constantly looking to what I

12  wanted to do.  And I had a friend who was hired by the

13  Phoenix Police Department, and I helped him move down to

14  Phoenix and I just enjoyed Phoenix.  And at some point,

15  I spoke to a deputy with the Maricopa County Sheriff's

16  Office and ultimately moved to Phoenix and was hired by

17  them as an unpaid, here you call them reserves.

18            And from there I took full-time employment

19  with the Arizona Department of Corrections, and I

20  graduated their academy and was assigned to Aristo --

21  Arizona State Prison complex Perryville, on the west

22  side of Phoenix, where I worked.  I worked as a gang

23  intelligence officer and ultimately as a K9 officer.

24      Q.  What does a gang intelligence offic --

25  officer's role entail?

1      A.   I tracked prison gang members and street gang

2   members as they came back into the prison system to

3   ensure that they were -- number one, that they were

4   identified; and, number two, that they were -- their

5   housing was recommended accurately.   There are certain

6   people that just don't get along.   And so it was a

7   responsibility to make sure that the accurate

8   information and the tracking of gang members and gang

9   activity inside the -- the prison system was -- was

10  managed.

11     Q.   And can you tell me about your use of a K9 in

12  that setting?

13     A.   Sure.

14          MS. VINSON:   Object to form.

15     A.   I attended -- I was selected as a K9 officer

16  for a dual-purpose patrol K9.   And I went to Tucson,

17  Arizona, where the academy is, and I went through a

18  ten-week -- it was 320 hours, ten-week live-in

19  academy there where I learned how to run a dog.   And I

20  ran a dual-purpose patrol dog.   The dog would do

21  apprehension and the dog would do narcotics detection.

22          And upon completion of that, I -- I came

23  back to Perryville where we utilized the dogs to detect

24  narcotics with the inmates and visitors and stopping

25  cars that were entering, you know, restricted places.

26

1   And, you know, that's pretty much what -- what we did.

2        Q.  (BY MS. LaVARCO) Did you often use the K9 for

3   apprehension in that setting?

4        A.  No, we didn't use --

5               MS. VINSON:  Object to form.

6               Sorry.  You can answer.

7        A.  We didn't.  I never did.  I was also assigned

8   at -- on -- on the SWAT team.  And back then -- this is

9   early 2000s -- the dogs were being trained to -- and

10  used for cell extractions and for -- for, you know, riot

11  purposes and things like that.  To increase the safety

12  of the individual officers K9s were trained and used.  I

13  never had occasion to -- to use the dog in that setting

14  for that purpose.

15       Q.  (BY MS. LaVARCO) Did you witness K9

16  extractions?

17       A.  I did.

18       Q.  Going back to a deputy you spoke to before you

19  took a position in Phoenix, can you tell me -- tell me

20  their name?

21       A.  Oh, I have no idea.  That was 27, 28 years ago.

22       Q.  And after your -- after your time working in

23  the prison setting that we were just -- just discussing,

24  what was your next job?

25       A.  So from there, unfortunate circumstances,

1    9/11 happened, and I felt the desire to go into federal

2    service.  So I had applied at a few federal agencies.  I

3    had applied to be a -- jeez, I can't even remember what

4    they're called now -- the air marshals.  Yeah, I applied

5    to -- to be an air marshal.

6              MS. LaVARCO:  I'd just like to note for the

7    transcript that Wayne Schultz is present during the

8    deposition and he just whispered or signaled an answer

9    to Mr. Bruss.

10       A.  Yeah, it wasn't an answer.  It was what it was.

11   So --

12       Q.  (BY MS. LaVARCO) What --

13       A.  -- I just couldn't remember.

14              It was an air marshal position, and I

15   applied at the Department of Veteran Affairs Police

16   Department.  And I was awaiting, and I was ultimately

17   hired by the -- the U.S. Department of Veterans Affairs

18   as a pol -- federal police officer, as an 083 police

19   officer.

20              So I left Arizona, and I took that job

21   back in Minneapolis, my home state.  From there I went

22   to Law Enforcement Training Center in North Little Rock,

23   Arkansas, where I completed 083 basic peace officer

24   training, and then I returned to the VA campus in

25   Minneapolis, where I worked for the next couple years.

1       And while I was at the academy, I had met

2   with a couple guys that had worked for the Houston

3   campus, and I don't remember their names.  I just

4   remember that, you know, they talked about that they

5   really liked it and the weather was a lot nicer and --

6   and the cost of living was -- was much nicer.

7       So I put in a transfer, an inter --

8   interagency transfer, and I flew down to Houston where I

9   met with the chief and the command staff there; and

10  ultimately I was selected to move to Houston.  And I

11  did.  I moved to Houston in 2003, maybe late 2003; and I

12  worked for the -- for the Houston campus.  It was a much

13  bigger campus than Minneapolis, a lot more officers and

14  a lot more specialized opportunities.  And, again, the

15  cost of living was substantially less.

16      So I worked for the Department of Veterans

17  Affairs as a police officer.  And at that time ██  ██

18  ██  ██  █ ██  ██████  and so I told her "If you

19  get hired with an agency here, then I will find a local

20  agency."  Because in the federal system, if you're not

21  willing to move around, you're not going to get

22  promoted.  You're not going to have the opportunities,

23  and I just -- I didn't really want to move again.

24      So she got hired.  She worked for the

25  City of Webster Police Department, and I applied at the

29

1  Santa Fe Police Department and was -- well, let me go

2  back.

3              Before -- before that, in order to have a

4  state license and my federal credentials, I took a job

5  with the Hillcrest Village Police Department in Texas,

6  and I worked there as a reserve -- actually, as a

7  part-time because they paid for a couple months.  While

8  I was still a federal officer, I had my -- my state

9  license as well.  And then I was hired by the Santa Fe

10 Police Department.  I was number one on the -- the

11 hiring list on the test and then number one on the --

12 the hiring list after the oral boards.  And I was

13 ultimately hired, and I started working for the Santa Fe

14 Police Department.

15             MS. LaVARCO:  My apologies for the

16 oversight --

17             THE WITNESS:  Sure.

18             MS. LaVARCO:  -- but I realize that I

19 should state for the record that we're taking this

20 deposition pursuant to the Federal Rules of Civil

21 Procedure.

22             Ms. Vinson, do you agree to that?

23             MS. VINSON:  I do.

24             MS. LaVARCO:  Thank you.

25     Q.  (BY MS. LaVARCO) ███ ██ ██ █ ██ ███

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

34

1 ████████████████████████████████████████

2 ███ -- ███████████ ██████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████

5           MS. VINSON:  Okay.  Your objection is noted

6 to my objection.  But he's not answering that question.

7      Q.  (BY MS. LaVARCO) ███ ███ ███ ████████ ███

8 ███ ████████

9           MS. VINSON:  I'm instructing you not to

10 answer.

11           Katie, write down the two questions she's

12 asked.  Thank you.

13      Q.  (BY MS. LaVARCO) How long were you on active

14 duty in the military?  Did you say four years?

15      A.  Three years active duty and an additional

16 year -- a little over a year as a reserve, in the

17 reserves.  So, yeah, four years total service.

18      Q.  Have you ever been arrested?

19      A.  I have never been arrested.

20      Q.  What else can you tell me about your work

21 history?  Is there anywhere -- withdrawn.

22           Is there anywhere that you've worked that

23 you have not yet mentioned?

24      A.  Oh, yeah.  I made it as far as the Department

25 of Veterans Affairs and then Santa Fe Police Department.

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

35

```
 1   I worked for Santa Fe Police Department for almost ten
 2   years. ████ ████ ████ ████ ████ ███ ███ ███ ████ ██
 3   ██████ ████ ████ █ █ ████ ██ ████ ███ ████
 4   ██ ██ ██ ████ ██ ████ ████ █ █ ██ ██████
 5   ████
 6            And so an opportunity arose to be an
 7   investigator with the City of Minneapolis as a -- for
 8   the prosecution, for the -- the City prosecutor's
 9   office.  Minneapolis is a little bit different.  I
10   don't -- down here the County prosecutes all crimes
11   and -- other than traffic offenses.  And in Minneapolis,
12   in that area of Minnesota, the Cities prosecute
13   misdemeanor crimes, assaults, thefts, things like that.
14            So I took a job there -- well, I applied
15   for a job there to assist and be an investigator and do
16   things to, you know, ensure that cases being prosecuted
17   were viable.  I'd go get evidence.  I'd interview
18   witnesses and -- and sometimes suspects.  So I was -- I
19   was selected for that position, and I ultimately moved
20   back to Minneapolis where I took that job and I worked
21   there.
22            I worked there in Minneapolis, and it's a
23   much different climate.  Clearly it's a lot colder,
24   and -- and I had been gone from Minnesota for a lot
25   longer than I thought I had.  I did not acclimate, and
```

1  it was -- and honestly, I just missed Texas.  I -- I

2  ultimately missed Texas.

3           I loved the job and I loved the people I

4  worked with.  I had a great schedule and -- but I missed

5  Texas.  So I had remotely applied for a position with

6  the Jersey Village Police Department where I had a

7  friend who worked there, and --

8       Q.  Where is the Jersey Village Police Department?

9       A.  It's on the west side of Houston.  It borders

10  the city of Houston on the northwest side.  Not that you

11  would know, it's kind of the Northwest Freeway and the

12  Beltway.  So I flew down here two or three times during

13  the background and ultimately was offered the job, and

14  I -- and I left Minneapolis.  My -- and I came down here

15  and was a sergeant with the Jersey Village Police

16  Department until I -- until I left to come to Harris

17  County in 2018, I think, late sev -- late '17, 2018.

18       Q.  And -- and what year did you start at Jersey

19  Village?

20       A.  2016, I believe.

21       Q.  Did you begin there as a sergeant?

22       A.  No.  No, I was an officer there, and I -- I

23  promoted pretty quickly because I had a lot of

24  experience and I had been -- I had been a sergeant

25  before and I had been a detective and I had done task

1  force and I -- I had some experience and -- and I did

2  fairly well on the -- on the -- the promotional process,

3  and I was selected as sergeant.

4      Q.  Did you have a rank in between officer and

5  sergeant?

6      A.  No.  No.  We had corporals, but I bypassed that

7  position and was promoted directly to sergeant.

8      Q.  Did you have a K9 there?

9      A.  No, I did not.  I didn't have one at Jersey

10  Village.

11      Q.  Did the department have a K9 unit?

12      A.  They did not, no.

13      Q.  Other than -- prior to Jersey Village, other

14  than the time where you were using a K9 in prison, had

15  you used a K9 apart from that?

16      A.  No.  In a law enforcement capacity, no.

17      Q.  Had you used it in a military capacity?

18      A.  No.  I had pets.

19      Q.  So after Jersey Village, remind me, you went

20  where?

21      A.  I came to Harris County.

22      Q.  And worked for which agency?

23      A.  Harris County Precinct One where I work now.

24  It's the only place I've ever worked in Harris County.

25      Q.  Any other law enforcement agencies in Texas

38

1    that you've worked at?

2         A.  No, no.  Just the ones I described.

3         Q.  In any other state that you haven't mentioned?

4         A.  No.

5         Q.  What ranks have you held throughout your law

6    enforcement career?

7         A.  Patrolman, deputy, detective, task force agent,

8    sergeant.

9         Q.  What sort of detective?

10        A.  I was a generalized detective, and then I was a

11   major case detective.  So I investigated everything from

12   quality of life issues to homicide.

13        Q.  What are quality of life issues?

14        A.  You know, neighbor disputes and criminal

15   mischiefs, and anything that required a follow-up.  You

16   know, if an officer made the scene of -- of a call and

17   it required a follow-up by an investigator, it would

18   come to investigations.  If it was a -- financial

19   crimes, it went to one detective.  If it was a sex

20   crime, it went to another detective.  And if it was a

21   major case like a robbery or crimes against person,

22   every once in a while I got involved with property

23   crimes, as long as they were high-dollar property

24   crimes.  But most -- most of my time was working

25   narcotics and major case detective.

1      Q.   And when you referred to the task force rank

2   before, what does what mean?

3      A.   I was assigned to a multijurisdictional task

4   force, an auto theft task force.  It was comprised of

5   many different agencies.  And we didn't work out of our

6   home agencies.  We had our own office, and we -- we

7   worked at the task force.

8      Q.   Have you ever been fired from any job?

9      A.   I have been asked to resign from a job, but

10  I've never been fired.

11     Q.   And where were you asked to resign?

12     A.   It was when I was a bouncer.  It was called

13  Bogart's Nightclub, and I had -- there was an employee

14  there who was off and came to the bar and was

15  intoxicated.  And the employee was trying to leave in

16  his vehicle, and I wouldn't let him leave in his

17  vehicle.

18           Back then we had TV commercials and said do

19  whatever it takes and stuff because we were serious

20  about stopping drunk drivers.  And I was serious about

21  it to the point where I called local law enforcement and

22  they came and -- and clearly he didn't drive the car.

23  He didn't get arrested.  But the bar manager at that

24  point thought that me involving the police could affect

25  the liquor license, and he felt that the owners didn't

40

1    need that exposure and he said, "You know, if you'd like

2    to resign."

3              I said, "I resign."  As soon as the police

4    cars pulled out of the driveway, I resigned.  It was the

5    right thing to do, and I'm not ashamed of it at all.

6         Q.  Did you intervene physically?

7         A.  No.  No, it never became necessary to do that.

8         Q.  Did you touch him?

9         A.  Oh, I'm sure I did.  I'm sure I probably put my

10   hand on his shoulder and said, "Hey, man, come on,

11   don't -- don't do this," or, you know, whatever.

12        Q.  Did he try to engage you physically?

13        A.  No.  It was not like that.

14        Q.  You've said that you weren't arrested.  Were

15   you ever pulled over for a suspected driving while

16   intoxicated?

17        A.  No.  Never been pulled over for driving while

18   intoxicated or evaluated or anything like that.  I don't

19   do that.

20        Q.  Have you ever been asked to submit to a

21   breathalyzer test?

22        A.  No.

23        Q.  Have you been asked to submit to drug testing?

24        A.  Sure.

25        Q.  Throughout your law enforcement career?

41

1       A.  Sure.  As conditions of employment, but

2  never -- and random but never because I was targeted for

3  or suspected of any type of narcotics use.  I've never

4  even smoked a cigarette in my life.

5       Q.  Have there been other instances in which you've

6  been asked to resign from a job?

7       A.  No.

8       Q.  Have you ever resigned for a job because you

9  thought you would be fired?

10      A.  No.  That was the only one.

11      Q.  So we've talked about you living in Texas and

12 Arizona and Minnesota.  Are there other --

13      A.  Correct.

14      Q.  -- states that you've lived in?

15      A.  No.  I mean, other than during my time in the

16 military where I had, you know, duty stations, whether

17 they be short-term like Missouri, you know, I -- no, I

18 haven't lived anywhere else.

19      Q.  Other than being stationed in Korea, have you

20 lived elsewhere outside the country?

21      A.  No, I've never lived outside the country other

22 than while on active duty.

23      Q.  At some point you referred, I think, to

24 OAD Veterans.  Can you explain what that is to me?

25      A.  OAD?

42

1      Q.   I may be misremembering the acronym.  Does it

2   ring a bell?

3      A.   I was an 083 police officer.

4      Q.   I think --

5      A.   Yeah, that's -- that's merely a job

6   classification.  We don't really use it in the civilian

7   world as much, but in the -- in the federal system, you

8   know, investigators are 1811s and police officers are

9   083 police officers.  So it's common -- it's common to

10  use those.  But, yeah, that's all it is, a -- it's a job

11  classification number.

12     Q.   Have you worked for any federal or law --

13  federal law enforcement agency you haven't mentioned?

14     A.   No.   No.   Department of Veterans Affairs is the

15  only one in the United States Department of Defense.

16     Q.   Have you worked for any state agency you

17  haven't mentioned?

18     A.   No.

19     Q.   Have you worked for any other precinct within

20  Harris County?

21     A.   No, I have not.

22     Q.   How would you describe the culture at the

23  Santa Fe Police Department?

24          MS. VINSON:  Objection, form.

25     A.   The culture?  I mean, there's some good police

43

1   officers doing good police work.  I mean, I don't -- I

2   know what the reputation for the City was.  I don't

3   subscribe to that idealogy.  It was a job for me.

4       Q.  (BY MS. LaVARCO) What's the reputation for the

5   City?

6       A.  There was always talks that it was a white

7   supremacist location, that there was some KKK rally back

8   in, I don't know, the '80s or something, which most of

9   that is -- my understanding is folklore.  Yeah, I don't

10  know why it -- it kind of stuck as -- but I would

11  definitely not describe it as a -- it's not -- that's

12  not an accurate representation of the police department

13  or the City or the people that work there.

14      Q.  Why don't you believe that it's accurate?

15      A.  Because I work there, and I worked with the

16  people and they were good people.  You know, they used

17  to refer to Pasadena, Texas, as Pasa-get-down-dena.

18      Q.  What does that mean?

19      A.  It means that it was just a rough-and-tumble

20  place to go and was always -- things always going on.

21  It seemed like every little city in the metro area has

22  their, you know, whatever, and that just kind of stuck

23  with Santa Fe up until, you know, we had the Santa Fe,

24  you know, school shooting and the -- the killings there.

25  And even that reputation I believe was only really

44

1   known, you know, in the Galveston County area.  That's

2   all it was.

3        Q.  Which reputation?

4        A.  The reputation that it was, you know, a white

5   supremacist and that, you know, the -- the local judge

6   was a member of the KKK.  And there was always -- always

7   rumors and stuff that I heard.  I did my due diligence.

8   I'm a -- I'm not a lawyer, but I'm a smart guy.  And

9   before I take a job somewhere, I'm going to do my due

10  diligence and make sure that it's the right place for

11  me, and it was the right place for me to work while

12  raising a family.  And the culture at the Santa Fe

13  Police Department I found to be a professional agency.

14  We helped a lot of people.  We solved a lot of crimes.

15       Q.  Were there allegations of hate crimes there?

16       A.  Sure.

17       Q.  Hate crimes committed by law enforcement?

18       A.  No.  No, not that I'm aware of.

19       Q.  Were there allegations of racial bias by law

20  enforcement there?

21       A.  There's always --

22            MS. VINSON:  Objection.  Calls for

23  speculation.

24       A.  Yeah, that's any agency.  It doesn't matter

25  where you go to, there's always people saying that.

45

1      Q.  (BY MS. LaVARCO) Did every -- anyone ever refer

2  to you as a white supremacist?

3      A.  Sure.  Sure.  I mean --

4      Q.  In which context?

5      A.  When -- during an arrest, dealing with a drunk

6  person or what have you.  Yeah, that happens.  It's --

7  you know, the black officers were called Uncle Tom.  So

8  it was -- you know, it was towards the uniform.  I

9  didn't take it personally because it's not me.  I don't

10 subscribe to it.  So it is what it is.

11     Q.  Did you interface with any officers who

12 subscribed to it, "it" --

13     A.  No.

14     Q.  -- being white supremacy?

15     A.  I only had one instance where I had anyone do

16 anything like that, and that resolved.

17     Q.  What instance was that?

18     A.  I had an instance where a supervisor at -- at

19 Harris County Precinct One used a -- a racial --

20 racially disparaging name, used the N word in my

21 presence, and -- and I reported him.  And an internal

22 affairs investigation was conducted, and he no longer

23 works at our agency.  I don't -- don't tolerate that.

24 It hurts my heart to be accused of that when that's not

25 me.  I didn't raise my children that way.  So...

46

1      Q.   What's the name of that officer?

2      A.   His last name was Crow, Doug Crow.  He was a

3  senior sergeant.

4      Q.   And he was terminated after an internal

5  investigation?

6      A.   The internal affairs investigation, apparently

7  he had more than one investigation going on.  I don't --

8  I wasn't privy to that.  I was -- I -- I made the

9  complaint that he used the language.  The fact how he

10 said it, almost like he thought I'd be okay with it.

11 I'm not.  So I reported him.

12           And, you know, contrary to what people

13 think, good police officers have ended the careers of

14 more bad police officers than lawsuits and news stories

15 and things like that.  So I reported him.  I gave my

16 statement in an internal affairs investigation, and that

17 in conjunction with whatever else he had going on,

18 ultimately he was no longer employed with our agency.

19     Q.   In what context did he use the racial slur?

20     A.   He was referring to an area of town on the

21 south -- southwest side of Houston which is a

22 predominantly black area, and he was having problems

23 with his wife and apparently he had -- if I recall, he

24 had followed her down into that area.  And he used the

25 terminology that I found to be offensive and -- and --

47

1    you know.

2       Q.  Did anyone take issue with your reporting?

3       A.  I don't think anybody took issue with my

4    reporting.  In fact, I was praised for reporting it.  I

5    have a command staff that was very supportive.  They

6    apologized to me that I was exposed to it.  That's not

7    what we do.  He was an anomaly, and he is no longer

8    there.

9                MS. VINSON:  Shirley, when you are ready

10   for a break, we have been going about an hour.  I need

11   to go to the restroom.

12               MS. LaVARCO:  Not a problem.  Go ahead.

13               MS. VINSON:  Thanks.

14               THE VIDEOGRAPHER:  Oh, you want to go off

15   the record?

16               MS. VINSON:  Whenever it's a good time.

17   Just let me know --

18               MS. LaVARCO:  Yeah.

19               MS. VINSON:  -- when it's a good time to

20   take break.

21               MS. FRANCIS:  Okay.  We can do that.

22               MS. LaVARCO:  We can take a break now.

23               MS. VINSON:  Okay.  Thank you.

24               THE VIDEOGRAPHER:  So we're going --

25               MS. LaVARCO:  No problem.  No problem.

48

1          THE VIDEOGRAPHER:  We're going off the

2   record.  The time is 11:13 a.m.

3              (Recess from 11:13 a.m. to 11:26 a.m.)

4          THE VIDEOGRAPHER:  We are back on the

5   record.  The time is 11:26 a.m.

6      Q.  (BY MS. LaVARCO) Mr. Bruss, did you confer with

7   anyone during the break about your answers to my

8   previous questions?

9      A.  I spoke to my attorney.

10     Q.  About your answers?

11         MS. VINSON:  You don't talk about what we

12  spoke about.

13     Q.  (BY MS. LaVARCO) Did you confer about a matter

14  of privilege?

15     A.  Yes.

16     Q.  Did you confer with Mr. Schultz?

17     A.  No, not about any testimony.  Just

18  pleasantries.  Top Gun movie.

19     Q.  Did any -- did anything from your conversation

20  with your attorney make you want to change your answers?

21     A.  Absolutely not.

22     Q.  Were you ever employed as a security guard or a

23  security officer?

24     A.  Yeah.  Yes, I was.  Jeez, where?  That -- you

25  know, honestly, that was part-time employment when I was

49

1  in high school.  I think I was a senior in high school,

2  and I think I worked at the local mall for a very short

3  time.  I don't -- God, that's been 30 years ago.  I

4  don't really remember.  But I -- I do remember now that

5  I did work at the mall for a very short time working

6  security, and that led up to me going into the military.

7  I think that was -- I worked at the Subway there at the

8  mall, and then I think I went into the security, yeah.

9      Q.  Any other instance where you've worked as a

10  security guard?

11      A.  Um, I think there is.  I'm thinking -- I

12  know -- yes, in Phoenix, when I first moved there, I

13  worked -- yeah, I worked in security at -- in Phoenix.

14  Oh, what was the name of the company?  I don't remember.

15      Q.  What sort of company was it?

16      A.  It was just a private security company.  I

17  worked a gas station, I think.  Yeah, I was security at

18  a Circle K in Phoenix.  Again, that was for a very

19  short -- very short time.  I guess I was kind of finding

20  myself back then.

21      Q.  Have you ever owned a business?

22      A.  Owned a business?  I have a side business now.

23  It's not -- I guess I wouldn't necessarily -- I don't

24  have a business license, but I do some fiber optic laser

25  engraving.

50

1      Q.   What does that mean?

2      A.   I -- well, I engrave, you know, metal Yeti

3   cups, and I just engrave names on some Houston Police

4   Department challenge coins, things like that.  It's

5   nothing that I can -- that I make a living off of.  In

6   fact, I probably do more stuff for free for friends than

7   I do for -- for money.

8      Q.   What's a challenge coin?

9      A.   There's -- it's a military -- it started in the

10  military.  They're little coins, and they've got your

11  unit on them and they might have your logo or your

12  patch.  And when you meet somebody from other military

13  units -- usually they're awarded by command staff for a

14  job well done, but it's kind of -- it's kind of evolved

15  into the law enforcement, fire department, first

16  responder services challenge coin against patches or

17  whatever.  And when you meet somebody from another fire

18  station or from another police department, you exchange

19  them.

20     Q.   Have you ever been awarded a challenge coin?

21     A.   Sure.

22     Q.   In what instances?

23     A.   I was awarded a challenge coin director's coin

24  for -- in the Arizona Department of Corrections.  I

25  think I got one when I got a lifesaving award.  Yeah, in

51

1   fact, I did, I got one.  An inmate was hanging himself

2   and I saved him.  I got a lifesaving award for that.

3        Q.  Do have any tattoos related to your law

4   enforcement work?

5        A.  No.  I mean, I have tattoos; but I'm not sure

6   what you mean in regards to law enforcement work.

7        Q.  What kind of tattoos do you have?

8        A.  I have some military tattoos.  I've got -- I've

9   got a 2nd Infantry Division patch, and I've got -- I'm

10  Irish.  So I've got some Irish tattoos, Irish-themed

11  tattoos.

12       Q.  Is that a clover or a leprechaun?

13       A.  No, not a leprechaun.  It's a shield.  It's an

14  ancient type shield with the -- the colors, and it's got

15  the clover in the middle of it.

16       Q.  Does it have any text on it?

17       A.  It doesn't have any text.  Oh, I do have a law

18  enforcement tattoo.  Yes, I do have a -- I have a

19  tattoo, and it's "Una Stamus."

20       Q.  What does that mean?

21       A.  It's Latin for we stand together.

22       Q.  What does that mean to you?

23       A.  It was a term of endearment.  It was a -- if

24  you -- you know, if you're not in law enforcement,

25  you -- you just don't get it.  So it's, I don't know,

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

52

1   kind of like, you know, a sailor getting a, you know,

2   "Mom" tattoo on their -- I don't know.  It -- it -- the

3   significance it has is -- is that you've accomplished

4   something and you are in -- you are in this and

5   you're -- you know, this is something bigger than

6   yourself.

7        Q.  So you would say it's a sign of camaraderie

8   among law enforcement?

9        A.  I would say it's a sign of camaraderie in law

10  enforcement but also service above self to your

11  community.

12       Q.  Would you say that it conveys loyalty?

13       A.  Loyalty to the profession?  Yeah.

14       Q.  And to your fellow officers?

15       A.  Well, you know, that -- it's -- it could be

16  taken that way, but it's in no way a sign that should be

17  dishonored by bad acts, even if it is by police.

18       Q.  Do you have any other tattoos?

19       A.  I have a Superman tattoo that I got when I was

20  in the military because I jumped off something that I

21  probably shouldn't have, and so -- and I have -- I have

22  a tattoo of a cowboy and a cowgirl.  What else do I

23  have?  I've got a knife, but that's the Irish.  It's

24  just the knife with the -- with the flag as the handle.

25       Q.  Why the cowboy and cowgirl tattoos?

53

```
1        A.   It was just something that I came up with to

2   cover up some scars, and so I put it together and I

3   liked the way it looked and...

4        Q.   When did you get the "Una Stamus" tattoo?

5        A.   When I first got into law enforcement.  So

6   1997.  There was only one guy who did it.  It was

7   trademarked, and you had to show a law enforcement ID to

8   get it done.

9        Q.   Do you have any tattoos reflecting membership

10  in a group?

11       A.   In a group?

12       Q.   In any sort of group other than those you've

13  mentioned?

14       A.   No.  Just my military service.

15       Q.   And no other tattoos?

16       A.   No.

17       Q.   What can you tell me about the scope of your

18  law enforcement training?

19            MS. VINSON:  Objection, form.

20       A.   The scope?  That's kind of vague.  I'm not

21  sure.  I have probably 5,000 hours of training.  So I'm

22  not --

23       Q.   (BY MS. LaVARCO) Why don't we begin with your

24  use of force training.

25       A.   Sure.  I have some.
```

54

1    Q.  Can you estimate how many hours of use of force

2    training you've received?

3    A.  Use of force training is statutory usually.  So

4    we receive updates in every training cycle.  In the

5    academies and all the academies, you receive use of

6    force training.

7    Q.  What --

8    A.  Sorry, go ahead.

9    Q.  What would you say are the key tenets of your

10   use of -- what would you say are the key tenets of your

11   use of force training?

12              MS. VINSON:  Objection, form.

13   A.  The tenets would be your safety is paramount,

14   but at the same time your use and application of force

15   has to be reasonable, objectively reasonable.  And -- I

16   mean, I -- I could go on and on about that.  I don't

17   know specifically what you're --

18   Q.  (BY MS. LaVARCO) What does "objectively

19   reasonable" mean?

20   A.  It's an act that would be reasonable

21   objectively to a person at the time it was happening

22   without the benefit of hindsight.

23   Q.  Can you give me an example?

24              MS. VINSON:  Object to form.

25   A.  I -- it sounds like they're having a use of

55

 1   force next door.

 2              THE VIDEOGRAPHER:  Do you want me to go off

 3   the record and see if I can --

 4              MS. LaVARCO:  Yeah, why don't we go off the

 5   record.

 6              THE VIDEOGRAPHER:  We're going off the

 7   record.  The time is 11:37 a.m.

 8              (Recess from 11:37 a.m. to 11:38 a.m.)

 9              THE VIDEOGRAPHER:  We are back on the

10   record.  The time is 11:38 p.m.

11              THE WITNESS:  It's very distracting, but we

12   can drive through.

13              THE VIDEOGRAPHER:  How would you like to

14   proceed?

15              MS. LaVARCO:  Is it all right for the

16   recording?

17              THE VIDEOGRAPHER:  It sounds muffled,

18   mumbling.  So you can't clearly define what -- what

19   they're saying.

20              MS. LaVARCO:  You can't define what they're

21   say -- is it interfering with your ability to hear me

22   and the deponent?

23              THE VIDEOGRAPHER:  No.

24              MS. LaVARCO:  Okay.

25              MS. FRANCIS:  Okay.  So all speak up.

56

1          MS. LaVARCO:  Okay.

2     Q.  (BY MS. LaVARCO) What are your continuing

3  training requirements at Precinct One?

4     A.  They're -- they're manded by -- mandated by the

5  State.  So they're for all law enforcement.  We have use

6  of force refreshers.  We util -- we have legal update on

7  laws that have changed.  A lot of it depends upon

8  your -- the license you hold in the state of Texas.

9  That can -- that can affect what training you need to

10  participate in.  There's been several changes lately in

11  regards to based on active shooter and ways for us to

12  address that.

13     Q.  You spoke about updates.  Can you tell me how

14  many hours of re -- of training are required annually?

15     A.  You know, I would have to look at the list to

16  be able to -- I mean, I could guess, but that probably

17  wouldn't be productive.  It's just there is always

18  training required every training cycle.

19     Q.  What's "every training cycle"?

20     A.  Every two years is a training cycle.

21     Q.  Do you subscribe to any law enforcement

22  publications?

23     A.  I do.  American Police Beat, maybe.

24     Q.  Is that a magazine?

25     A.  It is a magazine.  It's a -- it came with the

57

1  purchase of equipment, I think, and it's free.  It

2  doesn't cost me anything.  So I --

3       Q.  What equipment?

4       A.  I don't remember if I bought a pair of boots or

5  something.  I mean, I don't remember what it was.

6       Q.  Any other publications?

7       A.  No.

8       Q.  Do you subscribe to a magazine called K9 Cop

9  Magazine?

10       A.  No.  I may have in the past.  I know I have

11  some of them from -- sometimes when you go to K9

12  trainings, they'll give you a swag bag or whatever and

13  there will be a T-shirt in there.  There will be --

14  and -- and a lot of times there is, if they're a sponsor

15  of the -- of the event.

16       Q.  Do you subscribe to or receive any law

17  enforcement newsletters?

18       A.  I do.  Electronic newsletters.

19       Q.  From where?

20       A.  From the Texas Gang Investigators Association,

21  the Te -- Texas Tactical Officers Association.

22       Q.  What about military publications or veterans

23  publications?

24       A.  Veterans publication?  I -- you know, I review

25  so many things online it's tough to keep track of

1  whether it's a publication or not.  I don't believe that

2  I subscribe to -- maybe -- maybe I get something from

3  the American Legion.  You know, you go to -- you go to

4  the American Legion or you go to, you know, the VFW and

5  they ask for your email address.  And so sometimes you

6  get stuff that you -- you're not soliciting for, but,

7  yeah, to -- to be honest, I can't --

8      Q.  Do you receive emails from --

9      A.  -- give you specifics.

10     Q.  Apologies.

11          Do you receive emails from K9 vendors or

12  third-party entities that train K9s?

13     A.  Sometimes I do, sure.

14     Q.  Do you know the names of those entities?

15     A.  Houston K9 is where we -- we get a lot of our

16  dogs from, our police service dogs.  For equipment,

17  maybe because we've ordered equipment before from like

18  Ray Allen K9 Supplies or Elite K9, I get reminder emails

19  if there's a sale or something going on.  But as far as

20  a -- you know, an actual publication, no.

21     Q.  Are you a member of any law enforcement

22  Facebook groups?

23     A.  I am.  They're usually like extra job Facebook

24  pages where they post like extra jobs where they need an

25  officer.  Probably -- there's probably some K9 groups

59

1   that I'm in.  I don't know.  I can't remember what

2   they're called.  They're --

3       Q.  Would you say that you're --

4       A.  I'm not the moderator.  I'm not the -- it's not

5   my groups or anything like that.  So...

6       Q.  Do you ever post on them?

7       A.  Sure.  Sometimes.  Sometimes I'll post things.

8   I think I just posted the death of one of our retired

9   dogs.  Jack passed away from cancer.  So I posted that.

10  I think I posted a picture of my dog whose 11th birthday

11  was on March 10th, things like that, sure.  Sometimes

12  it's case law stuff, or sometimes somebody's looking for

13  an opinion on something and I'll post.  I mean, I don't

14  remember everything that I've posted.

15      Q.  What kinds of case law?

16      A.  I mean, you know, a lot of times there will be

17  a question about, hey, we're a small agency, and we --

18  we're just getting a police K9.  Can somebody give

19  guidance on, you know, how to get equipment donated; or

20  is there, you know, groups that will donate, you know,

21  ballistic vests for dogs, things like that.

22      Q.  Any LinkedIn groups?

23      A.  Any LinkedIn group?  I don't have LinkedIn.

24      Q.  Any other social media networking groups?

25      A.  Just Facebook.

60

1          Q.   In the Facebook groups you mentioned, do users

2     ever discuss lawsuits?

3          A.   Oh, I'm sure.   I'm sure they do.

4          Q.   Have you seen this lawsuit discussed in any of

5     those groups?

6          A.   No.

7          Q.   What would you say people typically discuss?

8               MS. VINSON:   Objection, form.

9          A.   You know, there's a lot of the posts that I

10    just go right over because they don't -- there's

11    something that just doesn't attract my attention or

12    whatever.   But they talk about everything from dog

13    leashes to, you know, tracking successes, you know,

14    equipment for the cars, budgetary stuff.   I mean, it's

15    so -- there's so many topics I could -- I couldn't even

16    begin to explain to you all the things.

17         Q.   (BY MS. LaVARCO) Do you ever see people

18    discussing K9 apprehensions?

19         A.   Sure.

20         Q.   Are they typically asking for advice about

21    whether the conduct was appropriate?

22         A.   No.

23              MS. VINSON:   Objection, form.

24         A.   No.   They're normally just ex -- explaining

25    a -- a situation or a success that their dog had ca --

1    capturing a suspect or finding narcotics or something

2    like that.

3        Q.  (BY MS. LaVARCO) What does a success look like

4    in an apprehension context?

5        A.  That the --

6              MS. VINSON:  Objection, form.

7        A.  Yeah, I mean, that's so subjective.  I

8    cannot -- I understand your position and I understand

9    what you're trying to get from that, but I just -- I

10   mean, there's so many different things that --

11   everything from no-bite apprehensions where the dog is

12   merely used and the dog barks and the suspect gives up

13   to the dog; you know, the suspect is, you know, running

14   and shooting at police or what have you.  I mean,

15   there's -- the scenarios are too vast for me to --

16       Q.  (BY MS. LaVARCO) What did you mean when you

17   said "success" initially?

18       A.  Well, if they apprehend the suspect and the

19   officers are safe and, you know, the suspect is

20   arrested, to me that's a success.

21       Q.  Have you seen people sharing photos of injuries

22   of suspects?

23       A.  Sure.  Sure.  That's happened.

24       Q.  Have you seen people making jokes or light of

25   those injuries?

62

1      A.  Oh, I'm sure.

2           MS. VINSON:  Objection, form.

3      A.  I'm sure.  You know, this job sucks.  It really

4  sucks and we go through a lot of stuff, and people don't

5  understand police officers' humor.  But, yeah, it's --

6  if there was something that I saw that I thought would

7  be derogatory or something like that, then I don't

8  participate.  I wouldn't engage in it.  I wouldn't be a

9  part of it.

10      Q.  (BY MS. LaVARCO) Have you ever shared a

11  success?

12      A.  Sure, absolutely.

13      Q.  How often would you say -- or withdrawn.

14           On how many instances would you say that

15  you've shared a success on a Facebook group?

16      A.  There's -- well, there was -- my dog got the

17  second-largest methamphetamine seizure in the history of

18  Harris County.  He got about 1,800 pounds of

19  methamphetamines off the streets.  That was a success

20  story.  There was a couple times when there was -- my

21  dog was used, and we apprehended a murder suspect.

22  Those are success stories, things like that.  Yeah, it's

23  not -- I mean, it's -- a dog has a lot of successes.

24  You don't post on everything, but significant ones.

25  There's police officers that never in their career ever

63

1    will see 1,800 pounds of methamphetamines.  So, yeah, we

2    give a shout out to our dogs because they're our

3    partners.

4        Q.  And you referred to police officers' humor.

5    What do you mean?

6        A.  You know --

7             MS. VINSON:  Objection, form.

8        A.  I mean the humor that is -- the humor that

9    police officers have is no different than humor that

10   doctors have in their profession.  Some of the crudest

11   things I've ever heard have been, you know, in the

12   emergency room from healthcare providers and things.

13   Everybody in a profession that sees things and that

14   needs some way to cope with things, and humor is one of

15   the attributes that God gave us to -- to be able to kind

16   of maybe lessen the stress or the burden.  So it's not

17   specific to police.  I mean, firemen probably joke about

18   cats in trees and stuff.  Doctors joke about this.  You

19   cannot tell me for a second, because I won't believe

20   you, that lawyers don't have jokes about other lawyers

21   and stuff.  It's just, you know, part of it.  As -- as

22   far as defining exactly what that is, I just -- I don't

23   know how to do that.

24       Q.  (BY MS. LaVARCO) Would you describe it as a

25   gallows humor?

64

1     A.  I don't know what a gallows humor is.

2          MS. VINSON:  Object to form.

3     A.  Yeah, I don't know.

4     Q.  (BY MS. LaVARCO) You referred to doctors'

5  humor.

6     A.  Um-hum.

7     Q.  In what ways is it similar to doctors' humor

8  police officers' humor?

9     A.  You know, it can be crude.  I mean, it can be

10 blunt.  It can be, you know, something that might be off

11 suit for somebody who doesn't understand, you know.

12    Q.  Have you cracked any jokes about this case?

13    A.  No.

14    Q.  Have you heard anyone else crack jokes about

15 this case?

16    A.  No.

17    Q.  Have you done any public speaking engagements

18 or public appearances related to your law enforcement

19 career?

20    A.  Sure.

21    Q.  Can you tell me about those?

22    A.  I mean, I've been the guest speaker at

23 different events and been an instructor.  I've been an

24 adjunct instructor.  I have years of experience, years

25 of credible experience, and -- and that can be sought

65

1   out to try to be used to teach new -- new officers.

2   I've done citizens police academies.

3       Q.  Would you say that you have an area of

4   specialization?

5       A.  Sure.

6       Q.  How would you describe that?

7       A.  In my law enforcement career, there are things

8   that I've excelled at that -- that I have a -- a firm

9   understanding of, and I'm respected amongst my peers in

10  those things.  And they would be gang intelligence,

11  K9 tactics.

12      Q.  When was the last time you gave a public

13  speaking appearance?

14      A.  I just gave one this last weekend, public

15  speaking.

16      Q.  Where was that?

17      A.  I mean, it wasn't law enforcement.  It was -- I

18  was the master of ceremonies for an event in Louisiana

19  raising money for Texas Children's Hospital.

20      Q.  How many total years of experience do you have

21  working with K9s?

22      A.  I would guess it's about 14, 15 years now.

23      Q.  Have you been a K9 handler continuously?

24      A.  No.  No.

25      Q.  How many K9s have you worked with as a handler?

66

```
1       A.   Three -- four now.  Yeah, four now.  I have a

2   replacement for my dog who's retiring.

3       Q.   What was the name of your first K9?

4       A.   Jerry was my first K9.

5       Q.   At which agency?

6       A.   In Arizona.

7       Q.   And how long did you work with Jerry?

8       A.   A year before I took the job with the Feds.

9       Q.   And your second K9?

10      A.   My second dog was Bohr, his name was Bohr.

11      Q.   B-O-A-R?

12      A.   No.  It's -- Bohr was short -- B-O-R-E --

13  B-O-R.  It's actually -- he was from the Netherlands.

14  So there's an H in there in the -- in the actual

15  spelling, but it was pronounced Bohr.

16      Q.   How long did you work with Bohr?

17      A.   Seven years, until they retired him.

18      Q.   And after Bohr?

19      A.   Edge, I have K9 Edge now.

20      Q.   You currently work with K9 Edge?

21      A.   I do.

22      Q.   Where did you begin?

23      A.   I got Edge in 2018, maybe, end of 2018.

24      Q.   And you referred to a fourth.  Is that Jeck?

25      A.   No, I never worked Jeck.  Jeck was never my
```

67

```
 1   dog.  That was Robert Johnson's dog.

 2        Q.  So who is the fourth dog you referred to?

 3        A.  I have a dog named Bosco that I just picked up

 4   from the vendor.

 5        Q.  Which vendor is that?

 6        A.  Houston K9.

 7             THE REPORTER:  Was that Jack or Jeck?

 8             MS. LaVARCO:  Jeck, J-E-C-K.

 9             THE REPORTER:  Thank you.

10        Q.  (BY MS. LaVARCO) You've worked as a law

11   enforcement trainer before?

12        A.  I have.

13        Q.  In what areas do you conduct training?

14        A.  I've been a primary trainer for several years

15   teaching hostage negotiations.  I'm a K9 trainer.  I'm a

16   police instructor.  I'm a -- was a taser instructor, a

17   doppler radar/LiDAR instructor, a firearms instructor.

18   And I've taught in all those disciplines.

19        Q.  How long have you worked as a K9 trainer?

20        A.  I was certified as a K9 trainer with 500 hours

21   of training in 20 -- maybe 2022, I believe.

22        Q.  Is that the in -- first instance in which

23   you've been certified as a trainer, a K9 trainer?

24        A.  Yes.

25        Q.  Which agency does the certification?
```

68

1     A.  It's an individual certification from

2   Houston K9.

3     Q.  Is that the Houston K9 Academy?

4     A.  It is.

5     Q.  Is that a private entity?

6     A.  It is.  People come from all over the country

7   to go there.

8     Q.  How many K9 officers would you say that you've

9   trained?

10    A.  That I've trained or that I've participated in

11  training?

12    Q.  That you've trained.

13    A.  I have not trained any K9 handlers from

14  beginning to end with their dogs.

15    Q.  How many K9 handlers would you say that you've

16  trained in any context?

17    A.  Hundreds.

18    Q.  Beginning in 2022 or prior to your

19  certification?

20    A.  Well, even prior, even prior to certification.

21    Q.  Was that in an informal setting?

22    A.  No.  It was, you know, in K9 training.

23  K9 trainer is not a -- that is nothing that is required.

24  It's not a certification that's required by the state or

25  anyone else.  That is literally an evaluation of your

69

1   experience and your knowledge.  And so even prior to

2   being certified, I would assist K9 handlers in training

3   settings, in scenarios and problem resolution and, you

4   know.

5        Q.  And with which companies or entities?

6        A.  Well, in a law enforcement setting.  So the

7   only time I did it with a private setting was when I was

8   being certified through Houston K9.  And even that was

9   other law enforcement agencies.  I don't -- I don't do

10  it private -- privately.

11       Q.  Have you ever worked as a law enforcement

12  consultant?

13       A.  Yes.  Yes, I have.

14       Q.  Through self-employment or through an agency?

15       A.  It would be self-employment as a result of my

16  agency, I guess is the way to put it.  I've been an

17  advisor.  I've been -- I've sat on assessment centers in

18  hiring and promotion from other agencies that reached

19  out to me that asked me to participate in the selection

20  of K9 handlers or generalized policing, promotions,

21  detectives, things like that.

22       Q.  What would you say makes an effective

23  K9 handler?

24       A.  Well, that's a -- well, you have to have an

25  absolute love for the animal and a respect of the animal

70

1    because you're asking them to do things that are in the

2    protection of yourself.  So you have to have a

3    willingness -- a love for the animal, a willingness to

4    learn the animal and how the -- how the dogs work, what

5    drives them, how to effect their drives to make them

6    successful and do what you want them to do.  You have to

7    be patient.  You have to be compassionate.  And I

8    don't -- I don't know.  I don't know what more you're

9    looking for.

10        Q.  What kind of temperament do you think is best

11   suited to be a K9 handler?

12        A.  Well, you have to be an even keel person.  In

13   selecting K9 handlers, you need to find responsible

14   K9 handlers that are, number one, good at their job,

15   good at being a police officer.  People don't find more

16   drugs because we give them a police dog.  They were

17   either finding drugs as a -- as a good officer or

18   they're not.

19            So you need to find a responsible person, a

20   person that can work with limited supervision because a

21   lot of what you do as a K9 handler is behind the scenes

22   working with your dog when you don't have the benefit of

23   a trainer.  So I -- I mean, a responsible person.

24   It's -- it's not that much of a stretch than what we

25   expect out of being a modern police officer.

71

1    Q.  Are there any red flags that you look out for?

2    A.  Sure.  Sure there are.  If you mistreat other

3 people, if you mistreat the people you work with.  You

4 know, if you have a bunch of use of force complaints, if

5 you have substantiated complaints and even if you just

6 have allegations, that would be a red flag to be a K9

7 handler.

8    Q.  What makes a bad K9 handler?

9    A.  Exactly the opposite of that.  Somebody who

10 is -- somebody who goes out and does just enough bad to

11 outweigh the good.  I mean, it's not -- you -- you know,

12 a bad K9 handler, I mean, you'd have the individual

13 things.  But, I mean, I could say a bad K9 handler is

14 the same thing that would make a bad police officer,

15 somebody that was not -- not patient, wasn't committed

16 to what they're supposed to be doing, committed to the

17 mission of, you know, creating a safe environment,

18 somebody that isn't open minded, somebody that doesn't

19 want to learn.  I mean, I could go on and on.

20    Q.  Would you say that becoming a K9 handler can

21 transform people?

22         MS. VINSON:  Objection, form.

23    A.  Yeah.  I don't understand what you mean by

24 "transform people."  I've seen where it's made people

25 better police officers, but I don't know that I've ever

72

1    seen it where it's made somebody a bad police officer.

2         Q.  (BY MS. LaVARCO) Have you ever seen an instance

3    in which someone after becoming a K9 handler is more

4    aggressive?

5         A.  I have not seen that to be the case.

6         Q.  Are you familiar with Critter Camp?

7         A.  Critter Camp?  No, ma'am.

8         Q.  Do you recall making a visit to a summer

9    camp for --

10        A.  Oh.

11        Q.  -- children through the ASPCA?

12        A.  I do.  I do.  Yeah, that is something that we

13   routinely are invited to and we go to.  It is a summer

14   camp at the ASPCA Houston, and we do it for free.

15   They -- we get to talk to the kids ranging from very,

16   very small -- maybe, you know, 4 or 5 years old -- up to

17   you know, preteens.  And we talk to them about law

18   enforcement and we talk to them about K9s and we get to

19   show them the K9s, and we get to have interaction with

20   kids, which is always a positive thing.  And it's one of

21   my priorities as -- as a K9 handler is to do things for

22   the community.

23        Q.  How do you keep up with the latest developments

24   in law enforcement?

25             MS. VINSON:  Objection, form.

73

1      A.  You know, that just depends.  We get

2  directives.  I receive emails, intelligence emails from

3  all across the country on incidences.  Again, we update

4  the way we do things based upon trending techniques that

5  are identified to us as well as case law.

6      Q.  (BY MS. LaVARCO) Do you get updates from the

7  precinct?

8      A.  Absolutely.  They're pretty good about updating

9  us on legal issues and putting out legal bulletins that

10  talk about case law and things like that.

11      Q.  Is that primarily through email?

12      A.  It is, yes.

13      Q.  Are there --

14      A.  I would say it's solely through email.

15      Q.  So you would say that you -- that the precinct

16  doesn't conduct meetings for these updates?

17      A.  No, I would say we do, actually.  When we have

18  a change in -- so we recently had a change to the

19  response to resistance reporting, how we report.  We

20  have a new system.  So we did have meetings, and we had

21  where we had all the deputies come in and we go over --

22  go over those things.  And besides that, again, we have

23  our -- our update training.

24      Q.  What's the new system for response to

25  resistance?

74

1        A.   We have an internet-based system now.  It used

2   to be a lot of paper.  We did a lot of paper.  And now

3   we're actually doing it -- it's a streamlined way to

4   report response to resistance through the chain of

5   command.  It goes through, and -- and every officer has

6   it.  It's -- it's a -- it's a system that we use now for

7   deputies, and I -- literally all staff members, whether

8   sworn or not sworn, to review departmental policy.  And

9   you not only -- you not only review department policy

10  but you acknowledge department policies.  So if a policy

11  addendum comes out, that will be posted.  You will read

12  it, and you'll acknowledge that.

13              My understanding is our pursuit package is

14  coming next, and that's going to be streamlined in that

15  program.  But in the last 90 days or so, we've had that,

16  where the response to resistance has been changed.  It's

17  in the program.  Guys have been trained how to use it

18  and...

19       Q.   Were there substantive updates to the response

20  to resistance policy?

21              MS. VINSON:  Objection, form.

22       A.   Yeah.  I mean, there was no change other than

23  the way we submit and approve.  But as far as any

24  changes as to making something a violation or -- there

25  was no change to the policy.  There was just the way

75

1  that we deliver it is a little different.

2      Q.  (BY MS. LaVARCO) What's the name of the new

3  system?

4      A.  Integrity, Integrity Whistleblower, I believe

5  is what the --

6      Q.  When did that roll out?

7      A.  Man, we've had that for several years.  I want

8  to say at least five years.  But the new -- again, the

9  response to resistance is something that's just been

10 added to it.  It's a growing -- it's a live thing that

11 grows.  I really don't have much to do with that.

12     Q.  But you use the system?

13     A.  I do.

14     Q.  What does that entail after, for example, an

15 apprehension?

16     A.  If there's a use of force, it gets reported.

17 The same way it used to be written down, now it's just

18 in a computerized form and it gets submitted.  It goes

19 to the first-line supervisor.  It goes to the shift

20 lieutenant.  It goes to the division commander and the

21 chief.  And if it goes beyond there, I'm -- I'm not sure

22 but...

23     Q.  And you said it rolled out about five years

24 ago.  So that would have been?

25     A.  Yeah, I mean -- I mean, honestly, I would just

76

1   be guessing.  I don't know how long they worked in the

2   development.  I just -- I don't remember.  I can't

3   remember a time when we didn't have it to some extent,

4   whether it was merely for policy reviews and then the

5   policies were put in there, but other than that, I --

6   you know, that's an operation support thing.  It's

7   not --

8       Q.  The reports that were generated for this case,

9   were those put into this new system?

10      A.  I don't know if they were put into it.  If they

11  did, it would be subsequent because this didn't exist

12  when we -- when this case occurred.

13      Q.  What were you using instead at that time?

14      A.  At that time it was just a paper -- it was a

15  paper system.  You typed it out.  You printed it out,

16  and you submitted it.

17      Q.  Who did you submit it to?

18      A.  I didn't have use of force in this.  So I never

19  submitted it to anyone.

20      Q.  So only an officer who is the one who uses the

21  force submits the --

22      A.  Correct.

23      Q.  -- Use of Force Report?

24          And where did you submit your incident

25  report?

1        A.   Well, that's a different system.

2        Q.   What's that system?

3        A.   Superion is the name of the reporting system.

4        Q.   And that was in use at the time?

5        A.   Yes.

6        Q.   How does Superion work?

7                 MS. VINSON:  Objection, form.

8        A.   I don't -- I type stuff in.  You know, I -- I

9    know that if I want a bag of popcorn I can put it in the

10   microwave.  I can't tell you how the microwave works.

11   But in all fairness to your question, it's -- it's a

12   reporting system that -- that all deputies have that we

13   write all of our reports in, and they're all submitted.

14   As far as the algorithms and all the other stuff for how

15   that works, I'm -- it's above my pay grade.

16       Q.   (BY MS. LaVARCO) So there's an incident that

17   occurs, you need to file a report?

18       A.   Correct.

19       Q.   You enter a narrative into -- remind me of the

20   name of the system?

21       A.   Superion.

22       Q.   Superion.  You enter a narrative into Superion?

23       A.   Sure.  Yeah, along with data fields.

24       Q.   Who reviews it?

25       A.   The supervisor.

78

1          MS. VINSON:  Objection, form.

2      A.  Yeah, this -- this -- I mean, it just depends.

3  I mean, it could be if you're training, you're a deputy

4  in training, your FTO reviews it.  But ultimately your

5  patrol sergeant that you're assigned to reviews it, and

6  then if it goes above that, you know, it would go to the

7  chain of command.  It's subject to being reviewed by --

8      Q.  (BY MS. LaVARCO) Any other reporting software

9  that you use?

10     A.  No.  No, that's it.  Superion is countywide.

11 It's all the precincts and all -- and the sheriff's

12 office, arson -- arson, police and the DA's office.

13     Q.  What about the system for body cameras?

14          MS. VINSON:  Objection, form.

15     Q.  (BY MS. LaVARCO) What system do you use for

16 capturing body camera footage?

17     A.  That's a Panasonic system, and that has also

18 recently changed.  I -- I don't know what it's called.

19 It's a UDE upload system.  It's -- honestly, I'm not

20 going to be able to give you the good information on

21 that because I just don't have the knowledge base.

22     Q.  Are you a member of the union?

23     A.  I am.

24     Q.  What's the name of the union?

25     A.  Texas Municipal Police Officers Association,

79

1   TMPA.

2        Q.   How long have you been a member?

3        A.   Since I arrived in Texas.  So 2003 maybe.

4        Q.   Continuously since 2003 you've been a member?

5        A.   Absolutely.  I think even when I went back to

6   Minnesota for -- for the short time, I think I still --

7   it was just being taken out of my account.  So I believe

8   I still was.  If I wasn't, there would have been a

9   break, it would have been a very short time.

10       Q.   Have you ever been a member of any other union?

11       A.   Yeah.  In Arizona I was a member of AZ Cops.

12  That's -- it was a labor organization.  I didn't -- I

13  can't tell you anything more than that, really.

14       Q.   Any other union?

15       A.   No.  No.

16       Q.   Have you ever served on any union committees?

17       A.   I have.  Sure.  I served -- I served in Arizona

18  on AZ Cops.  I think I was just a field rep, which

19  essentially translated to a fancy way of saying you're

20  spreading the word about people joining the union.

21       Q.   Any other committees?

22       A.   No.

23       Q.   Any committees at TMPA?

24       A.   No, I haven't done any.

25       Q.   Why'd you join the union?

80

1      A.  Because they're literally a voice for law

2   enforcement.  Some people join because they worry about

3   having legal protections, and some people, like myself,

4   initially got into it because of their legislative

5   agenda and trying to move law enforcement forward.

6      Q.  What kind of legal protections does the union

7   offer?

8              MS. VINSON:  Objection, form.

9      Q.  (BY MS. LaVARCO) What kind of legal objections

10  does TMPA offer?

11     A.  Legal objections?

12     Q.  Excuse me.  What kind of legal protections --

13     A.  Protections.

14     Q.  -- does TMPA offer?

15     A.  They afford you an attorney, and they res --

16  they will do field response to significant events, you

17  know, shootings or car crashes or things like that.  And

18  then they'll -- they'll represent you in civil,

19  criminal.

20     Q.  Is that how you came to be represented by

21  Ms. Vinson?

22     A.  No.  No.  That's -- this is a Harris County

23  thing.

24     Q.  So in what instances would you be afforded an

25  attorney through the union?

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

81

1      A.  The same thing here.  I mean, I do have

2  Greg Cagle who represents me.  Anytime a law enforcement

3  officer is sued, anytime there's misconduct and they're,

4  you know, being punished or suspended or terminated

5  or -- you know, you would have union protections.

6      Q.  Other than Greg Cagle, who else at the TMPA

7  have you spoken with about this lawsuit?

8      A.  I spoke to someone at TMPA that literally does

9  the intakes when you call them, and then they get your

10  information.  You tell them that you're being sued,

11  you've been served with a lawsuit or you haven't been or

12  you're under an IA or something, and then they ask for,

13  you know, which lawyer you would like.  You choose your

14  lawyer, and they have lawyers based all over the place.

15  Greg Cagle happens to be the one here in Houston.  And

16  then they contact the lawyer, and then you hear from the

17  lawyer shortly after.  So nothing substantive, but she

18  took the call and she relayed the information to a

19  lawyer.  I don't know what her name was.  They're based

20  out of Austin.

21      Q.  You referred previously to the union's

22  legislative agenda.  How would you describe that?

23      A.  Pro law enforcement.

24      Q.  What does that mean?

25      A.  Fighting for better pay, better training, law

82

1   and order issues.

2        Q.   What do you mean by "law and order issues"?

3        A.   If somebody wants to decriminalize narcotics,

4   our lawyers are going to fight that.  If there's a

5   parole hearing for somebody that's murdered a police

6   officer or something like that, they're going to fight

7   that.  I'm not an expert in their legal agenda, but

8   they -- that's part of what they do.

9        Q.   Has TMPA coordinated with the County on your

10  behalf?

11       A.   Sure.  I mean, "coordination" is a broad term.

12  Greg Cagle has spoken to my attorney, and we've had a

13  meeting.

14       Q.   Has Greg Cagle spoken to anybody at the County

15  Attorney's office?

16       A.   I don't know.  He's been privy to our email

17  correspondence.  That's about all I can say about that.

18       Q.   Have you ever served as a bargaining

19  representative for a union?

20       A.   No, I have not.

21       Q.   Have you ever filed a grievance?

22       A.   No, I've never filed a grievance.

23       Q.   Have you ever been the subject of a union

24  grievance?

25       A.   No.

83

1      Q.  Have you ever sought guidance from union

2  personnel related to your duties?

3              MS. VINSON:  Objection, form.

4      A.  I don't know.  Again, that question is so

5  bland.  I mean, in passing have I -- you know, have I

6  inquired as to, you know, maybe who we were supporting

7  in a local election or something like, but I -- I don't

8  know that I've ever, you know, needed to call and say,

9  "Hey, before I do this, should I do this?"  That's

10  not -- yeah, no.

11      Q.  (BY MS. LaVARCO) Have you sought guidance from

12  union personnel with respect to public affairs?

13      A.  No, not that I'm aware of.

14      Q.  Have you sought guidance from union personnel

15  related to misconduct allegations apart from this case?

16      A.  Can you ask your question again?

17      Q.  Have you sought guidance from union personnel

18  related to misconduct apart from this case?

19      A.  Only if they were representing me.  Not --

20  yeah, I don't -- it's not a common practice to just call

21  the union lawyers to ask them questions.

22      Q.  In what other instance have they represented

23  you?

24      A.  They represented me in a lawsuit that I had

25  prior.

84

1        Q.  What lawsuit is that?

2        A.  Sergio Robles.

3        Q.  Any other lawsuits?

4        A.  Yes.  A lawsuit where I sued a lawyer.

5        Q.  Who did you sue?

6        A.  A guy named Michael Aldous and his father.

7        Q.  Any other instances in which you've been a

8    defendant in a lawsuit?

9        A.  No.  This is it.

10       Q.  Any other instances in which you've been a

11   plaintiff in a lawsuit?

12       A.  Well, I -- I -- I want to correct that.  I was

13   listed in a lawsuit, and I don't really even know what

14   the -- the details were because I was quickly removed.

15   It was an officer that had worked for me maybe two years

16   before that, didn't work for me any longer.  He was on

17   another shift, and he was sued and they added me to the

18   lawsuit.  I was quickly removed from the lawsuit, and

19   then the lawsuit was dismissed anyways, but --

20       Q.  Do you remember the --

21       A.  I don't -- I don't remember any of it.  It was

22   back in the early 2000s, maybe 2008, something.

23       Q.  Why isn't TMPA representing you here today at

24   the deposition?

25       A.  Because he had another obligation at

85

1   Harris County.

2        Q.  Why hasn't he represented you in court up until

3   this point?

4             MS. VINSON:  Object to form.

5        A.  Yeah.

6             MS. VINSON:  Assumes facts not in evidence.

7        A.  Yeah, I'm not -- I'm not sure.  He is

8   absolutely willing to, but normally the way it works is

9   that the union attorney -- if you are being represented

10  and they are doing quality work, the union attorney will

11  stand by and they will consult with the attorneys that

12  are assigned to you.  But they just don't take over

13  unless I say I want them to.  He's absolutely willing

14  and able.  That's all he does.

15       Q.  (BY MS. LaVARCO) How did you get counsel from

16  the County?

17       A.  I was assigned counsel.  Yeah, I was -- I was

18  advised.

19       Q.  Who told you that you were assigned counsel?

20       A.  I don't remember whether it was Chief Harrison,

21  the division chief, just said that I would be contacted

22  by someone from Harris County County Attorney's Office

23  or one of their representatives.

24       Q.  Do you know how assignment of counsel decisions

25  are made at Precinct One?

86

1        A.   I --

2             MS. VINSON:   Objection, form.

3        A.   Yeah, I'm not privy to that.  I don't know.

4   I've fared pretty good.  So...

5        Q.   (BY MS. LaVARCO) How were you first made --

6   made aware of this lawsuit?

7        A.   Maybe email.

8        Q.   From who?

9        A.   I -- I don't remember, I really don't.

10  Maybe -- most of the stuff would come from Chief, from

11  Chief Harrison.  I heard some of it on the news, but...

12       Q.   Before this lawsuit did you know that the

13  County would provide you counsel in the event you were

14  sued?

15       A.   Yeah, I never did any research into it.  I

16  didn't know whether or not -- I mean, I knew I had TMPA,

17  but I didn't know -- I don't know the dynamic with that.

18  I've never had an issue like that.

19       Q.   Does your employment contacts -- does your

20  employment contract speak to that, legal representation?

21       A.   I don't have a contract.  I'm an at-will

22  employee.  So...

23       Q.   Does your Collective Bargaining Agreement speak

24  to that?

25       A.   We don't have collective bargaining.

87

1       Q.  Do you receive any communications from the

2   union about what you should do in the instance that

3   you're sued?

4               MS. VINSON:  I'm going to object if -- and

5   instruct you not to answer if it's through your lawyer,

6   if you get attorney-client communications from

7   Mr. Cagle.

8               THE WITNESS:  Oh, yeah, I wouldn't --

9               MS. VINSON:  Those would be --

10              THE WITNESS:  -- discuss that.

11              MS. VINSON:  -- confidential.  Yeah.

12      A.  If you're talking about does sometimes TMPA or

13  other labor organizations post stuff, "Hey, if you're

14  involved in a -- you know, a deadly force con --

15  conflict or something, here's what you need to do.  Call

16  this number.  Do this, this," yeah, those are routinely,

17  and they're sometimes posted at the -- at the stations

18  for -- for your guidance.

19      Q.  (BY MS. LaVARCO) What did they tell you to do?

20              MS. VINSON:  Objection, form.

21      A.  TMPA?

22      Q.  (BY MS. LaVARCO) Yes.

23      A.  Yeah, I'm not sure about what we're --

24      Q.  When you receive guidance from TP -- TMPA about

25  what to do in the event that you're sued, what is the

88

1   substance of that guidance?  What is the process?

2        A.  Call them immediately.  That starts the

3   process.

4        Q.  Are you a member of any other law enforcement

5   organizations?

6        A.  No, I don't believe I am.

7        Q.  Returning to recordkeeping practices at the

8   precinct, if you wanted to find an incident report that

9   a colleague of yours wrote, how would you look for it?

10       A.  Well, I would have to have a reason to look for

11  it.  But I could get onto Superion, and I could look it

12  up by case number or the date and time or...

13       Q.  Do you need clearance before doing that?

14       A.  It depends on what it is.  If I am -- you know,

15  if I responded to a stolen vehicle recovery, I can

16  clearly access the original officer's reports, that I

17  can supplemental it and, you know, take the stolen

18  vehicle out of the system.  So there's so many different

19  scenarios.  You'd have to be much more specific.

20       Q.  Can you search by incident number?

21       A.  Sure.

22       Q.  Can you search by the name of officers

23  involved?

24       A.  I am sure that is a -- a searchable field.  I

25  don't know that I've ever done that.

89

1    Q.  What other search terms does it have?

2    A.  Oh, I mean, you know, it's a -- it's a modern

3  system.  So it -- the Crystal reporting allows you to

4  search any searchable field, which it could be the date,

5  it could be the time.  I could search every single

6  incident that occurred, you know, on Thursdays for a

7  year.  I could search location.  I could search

8  telephone number.

9    Q.  Do you know how far back it goes --

10   A.  I don't.

11   Q.  -- in time?

12   A.  Yeah, I'm not sure.  I know I can do those

13  things, but I don't routinely do those things because I

14  just don't need to.

15   Q.  If you wanted to find a precinct policy on a

16  matter, where do you find it?

17   A.  On that Integrity site.

18   Q.  On the Integrity.

19   A.  Or in written form.

20        MS. VINSON:  Guys, we need to take a little

21  break.

22        MS. LaVARCO:  Okay.

23        THE VIDEOGRAPHER:  We're going off the

24  record.  The time is 12:33 p.m.

25        (Recess from 12:33 p.m. to 12:41 p.m.)

90

1          THE VIDEOGRAPHER:  We are back on the

2   record.  The time is 12:41 p.m.

3      Q.  (BY MS. LaVARCO) Mr. Bruss, how do you store --

4      A.  Yes, ma'am.

5      Q.  -- body camera footage at the precinct?

6      A.  Again, I'm -- it's going to be layman's.  It's

7   stored to a server.  I'm not sure of the process.

8      Q.  If you wanted to find a specific file of body

9   camera footage, how would you go about doing so?

10          MS. VINSON:  Object to form.

11          But you can answer.

12      A.  Okay.  There is -- you have to be a supervisor

13  to access anything other than your own video footage.

14  So as a supervisor I can use a case number.  I can use a

15  date and a time.  I can use a unit number.  I can pretty

16  much search kind of like the Superion system.

17      Q.  (BY MS. LaVARCO) Can you remind me of the name

18  of the body camera outfit?

19      A.  Arbitrator.  I believe it's Arbitrator,

20  Panasonic Arbitrator.  But the storage is different.

21  It's got a different name.  Maybe it's UDE.  I'm not

22  really sure what that stands for.  Again, I'm not the

23  technical one.

24      Q.  Is body camera footage uploaded to these

25  systems automatically?

91

1    A.   No.  You have to -- you have to upload them.

2    Q.   Whose responsibility is it to upload?

3    A.   The individual deputy's responsibility to

4  upload his -- his or her body camera footage.  There's

5  more than one way to do it.

6    Q.   As a supervisor are you able to see any

7  officer's body camera footage?

8    A.   Yes.

9    Q.   Regardless of whether you supervise them

10  personally?

11    A.   Correct.  Unless -- unless the file is

12  restricted.

13    Q.   In what instances would the file be restricted?

14    A.   Well, I mean, if we have a -- a homicide or we

15  have something where it just doesn't need to be viewed

16  by everyone; maybe a critical incident, maybe a -- you

17  know, Downtown can lock whatever they want.  If there's

18  maybe something that's an internal affairs issue or

19  something, you know, they can do that.

20    Q.   What do you mean by "Downtown"?

21    A.   Well, we have Downtown command, which would be

22  the Downtown headquarters.  I don't work out of

23  Downtown.  I work out of a patrol substation on the

24  north side.

25    Q.   Is Downtown command, you mean at Precinct One?

92

1      A.  Correct.  Yeah, the command staff above the

2   patrol division and some of the other divisions that

3   work out of different satellite locations, but...

4      Q.  Can officers choose not to upload their footage

5   to the system?

6            MS. VINSON:  Object to form.

7      A.  I -- they could choose not to.  They -- that's

8   not acceptable.  I mean, we would know.

9      Q.  (BY MS. LaVARCO) How would you know?

10     A.  Well, because there would be a request or

11  anything like that.  We get requests from the DA's

12  Office for prosecutions.  And -- and we can look at

13  dates and see whether there's in-car video.  Now, in-car

14  video requires no prompting.  They pull up to a -- a

15  Harris County facility, and it will automatically do it.

16  Well, there's got to be a matching body camera.  And if

17  there's not a matching body camera, we would be able to

18  see that if we were looking.

19     Q.  Does the in-car video use the same system?

20     A.  It is the same system.  It's a

21  Panasonic Arbitrator system.

22     Q.  Does the system track each time somebody

23  reviews it?

24            MS. VINSON:  Object to form.

25     Q.  (BY MS. LaVARCO) Does the system track when

93

1   somebody goes in there to look at body camera footage?

2            MS. VINSON:  Calls for speculation.

3        A.  I -- I honestly don't know.  I would assume so,

4   but I -- that assumption is coming from a novice in

5   regards to that.

6        Q.  (BY MS. LaVARCO) Have you seen view logs in the

7   system?

8        A.  No, I don't believe so.

9        Q.  Have you ever downloaded files from the system

10  onto a CD?

11       A.  No.  I don't have access to do that.  Only

12  Downtown operation support is the only one.  Once it's

13  in the system, it's there.  As far as I know, nobody can

14  remove it.  But -- sorry -- but in regards to

15  downloading and putting it on a disk or something like

16  that, I'm sure they can.

17           MS. VINSON:  That's yours.

18           THE WITNESS:  Thank you.

19       Q.  (BY MS. LaVARCO) Do officers have the ability

20  to edit their footage?

21       A.  Absolutely not.

22       Q.  Do supervisors?

23       A.  No.  There's nobody that can edit.  That's --

24  my understanding, it's encrypted footage and there is no

25  editing or...

94

1      Q.  Can you walk me through what the upload process

2  involves?

3              MS. VINSON:  Objection.  Calls for

4  speculation.

5      Q.  (BY MS. LaVARCO) In your personal experience

6  uploading footage to the system, can you tell me what

7  that involves?

8      A.  Sure.  My in-car video, I pull up to any

9  Harris County building that is equipped with the antenna

10  systems, and it will automatically start an upload on my

11  MDT.  But that's of the video footage.  The bodycam

12  footage is actually stored on the bodycam.  So the

13  bodycam itself needs to be uploaded to the system to be

14  uploaded.  So we actually have a bodycam cradle in all

15  the patrol cars.

16              And there is a system that we need to use,

17  a protocol.  When you put your bodycam in the cradle,

18  you'll actually go to a -- a program that will then --

19  you log into that program and that will allow you.

20              So everything, whether it be the in-car or

21  the body, requires access, password-compliant access,

22  and then it will upload and it will show that it's

23  uploading and then your bodycam will be empty.

24      Q.  What does MDT stand for?

25      A.  Mobile data terminal.  Sometimes it's called an

95

1  MCT, mobile computer terminal.

2      Q.  Are officers required to upload footage at a

3  regular interval?

4      A.  They are required to upload their bodycam video

5  before they go on their days off, unless they've had a

6  use of force or something that needs to be a pursuit or

7  something that needs to be reviewed by a supervisor.  I

8  encourage my guys to make sure that they upload their

9  bodycam anytime they've arrested a suspect because we

10  don't know when the DA's office may contact us for that.

11  So if a deputy is off on Friday and Saturday, come

12  Thursday we want all their video uploaded.

13      Q.  Is it accurate to say that officer's body

14  camera footage is uploaded on at least a weekly basis?

15          MS. VINSON:  Objection, form.  Calls for --

16      A.  Yeah.

17          MS. VINSON:  -- speculation.

18      A.  Yeah, it's supposed to, but we have a lot of

19  deputies.  So...

20      Q.  (BY MS. LaVARCO) How many deputies or other

21  officers do you supervise?

22      A.  I supervise -- I'm one of the supervisors on

23  night shift.  We have two sergeants and a lieutenant

24  assigned to our night shift, 10 -- 10:00 p.m. to

25  6:00 a.m.  At max capacity that's about 23 to 25

96

1  deputies.  And then I also supervise the K9 unit, which

2  is comprised of six K9 teams.

3      Q.  Is a K9 team comprised of the handler and the

4  canine?

5      A.  It is, yes, ma'am.

6      Q.  And just the two of them?

7      A.  Correct, yes.

8      Q.  How many K9 teams did you say you supervise?

9      A.  Six.  Well, that would be five, and six

10  including myself.

11      Q.  Who supervises you?

12      A.  The K9 lieutenant would be Lieutenant Moncreif.

13      Q.  And who does he report to?

14      A.  He reports to the division captain.

15      Q.  What's the name of the division captain?

16      A.  Captain Bender, Lori Bender.

17      Q.  Can you spell that for me?

18      A.  B-E-N-D-E-R.

19      Q.  And the first name?

20      A.  Lori.

21      Q.  L-A-U-R?

22      A.  I-E, maybe.

23      Q.  Okay.

24      A.  Her first name to me is "Captain."  So I don't

25  really use her first name too much, but --

97

1        Q.  How many K9 units total does Precinct One have?

2        A.  12.

3        Q.  Who's the other supervisor?

4        A.  That would be Justin Royall.  He's a supervisor

5   over our what we call floppy-eared bomb dogs.  They're

6   single-purpose explosives dogs that are used.  They're

7   not patrol dogs, and they don't detect narcotics.

8        Q.  So you supervise patrol dogs, and Justin Royall

9   supervises bomb dogs?

10       A.  Correct.  Yes, ma'am.

11       Q.  Are there any other designations apart from

12  patrol dogs and bomb dogs?

13       A.  No.  As far as K9 goes, no, that's it.

14       Q.  And patrol dogs encompasses both dogs used for

15  narcotics and suspect apprehension?

16       A.  Correct.  It's not just suspect apprehension.

17  It could be tracking.  It could be finding a piece of

18  evidence.  We -- we use the term "patrol" in narcotics,

19  dual purpose.  But, yes, you're there.

20       Q.  Does the County issue any policies on the use

21  of K9s?

22       A.  Sure.

23       Q.  How do you access those policies?

24       A.  The same way.  Through the Integrity website

25  and also in writing.  We have -- we have policy books

98

1    that, you know, somebody can review that didn't want to

2    log on the computer.  There is access to our policies

3    from any County computer.

4        Q.  Are the County policies distinct from the

5    precinct policies, or are they one and the same?

6        A.  I want to make sure I don't -- so our --

7             MS. VINSON:  Yeah, let me object to form to

8    that.

9             Go ahead.

10       A.  Our precinct policies are on the Integrity

11   site.  County policies and rules I believe can be

12   accessed on the Harris County site.  They are applicable

13   to all Harris County employees.  You know, you -- you

14   might be a clerk or you could be driving a dump truck or

15   whatever.  So I don't really know too much about theirs.

16       Q.  (BY MS. LaVARCO) Does the County specifically

17   have policies on the use of K9s?

18       A.  No.  I believe that's the individual agencies.

19   It's usually based upon -- from my understanding, it's

20   usually based upon review of the County attorney's

21   office and, you know, some -- some -- somewhere it's

22   been scrutinized by a legal scholar.

23       Q.  Does the County have policies on the use of

24   force?

25       A.  Again, I believe that it's just the individual

99

1  agencies that do.

2      Q.  Do the constables' precincts share policies

3  with one another?

4              MS. VINSON:  Object to form.

5      A.  Yeah, sure we share them.  I don't know that

6  we -- I mean, our -- our policies have historically

7  been -- been built upon what the sheriff's office

8  policies were.  So we might share a policy because maybe

9  we have drones, which we have a drone program, and

10  another precinct doesn't and they want to start a drone

11  program.  So, yeah, we -- we share stuff back and forth.

12  But as far as, you know, just plagiarizing -- plagi --

13              MS. VINSON:  Finish.  I'm sorry.

14      A.  Yeah, we don't just -- most agencies don't just

15  take their policy and put their name on it.

16              MS. LaVARCO:  Okay.  Just one more

17  question --

18              MS. VINSON:  Sure.

19              MS. LaVARCO:  -- and then we can break.

20              MS. VINSON:  Sure.

21      Q.  (BY MS. LaVARCO) At the constable's office, do

22  policies accry -- apply across precincts or only to the

23  individual precinct?

24      A.  Yeah, only to the individual precincts.  I

25  mean, I don't -- ours is not in effect for a Precinct

100

1  Eight deputy any more than theirs would be on one of our

2  deputies.

3            MS. LaVARCO:  Okay.  We can go ahead and

4  take a break now.

5            THE WITNESS:  Okay.

6            THE VIDEOGRAPHER:  We are going off the

7  record.  The time is 12:55 p.m.

8              (Recess from 12:55 p.m. to 2:04 p.m.)

9              (Mr. Schultz left the deposition.)

10           THE VIDEOGRAPHER:  We are back on the

11 record.  The time is 2:04 p.m.

12   Q.  (BY MS. LaVARCO) Mr. Bruss, did you consume any

13 alcohol over lunch?

14   A.  No, ma'am.

15   Q.  Is there anything that happened over lunch that

16 would change your ability to respond truthfully,

17 accurately and completely to my questions?

18   A.  It was a good sandwich but not that good.

19   Q.  Okay.

20   A.  You're going to get the truth from me.

21   Q.  Are the Harris County Sheriff's Office policies

22 binding on the constables?

23   A.  No, they're not.  They're usually mimicked, but

24 they're not in -- we don't fall under their policies, no

25 more than they fall under our policies.

1    Q.  So if anyone is accused of a violation of

2    policy, it's only with respect to their particular

3    precinct's policy?

4    A.  Correct.

5    Q.  Are you familiar with an effort to create a

6    unified use of force policy across the constables'

7    offices?

8    A.  I am, sure.

9    Q.  Can you tell me about that?

10   A.  I think that was something that has been in the

11   works for a while, and I think they're actually

12   implementing a lot of it.  And essentially what it is is

13   it just has everybody -- they've all operated

14   autonomously, but it's -- in regards to the use of force

15   they all agree that this is the best course of action in

16   regards to use of force policy, and they all adopt the

17   same policy together.

18   Q.  Has it been adopted at this point?

19   A.  I don't believe it has.

20           (Mr. Carl Shaw entered the deposition.)

21   Q.  (BY MS. LaVARCO) Is it correct that it was

22   introduced in 2021, a draft?

23   A.  Oh, I -- I wasn't privy to that.  So it may

24   have been, but I don't know.

25   Q.  Do you -- do you recall conversations of that

102

1    coming about around the time that George Floyd was

2    murdered?

3         A.  That was probably about the time, yes.

4         Q.  Do you think that more standardization across

5    the precincts is a good thing?

6         A.  I think that in certain aspects of our job it

7    can't hurt.

8         Q.  I'm sorry.  Did you say can or can't hurt?

9         A.  Can't, can't hurt.  But I also believe that

10   certain areas police different environments.

11        Q.  So you think that precincts need to -- the

12   individual precincts need to be flexible on some

13   matters?

14        A.  Yeah, I don't really have a say one way or

15   another but --

16        Q.  Do you know whether the County attorney's

17   office is reviewing the unified use of force policy?

18             MS. VINSON:  Objection.  Calls for

19   speculation.

20        Q.  (BY MS. LaVARCO) Do you know whether?

21        A.  I don't.

22        Q.  Do you know who was involved in drafting the

23   proposed policy?

24        A.  My understanding is it was a combined endeavor

25   between the heads of the different law enforcement

103

1   agencies.  As far as if they had, you know, a delegate

2   to do that, I don't know.

3        Q.  How do you think of an environment that the

4   particular precinct should influence their policy?

5                MS. VINSON:  Objection, form.

6        A.  It's so broad I can't -- without it being more

7   specific, I wouldn't be able to give you a fair --

8        Q.  (BY MS. LaVARCO) In your capacity as a police

9   supervisor and sergeant --

10       A.  Um-hum.

11       Q.  -- how do you think that the geographic area in

12  which a precinct is located should influence the use of

13  force policy?

14       A.  Well --

15                MS. VINSON:  Objection, form.

16       A.  Yeah, I don't think that that should matter

17  where you're at.  I think that's one of the things that

18  should main a -- remain a constant.  I don't think that

19  there should be flexibility based on the area.  It's

20  either a justified use of force, or it's not.

21       Q.  (BY MS. LaVARCO) So when I asked you whether

22  more standardization is a good thing and you said in

23  certain aspects it can't hurt, but you believe there are

24  certain areas with certain police that are different

25  environments.  You sort of trailed off.  Can you --

THOMAS v                                                    Eric Bruss
BRUSS                                                March 20, 2024

                                                              104

1          A.   Sure.   I mean, there's certain areas where

2    predominantly their function is to do just traffic

3    enforcement, like the toll roads and things like that.

4    That's a different environment than necessarily the

5    patrol environment where we're responsive to emergency

6    calls for service and things like that.

7               So our job can be as different as -- you

8    know, I've -- I've gone to back up Texas

9    Parks & Wildlife who's gone to arrest somebody on a

10   warrant.  I have no idea what they do for a living, but

11   they're law enforcement.

12              MS. LaVARCO:  Excuse me for a moment.  Hi.

13   I didn't get to meet you.  Are you -- you representing

14   Mr. Bruss as well?

15              MR. SHAW:  What am I doing?

16              MS. VINSON:  No.  That's Chief Shaw.

17              MS. LaVARCO:  Oh.

18              MS. VINSON:  Carl Shaw.

19              MS. LaVARCO:  Good to meet you.

20              MR. SHAW:  Hi, good to meet you.

21              MS. LaVARCO:  I'm Shirley.

22              MR. SHAW:  Thanks for coming to Houston.

23   Yes, ma'am.

24              MS. LaVARCO:  Can you state your name for

25   the record?

105

1           MR. SHAW:  You just said it.

2           MS. LaVARCO:  Can you say it for me?

3           MR. SHAW:  Didn't you just say it?

4           MS. VINSON:  He's not asking questions.

5    He's not going to be on the record, but his appearance

6    is Carl Shaw, with the Constable's Office.

7           MS. LaVARCO:  Thank you.

8           THE REPORTER:  With a K or a C?

9           MR. SHAW:  C, ma'am, S-H-A-W.

10      Q.  (BY MS. LaVARCO) The precinct has a use of

11   force or poli -- policy and a response to resistance

12   policy?

13      A.  They are one and the same.  It's just kind of

14   being coined a response to resistance as opposed to the

15   old use of force.

16      Q.  Why the change in name?

17      A.  I'm not sure.

18      Q.  Is force ever appropriate in the absence of

19   resistance?

20          MS. VINSON:  Object to form.

21      A.  Well, I would have to say yes.

22      Q.  (BY MS. LaVARCO) In what circumstances?

23      A.  Well, because the simple laying hands on

24   somebody and -- and guiding them could be construed as

25   use of force.  So if you have somebody that's blocking

106

1  the roadway in a protest, they might not be actively

2  physically resisting.  However, your obligation as a

3  peace officer is to remove them from the roadway.  And

4  so you might have to put your hand on them.  You might

5  have to lift them up.  You might have to, you know,

6  assist them out of the road.  So...

7      Q.  Does the failure to immediately comply with

8  commands always justify the use of force?

9      A.  I think that's so subjective.  I don't -- I

10  don't know if there's a good answer for that.

11  Sometimes, maybe; sometimes, not.

12      Q.  If somebody is verbally insulting you or

13  cursing, could that qualify as a justification for use

14  of force?

15      A.  No.  There would have to be something else.

16      Q.  What's the minimum?  What's the minimum

17  something else in response to somebody who's verbally

18  abusive?

19          MS. VINSON:  Object to form.

20      A.  Yeah.  I would need more specifics.  But

21  noncompliance is something that may escalate force.

22      Q.  (BY MS. LaVARCO) What types of noncompliance

23  are there?

24      A.  There's verbal and physical noncompliance.

25      Q.  Does verbal noncompliance justify force?

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

107

1       A.  Again, force is such a -- a bland term because

2   merely reaching up and grabbing somebody's arm could be

3   construed force.  So, yes, it could be; and, no, maybe

4   not in other circumstances.

5       Q.  Does verbal noncompliance ever justify the use

6   of brandishing a weapon?

7       A.  Again, that's so bland.  If -- if somebody has

8   just come out from robbing a bank and they're confronted

9   by police, it's likely that a weapon is going to be

10  brandished at them.

11      Q.  Have you received any training on the Graham

12  Standard?

13      A.  I don't recognize that by name.  Maybe by -- by

14  theory.  I don't know.  Is that the reasonable

15  objectiveness, is that what you're looking for?

16      Q.  Can you tell me about the reasonable

17  objectiveness standard?

18      A.  Just like I said earlier, it's, you know, what

19  a trained person with similar like training would do at

20  that time they believe without the benefit of hindsight.

21      Q.  What factors come into play?

22      A.  The sever --

23          MS. VINSON:  Object to form.

24      Q.  (BY MS. LaVARCO) What factors come into play

25  when you're assessing whether force is appropriate?

108

1      A.   The severity of the crime, location.  Age can

2  be a factor.

3      Q.   What's a -- according to your training and

4  experience, what's a severe crime that puts you on

5  notice that the use of force might be necessary?

6                MS. VINSON:   Object to form.

7      A.   I would say any -- any weapons type call,

8  physical assaults.  It can even be property theft, such

9  as stolen vehicles.  The examples are endless.

10     Q.   (BY MS. LaVARCO) Does the crime have to be a

11  violent crime?

12                MS. VINSON:   Objection, form.

13     Q.   (BY MS. LaVARCO) Does the suspected crime have

14  to be a violent crime to justify the use of force?

15     A.   No.

16     Q.   Apart from vehicle threats, what other

17  nonviolent crimes might justify the use of force?

18     A.   I mean, you know, there's occasions where

19  police officers have to make a physical arrest on a

20  person for a nonviolent crime, and they may have to use

21  force.

22     Q.   How does the severity of the crime impact your

23  decision about whether to use a weapon, whether a

24  firearm or a taser?

25     A.   Well, first I want to clarify.  When we say

1   "use," are we talking about displaying, or are we

2   talking about discharging?

3        Q.  Displaying.

4        A.  Okay.  The display of a firearm or a taser or

5   threat use of a taser is actually in most cases a

6   de-escalation technique.  Most reasonable people will

7   comply with directives when there's a threat of a use of

8   force.  So physical fighting or an unknown crime.

9   Certainly anything that involved a weapon would justify

10  the display of a firearm.

11       Q.  What if you're notified that someone on the

12  scene has a weapon but there's only a nonviolent crime

13  alleged?

14            MS. VINSON:  Objection.  Calls for

15  speculation.

16       A.  Yeah, there -- there would have to be something

17  more than that because we encounter people that legally

18  own and carry firearms all the time.  So, again, without

19  more specifics, it would be unfair for me to speculate

20  on that.

21       Q.  (BY MS. LaVARCO) The precinct's use of force

22  policy says "All response to resistance incidents shall

23  be referred to the Response to Resistance Committee,

24  Chain of Command and/or IAD as appropriate."  Are you

25  famil -- are you familiar with this referral process?

110

1        A.  I'm aware of that.

2        Q.  Can you walk me through what it looks like?

3               MS. VINSON:  Object to form.

4        A.  Above -- above my level, I might be able to

5    explain one level above that.  But beyond that, I --

6    I -- I really don't play a role in that.  I'm not

7    familiar with that process.  I know that there is a

8    process and I know that it is in effect, but I couldn't

9    give you the -- the algorithm for how that works.

10       Q.  (BY MS. LaVARCO) Who's on the response to

11   resistance committee?

12       A.  I'm not sure.

13       Q.  Is it comprised of supervisors?

14              MS. VINSON:  Objection.  Calls for

15   speculation.

16       A.  Yeah.  Honestly, I couldn't answer that.  I'm

17   not sure who's on it.

18       Q.  (BY MS. LaVARCO) Who's the chain of command for

19   use of force reviews?

20       A.  So that would vary upon the command.  But in

21   the patrol division, which I would be familiar with, if

22   a deputy utilized force, that will be reviewed by the

23   supervisor, the sergeant.  Then it would go to the shift

24   commander, which would be the lieutenant; then the

25   division commander, captain; and then the division

1  chief.  And where it went beyond that, I'm not a part of

2  usually.

3      Q.  Do you know the constitutional standard for

4  when force is permissible?

5              MS. VINSON:  Objection.  Calls for a legal

6  conclusion.

7      Q.  (BY MS. LaVARCO) What is your training about

8  the constitutional standards for when force is

9  permissible?

10     A.  Well, I mean, there's -- if we're being

11  specific in regards to the Fourth Amendment, the right

12  to be free of search and seizure, warrantless, I mean,

13  using force on a person would be considered a seizure.

14  So it's got to be, again, reasonably objective.  It's

15  got to be necessary.

16     Q.  What does the Constitution require officers to

17  consider before using force?

18             MS. VINSON:  Object to form.

19     A.  The Constitution?

20     Q.  (BY MS. LaVARCO) Based on your training and

21  experience about constitutional standards for the use of

22  force, what is required?

23             MS. VINSON:  Objection, form.

24     Q.  (BY MS. LaVARCO) What is an officer required to

25  consider before using force?

1        A.   The totality of the situation, the -- the type

2   of call, the threats posed, the threats implied, the

3   person's response, the type of crime, the day, the time,

4   the location.  They can all play a role in an officer

5   determining whether force is going to be used.

6        Q.   What does an implied threat look like?

7        A.   An implied threat?  I mean, I could give you an

8   example of somebody who robs a convenience store with a

9   hand in their pocket.  That's kind of implied that they

10  have a gun.

11       Q.   According to your training and experience, when

12  is force objectively unreasonable?

13       A.   So --

14            MS. VINSON:  Objection, form.

15       A.   -- I've always based what I do and how I've

16  trained people that brutality begins when resistance

17  ends.  When there is no resistance, none -- and, I mean,

18  no resistance -- then any force being used after that

19  would probably not be reasonably an objective.  Now, in

20  clarification, that means a person is fully compliant.

21       Q.   (BY MS. LaVARCO) Does the level of choice --

22  force change, or not until the person is fully

23  compliant?

24       A.   No.  The level of force should be continually

25  evaluated during the use of force -- some use of force

1   are extended, some are very quick -- but it should

2   constantly be reevaluated so that the least amount of

3   force necessary to overcome the resistance is used.

4        Q.   What if a sus -- a suspect who was previously

5   resisting physically is now resisting only verbally --

6        A.   Well --

7        Q.   -- is physical force still appropriate?

8              MS. VINSON:   Give me -- hold on.   Give me a

9   minute to object.

10             Object to form.

11             Go ahead, you can answer.

12       A.   I'm -- I'm sorry.   Can you --

13       Q.   (BY MS. LaVARCO) In a circumstance where a

14  suspect is physically resisting and you've subdued them

15  to the point where they're only verbally resisting, do

16  you stop using physical force at that time?

17       A.   Yeah.

18             MS. VINSON:   Objection, form.

19       A.   The use of force for -- for a verbal resistance

20  is not common unless the resistance -- the verbal

21  resistance is telling you "I'm not going to jail" or

22  "I'm going to kick your butt" or "I'm going to do

23  something else."   In the situation you just gave me,

24  constantly reevaluating the use of force, at the point

25  it's verbal only and it doesn't consist of physical

Case 4:23-cv-00662  Document 58-6  Filed on 05/01/24 in TXSD  Page 115 of 345

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

114

1  noncompliance, yeah, the -- the use of force should

2  change.

3      Q.  (BY MS. LaVARCO) When you're facing only verbal

4  resistance, what types of force are appropriate?

5              MS. VINSON:  Objection, form.

6      Q.  (BY MS. LaVARCO) When you're facing only verbal

7  resistance, is it appropriate to use an open hand?

8      A.  To strike someone?

9      Q.  To strike someone.

10     A.  No, not to -- not to gain compliance for -- for

11  being verbal.

12     Q.  Is it appropriate to use a closed fist?

13     A.  No.  Like I said, it depends on what the verbal

14  is.  If the verbal is threats towards the officer or a

15  third party which you believe to be reasonable and that

16  person could carry out, you may end up using force on

17  someone who is being verbal only just to make sure that

18  that doesn't escalate into something else.

19     Q.  So would you say that physical force is

20  sometimes used as a deterrent?

21     A.  I would say that physical force isn't -- isn't

22  always the option but always must be an option; so, yes.

23  And, again, in fairness, your scenarios are very, very

24  broad.  There's a lot of different elements involved

25  in -- in the -- the decision to use force.  So...

1      Q.   In your opinion should force ever be used for

2   the purpose of causing pain?

3      A.   Yes.  But that is for the purposes of pain

4   compliance which can be a technique to overcome a

5   resistance.  We utilize pressure points and other

6   tactics that are authorized and justified to overcome

7   resistance.  So, yes, in that particular case the

8   inflicting of pain to gain a compliance would be

9   justified.

10     Q.   If there are multiple officers on a scene, who

11  gives the orders?

12          MS. VINSON:  Objection, form.

13     A.   You know, that can vary.  It doesn't always

14  need to be -- I mean, if we had a chief on the scene but

15  he had called out SWAT, it's likely that a SWAT

16  commander that may be of less rank has command over the

17  scene.  Under normal circumstances the ranking person on

18  the scene is in charge of the scene.

19     Q.   (BY MS. LaVARCO) So the ranking person under

20  the scene under normal circumstances is the one who

21  should be giving orders?

22     A.   Yes, ma'am.

23     Q.   When is it appropriate for multiple people to

24  be giving orders?

25          MS. VINSON:  Objection, form.

116

1      A.  I'm sure there's a scenario where it is

2  appropriate, but I -- I -- I don't know without more

3  specifics.

4      Q.  (BY MS. LaVARCO) Is it the ranking officer's

5  responsibility to decide who gives orders?

6      A.  It can be.  It can be.  It doesn't always need

7  to be.

8      Q.  Is there ever an issue with crosstalk if there

9  are multiple officers on the scene?

10     A.  Certainly.  It's a -- in real-life scenarios

11  nothing is perfect.

12     Q.  How do you make sure that a suspect understands

13  your orders?

14     A.  Well, you try to be clear and concise.

15           MS. VINSON:  Object to form.

16           MS. FRANCIS:  I'm sorry, did you answer

17  that question?

18     A.  Yeah, clear and concise.  Be as clear and

19  concise as you possibly can.  And usually the

20  indications that somebody understands is that they are

21  complying.

22     Q.  (BY MS. LaVARCO) Do you ever use a K9 as a

23  deterrent?

24     A.  Absolutely.

25     Q.  How does that look different than using a K9

117

1   for apprehension?

2              MS. VINSON:  Objection, form.

3        A.  We utilize the K9 to deter in a multitude of

4   different scen -- scenarios.  Normally a reasonable

5   person that's being told that the dog is going to be

6   sent into a building that they've just burglarized along

7   with a warning that the dog will find them and bite

8   them, they will surrender without the deployment of the

9   dog.  That happens way more than not.

10             Whereas if the person does not come out of

11  the building, to enhance the safety of the officers that

12  are there, the dog is a searching tool that we use to

13  detect and find a hiding suspect.

14       Q.  (BY MS. LaVARCO) And when you're confronting a

15  suspect who's not hiding and you're attempting to make

16  an apprehension and you'd like to use the dog as a -- as

17  a deterrent, does the positioning of the dog look

18  different than when you expect to deploy the dog?

19             MS. VINSON:  Object to form.

20       A.  Yeah.  There's so many different scenarios

21  that -- that could encompass that question.  I just --

22  you know, I don't know if you're next to your car, if

23  that would look different.  It normally is from the

24  position of cover, but I -- I don't think I can give you

25  an answer that's going to satisfy that.

1      Q.  (BY MS. LaVARCO) What's the attack position?

2      A.  I'm not familiar with an attack position.  We

3  don't utilize the word "attack" in K9.

4      Q.  Do you use the term "ready commission" --

5  "ready position"?

6      A.  We don't use that either.

7      Q.  What terms do you use?

8      A.  We deploy the dog.  We post up with the dog.

9  For a perimeter we post up on the -- we deploy the dog

10 out of the car.  If we send the dog, we've sent the dog.

11     Q.  What is the apprehension position?

12     A.  Again, there is no set apprehension position.

13 That -- that varies.  The dog's apprehension could

14 result -- be the result of the officer outside of his

15 car being attacked on a traffic stop or searching a

16 building.  It's -- it varies so much, again, I couldn't

17 give you -- based on that question, I couldn't give you

18 a specific response.

19     Q.  What does it mean to deploy a dog?

20     A.  Anytime that I use my K9 for the purposes of a

21 police action, the dog is deployed.

22     Q.  Does that include when you don't let the dog

23 off the leash?

24     A.  Yes.

25     Q.  What does the post-up position mean?

1    A.  So if I post up on a perimeter, we've got a

2  building that's being burglarized or what have you, I

3  may call out that "I'm posting up on the northeast

4  corner of the building with my K9."  That means I'm just

5  essentially holding what I've got and I'm evaluating the

6  circumstances involved.

7    Q.  What physical position is the K9 in in that

8  circumstance?

9           MS. VINSON:  Object to form.  Calls for

10  speculation.

11    A.  Yeah, there again, the dog could be laying

12  down.  If it's a situation where, you know, there's

13  windows and, you know, we're trying to use stealth, I've

14  had my dog behind a ballistic shield before on a SWAT

15  call.  I mean, it just, again, the -- it varies so much.

16    Q.  (BY MS. LaVARCO) Do you ever make use of

17  muzzles on dogs?

18    A.  Sure.  For training we do, yeah, absolutely.

19    Q.  And what about in patrol circumstances, do you

20  make use of muzzles?

21    A.  No, we don't.  The dog's mouth is how they're

22  able to defend themselves and accomplish task.  We would

23  really be handcuffing the dog and likely get them

24  injured or hurt without the ability to defend

25  themselves.

120

1      Q.   When you show up to a scene with a dog, do you

2  always remove your K9 from the vehicle?

3      A.   No.

4      Q.   What factors do you consider before removing

5  the K9?

6      A.   If it's a K9 call, if it's something that's a

7  viable K9 call where the dog can be used to apprehend

8  someone.  But, you know, we respond to numerous calls

9  every single shift, and the dog does not get out because

10 it's not an appropriate K9 call.

11     Q.   Are there -- there specific categories of calls

12 or suspected crimes where the K9 comes out?

13     A.   Sure.  Every single one of them is evaluated

14 while en route based on the information they're

15 receiving from dispatch.  You know, Priority One calls,

16 which would be weapons disturbances, vehicle pursuits,

17 robberies, things like that, there's a high likelihood

18 that that could be a good K9 call.  But, again, there's

19 property crime calls we go to where the dog never has to

20 be deployed.  It's just not necessary.

21     Q.   What factors do you consider before letting the

22 dog off the leash?

23          MS. VINSON:  Object to form.

24     A.   To make an apprehension?

25     Q.   (BY MS. LaVARCO) Letting the dog off the leash.

121

1      A.  Well --

2            MS. VINSON:  Object to form.

3      A.  -- I mean, I let my dog off the leash to go to

4  the bathroom.

5      Q.  (BY MS. LaVARCO) During an apprehension.

6      A.  Okay.  During an apprehension, well, we -- we

7  would determine whether or not it was a responsible

8  reaction to what the totality of the situation was.

9  Again, it -- it's so bland that I can't -- I can't tell

10  you.  I mean...

11      Q.  Do you go primarily off of what the 911 call or

12  dispatch communication was?

13      A.  We go off of everything.  Everything pay --

14  plays a part to our evaluating.  If I -- if I were to

15  equate this, I would equate every single call I go on as

16  a math problem, and it's my job to do the math in my

17  head to come up with the solution to that problem.  So

18  every single part plays a role, whether a witness said

19  something, if dispatch says something, what I see, what

20  another officer relays to me, what I know from my past

21  experiences, all of those things -- what my training is,

22  what the law is, all of those things come into play.

23      Q.  In your K9 training are you ever asked to

24  evaluate hypothetical scenarios?

25      A.  Sure.  Sure.

1      Q.   Is that done in writing or during a lecture?

2      A.   Well, it could be just a -- a briefing.

3  There's times when you go to training where they have a

4  set scenario, and you can read the scenario.  But most

5  of the time it is verbal where you respond to training

6  and I'll say, "Okay.  This is a stolen vehicle.  It's

7  occupied three times.  Make it a K9 call."

8           Or there's times when I have run a scenario

9  where I've put a fake bomb in the front window of the

10  car, and as the handler approaches the car, he sees a

11  pipe bomb and he says, "Stop.  This is not a training --

12  this is not a K9 deployment," and that stops the

13  scenario.

14           So it could be verbal, writing.  It could

15  be --

16      Q.   When you arrive on a scene, how do you respond

17  to the changing circumstances?

18           MS. VINSON:  Object to form.

19      A.   Yeah, I mean, that's the challenges of a modern

20  law enforcement officer.  There is so many things that

21  you have to evaluate.  The consequences are dire.

22      Q.   (BY MS. LaVARCO) Would you say that it's your

23  responsibility to take note of circumstances that didn't

24  come through the 911 call?

25      A.   Oh, absolutely.

123

1              MS. VINSON:  Wait.  Wait.  Hold on.

2              Object to form.

3      A.  Absolutely.  I would -- I mean, that's your

4  responsibility.  You have the responsibility to your

5  family to go home safe, and the only way you can do that

6  is if you're constantly evaluating your surroundings.

7      Q.  (BY MS. LaVARCO) How might you evaluate your

8  surroundings?

9              MS. VINSON:  Objection, form.

10     A.  Yeah, I mean, you look, you listen, you recall

11  your training, you recall pri -- prior experiences that

12  you've had.  Education may come into play.  Your past

13  interaction with that person may come into play.

14     Q.  (BY MS. LaVARCO) Do you speak to witnesses?

15     A.  Sure.  We always speak to witnesses.  It's

16  dependent upon the circumstances.  You can't always talk

17  to the witness before.

18     Q.  How do you control your K9 after it's out of

19  the vehicle?

20              MS. VINSON:  Object to form.

21     A.  I'm not sure what you mean.  You physically and

22  verbally control your -- your K9 partner.

23     Q.  (BY MS. LaVARCO) How do you physically control

24  your K9 partner?

25              MS. VINSON:  Object to form.

Case 4:23-cv-00662  Document 58-6  Filed on 05/01/24 in TXSD  Page 125 of 345

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

124

1      A.  I always call it positive control.  You have

2  positive control over your dog, means you have hands on

3  your dog.

4      Q.  (BY MS. LaVARCO) How do you verbally control

5  your K9?

6      A.  You give good verbal commands.

7      Q.  Where does the K9 learn the verbal commands?

8      A.  Through the training.  Most of our dogs are

9  imported from overseas.  So instead of retraining them

10  in English, the handlers learn the -- the language of

11  origin for the dog.  My dog is Hungarian, and my newest

12  dog is Dutch.  So you're kind of the Rosetta Stone of

13  police.

14      Q.  Have you been trained to physically control

15  your dog in different ways depending on the

16  circumstances you're facing?

17      A.  Sure.

18      Q.  How might that look when you're facing a

19  suspected violent crime?

20      A.  Again, it -- it depends.  I might just have

21  physical control, positive control on my dog by hands on

22  my dog.  I might be hooked with a leash to the dog's

23  collar.  I may be hooked to the dog's harness, patrol

24  harness.

25      Q.  What if the dog is trying to -- what if the dog

125

1   is struggling against the leash?

2              MS. VINSON:  Object to form.

3       A.  Yeah.  I mean, the dog sees an objective.  So

4   it's called opposition reflex.  The dog is going to push

5   away from.  It's -- it's the response to what the

6   handler is doing.  Minus a correction or minus a verbal,

7   the dog is going to go into opposition reflex and the

8   dog is going to move forward, try to, you know, do what

9   the dog does.

10      Q.  (BY MS. LaVARCO) What do you mean by a

11  correction?

12      A.  I mean, if you tell your dog "phuey" or you,

13  you know, pop the collar and remind them or whether you

14  intervene, you know, by use of a -- an electric collar,

15  all of those are ways that you can make a correction.

16      Q.  Do you ever make a correction by yanking on the

17  dog's collar?

18      A.  Absolutely.

19      Q.  Do you ever make a correction by striking the

20  dog?

21      A.  No.  I could see a circumstance where that may

22  become necessary, but I have never had it in my career.

23      Q.  In your experience as a K9 handler and trainer,

24  would you say that real-life bites are important for the

25  dog to be effective?

126

1        A.  Real-life?

2             MS. VINSON:  Object to form.

3        A.  What do --

4        Q.  (BY MS. LaVARCO) Meaning -- I -- I can

5   rephrase.

6        A.  Sure.

7        Q.  For a K9 partner to be effective, is biting in

8   a real-life as -- apprehasince -- apprehension

9   circumstance important?

10            MS. VINSON:  Object to form.

11       A.  Yeah.  No, it's -- it's -- it's not important.

12  If your dog is going to respond, your dog is going to

13  respond.  It's -- it's not -- that doesn't make or break

14  the -- the K9 team because the dog doesn't bite someone.

15       Q.  (BY MS. LaVARCO) Once a K9 is released, can you

16  be sure about where it's going to bite?

17       A.  On the person?

18       Q.  Yes.

19       A.  No.  There's too many variables.

20       Q.  Where is the K9 trained to bite?

21       A.  The K9 is trained to bite on what they can get

22  ahold of.  And usually that's presented, the arms or the

23  legs.

24       Q.  If the K9 can't get at the arms or the legs,

25  are they likely to bite someone's face?

127

1      A.  They could.

2      Q.  Their head?

3      A.  They could.

4      Q.  Their neck?

5      A.  They could.

6      Q.  Have you ever seen a K9 bite someone's face,

7   head or neck?

8      A.  Yes.

9      Q.  When have you seen a K9 bite somebody's face?

10      A.  Not their face.  Their head.

11      Q.  When was that?

12      A.  A couple years ago I had a deployment where my

13   dog bit someone in the head.

14      Q.  Can you tell me about how that happened?

15      A.  The suspect was being arrested on a family

16   violence charge where he had assaulted his wife.  He

17   made threats to the police.  He started fighting with

18   officers.  He had been tased, and it was not effective.

19   And the dog was there doing what the dog is supposed to

20   be doing.  And he was warned, and when the dog went for

21   his arm, he turned.  He was on the ground and he turned

22   and the dog engaged the top of his head.

23      Q.  Are you trained to use specific physical

24   stances before releasing a dog for a bite?

25      A.  Physical stances?  No, ma'am.

128

1      Q.   Is the dog trained to stand -- stand in a

2   physical position before being released?

3      A.   No.   It's not always applicable.   But if you're

4   asking if the dog stands when he's released or if he's

5   sitting or laying down, that depends on the handler.

6      Q.   How do you signal that you want the dog to

7   bite?

8      A.   Verbally.   The only nonverbal -- the only

9   nonverbal would be handler protection scenarios where if

10  you start fighting with the handler the dog is trained

11  to engage without the verbal.

12     Q.   If who starts hiding -- fighting with the

13  handler?

14     A.   If a suspect starts fight -- fighting with the

15  handler, no verbal command needs to be given.   The dog

16  goes into what we call handler protection mode and the

17  dog acts based off the resistance.

18     Q.   Other than the example you shared with me, in

19  what other circumstances have you seen a dog bite

20  somebody's face, head or neck?

21     A.   I've never seen any dogs bite the neck.

22  There's been times where suspects were hidden in a

23  location where the dog encountered the head first or

24  maybe the foot first or -- and the dog is trained to

25  apprehend the person.   So what's presented is what's

129

1   bit.

2        Q.  So the first body part that the dog can get

3   ahold of --

4        A.  Yes.

5        Q.  -- is what the dog will bite?

6        A.  Right.  That's all subsequent to many, many

7   warnings of what the consequence is for not

8   surrendering.

9        Q.  And is that consistent with your training?

10       A.  Absolutely.

11       Q.  And you're not trained to -- the dogs are not

12   trained to bite the arms specifically?

13       A.  No.  We --

14              MS. VINSON:  Object to form.

15       A.  It is eas -- it is the easiest way to train the

16   dog because we use bite suits and we use bite sleeves.

17   However, if the -- if the arms or the legs are not

18   available, the dog is going to apprehend the person with

19   what -- what it is.  I've seen back bites and -- you

20   know.

21       Q.  (BY MS. LaVARCO) Have you --

22       A.  So it's not that we -- when we train for -- for

23   patrol dogs to apprehend, the training is -- usually

24   involves the head and neck -- or not the head and neck,

25   the arms and the legs.  But, again, that's training.

130

1    That's not real life.  We respond to what we're

2    presented, not...

3        Q.  (BY MS. LaVARCO) So even though the dogs are

4    trained to bite the arm or the leg, you can't control

5    which part of the body it actually bites?

6        A.  No.  There's too many variables.  The -- the

7    suspect has more control over where the dog bites than

8    we do.

9        Q.  Have you seen a dog bite somebody's genitals?

10       A.  I have not personally seen that.

11       Q.  Have you heard about that happening at

12   Precinct One?

13       A.  I don't believe I've heard anybody that

14   happened at Precinct One.

15       Q.  Is a K9 capable of causing fatal ener --

16   injuries?

17       A.  Very, very, very rare circumstances; but there

18   have been a documented circumstance where out of

19   hundreds of thousands of bites the dog has actually

20   caused death.  But that's why the dog is still

21   considered to be less lethal because the courts have

22   found that that is not the purpose of the dog -- dog to

23   kill the person.  It's to apprehend them.

24       Q.  Even though you can't control where the K9 is

25   going to bite?

```
1              MS. VINSON:  Objection, form.  Asked and

2  answered.

3       A.  Yeah.  Correct.  Even if you -- you know,

4  again, the dog is going to apprehend the person.  Every

5  scenario is different, and the suspect plays more of a

6  role in where the dog bites than the officer does.

7       Q.  (BY MS. LaVARCO) Have any of the K9s you've

8  used caused death?

9       A.  Absolutely not.

10      Q.  Have any of the K9s used by Precinct One caused

11  death?

12      A.  Absolutely not.

13      Q.  By the County?

14      A.  I don't --

15              MS. VINSON:  Object to form.  Calls for

16  speculation.

17      A.  Yeah, I don't know.  I'm not aware of anything

18  like that that's ever happened in Harris County.

19      Q.  (BY MS. LaVARCO) Is it appropriate to use a K9

20  in circumstances where you suspect that the suspect has

21  a disability?

22      A.  It could.

23      Q.  How does the disability come into play?

24              MS. VINSON:  Object to form.  Calls for

25  speculation.
```

132

1    Q.  (BY MS. LaVARCO) Based on your training ex --

2  and experience, is disability a factor in deciding

3  whether to deploy a K9?

4           MS. VINSON:  Objection, asked and answered.

5  He said it could.

6    A.  Yeah.  I'm sticking with that.  It could.

7           MS. FRANCIS:  If you could cut back on the

8  speaking objections.  You're influencing his answers.

9           MS. VINSON:  Asked and answered is an

10  appropriate objection.

11           MS. LaVARCO:  Objection to form is an

12  appropriate objection.

13           MS. VINSON:  So is asked and answered.  I

14  agree.

15    Q.  (BY MS. LaVARCO) Would you say that the

16  suspect's mental health is a factor in determining what

17  kind of force to use?

18           MS. VINSON:  Object to form.

19    A.  Again, it could.  We rarely know what their

20  mental health is.  And I would also say that a lot of

21  police officers and other people have been killed by

22  people with mental illness.  So it doesn't negate the --

23  the officer safety considerations.

24    Q.  (BY MS. LaVARCO) If somebody is exhibiting

25  symptoms of a mental illness, does that necessarily pose

1   a threat?

2            MS. VINSON:  Object to form.  Calls for

3   speculation.

4      A.  It doesn't necessarily not pose a threat.

5            MS. FRANCIS:  Shirley, you have to repeat

6   the question.  He didn't answer it.

7            MS. LaVARCO:  Oh.  What was the question?

8            MS. VINSON:  He did answer it.  And I'm

9   going to object to two lawyers asking the questions.

10           MS. FRANCIS:  I haven't --

11           MS. VINSON:  So are you --

12           MS. FRANCIS:  -- asked him any questions.

13  I'm supporting my co-counsel.

14           MS. VINSON:  Thank you.

15           MS. FRANCIS:  Thank you.  So --

16           MS. LaVARCO:  Okay.  I'd like to put on the

17  record that Ms. Vinson is whispering to her client.

18           MS. VINSON:  I was whispering to all of

19  you-all.  Is that Carl being loud?

20           MS. VESTAL:  That is what was said.  Would

21  you like for me to go tell him to go outside?

22           MS. VINSON:  I mean, if it's him, yeah.  He

23  needs to be quiet.

24           MS. VESTAL:  There is noise.

25      Q.  (BY MS. LaVARCO) Does a suspect's mental

1   illness necessarily pose a threat to an officer?

2            MS. VINSON:  Objection, form.  Calls for

3   speculation.

4       A.  Again, it doesn't necessarily mean it doesn't.

5            MS. LaVARCO:  Ms. Vinson, I'd ask you to

6   cut down on the speaking objections, please.  You're

7   improperly in -- influencing the witness.

8            MS. VINSON:  Calls for speculation is a

9   proper objection, Shirley.

10           MS. LaVARCO:  You can tell him that you

11  object to the form of the question, and your objection

12  will be reserved.  By telling him that you're object --

13  that it calls for speculation or by it's vague, you're

14  influencing him in his answer.

15           MS. VINSON:  Okay.  So are you saying "It

16  calls for speculation" is an improper objection in

17  Federal Court?

18           MS. FRANCIS:  You should say "Object to

19  form."  If you're elaborating, you're telling him how to

20  navigate the question.

21           MS. VINSON:  Okay.  Is it your position

22  that that's an improper objection in Federal Court,

23  "Calls for speculation"?

24           MS. LaVARCO:  My position is that your

25  speaking objections are improper, and that "Calls for

135

1  speculation" is a speaking objection.

2                    MS. VINSON:  Okay.

3                    MS. LaVARCO:  All of your objections except

4  as to form are reserved.

5      Q.  (BY MS. LaVARCO) So in your opinion is mental

6  illness necessarily a threat to a responding

7  officer's -- the suspect's mental illness necessarily a

8  threat?

9                    MS. VINSON:  Object to form.

10     A.  I mean, that -- that is so bland.  It depends

11 on whether the officer is aware of mental illness.

12 It's -- I -- I can't answer that fairly.  It's not a --

13 it's not a question that -- that could be fair because

14 it's so broad.

15     Q.  (BY MS. LaVARCO) Is it always a threat?

16     A.  It --

17                   MS. VINSON:  Object to form.

18     A.  -- may not always be a threat, but it always

19 needs to be contin -- considered a threat.  Again,

20 mental -- people with mental illness murder people and

21 they murder police officers and they do all kinds of

22 things.  So it doesn't negate their responsibility to be

23 safe and go home.

24     Q.  (BY MS. LaVARCO) Did you say that mental

25 illness always needs to be considered a threat?

1        A.   No, it al -- always -- it could be a threat,

2   and it always needs to be constantly evaluated.  But you

3   can't -- you can't put a bland question like that

4   because if an officer is unaware that somebody is

5   mentally ill, they may have signs and symptoms of mental

6   illness, but it could be intoxication and they could

7   still pose a threat.

8        Q.   (BY MS. LaVARCO) What are the signs and

9   symptoms that a suspect is mentally ill?

10       A.   I mean --

11            MS. VINSON:  Objection, calls for

12  speculation.

13       Q.   (BY MS. LaVARCO) In your training and

14  experience, what are the signs and symptoms that a

15  suspect you're attempting to apprehend may be mentally

16  ill?

17       A.   The list is so varied because it's so similar

18  to that of an impaired person.  Sometimes people

19  impaired on drugs exhibit the same signs as other people

20  that exhibit mental health illness.  It doesn't --

21  noncompliance is noncompliance.

22       Q.   Can you give me examples of what signs of

23  intoxication look like?

24       A.   Sure.  They might be somebody who has an

25  unsteady gait or is slow to respond or has slurred

137

1   speech or is just making decisions that an average

2   reasonable adult wouldn't make.

3       Q.  Have you been trained on interacting with

4   people who are intoxicated?

5       A.  Sure.

6       Q.  Have you been trained on de-escalation tactics

7   with people who are intoxicated?

8       A.  I have.

9       Q.  What are some of those tactics?

10      A.  Speaking to people and having an even tone,

11  affording them, you know, options where they may still

12  have a little bit of control on what happens.  But

13  de-escalation only works if both parties are willing to

14  de-escalate.  If only one party is willing to

15  de-escalate, that gets police officers hurt.

16      Q.  Have you been trained on de-e -- de-escalation

17  techniques for responding to people with mental illness?

18      A.  I think it's all incorporated in dealing with

19  MHMR-type people.  But de-escalation I don't think --

20  how do I answer that?  De-escalation just applies

21  generally across the board.  Again, it is very unlikely

22  that an officer going to a call is going to know the

23  mental status of every person in their precinct.  We

24  have over a million people in our precinct.

25      Q.  What is MHR-type people?

1     A.   It's a mental health.  It's a term used in --

2  in mental health here in Texas.

3     Q.   What is -- so MH stands for mental health?

4     A.   Mental health.

5     Q.   And R stands --

6     A.   Mental retardation.

7     Q.   Have you been trained to work with MHR people?

8     A.   I have.  All police officers have.  It's

9  mandatory.

10     Q.   What does that training involve?

11     A.   It involves classroom where you learn theories

12  and you learn about the different illnesses and

13  recognizing different illnesses.  And it also normally

14  encompasses some type of scenario-based training.

15     Q.   Has that enabled you to recognize potential

16  mental illnesses in suspects?

17     A.   Sometimes it does, yes.

18     Q.   What are some of the most common mental

19  illnesses that you encounter?

20     A.   The most I would say are poly issues, meaning

21  they are a combination of mental health issues and the

22  introduction of narcotics or alcohol.

23     Q.   What symptoms or behaviors are you trained to

24  look out for?

25          MS. VINSON:  Objection, form.

139

1      Q.  (BY MS. LaVARCO) What symptoms or behaviors are

2  you trained to look out for to put you on notice that

3  someone may have a mental illness?

4      A.  Erratic behavior, behavior that's not conducive

5  to the circumstances that they're in.  I mean, their --

6  their physical actions.  All those things can play a

7  role.  They also can mimic somebody who's a criminal

8  that's just been caught committing a crime.

9      Q.  Can you say more about what you mean by erratic

10 behavior?

11     A.  Sure.  We've gone into stores where there's

12 been a shoplifting call and the person starts throwing

13 things on the floor and throwing a fit.  They're not

14 mental health issues.  They're criminal issues and

15 they've committed a crime, and they're caught and they

16 don't like it.

17     Q.  So in the scenario you have just described

18 where somebody is throwing a fit in a store, you treat

19 them from a criminal perspective and not with respect to

20 their mental health concerns?

21     A.  No.

22          MS. VINSON:  Objection, form.

23     A.  I didn't -- I didn't say that.  I said we

24 constantly evaluate things, but ultimately, regardless

25 of whether people want to think it's a certain way,

1   they're the ones that are not having to go in and

2   handcuff somebody who is throwing bleach on them and

3   doing other things erratically.  It is not my position

4   that I can come up with a -- a legitimate diagnosis on

5   somebody in a split second without knowing.  It's just

6   not fair.  It's not reasonable, and it's just not how it

7   really works.

8              And I tell you because I have some

9   experience in this.  I've written a paper on this.  I've

10  written an article and been published on dealing with

11  emotionally disturbed people.  I take it very seriously,

12  but it can never be disguised or mistaken because it

13  still poses the same threat to officer safety and third

14  parties.

15      Q.  (BY MS. LaVARCO) Does your training require you

16  to treat people with suspected MHR different than

17  others?

18      A.  Some aspects, yes.  There are -- there are

19  aspects of -- of certain mental illnesses or

20  disabilities where maybe a loud noise can set them off,

21  or maybe touching can set them off.  You try to do the

22  best you can.  Like I said, every interaction, every

23  call is a math problem.  You're constantly doing your

24  math in the head trying to figure out the easiest

25  solution to the problem.

1        Q.   Did your MHR training address uses of force?

2        A.   Sure.

3        Q.   Can you tell me more about that?

4        A.   Sure.

5             MS. VINSON:  Object to form.

6        A.   The bottom line is use of force is use of

7    force.  And if a use of force needs to be utilized

8    against somebody, it doesn't matter what the reason.  It

9    has to be for the safety of the officers and the third

10   party and the safety of that person.  Again, we don't --

11   we can't give a diagnosis.  It would be different if we

12   responded to a healthcare setting and there was a doctor

13   right there saying, "Look, this person has, you know

14   this, this or this.  This sets him off.  This doesn't."

15            Although we're expected to have all those

16   tools, we don't.  We're just people.  We're just human

17   beings trying to evaluate things.

18       Q.   (BY MS. LaVARCO) So to clarify, your training

19   does not require you to treat people who are suspected

20   to have mental illness or retardation differently?

21            MS. VINSON:  Objection, that misstates his

22   testimony.

23       A.   Yeah, that's not what I said.  Look, if you

24   are --

25            MS. FRANCIS:  That's a speaking objection.

142

1        A.   If you are aware of a person's condition or you

2   are aware of things like that, that could play a role.

3   But if an emotionally disturbed person is armed with a

4   knife in the mall, I mean, you take a lot of things into

5   consideration.  But the safety of the public and the

6   safety of the officer outweigh that individual and

7   what -- what they're feeling at that time.

8        Q.   (BY MS. LaVARCO) You said that it plays a role.

9   How does it play a role?

10        A.   What part?

11        Q.   Suspected mental illness and how you apprehend

12   a suspect.

13        A.   Sure.  It can play a role if we know about it.

14   Our dispatchers are trained to ask whether or not

15   there's mental health issues, there's weapons in the

16   house, whether there's alcohol, things like that.  So if

17   we have that information, it does play a role.  Or if

18   we've got previous interactions with the person.  I've

19   built a rapport with people in my area.  Some of them

20   have mental illness.  I've built a rapport through --

21   I've dealt with -- with veterans that have PTSD who are

22   talking about killing themselves.

23             Well, I'm a veteran.  I'm more effective at

24   talking to somebody about PTSD than maybe another deputy

25   is who doesn't know that, has never lived that life,

143

1   doesn't know those pressures and things.

2            So, yeah, it would be irresponsible for us

3   not to take those things into consideration.  But,

4   again, the number one goal is the safety of the public,

5   the police and that person.  And if that requires force

6   to detain them to make everybody safe, then that's

7   wha -- is what it is.

8       Q.  How does it influence your specific behavior if

9   you suspect that someone has mental illness or is

10  otherwise impaired?

11      A.  Well, we don't give a lot of leeway for

12  impairment.  Okay.  That's something that they control,

13  their impairment.  As far as mental health, again,

14  it's -- it's such a bland question.  And I -- I

15  understand what you're trying to ask.  I just don't know

16  that it's fair for me to give an answer that's going to

17  be all inclusive of the different scenarios that we may

18  be faced with.

19      Q.  You have stated, though, that it plays a

20  role --

21      A.  Sure.

22      Q.  -- correct?

23      A.  I believe known mental health can play a role.

24      Q.  What about suspected mental health with respect

25  to the training you've received about signs and

1  symptoms?

2          MS. VINSON:  Object to form.

3      A.  Sure.  But, again, those are in situations that

4  are very, very defined.  Like if I come up on scene and

5  somebody's talking about "Look at all the snakes around

6  me" and there's no snakes around them, okay, those are

7  things that are -- make it a lot easier to determine

8  whether something is going to be a mental health crisis

9  or -- or something else.  But so many of those things

10  are intertwined and they're exhibited by people that

11  also are committing other crimes or doing other things,

12  that it -- it makes it -- it puts us in a difficult

13  position.

14     Q.  (BY MS. LaVARCO) If you suspect that someone is

15  experiencing hallucinations, what does your training

16  tell you to do?

17     A.  I mean, there again, if the hallucin -- if the

18  hallucinations are causing them to be physically

19  aggressive, then that changes things as opposed to

20  somebody that is having hallucinations that, you know,

21  there's a pink elephant in the room.  I mean, there's

22  just too many different scenarios to give you a -- a

23  definite answer.

24     Q.  If you suspect that someone has cognitive

25  delays but hasn't exhibited any physical resistance,

145

1   what does your training tell you to do?

2       A.  Well, you take those into consideration.  You

3   might offer a little more time.  I -- I don't know.

4       Q.  A little more time to comply with orders?

5       A.  That could be or just asking questions, "What's

6   your name?"

7               Somebody with a cognitive delay may take

8   20 seconds, 30 seconds to answer your questions.  Again,

9   it just depends on -- I can't give an answer that is

10  going to quantify a response to all people with mental

11  illnesses.

12      Q.  Does your training tell you how to recognize

13  cognitive delays?

14      A.  I think that it trains us how to recognize

15  certain behaviors, and a cognitive delay could be masked

16  by somebody who is under the influence, too.  It just --

17  it's too hard to answer that.

18      Q.  You said certain behaviors.

19      A.  True.

20      Q.  Which behaviors?

21      A.  Do --

22              MS. VINSON:  Object to form.

23      A.  Erratic behaviors, you know, speech that

24  doesn't make sense in the context.  There -- again,

25  there's so many different.  Now, with that said, let me

146

1    establish the fact that I'm a police officer and I am

2    trained in these areas maybe more than the average

3    person, but if you're asking me to give diagnoses or,

4    you know, recognize every sign of a mental illness that

5    could be masked by intoxication or impairment, every

6    scenario we face is different.

7        Q.   (BY MS. LaVARCO) I'm only asking you to draw

8    from your experience.  I'm not asking you to give

9    diagnoses.

10            When dealing with someone who you suspect

11   has cognitive impairments, might you use a lower tone of

12   voice?

13       A.   You may.

14       Q.   Does your training tell you to do that?

15       A.   Yeah.  Yeah.  To speak to them, you know, maybe

16   softer and slower, try to inter -- make it a little bit

17   more personalized.

18       Q.   Is the same true with respect to dealing with

19   people who you suspect have mental illness?

20       A.   It can; but, again, it depends on the scenario

21   that you're faced with.  Regardless of what their mental

22   issue may be, if something poses a threat to a third

23   party or the police, the response is a little bit more

24   specific.

25       Q.   Do erratic behaviors necessarily signal a

147

1   threat?

2        A.  They should always be considered, but sometimes

3   they can de-escalate as fast as they -- as they got

4   wound up.

5        Q.  If you suspect that someone has cognitive

6   delays, might you just have one officer on the scene

7   speak to that person?

8              MS. VINSON:  Object to form.

9        A.  If -- if it's as a result of a police action,

10  no, because unfortunately our -- the safety of ourselves

11  and the safety of the public is going to have to trump

12  the inconvenience of, you know, talking to them.

13       Q.  (BY MS. LaVARCO) Does your training tell you

14  that it can de-escalate the situation if only one

15  officer is speaking at a time to somebody who has

16  cognitive delays?

17       A.  So absolutely I don't think you have to have

18  cognitive delays for that to be the rule that one person

19  talks at one time.  We all receive things better if

20  we're only get one message.  It is what it is, but in a

21  perfect world that's not always how it happens.

22       Q.  What other strategies might you use to

23  de-escalate without the use of force if you're dealing

24  with somebody who is behaving erratically?

25       A.  Again, it would depend on the scenario.  On a

148

1   weapons disturbance, there's probably not much that

2   we're going to do different.  On a call that a

3   14-year-old, you know, girl doesn't want to go to school

4   because she's being bullied and she's sad, we may do

5   some things different.  Every scenario is different, and

6   there's -- the scenarios are vast.  I can't give you

7   a -- a definite.

8        Q.  What are some of the options for de-escalation

9   if you decide that de-escalation is an appropriate

10  tactic?

11       A.  Well, first --

12            MS. VINSON:  Object to form.

13       A.  Yeah.  De-escalation, again, is a great theory

14  and feels good.  But de-escalation in the real world, in

15  the police world only works if both parties are willing

16  to de-escalate.  If the other party is not willing to

17  de-escalate, de-escalation is going to be a failure.  We

18  actually utilize some levels of force as a de-escalation

19  or threaten use of force as a de-escalation.  It's just

20  the world that we're presented.

21       Q.  (BY MS. LaVARCO) Specifically in your training,

22  what de-escalation strategies were you taught?

23       A.  Verbally communicating with a person, your

24  presentation.

25       Q.  What do you mean by your presentation?

1      A.  Well, your presentation as opposed to yelling

2  through a window and hearing just a voice and not

3  putting a face on a voice; actually being where you can

4  have a conversation where you can look concerned,

5  because we are concerned with what they're going

6  through.

7      Q.  Any other strategies for de-escalation that

8  you've learned through your training?

9      A.  Sure.  I mean, there's strategies of actually

10  using more than one person.  There's strategies of using

11  less lethal options.  Again, the -- the scenarios are

12  vast and the responses are individual to those

13  scenarios.

14      Q.  What are some of those less lethal options?

15      A.  Taser device, a police dog, impact weapons,

16  chemical spray, BoloWrap.

17      Q.  How do you decide which of those less lethal

18  weapons to attempt to use first?

19              MS. VINSON:  Objection.  Calls for

20  speculation.

21      A.  Yeah.  Again, given no, you know, solid

22  scenario, I can't really say.  I mean, we don't

23  necessarily have to use one or -- over the other, and

24  the decision to use force is fluid.  It doesn't require

25  you to take each step individually.  It could force you

150

1    to go to the top of the scale.  But the individual

2    deputy is tasked with making that decision.  Whoever is

3    contact with the person, they can make the decision of

4    what force is necessary or to escalate.

5         Q.  (BY MS. LaVARCO) Are you equipped with all of

6    those less lethal options at all times?

7         A.  We are equipped with everything at all times

8    with the exception of the BoloWrap.

9              MS. VINSON:  Let's take a break when you

10   get a break, please.

11             MS. LaVARCO:  Sure.

12             THE VIDEOGRAPHER:  We're going off the

13   record.  The time 3:17 p.m.

14             (Simultaneous talking.)

15             MS. LaVARCO:  Oh, sorry.  I just need a

16   minute.

17             THE VIDEOGRAPHER:  Oh, sure.  Sorry.

18             We're -- we're not going off the record.

19   We're still on the record.  Sorry.

20             MS. VINSON:  Watch it.

21        Q.  (BY MS. LaVARCO) Would you say that certain

22   less lethal options are more severe than others?

23        A.  Sure.  Absolutely.

24        Q.  How would you rank them, starting with the most

25   lethal?

1       A.  Well, the mo -- well, none of them are lethal,

2   or we wouldn't be using them.

3       Q.  Starting with the most severe.

4       A.  I would say probably -- and, again, that varies

5   because the taser device is formidable but it is

6   short -- short lasting to gain compliance.  Chemical

7   spray might be one of the worst things anybody has ever

8   felt in their life, and it lasts a half an hour.  A dog

9   bite could create punctures, cause pain.  They all have

10  a role in less lethal.  They don't all act the same.

11  There's scenarios where you can use one and you can't

12  use the other.

13              MS. VINSON:  Is now say good time, Shirley?

14              MS. FRANCIS:  We'll let you know.

15              MS. LaVARCO:  No, I just want to finish.

16              What's that?

17              MS. FRANCIS:  I said we'll let her know.

18              MS. LaVARCO:  Yeah.

19              MS. VINSON:  I need to take a break, guys.

20  Sorry, I'm taking break.

21              THE VIDEOGRAPHER:  Can we go off the

22  record, Counsel?

23              MS. VINSON:  You can stay on the record if

24  you want.  You have seven hours.  Don't talk while I'm

25  gone.  I'm going to go to the restroom.

152

1              THE WITNESS:  Yes, ma'am.

2              MS. LaVARCO:  Okay.  We'll go off the

3   record.

4              THE VIDEOGRAPHER:  We're going off the

5   record.  The time is 3:19 p.m.

6              (Recess from 3:19 p.m. to 3:28 p.m.)

7              THE VIDEOGRAPHER:  We are back on the

8   record.  The time is 3:28 p.m.

9     Q.  (BY MS. LaVARCO) Mr. Bruss, did you confer with

10  counsel about your training over the break?

11    A.  About my training?

12    Q.  Yes.

13             MS. VINSON:  Object to him being asked what

14  he talked to his counsel about, Shirley.

15             MS. LaVARCO:  You're not permitted to

16  discuss the substance of the deposition questions with

17  him during break.

18             MS. VINSON:  And you're not permitted to

19  ask him what he talked to his lawyer about.

20    Q.  (BY MS. LaVARCO) Did you speak to anyone about

21  your training during the break?

22    A.  No.

23    Q.  Including your lawyer?

24    A.  My --

25             MS. VINSON:  You can't ask him what we

153

1  talked about.  If you want to ask him if we talked

2  during the break, that is appropriate.  But you can't

3  ask him what -- the substance of our conversation.

4      Q.  (BY MS. LaVARCO) Did you talk about the

5  substance of the -- of your answers during the break

6  with your counsel?

7             MS. VINSON:  You can't answer what we

8  talked about.

9      A.  Unfortunately, I'm going to go with my -- my

10  attorney says.  We spoke.  That's about it.

11     Q.  (BY MS. LaVARCO) Did you engage in more than

12  pleasantries?

13             MS. VINSON:  Object to form.

14     A.  Talked about the bathroom code and some other

15  things, but I'm going to -- I'm just going to stick

16  with --

17     Q.  (BY MS. LaVARCO) Did you talk about --

18     A.  -- what my attorney said.

19     Q.  -- precinct policy during the break?

20     A.  No.

21             MS. VINSON:  Object to -- it's okay.

22             Object to asking what we talked about,

23  Shirley.  Are you going to go on?  Are you going to keep

24  asking about privileged communications?

25             MS. LaVARCO:  Your communication --

154

1                MS. VINSON:  It doesn't -- it doesn't --

2   this doesn't take away the privilege.  I'm not supposed

3   to coach the witness.  I understand the rules.  You

4   don't get to ask what the lawyer talked to the client

5   about.  I still have --

6                MS. LaVARCO:  The privilege --

7                MS. VINSON:  -- privilege.

8                MS. LaVARCO:  The privilege is waived if

9   you talk about --

10                MS. VINSON:  Where does --

11                MS. LaVARCO:  -- in the context --

12                MS. VINSON:  Where does it say that?

13                MS. LaVARCO:  -- of the communications.

14                Shall we take a break and come to the case

15   law about this, or do you want to return to this later,

16   Brittany?

17                MS. VINSON:  How much time have they used?

18   Can you --

19                THE REPORTER:  Three hours and 30 minutes

20   before the last break.

21                MS. VINSON:  Thank you.

22                THE REPORTER:  I mean, after the last

23   break, before we --

24                MS. VINSON:  Okay.

25                THE REPORTER:  -- went on the record.

155

1      Q.   (BY MS. LaVARCO) Did your attorney coach you

2   about your deposition performance during the break?

3             MS. VINSON:  Don't talk about what we

4   talked about.  Are we going to move on?  He's already

5   told you we talked during the break.

6             MS. FRANCIS:  Counsel, you've agreed that

7   it's inappropriate for you to coach a witness during a

8   deposition; right?  You said that just a minute ago.  So

9   we're asking --

10            MS. VINSON:  You're not going to talk to my

11  client about what we talked to during the break.

12            MS. FRANCIS:  You agree, though, that

13  you're not permitted to coach him during a break?

14            MS. VINSON:  I do.

15            MS. FRANCIS:  Okay.

16            MS. LaVARCO:  Did you coach him during

17  the break?

18     Q.   (BY MS. LaVARCO) Did -- did your counsel coach

19  you during the break about your performance during this

20  deposition?

21            MS. VINSON:  "About your performance during

22  this deposition," that's not what coaching is.  You're

23  not going to -- okay.  You're going to move on.

24            MS. FRANCIS:  Did you not say --

25            MS. VINSON:  Excuse me, I'm talking to

                                                            156

1   Mr. LaVarco.  Can you move back?

2                MS. FRANCIS:  Did you not say that it's

3   inappropriate to coach a witness --

4                MS. VINSON:  I said what I said.

5                MS. FRANCIS:  -- during a deposition?

6                MS. LaVARCO:  I'd like to put on the record

7   that Ms. Vinson has reached out her hand towards

8   Ms. Francis' face.

9                MS. VINSON:  To move your -- so I can talk

10  to Shirley.  I'm trying to communicate with you.

11               MS. LaVARCO:  I would appreciate if you

12  want to communicate that you don't raise your voice and

13  speak to me in a condescending tone.  You're not

14  permitted to coach your witness during --

15               MS. VINSON:  Thank you.

16               MS. LaVARCO:  -- the deposition --

17               MS. VINSON:  Thank you --

18               MS. LaVARCO:  -- at any point.

19               MS. VINSON:  -- for the instructions.  Are

20  you ready to move on?

21               MS. LaVARCO:  I have --

22               MS. VINSON:  Are you ready to move on with

23  the deposition?

24       Q.  (BY MS. LaVARCO) Did your attorney coach you

25  about your deposition performance during the break?

157

1      A.   I'm not going to discuss anything that we

2  talked about during the break in reference to my

3  attorney.

4              MS. FRANCIS:  Are you instructing your

5  client not to --

6              MS. LaVARCO:  Are you instructing your

7  client not to answer that question?

8              MS. VINSON:  I am.

9              MS. FRANCIS:  It's her duty to seek a

10 protective order, whatever she's instructing him not to

11 answer.

12             MS. LaVARCO:  Are you aware that it's your

13 duty to a seek a protective order if you're instructing

14 him not to answer?

15             MS. VINSON:  No, I'm not.

16             MS. LaVARCO:  Okay.

17             MS. FRANCIS:  I think we need to call

18 Rosenthal.

19             MS. LaVARCO:  I think so, too, because we

20 need to know what happened during the break.  You

21 insisted --

22             MS. FRANCIS:  It's concerning that --

23             MS. LaVARCO:  You insisted on -- you

24 insisted on having the break before I finished my line

25 of questioning.  We hadn't agreed to it.  You jumped up,

1  and now you're extremely defensive about the content of

2  your communications during the break.

3              MS. VINSON:  Okay.  I'm not going to let

4  you ask my client what we talked about during the break.

5              MS. FRANCIS:  If you didn't coach him, you

6  would permit him to answer the question.

7              MS. VINSON:  Okay.

8              MS. FRANCIS:  What's there to hide, right,

9  if you didn't do anything wrong on the break?

10             MS. VINSON:  That's not how privileges

11  work, Brittany.  Is that what you would do, you would

12  reveal attorney-client communication if it was okay?

13             MS. FRANCIS:  I would not engage in

14  unethical behavior that's not allowed during the break.

15             MS. VINSON:  Okay.

16             MS. FRANCIS:  And as we've agreed, you're

17  not supposed to coach the witness during a deposition.

18             So should we call --

19             MS. VINSON:  Thank you.

20             MS. FRANCIS:  -- Judge Rosenthal?

21             MS. VINSON:  And I've been admonished as

22  such.  Thank you for the admonishment.

23             MS. FRANCIS:  Should we call

24  Judge Rosenthal?

25             MS. VINSON:  You can do whatever you'd

159

 1  like.

 2                  MS. FRANCIS:  Are you going to permit him

 3  to answer the question?

 4                  MS. VINSON:  No, I'm not.

 5                  MS. LaVARCO:  Okay.  Then -- then we have

 6  to.

 7                  MS. FRANCIS:  Okay.  Then I think we have

 8  to call Judge Rosenthal.

 9                  MS. LaVARCO:  Yeah.

10                  Can we go off the record so that we can --

11                  THE VIDEOGRAPHER:  Sure thing.

12                  MS. LaVARCO:  -- take the time?

13                  THE VIDEOGRAPHER:  We're going off the

14  record.  The time is 3:33 p.m.

15                  (Recess from 3:33 p.m. to 3:44 p.m.)

16                  THE VIDEOGRAPHER:  We are back on the

17  record.  The time is 3:44 p.m.

18      Q.  (BY MS. LaVARCO) Mr. Bruss, do precinct

19  policies rank less lethal modes of force in order of

20  severity?

21      A.  Sure.  Yeah, they do.

22      Q.  Can you describe the ranking to me?

23      A.  Sure.  You have an officer's presence, their

24  mere presence.  Then you have verbal commands.  Then you

25  have open empty hand tactics.  Then you have closed

160

1   empty hand tactics.  Taser, impact weapons are all in

2   the same, and K9.

3        Q.  Did you consult any documents during any of

4   your breaks today?

5        A.  No.  I don't have access to anything.

6        Q.  Did you consult anybody about this question in

7   terms of ranking?  Did you consult anybody about this

8   question about less lethal forms of force?

9        A.  You just asked it, ma'am.  I didn't.

10       Q.  Okay.

11       A.  No.

12       Q.  Are you trained to use less lethal options

13  in -- in order of severity?

14       A.  You're trained to use all of them.  As far as

15  when they're used is dependent on the situation.

16       Q.  Are you trained to use the least severe weapon

17  that's necessary?

18       A.  Absolutely.  Least amount of force necessary to

19  overcome the resistance is the standard.

20       Q.  Under what circumstances in your experience do

21  you use a K9 instead of a taser?

22            MS. VINSON:  Object to form.

23       A.  Yeah, there's several circumstances where you

24  wouldn't necessarily use a taser when you could use a

25  dog.  If somebody was standing in, you know, waist-deep

161

1  water, you wouldn't want to use a taser.  You could use

2  a dog.

3      Q.  (BY MS. LaVARCO) What about when you're making

4  a felony vehicle stop, would you use the taser first?

5      A.  Probably not.

6      Q.  You'd deploy the dog first?

7      A.  Yes.

8      Q.  Why is that?

9      A.  Again, deploying the dog and sending the dog

10  are two different things.  So getting the dog out, yes,

11  I would get the dog out.

12      Q.  Before using a taser?

13      A.  Absolutely.

14      Q.  Would you send the dog before using the taser?

15      A.  It would depend on the circumstances.

16          MS. VINSON:  Object to form.  Sorry.

17      Q.  (BY MS. LaVARCO) What is the duty to intervene?

18      A.  The duty to intervene in what scenario?

19      Q.  What is a law enforcement officer's duty to

20  intervene when another officer is using excessive force?

21      A.  They have a duty to intervene and report if

22  they are using excessive force.

23      Q.  When does that duty come into play?

24      A.  Well, the reporting would be immediately

25  following, and the intervening would be at the time.

162

1      Q.  How might you intervene when you see another

2   officer using excessive force?

3             MS. VINSON:  Object to form.

4      A.  I'm not sure what scenario because I've never

5   come across that.

6      Q.  (BY MS. LaVARCO) Based on your training, how do

7   you intervene when you see another officer using

8   excessive force?

9             MS. VINSON:  Object to form.

10     A.  It would all depend.  I don't --

11     Q.  (BY MS. LaVARCO) Your training does not give

12  you any specific scenarios or hypothetical scenarios in

13  which you should intervene?

14            MS. VINSON:  Object to form.  That

15  mischaracterizes his testimony.

16     A.  Yeah, you're the one that didn't give me a

17  scenario.

18     Q.  (BY MS. LaVARCO) Does your training give you

19  specific scenarios in which you have a duty to intervene

20  because another officer is using excessive force?

21     A.  I don't know about a scenario.  A verbal-type

22  scenario maybe.  Yeah, you intervene using, you know,

23  the force that you have to use to intervene.  I guess

24  I'm not -- I mean, if -- if an officer is, you know,

25  using a bat on somebody, I mean, that may change what

Case 4:23-cv-00662   Document 58-6   Filed on 05/01/24 in TXSD   Page 164 of 345

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

163

1    the response is.  I just -- it depends so much I can't

2    even answer that.

3        Q.  Based on your training, what options do you

4    have to carry out your duty to intervene when another

5    officer is using excessive force?

6            MS. VINSON:  Object to form.

7        A.  Yeah, I can't -- I don't know.  I don't know.

8        Q.  (BY MS. LaVARCO) What do you remember from your

9    training about the duty to intervene?

10       A.  That you have one, that you have a duty to

11   intervene.

12       Q.  Do you remember anything about the options that

13   you have to intervene?

14       A.  No, I don't.  Other than the reporting, I don't

15   remember.  And minus a situation, I just -- it depends

16   so much I can't even say.

17       Q.  A moment ago you said -- you drew out the

18   distinction between the duty to intervene and the duty

19   to subsequently report.  So you're saying --

20       A.  Correct.

21       Q.  -- you're only familiar with what -- with the

22   reporting part.  You don't know how to intervene?

23       A.  That is not what I said.

24           MS. VINSON:  Object to form.

25       A.  That is not what I said, ma'am.

164

1      Q.   (BY MS. LaVARCO) So what does the duty to

2   intervene entail?

3      A.   An attempt to stop what's happening.

4      Q.   What -- what methods can you use to attempt to

5   stop what's happening?

6      A.   The -- I would assume the same methods that you

7   have to stop anybody from committing a crime or from --

8      Q.   Such as?

9      A.   I mean, all the less lethal options you're

10   talking about: taser, empty hands, telling somebody to

11   stop, physically intervening.  I -- I don't know exactly

12   what you're looking for.

13      Q.   Are you trained to verbally intervene and ask a

14   fellow officer to stop using excessive force?

15      A.   Sure.  You don't have to be trained at that.

16   That's common sense.

17      Q.   Have you ever been presented with scenarios in

18   your training where you were required to intervene?

19      A.   No.

20      Q.   Have you ever been printed -- presented with

21   hypothetical scenarios in your training that require the

22   duty to intervene?

23      A.   No.

24      Q.   Does the precinct have a duty to intervene

25   policy?

1      A.  Yes.

2      Q.  Where is that policy contained?

3      A.  I believe it would be in the Integrity where

4   the rest of the policies are.  There's an addendum to a

5   policy.

6      Q.  An addendum to which policy?

7      A.  I don't remember if it falls under the response

8   to resistance or -- I just don't recall.

9      Q.  Have you read that policy?

10     A.  Sure.

11     Q.  Is that "yes"?

12     A.  Yes.

13     Q.  Does your training tell you that it's ever

14  necessary to physically intervene when you see another

15  officer using excessive force?

16     A.  I don't recall.  I would assume it does.

17     Q.  Have you ever seen another officer intervene

18  when someone is using excessive force?

19     A.  No.

20     Q.  Have you ever seen an officer use excessive

21  force?

22     A.  No.

23     Q.  Apart from department policy -- apart from

24  precinct policy, what training do you receive on the

25  duty to intervene specifically?

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

166

1      A.   That's it.

2      Q.   Have you received any training outside of the

3  precinct on the duty to intervene?

4      A.   No.

5      Q.   Has anyone ever tried to intervene to stop you

6  from using force?

7      A.   No.  It's never been necessary.

8      Q.   Have you ever instructed a fellow officer to

9  cool it or calm down or attempt to get them to

10 de-escalate the situation?

11     A.   Yes.

12     Q.   Can you describe for me a time when that's

13 happened?

14     A.   Yeah.  Not too long ago after a -- a foot

15 pursuit, a suspect ran, and the subject was in handcuffs

16 and the deputy was using foul language that I found to

17 be unproductive, and I told him to knock it off.  It had

18 nothing to do with physical.

19     Q.   Is (███ ███-███ your current cell phone

20 number?

21     A.   It is.

22     Q.   How long have you had that number?

23     A.   Since 2003 maybe.

24     Q.   Do you remember your phone number from before

25 that?

1        A.  I do not.

2        Q.  Do you have any other phones?

3        A.  I do.

4        Q.  How many?

5        A.  Just one.

6        Q.  One additional phone?

7        A.  Yeah.

8        Q.  Is that an additional personal phone?

9        A.  No.  It's an additional -- it's a personally

10  owned phone, but I only use it for work.

11       Q.  What's the phone number for that?

12       A.  I don't know what it is.  I don't know what it

13  is, and it's not charged up.  But I just recently got it

14  in the last couple of weeks.

15       Q.  What kind of phone is it?

16       A.  It's an iPhone.

17       Q.  Do you know what model?

18       A.  iPhone 15.

19       Q.  What kind of charger does it use?

20       A.  Just the regular -- I don't know what that is

21  (indicating), the small one.

22       Q.  Okay.  We have a charger that we can use so we

23  can get the phone number.

24       A.  Sure.

25            MS. VINSON:  It's not a number I have?

168

```
 1              THE WITNESS:  I don't think so.

 2      Q.  (BY MS. LaVARCO) So the cell phone number I

 3  mentioned first ending in ████  that's your personal

 4  phone?

 5      A.  It is now, yes.

 6      Q.  It wasn't previously?

 7      A.  Oh, yes.  Yeah.

 8      Q.  Okay.

 9      A.  Yeah.

10              MS. FRANCIS:  You know what, I don't have

11  the lightning charger.

12              MS. LaVARCO:  Oh.  I might.

13              MS. FRANCIS:  Is it a lightning charger?

14              THE WITNESS:  I don't know.  It's a USC,

15  maybe.

16              MS. FRANCIS:  Oh, I do have that.

17              THE WITNESS:  Is that --

18              MS. FRANCIS:  Okay.  Great.

19              THE WITNESS:  Is that what it is?

20              MS. FRANCIS:  Yeah.  If you want to plug it

21  into --

22              MS. LaVARCO:  Yeah.

23              THE WITNESS:  Sure.  Thank you.

24              MS. VINSON:  That doesn't look right.

25              THE WITNESS:  That's right, yeah.
```

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

169

```
 1              MS. LaVARCO:  Great.
 2              THE WITNESS:  We'll give it a second here.
 3       Q.  (BY MS. LaVARCO) So your second phone, is that
 4  purchased by the department?
 5       A.  No.  Purchased by me.
 6       Q.  Do you use it for both work and personal
 7  communications?
 8       A.  No, I do not.  Work only.
 9       Q.  Is that pursuant to department policy?
10       A.  No, it's not.
11       Q.  Why do you have two phones, one for work and
12  one for personal?
13       A.  Because of this lawsuit I just felt that it
14  would be more appropriate because of all the drama.
15  It's easier to have one phone for work.
16       Q.  So prior to this lawsuit you were using your
17  personal phone for work?
18       A.  For all my business, yeah.  Talking to friends,
19  family, work, whoever.
20       Q.  How does having two phones make the drama
21  easier to deal with?
22       A.  Well, if I ever have to provide records, it
23  would probably be easier.  This is all work, nothing
24  else.  There's no phone calls to ███ ██████████   There's
25  no...
```

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

170

1       Q.  For the -- did your attorney know about this

2   phone?

3       A.  Yes, I told her.

4       Q.  When did you get it?

5       A.  Maybe -- I don't know that it's quite been even

6   a month, but -- well, let me look and see how I -- I'm

7   just trying to figure out how I find my phone number on

8   there.  I thought it was like find --

9               MS. VINSON:  Under settings, maybe.

10              THE WITNESS:  Let's see here.

11              MR. SHAW:  You can just call Celena --

12              THE WITNESS:  Yeah.

13              MR. SHAW:  -- or call me.

14              THE WITNESS:  Can I do that?

15              MS. VINSON:  It's fine with me.

16              THE WITNESS:  What's your number?

17              MS. VINSON:  (███ ███-███

18              THE WITNESS:  I believe it's an ███ isn't

19   it?

20              MS. VINSON:  Um-hum.  █ -- ███-███

21              THE WITNESS:  So (███ ███-██ █

22              MS. VINSON:  ███

23              THE WITNESS:  -- ███

24              MS. FRANCIS:  Thank you.

25       Q.  (BY MS. LaVARCO) So that's (███ ███-███

                                                            171

1      A.   Correct.

2      Q.   And that's the telephone number for your second

3  phone that you got recently to use for work

4  communications?

5      A.   That's correct.

6      Q.   And that's an iPhone 15, you said?

7      A.   It is, um-hum.

8      Q.   And your ████  phone number, what model do you

9  use for that?

10     A.   That's an iPhone 15 also.

11     Q.   Okay.

12     A.   But it's a Max Pro or some -- the bigger one.

13  I'm old.  So I can't really read the text.

14     Q.   Do you use iMessage?

15     A.   I don't know what -- iMessage, is that

16  something different than just regular text message?

17     Q.   When you text other people with an iPhone, does

18  it come up in a blue bubble or a green bubble?

19     A.   I don't know.

20     Q.   Okay.

21     A.   I'm sorry.

22     Q.   Do your communications save to any cloud?

23     A.   I don't know.  I don't really know how that

24  works.

25     Q.   What messenger apps do you use?

172

```
1        A.   Messenger apps?

2        Q.   Uh-huh.

3        A.   Messenger.

4        Q.   Messenger, meaning Facebook Messenger?

5        A.   I don't know.  It's the one that's got the

6    little envelope or whatever, the -- I don't know.  It's

7    Messenger.  I don't know if that's Facebook or not.  Let

8    me turn it back on and see.

9        Q.   Do you want to show it to me on your phone?

10       A.   Yeah, I apologize.  I'm not technologically

11   savvy.  So...

12       Q.   That's totally fine.

13       A.   Let's see here.  I don't even have it on this

14   phone yet.  Yeah, I'm sorry.  I don't even have it on my

15   phone.

16       Q.   You don't have any text messaging app at all?

17       A.   I have the -- the green one (indicating).

18            MS. LaVARCO:  Brittany, is that

19   describing -- is it the regular messaging app?

20            MS. FRANCIS:  It appears to be the iPhone

21   messenger app, iMessage app.

22            MS. LaVARCO:  The deponent appears to have

23   showed us the iPhone messenger app.

24       Q.   (BY MS. LaVARCO) On your -- on either of your

25   phones, do you use Facebook Messenger?
```

173

1      A.  Yes.

2      Q.  On both?

3      A.  No.  I don't even have Facebook on this.

4      Q.  What Facebook accounts do you use?

5      A.  I have my own and then I have another one for

6  my laser work and then I have another for fishing.

7      Q.  Can you tell me the names of those Facebook

8  accounts?

9      A.  Eric Bruss, I think is my first one.  Eric

10 Bruss Pro Fishing is my second one.  And Standard Issue

11 Laser Engraving is my third.

12     Q.  Do you use Snapchat?

13     A.  No.  I don't know which -- which one that is.

14     Q.  It's the one with the ghost icon.

15     A.  Oh, I have in the past I think.  Is that the

16 one that you can change your face and --

17     Q.  Yes.

18     A.  -- it has filters?

19          Yes.  Between me ███ ██ ████████  I think I

20 used one that made it look like she was crying or

21 something.

22     Q.  Do you use Instagram?

23     A.  No.  I'm not -- that's the orange one?

24     Q.  Do you have your personal phone on you?

25     A.  I don't.  I haven't used any of that stuff in a

174

1   long time.  I don't know.

2       Q.  You haven't used Instagram in any capacity?

3       A.  I don't know.  I -- I probably have if I have

4   it, but I don't remember.  It's not something I use

5   daily for sure.

6       Q.  You described a messenger app that you use on

7   your personal phone that looks like an envelope.  Is

8   that an app that comes with the iPhone?

9       A.  No.  The only one that I use is the -- the one

10  you said, the Facebook -- or not the Facebook, the

11  iPhone messenger.

12          MS. FRANCIS:  The green icon.

13      A.  Yeah.  That's the only one that I have on my

14  phone -- on this phone.

15      Q.  (BY MS. LaVARCO) Do you use YouTube?

16      A.  YouTube?  Sure.  Yeah.

17      Q.  What do you use YouTube for?

18      A.  I watch videos, and I have a YouTube channel.

19      Q.  Is that the fishing channel?

20      A.  Yes.  I think it's Eric Bruss Fishing.

21      Q.  Do you have a YouTube channel for the

22  Standard Issue Laser Engraving?

23      A.  I don't recall.  I don't know if I made one or

24  not.

25      Q.  Did you decide to reduce your social media

175

```
 1   usage after this lawsuit began?

 2       A.  No.

 3       Q.  Have you deleted any messaging -- messages

 4   since this lawsuit began?

 5       A.  Messages?

 6       Q.  Have you deleted any text messages since this

 7   lawsuit began?

 8       A.  I don't believe so.

 9       Q.  Have you changed your setting so that your

10   messages automatically delete?

11       A.  I haven't -- I'm probably on the factory

12   settings on them.  I don't mess with that.

13       Q.  Do you use a messaging application called

14   Signal?

15       A.  Signal?

16       Q.  Um-hum.

17       A.  No.  I've never even heard of it.

18       Q.  Do you use WhatsApp?

19       A.  I have in the past for work.

20       Q.  Where did you use it for work?

21       A.  We used WhatsApp when we were doing initiatives

22   with the -- the Texas Anti-Gang, the FBI and some of the

23   other agencies.

24       Q.  Was that during your time with Precinct One?

25       A.  Yes.
```

176

1      Q.   There are WhatsApp groups.  Do you use WhatsApp

2   groups for Precinct One?

3      A.   No.  I don't know what it is I receive.

4   When -- when you go for a briefing, they would send you

5   an invitation and you would click on it.  It would allow

6   you to talk during that time period, and then it went

7   away when the operation was over with.

8      Q.   Are there more than one person on the thread?

9      A.   Oh, yeah.  Multiple.

10      Q.   What kind of group is it?

11      A.   Again, it was when we were doing initiative,

12   when we were out looking for fugitives or we're trying

13   to get guns or what have you.  We would use that to

14   communicate rather than have to tie up the air.  There

15   may be a message that says, "Hey, I'm on the north side

16   of this apartment complex.  I've got eyes on this" and

17   there may be a picture of a target vehicle or whatever.

18      Q.   Is the precinct aware of these groups?

19      A.   I don't know.  I'm sure they are.

20      Q.   Has the precinct ever issued a -- you a work

21   phone or work phone number?

22      A.   No.

23      Q.   What electronic devices has the precinct issued

24   you?

25      A.   A handheld radio, body-worn camera, and I

1  believe I got a digital camera from -- from the County.

2      Q.  What's the digital camera for?

3      A.  For photographing crime scenes and stuff and

4  such.  And I also have a mobile AFIS.

5      Q.  Can you repeat that?

6      A.  I have a mobile AFIS assigned to me, which is a

7  portable fingerprint system.

8      Q.  Okay.  Is that mobile A-P-H-I-S?

9      A.  No.  Mobile AFIS, A-F-I-S.

10     Q.  Okay.  Do you use an iPad?

11     A.  I do have an iPad, yes.

12     Q.  Only one?

13     A.  Yes.

14     Q.  Did you have a different one before?

15     A.  An iPad?

16     Q.  Yes.

17     A.  I had an iPad when they first came out.  I

18  don't remember what happened to that.  It wasn't one of

19  the fancy ones.  It was one that you had to be at your

20  house or whatever, or you had to be on the Wi-Fi.

21     Q.  Has the agency ever issued you an iPad or a

22  tablet?

23     A.  No.

24     Q.  What about a laptop?

25     A.  Yes.  I have an MDT in my patrol car.

1    Q.  What email addresses do you use?

2    A.  Ericbruss2181@aol.com,

3  armyredfishanglers_ericbruss@yahoo.com and

4  eric.bruss@cn1.hctx.net [sic].

5          THE REPORTER:  C-N as in Nancy or M as in

6  Mary?

7          THE WITNESS:  Yes, ma'am, N as in Nancy.

8          THE REPORTER:  Thank you.

9          THE WITNESS:  And then the 1 is just the

10  numeral run -- 1, not the -- not spelled out.

11    Q.  (BY MS. LaVARCO) Can I repeat that back to you?

12  Is it eric.bruss@cn1.htcx.net?

13    A.  No.  @hctx, like Harris County Texas.

14    Q.  I see.

15    A.  Dot net.

16    Q.  Thank you.

17    A.  Um-hum.

18    Q.  Do you use any Gmail addresses?

19    A.  Gmail?

20    Q.  Um-hum.

21    A.  Oh, I think I have in the past.  I don't know.

22  Maybe my Standard Issue Laser Engraving is a Gmail.  I

23  just -- I don't remember.

24    Q.  Do you have any other Yahoo accounts?

25    A.  No.

179

1      Q.   Any other AOL accounts?

2      A.   No.

3      Q.   Do you use an iCloud email address?

4      A.   I don't know what that is.  How that's

5   different from regular email, I don't know.

6      Q.   Do you use email often for work?

7      A.   I do.  Daily.

8      Q.   Do you ever delete your work emails?

9      A.   Sure.

10     Q.   Have you deleted any work emails since this

11  lawsuit was filed?

12     A.   Sure.  Not in regards to this lawsuit.

13     Q.   Do you ever use your personal email address or

14  email addresses for work?

15     A.   No.

16     Q.   But you do use your personal phone number for

17  work?

18     A.   I don't anymore; but, yes, I have.

19     Q.   Up until about a month ago?

20     A.   Yes, ma'am.

21     Q.   Do you use TikTok?

22     A.   I do.

23     Q.   What for?

24     A.   Just watching videos, and I think I have a

25  TikTok video on there of my chihuahua sneezing.

180

1      Q.   What's your handle?

2      A.   It didn't go viral.  So -- so there.

3           I don't -- I don't remember.  Big Mo maybe,

4  something like that.

5      Q.   Can you say that again?

6      A.   Big Mo.  That's my dog's name.

7      Q.   Big Mo?

8      A.   One of my dogs.

9      Q.   Have you deleted or deactivated any of your

10  social media accounts since this lawsuit began?

11     A.   No.

12     Q.   Have you changed your privacy settings on

13  any of -- on any of your social media accounts since the

14  lawsuit has began?

15     A.   No.  I think my privacy settings have been set

16  the whole time.  I don't know.

17     Q.   Do you have an email address that's associated

18  with your iPhones?

19     A.   With my iPhones?  Just the email addresses that

20  I gave you.  Is there a separate one?

21     Q.   There's typically one when you're setting up an

22  iPhone for cloud storage.

23     A.   Oh, I have no idea.  The guy -- they guy at

24  Verizon did it for me.  So...

25     Q.   Can you look at your work phone now and tell me

1  the email associated with that phone in settings?

2      A.  Sure.  Sorry, I had to turn it back on because

3  I only had --

4      Q.  That's all right.

5      A.  -- 2 percent.

6              MS. VINSON:  Do you want a charger?

7      A.  I'm -- yeah, if I have to.  All right.  So it's

8  in settings?

9      Q.  (BY MS. LaVARCO) So you're going to want to go

10  to settings --

11     A.  Um-huh.

12     Q.  -- tap your name, tap sign in and security.

13             MS. VINSON:  I don't know that you should

14  be giving that out, your security code or your e --

15             MS. LaVARCO:  We're not asking for his

16  security code.  We're just directing him to --

17     A.  The only e --

18             MS. LaVARCO:  -- find the email address.

19     A.  The only email address I have on my phone is

20  the eric.bruss@cn1.net --

21     Q.  (BY MS. LaVARCO) Thank you.

22     A.  -- or hctx.net.

23     Q.  Do you have a home telephone?

24     A.  I do not.  I guess I'm that modern.  Does

25  anybody?

182

1    Q.  How long have you had your personal iPhone 12?

2    A.  My iPhone 15?

3    Q.  Yes, your iPhone 15.  I didn't mean to

4  downgrade you.

5    A.  Yeah, please don't.  I pay enough for it.

6        I have the -- I bought the iPhone for life

7  program or whatever.  So every time a new iPhone comes

8  out, I have the option of upgrading.

9    Q.  When you've upgraded your phones, have your

10  contacts been able to transfer over?

11   A.  Some -- sometimes.  The last time I think -- I

12  think I had some problems getting everything over, and I

13  started getting phone calls just that were, you know,

14  like, "Who's this?"

15       "Oh, you don't have me saved in?"

16   Q.  When you changed -- when you upgraded your

17  iPhone in the past, have your photographs migrated with

18  the new phone?

19   A.  Yeah, I think.  I -- I don't know if all of

20  them did, but I believe so.

21   Q.  But you're not familiar with how that happens

22  through cloud storage?

23   A.  Yeah.  I know -- I think I pay 99 cents or

24  something a month for iCloud storage, but I have no idea

25  how that works.

183

```
1        Q.  Is that for both phones?

2        A.  No.  That's just for my personal phone.

3   There's plenty of storage on this phone for whatever, I

4   think.

5        Q.  There's plenty of storage on your work phone?

6        A.  Yeah, because I don't -- I don't use it for --

7        Q.  Do you have any business phones?

8        A.  I do not.

9        Q.  Have you ever?

10       A.  I have not had a specific business phone, no.

11       Q.  Do you ever take paper notes at work?

12       A.  Sure.

13       Q.  Is there a particular memo book or notebook

14   that you use?

15       A.  No.  I'm kind of the yellow sticky guy.

16       Q.  Does the precinct have a policy on taking paper

17   notes?

18       A.  I don't believe they do.

19       Q.  Do you have any notebooks with paper notes from

20   work?

21       A.  No, I don't.

22       Q.  Are you required to preserve them?

23       A.  I think the long-standing rule was either if

24   you kept some, you had to keep them all; if not, you

25   could destroy them.
```

184

1     Q.   Where did that rule come from?

2     A.   I don't remember.  I don't know that that even

3  came from Harris County.  That's just been a long, long

4  standing thing when I was a detective.

5     Q.   Do you use Hotmail?

6     A.   I'm sorry.

7     Q.   Hotmail, an email service provider called

8  Hotmail?

9     A.   No, I don't think so.

10    Q.   Outlook?

11    A.   Yes, I use Outlook.  That's my departmental

12 email.

13    Q.   Do you take field notes during your

14 investigations?

15    A.   Rarely.  My field notes usually are composed of

16 writing somebody's name and date of birth down and then

17 going back and putting them in the computer and checking

18 them.  I mean, I have in the past, you know, for certain

19 things.

20    Q.   What kinds of things?

21    A.   Like --

22         MS. VINSON:  Object to form.

23    A.   I mean, you know, shootings, things like that.

24    Q.   (BY MS. LaVARCO) Do you retain those?

25    A.   No.

1      Q.  You destroy them?

2      A.  Yeah.  I mean, they're not specific to the

3   investigation.  They might be when I'm calling watch

4   command or something and I'm writing down the homicide

5   sergeant's name for who I'm calling, but every -- all

6   that stuff gets put into a supplement.

7      Q.  But do you use it to write down notes from your

8   conversations with witnesses?

9      A.  No.  I usually don't because it's all on

10  bodycam.

11     Q.  Did you take paper field notes at any point

12  about the incident underlying this case?

13     A.  No, I don't think so.

14     Q.  Did you take paper notes in your conversations

15  after the dog was unleashed?

16     A.  No.

17     Q.  Can you explain to me your duties around report

18  writing?

19     A.  Sure.  I mean, your -- as a police officer your

20  job is to write reports.

21     Q.  What kind of reports do you do?

22     A.  Offense reports, criminal offense reports.

23     Q.  Is it important to be complete in those

24  reports?

25     A.  Of course.

186

```
1      Q.  Is it important to be accurate?

2      A.  Of course.

3      Q.  Why is it important to be complete and

4   accurate?

5      A.  That's the purpose for writing the report is to

6   relay complete and accurate information.

7      Q.  What are the risks of including inaccuracies in

8   your reports?

9           MS. VINSON:  Objection, form.

10     A.  I don't know what you mean.  It's not an

11  accurate representation of what happened if you put the

12  wrong stuff in it.

13     Q.  (BY MS. LaVARCO) If you leave out an important

14  detail, what are some of the consequences that you might

15  face?

16          MS. VINSON:  Object to form.

17     A.  If you omit something?

18     Q.  (BY MS. LaVARCO) If you leave out an important

19  detail from an -- for example, if during your writing of

20  a Use of Force Report you leave out an important detail,

21  what consequences might follow as a result?

22          MS. VINSON:  Object to form.

23     A.  I have no idea because I've never done that.

24  So...

25     Q.  (BY MS. LaVARCO) How do you train your
```

1    subordinates in writing reports that are complete and

2    accurate?

3        A.  I review their reports, and if there is

4    deficiencies in the reports I kick it back to them and

5    ask for, you know, them to check their punctu --

6    punctuation or their spelling or what have you.  But as

7    far as training them to write reports, they're already

8    police officers when I get them.  So they've already

9    been trained.

10       Q.  In your capacity as a supervisor, when you're

11   reviewing reports where multiple officers were on the

12   scene and there are contradictions, what do you do?

13              MS. VINSON:  Object to form.

14       A.  Well, I would address it, but I don't --

15       Q.  (BY MS. LaVARCO) How would you address it?

16       A.  -- I haven't seen that.

17              Well, I would call, and I would talk to

18   them.  Everybody sees things differently.  Everybody has

19   different vantage points.  Everybody -- it doesn't

20   necessarily mean that they're, you know, incorrect or

21   not factual.

22       Q.  Does that ever lead people to revise their

23   reports?

24       A.  I guess it could.  I don't know of an example

25   of where it has.

188

1              MS. VINSON:  Object.  It calls for

2    speculation.

3       Q.  (BY MS. LaVARCO) Are there records of any

4    revisions to reports?

5              MS. VINSON:  Object to form.

6       A.  I -- that, I don't know.  I'm sure -- I think

7    that every keystroke is recorded on the computer

8    systems, but I'm not -- I'm not sure.

9       Q.  (BY MS. LaVARCO) At what point after an

10   incident do the officers typically write their reports?

11             MS. VINSON:  Object to form.  Calls for

12   speculation.

13             MS. LaVARCO:  Those are speaking

14   objections, and we've discussed those already,

15   Ms. Vinson.

16      A.  The response varies.  I mean, it's not unlikely

17   in our precinct on patrol to go from one call to a next

18   and have calls stacked and then do a report at the end

19   of your shift or sometimes even the following day.

20      Q.  (BY MS. LaVARCO) Is it helpful for officers

21   who -- to communicate about what they saw as they write

22   their reports?

23      A.  Is it helpful?

24      Q.  Yes.

25             MS. VINSON:  Object to form.

189

1      A.  I don't know.  Every single person would be

2  different.  Some people would find it distracting.

3      Q.  (BY MS. LaVARCO) Are officers trained to write

4  reports -- write -- write their reports in isolation?

5      A.  No.  You rarely get to write your reports in

6  isolation.  Usually you're in the parking lot of some

7  beat-up gas station in the dark writing a report.

8      Q.  Would you say that that's an iterative process?

9      A.  A what?

10      Q.  An iterative process.

11          MS. VINSON:  Object to form.

12      A.  Yeah, You're going to have to desc -- I'm

13  fairly educated, but you got me on that one.

14      Q.  (BY MS. LaVARCO) Would you say that as officers

15  are writing their reports, for example, in a dark

16  parking lot they have a continuing conversation about

17  what should go in the report?

18          MS. VINSON:  Object to form.

19      A.  No.

20          MS. VINSON:  Calls for speculation.

21      A.  I don't -- I don't know how to answer that.

22  I --

23      Q.  (BY MS. LaVARCO) Does precinct's policy speak

24  to whether officers can consult with each other before

25  they're writing their reports?

190

1    A.  I don't think there's a policy in regards to

2  it.  When you say "precincts," I can't answer for all

3  the precincts.  Precinct One.

4    Q.  Does Precinct One policy speak to whether

5  officers can confer with each other while they're

6  writing their reports?

7    A.  No.  I don't think there's a policy prohibiting

8  that.

9    Q.  When you go into the system to review reports,

10 have you ever seen an edit history?

11   A.  I don't see an edit history.  What I can see is

12 when I -- when I approve or -- or I deny a report, if

13 the supervisor wrote a note in there saying "You

14 misspelled misdemeanor," it will say that in there.  But

15 as far as, you know, some kind of log, I don't -- I'm

16 sure operations support or someone else does, but I

17 don't.

18   Q.  So you can see, for example, track changes or

19 comments?

20   A.  Well, what I will say is I can track what the

21 supervisor wrote in there for them to change, and then I

22 go and look and see if they changed it.  And then I can

23 approve or deny it, and I can add my own notes saying,

24 again, "Houston should be capitalized" or, you know --

25 you know, "Give the suspect description in the

1  narrative" or whatever I want to write.

2     Q.  Typically do supervisors directly edit reports

3  or only responding officers?

4     A.  No, I can't edit an officer's report.  I don't

5  do that, even if I could.  An officer's report is their

6  investigation and their words.

7     Q.  Do you direct subordinates to make edits?

8     A.  Sure I can.

9     Q.  Through comments?

10    A.  Sure.

11    Q.  Verbally?

12    A.  Sometimes I call them.

13    Q.  Can officers watch their body-worn camera or

14 their dash camera footage before writing their reports?

15    A.  Absolutely can.

16    Q.  Is it recommended that they do that?

17    A.  I don't know if it's recommended, but it's --

18 the state law supports you watching your bodycam and

19 your video before you write your report.

20    Q.  Would you say it's helpful to jog your memory?

21    A.  Absolutely it is.  It can be.

22    Q.  If you'd like one of your subordinates to

23 consider making a change to their report, how do you

24 decide whether to leave a comment versus calling them on

25 the phone?

192

1             MS. VINSON:  Object to form.

2       A.  How busy I am, if I'm at my desk or if I'm in a

3  patrol car.  It just -- I have no method to that matter.

4  So it's just -- it's either one or the other.

5       Q.  (BY MS. LaVARCO) Do you document calls with

6  your subordinates?

7       A.  What do you mean "document"?

8       Q.  For example, do you have a system where you log

9  calls among colleagues?

10      A.  I still don't really understand.  We have -- we

11 have a system where calls are dispatched and -- but as

12 far as something for us, for me individually saying "Go

13 to this call" or whatever, I mean, I can -- I can send

14 them a message.

15      Q.  How are 911 calls preserved?

16      A.  I don't know.

17            MS. VINSON:  Object to form.

18      Q.  (BY MS. LaVARCO) I'd like to read you a list of

19 the various types of reports that are mentioned in the

20 department's K9 and use of force policies, and I'm

21 hoping that you can explain to me the difference between

22 some of these reports or how they overlap.

23      A.  Sure.  I'll do my best.

24      Q.  I see listed here K9 Deployment Report, Use of

25 Force Report, Supplemental Report, Incident Report,

193

1  K9 Contact Report, Animal Control Or Veterinarian

2  Reports and Offense Reports.  I can take each of those

3  in turn if you want to comment on them.

4      A.  Sure.  Sure.

5      Q.  Can you tell me what the K9 Deployment Report

6  is?

7      A.  Yeah.  That's anytime the dog is deployed from

8  the car to be used in a police action.  Whether they're

9  actually used or whether they just stand there, it's a

10  deployment.

11      Q.  And a Use of Force Report?

12      A.  Yeah.  The Use of Force Report is the new

13  Response to Resistance.  That document is response to

14  resistance issues.

15      Q.  Are there statistical reports on the use of

16  force?

17      A.  I don't know.

18      Q.  Do you know whether the K9 patrol chain of

19  command keeps, for example, records of the number of

20  K9 deployments in a particular year?

21      A.  Yes.

22      Q.  In what form do they report those numbers?

23      A.  I don't know where they report them to, but

24  they are pulled up from the Superion system because

25  there's a K9 module in the system that is completed.

194

1        Q.   What's inside the K9 module?

2        A.   The K9 module is literally the deployment

3   record.  The old deployment records are -- are gone.  We

4   don't handwrite them.  They're done in the module that's

5   provided in the Superion system.

6        Q.   What's a Supplemental Report or a Case

7   Supplemental Report?

8        A.   A Supplemental Report and a Case Supplemental

9   Report are the same exact thing.  I don't know why they

10  have it there twice.  But a Supplemental Report is

11  something where you're not the primary and you write a

12  supplement as to what you did or you saw.

13       Q.   What does it mean to be the primary?

14       A.   The primary is the person who does the Offense

15  Report, the original report, or the Case Report.

16       Q.   Who decides who the primary is?  Is it based on

17  who uses force?

18       A.   Well, a lot of it comes down to whose call it

19  is, if it's in their area and it's their call.  But

20  ultimately the -- the supervisor dictates who takes

21  primary on a call.

22       Q.   What about the Incident Report?

23       A.   That's same as the Offense Report.

24       Q.   Okay.

25       A.   And that's what the original person would be,

195

1  or the primary would be writing.

2       Q.  I've asked you about K9 Deployment Reports.  Is

3  that different from a K9 Contact Report?

4       A.  I -- I think that's an old term, that we don't

5  have K9 Contact Reports.  We never have since I've been

6  here.

7       Q.  What's a Significant Offense Report?

8       A.  A Significant Report is something that if we

9  have a homicide or we have, you know, multiple people

10 shot or something that's likely to make the news, the

11 supervisor will author a Significant Report, and that

12 will be sent up to the chain of command so that they're

13 aware that that incident occurred.

14      Q.  Are you aware of a Significant Offense Report

15 being generated with regard to this case?

16      A.  No.  This wouldn't meet the criteria for

17 significant.

18      Q.  Does that ever change if an event makes the

19 news?

20           MS. VINSON:  Object to form.

21      A.  Yeah.  That, I -- I don't know.  I -- I

22 haven't -- I'm not aware of that ever being the case.

23      Q.  (BY MS. LaVARCO) With respect to your report

24 for the K9 deployment against Mr. Thomas, what --

25      A.  I didn't do a K9 Deployment Report.  It wasn't

1   my dog.  I didn't --

2       Q.  Which reports did you do?

3       A.  I did a Supplemental Report.

4       Q.  Who reviewed your Supplemental Report?

5       A.  I don't remember.

6       Q.  Who typically reviews the Supplemental Report?

7   Is it your supervisor?  Is it the ranking person on the

8   scene?

9       A.  No.  It's definitely the supervisor.  It

10  doesn't matter what your rank is on the scene.  If

11  you're not a supervisor, you don't have access.

12      Q.  So who was the supervisor at the time?

13      A.  Robert Johnson was one of my supervisors, and

14  Sergeant Medina, I believe, was one of my supervisors.

15      Q.  Did Robert Johnson ask you to make any changes

16  to your report?

17      A.  Absolutely not.

18      Q.  What was the process like for you drafting your

19  report alongside Robert Johnson and Wayne Schultz?

20      A.  I wasn't alongside either one of them.  I --

21      Q.  You drafted that report in isolation?

22      A.  I -- I don't know where I wrote it.  I don't

23  remember.  I just know that if it's being implied that

24  we were sitting side by side writing a report, that

25  never happened.

197

1      Q.  I don't mean to imply anything.

2      A.  Okay.

3      Q.  I'm just trying to understand when and under

4  what circumstances you drafted your -- and I want to get

5  the name right because you've asked me to -- your

6  Supplemental Report?

7      A.  Correct.  Yeah.  I don't remember if I wrote it

8  in my car or if I wrote it at the station.  I -- I don't

9  know.

10     Q.  Do you remember drafting it alone?

11     A.  Yes.

12     Q.  Did you have assistance from anyone?

13     A.  No.

14     Q.  Did anyone other than Robert Johnson review

15  your report before it became final?

16     A.  I don't know.

17     Q.  Did you talk with Mr. Johnson before submitting

18  your final report?

19     A.  I don't believe I did.

20     Q.  Did you watch the body camera footage?

21     A.  I watched the body camera footage, but I don't

22  think I -- if I -- memory serves me, I didn't do it

23  before I wrote my report.

24     Q.  Did you make any changes between your initial

25  draft and your final report?

198

1    A.  Oh, I'm sure I did.

2    Q.  Where would those changes be recorded?

3    A.  I don't know that they would be recorded.  I

4  mean, I'm in the process of writing the report and then

5  I read the report and I decide that I don't like the

6  sentence structure or whatever and I go back and I

7  change that.  If you mean like submitting my report and

8  then coming back and changing this or that, that didn't

9  happen.  It would have been documented.

10    Q.  You previously said that every keystroke is

11  report -- is recording; isn't that right?

12    A.  Yeah, that's the -- that's the rumor.  That's

13  what we understand, that under the system it can tell

14  who does what, when they do it, the times and

15  everything, but that's well beyond my purview.

16    Q.  But that's your understanding that every

17  keystroke is recorded?

18    A.  Yes.

19    Q.  If your supervisor is on the scene with you,

20  are they still the one to review your report?

21    A.  Sure.  They can be.

22    Q.  Does precinct policy prohibit you from making

23  false statements in your reports?

24    A.  Absolutely.

25    Q.  And from -- does it prohibit you from making

199

1   false statements to supervisors?

2       A.   Absolutely.

3       Q.   How many policies would you say Precinct One

4   has?

5             MS. VINSON:   Object to form.

6       A.   I don't know.  Without being able to look at

7   the policy manual, I -- I couldn't tell you.

8       Q.   (BY MS. LaVARCO) Are they all compiled into a

9   single policy manual?

10      A.   In the printed form they are.  In the

11  electronic form they're individualized.

12      Q.   Does Precinct One prohibit false statements to

13  prosecutors?

14      A.   Obviously they do.

15      Q.   Does Precinct One have a policy on racial bias?

16      A.   Yes.  It's not permitted.

17      Q.   Have you read the policy?

18      A.   In the written form, I'm sure I have.  On the

19  racial profiling and -- and on how we treat people

20  and -- absolutely.

21      Q.   What does it contain, the policy?

22      A.   I would have to look at the policy to tell you.

23      Q.   Do you remember any of the key elements of the

24  policy against racial profiling and bias?

25      A.   Yeah, it's against the policy, and it's against

200

1    the law.  We're not to engage in activity racial

2    profiling.

3          Q.  What do you know about the history of the use

4    of K9s in law enforcement?

5          A.  I know that it's very different than what your

6    opinion is on it.

7          Q.  How so?

8          A.  Well, I don't know anything about police dogs

9    being used to track slaves and things like that.  So...

10         Q.  Was that -- so you're not aware that police

11   dogs were previously used to track and catch slaves?

12         A.  Correct, I --

13              MS. VINSON:  Objection.

14         A.  -- was not aware of that.

15              MS. VINSON:  Object to form.

16         Q.  (BY MS. LaVARCO) What do you know about that

17   history?

18         A.  I -- not enough to speak on it.

19         Q.  Are you aware of the use of police dogs in

20   Nazi Germany?

21         A.  No.  I didn't know police dogs were used.

22         Q.  You said what you know about the history of

23   police dogs is different than what you perceive to be my

24   opinion on the history of police dogs.

25         A.  Sure.

201

1       Q.  What did you mean by that?

2       A.  I meant that the history that I'm aware of is

3  that law enforcement entities quickly realized that the

4  dogs' sense of smell and other attributes were that --

5  far more superior than that of a man.  Their speed to

6  run, their olfactory to detect substances was much

7  better.  Their ability to see in the dark was much

8  better.  And for that reason they were incorporated into

9  training and utilized as a tool for police.

10      Q.  Are you aware of when this practice began, to

11  the best of your knowledge?

12              MS. VINSON:  Object to form.

13      A.  I -- I don't know.

14      Q.  (BY MS. LaVARCO) Did you learn anything about

15  the history of police dogs during your years of training

16  and experience as a K9 handler?

17      A.  I don't believe I received any formal training

18  on that.

19      Q.  Did you receive any training on that?

20      A.  I don't believe so.  I think it was self-study

21  or talk or --

22      Q.  What kind of self-study?

23      A.  Just --

24              MS. VINSON:  Object to form.

25      A.  -- yeah, reading old things, you know, reading

202

1   old articles and things like that.

2        Q.  (BY MS. LaVARCO) What kinds of old things apart

3   from articles?

4        A.  I don't know how you want me to answer that.

5        Q.  You said that you engage in self-study about

6   the use and history of K9s.

7        A.  No, I didn't say that.  I said I've engaged in

8   the use of self-study to learn about things, which may

9   have included the history of K9s, but I never went back

10  and directly studied the origin of police K9s.  It

11  wasn't really relevant to what I do now.

12       Q.  What publications about the use of police K9s

13  have you read?

14       A.  Police K9 magazines, training articles that

15  have been posted.  I've been running dogs for a long

16  time.  So I can't tell you all of them.

17       Q.  Are there any recognized experts in the field

18  whose publications you look to?

19       A.  Sure.  He's recently pas -- well, not recently.

20  He passed a few years ago.  His name was Terry Fleck,

21  and he is an expert.  He's a renowned expert in the use

22  of police K9s.

23       Q.  Anyone else?

24       A.  No, not really.  He was the standard.

25            MS. LaVARCO:  I think we can take a break

203

1   shortly because the Court is ready to hear from us soon.

2              THE WITNESS:  Okay.

3              MS. LaVARCO:  We can take a break.

4              THE VIDEOGRAPHER:  We are going off the

5   record.  The time is 4:45 p.m.

6              (Recess from 4:45 p.m. to 4:54 p.m.)

7              THE VIDEOGRAPHER:  We are back on the

8   record.  The time is 4:54 p.m.

9       Q.  (BY MS. LaVARCO) Mr. Bruss, during the break

10  that commenced at approximately 3:19 p.m., did you

11  confer with counsel about how to answer any questions

12  during this deposition?

13      A.  No.

14      Q.  Did your counsel advise you on your performance

15  up until that point during the deposition?

16              MS. VINSON:  You cannot ask that.  The --

17  the prohibition is telling him how to answer a question.

18      Q.  (BY MS. LaVARCO) Did your counsel coach you --

19              MS. VINSON:  You can't ask --

20      Q.  (BY MS. LaVARCO) -- on how to answer --

21              MS. VINSON:  -- those questions, Shirley.

22      Q.  -- a question during the deposition?

23              MS. VINSON:  The judge told you exactly

24  what you can ask.  That is going into attorney -- I'm

25  sorry.  Maybe I jumped the gun.  What was your -- how

204

1    did you rephrase it?  Did you rephrase it?

2              MS. FRANCIS:  Yeah, she said "Did your

3    attorney coach you on how to answer questions during

4    this deposition?"

5              MS. VINSON:  Okay.

6        A.  No.

7              MS. VINSON:  I will let you -- yes, sorry.

8        A.  Absolutely not.

9        Q.  (BY MS. LaVARCO) Did your attorney coach you on

10   how to answer questions during the deposition during any

11   break that we've taken today?

12       A.  No.

13       Q.  Did any other person coach you on how to answer

14   questions during any break that we've taken today?

15       A.  No.

16       Q.  Thank you.

17       A.  Thank you.

18             MS. LaVARCO:  We can go off the record.

19             THE VIDEOGRAPHER:  We are going off the

20   record.  The time is 4:55 p.m.

21             (Recess from 4:55 p.m. to 5:11 p.m.)

22             THE VIDEOGRAPHER:  We are back on the

23   record.  The time is 5:11 p.m.

24             MS. LaVARCO:  Ms. Boothe, I'm about to drop

25   a document into our shared exhibit folder.

205

```
 1                THE REPORTER:  Okay.

 2                (Exhibit 1 marked.)

 3                MS. LaVARCO:  Brittany, are you going to

 4   pull up the exhibit on --

 5                MS. FRANCIS:  I've got it.

 6                MS. LaVARCO:  Okay.

 7                MS. VINSON:  Let me see what it is first.

 8   If it's short, I'll just show him mine.

 9                MS. LaVARCO:  It's a policy.  I think we'll

10   be ask -- asking him to be with it for a few minutes.

11   So I think it might make sense to use the iPad.

12                MS. VINSON:  Oh, awesome.

13                THE WITNESS:  Thank you.

14                MS. VINSON:  But we don't have it yet, or I

15   don't.

16                MS. FRANCIS:  It's in the folder we shared

17   with you.

18                MS. LaVARCO:  The folder is empty.

19                MS. LaVARCO:  Try refreshing.

20                MS. VINSON:  Oh, there it is.  There it is.

21                MS. LaVARCO:  Okay.

22        Q.  (BY MS. LaVARCO) Mr. Bruss --

23        A.  Yes, ma'am.

24        Q.  -- the exhibit just shared with you has been

25   marked as Exhibit 1.
```

206

 1      A.  Okay.

 2      Q.  It appears to us to be Precinct One's use of

 3  force policy which was effective in February 2021.  Is

 4  that an accurate description to you?

 5      A.  It appears to be, yes, ma'am.

 6      Q.  Do you want to take a moment to refamiliarize

 7  with -- yourself with the policy?

 8      A.  Yes, ma'am.  (Reviewing document.)

 9      Q.  Will you let me know when you're finished --

10      A.  I will.

11      Q.  -- reviewing the document?

12      A.  Yes, ma'am.  (Reviewing document.)

13          (Off record discussion.)

14      A.  (Reviewing document.)  I'm just scanning

15  because it's 23 pages long.  So...

16          MS. FRANCIS:  Debbie, how much time do we

17  have?

18          THE REPORTER:  You -- it was 4:39 before we

19  started this last time.

20          THE VIDEOGRAPHER:  You have 4 hours and

21  47 minutes on the record.

22          MS. FRANCIS:  Okay.

23      Q.  (BY MS. LaVARCO) Mr. Bruss, is it all right

24  with you if I direct your attention to particular

25  portions, and if you need to go back --

207

1     A.  Sure.

2     Q.  -- to review --

3     A.  Absolutely.

4     Q.  -- we can do that?

5     A.  Um-hum.

6     Q.  When was the last time you read this policy?

7     A.  We read this policy every time we qualify with

8  one of our duty weapons.  So the last qualification, I

9  don't know, maybe six months ago.

10     Q.  And can you confirm again that this is the

11  complete policy --

12     A.  I can --

13     Q.  -- or appears to be?

14     A.  I can confirm it appears to be, um-hum.

15     Q.  Can you confirm that according to the date on

16  the very last page, Page 23 of the exhibit, it says,

17  "This policy has been revised on the below listed

18  dates."  The last date is "February 2021."  That

19  indicates to me that it was the policy that was in

20  effect at the time of the incident giving rise to this

21  litigation, which was in February 2021.  Do you agree

22  with that?

23     A.  Sure.  I agree that's the date, yeah.

24     Q.  When I asked you earlier today about whether

25  you'd received any drain -- training on the Graham

THOMAS v                                                      Eric Bruss
BRUSS                                                    March 20, 2024

208

1   standard, you said you were unfamiliar.  Do you recall

2   that?

3        A.  Yeah, I -- I am familiar with the -- I just --

4   terminology different.  Graham vs. Connor is how we use

5   it.  The Graham standard, I just didn't make the

6   connection.  I'm well aware of it.

7        Q.  Can you read into the record the Graham

8   standard as it's summarized on Page 4 of the policy

9   under "Determining Objectively Reasonable Force"?  You

10  can begin with "Graham states, in part."

11       A.  "Graham states, in part, 'The objectable -- the

12  objective reasonableness of a particular use of force

13  must be judged from the perspective of a reasonable

14  officer on scene, rather than with the 20/20 vision of

15  hindsight.  The calculus of reasonableness must embody

16  allowance for the fact that police officers are only

17  forced to make split-second judgments in circumstances

18  that are tense, uncertain, and rapidly evolving about

19  the amount of force that is necessary in a particular

20  situation.  The test of reasonableness is not capable of

21  precise def -- definition or mechanical application.'

22  The force must be reasonable under the circumstances

23  known to the officer at the time the force was used.

24  Therefore, the Harris County Constable's Office

25  Precinct One examines all uses of force from an

209

1  objective standard rather than a subjective standard."

2      Q.  Let me direct your attention to the following

3  paragraph under "Considerations Governing the Use of

4  Force."  Do you see the sentence that says "Additionally

5  only amount -- the amount of information the peace

6  officer had at the time of the incident will be

7  considered"?

8      A.  Absolutely.

9      Q.  Do you agree with that?

10     A.  Yes.

11     Q.  What does that mean, "the information that the

12 officer had at the time of the incident"?

13     ██    ████████████████████████████████████████████

   ██  ████████████████████████████████████████████████

   ██  ████████████████████████████████████████████

16     Q.  Earlier today I also asked you about the duty

17 to in intervene?

18     A.  Correct.

19     Q.  Do you remember that in response to many of my

20 questions you suggested that it was too bland a

21 situation for you to be able to comment on?

22     A.  It was too what?

23     Q.  Bland, you used the word "bland."

24     A.  Sure.

25     Q.  Can you go to Page 8 of the exhibit and read me

THOMAS v                                                                    Eric Bruss
BRUSS                                                                    March 20, 2024

210

1    Subpoint (e)?

2         A.   "An officer present and observing another

3    officer, regardless of rank, using force that is clearly

4    beyond what is -- which is objectively reasonable under

5    the circumstances shall, when in a position to do so,

6    safely intervene to prevent the use of force.  Examples

7    of force that would require an officer's intervention

8    may include, but are not limited to:  Use of choke holds

9    [in any situation where deadly force would not be

10   authorized]; use of force against a restained or subdued

11   subject; leaving a sec -- secured subject in a prone

12   position in any fashion that re -- restricts breathing

13   or blood flow; any use of force in violation of this

14   department's policy.  Officers shall promptly report

15   those observations to a supervisor.  The obligation to

16   report remains in place even if the officer is

17   successful in intervening in the use of force.  Any

18   failure to intervene and/or failure to report improper

19   use of force shall be grounds for discipline up to and

20   including termination."

21        Q.   When Robert Johnson unleashed his K9 on the

22   Plaintiff in this case, did you feel that you should

23   have intervened?

24        A.   No.

25        Q.   Did you feel that Officer Johnson was about to

211

1   use excessive force?

2       A.   No.

3       Q.   Why did you think that it was appropriate to

4   release the K9?

5       A.   That's a difficult question for me to answer

6   because I was looking at it from a different angle.  I

7   was not in control of the dog.  I did not see what

8   Robert Johnson saw.  I don't know what's his training.

9   I don't know what his experience was.  But at best I

10  would be guessing.  I don -- I can't go into his head

11  and figure out exactly why he did what he did.

12      Q.   Did you think at the time that it was

13  appropriate to release the dog under the objectively

14  reasonable standard?

15      A.   Absolutely, because I didn't know what he saw.

16  I don't know if, you know, Sergeant Johnson saw him make

17  a furtive movement.  I had no idea.

18      Q.   What indication did you have, if any, that you

19  saw -- that Sergeant Johnson saw a furtive movement?

20      A.   I didn't.  Again, you're asking me to speculate

21  on that.  I didn't.  I was looking at the driver, and I

22  was looking at the vehicle.  That was my area of

23  responsibility.

24      Q.   What about in the moments while the K9 was

25  continuing attack -- to attack Mr. Thomas while you

212

```
 1   stood over him?

 2       A.  The dog was not attacking --

 3               MS. VINSON:  Object to form.

 4               Excuse me.  Let me object.  Then you can

 5   answer.  Go ahead.

 6       A.  The dog as was not attacking.  The dog was

 7   apprehending the subject and controlling the subject.

 8   And when I was standing over him, I had already gone and

 9   cleared the vehicle to make sure that that was not a

10   threat because that was my priority.

11       Q.  (BY MS. LaVARCO) Are you suggesting that you

12   didn't have a clear line of sight as to what was

13   happening with Sergeant Johnson and Plaintiff Thomas?

14       A.  I'm not saying that I didn't have a clear line

15   of sight.  I'm saying that that's not what I was

16   watching.

17       Q.  After watching the body camera footage of

18   Robert Johnson, does that change your opinion?

19       A.  No.  That's hindsight.

20               MS. VINSON:  Object to form.

21               Just give me time, please, before you

22   answer.  Go ahead.

23       A.  That's hindsight.  It still does not accurately

24   give me an impression as to what he may have saw, what

25   he may have felt, what his -- what his training, what
```

213

1    his experience, if he's had a past experience like this

2    and I wasn't present before.  So I don't know other than

3    what he heard on the radio, that the subject was

4    uncooperative and telling him to shoot him.

5              So I -- you know, I'm -- I'm not qualified

6    to make a statement about why he did what he did or if

7    it was -- because I didn't see what he saw.  I didn't

8    know what he knew.

9         Q.  (BY MS. LaVARCO) Do you ever conduct use of

10   force reviews for your subordinates?

11        A.  I do.

12        Q.  If you were reviewing the body camera footage

13   on the scene, would you think that the force was

14   appropriate here?

15        A.  With reading the report and speaking to the

16   deputy, yes.  Yeah, it's ugly.  It's -- it's ugly.

17        Q.  In what way?

18        A.  All use of forces are, but that doesn't make it

19   illegal.

20        Q.  So your position is that if Sergeant Johnson

21   was your subordinate and you were asked to review his

22   use of force on the body camera footage, you would find

23   it appropriate, ugly but appropriate?

24        A.  With an explanation.  Not in a bubble, not

25   watching a video with no explanation, no anything else

Case 4:23-cv-00662   Document 58-6   Filed on 05/01/24 in TXSD   Page 215 of 345

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

214

1  like how it get's portrayed on the news and stuff.  That

2  is not a fair, accurate representation.

3       Q.  What specifically did you see in the footage

4  that justified the use of force?

5       A.  His noncompliance.  He's an un-searched suspect

6  on a weapons call.

7       Q.  Can you describe his noncompliance?

8       A.  Sure.  He was told multiple times stay in the

9  car; he failed to stay in the car.  He was told to get

10 up; he refused to get up.  All those things trying to

11 lure us from a position of cover to move up on a vehicle

12 that is un-searched and I don't know if there's another

13 suspect in there.

14      Q.  Do you assume that everyone is armed?

15      A.  That is a fair assumption in 2024 with the

16 number of police officers that have been killed in the

17 line of duty.  That doesn't mean we take direct action.

18 But we are conscious that every single person has the

19 potential for violence.

20      Q.  Did you have a specific reason to believe that

21 Mr. Thomas was armed?

22      A.  Yes.

23      Q.  What was that reason?

24      A.  I was told he was armed --

25      Q.  Who told you?

215

1      A.  -- they were armed.

2              The dispatch.

3      Q.  Who is "they"?

4      A.  I don't know which dispatcher it was.  You're

5  going to have to check that.

6      Q.  I apologize.  Who -- who did dispatch tell you

7  was armed?

8      A.  The suspects, and then later the homeowner.

9      Q.  Okay.  I'd like to back up --

10     A.  Sure.

11     Q.  -- and begin with your account of what happened

12 from the time you got the dispatch communications to the

13 time after the dog was unleashed.

14     A.  Sure.

15     Q.  Can you walk me through what happened?

16              MS. VINSON:  Object to form.

17     A.  So I received a call, as did everyone -- it was

18 a hot tone call, Priority One call -- of a weapons

19 disturbance.  As I started to leave where I was at, I

20 got on the radio and I said "1 King 17.  Is it the

21 suspects that are armed or the homeowner?"  And dispatch

22 returned and said "The suspects."

23              At that point I turned my lights on and

24 began my response.  The way the camera system works is

25 there is a pre-event capture period.  When I turn my

216

1   lights on, the camera activates.  It goes back, but it

2   lacks audio.  No audio is recorded.  So that portion was

3   not recorded.  It does not change the fact that that is

4   exactly what they said.

5              During the response, dispatch updated and

6   said that the homeowner had their gun out.  But at no

7   point was -- was I told that the suspects no longer had

8   guns.  So all I thought in response was that the suspect

9   had guns and the homeowner had a gun.  So now there's

10  more than a couple of guns on scene.

11      Q.  (BY MS. LaVARCO) So at that point you think

12  that both the suspects who are described as two black

13  men, and the homeowners, who have no description, are

14  potentially armed?

15      A.  Yes.

16      Q.  Did you make any effort to locate the

17  homeowners upon arrival?

18      A.  We were tied up.

19      Q.  Tied up in what way?

20      A.  There was no time to go and investigate

21  everything.  Sergeant Johnson had already relayed over

22  the radio that he was out with the suspects, that they

23  were uncooperative, that one was noncompliant and

24  yelling for him to shoot him.  That is not the time for

25  me to go and check with other people.  My job at that

217

1  particular point is in support of the officer that's on

2  location, and that's what I did.

3      Q.  You've -- you've testified as to what dispatch

4  said.  And I understand your position is that the

5  entirety of the dispatch communications were not

6  captured on the radio; is that correct?

7      A.  Correct.

8      Q.  Have you reviewed the Dispatch Communications

9  Report in this case?

10      A.  I have.

11          MS. LaVARCO:  I'd like to enter that as

12  Exhibit 2.

13          MS. LaVARCO:  Brittany, can you go ahead

14  and drop that in.

15          MS. FRANCIS:  Yeah.

16          MS. LaVARCO:  Thanks.

17          (Discussion off the record.)

18      A.  Okay, ma'am.

19      Q.  (BY MS. LaVARCO) Right.  Hold on, while I find

20  a folder.

21          (Discussion off the record.)

22          (Exhibit 2 marked.)

23      Q.  (BY MS. LaVARCO) Mr. Bruss, I've shared with

24  you what has been marked as Exhibit 2.

25      A.  Um-hum.

218

1      Q.   I understand this to be the Dispatch

2  Communications Report?

3      A.   It is.

4      Q.   Can you scroll down to the "Event Notes" on

5  Page 5?

6      A.   Sure.

7      Q.   Do you agree that the Event Notes are listed in

8  reverse chronological order with the first Event Notes

9  at the bottom of that page?

10     A.   They do appear to be ascending.

11     Q.   Can you read for me the Event Notes starting

12 with the bottom of Page 5?  And to the extent that it

13 requires translation of law enforcement terms, you can

14 offer a brief explanation, but just a brief definition.

15 Starting at the bottom.

16     A.   "Reporting person two black males, two BM, in

17 front of home screaming and yelling.  Report advises

18 second time they came to location.  Reportee has weapon

19 out."

20     Q.   What is a reportee?

21     A.   The person calling.

22     Q.   Would you agree that that means that dispatch

23 first advised that the person calling had their weapon

24 out?

25     A.   I would absolutely disagree with that.  That is

219

1   not the information that was relayed on the radio.

2       Q.  Would you agree that that's the information

3   captured here?

4       A.  Sure.

5       Q.  Do you have reason to think that the document

6   is inauthentic?

7       A.  No, not inauthentic.  It's just flawed.

8       Q.  Can you continue reading?

9       A.  "Black male driving red Dodge Chrysler.

10  Reportee advised does not know black males.  Possible

11  MHI."

12              I don't know what that means.  Or MH1.

13      Q.  Does it mean mental health?

14      A.  I don't know what it means.  It's not a -- it's

15  not an abbreviation that we use in describing that.

16  So...

17              "Males heard in background yelling.  Does

18  suspect have weapon out or reportee?"

19      Q.  Who ask --

20      A.  Yes.

21      Q.  Who asked whether the suspect had the weapon

22  out or reportee?

23      A.  It doesn't say, but I know that I did.

24      Q.  So it says next to "Does suspect have weapon

25  out or reportee," I see it says "CSHIREMAN."

220

1      A.  That's who entered the call note.

2      Q.  I see.

3      A.  And although they aired it out over the radio

4  that it was the suspect, they didn't enter it.  "Black

5  male brown shirt, black pants, white shoes.  Two black

6  male unknown of clothing descrip -- or second black male

7  unknown of clothing description.  Called back twice.

8  Going to voicemail."

9          MS. VINSON:  Are you asking him to read --

10  read the whole thing, Shirley, or do you want to just

11  direct him to where you want him to read?

12          MS. LaVARCO:  We can pause for a moment.

13      A.  Thank you.

14      Q.  (BY MS. LaVARCO) Do you see the second instance

15  in which someone is reporting, does ask "Does the

16  suspect have their weapon out, or does the reportee?"

17      A.  Correct.

18      Q.  So there are at least two instances in this

19  communications report where someone asks whether the

20  suspect had the weapon out?

21      A.  Correct.

22      Q.  And what was the response?

23      A.  "Reportee has weapon out."

24      Q.  Do you recall who asked that?

25      A.  I don't recall who asked that, but I know that

1  that's not the response given on the radio.  Even on the

2  captured video that is not what was said on the radio.

3  What was said on the radio is the dispatcher said

4  "Update, the homeowner now has their weapon out."  That

5  "update" implies that that is updated information that

6  was not given before.

7       Q.  I'd like to go to another exhibit with

8  Robert Johnson's body-worn camera footage which captures

9  some of the radio communications.

10      A.  Sure.

11            (Exhibit 3 marked.)

12            MS. LaVARCO:  I think you might have to add

13 it as a shortcut.

14            (Downloading exhibit.)

15      Q.  (BY MS. LaVARCO) Okay.  I'm going to ask you to

16 play the video from the time Robert Johnson's footage

17 begins until the time he gets out of the car.

18      A.  Okay.

19            MS. VINSON:  It's on mine.

20            MS. FRANCIS:  Oh, you have it?

21            MS. VINSON:  I have it, yeah.  But we'll

22 put it here, and I'll play mine.  I'm telling Katie.

23            Did you get it?

24            THE WITNESS:  What's on there?

25            THE REPORTER:  You wanted that one marked

222

1  as Exhibit 3; is that correct?

2              MS. LaVARCO:  Yes, please.

3              MS. FRANCIS:  That's right.

4              MS. VINSON:  So what part do you want

5  played?

6              MS. LaVARCO:  Okay.

7              MS. FRANCIS:  From the very beginning.

8              MS. VINSON:  Is it an hour long?

9              MS. LaVARCO:  We're not going to watch the

10  entire footage, no.  Just a few minutes until --

11      A.  You realize I wasn't with Robert Johnson.

12      Q.  (BY MS. LaVARCO) I understand.

13      A.  So this video is not of me -- me.

14      Q.  The -- the video is not of you.

15      A.  Okay.

16      Q.  Do you agree that this video is of Robert

17  Johnson?

18      A.  I -- I would assume it is, but I'll have to --

19  I'll have to watch some of it just to make sure.  It

20  doesn't have his name on there.  So -- but I'll be able

21  to tell as soon as he --

22              MS. VINSON:  Do you want -- I don't know if

23  the volume is on here?

24      A.  This is the pre-event capture.  So there's no

25  audio for the first how many ever seconds.

1              (Playing video.)

2      A.   That's Robert Johnson.

3              (Playing video.)

4      A.   Yes.

5      Q.   (BY MS. LaVARCO) Can you pause the video now?

6      A.   I'm sorry?

7      Q.   Can you pause the video now?

8      A.   Yes.

9      Q.   In that video did you hear dispatch at any

10 point say that the suspects are armed?

11      A.   No, not in that point.  I did hear the part

12 where they updated that the homeowner had their gun out.

13      Q.   Can you confirm that this exhibit appears

14 to be Robert Johnson's body-worn camera footage on

15 February 22, 2021?

16      A.   Yes, ma'am.

17      Q.   Comparing the footage to the Dispatch

18 Communications Report, the first thing that's said is

19 that there are "two black males in front of the home

20 screaming and yelling.  Reportee is advised this is the

21 second time they came to this location, and reportee has

22 weapon out."  Did you hear that reflected in there?

23      A.   No.

24      Q.   What's the first dialogue that you hear

25 reflected in the video?  You can return to the beginning

1   of it if you need to.

2       A.  Are you asking about the first thing I hear

3   from dispatch?

4       Q.  Yes.

5               (Playing video.)

6               (Stopping video.)

7       A.  That's the first thing I hear from dispatch in

8   this video.

9       Q.  (BY MS. LaVARCO) What timestamp did you end it?

10      A.  It looks like 19:20:09, if that was correct.  I

11  don't know.

12      Q.  Can you play it again and tell me whether you

13  hear Robert Johnson ask, "Does the suspect have his

14  weapon out or reportee"?

15      A.  I don't believe he asked that.  That was me.

16  But it was long before this.

17              (Playing video.)

18              (Stopping video.)

19      Q.  (BY MS. LaVARCO) Can you continue playing it?

20      A.  Sure.

21              (Playing video.)

22      Q.  (BY MS. LaVARCO) You can pause again.

23              (Stopping video.)

24      Q.  (BY MS. LaVARCO) And Note the timestamp,

25  please.

225

1     A.  19:21:01.

2     Q.  And, again, to confirm, dispatch in that video

3  never says that the suspects had their weapons out --

4     A.  Correct.

5     Q.  -- or had any weapons?

6     A.  Correct.

7     Q.  And when I asked you before -- withdrawn.

8          When I asked you before who said "Does the

9  suspect have his weapon out or reportee," your position

10  is that that was you?

11     A.  Correct.

12     Q.  But that it was prior to the beginning of

13  Johnson's video?

14     A.  Correct.

15     Q.  Despite the fact that according to the Dispatch

16  Communications Report it happened after?

17     A.  It's incorrect.

18     Q.  Do you see at the 19:19 and 37 seconds mark on

19  the Dispatch Communications Report the question, "Does

20  suspect have weapon out or reportee"?

21     A.  I don't -- I guess I can get -- 19:19 -- okay.

22  Yeah, I see it.

23     Q.  And that was you, to your recollection?

24     A.  Yes.

25     Q.  But you're saying it happened before the

1  beginning of Robert Johnson's body camera footage?

2       A.  I don't know about Robert Johnson's video

3  footage.  I'm not seeing it here.  I'm telling you it

4  was in the pre-event capture I asked dispatch, and

5  dispatch advised the suspects.  It was put out as a

6  weapons disturbance Priority One call.

7            From the dispatch I can tell that dispatch

8  is getting information from a call taker from somebody

9  else.  So they may have lost something in the

10 communication because they certainly did when it was

11 relayed to us.

12      Q.  Did you notice that you asked an either/or

13 question, "Does the suspect have his weapon out or the

14 reportee"?

15      A.  Correct.  I believe I said "One King 17, is it

16 the suspects that have weapons or the homeowner,"

17 something along that lines.

18      Q.  What is captured on the dispatch communication

19 report?

20      A.  Nothing.  There's no response to it.

21      Q.  At 19:20 and 42 sec -- seconds do you see a

22 response on the Dispatch Communications Report?

23      A.  Yes.

24      Q.  Is that an immediate -- is that immediately

25 following the question, "Does suspect have weapon out or

227

1    reportee"?

2         A.  It is.

3         Q.  Do you agree that dispatch answered "the

4    reportee" according to the communications report?

5         A.  I do not.

6         Q.  Do you think the communications report is

7    inaccurate?

8         A.  I absolutely know it was inaccurate.

9         Q.  Do you agree that that's what the communica --

10   do you agree that the communications report in front of

11   you says that in response to your question, "Does

12   suspect have weapon out or reportee," dispatch

13   responded, "Reportee has weapon out"?

14        A.  Correct.  And I am testifying right now under

15   oath that that is not what happened, and that's why when

16   it came back later and dispatch said he asked for

17   updates, she said "Update, the homeowner now has their

18   weapon out."

19        Q.  Okay.  So going back to the scene, you had this

20   conversation with dis -- you're testifying that you had

21   a conversation with dispatch about whether the suspect

22   had their weapon out -- had a weapon; they said yes?

23                You arrived --

24        A.  It wasn't formatted like that; but, yeah,

25   that's the gist of it.

228

1      Q.  What did you know about the suspects at the

2   time you arrived on the scene?

3      A.  That they were uncooperative and that one was

4   yelling for Sergeant Johnson to shoot him.

5      Q.  Did you know their names?

6      A.  I had no idea who they are.

7      Q.  Did you have a physical description?

8      A.  Only what was there about two black males in a

9   red Chrysler and some clothing description.

10      Q.  What happened after you arrived?

11      A.  I posted up in a support position, a secondary

12   position, and got out of the vehicle and took a

13   position of cover on the vehicle and the driver who

14   Sergeant Johnson was saying was being uncooperative, he

15   keeps reaching.

16      Q.  Who was being uncooperative according to

17   Johnson?

18      A.  He said the driver kept reaching.

19      Q.  Did you observe that?

20      A.  I did.

21      Q.  In what order did everyone arrive on the scene?

22           MS. VINSON:  Object to form.

23      A.  Well, Sergeant Johnson clearly first.  I

24   arrived second.  I don't know the order they arrived.  I

25   don't know whether it was -- I don't know.

229

1      Q.  (BY MS. LaVARCO) How would you describe the

2  scene once you arrived?

3      A.  It was chaotic.

4      Q.  What made is chaotic?

5      A.  The noncompliance.

6      Q.  What noncompliance?

7      A.  The noncompliance from your client --

8      Q.  Specifically what non --

9      A.  -- and the noncompliant -- he was being told to

10  get back in the car.  He was yelling "All lives matter."

11  Just yelling and screaming, waving his arms.  The pa --

12  driver was noncompliant, reaching around in the car, and

13  we were dispatched to a weapons disturbance.

14      Q.  Did you see any physical resistance from

15  either of -- either Mr. Gray or Mr. Thomas?

16      A.  No.  Physical resistance?  No.  Nobody --

17  nobody had put hands on him or approached him at that

18  point.

19      Q.  Did you have any indication of physical

20  resistance from them or a threat?

21      A.  The information that it was a weapons

22  disturbance and that they were noncompliant with

23  directives, even at gunpoint.

24      Q.  Can you tell me more about the specific

25  movements that you saw they exhibited resistance to you?

230

1      A.  Well, at this particular point I was only

2  really concentrating on the driver, and the -- what I

3  saw was the driver reaching around, and he was told

4  "Stop reaching around."

5      Q.  What levels of resistance in your professional

6  experience justifies the -- justifies the use of a K9?

7      A.  Well, the use or the deployment of a K9?

8      Q.  The deployment of a K9.

9      A.  That.  A weapons disturbance involving a

10  vehicle and noncompliance, absolutely.

11      Q.  What are the different types of resistance

12  according to department policy?

13      A.  Passive resistance, active resistance.  I'd

14  have to go back and look at every headline or every...

15      Q.  What's an example of passive resistance?

16      A.  Verbal noncompliance.

17      Q.  Would you say that shouting "All lives matter"

18  constitutes verbal noncompliance?

19      A.  Coupled with the fact he was be given -- given

20  a directive by a police officer, yes.

21      Q.  Does failing to immediately respond to a

22  directive by a police officer constitute passive

23  resistance?

24      A.  No.  But two minutes into it, yes.

25      Q.  At what point does it become passive

231

1    resistance?

2              MS. VINSON:  Object to form.

3       A.  It never became passive resistance.  It only

4    escalated.

5       Q.  (BY MS. LaVARCO) Is your position that

6    Mr. Thomas did not respond to instructions for a full

7    two minutes?

8       A.  I don't know what the time frame was, but I

9    know it was from well before I got there.  I don't know

10   what time I got there on scene compared to when

11   Sergeant Johnson got there.  And then again, once I got

12   there, my job was to manage the driver of the vehicle

13   and the safe -- and the security of the vehicle.

14      Q.  Is it your position that he never responded to

15   instructions before the dog was we released?

16      A.  I don't know if he never responded to any

17   instructions.  I know he got on the ground when he was

18   initially told to get on the ground.

19      Q.  What instructions specifically did he

20   non-comply with?

21      A.  "Get back in the car," "Get up" for -- for a

22   long time, it's on video what he failed to do.

23      Q.  What position was he in when you first exited

24   the car?

25              MS. VINSON:  Object to form.

232

1      A.   When he exited the car?

2      Q.   (BY MS. LaVARCO) What po -- what position was

3  Mr. Thomas in when he first exited the car?

4           MS. VINSON:  Object to form.

5      A.   That was standing, I believe.

6      Q.   (BY MS. LaVARCO) Did he have his arms --

7      A.   Maybe he was sitting when I first got -- I

8  don't know.

9      Q.   Did you review the body camera footage leading

10  up to the K9 being unleashed?

11      A.   I reviewed my bodycam video because that's what

12  seemed to be pertinent.

13      Q.   But you --

14      A.   This is all hindsight.  I don't know anything

15  about what he did, what he was feeling, what he was

16  doing to justify the use of force or deploy the dog.

17      Q.   Did Mr. Thomas have his arms up when he was

18  standing outside of the car?

19      A.   At one point he did, yes.

20      Q.   Did he ever --

21      A.   When he was yelling "Shoot me," he did.

22      Q.   Did you think that that was a threat coming

23  from Mr. Thomas?

24      A.   I think in the totality of the situation with a

25  subject who is failing to comply with directives on a

233

1  call that's been declared a weapons disturbance.

2  Noncompliance, a person failing to comply, telling a

3  police officer to shoot him, absolutely, that is going

4  to escalate things.

5       Q.  So if a suspect has their arms up and are

6  refusing to get back in a vehicle --

7       A.  That's noncompliance.

8       Q.  Is it resistance?

9       A.  It could be.  It could -- it's defined in

10  there.

11       Q.  Is it resistance in this circumstance based on

12  your review of the body camera footage?

13       A.  Yes.

14       Q.  What level of resistance is it?

15       A.  Not the passive resistance.  The next one,

16  which would be active resistance, I believe.  I'd have

17  to go back and -- and look at it, where it says verbally

18  or physically indicates that they are not going to

19  comply and be reduced to capture.

20       Q.  Did it rise to the level of aggressive or

21  assaultive resistance?

22       A.  At that point?  Not --

23       Q.  When he had his arms in the air and was not

24  complying with orders?

25       A.  No, I don't think so.  Then again, I didn't

1    have his vantage point.  So I don't know what he saw.

2       Q.  When Mr. Thomas' arms were in the air, were his

3    hands visible?

4       A.  Yes.

5       Q.  Did they appear to be empty?

6       A.  They did when I looked, when I saw.  But,

7    again, I was concentrating on the driver and the

8    vehicle.

9       Q.  At -- at any point did you see Mr. Thomas with

10   anything in his hands?

11      A.  No.

12      Q.  At any point did you see anything resembling a

13   weapon on Mr. Thomas?

14      A.  In his hands?  Because he was un-searched.  I

15   don't know if he had something on his waistband or under

16   his shirt.  I don't know.

17      Q.  Was his waistband visible?

18      A.  No, I don't believe so.

19      Q.  What sort of clothing was he wearing?

20      A.  I don't remember.  I think he had a sweatshirt

21   on, maybe.  I don't remember.  I'd have to look.

22      Q.  Did he have any objects in his hands from what

23   you could tell?

24      A.  Ma'am, I already answered that.  He did not.

25   Not that I saw.

1       Q.   Did you ever search him?

2       A.   Subsequent to his arrest he was searched.

3       Q.   Who searched him?

4       A.   I believe Sergeant Johnson pat searched him

5   quickly.

6       Q.   Did you see Sergeant Johnson pat search him?

7       A.   I believe I was standing there.  I remember

8   saying "Search him real good."  That might have been the

9   driver.  I'd -- I'd have to refresh with my footage, not

10  with someone else's footage.

11      Q.   When specifically did you see Johnson search

12  him?

13      A.   I don't remember.  Again, I -- I would need to

14  look at my footage, not his footage.

15      Q.   Was it after the dog was released?

16           MS. VINSON:  Objection, asked and answered.

17      A.   I just don't -- I don't remember.

18      Q.   (BY MS. LaVARCO) Okay.

19      A.   I don't remember if the dog was still on.  I

20  think the dog was already taken off.  The dog was not on

21  the bite for a long -- an extended period of time.

22           MS. LaVARCO:  I'm going to propose a break.

23  How much do you think?

24           MS. FRANCIS:  Ten minutes.

25           MS. LaVARCO:  Ten minutes, does that

236

 1   work --

 2                    THE WITNESS:  Yes, ma'am.

 3                    MS. LaVARCO:  -- for everyone?

 4                    THE WITNESS:  Thank you.

 5                    THE VIDEOGRAPHER:  We are going off the

 6   record.  The time is 6:10 p.m.

 7                    (Recess from 6:10 p.m. to 6:21 p.m.)

 8                    THE VIDEOGRAPHER:  We are back on the

 9   record.  The time is 6:21 p.m.

10                    THE REPORTER:  Go tell them to be quiet.

11                    THE WITNESS:  I told you as soon as we

12   start there will be noise.  So...

13                    (Exhibit 4 marked.)

14                    MS. LaVARCO:  Ms. Boothe, I dropped an

15   exhibit into our shared folder, and we've marked it as

16   Exhibit 4.

17                    Ms. Francis, can you show the exhibit to

18   Mr. Bruss.

19                    MS. FRANCIS:  The video is still loading.

20                    MS. LaVARCO:  Okay.

21                    MS. FRANCIS:  So I don't know if you want

22   to see if you can get it to upload faster.  If not, we

23   can share a copy we've already loaded.

24                    MS. LaVARCO:  Okay.

25                    MS. VESTAL:  Mine says 48 minutes.

1              MS. VINSON:  Yeah, mine's on --

2              MS. LaVARCO:  Okay.

3              MS. VINSON:  47 minutes on mine.

4              THE WITNESS:  Thank you.

5              MS. FRANCIS:  Um-hum.

6              Have him note the timestamp it's at right

7    now.

8         Q.  (BY MS. LaVARCO) Can you note the timestamp

9    it's at currently.

10        A.  19:19:19.

11        Q.  Okay.  Can you press "Play," please.

12        A.  Sure.  Is this touchscreen or no?

13              MS. FRANCIS:  No.  Just the pad on there.

14        A.  It's still spinning.  Here we go.

15              (Playing video.)

16        Q.  (BY MS. LaVARCO) This exhibit appears to be

17   your body camera footage, Mr. Bruss.

18        A.  Yes.

19        Q.  Do you agree?

20        A.  Yes.

21        Q.  Can you press "Play?"

22        A.  I did.

23              MS. VINSON:  It's --

24        A.  It's the pre-event capture.  So there's --

25        Q.  (BY MS. LaVARCO) I see.

238

1      A.  -- no audio.

2              (Playing video.)

3      Q.  (BY MS. LaVARCO) Can you jump ahead to

4   4 minutes and 6 sen -- seconds into the video?

5      A.  To 4 minutes?

6      Q.  And 6 seconds into the video, and then --

7              (Playing video.)

8      A.  So I'm just arriving.

9      Q.  (BY MS. LaVARCO) Do you see Mr. Thomas from

10  that angle --

11     A.  I'm sorry?

12     Q.  Can you pause for a moment?

13     A.  Yes.

14             (Video stopped.)

15     Q.  (BY MS. LaVARCO) That footage captures you just

16  upon arrival at the scene?

17     A.  It does.

18     Q.  Does it show a view of you looking at

19  Mr. Thomas?

20     A.  No, it doesn't.

21     Q.  Does it show --

22     A.  It shows a camera view.  It doesn't show a view

23  of me looking at it, but --

24     Q.  But your camera is directed at --

25     A.  Correct.

1    Q.  -- Mr. Thomas?

2    A.  Yeah.

3    Q.  And in the camera's view, what is Mr. Thomas

4   doing?

5    A.  He's got his hands up standing next to the car.

6    Q.  Are his hands empty?

7    A.  I -- yes, they're -- they're empty.

8    Q.  Do you see anything in his waistband?

9    A.  I can't see his waistband.  I don't have a

10  clear view, even on the camera.

11   Q.  Do you have any visual signals that he's armed?

12   A.  I --

13        MS. VINSON:  Object to form.

14   A.  Like him waving a flag, I've got a gun or

15  something, there's none of that.  It's the totality of

16  it.  And right then as soon as I push play and arrive,

17  the first thing Sergeant Johnson told me was, "Cover the

18  driver.  He's reaching.  He's not complying."

19        And for the --

20   Q.  (BY MS. LaVARCO) Can you press play again?

21   A.  -- two minutes before I got there, I don't know

22  what happened except that he was yelling, "Shoot me."

23        (Playing video.)

24   Q.  (BY MS. LaVARCO) But as soon as you arrived,

25  you did see Mr. Thomas with his arms in the air?

240

1     A.  Yes.

2             (Video stopped.)

3     A.  Yes, I can see that.  But he's standing behind

4  the car.  So I don't -- and, again, I want -- I want to

5  be clear just for the video, it's only fair.  Because

6  a -- a body-worn camera captures something, that does

7  not mean that I'm looking that way or anything like

8  that.  So the view of the camera, although we absolutely

9  love it, is not the same vantage point as what I'm

10  seeing.  I still have to concern myself with the

11  neighbors and everyone else.  So...

12            Oops.

13     Q.  Go ahead and play.

14            (Playing video.)

15     Q.  (BY MS. LaVARCO) Can you pause the video?

16            (Video stopped.)

17     Q.  (BY MS. LaVARCO) Did Mr. Thomas have his hands

18  in the air at that moment?

19     A.  He did, yes.  The driver didn't.

20     Q.  Did Mr. Thomas say anything to the driver?

21     A.  To the driver?  I -- I don't know.

22     Q.  Did you hear somebody say, "Show him your

23  hands, bro"?

24     A.  Oh, I heard something.  I don't know whether --

25  I don't know who said it.

                                                                      241

1      Q.  What timestamp did you just end it?

2      A.  19:24:05.

3      Q.  Thank you.

4           Can you show me where in the video you see

5  Mr. Thomas resisting from the vantage point of your

6  body-worn camera footage?

7      A.  I'd have to watch it all.

8      Q.  Nothing so far?

9      A.  No, nothing so far.

10     Q.  Can you play another minute of it and tell me

11 if you see any --

12          MS. VINSON:  Just the record will reflect

13 that you're hitting still frames and being directed

14 where to go.  In other words, we haven't played the

15 video.

16          THE WITNESS:  Right.

17          MS. VINSON:  Just the record to reflect

18 that we have not played the video.

19     A.  Well, we're going to a point on --

20     Q.  (BY MS. LaVARCO) I've asked whether the video

21 reflects any resistance so far, any physical resistance

22 so far?

23     A.  No.

24     Q.  And you have reviewed enough of the video to

25 determine whether that's the case?

242

1      A.  Yes.

2      Q.  Thank you.

3            Can you play another minute of the video

4  and tell me in the next minute do you see any instances

5  of resistance --

6            (Playing video.)

7      Q.  (BY MS. LaVARCO) -- from Mr. Thomas?

8            (Playing video.)

9            MS. FRANCIS:  Can you pause it?

10            THE WITNESS:  Sure.

11            (Video stopped.)

12     Q.  (BY MS. LaVARCO) At this point in the video,

13  has Mr. Gray, the driver, gotten down on the ground?

14     A.  He just did, yes.

15     Q.  Was the -- what was the timestamp that you've

16  ended at now?

17     A.  19:24:44.

18     Q.  Did Mr. Gray exhibit any physical resistance

19  before he got on the ground?

20     A.  Not physical resistance, no.  Noncompliance but

21  not physical resistance.

22     Q.  Was Mr. Thomas instructed to get on the ground

23  at this point in the video?

24     A.  Yes.

25     Q.  Did he get on the ground?

243

```
1        A.   He did after he told the sergeant to shoot him.

2        Q.   Did he have his arms out on the ground?

3        A.   He did.

4        Q.   Was he laying in a prone position?

5        A.   I mean, I -- I'm testifying as to what I'm

6   watching right now because that's not what I saw when I

7   was there.  So what I'm watching on my video, yes, he

8   was --

9        Q.   What's the --

10       A.   -- on the ground with his hands up, yes, ma'am.

11       Q.   Did you see any instance of physical resistance

12  from Mr. Thomas up until this point in this video?

13       A.   Just noncompliance, no --

14       Q.   Is that physical resistance?

15       A.   -- physical -- no physical resistance I don't

16  think.

17       Q.   Did you see him reaching for anything?  Did you

18  see Mr. Thomas reaching for anything?

19       A.   No, I don't think so.

20       Q.   Did he make any sudden movements?

21            MS. VINSON:  Object to form.

22       Q.   (BY MS. LaVARCO) Did Mr. Thomas make any sudden

23  movements up until this point in the video?

24       A.   No.

25            MS. FRANCIS:  Could we rearrange the laptop
```

244

1   so that we're all able to see it?  Maybe Shirley and I

2   could scoot down.

3               MS. LaVARCO:  Yeah.

4               MS. FRANCIS:  Just so we can make it

5   easier.

6               MS. LaVARCO:  I think so, too.

7               MS. VINSON:  Why don't we put it like this.

8               MS. LaVARCO:  Thank you.

9               MS. VINSON:  Is that -- is that good for

10  you?

11              THE WITNESS:  Sure.

12              MS. VINSON:  And I can scoot back a little.

13              MS. FRANCIS:  Shirley, can you see this?

14  Maybe should move down.

15              THE WITNESS:  She's taped.

16              MS. LaVARCO:  Yeah.

17              THE VIDEOGRAPHER:  Yeah.

18              THE WITNESS:  She can't go anywhere.

19              THE VIDEOGRAPHER:  You can -- you can put

20  that mic down, and then that center mic right there

21  will --

22              MS. LaVARCO:  This mic?

23              THE VIDEOGRAPHER:  Yes.

24              MS. LaVARCO:  Oh, okay.  Great.

25              MS. VESTAL:  Do you want me to move it?

245

1          THE VIDEOGRAPHER:  Just move -- just put it

2   in their general area.

3          MS. FRANCIS:  Thank you.

4     Q.  (BY MS. LaVARCO) Can you hit play again?

5     A.  Sure.

6          (Playing video.)

7     Q.  (BY MS. LaVARCO) Can you pause the video?

8          (Video stopped.)

9     Q.  (BY MS. LaVARCO) What's the timestamp?

10    A.  19:24:59.

11    Q.  Who was ordering people not to -- to stop

12  moving around?

13    A.  Me was ord -- was ordering --

14    Q.  Mr. Gray?

15    A.  -- Mr. Gray.  Mr. Gray.

16    Q.  Was he moving around?

17    A.  Yes, he was moving around.

18    Q.  On the ground?

19    A.  Yes.

20    Q.  In what way?

21    A.  He was moving his arms.  He had brought his

22  arms up front.  He kept lifting his head up looking

23  around.

24    Q.  Had Mr. Thomas moved?

25    A.  Again, I was concentrated on my job, which was

246

1    covering the driver and the -- and the vehicle.

2         Q.  But from what you can tell about the video?

3         A.  No.  He appears to be laying static.

4         Q.  Completely still?

5         A.  Well, I mean, he raises his head and looks

6    around.

7              MS. VINSON:  I'm going to object to -- and,

8    again, document the video is still.  So is your question

9    is he still?

10        Q.  (BY MS. LaVARCO) My question is based onto the

11   portions of the video that we've referred -- we -- we've

12   reviewed in the past few minutes, has Mr. Thomas

13   exhibited any physical resistance or moved from his

14   prone position on the ground?

15        A.  I think at one point he lifts his leg up.

16        Q.  At what point?  Can you show me?

17        A.  I -- I don't know.  I have to watch the whole

18   video.

19        Q.  Oh, but up until now you haven't seen him lift

20   his leg up?

21        A.  I -- again, I was kind of concentrating on him

22   because you were asking me questions on him, too.

23        Q.  What did you mean when you said "This is how

24   bad things happen"?

25        A.  People that are noncompliant with the police,

247

1    this is how things happen.

2         Q.   What kind of things?

3         A.   Uses of force, people running.

4         Q.   Did you think that they were going to run?

5         A.   Absolutely.  I had no reason not to think.

6         Q.   You --

7         A.   I --

8         Q.   -- didn't think that because they were prone on

9    the ground with their arms out with a K9 barking at them

10   and officers pointing their weapons at them, you thought

11   they were going to get up and run?

12        A.   We had dogs barking and guns pointed at them,

13   and your client still failed to comply with directives.

14   So I had no reason to believe that he was going to.

15        Q.   But he complied when ordered to get on the

16   ground.

17        A.   Absolutely.

18        Q.   He stayed on the -- he stayed on the ground?

19        A.   It's only fair that a police officer give them

20   warnings as to what's going to happen.  That's how I

21   operate.  That's why I have very, very, very low use of

22   force.

23        Q.   Can you hit play, please?

24             (Playing video.)

25        Q.   (BY MS. LaVARCO) Can you please focus your

                                                                    248

1   attention on Mr. Thomas as you watch this video?

2       A.  Sure.  All of that was directed towards

3   Mr. Gray.

4       Q.  Can you hit pause?

5       A.  Sure.

6               (Video stopped.)

7       Q.  (BY MS. LaVARCO) What's the timestamp we've

8   ended at?

9       A.  19:25:54.

10      Q.  Have either Mr. Thomas or Mr. Gray moved from

11  their prone position at that point?

12      A.  They moved, but they haven't moved from the

13  position.  Yeah, they haven't run.

14      Q.  Have they gotten off the ground?

15      A.  No.

16      Q.  Has Mr. Thomas moved his arms?

17      A.  Mr. Thom -- no.

18      Q.  His arms are still out to the side?

19      A.  He just moved his head.  That's all.

20      Q.  Can you hit play?

21              (Playing video.)

22      Q.  (BY MS. LaVARCO) Can you hit pause, please?

23              (Video stopped.)

24      Q.  (BY MS. LaVARCO) We ended the vid -- we stopped

25  the video at 19:26:52; correct?

                                                            249

1        A.  Correct.

2        Q.  You asked Mr. Gray to walk backwards towards

3   you so you could make an arrest?

4        A.  Correct.

5        Q.  Do you think Johnson could have done the same,

6   instructed Mr. Thomas to walk backwards towards him?

7        A.  Well --

8             MS. VINSON:  Object to speculation.

9        A.  Yeah, he could have, but he didn't.  That's

10  normally the way we train is that the person that's on

11  the right handles the person on the right.  In this case

12  the car just happened to be backwards facing us.  So --

13       Q.  (BY MS. LaVARCO) Are you --

14       A.  -- it was easier to bring the suspect to me

15  than to bring him to him because then there's a cross

16  fire, and the dog is out and all that other stuff.  This

17  was just sound police work.

18       Q.  Why not approach the vehicle from behind?

19  There are multiple officers on the scene at that point.

20       A.  That's a -- we didn't have an opportunity.  We

21  would of had to drive past the suspect vehicle.

22       Q.  You couldn't have come from the other side of

23  the street?

24       A.  That's not the way we came.  This is what we

25  got.  We don't always get to pick how -- how we arrive

250

1   on scene.  That is where we -- that's where we arrived.

2        Q.  And at this point in the video Mr. Thomas is

3   still laying prone on the ground?

4        A.  He is.

5        Q.  Arms out?

6        A.  Correct.

7        Q.  Mr. Gray is in custody at this point?

8        A.  Yes.

9        Q.  Have you had a -- your position is that you had

10  a suspicion that somebody else might have been in the

11  vehicle?

12       A.  Always.

13       Q.  Always.  Was that based on --

14       A.  Always.

15       Q.  -- any specific information that was given to

16  you?

17       A.  No.  That's based on training and experience.

18       Q.  How do you normally clear a vehicle?

19       A.  We approach the vehicle, and we clear it.

20       Q.  Why not use the dog to clear the vehicle?

21       A.  Because the dog was already engaged.

22       Q.  Did the dog have to be engaged?

23            MS. VINSON:  Object to form.

24       A.  I don't know because I wasn't where

25  Robert Johnson was.  I didn't see what Robert Johnson

251

1   saw.

2       Q.   (BY MS. LaVARCO) Do you see Mr. Thomas laying

3   prone on the ground now?

4       A.   I do.  But, again, this is hindsight, ma'am.

5   This is -- this is exactly what is -- we don't use for

6   Graham v. Connor.  We don't operate in hindsight.

7       Q.   In the video, do you see Mr. Thomas prone on

8   the ground?

9       A.   I do.

10      Q.   Was your body angled towards him?

11      A.   My body was angled towards the vehicle.  I am

12  covering vehicle.

13      Q.   Can you press play, please.

14      A.   Sure.

15              (Playing video.)

16              MS. LaVARCO:  Can you pause the video.

17              (Video stopped.)

18      Q.   (BY MS. LaVARCO) What timestamp is that?

19      A.   19:27:26.

20      Q.   What did you just see in that portion of the

21  video?

22      A.   I saw Mr. Thomas on the ground being given

23  directives.  I saw him look up.  I saw him move his left

24  leg.  I -- I heard the warnings given, and the dog was

25  deployed.  The dog was sent.

252

1    Q.  Did he appear to be complying with orders to

2  get --

3    A.  He --

4    Q.  -- off the ground?

5    A.  No.

6    Q.  Did he lift his leg on the way to get off the

7  ground?

8    A.  Sure, he lifted his leg, but I don't know it

9  was on the way to -- to get off the -- the ground.

10   Q.  Did he appear to pose a threat?

11   A.  He's posed a threat to officer safety and

12 everyone else the entire time that he was noncompliant,

13 and he's an un-searched suspect.

14   Q.  How would you know whether he was moving to get

15 off the ground?

16   A.  I would have no idea.

17   Q.  So how do you know whether somebody is

18 complying with an order to get off the ground or in the

19 process of complying with an order to get off the

20 ground?

21   A.  Because he had plenty of opportunity to get off

22 the ground, and he didn't.

23   Q.  Did he appear to be disoriented?

24   A.  No, he didn't.

25   Q.  You described -- how long is plenty of

253

1  opportunity to get off the ground?

2      A.  I don't know.  The first arriving officer has

3  been on scene, what, five minutes now, and he's still

4  not reduced to capture.

5      Q.  How --

6      A.  He has not complied at all except to lay on the

7  ground, and five minutes of a barking dog and guns

8  pointed at him.

9      Q.  Mr. Thomas up until the time he was off --

10  ordered to get to the ground was in compliance with

11  orders?

12      A.  Was in compliance with orders?

13      Q.  He was ordered to get on the ground?

14      A.  Right.

15      Q.  He stayed on the ground until the dog was

16  released; is that correct?

17      A.  Correct.  If you're taking that section of

18  the -- of the video again.

19      Q.  So are you saying the first time that he didn't

20  physically comply with orders was when he was told to

21  get off the ground?

22      A.  No.  No.  I watched video you showed had me

23  him -- telling him to get back in the car and everything

24  else and he failed --

25      Q.  From the time --

```
 1      A.  -- to comply.

 2      Q.  -- he was on the floor --

 3           MS. VINSON:  Please let him finish his

 4   answer.

 5           MS. LaVARCO:  Excuse me.

 6      Q.  (BY MS. LaVARCO) From the time he was on the

 7   floor in a prone position, between the time he was

 8   ordered to get on the floor in a prone position and the

 9   time the dog was released, did he fail to comply with

10   any order other than to stand up?

11      A.  On this video, no.  He just didn't stand up.

12      Q.  He just didn't stand up?

13      A.  Again, I didn't deploy the dog.

14      Q.  About how many seconds would you say between

15   Mr. Thomas being ordered to stand up and the dog being

16   released?

17      A.  Well, that's not fair because there was also a

18   warning given that he was going to send the dog.  So

19   that should be --

20      Q.  Can you please answer the question?

21      A.  Sure.  What -- what was your question again?

22      Q.  About -- approximately how many seconds between

23   the time Mr. Thomas was ordered to stand up from his

24   prone position and time the dog was released, how many

25   seconds passed?
```

255

1    A.  I would --

2              MS. VINSON:  Object to form.

3    A.  I would have to go back and review that.

4    Q.  (BY MS. LaVARCO) Would you say it was less than

5  a minute?

6              MS. VINSON:  Object to form.

7    A.  I believe it probably could have been less than

8  a minute.  A minute is a long time.

9    Q.  (BY MS. LaVARCO) What else could Robert Johnson

10  have done to -- to gain compliance with the order to get

11  off the ground?

12   A.  You'd have to ask Robert Johnson, ma'am.  I --

13  I cannot tell you.  You're asking me to answer for him,

14  and I don't have that hindsight, even watching the

15  video.  I don't know what Robert Johnson felt.  I don't

16  know what his experience was.

17   Q.  If it were you?

18   A.  It's -- it wasn't me.  It was not me.  And so I

19  don't have all the information to give you a valid

20  tactical plan because it wasn't me.

21   Q.  If a suspect is prone on the ground and

22  delaying compliance with an order to get up, would you

23  immediately release your K9?

24   A.  I wouldn't.  And I don't believe Robert Johnson

25  immediately released his K9 from the video you showed

 1   me.

 2       Q.  Would you release your K9 even within a minute

 3   if the suspect had not gotten off the ground?

 4       A.  If I saw something that indicated to me that

 5   this was going to be a threat.

 6       Q.  Can you please answer the question asked?

 7       A.  I did.  I don't -- I -- I'm not answering how

 8   you want me to answer.  It doesn't mean I'm not

 9   answering it.

10       Q.  In these circumstances would you have released

11   the dog at the moment that Johnson released the dog?

12       A.  I don't know.

13               MS. LaVARCO:  Okay.  I'm going to take one

14   second.

15               MS. FRANCIS:  Okay.  How much time do we

16   have, Debbie?

17               THE VIDEOGRAPHER:  58 minutes left.

18               MS. FRANCIS:  Okay.

19               MS. LaVARCO:  Okay.  Can you jump ahead

20   until the time roughly when the dog was released.

21               THE WITNESS:  Sure.

22               MS. FRANCIS:  Oh, it's this.

23               MS. LaVARCO:  It's right at this moment?

24               MS. FRANCIS:  Um-hum.

25       Q.  (BY MS. LaVARCO) Okay.  You can play.

257

1                    (Playing video.)

2                    MS. LaVARCO:  Can you pause the video.

3                    (Video stopped.)

4        Q.  (BY MS. LaVARCO) What do you see after you

5  clear the vide -- after you cleared the vehicle?

6        A.  I see the dog has apprehended him and -- and

7  Sergeant Johnson is attempting to handcuff him.

8        Q.  Did Sergeant Johnson get on Mr. Thomas' back?

9        A.  Get on his back?  I believe he straddles him,

10  but I don't -- I don't know that he was on his back.

11       Q.  Typically do you order a dog to be released --

12  do you wait until after a suspect is handcuffed to order

13  a dog to be released?

14       A.  Yes.  And for the reason that you don't want

15  the dog to have to reengage if they decide to fight

16  again.  That is the way we're trained, and it's the

17  safest way.  It's the industry standard.

18       Q.  Can you play again?

19       A.  Sure.

20                   (Playing video.)

21       Q.  (BY MS. LaVARCO) Can you pause the video?

22       A.  Sure.

23                   (Video stopped.)

24       Q.  (BY MS. LaVARCO) Is that you saying "As soon as

25  he gets the dog -- as soon as he gets you handcuffed,

258

1   he'll get the dog off of you"?

2        A.  Yes, ma'am.

3        Q.  Is that also you saying "Stop moving around"?

4        A.  Yes, ma'am.

5        Q.  In your experience and training, is it possible

6   for someone to lay perfectly still while a dog is

7   tearing at their arm?

8        A.  It is.  Better than that, the -- the problem is

9   the dogs are trained to respond to resistance.  And so

10  when a subject continues to move around, the dog thinks

11  "My job is not done."  That's just how the dogs are

12  trained.

13       Q.  Would you say it's a natural inclination to

14  struggle against a dog who's gnawing at your arm?

15            MS. VINSON:  Objection, form.

16       A.  I've never had a police dog sent on me because

17  I would comply.

18            MS. FRANCIS:  That wasn't the question.

19  Repeat the question.  I don't have any left.

20            MS. LaVARCO:  Okay.

21       Q.  (BY MS. LaVARCO) Did you take any steps to slow

22  down or stabilize the situation after Mr. Gray was in

23  handcuffs?

24       A.  Yeah, I did.

25       Q.  What did you do?

259

```
 1      A.  I told him to just relax, it was over with.  We

 2   were going to are have EMS come and check him, ██████████

     █ ██████████████████████████████████████████

 4      Q.  What about before Johnson took the dog off the

 5   bite, did you take any steps to intervene or

 6   de-escalate?

 7      A.  I told him to stop moving around.  I told him

 8   what would happen, that he needed to stop moving around.

 9      Q.  In your experience are suspects ever -- are

10   suspects able to stop moving around?

11           MS. VINSON:  Object to form.

12      A.  I mean, I've had suspects stop moving around

13   when they're instructed by the police.  I don't -- I

14   don't know what he -- I -- I can't tell you what

15   Mr. Thomas -- I can't tell you that.

16      Q.  (BY MS. LaVARCO) Have you seen suspects lay

17   perfectly still while a dog is chewing at their arm?

18      A.  Perfectly still, no.  I don't believe that

19   that's reasonable.

20      Q.  Do you think that he was able to put his hands

21   behind his back?

22      A.  Yeah, he was.  But he started rolling around

23   and moving his legs and things like that.

24      Q.  Did anyone else make any attempt to

25   de-escalate?
```

260

1          MS. VINSON:  Object to form.

2     A.  I -- I don't know.  I know that I told him what

3 to do and that the dog would be taken off him.

4     Q.  (BY MS. LaVARCO) Did you observe or hear anyone

5 attempt to de-escalate the situation?

6     A.  I don't -- after he's handcuffed you mean, or

7 during the dog bite?

8     Q.  Leading up to the dog bite.

9     A.  Oh, yeah, there was tons --

10          MS. VINSON:  Ojbect --

11    A.  -- of de-escalation.  There was tons of giving

12 verbal warnings.  That's a de-escalation.  The dog

13 barking is a de-escalation technique.

14    Q.  (BY MS. LaVARCO) Earlier when we were playing

15 Robert Johnson's body camera footage --

16    A.  Um-hum.

17    Q.  -- and he referred to somebody as -- I believe

18 he said "Get out of my way you fucking bitch," and you

19 remarked "That's Johnson."  Do you recall that?

20    A.  Yeah.  You asked -- I told you that I would be

21 able to recognize him when I heard his voice, and that

22 was the first thing he said on the video.  And so I

23 identified Robert Johnson.

24    Q.  Is that characteristic of Robert --

25 Robert Johnson to use profanity?

261

1          A.  I --

2                  MS. VINSON:  Object to form.

3          A.  I don't know.  He was in his car.  He was

4      driving.  There was nobody else around.  Was it common

5      for him to -- to use coarse language?  Occasionally he

6      did.

7          Q.  (BY MS. LaVARCO) How would you describe his

8      temperament?  Mr. Johnson, how would you describe

9      Mr. Johnson's temperament?

10         A.  You mean outside of this call?

11         Q.  How would you describe Mr. Johnson's

12     temperament generally?

13         A.  I mean, he was a firm guy.

14         Q.  Firm in what way?

15         A.  I mean, he wanted things done.  If he told

16     you -- if he told you to do something, you did it.  He

17     commanded respect.  He commanded -- he had a command

18     presence about him.

19         Q.  What happens if you didn't do what he asked?

20                 MS. VINSON:  Object to form.

21         Q.  (BY MS. LaVARCO) You said he commanded respect

22     and he expected people to do what he wanted.

23         A.  Sure.  He's a supervisor.  He's a police

24     supervisor.

25         Q.  What might the consequences be if you do not?

262

1    A.  Oh, you could have been --

2              MS. VINSON:  Object to form.

3              Hold on.  Let me finish.  You can answer.

4              Object -- object to form.

5    A.  You could have been counseled, could have been

6    written up.

7    Q.  (BY MS. LaVARCO) Would you describe Mr. Johnson

8    as patient?

9    A.  Yeah, I would describe Robert Johnson as

10   reasonable.

11   Q.  Would you describe him as emotionally stable?

12   A.  Yes.

13   Q.  Earlier we discussed the different types of

14   levels of resi -- the different levels of resistance,

15   and you named passive, active, aggressive and assaultive

16   resistance; correct?

17   A.  I believe so.

18   Q.  Do you know which of these levels is required

19   to justify the use of a K9, the deployment of a K9?

20   A.  Pulling the dog out of the car?  That's the

21   deployment.

22   Q.  What level of --

23   A.  You mean sending the dog.

24   Q.  What level of resistance is necessary to

25   justify sending a dog to bite a person?

263

1      A.  Active resistance, but also in the policy it

2  states that it is based on the totality of a situation

3  because things are ever evolving, changing and unknown.

4      Q.  So you're -- do you think Johnson was in

5  control of his dog?

6            MS. VINSON:  Object to form.

7      A.  I -- I don't know.

8      Q.  (BY MS. LaVARCO) Based on your review of the

9  body camera footage, did Johnson appear to be in his --

10  in control of his dog?

11      A.  He had physical control over his dog.

12      Q.  Did the dog appear to be complying with

13  Johnson's orders?

14      A.  I think the dog was wound up.  He was, number

15  one, being held by his collar, which shows a lot more

16  movement than it would be if he was on a leash.  So I

17  think that kind of exaggerates movements.

18            MS. VINSON:  Counsel, are we done with the

19  video?  Are you done playing it?

20            MS. LaVARCO:  No.

21            MS. VINSON:  Can we wrap this up so we can

22  all move this way (indicating)?  This is odd to all --

23            MS. FRANCIS:  We -- we need to finish.

24            MS. VINSON:  Right.  But --

25            MS. FRANCIS:  We have an hour left.  So

264

1   we'd appreciate you not wasting our remaining time.

2              MS. VINSON:  Okay.  And I'd appreciate if

3   you play the video --

4              MS. FRANCIS:  On to the next question.

5       Q.  (BY MS. LaVARCO) Does grabbing the dog by the

6   collar signal anything to the dog?

7       A.  Signal?

8              MS. VINSON:  Object to form.

9       Q.  (BY MS. LaVARCO) About whether the dog should

10  be ready to attack?

11      A.  We don't have attack dogs, ma'am.

12      Q.  About whether the dog should be ready to be

13  deployed and bite a suspect?

14      A.  I think the totality with the yelling and all

15  that other stuff indicated to the dog that, yes, there's

16  work to be done.  It put the dog in the -- in the

17  apprehension mode different than, say, you know, a

18  search for narcotics.

19      Q.  Is holding a dog by its collar more likely to

20  get it more riled up?

21      A.  No.

22      Q.  Is yanking on its collar?

23      A.  I can't answer that because there's a lot of

24  different dogs that do a lot of different things.

25      Q.  Are you trained to hold dogs by the collar

265

1  before you send them into a deployment?

2      A.  We are trained to have positive control over

3  our dogs.  There is times when things fail.  Leashes

4  fail.

5      Q.  Are you trained to hold them by the collar?

6      A.  Sure.  You can hold them by the collar.  It's

7  positive control over the dog.

8      Q.  Are you trained to hold them by the collar

9  before sending the dog to bite somebody?

10     A.  That is not the ideal way to send the dog.

11     Q.  What's the ideal way to send the dog?

12     A.  The ideal way is when you have time to a put

13  patrol harness on the dog and hook on the backside of

14  the patrol harness.  That's ideal.  We rarely run into

15  ideal circumstances.

16     Q.  Why was -- why was the patrol harness not used

17  here?

18          MS. VINSON:  Object to form.

19     A.  I have no idea.  If I had to speculate, which I

20  hate doing because that's just a guess, but there was no

21  time.

22     Q.  (BY MS. LaVARCO) Were you afraid for your life

23  during this interaction?

24     A.  I'm afraid for my life during every interaction

25  on the north side of Houston.

266

1       Q.   Why the north side of Houston?

2       A.   Because it's a rough place to work.  It's a

3   rough place to be a cop.

4       Q.   Did Mr. Thomas do anything specifically that

5   made you fear for your life?

6       A.   Again, it is not the one thing.  It is a

7   totality of things that I have to evaluate.

8       Q.   Which things made -- if --

9       A.   Noncompliance, yelling "Shoot me," yelling

10  "Kill me."  Those are all triggers.  Those are red

11  flags.  Those are things that if he was yelling in the

12  mall, you'd be calling 911.

13      Q.   Did he do -- did he have any physical

14  resistance or threats towards you that made you feel for

15  your -- fear for your life?

16      A.   No.  Other than the fact he was an unsearched

17  suspect, and I didn't know if he was armed.

18      Q.   Did you fear serious -- serious bodily harm?

19              MS. VINSON:  Object to form.

20      A.   I had a basic fear anytime we interact with

21  somebody on a weapons disturbance.  I wasn't trembling

22  and sucking my thumb.  I was acting appropriately.

23      Q.   (BY MS. LaVARCO) And why didn't you take cover

24  behind the vehicle?

25      A.   What do you mean "behind the vehicle"?  I

267

1   remained behind the vehicle until the dog was on him,

2   and then I moved up in cover of him to clear the

3   vehicle.  That's what we're trained to do.

4        Q.  Why did you holster your gun?

5        A.  Because the vehicle was cleared, and he was --

6   already had control over the suspect.

7             MS. VINSON:  Okay.  I'm going to ask

8   you-all just to move down a little bit if you're going

9   to just keep popping off questions.

10             MS. FRANCIS:  Let's play the rest of the

11  video.

12       Q.  (BY MS. LaVARCO) Okay.  Yeah, we'll play the

13  rest of the video and we'll --

14       A.  Thank you.

15       Q.  -- switch down.  Go ahead.

16             (Playing video.)

17       Q.  (BY MS. LaVARCO) Pause, please.

18             (Video stopped.)

19       Q.  (BY MS. LaVARCO) What's the timestamp?

20       A.  19:28:23.

21       Q.  Do you hear yourself and Robert Johnson

22  celebrating the dog attack?

23       A.  Nope.

24       Q.  What do you hear?

25       A.  I hear us praising a dog for doing what a dog

268

1   is trained to do.  Not attack.  Apprehend and hold the

2   suspect.

3       Q.  In what way did you praise the dog?

4       A.  Verbally.

5       Q.  With what words?

6       A.  "Good boy."  I don't know.

7       Q.  Did you cheer?  Did you say, "Whoa, good boy"?

8       A.  No.  That was --

9           MS. VINSON:  Objection, asked and answered.

10      A.  Yeah, that was Sergeant Johnson, but that is

11  the industry standard.  These dogs work for a tennis

12  ball, and they work for verbal praise.  And I can't tell

13  you whether he was praising the dog because the dog bit

14  him or because the dog released when he was told to.

15      Q.  (BY MS. LaVARCO) Why were you praising the dog?

16  You said "good boy"?

17      A.  Because the dog did a good job.

18      Q.  In what way did the dog do a good job?

19      A.  He apprehended the suspect.  The dog's job was

20  to apprehend the suspect.  That's it.

21      Q.  Why didn't you holster your weapon before

22  you --

23          MS. FRANCIS:  No, why did you.

24      Q.  (BY MS. LaVARCO) Why did you holster your

25  weapon before you checked the car?

269

1      A.  I did not.  I holstered my weapon after I said

2  that the car was clear.  At no point did I put my gun in

3  my holster before that car was clear.  You can see it on

4  the video, and you can hear me holster the weapon.  I

5  never stood over him and taunted him or any of that

6  other stuff.

7              MS. FRANCIS:  Okay.  Are we done with the

8  video?

9              MS. LaVARCO:  Yeah, I think so.

10             THE WITNESS:  Thank you.

11             THE VIDEOGRAPHER:  Please don't forget to

12  put your microphone back on.

13             MS. FRANCIS:  Yeah, put your mic on.

14             MS. LaVARCO:  Thank you.  I'm actually not

15  putting it on my shirt.

16             MS. VINSON:  You can't write me a note.

17             THE WITNESS:  No, this is a reminder for

18  me.

19             MS. FRANCIS:  How much time?

20             THE VIDEOGRAPHER:  I'd say 40 minutes.

21             MS. LaVARCO:  Okay.

22             Do you want to take a break before we use

23  the last 40 minutes?

24             MS. FRANCIS:  It's up to you.  Do you want

25  to?

270

```
 1                 MS. LaVARCO:  Yeah.

 2                 MS. FRANCIS:  Okay.

 3                 MS. LaVARCO:  Let's take a five-minute

 4   break.

 5                 MS. VINSON:  Five minutes.

 6                 Don't move, please.

 7                 THE VIDEOGRAPHER:  We're going off the --

 8                 MS. VINSON:  I want to go back on at

 9   7 o'clock.  So we're going to take a short break.

10                 THE VIDEOGRAPHER:  We're going off the

11   record.  The time is 7:01 p.m.

12                 (Recess from 7:01 p.m. to 7:15 p.m.)

13                 THE VIDEOGRAPHER:  We are back on the

14   record.  The time is 7:15 p.m.

15                 MS. VINSON:  Debbie, how much time do they

16   have left?

17                 THE REPORTER:  42 minutes.

18                 MS. VINSON:  Is that right?

19                 THE VIDEOGRAPHER:  40 -- exactly 40 right

20   now.

21                 MS. VINSON:  40.  Okay.

22                 MS. LaVARCO:  Okay.  Can we take the Jeck

23   medical records.

24                 MS. FRANCIS:  Where is that?

25                 MS. LaVARCO:  That's in the potential
```

271

1  exhibits folder -- possible exhibits folder.  I'll link

2  you to it.

3              MS. FRANCIS:  I can see to do it.

4              MS. LaVARCO:  Okay.

5              (Discussion off the record.)

6              THE WITNESS:  Are we on the record, boss?

7              THE VIDEOGRAPHER:  Yes, sir, we are.

8              MS. LaVARCO:  Can you find -- never mind.

9       Q.  (BY MS. LaVARCO) Could you have directed

10 Robert Johnson at any point to remove his dog?

11      A.  Could I have or did I?

12      Q.  Did you have the opportunity to direct

13 Mr. Johnson to take his dog off the bite?

14      A.  Sure I had an opportunity.

15      Q.  Did you have an opportunity to tell him not to

16 release the dog?

17      A.  I had an opportunity for that, too.

18      Q.  And that was after Mr. Gray was in custody that

19 the dog was released?

20      A.  Yes.

21      Q.  Did you have an opportunity to tell Johnson to

22 put the dog back in the car?

23      A.  Yes, I could have.

24      Q.  Did you have an opportunity to tell Johnson to

25 remove the dog from the bite while you were standing

272

1   over him?

2        A.  Yes.  I think I did.

3        Q.  Did you have an opportunity to tell him that

4   before Mr. Thomas was handcuffed?  I can rephrase the

5   question.

6        A.  Yeah, I --

7        Q.  Did you have an opportunity while Johnson was

8   sitting on Mr. Thomas' back while the dog was biting

9   into his arm to tell Johnson to take the dog off the

10  bite?

11       A.  Well, I -- I'm not going to answer that

12  question because it's asked in a manner that implies

13  that something was done that wasn't.  At no point did I

14  see Sergeant Johnson sitting on Mr. Thomas' back.

15       Q.  You did not see Mr. --

16       A.  I did not see that.

17       Q.  Did you use the word "straddled" before?

18       A.  Yes.  Straddle is totally different.

19       Q.  So when you saw Robert Johnson straddling

20  Mr. Thomas, did you have an opportunity to tell him to

21  release the dog from the bite?

22       A.  Sure, I had the opportunity.

23       Q.  Did you do that --

24       A.  No, I didn't.

25       Q.  -- before Mr. Thomas was handcuffed?

273

1      A.   No.  It's -- that's not proper.  It's not the

2  industry standard.  It's not how we're trained.  That's

3  not my job.

4      Q.   You're never trained to intervene or to tell

5  another officer to --

6      A.   I have a duty to --

7           MS. VINSON:  Hold on.  Let her finish her

8  question.

9           Object to form.

10     A.   I have a duty to intervene when I believe that

11  something is unlawful.  At that particular point, I

12  didn't have the hindsight of watching these videos.  And

13  even at this point, I don't believe it was unlawful.  So

14  I wouldn't stop that use of force because that officer

15  with his angle and his experience and his -- chose to

16  utilize that.

17     Q.   (BY MS. LaVARCO) Has your perspective changed

18  at all now that you've watched the body-worn camera

19  footage?

20     A.   No, it can't, because it's not fair.  I wasn't

21  in his vantage point.  I don't know what was going

22  through his head.  I don't know if he was scared.  I

23  don't know whether he saw a movement.  I don't know.  I

24  can't say any more than I can say what was in Mr. Gray's

25  head.

1    Q.  What was his vantage point?  What was Johnson's

2  vantage point?

3            MS. VINSON:  Object to form.

4    A.  It was on -- on the other side of the car.

5    Q.  (BY MS. LaVARCO) And you watched

6  Robert Johnson's body-worn camera footage; right?

7    A.  I did.

8    Q.  And what was his vantage point throughout the

9  encounter?

10           MS. VINSON:  Object to form.

11   A.  Okay.  Again, I can't answer that.  I can tell

12  you what the body camera was picking up --

13   Q.  (BY MS. LaVARCO) What was the body --

14   A.  -- but I don't what he was --

15           MS. VINSON:  Let him finish.

16   A.  -- looking --

17   Q.  (BY MS. LaVARCO) What was the body camera --

18           MS. VINSON:  You can finish your

19  question [sic].  Please let him finish his question

20  [sic].

21   A.  I don't know what -- where he was looking.  You

22  keep referring to his advantage point.  We cannot

23  confuse the difference between the camera view and the

24  deputy's vantage point.

25           MS. LaVARCO:  I'd like to enter another

                                                            275

1    exhibit, Jeck's medical records.  What exhibit number is

2    this, Brittany?

3               MS. FRANCIS:  Exhibit 5.

4               MS. LaVARCO:  Exhibit 5.

5               (Exhibit 5 marked.)

6               MS. LaVARCO:  What page is that?  Okay.

7    Are you at Page 26?

8               MS. FRANCIS:  Yeah.

9        Q.  (BY MS. LaVARCO) Earl -- earlier today you said

10   that you were never Jeck's handler?

11       A.  Correct.

12       Q.  Can I ask you to open Exhibit 5.

13       A.  Sure.

14       Q.  These appear it be Jeck's medical records.

15   Does that -- do they appear to be Jeck's medical records

16   to you?

17       A.  Sure.  Yes, they do.

18       Q.  Can you go to Page 26 of that PDF.  It's the

19   second-to-last page.

20       A.  Oh.  26?

21       Q.  Yeah, the PDF pages.

22       A.  Oh.  I got you.

23       Q.  Do you see next to the dated entry May 26,

24   2021, the words "New hander - Deputy Bruss.  New handler

25   to be contacted in regards to Jeck:  Deputy Bruss, phone

1  number (████  ██-█████

2      A.  Yes, I see that.

3      Q.  Can you explain why you're listed as Jeck's new

4  handler?

5      A.  Because I was put in charge of the K9 unit, and

6  he didn't have a handler at that time.  I never handled

7  that dog.  I never took that dog on patrol.  That dog

8  was never my partner.

9      Q.  So you were responsible for the care and

10  custody of Jeck at that time?

11      A.  At that time there was no handler for the dog.

12  So the dog had some medical issues, and I was the

13  contact.  I still am the contact for several of the

14  handlers, I get their -- I get calls from VCA when their

15  dogs are ready for shots and things like that.  But I

16  was never the handler.  I don't know why they --

17      Q.  Where --

18      A.  -- put that.

19      Q.  Where was Jeck --

20          MS. VINSON:  Okay.

21      Q.  (BY MS. LaVARCO) -- being housed?

22          MS. VINSON:  I'm going to object to any

23  more interruptions.  Please let him finish.

24          MS. LaVARCO:  I'm happy to let Mr. Bruss

25  finish.

1      Q.  (BY MS. LaVARCO) But in the interest of time, I

2  just ask, Mr. Bruss, that you try to ask only -- answer

3  only the question asked of you.

4      A.  Absolutely.

5      Q.  Thank you.

6              Was Jeck in your care at home?

7      A.  No.  Never in my house.

8      Q.  Where was Jeck being cared for?

9      A.  At that time Jeck was at J.P. Hernandez, who's

10  a deputy with Harris County K9.  He had a spare crate

11  and residence.

12     Q.  Would you say that different K9s have their own

13  temperaments?

14     A.  Absolutely they do.

15     Q.  How would you describe Jeck's temperament?

16     A.  Jeck is a sweetheart.

17     Q.  Would you say that Jeck has been -- ever been

18  aggressive in instances when he wasn't supposed to be?

19     A.  I have never --

20             MS. VINSON:  Object to form.

21     A.  -- witnessed that.

22     Q.  (BY MS. LaVARCO) I'm sorry, I didn't hear your

23  answer.

24     A.  I never witnessed that.

25     Q.  Are you aware of an instance in with -- in

278

1    which Jeck bit his K9 handler, Johnson?

2       A.   I don't know the specifics of that; but, yeah,

3    we've all been bit by our dogs.

4       Q.   Are you aware of the specific incident -- I'll

5    find it for you in the medical records.  Page 12.

6       A.   Okay.

7       Q.   Do you see at the bottom where it says "Staff

8    comment"?

9       A.   Yes.

10      Q.   What date is that?  What date does it appear to

11   be?

12      A.   22 February 2019.

13      Q.   What does the "Staff comment" say?

14      A.   "Patient presented for annual check up and

15   vaccines.  Handler warned that he has to be sedated for

16   check ups.  Jeck recently bit handler in the arm while

17   in his patrol car - did not seem to be any reason for

18   it - just latched on."

19      Q.   Are you familiar with that incident?

20      A.   I am not.

21      Q.   Are you familiar of any other instances of

22   unprovoked aggression by Jeck?

23      A.   No.  Yeah, he did nip at a new handler that he

24   was given, a female handler.

25      Q.   When was that?

279

1    A.  I don't remember when she got the dog, but it

2  was probably -- it was definitely after this, clearly.

3    Q.  Was she injured?

4    A.  Yeah, she was.

5    Q.  In what way?

6    A.  She had a scrape on her arm and -- I don't

7  remember.

8    Q.  What's her name?

9    A.  Kourtney Kuehn.

10    Q.  You can spell Kuehn?

11    A.  K-U-E-H-N.

12    Q.  Kourtney, C-O-U-R-T-N-E-Y?

13    A.  I believe it was with a K.

14    Q.  Got it.

15    A.  I think.

16    Q.  Are there Precinct One policies about what to

17  do when dogs engage in unprovoked aggression?

18    A.  Policies, unprovoked aggression?  Yeah, I'm

19  sure in the policy it talks about documentation of -- of

20  bites on citizens and such.  But Kourtney Kuehn was in

21  training when this happened, training -- K9 training

22  with the dog.

23    Q.  Is there any steps other than documentation,

24  such as follow-up training?

25    A.  Follow-up --

280

1          MS. VINSON:  Object to form.

2     A.  -- by --

3     Q.  (BY MS. LaVARCO) After a dog has engaged in an

4  unprovoked aggression, is the dog required to go to

5  additional training?

6     A.  I don't know about unprovoked aggression.

7  99 percent of the time when a handler is bit, it's a

8  handler error, not the dog's unprovoked attack.  I've

9  been bit by my dog.  I stepped on his foot.

10     Q.  Does the dog have to undergo additional

11  training after engaging in unprovoked addre --

12  aggression?

13          MS. VINSON:  Object to form.

14     A.  Yeah.  I still take exception to the unprovoked

15  aggression.  I don't -- we train weekly.  So the dogs

16  are continually trained no matter what.

17     Q.  (BY MS. LaVARCO) If a dog bites somebody when

18  they've not been ordered to bite somebody and it's not

19  part of a training exercise, is the dog required to

20  undergo additional training?

21     A.  No.  The dogs are continual training.

22     Q.  How is -- how are K9s evaluated?

23          How is the dog evaluated for its -- is the

24  K9 evaluated for its fitness after an incident of

25  unprovoked aggression?

1              MS. VINSON:  Object to form.

2       A.  I don't know because I've not had a case of

3  unprovoked aggression, period.  I'm unaware of one.  We

4  can make something up, but that's not...

5       Q.  (BY MS. LaVARCO) Are you aware of any policies

6  requiring that a dog be evaluated for its fitness after

7  it's bit somebody that it's not been ordered to bite?

8       A.  The dog is always evaluated after.  Whether

9  it's a justified bite or a bad bite, whatever you want

10  to call it, the dogs are evaluated, and then ten days

11  later, they are re-evaluated.

12       Q.  Does Precinct One have any policies about what

13  to do in the aftermath of a dog biting not pursuant to

14  orders?

15       A.  I -- no.  I'm unaware of one.

16       Q.  Okay.  Apart from Jeck's medical issues, can

17  you describe his performance issues for me?

18              MS. VINSON:  Object to form.

19       Q.  (BY MS. LaVARCO) Can you describe Jeck's

20  performance issues?

21       A.  I can't.

22              MS. VINSON:  Object to form.

23       Q.  (BY MS. LaVARCO) You can't?

24       A.  No.  He was a high-performing dog.  I wasn't

25  the trainer at the time, and I wasn't his handler.

1  Everything I saw of that dog was that he was a

2  spectacular patrol dog.

3      Q.  To your knowledge, did he have performance

4  issues?

5      A.  No.

6              (Mr. Shaw left the deposition.)

7      Q.  (BY MS. LaVARCO) I'd like to ask you about the

8  internal affairs investigation into this case.

9              MS. VINSON:  Objection, form.  Misstates

10  testimony.

11     Q.  (BY MS. LaVARCO) Was there an internal affairs

12  investigation of any kind into the deployment of K9 Jeck

13  on Mr. Thomas?

14     A.  Yes.  There was a use of force review.

15     Q.  When was that?

16     A.  Immediately following.  I don't have any part

17  of that.

18     Q.  Did Johnson have a part in it?

19     A.  Other than the reporting it, I don't believe

20  so.

21     Q.  Was there investigation after the lawsuit was

22  initiated?

23     A.  I don't know.

24     Q.  Did you speak with an internal affairs

25  investigator by the name of Eric Green -- Greenwood

1  about this case?

2      A.  I did.  Not in an official capacity.

3      Q.  What -- in what capacity?

4      A.  He called me and asked me if I remembered what

5  the passen -- or what the driver's name was, and I said

6  I didn't remember what it was --

7      Q.  Why did he --

8      A.  -- because I didn't.

9      Q.  Why did he want to know the driver's name?

10     A.  I have no idea.

11             MS. VINSON:  Object to form.

12     Q.  (BY MS. LaVARCO) What else did you talk about

13  with Greenwood?

14     A.  I think he was going to the Texans game, and

15  the conversation was brief.

16     Q.  Did you talk to any other internal investigator

17  about this case?

18     A.  No.

19     Q.  Did you see the news articles in which

20  Precinct One spokesperson, Jeff McShan, said that you

21  were cleared of any wrongdoing --

22     A.  I did.

23     Q.  -- after an investigation?

24     A.  I did see that.

25     Q.  Did anyone inform you that you were cleared?

284

1      A.  No.  I was never informed we were under

2   investigation.

3      Q.  Were you aware of Robert Johnson or anybody

4   else involved being under investigation?

5      A.  No.

6      Q.  What is your relationship like with

7   Mr. Schultz?

8              MS. VINSON:  Object to form.

9      A.  I wouldn't say we necessarily have a

10  relationship.  Professional relationship.  I mean, I've

11  never seen him off duty.  I've never been to his house.

12  He's never been to my house.

13     Q.  (BY MS. LaVARCO) How often did you work

14  together when he was with Precinct One?

15     A.  Any of his assigned shifts when our shifts

16  overlapped.  I don't remember what his days off were.

17     Q.  When was the last time you saw him before your

18  deposition today?

19     A.  Had to be a meeting at my attorney's office

20  back probably maybe three months ago.

21     Q.  Did you see him at any point after the lawsuit

22  was filed when your attorney was not present?

23     A.  Yes.  I mean, I picked him up, and he rode with

24  me to meet with our attorney.

25     Q.  When was the last time you spoke with him

Case 4:23-cv-00662  Document 58-6  Filed on 05/01/24 in TXSD  Page 286 of 345

THOMAS v
BRUSS

Eric Bruss
March 20, 2024

285

1    before this morning?

2        A.  At my attorney's office probably -- I don't

3    remember when that was.  I don't remember when my

4    meet -- when our meeting was.  But it's been a couple

5    months at least.

6        Q.  Your phone records show that you exchanged

7    texts with Mr. Schultz on November 3, 2023.  What did

8    you talk about?

9            MS. VINSON:  Don't reveal any

10   attorney-client communication, please.

11       Q.  (BY MS. LaVARCO) Was your counsel a party to

12   those text messages?  Did you have a group tex -- I'll

13   ask a new question.

14           Did you have a group text with any of your

15   counsel and Mr. Schultz?

16       A.  No.

17       Q.  So when you texted with Mr. Schultz, Ms. Vinson

18   was not a party to that communication?

19       A.  I believe it was directed to her -- or directed

20   by her for me to contact him and tell him --

21           MS. VINSON:  Object to form.

22           I mean, object to you testifying to what I

23   directed you to do.

24           THE WITNESS:  Right.

25       A.  I mean, I don't know how to answer these

286

```
 1   questions.  So...

 2        Q.  (BY MS. LaVARCO) What did you talk about with

 3   Mr. Schultz without revealing -- without revealing

 4   anything about your conversations with your attorney?

 5        A.  Well, that's impossible for me to do.

 6        Q.  So you were delivering legal advice to

 7   Mr. Schultz through your attorney?

 8        A.  It was at the direction of my attorney.

 9        Q.  You also spoke on the phone for several minutes

10   that day.  Do you know why?

11        A.  I don't.  I don't remember.  I don't remember

12   speaking to him that day.

13        Q.  Text messages you've produced in this case

14   include -- to Defendant Schultz "You lied when talking

15   to the DA, and your account was clearly contrary to the

16   video."

17             Withdrawn.  I don't want to misstate the

18   text messages.

19        A.  Yeah.

20        Q.  You are saying that "You've misblown mind.  I'm

21   trying to get" --

22        A.  Yes.

23        Q.  Yes.

24        A.  It's not even close.

25             MS. FRANCIS:  Read the whole thing.
```

287

1        Q.  (BY MS. LaVARCO) I'll read the whole thing.

2               You say to Mr. Schultz, "I have no clue.

3    It blows my mind.  Literally says we should have stopped

4    the dog.  We should have handcuffed him while the dog

5    was on the bite -- we should have handcuffed him while

6    the dog was on the bite to minimize the damage.  You

7    lied when talking to the DA, and your account was

8    clearly contrary to the video.  I'm speechless.  I have

9    a call in to her.  She said that she was going to call

10   me back."

11              You had a call in to the DA?

12       A.  No.  I had a call in to my attorney.

13       Q.  Did you speak with the DA at all?

14       A.  The DA?  No.  I never had any contact with the

15   DA in regards to this case.

16       Q.  You also texted Mr. Schultz that you suspect

17   there was some, quote, "fuckery going on."  What did you

18   mean by that?

19       A.  Exactly what I said.  I mean, just like that

20   was just taken out of context, the whole text stream was

21   talking to Mr. Schultz in regards to what the judge had

22   put out.  So I was relaying to him what the -- whatever

23   was put out by the judge.  And I didn't understand the

24   process of them only taking your account and having to

25   use what you said to move this case forward even if it

1   was false.

2        Q.   What the judge put out was fuckery?

3        A.   The whole process that I didn't understand.  I

4   didn't understand that we didn't get a part, we didn't

5   get a say in that.  At that level moving this case

6   forward into the federal system beyond that, I didn't

7   understand that they -- she could only base her opinion

8   off of the information you provided.

9        Q.   Were you aware that she referred to the

10  body-worn camera footage to form --

11       A.   To --

12       Q.   -- her opinion?

13       A.   To Robert Johnson's, not to mine.

14       Q.   Does Robert Johnson's body camera footage ever

15  capture you?

16       A.   Yes.  But it also does not capture me standing

17  over the suspect taunting him with my pistol pointed at

18  him.  And you just asked me why I holstered up my gun

19  before I even moved over there.  That never happened.

20  You knew that never happened.  You put it down in there,

21  and that was part of what the judge had to read.  That

22  was all false.  The video was there.  You had the video.

23  You chose to put false information in there.

24       Q.   Does --

25       A.   I'm just going to say what it is.

289

1   Q.  Does Robert Johnson's video show you standing

2   over -- does your body camera vid -- does the body

3   camera footage show you standing over Robert Johnson and

4   Kerry Thomas while Robert Johnson is straddling Kerry

5   Thomas' back?

6   A.  Yes.  But you wrote that I had my gun trained

7   on him, and I was taunting him.  Never happened.  Should

8   have never been included in there, and I take exception

9   to it.

10          THE WITNESS:  Ladies, just for information,

11  this has got 4 percent.  So I don't know --

12          MS. LaVARCO:  Oh, thank you.

13          THE WITNESS:  -- if you want it to die or

14  not.

15          MS. FRANCIS:  Thanks.

16   Q.  (BY MS. LaVARCO) Were you ever trained about

17  the duty to intervene specifically in the context of

18  handling K9s?

19   A.  No.

20   Q.  Were you trained about the duty of inter -- to

21  intervene in other forms of force?

22   A.  Sure.  What we went over as far as the -- the

23  use of force policy, sure.  We were specifically trained

24  not to get in the K9's way and interfere because the dog

25  would take that as an act of aggression.  That's how the

1  dogs are trained.

2          MS. LaVARCO:  How much time do we have

3  left?

4          THE VIDEOGRAPHER:  11 minutes.

5          MS. FRANCIS:  How much?

6          THE VIDEOGRAPHER:  11 minutes.

7          MS. LaVARCO:  11 minutes.

8          MS. FRANCIS:  Okay.

9          MS. VINSON:  10:59.

10          THE REPORTER:  I have a hard time

11  calculating time during the middle --

12          MS. FRANCIS:  I'm sorry.  I keep asking you

13  because you're across from me.

14      Q.  (BY MS. LaVARCO) Are you indemnified for law

15  enforcement misconduct?

16          MS. VINSON:  Object to form.

17      A.  I don't know what that means.  I -- if I

18  believe I know what you mean, I am an at-will employee.

19  I work under no contract.  I -- I'm not -- I don't

20  believe I'm indemnified at all.

21      Q.  (BY MS. LaVARCO) When a law enforcement officer

22  in Harris County gets sued and there's a settlement or

23  judgment award, who usually pays?

24          MS. VINSON:  Object to form.

25      A.  Honestly, I have no idea.  I've never been sued

291

1    in Harris County.  I couldn't tell you what happens with

2    that.

3        Q.  (BY MS. LaVARCO) When you've been sued in the

4    past, who paid?

5        A.  Texas Municipal League.  That's like an

6    insurance company for the Cities.  It was a nuisance

7    lawsuit is what I was advised.

8        Q.  Any other lawsuit in which somebody paid a

9    settlement award on your behalf?

10       A.  No.

11       Q.  Do you know anyone else at Harris County who's

12   been sued for on-the-job misconduct?

13           MS. VINSON:  Object to form.

14       A.  I -- I don't.  I don't know -- I mean, I think

15   I know people have been sued, not successfully, but I

16   don't know.

17       Q.  (BY MS. LaVARCO) Are you covered by any

18   insurance policy currently?

19       A.  No, I'm not.

20       Q.  Are you covered by any insurance policy or

21   indemnification agreement specific to this lawsuit?

22       A.  No, I'm not.

23       Q.  Can you tell me about your -- give me a moment.

24       █████ ████ ████ █ ████ ████ ██████

25   ████████ ████████

293

1　████████　█████████

2　　A.　████　$███　████　██　██████　██　███

3　　Q.　██　██████　██　██　██　█████　██　████

4　　A.　████　██　████　██　██　███████　█　███

5　███　████　██　██████　██　████

6　　Q.　██　██　████　████████　██████　██　████

7　　A.　██

8　　Q.　██████　██　█████████　██████　██　███

9　████████　██████

10　　A.　██　I　█████　████　██████　█　████　██　████

11　████　██　████████　██　██　██　██　██　████　███

12　██████　██████　████　██　██████　███　██　██

13　███　██████

14　　Q.　How do you keep a K9 under control in high --

15　in high-stress situations?

16　　　　MS. VINSON:  Object to form.

17　　A.  My K9?

18　　Q.  (BY MS. LaVARCO) How do you keep a K9 -- in

19　your training and experience, what methods does a K9

20　handler use to keep a K9 under control?

21　　　　MS. VINSON:  Object to form.

22　　A.  Positive contact (indicating) and verbal

23　commands.

24　　Q.  (BY MS. LaVARCO) Positive contact, you

25　gestured.  Can you explain what you mean?

294

1     A.  Sure.  If the dog is in a harness, I can reach

2   down and grab the dog's harness.  I can grab the dog's

3   collar.  I can grab the leash.  Some form of positive

4   control over the dog, which means your hands are

5   actually on the dog.

6     Q.  Is it ever appropriate to antagonize a K9?

7           MS. VINSON:  Object to form.

8     A.  In certain training tasks, yes, agitation of

9   the dog is appropriate.

10    Q.  (BY MS. LaVARCO) Is it appropriate in the field

11  work context?

12          MS. VINSON:  Object to form.

13    A.  You would have to describe that because some

14  people may take it as me looking down at my dog and

15  saying "Watch the bad guy, watch the bad guy" as

16  antagonizing.  It's not.

17    Q.  (BY MS. LaVARCO) Do you train your dogs to go

18  forward but not attack unless there's some kind of

19  movement?

20          MS. VINSON:  Object to form.

21    A.  We let the dog move as forward as we want the

22  dog to move while maintaining control.  Again, the dog

23  goes into an opposition reflex, which is a natural for

24  the dog.  It also assists us in making sure that the dog

25  is on target and the dog is looking at the right.

THOMAS v                                                          Eric Bruss
BRUSS                                                        March 20, 2024

295

1        Q.  (BY MS. LaVARCO) Is the dog trained -- are K9s

2   trained to respond to sudden movements by suspects?

3        A.  They are.

4             MS. VINSON:  Object to form.

5        Q.  (BY MS. LaVARCO) Are K9s trained not to attack

6   in the absence of a sudden movement?

7             MS. VINSON:  Object to form.

8        A.  Our dogs are never trained to attack.

9        Q.  (BY MS. LaVARCO) Are dogs trained to bite and

10  engage in the absence of sudden movements?

11            MS. VINSON:  Objection, form.

12       A.  Only with verbal direction.

13       Q.  (BY MS. LaVARCO) When you order a dog to remove

14  the bite, do they obee -- do they obey immediately?

15            MS. VINSON:  Object to form.

16       A.  Yeah.  I mean, that depends on the dog.  That

17  depends on the circumstances.  It just depends on a lot

18  of things.

19       Q.  (BY MS. LaVARCO) From what you saw in

20  Robert Johnson's body camera footage, did Jeck disengage

21  immediately upon being ordered?

22       A.  He did, and then he re-bit the sweat pant, or

23  the pants that he was wearing.

24       Q.  Have you ever had a dog refuse to release a

25  bite upon being ordered to do so?

296

```
1       A.  No, I've never had that.

2       Q.  Are you aware of the circumstances of

3   Robert Johnson's death?

4       A.  I am.

5       Q.  Can you tell me about them.

6               MS. VINSON:  Object to form.

7       Q.  (BY MS. LaVARCO) Are you aware that

8   Robert Johnson killed himself after confessing to child

9   sexual abuse?

10      A.  I'm aware of that.

11      Q.  Did that come as a surprise to you?

12      A.  Absolutely did.

13              MS. VINSON:  Object to form.

14      Q.  (BY MS. LaVARCO) Were there rumors in advance

15  of that?

16      A.  Absolutely not.

17      Q.  Would you have considered Robert Johnson a

18  model K9 handler?

19              MS. VINSON:  Objection, form.

20      A.  A mod -- Robert Johnson was a good K9 handler,

21  and he was a good police officer.  He was a terrible

22  person outside of work apparently, but I didn't see that

23  part of him.

24      Q.  (BY MS. LaVARCO) Didn't he use his position to

25  abuse children?
```

297

1              MS. VINSON:  Objection, form.

2      A.  I have no idea with about that.  I've never

3  heard anything like that.  I don't know where you got

4  that.

5              THE VIDEOGRAPHER:  Ms. LaVarco, you have

6  one minute remaining.

7              MS. LaVARCO:  Okay.

8              MS. VINSON:  I have shorter than that.

9              THE VIDEOGRAPHER:  Shorter than that?  I'm

10  just reading off what the camera said.

11              MS. VINSON:  Okay.

12      Q.  (BY MS. LaVARCO) Has a police dog ever bitten

13  you?

14      A.  Yes.

15      Q.  In which context?

16      A.  In a training context.

17      Q.  In any other context aside from training?

18      A.  No.

19      Q.  Not at home?

20      A.  Oh, yeah.  Yeah, I've been bitten by my dog.

21      Q.  By your police K9?

22      A.  No.  By my pet.  He had a brain tumor and he

23  had a seizure, and when he came out of the seizure, he

24  bit me.  He bit me pretty good.

25              MS. LaVARCO:  Okay.  Thank you, Mr. Bruss.

298

1            THE WITNESS:  Thank you, ladies.

2            MS. VINSON:  I have just a few questions.

3   I have to clear up some things so I'm going to ask just

4   a couple questions.

5            THE WITNESS:  Sure.

6                      EXAMINATION

7   QUESTIONS BY MS. CELENA VINSON:

8       Q.  With respect to Use of Force Reports, you said

9   there was a review of the Use of Force Report in this

10  case?

11      A.  Yes.

12      Q.  Is there always a review of the Use of Force

13  Report?

14      A.  Yes, per policy.

15      Q.  Is that the same thing as an internal affairs

16  investigation?

17      A.  No, it's not.

18      Q.  Was there any internal affairs investigation

19  done with respect to this incident?

20      A.  I was never notified of anything like that.

21      Q.  Are you aware of any internal affairs

22  investigation -- report or investigation being performed

23  related to this incident?

24      A.  No.

25            MS. LaVARCO:  We just --

299

1                    MS. VINSON:  I'll reserve -- hold on.

2                    I'll reserve the rest for trial.  And we're

3    done.

4                    MS. LaVARCO:  I just have a brief follow-up

5    to your question.

6                    MS. VINSON:  You can ask it, and he's not

7    answering it.  You've past your seven hours.

8                    MS. LaVARCO:  We are permitted to respond

9    to what you've just come up with.

10                   MS. VINSON:  I don't think so.  You've

11   exhausted all your time.  You didn't save any time for

12   rebuttal.

13                   MS. LaVARCO:  We exhausted a lot of time

14   for speaking objections that we had to coach you on.  It

15   is --

16                   MS. VINSON:  It wasn't a speaking

17   objection, Shirley.  If someone listened to that and

18   thought that was exhausting a lot of time for speaking

19   objections, you haven't done any depos.

20                       (Ms. LaVarco and Ms. Francis speaking

21                        sotto voce.)

22                   MS. VINSON:  What is your question?  Let me

23   hear it because it might clear up your concerns with the

24   motion to compel.  Is it related to the internal affairs

25   investigation?

300

```
 1                MS. LaVARCO:  It isn't.  I -- I would like

 2   for -- for Mr. Bruss to take a look at statements by

 3   Jeff McShan in the media.  I have those exhibits ready.

 4   I would like to know if that -- great.  Let's go ahead

 5   and do that.

 6                MS. VINSON:  I don't think so.  You can

 7   just ask him about, Shirley.  We're not going to wait

 8   for you to pull up an exhibit.

 9                MS. LaVARCO:  Okay.  I'll read it.

10                MS. VINSON:  Ask him a ques -- yes.

11                MS. LaVARCO:  I will read it.

12                MS. VINSON:  Perfect.

13                   (Ms. LaVarco and Ms. Francis speaking

14                    sotto voce and off the record.)

15                MS. VINSON:  All right.  We're done guys.

16   You could have asked him this the whole time.  And I

17   didn't even ask him about Jeff McShan.  So that's not

18   rebuttal to my questions.

19                MS. LaVARCO:  It is rebuttal.  I -- I --

20   Celena.

21                MS. VINSON:  What?

22                MS. LaVARCO:  I would --

23                MS. VINSON:  If you want to ask him if

24   there was an investigation --

25                MS. LaVARCO:  I don't want to ask him --
```

301

1          MS. VINSON:  -- that's what I heard.

2          MS. LaVARCO:  I don't want to ask him if

3  there was an investigation.

4                    FURTHER EXAMINATION

5  QUESTIONS BY MS. SHIRLEY LaVARCO:

6     Q.  Are you aware -- aware of Jeff -- Jeff McShan's

7  statements in the media that there was an investigation

8  conducted after the lawsuit was initiated?

9     A.  I didn't read that.  I read where he said that

10  we were cleared of any wrongdoing but nothing that they

11  had an investigation or that it was after the lawsuit,

12  nothing like that.  That's completely incorrect.

13     Q.  Did you read anything where Jeff McShan said in

14  the media that they were launching an investigation upon

15  learning of the lawsuit?

16     A.  Absolutely not.

17          MS. VINSON:  You ready?

18          MS. LaVARCO:  I think we're good.

19          THE WITNESS:  Okay.

20          MS. LaVARCO:  Thank you.

21          THE WITNESS:  Thank you.

22          THE VIDEOGRAPHER:  We are going off the

23  record.  The time is 7:59 p.m.

24

25

302

1              CHANGES AND SIGNATURE

2    WITNESS NAME:                    DATE OF DEPOSITION:

3    ERIC M. BRUSS                    MARCH 20, 2024

4

5    PAGE    LINE              CHANGE              REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

303

1        I, ERIC M. BRUSS, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted herein.

4                            _____

5                            ERIC M. BRUSS

6

7

8    THE STATE OF _____)

9    COUNTY OF    _____)

10       Before me, _____, on this day

11   personally appeared ERIC M. BRUSS, known to me (or

12   proved to me under oath or through

13   _____) (description of identity card

14   or other document) to be the person whose name is

15   subscribed to the foregoing instrument and acknowledged

16   to me that they executed the same for the purposes and

17   consideration therein expressed.

18       Given under my hand and seal of office this _____

19   day of _____, _____.

20

21                            _____

22                            NOTARY PUBLIC IN AND FOR

23                            THE STATE OF _____

24                            MY COMMISSION EXPIRES:

25                            _____

304

```
1                    UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3
    KERRY LEE THOMAS,                   *
4                                       *
                      Plaintiff,        *
5                                       *
    v.                                  * Case No. 4:23-cv-00662
6                                       *
    ERIC M. BRUSS, WAYNE SHULTZ,        *
7   and KEITH MORRIS, in his            *
    capacity as Temporary Defendant     *
8   Administrator of the Estate of      *
    Robert Johnson,                     *
9                                       *
                      Defendants.       *
10
```

```
11                    REPORTER'S CERTIFICATION
                   ORAL VIDEOTAPED DEPOSITION OF
12                         ERIC M. BRUSS
                          MARCH 20, 2024
13
```

14          I, Debbie Boothe, Certified Shorthand Reporter

15    in and for the State of Texas, hereby certify to the

16    following:

17          That the witness, ERIC M. BRUSS, was duly

18    sworn by the officer and that the transcript of the oral

19    deposition is a true record of the testimony given by

20    the witness;

21          I further certify that pursuant to FRCP Rule

22    30(f)(1) that the signature of the deponent:

23          __XX___ was requested by the deponent or a party

24    before the completion of the deposition and returned

25    within 30 days from date of receipt of the transcript.

1   If returned, the attached Changes and Signature Page

2   contains any changes and the reasons therefor;

3          _____ was not requested by the deponent or a

4   party before the completion of the deposition.

5          I further certify that I am neither attorney

6   nor counsel for, related to, nor employed by any of the

7   parties to the action in which this testimony was taken.

8   Further, I am not a relative or employee of any attorney

9   of record in this cause, nor am I financially or

10  otherwise interested in the outcome of the action.

11          Subscribed and sworn to on this the 25th

12  day of March, 2024.

13

14

15  _____

16  DEBBIE BOOTHE, CSR
    Texas CSR 4708
17  Expiration Date:  7-31-25

18

19

20

21

22

23

24

25