**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

KERRY LEE THOMAS,

                    Plaintiff,

          v.                                                    Case No. 4:23-cv-00662

ALAN ROSEN,
JAMES C. MONCRIEF,
LOFTON HARRISON,
LORI BENDER,
ERIC M. BRUSS,
WAYNE R. SCHULTZ,
KEITH MORRIS, in his capacity as
Temporary Dependent Administrator of the
Estate of Robert Johnson,
and HARRIS COUNTY,

                    Defendants.

---

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

---

**TABLE OF CONTENTS**

NATURE OF THE CASE ......................................................................... **4**

PARTIES............................................................................................... **6**

JURISDICTION AND VENUE ............................................................. **7**

STATEMENT OF FACTS ..................................................................... **8**

I. On February 22, 2021, the Deputy Defendants Attacked Mr. Thomas Without Justification and Conspired to Fabricate Evidence and Cover It Up. ........................................................... 8

    A.    Defendant Johnson Directed His Dog to Attack Mr. Thomas Without Justification. 12

    B.    Defendants Johnson, Bruss, and Schultz Unnecessarily Prolonged the K-9 Attack. 14

    C.    The Deputy Defendants, Along with Lieutenant Moncrief, Conspired to Fabricate Evidence and Cover Up Their Unconstitutional Attack. ...................................................... 17

    D.    Defendants' Excessive Force Caused Mr. Thomas to Suffer Ongoing Serious Physical, Mental, and Emotional Injuries. ......................................................... 20

II. Precinct 1 Leadership Was On Notice of Johnson's Pattern of K-9 Inflicted Excessive Force. ....................................................................................................... 22

    A.    Johnson's K-9 Utilization Reports Show His Supervisors Knew Or Should Have Known That Johnson Was Using His K-9 To Attack Community Members Without Just Cause. ....................................................................................... 23

    B.    Johnson's Crude Jokes with His Supervisor and Conversation With Defendant Schultz Suggest that Johnson's Misconduct Was No Secret or Surprise to Precinct 1 Leadership, Nor to His Fellow Deputies. ............................................................. 25

III. Precinct 1 Leadership Failed to Supervise Robert Johnson and the Rest of Its K-9 Operations, and These Failures Caused and Exacerbated Mr. Thomas's Injuries. ................. 26

    A.    Constable Alan Rosen Failed To Supervise Or to Provide For Adequate Supervision Of Robert Johnson, Causing And Exacerbating Mr. Thomas's Injuries. ............................ 26

    B.    Lieutenant James Moncrief Failed To Supervise Robert Johnson, Causing And Exacerbating Mr. Thomas's Injuries. ................................................................. 27

    C.    Assistant Chief Lofton Harrison and Captain Lori Bender Failed to Supervise Precinct 1's K-9 Operations, Causing and Exacerbating Mr. Thomas's Injuries. ............... 29

    D.    Precinct 1 Leadership Was on Notice that Johnson's K-9 Jeck and Other Precinct 1 K-9s Were Exhibiting Uncontrollable Aggression Towards Community Members. .......... 32

IV. Precinct 1 Leadership Failed to Remove K-9 Jeck from the Force Despite Serious Issues with His Performance, and This Failure Caused and Exacerbated Mr. Thomas's Injuries. .... 33

V. Harris County Custom and Policy Caused and Exacerbated The K-9 Attack on Mr. Thomas. ...................................................................................................... 37

    A. Constable Alan Rosen's Customs and Policies Caused and Exacerbated the K-9 Attack on Mr. Thomas. ........................................................................................ 37

        i. Constable Alan Rosen Has Inherent Authority To Make County Policy Concerning The Policing Functions Of Precinct 1 ..................................................................... 37

        ii. Additionally, Or In The Alternative, Harris County Has Delegated To Constable Rosen The Authority To Make Policy Concerning The Policing Functions Of Precinct 1. ....... 38

iii. Constable Rosen Knew or Should Have Known that his Policies and Customs Would Lead Deputies to Use Unconstitutionally Excessive Force During K-9 Operations. ...... 39

B. Alternatively, Harris County is Directly Responsible for the Customs and Policies that Caused and Exacerbated Mr. Thomas's Injuries. ................................................................. 44

i. As a Matter of Custom or Policy, Harris County Does Not Regulate the Use of K-9s or the Conduct of K-9 Handlers. ........................................................................................... 44

ii. Harris County Blocked Its Eight Constables' Precincts From Implementing A Unified Use of Force Policy—Despite Its Awareness that Such a Policy Was Necessary to Prevent Excessive Force Violations. ......................................................................................... 48

**CLAIMS FOR RELIEF** ...................................................................................... **51**

I. Count One: Defendant Johnson Violated Mr. Thomas's Constitutional Rights by Subjecting Him to Excessive Force in Violation of the Fourth Amendment. ............................................ 51

II. Count Two: Defendants Bruss and Schultz Violated Mr. Thomas's Constitutional Rights by Subjecting Him to Excessive Force in Violation of the Fourth Amendment. .......................... 52

III. Count Three: Defendants Johnson, Bruss, Schultz, and Moncrief Conspired to Fabricate Evidence Against Mr. Thomas to Cover Up Their Excessive Force, In Violation of Mr. Thomas's Fourteenth Amendment Right to Due Process. ....................................................... 52

IV. Count Four: By Failing to Supervise Robert Johnson and Precinct 1's K-9 Operations, Precinct 1 Leadership Caused Mr. Thomas To Be Deprived of His Fourth and Fourteenth Amendment Rights. ................................................................................................................ 53

V. Count Five: By Maintaining Policies and Customs of Acquiescence, Ratification, and Non-Regulation, Harris County Caused Mr. Thomas To Be Deprived of His Fourth Amendment Rights. ................................................................................................................................... 55

**REQUEST FOR RELIEF** ..................................................................................... **56**

## NATURE OF THE CASE

1.      Kerry Lee Thomas is a 38-year-old Black man and loving father of three girls. On February 22, 2021, Sergeant Robert Johnson ("Defendant Johnson")[1] of the Harris County Constable's Office (Precinct 1) ordered his police dog to attack Mr. Thomas while he lay prone on the ground with his hands outstretched and clearly visible.[2] Mr. Thomas made no attempt whatsoever to flee, fight back, or resist.[3] He was unarmed.

2.      Defendant Johnson unleashed K-9 Jeck, a specially trained attack dog, on Mr. Thomas. The K-9 sunk its teeth deep into the flesh of Mr. Thomas's upper arm, clamping its jaws shut and yanking repeatedly.[4] Just steps away, Defendant Eric M. Bruss and Defendant Wayne R. Schultz stood by, watching. Not only did they fail to stop Johnson, they helped him: aiming a gun on Mr. Thomas, taunting and threatening him, and lying to cover up their unjustified and unlawful conduct.

3.      After the attack, Defendant Johnson laughed and cheered.[5] He later joked to his supervisor, Lieutenant James Moncrief, that his dog was now "full" and "satisfied."

4.      Mr. Thomas continued to cry out in agony. He was in such pain that he believed his right arm had been torn off.

5.      At various points, Mr. Thomas pleaded for someone to call his mother. From the back of the ambulance, he called out for his three daughters: "My daughters! Where's my daughters? My princesses!"

---

[1]  Johnson is deceased and is sued through the personal representative for his estate, but, for ease of reference, Plaintiff refers to him as Defendant Johnson.
[2] Exhibit 1 at approximately 19:27:23. Exhibit 1 was promptly mailed to the Court on a USB drive after Plaintiff filed his Original Complaint (Doc. 1) on February 22, 2023, per the clerk's instructions. It is also available at https://bit.ly/3ZkHVlM.
[3] *Id.* from approximately 19:22:10 to 19:28:05.
[4] *Id.* beginning at approximately 19:27:24.
[5] Exhibit 1 at approximately 19:28:18.

6.     The Deputy Defendants' attack left Mr. Thomas with severe lacerations, puncture wounds, permanent scarring, persistent muscle damage, and other impairments to his right arm.[6] Even now, he continues to suffer serious and long-term mental and emotional consequences.

7.     Mr. Thomas is far from the first Black man to be brutalized in this way. Even before the proliferation of modern "K-9 units," dogs have long been used to terrorize Black people. Throughout the United States, and especially in the South, dogs were bred and groomed to maul enslaved Black people for running away or otherwise angering their enslavers.[7] Historians have drawn a straight line from this gruesome antebellum practice to the modern use of attack dogs by policing agencies like the Harris County Constable.[8]

8.     With eyes wide open to that history, Mr. Thomas brings this civil rights lawsuit against the estate of Robert Johnson, who subjected him to an unprovoked and illegal K-9 attack and then laughed about it, as well as against then-Sergeant Wayne R. Schultz and then-Deputy Eric M. Bruss, who looked on as a terror-stricken Mr. Thomas suffered, without any regard for his humanity.

9.     In addition, Mr. Thomas seeks to hold Precinct 1 leadership liable for their complicity in Johnson's violence, both as policymakers for Harris County and as the Deputy Defendants' supervisors.

10.     Specifically, Mr. Thomas seeks relief under the Ku Klux Klan Act of 1871, as amended and codified in 42 U.S.C. § 1983, against Precinct 1 Constable Alan Rosen, Assistant Chief

---

[6] For ease of reference, when referring to Bruss, Schultz, and Johnson collectively, Mr. Thomas uses the term "the Deputy Defendants," notwithstanding their respective ranks.
[7] Tyler D. Parry & Charlton W. Yingling, *Slavehounds and Abolition in the Americas*, 246 Past & Present 69, 81, 91 (2020), https://academic.oup.com/past/article/246/1/69/5722095.
[8] *See* Larry H. Spruill, *Slave Patrols, "Packs of Negro Dogs" and Policing Black Communities*, 53 Phylon 42 (2016), https://is.cuni.cz/studium/predmety/index.php?do=download&did=139755&kod=JMB215.

Lofton Harrison, Captain Lori Bender, and Lieutenant James C. Moncrief, each of whom had a hand in the constitutionally deficient policies and supervision at issue here and the power to remedy them.

11.     Mr. Thomas also seeks relief from Harris County, which has (i) a general policy and oversight role concerning the Constables' policing functions, and (ii) an express duty to ensure that County K-9s are adequately trained and "do not fall into the hands of persons who are not qualified to control them or who might misuse them."

**PARTIES**

12.     Mr. Thomas is a 38-year-old Black man and father of three teenage girls. He is a resident of the State of Texas.

13.     Defendant Robert Johnson was a sergeant with Precinct 1 of the Harris County Constable's Office, where he worked from 2013 to 2021. He joined the Constable's Office shortly after being fired from the Harris County Sheriff's Office for on-the-job sexual misconduct.[9] In May of 2021, Defendant Johnson confessed to sexually abusing multiple children, at least one of whom he reportedly drugged, in coordination with a Precinct 1 dispatcher and fellow deputy.[10] After a six-hour standoff with police, Johnson killed himself. Johnson is sued in his individual capacity, by and through the administrator of his estate, which is Johnson's successor in interest.

---

[9] Mike Glenn, *Deputies Fired Over Sexual Misconduct*, Chron (Feb. 6, 2013), https://www.chron.com/news/houston-texas/houston/article/Deputies-fired-over-sexual-misconduct-4258117.php.

[10] Jessica Wiley, *Deputy's Dying Confession Leads to Child Sex Crime Charges Against 2 Colleagues*, ABC13 (May 24, 2021), https://abc13.com/deputy-suicide-harris-county-precinct-1-sgt-accused-of-sex-assault-child-abuse-allegations/10673478/.

14.    Defendant Eric M. Bruss is a sergeant with Precinct 1 of the Harris County Constable's Office. He is a resident of the State of Texas. At the time of the events at issue in this case, he was a deputy with Precinct 1. He is sued in his individual capacity.

15.    Defendant Wayne R. Schultz is a former sergeant with Precinct 1 of the Harris County Constable's Office.[11] He is a resident of the State of Texas. He is sued in his individual capacity.

16.    Defendant Alan Rosen is the Harris County Constable for Precinct 1. He is a resident of the State of Texas. He is sued in his individual capacity with respect to Count Four and in his official capacity with respect to Count Five.

17.    Defendant Lofton Harrison is an Assistant Chief for Precinct 1. His duties include oversight of the Precinct's Patrol Division, including K-9 Operations, and its Internal Affairs Division ("IAD"). He is a resident of the State of Texas. He is sued in his individual capacity.

18.    Defendant Lori Bender is a Captain for Precinct 1, where her duties include oversight of the Precinct's Patrol Division, including K-9 Operations. She is a resident of the State of Texas. She is sued in her individual capacity.

19.    Defendant James C. Moncrief is a Lieutenant for Precinct 1. Defendant Moncrief was Johnson's direct supervisor at the time of the K-9 attack at issue. He is a resident of the State of Texas. He is sued in his individual capacity.

## JURISDICTION AND VENUE

20.    Mr. Thomas brings this action under the Fourth and Fourteenth Amendments to the United States Constitution, as authorized by 42 U.S.C. § 1983.

---

[11] At the time of the K-9 attack at issue, Defendant Schultz was a corporal at Precinct 1. Two months later, on or about April 30, 2021, he was promoted to sergeant. In 2023, Schultz was given a "general discharge" from Precinct 1, based on the outcome of an IAD investigation that revealed he kept an illegal GPS scrambler device in his patrol vehicle. Shortly thereafter, he was hired as a deputy at Constable Precinct 6, but he was asked to resign after only a week's time due to public scrutiny.

21.     The Court has jurisdiction over Mr. Thomas's claims under 28 U.S.C. § 1331 (action arising under the Constitution and federal law) and § 1343(a) (action to redress deprivation of civil rights).

22.     Venue is proper under 28 U.S.C. § 1391(b) because one or more Defendants reside in this judicial district and all Defendants are residents of Texas, or, alternatively, because a substantial part of the events or omissions giving rise to Mr. Thomas's claims occurred in this district.

## STATEMENT OF FACTS

**I.   On February 22, 2021, the Deputy Defendants Attacked Mr. Thomas Without Justification and Conspired to Fabricate Evidence and Cover It Up.**

23.     At approximately 7:15 p.m. on February 22, 2021, Defendant Johnson drove to Capstone Drive in Houston in response to a dispatch report of two men making noise outside of a home.

24.     The dispatcher stated over the radio that the caller had his weapon out. As he drove, Defendant Johnson confirmed over the radio that the homeowner—not the suspects—was armed.[12]

25.     Even before pulling up to the location, Defendant Johnson was irate. While driving through the streets, bodyworn camera footage captures him barking, "Just stop right in the middle of the fucking way, you dumb bitch."[13]

26.     Defendant Johnson was the first to arrive on the scene. Mr. Thomas and his friend, Rapheal Gray, watched Defendant Johnson's police car speed up the street towards them, then

---

[12] Exhibit 1 at approximately 19:20:31; 19:20:46.
[13] Exhibit 1 at approximately 19:19:48.

suddenly halt near them. Mr. Thomas was in the front passenger seat of a red PT Cruiser.[14] Mr. Gray was in the driver's seat.[15]

27.     Defendant Johnson exited his car and began shouting commands at them.[16]

28.     Mr. Thomas immediately exited the car.[17] He stood with his hands high in the air and empty, facing Defendant Johnson.[18]



29.     Defendant Johnson continued shouting commands as he let his attack dog out of the backseat.[19]

30.     He lifted his gun and aimed it at Mr. Thomas.[20]

---

[14] *Id.* at approximately 19:22:05.
[15] *Id.*
[16] *Id.* at approximately 19:21:55.
[17] *Id.* at approximately 19:22:10.
[18] *Id.* at approximately 19:22:10.
[19] Exhibit 1 at approximately 19:22:14.
[20] *Id.* at approximately 19:22:21.

31.      Defendants Bruss and Schultz arrived shortly after Defendant Johnson.[21] Defendant Bruss unholstered his gun and aimed it at Mr. Gray.

32.      Defendant Schultz unholstered his taser and aimed it at Mr. Thomas.

33.      Neither Mr. Thomas nor Mr. Gray had a weapon. Neither Mr. Thomas nor Mr. Gray made any attempt to run or resist.

34.      After arriving on the scene, Defendants gave a series of conflicting commands that would have been confusing to any reasonable person, let alone one facing a snarling dog and multiple armed officers, ready to shoot. Mr. Thomas nonetheless did his best to follow their orders.

35.      Defendants Bruss and Johnson commanded Mr. Thomas to get on the ground. Defendant Johnson continued aiming his gun at him.[22] Mr. Thomas asked, "Me?"[23] He then slowly lowered himself to the ground.



---

[21] Johnson arrived at approximately 7:21:55 p.m., Bruss arrived at approximately 7:23:16 p.m., and Schultz arrived at approximately 7:25:25 p.m.
[22] Exhibit 1 at approximately 19:24:33.
[23] *Id.* at approximately 19:24:33.

36.     Mr. Thomas was careful not to make any sudden movements for fear that Defendants would shoot him. He did nothing that could be credibly construed as threatening. Mr. Thomas gave no indication, verbal or nonverbal, that he intended to flee or resist arrest.

37.     Defendant Johnson nonetheless continued to rile up his panting dog, yanking Jeck's leash and cursing at Jeck.[24] He did so knowing that Jeck had a well-documented history of uncontrollable aggression.



38.     Defendant Johnson ordered K-9 Jeck at least four times to "Watch 'em!" and "Watch 'em, boy!" even as Mr. Thomas lay prone on the ground with his hands outstretched.[25]

39.     At times, Johnson struggled to control K-9 Jeck.[26]

40.     Defendant Johnson cursed at Mr. Thomas, yelling, "Put your fucking hands out to your sides, now!", "Fucking do it, fucking try me!", and "Try me, motherfucker!"[27]

---

[24] Exhibit 1 at approximately 19:23:52, 19:25:35, 19:26:41.
[25] *Id.* at approximately 19:25:10.
[26] *Id.* at approximately 19:25:35, 19:26:40–51.
[27] *Id.* at approximately 19:25:33.

41.     Mr. Thomas and Mr. Gray remained prone on the ground with their hands outstretched and empty.[28]

42.     Defendant Johnson then directed Defendant Bruss to take Mr. Gray into custody.[29] Defendant Bruss commanded Mr. Gray to stand up, face away from him, and walk backwards towards him.[30] Mr. Gray did as he was told, and another officer handcuffed him.[31]

43.     Defendant Schultz then ordered Mr. Thomas to "step up," and "do it now."[32] Defendant Schultz addressed Mr. Thomas as "you in the gray," referring to the color of Mr. Thomas's shirt.[33]

44.     Given that Mr. Thomas had, until that point, been receiving orders primarily from Defendant Johnson, it took him a few seconds to register that this command was directed at him. During those few seconds, he stayed prone on the ground, with his arms remaining outstretched and still.

**A.   Defendant Johnson Directed His Dog to Attack Mr. Thomas Without Justification.**

45.     Defendant Johnson then joined in Defendant Schultz's commands, shouting, "This is your last chance or I'm going to send the dog after you."[34] Upon hearing Defendant Johnson's voice, Mr. Thomas lifted his head from the ground.[35]

46.     Defendant Johnson released his K-9.[36]

---

[28] *Id.*
[29] Exhibit 1 at approximately 19:25:53.
[30] *Id.* at approximately 19:25:58.
[31] *Id.* at approximately 19:26:34.
[32] *Id.* at approximately 19:27:03.
[33] *Id.* at approximately 19:27:03.
[34] *Id.* at approximately 19:27:09.
[35] *Id.* at approximately 19:27:19.
[36] *Id.* at approximately 19:27:23.



47.     Defendant Johnson's dog charged at Mr. Thomas and lunged at him. It locked its jaws

on Mr. Thomas's right arm, embedding its teeth deep into his flesh and shaking it from side to

side as Mr. Thomas cried out in pain.[37]

48.     Defendant Johnson walked over to Mr. Thomas and continued to taunt him, stating,

"You think we're fucking around, don't you?"[38] He made no effort to restrain his K-9.

49.     Meanwhile, Defendant Schultz stood steps away with his Taser aimed directly at Mr.

Thomas, who was still in the dog's jaws, writhing in pain.

---

[37] Exhibit 1 at approximately 19:27:25.
[38] Exhibit 1 at approximately 19:27:27.



50.     Defendant Bruss, just a few feet away, also watched while Defendant Johnson permitted the K-9 attack to continue.

**B. Defendants Johnson, Bruss, and Schultz Unnecessarily Prolonged the K-9 Attack.**

51.     Despite the fact that Mr. Thomas had at no point given any indication he might flee or threaten any officer's safety, Defendant Johnson did not order K-9 Jeck to release the bite. Instead, Defendant Johnson climbed on top of Mr. Thomas as Jeck continued to bite down on his arm, pulling and tearing at his flesh.[39]

---

[39] Exhibit 1 beginning at approximately 19:27:30.



52.     All the while, Mr. Thomas remained as still as possible. He put his hands behind his back, as directed, so that Defendant Johnson could handcuff him.

53.     Even so, Mr. Thomas was writhing in pain because K-9 Jeck was actively gnawing on his arm. Instead of removing K-9 Jeck from the bite, Johnson deliberately stomped on Mr. Thomas's right leg as he handcuffed him.

54.     For approximately 20 seconds after the handcuffs were on, Johnson allowed K-9 Jeck to continue tearing at Mr. Thomas's arm.

55.     After approximately 43 seconds since releasing his K-9, Defendant Johnson finally began to remove Jeck from Mr. Thomas's mangled arm, but not before rubbing Jeck's neck and praising him.[40] He then allowed K-9 Jeck to lunge at Mr. Thomas and latch onto his pant leg before pulling Jeck off for good.[41]

---

[40] Exhibit 1 at approximately 19:28:06.
[41] *Id.* at approximately 19:28:13.



56.     Defendant Bruss commanded Mr. Thomas to roll over onto his stomach.[42] Mr. Thomas complied. Defendant Bruss then threatened Mr. Thomas: "You ain't seen nothing yet."[43]

57.     Defendants Johnson and Bruss immediately celebrated the attack, laughing and cheering.[44] Johnson also praised Jeck, exclaiming, "good boy!", "yeah!", and "woo-hoo!".[45]

58.     Some twenty minutes later, Defendant Johnson joked with his supervisor, Lieutenant James Moncrief, that his dog was now "full" and "satisfied."

59.     Defendant Bruss, too, made light of Mr. Thomas's suffering. When confirming the spelling of Mr. Thomas's first name, which is spelled K-E-R-R-Y (the more common spelling for men), Bruss quipped to Johnson, "I don't know, the way he's yelling it could be K-E-R-R-I" (the more common spelling for women).

60.     Neither Mr. Thomas nor Mr. Gray possessed any weapons or objects that could be mistaken for weapons. No officer ever claimed to have seen a weapon in any of their hands.

---

[42] Exhibit 1 at approximately 19:28:15.
[43] *Id.* at approximately 19:28:16.
[44] *Id.* at approximately 19:28:20.
[45] *Id.* at approximately 19:28:17.

61.     Defendants Bruss and Schultz knew or should have known that Defendant Johnson's use of force was excessive and unreasonable. Yet neither Defendant Bruss nor Defendant Schultz made any verbal or physical attempt to restrain Defendant Johnson or his K-9.[46] On the contrary, they assisted Defendant Johnson by pointing their weapons at Mr. Thomas, taunting him, and levying threats of their own.

### C. The Deputy Defendants, Along with Lieutenant Moncrief, Conspired to Fabricate Evidence and Cover Up Their Unconstitutional Attack.

62.     While Mr. Thomas continued to cry out in pain, Johnson, Bruss, and Schultz made several self-serving, false, and misleading statements designed to cover up their illegal K-9 attack, with the help of Johnson's supervisor, Lieutenant James Moncrief.

63.     Johnson falsely told Moncrief that it was "just a generic dog bite for refusal" and that Mr. Thomas was "not complying at all."

64.     In reality, Mr. Thomas did follow orders and even sought clarification from Defendants about which orders they were directing at him versus his friend.[47]

65.     Moreover, Mr. Thomas barely moved before Johnson unleashed his K-9, except to comply with Defendants' orders to lay down on the ground. At no point did Mr. Thomas give any indication that he was going to run, nor did he make any attempt to flee, fight, or resist.[48] Indeed, Mr. Thomas was lying prone on the ground with his hands outstretched when Defendant Johnson unleashed his K-9 on him.

---

[46]     Defendant     Bruss     was     also     a     trained     K-9     handler. https://m.facebook.com/Precinct1Constable/posts/2174105712665731/.

[47] *Supra* ¶¶ 28, 35.

[48] Exhibit 1 at approximately 19:24:45.

66.     For his part, Bruss admitted that he "asked communications if it was the reportee or the suspects with the gun" but falsely reported that communications "indicated it was the suspects that were armed."

67.     Defendant Johnson maintained this falsehood in a written report, stating, "While responding to the location, dispatch advised the suspects also had firearms. . . . Dispatch advised the suspects had the firearms and were inside of a maroon Chrysler."

68.     In reality, dispatch specifically stated—more than once—that it was the *reporter*, not the suspects, who was armed.[49] Defendants Johnson, Bruss, and Schultz were aware of this fact. Defendant Johnson even confirmed it over the radio while communicating with dispatch before any other officers arrived at the location.[50]

69.     Yet none of the Deputy Defendants made any mention of this fact in their written reports. Instead, Bruss downplayed the importance of assessing or investigating whether a suspect is armed before using overwhelming force. Specifically, Defendant Bruss told Defendant Johnson: "You know what, everybody's armed until we determine otherwise anyways."

70.     Moreover, in coordination with Defendants Johnson and Bruss, Defendant Schultz lied to the Harris County District Attorney's Office.

71.     Defendant Schultz told an Assistant District Attorney ("ADA") over the phone that he was hoping to secure an interference charge against Mr. Thomas, falsely claiming that Mr. Thomas was not compliant and looked like he was going to run.

---

[49] Even if dispatch *had* misinformed Defendants that Mr. Thomas was armed, it would not justify siccing an attack dog on a person who lay prostrate on the ground, with his hands outstretched and empty.

[50] Exhibit 1 at approximately 19:20:46.

72.     Johnson repeated these same lies when recounting the night's events to his supervisor.

73.     Johnson's supervisor, Lieutenant Moncrief asked, "Johnson what you got?" Johnson responded that he "pull[ed] up and dispatch said they have guns," that Mr. Thomas and Mr. Gray were "not complying at all," and that they were "both trying to walk."

74.     Johnson then told Moncrief that releasing K-9 Jeck was necessary because of Johnson's unsupported hunches that: (i) there may have been "a third person lying down [in the Chrysler] with a gun" and (ii) Mr. Thomas *may* have had a gun.

75.     Johnson did not acknowledge that dispatch had directly contradicted both of his justifications by informing him that there were only two "suspects" and that the homeowner— not the suspects—was reported to have a gun.

76.     Regarding the K-9 attack itself, Johnson told Moncrief: "I gave him my warnings and he refused to get up. So, unfortunately, it is what it is. *At least we got trespassing and interfering and all*." This commentary suggests that the Deputy Defendants were motivated to fabricate the criminal charges against Mr. Thomas as insurance against scrutiny for their unlawful K-9 attack.

77.     As a matter of Precinct 1's written policy, after a K-9 apprehension resulting in injury, Defendant Moncrief had an obligation to independently verify Johnson's accounts, as well as those of his fellow deputies, including by reviewing the Deputy Defendants' bodyworn camera footage. Defendant Moncrief either failed to conduct a meaningful review or, alternatively, chose to ratify the Deputy Defendants' obviously falsified accounts and facially excessive use of force.

78.     By contrast, the ADA rejected the interference charge.

79.     Instead, Mr. Thomas was charged only with trespassing, and that charge was ultimately dismissed.

80.     Johnson was visibly angered by the prosecutor's refusal to assist in his cover-up.

81.     When Schultz relayed the prosecutor's decision, Johnson said, "Are you fucking kidding me? . . . You told them he had to be dog bit and taken into custody and they didn't want to take shit?"

82.     Defendant Johnson then bemoaned, "Why even do our jobs anymore? Why? It's fucking ridiculous."

**D. Defendants' Excessive Force Caused Mr. Thomas to Suffer Ongoing Serious Physical, Mental, and Emotional Injuries.**

83.     Defendants' conduct led Mr. Thomas to suffer severe and continuing harm, including, but not limited to, medical expenses, lost earnings, loss of future earning capacity, physical pain and suffering, temporary and permanent physical and emotional impairments, mental anguish and emotional distress, fear, humiliation, and loss of enjoyment of life.

84.     Mr. Thomas suffered excruciating pain from the K-9 attack. He was in such agony that he believed his arm had been torn off. He had to be repeatedly assured by medical personnel that his arm remained attached to his body.



85.     Defendants needlessly aggravated Mr. Thomas's pain by tightly handcuffing him with his hands behind his back for approximately thirty minutes after the attack, in such a position that medical personnel struggled to transport him from the ground to an ambulance and attend to his urgent medical needs.

86.     Only after medical personnel alerted Defendant Bruss that they could not check Mr. Thomas's vitals with his hands cuffed behind his back did Bruss authorize adjusting the handcuffs so that Mr. Thomas could keep his arms in front of him.

87.     On the way to the hospital, Mr. Thomas was convulsing in pain and struggling to breathe, to the point where medical personnel needed to lift an oxygen pump to his mouth and, later, intubate him.

88.     At the time of the attack, Mr. Thomas was wearing a basketball jersey that carried great sentimental value to him. His nephew had given it to him as a gift. After the attack, not only was the jersey soaked in Mr. Thomas's blood and shredded by the K-9's teeth, but it also had to be cut from his body so that medical personnel could tend to his wounds. It was destroyed.

89.     Mr. Thomas suffered severe physical injuries, including lacerations, puncture wounds, permanent scarring, persistent muscle damage, and other impairments to his right arm.

90.     After the attack, Mr. Thomas was unable to provide for his three daughters. As a right-handed person, the injuries handicapped Mr. Thomas's use of his dominant arm. He tried returning to construction work, but his injuries were too much of a barrier to participate beyond smaller, minimally demanding tasks, such as passing tools to other workers.

91.     Because of the attack, Mr. Thomas also suffered severe emotional distress that has had a lasting psychological impact.

92.     Mr. Thomas continues to suffer severe emotional consequences. He is still tormented by nightmares about Defendant Johnson and the attack dog. He experiences heightened levels of anxiety, depression, and post-traumatic stress.

93.     Mr. Thomas now lives in fear of the police, knowing that at any moment he could encounter another police officer who will treat him like Defendants Johnson, Bruss, or Schultz did, and that, if he does, there is nothing he can do to save himself from being held at gunpoint, brutalized, and perhaps even killed.

## II.     Precinct 1 Leadership Was on Notice of Johnson's Pattern of K-9 Inflicted Excessive Force.

94.     Robert Johnson was known by his supervisors and his fellow officers to use his K-9 recklessly and gratuitously.

95.     This is evidenced by numerous occasions in which Johnson filed incident reports with indicia of serious misconduct, often recounting excessive force against Black and Brown community members. These reports contained boilerplate recitations of Johnson's purported hunches about weapons or other contraband without supporting facts, and without indicating the basis for the stop in the first place.

96.     On multiple occasions, Johnson unleashed his K-9 on people of color who were intoxicated or otherwise incapacitated; who were suspected, at most, of minor violations or offenses; and who were not resisting arrest.

97.     Moreover, Johnson's conversations with Defendants Bruss, Schultz, and Moncrief on February 22, 2021, make clear that this was not an unusual K-9 deployment for him. In fact, he felt Mr. Thomas's pain was a laughing matter, as did Defendants Moncrief and Bruss.[51]

---

[51] *See supra* ¶ 59 (describing Bruss's crude joke about the spelling of Mr. Thomas's name).

**A. Johnson's K-9 Utilization Reports Show His Supervisors Knew or Should Have Known That Johnson Was Using His K-9 to Attack Community Members Without Just Cause.**

98.     Each time a K-9 is brought to a scene, officers must submit a K-9 utilization report, explaining the circumstances and documenting any use of force.

99.     Johnson's K-9 utilization reports reveal a pattern of unconstitutional conduct, which should have put his supervisors on notice that he required further training, supervision, and discipline.

100.    Johnson frequently used his K-9 to initiate traffic stops without legal justification.

101.    Johnson would then subject motorists to illegal K-9 searches, based solely on an unsupported "belief" that "there may possibly be narcotics inside of the vehicle."

102.    Often, these searches failed to yield any contraband at all and only rarely did they yield anything constituting a legal basis for an arrest.

103.    On one occasion, in 2019, Johnson ordered K-9 Jeck to bite a Black man who was reportedly intoxicated by PCP, leaving the man with lacerations to his right forearm and shoulder.

104.    There was no indication that the man had committed an arrestable offense, let alone that he was violent or threatening in any way. Nor was there any indication that the man was armed.

105.    This self-reported use of K-9 Jeck as a "compliance tool" on a person who posed no threat should have alerted his supervisors to the need for further training, discipline, or other corrective action. Despite their awareness of this need, Johnson's supervisors took no corrective action.

106.   On at least one other occasion, a lieutenant on scene was forced to intervene when Johnson attempted to use his K-9 to attack a community member without just cause.[52]

107.   In May 2018, Johnson assisted with a DWI stop of a Hispanic woman.

108.   When the woman did not respond to a command to exit her vehicle, Johnson attempted to unleash his K-9 on her.

109.   There was no indication that the woman was armed, that there were others in the vehicle with her, or that the woman was otherwise dangerous.

110.   Johnson did not report the use of any de-escalation tactics, nor did he engage with the possibility that the woman did not understand his commands due to a language barrier or because she was intoxicated.

111.   This was yet another failure by Defendant Johnson to consider less violent alternatives to K-9 apprehension and to use only that force that is proportional and necessary.

112.   In this case, the person stopped was fortunate that there was a lieutenant on scene who chose to intervene and prevent Johnson from carrying out an unlawful K-9 attack.

113.   However, the same cannot be said for Mr. Thomas, who suffered the consequences of both Johnson's violence and Precinct 1's failings, as detailed in Section III.

114.   Both before and after Lieutenant Hubert's intervention, Johnson's supervisors were aware that Johnson required further training, discipline, and supervision. But they took no corrective action.

---

[52] The Lieutenant was Dale Hubert.

**B. Johnson's Crude Jokes with His Supervisor and Conversation With Defendant Schultz Suggest That Johnson's Misconduct Was No Secret or Surprise to Precinct 1 Leadership, Nor to His Fellow Deputies.**

115.    Shortly after unleashing his K-9 on Mr. Thomas, while he was still on the scene, Johnson called his supervisor, Lieutenant James Moncrief.

116.    While on the phone with Moncrief, Johnson described the attack as "just a generic dog bite for refusal," suggesting that the attack on Mr. Thomas was a routine occurrence for both Johnson and Moncrief.

117.    Later that evening, the two laughed and joked about the attack.

118.    Specifically, when Moncrief asked Johnson how his dog was doing, Johnson responded that his K-9 was "full…and satisfied"—referring to the fact that K-9 Jeck had torn the flesh out of Mr. Thomas's right arm.

119.    Moncrief chuckled in amusement.[53] Steps away, Mr. Thomas cried out in pain.



---

[53] In response to a subpoena, Harris County asserted that neither the County nor Precinct 1 possess bodyworn camera footage for Defendant Moncrief from the night at issue. However, Mr. Thomas was able to infer that the officer joking with Johnson was Moncrief by first ruling out all other possibilities. Johnson made his "full and satisfied" joke at 7:52 p.m., just four minutes after Moncrief arrived on scene. There were only four other officers on scene, whether before, during, or after the encounter: Eric Bruss, Wayne Schultz, Asli Tuzun, and Nathaniel Vital, each of whom Plaintiff was able to rule out based on a review of their bodyworn camera footage. Thus, the officer joking with Johnson could only have been Moncrief.

120.    That same evening, Defendant Schultz told Johnson: "There's nothing I can do when you're like that, because I know your dog's going to go after me and I was just letting you do your thing."

121.    These exchanges suggest that Johnson's history of misconduct involving his K-9 was no secret to his fellow deputies, nor to Precinct 1 leadership.

### III.    Precinct 1 Leadership Failed to Supervise Robert Johnson and the Rest of Its K-9 Operations, and These Failures Caused and Exacerbated Mr. Thomas's Injuries.

122.    Precinct 1 leadership failed to supervise Robert Johnson—despite being on notice of Johnson's routine misuse of his K-9 to violate community members' constitutional rights.

123.    This failure to supervise Johnson caused and exacerbated Mr. Thomas's injuries.

### A.    Constable Alan Rosen Failed to Supervise or Provide for Adequate Supervision of Robert Johnson, Causing and Exacerbating Mr. Thomas's Injuries.

124.    In February of 2013, Robert Johnson was fired from his job as a deputy with the Harris County Sheriff's Office ("HCSO") for on-the-job sexual misconduct involving a participant in the Citizen's Police Academy.

125.    Johnson's wrongdoing was uncovered only after an internal affairs investigation.

126.    Just six months after Johnson was fired from the Sheriff's Office for conduct evincing a lack of sound judgment and professionalism—some of the very same qualities that are essential to K-9 Operations—Constable Rosen hired him as a deputy for Precinct 1.

127.    According to news reports, Johnson later confessed to using his position at Precinct 1 to sexually abuse children, at least one of whom he reportedly drugged.

128.    Shortly after confessing, Johnson took his own life during a standoff with another police agency.

129.    Speaking at a press conference following Johnson's dying confession, Rosen said he hired Johnson with full knowledge of his disciplinary history because he wanted to give him a "second chance."[54]

130.    Given his awareness of Johnson's history, Constable Rosen knew or should have known that Johnson did not possess the maturity, sound judgment, or professionalism necessary to be a K-9 handler.

131.    Indeed, Precinct 1's written K-9 policy emphasizes that a K-9 handler must possess "strong character traits" including, "maturity," "patience," "dependability," and "emotional stability," none of which are compatible with the findings of HCSO's internal affairs investigation into Johnson's misconduct.

132.    However, Rosen did not intervene to prevent Johnson's assignment to the Precinct's K-9 Operations, nor did he arrange for adequate supervision of Johnson once he was assigned there to ensure he was carrying out his duties in a responsible and constitutionally compliant manner.

133.    Constable Rosen's failure to supervise Robert Johnson and the Precinct's K-9 Operations caused and exacerbated Mr. Thomas's injuries.

   **B. Lieutenant James Moncrief Failed to Supervise Robert Johnson, Causing and Exacerbating Mr. Thomas's Injuries.**

134.    Lieutenant James Moncrief, Robert Johnson's direct supervisor, was on notice of Johnson's routine civil rights violations involving K-9 Jeck, but failed to supervise Johnson, discipline him, or institute other corrective action.

135.    Lieutenant James Moncrief is the K-9 Lieutenant for Precinct 1. He was also Robert Johnson's direct supervisor.

---

[54] Wiley, *Deputy's Dying Confession* (May 24, 2021).

136.   As Johnson's supervisor, Lieutenant Moncrief was responsible for reviewing Johnson's K-9 utilization reports.

137.   He was also responsible for reviewing Johnson's bodyworn camera footage and incident reports for each of Johnson's K-9 deployments, to ensure compliance with Precinct policy and constitutional standards.

138.   As a matter of written policy, these reviews were mandated on at least a monthly basis.

139.   As a matter of written policy, Defendant Moncrief was immediately notified and called to the scene each time Johnson's K-9 injured a community member.

140.   Before Johnson unleashed his K-9 on Mr. Thomas, Defendant Moncrief either knew or should have known that Johnson was regularly using his K-9 to violate community members' Fourth Amendment rights.

141.   Johnson's choice of words when he described the attack to Moncrief—"just a generic dog bite for refusal"—suggests that this was a routine occurrence for both Johnson and his supervisor.

142.   Indeed, Moncrief later laughed in amusement as Johnson joked that his dog was "full" and "satisfied," shortly after Johnson's K-9 tore the flesh from Mr. Thomas's right arm.

143.   Even the most cursory review of Johnson's bodyworn camera footage would have led any reasonable supervisor to conclude that Johnson used excessive force when he sicced his K-9 on Mr. Thomas.

144.   However, Moncrief did not refer the matter to internal affairs for investigation, nor did he institute other corrective action—such as disciplining Johnson or removing him from K-9 patrol duties. Instead, on information and belief, Moncrief rubber stamped Johnson's written reports to help cover up his misconduct.

145.    On information and belief, this was not the first time Moncrief failed to: (i) meaningfully review Johnson's K-9 deployment records for compliance with the Precinct's policies and constitutional standards, or (ii) take corrective action after learning Johnson had misused his K-9 or committed an excessive force violation.

146.    Defendant Moncrief's failure to supervise Robert Johnson caused and exacerbated Mr. Thomas's injuries.

147.    Had Moncrief taken action to address Johnson's routine misconduct, Mr. Thomas would not have suffered the gruesome attack at issue here.

148.    In addition, or alternatively, had Moncrief investigated prior indications of Johnson's possible misconduct, Mr. Thomas would not have suffered the gruesome attack at issue here.

### C. Assistant Chief Lofton Harrison and Captain Lori Bender Failed to Supervise Precinct 1's K-9 Operations, Causing and Exacerbating Mr. Thomas's Injuries.

149.    Assistant Chief Lofton Harrison and Captain Lori Bender failed to supervise Lieutenant Moncrief, Robert Johnson, and the rest of Precinct 1's K-9 Operations.

150.    Chief Harrison is the Division Commander for Precinct 1's Patrol Division, which includes K-9 Operations, as well as its Internal Affairs Division. Notably, despite Precinct 1's statements to the media that "Bruss and the other officers were cleared of any wrongdoing after an investigation," Precinct 1 never produced a case file or investigative report from IAD and has asserted that no such records exist.

151.    Captain Bender manages, supervises, and coordinates the day-to-day activities of Precinct 1's Patrol Division, including K-9 Operations. She reports directly to Chief Harrison.

152.    Chief Harrison and Captain Bender are responsible for ensuring each K-9 unit is appropriately trained and fit to carry out their patrol duties in a constitutionally compliant manner.

153.    This includes, among other things, reviewing K-9 deployment records and incorporating them into an annual evaluation for each K-9 unit.

154.    At the time that Johnson attacked Mr. Thomas, Chief Harrison and Captain Bender either knew or should have known that Johnson was using his K-9 to violate community members' Fourth Amendment rights.

155.    Furthermore, Chief Harrison and Captain Bender either knew or should have known that Lieutenant Moncrief was failing to supervise Johnson in his K-9 duties and failing to institute corrective action when Johnson departed from Precinct policy or constitutional standards.

156.    Indeed, Precinct 1's written K-9 policy required Lieutenant Moncrief to report regularly to Chief Harrison and his entire chain of command, including Captain Bender, to keep them informed of all events and information affecting K-9 Operations. This oversight was mandated, at least on paper, through, *inter alia*, maintenance of a K-9 database system; inspection and review of any K-9 related incident reports and deployment records; regular statistical reporting on K-9 operations; and investigation and inquiries into conformance with Precinct 1 policy and procedures. Precinct 1's written use of force policy also required supervisors to forward all use of force reports involving K-9s to Chief Harrison.

157.    However, on information and belief, there were significant gaps and inaccuracies in Defendant Moncrief's reporting on K-9 Operations, as evidenced by, *inter alia*, the absence of many of the mandated reports from Precinct 1's document productions over the course of discovery.

158.    Defendants Harrison and Bender never remedied Defendant Moncrief's oversight failures, nor did they remedy Johnson's pattern of constitutional violations by, for example, reprimanding, disciplining, retraining, or removing Johnson from K-9 Operations or patrol

duties. These failures, individually and in tandem, caused and exacerbated Mr. Thomas's injuries.

159.   Alternatively, Defendant Moncrief's reporting on K-9 Operations was complete and accurate, and thus put Defendants Harrison and Bender on notice of the risk that Johnson was routinely using his K-9 to violate community members' Fourth Amendment rights. However, Defendants Harrison and Bender did not remedy Johnson's violations, by, for example, reprimanding, disciplining, retraining, or removing Johnson from K-9 Operations or patrol duties. Nor did they remedy Defendant Moncrief's failure to adequately supervise Johnson to prevent him from using his K-9 to violate community members' Fourth Amendment rights.

160.   If there were significant gaps and inaccuracies in Lieutenant Moncrief's reporting on K-9 Operations, then it was the responsibility of Defendants Harrison and Bender to remedy these oversight failures to prevent constitutional violations to Mr. Thomas and other community members. Alternatively, if Defendant Moncrief's reporting on K-9 Operations was complete and accurate, Defendants Harrison and Bender should have recognized and remedied Johnson's pattern of constitutional violations.

161.   These failings by Defendants Harrison and Bender caused and exacerbated Mr. Thomas's injuries.

162.   Had Precinct 1 leadership taken action to address Defendant Moncrief's inadequate supervision and Johnson's routine misconduct, Mr. Thomas would not have suffered the gruesome attack at issue here.

**D. Precinct 1 Leadership Was on Notice that Johnson's K-9 Jeck and Other Precinct 1 K-9s Were Exhibiting Uncontrollable Aggression Towards Community Members.**

163.     On the night that K-9 Jeck mauled Mr. Thomas, Jeck was visibly agitated. Johnson struggled to control him.[55]

164.     Indeed, shortly after the attack, Schultz told Johnson, "There's nothing I can do when you're like that, because I know your dog's gonna go after me and I was just letting you do your thing."

165.     Jeck's uncontrollable aggression was not new. Two years prior, Johnson reported to Jeck's veterinarian that Jeck attacked Johnson by "latching on" to his arm without provocation.

166.     This pattern of uncontrolled aggression did not end with Mr. Thomas. Harris County records reveal that six months after attacking Mr. Thomas, K-9 Jeck bit another deputy on her arm and hand.

167.     Moreover, Johnson regularly unleashed Jeck on police subjects with little or no justification beyond allegations that they were evading arrest—an indicator that there was no underlying crime or independent basis to pursue them in the first place and that Johnson and his K-9 were out of control.

168.     Similarly, animal control records reveal multiple instances in which Precinct 1 deputies, including Johnson, ordered their K-9s to bite a community member without apparent legal justification.

169.     For years, Jeck regularly had to be muzzled and sedated during visits to the veterinarian because neither Johnson nor the veterinary staff could control his aggression.

---

[55] *Supra* ¶ 39.

170.    On information and belief, Jeck is not the only Precinct 1 K-9 to have exhibited a lack of control.

171.    Defendant Schultz—who had been employed by Precinct 1 for approximately three years and employed by other Harris County policing agencies for the better part of two decades—has himself encountered multiple instances of uncontrolled K-9 aggression. In one instance, Defendant Schultz saw a K-9 bite a deputy's groin area, just missing her femoral artery; in another instance, he saw a K-9 bite a deputy's genital area; and in a third instance, he saw a K-9 attack an innocent bystander without provocation.

## IV.    Precinct 1 Leadership Failed to Remove K-9 Jeck from the Force Despite Serious Issues with His Performance, and This Failure Caused and Exacerbated Mr. Thomas's Injuries.

172.    Precinct 1 leadership failed to supervise Precinct 1's K-9 Operations and failed to remove K-9 Jeck from patrol duties—despite Jeck's history of uncontrolled aggression and other documented performance issues.

173.    In September 2017, Constable Alan Rosen requested that the Harris County Commissioners' Court approve the donation of K-9 Jeck from a third party entity: K9s4COPs.

174.    The Commissioners' Court approved the donation unanimously on October 10, 2017.

175.    On information and belief, Constable Rosen made this request without meaningful inquiry into Jeck's training, certifications, and fitness to assist deputies with their patrol duties in a constitutionally compliant manner.

176.    Alternatively, Constable Rosen was on notice that K-9 Jeck had performance issues, but failed to notify the Commissioners' Court when he requested that the donation be approved.

177.    On information and belief, Chief Harrison and Captain Bender also failed to make a meaningful inquiry into Jeck's training, certifications, and fitness to assist deputies with their patrol duties in a constitutionally compliant manner.

178.    Alternatively, Chief Harrison and Captain Bender were on notice that K-9 Jeck had performance issues, but failed to notify Constable Rosen or the Commissioners' Court before Rosen requested that the donation be approved.

179.    Records show that Precinct 1 took physical possession of K-9 Jeck at least as early as August 2017—a month before requesting County approval and two months before it was granted.

180.    Indeed, on information and belief, Precinct 1 may have taken physical possession of Jeck as early as January 2017—eight months prior to requesting County approval.[56]

181.    Jeck's veterinary records show that by August 2017 Jeck had already been assigned to Robert Johnson and already had serious performance issues. Jeck was "biting down but letting go and biting in the same spot repeatedly." Veterinary records note that "this is not normal for a biting dog in training" and suggest that it may have been a medical issue with the dog's jaw or teeth.

182.    Later records suggest that the issue may have been caused by untreated anxiety that only worsened with time, perhaps exacerbated by his experience working with a highly reactive handler like Defendant Johnson. By April 2023, Jeck was "constantly pacing in his kennel" and had "worn down" his teeth by chewing at the bars and flooring.

183.    Jeck's performance and behavioral issues only worsened with time.  Jeck's veterinary chart is full of notations like "aggressive," "very aggressive," and "will bite," sometimes accompanied by the warning symbol: "⚠"

---

[56] Precinct 1 records clearly show Jeck was in the Precinct's possession by August 2017, when Robert Johnson reported training and performance issues to Jeck's veterinarian. County records also show that Jeck received certain tests and vaccinations in January 2017, but it is unclear whether Jeck was in the Precinct's possession at that time, or if the January 2017 records were transferred from Jeck's prior custodian (which is, presumably, K9s4COPs).

184.   On February 22, 2019, Johnson reported that Jeck had recently bitten him without warning. According to Johnson, there "did not seem to be any reason for it" and Jeck "just latched on." Jeck had to be sedated for his veterinary exam that day.

185.   On October 30, 2019, veterinary technicians were unable to properly examine Jeck's mouth because he was "aggressive" and needed to be muzzled. He was then sedated—again—to allow for the examination.

186.   On February 10, 2021—just 12 days before he was unleashed on a prone Mr. Thomas—Jeck was again "aggressive" during his veterinary exam. Again, the technician was unable to examine Jeck's mouth because he had to be muzzled. He was sedated yet again to allow for an examination.

187.   On March 4 and March 5, 2021, veterinary technicians again reported that Jeck was "aggressive" and "very aggressive." Each time he required sedation.

188.   Even those outside of Precinct 1's K-9 Operations were aware of Jeck's issues.

189.   Shortly after Johnson unleashed his K-9 on Mr. Thomas, Defendant Schultz, who was not a K-9 handler, told Johnson: "There's nothing I can do when you're like that, because I know your dog's going to go after me and I was just letting you do your thing."

190.   Precinct 1 leadership—including Constable Rosen, Chief Harrison, Captain Bender, and Lieutenant Moncrief—knew or should have known about Jeck's well-documented performance issues and history of uncontrolled aggression, dating back to at least August 2017.

191.   Despite this known risk to the public, Precinct 1 leadership failed to institute corrective action or remove Jeck from patrol duties, even though Precinct 1's written policy expressly provides that any supervisor has the authority to remove a K-9 from active duty.

192.    It was not until shortly after Mr. Thomas filed this lawsuit that Precinct 1 leadership finally removed K-9 Jeck from the force—on the recommendation of Defendant Bruss, no less.

193.    In a letter dated March 30, 2023, and addressed to Lieutenant Moncrief, Defendant Bruss wrote that K-9 Jeck had "experienced significant tooth loss which could affect his performance" and was unable to maintain a bite during training exercises.

194.    Defendant Bruss also wrote, "As you are aware, K-9 'Jeck' has been in hiatus for approximately the last 9 months," but did not elaborate. Bruss recommended that Jeck be retired and not returned to active duty.

195.    On April 6, 2023, Lieutenant Moncrief passed on Bruss's recommendation to Captain Bender, Chief Harrison, and Constable Rosen.

196.    Moncrief stressed that Jeck should be retired due to "health issues that has [sic] affected his performance."

197.    Constable Rosen approved the request on April 13, 2023.

198.    A few weeks later, the Commissioners' Court voted to authorize the agreement to remove Jeck from the force and transfer him to the custody of Mission K9 Rescue, a third party entity.

199.    Had Precinct 1 leadership acted sooner to address K-9 Jeck's performance issues and uncontrollable aggression—issues that they either knew or should have known about—Mr. Thomas would not have suffered the gruesome attack at issue here.

200.    In other words, Precinct 1 leadership's acts and omissions caused and exacerbated Mr. Thomas's injuries.

**V.    Harris County Custom and Policy Caused and Exacerbated the K-9 Attack on Mr. Thomas.**

201.    Through its deficient policies and customs regarding K-9s, the use of force, and the duty to intervene, Harris County caused and exacerbated the unlawful K-9 attack on Mr. Thomas.

202.    The County is responsible for its deficient policies and customs in one of two ways: either directly, through the acts and omissions of the Commissioners' Court, or indirectly, through the acts and omissions of Constable Alan Rosen.

**A.  Constable Alan Rosen's Customs and Policies Caused and Exacerbated the K-9 Attack on Mr. Thomas.**

203.    As Head Constable of Precinct 1, Alan Rosen is directly responsible for setting policing policy that is binding on Precinct 1 deputies.

204.    Constable Rosen acts as a final policymaker for Harris County regarding Precinct 1's policing functions, whether as a matter of inherent or delegated authority.

205.    Constable Rosen knew or should have known that his policies and customs would lead deputies to use unconstitutionally excessive force during K-9 patrol operations.

**i.    Constable Alan Rosen Has Inherent Authority to Make County Policy Concerning the Policing Functions of Precinct 1.**

206.    Constable Rosen has inherent authority, as conferred on him by the Texas Constitution and Legislature, to set County policy concerning the policing functions of Precinct 1 and its deputies.

207.    By adopting and maintaining policies and customs governing the use of force, the duty to intervene, and the acquisition and use of K-9s, Constable Rosen has acted on the authority conferred on him by the Texas Constitution and Legislature.

208.    In so doing, Constable Rosen acts as a final policymaker for the County regarding the use of force, the duty to intervene, and the use of K-9s by his deputy constables in Precinct 1.

209.    Constable Rosen's authority also includes the inherent and unfettered authority to hire and fire Precinct 1 deputy constables.

210.    By adopting and maintaining policies and customs governing the hiring, firing, supervision, and discipline of Precinct 1 deputy constables, Constable Rosen has acted on the authority conferred on him by the Texas Constitution.

> **ii.  Additionally, or in the Alternative, Harris County Has Delegated to Constable Rosen the Authority to Make Policy Concerning the Policing Functions of Precinct 1.**

211.    The County Commissioners' Court is authorized by the Constitution and laws of the State of Texas to set County policy concerning the policing functions of Precinct 1 and its deputies.

212.    The Harris County Commissioners' Court ("Commissioners' Court") may delegate certain functions to an appropriate county official.[57]

213.    In so doing, the Commissioners' Court exercises, without limitation, its duty under the Texas Constitution to carry out county business.

214.    The Commissioners' Court has expressly delegated to all elected or appointed county officials, including Constable Alan Rosen, the authority to set policy governing their respective offices. For Constable Rosen, this necessarily includes policy related to Precinct 1's policing functions.

215.    By adopting and maintaining policies governing the use of force, the duty to intervene, and the use of K-9s, Constable Rosen has acted on the authority conferred on him by the Commissioners' Court.

---

[57] Texas Constitution, art. V, § 18(b).

216.    In so doing, Constable Rosen acts as a final policymaker for Harris County with respect to Precinct 1's policing functions, including, without limitation, the use of force, the duty to intervene, and the use of K-9s by his deputy constables in Precinct 1.

217.    The Commissioners' Court further tasks Constable Rosen with disciplining deputies who commit on-the-job misconduct and with conducting background checks on applicants to Precinct 1 to reduce the risk of misconduct in the first place.

218.    By adopting and maintaining policies governing the hiring, firing, supervision, training, and discipline of Precinct 1 deputies, Constable Rosen has acted on the authority conferred on him by the Commissioner's Court.

219.    In so doing, Constable Rosen also acts as a final policymaker for Harris County with respect to the hiring, firing, supervision, training, and discipline of Precinct 1 deputy constables.

### iii. Constable Rosen Knew or Should Have Known that His Policies and Customs Would Lead Deputies to Use Unconstitutionally Excessive Force During K-9 Operations.

220.    Constable Alan Rosen has exercised his policymaking authority to set policies and maintain customs that he knew or should have known would lead deputies to use unconstitutionally excessive force during K-9 patrol operations.

221.    Specifically, Constable Rosen has adopted and maintained written policies governing:

i.   the use of force, de-escalation tactics, and the duty to intervene when another officer is using excessive force;

ii.  supervisory review of use of force incidents;

iii. the acquisition, training, assignment, and deployment of Precinct 1 K-9s;

iv.  the training, supervision, and discipline of deputy constables; and

v.   internal investigations into alleged or suspected constitutional violations or other forms of misconduct committed by deputy constables.

222.   Constable Rosen has also adopted and maintained unwritten policies and customs governing:

    i.   the use of force, de-escalation tactics, and the duty to intervene when another officer is using excessive force;

    ii.   supervisory review of use of force incidents;

    iii.   the acquisition, training, assignment, and deployment of Precinct 1 K-9s;

    iv.   the training, supervision, and discipline of deputy constables; and

    v.   internal investigations into alleged or suspected constitutional violations.

223.   Constable Rosen's policies and customs endanger the public by permitting the acquisition and use of K-9s, including K-9 Jeck, that:

    i.   have not been adequately screened before acquisition to determine whether they are fit to assist officers with patrol and apprehension in a constitutionally compliant manner;

    ii.   have not been adequately trained to assist officers with patrol and apprehension in a constitutionally compliant manner;

    iii.   cannot be adequately controlled by their handlers nor by other officers; and

    iv.   do not reliably respond to commands to release a bite.

224.   As a matter of custom or policy, Precinct 1 does not keep up with national standards and best practices regarding K-9s, nor does it require its K-9 handlers or supervisors to do so.

225.   As a matter of custom or policy, Precinct 1 does not regulate the screening, acquisition, and use of K-9s, nor does he regulate the screening, training, supervision, and discipline of K-9 handlers and supervisors.

226.    As a matter of custom or policy, Precinct 1 does not maintain any enforcement mechanism to ensure that a K-9 with failing abilities is removed from the force and does not continue to put the public at risk.

227.    As a matter of custom or policy, Precinct 1 does not inquire about whether K-9s acquired through private parties—whether through donation or purchase—are fit to assist with Precinct 1's operations in a constitutionally compliant manner.

228.    As a matter of custom or policy, Precinct 1 does not ensure that K-9s are screened or trained for patrol operations and suspect apprehensions.

229.    As a matter of custom or policy, Precinct 1 does not institute corrective action after a K-9 exhibits unwarranted aggression, such as by refusing to release a bite upon command or by biting someone other than a person the K-9's handler intended to detain.

230.    As a matter of custom or policy, Precinct 1 uses the "bite and hold"[58] rather than "find and bark" method of suspect apprehension. The United States Department of Justice has recognized the "find and bark" method as a best practice. By contrast, the "bite and hold" method is widely recognized as creating a far greater risk of unconstitutionally excessive force.

231.    As a matter of custom and policy, Precinct 1 praises and rewards K-9s when they help their handlers commit violence against community members—even where the force was objectively unreasonable. This is exactly what Bruss and Johnson did after Jeck mauled Mr. Thomas.[59]

232.    As a matter of custom or policy, Precinct 1 effectively trains K-9s to attack for the sake of causing injury beyond that which is "necessary" to detain a person. As a matter of custom or

---

[58] This is sometimes called the "find and bite" method.
[59] *Supra* ¶¶ 55, 57.

policy, Precinct 1 assigns deputies to be K-9 handlers without first screening them for the judgment, training, and temperament necessary to handle K-9 deployments.

233.    Additionally, or in the alternative, as a matter of custom or policy, Precinct 1 assigns deputies to be K-9 handlers—like Defendants Johnson and Bruss—despite a demonstrated lack of the judgment, training, and temperament necessary to handle K-9 deployments.

234.    As a matter of custom or policy, Precinct 1 does not adequately train its K-9 handlers—like Defendants Johnson and Bruss—on how to conduct an apprehension without resorting to unconstitutionally excessive force.

235.    As a matter of custom or policy, Precinct 1 does not adequately train deputies—like Defendants Johnson, Schultz, and Bruss—in de-escalation tactics that would prevent officers from using unconstitutionally excessive force.

236.    As a matter of custom or policy, Precinct 1 does not adequately train deputies—like Defendants Johnson, Schultz, and Bruss—in interacting with community members who are impaired—whether mentally, emotionally, physiologically, or physically—without resorting to unconstitutionally excessive force.

237.    As a matter of custom or policy, Precinct 1 does not meaningfully supervise K-9 handlers, as illustrated by the failure to meaningfully investigate, censure, or discipline Defendants Johnson or Bruss for their unlawful K-9 attack on Mr. Thomas.

238.    As a matter of custom or policy, Precinct 1 does not institute corrective action—such as the reprimand, discipline, retraining, or removal of a K-9 handler from patrol duties—after a K-9 handler uses excessive force during a K-9 apprehension.[60]

---

[60] By "K-9 apprehension," Plaintiff means gaining control and custody of a police subject in the course of a K-9 deployment.

239.    Indeed, after the obviously unlawful K-9 attack at issue here, Precinct 1 took no corrective action at all against Defendants Johnson, Bruss, or Schultz—either before or after the initiation of this lawsuit.

240.    Instead, Precinct 1 leadership "cleared" the officers of any wrongdoing and found that there was no need for further review or an IAD investigation.

241.    Despite Precinct 1's statements to the media that the officers were "cleared" after an internal investigation, Precinct 1 produced no investigative report, notes, or findings—even after Plaintiff's repeated discovery requests and the Court's order (in the course of this litigation) that Defendants produce any related internal affairs records.

242.    Lieutenant Moncrief laughed along with Defendant Johnson when he joked that his K-9 was "full" and "satisfied" after tearing the flesh from Mr. Thomas's right arm. This illustrates a custom or policy of acquiescence—or ratification—by Precinct 1 leadership to the use of excessive force during K-9 deployments.

243.    As a matter of custom or policy, Precinct 1 does not adequately train its deputies—like Defendants Schultz and Bruss—on the constitutional duty to intervene when a fellow officer is using excessive force.

244.    As a matter of custom or policy, Precinct 1 does not adequately train its deputies—like Defendants Schultz and Bruss—on the constitutional duty to intervene in the context of an unconstitutional K-9 attack, nor does it train its deputies on how to intervene in these circumstances.

245.    As a matter of custom or policy, Precinct 1 does not adequately supervise deputies—like Defendants Schultz and Bruss—who do not fulfill their duty to intervene when they see a fellow deputy using excessive force.

246.   As a matter of custom or policy, Precinct 1 does not institute corrective action—such as reprimand, discipline, or retraining—when an officer does not fulfill his duty to intervene to prevent another officer's use of excessive force.

247.   As a matter of custom or policy, Precinct 1 does not meaningfully investigate alleged misconduct by its deputies—even after a lawsuit or a criminal complaint has been filed. In so doing, Precinct 1 effectively turns a blind eye to constitutional violations and tells future wrongdoers that even the most brazen misconduct will go unpunished. This is evidenced by Precinct 1's repeated claims that there is no IAD case file or report assessing the K-9 attack on Mr. Thomas, and that there are no records of any IAD investigation into Defendant Johnson's admissions of child sex abuse, in which he implicated other Precinct 1 employees.

248.   These policies and customs, individually and in tandem with the other policies and customs described herein, caused and exacerbated Mr. Thomas's injuries.

249.   Constable Rosen knew or should have known that his policies and customs would lead deputies to use unconstitutionally excessive force during K-9 operations.

**B. Alternatively, Harris County is Directly Responsible for the Customs and Policies that Caused and Exacerbated Mr. Thomas's Injuries.**

250.   Additionally, or in the alternative, Harris County is directly responsible for setting law enforcement policy that is binding on Precinct 1 deputies. Harris County knew or should have known that its acquiescence, ratification, and non-regulation of K-9 use would lead deputies to use unconstitutionally excessive force during K-9 patrol operations.

**i.   As a Matter of Custom or Policy, Harris County Does Not Regulate the Use of K-9s or the Conduct of K-9 Handlers.**

251.   As a matter of custom or policy, Harris County does not regulate the screening, acquisition, and use of K-9s.

44

252.     As a matter of custom or policy, Harris County does not regulate the screening, training, supervision, and discipline of K-9 handlers and supervisors.

253.     These customs or policies of non-regulation led to the gruesome and unjustified K-9 attack on Mr. Thomas, and to similar attacks on similarly situated community members.

254.     As a matter of state law, the Harris County Commissioners' Court is responsible for approving or rejecting any donations, gifts, or other conferrals of property used for County policing functions.[61]

255.     The Commissioners' Court frequently exercises this authority when a third party offers to donate a K-9 or other "property"—whether to the Sheriff's Office or one of the eight Constables' precincts.[62]

256.     K-9 Jeck was donated to Precinct 1 by a private entity called K9s4COPs.

257.     In 2017, the Commissioners' Court unanimously approved the donation of Jeck to Precinct 1 without any meaningful inquiry into Jeck's training, certifications, and fitness to assist deputies with K-9 apprehensions in a constitutionally compliant manner.

258.     As a matter of policy or custom, Harris County does not inquire into a K-9's training, certifications, or fitness before accepting it for donation.

---

[61] Local Gov't Code § 81.032 ("The commissioners court may accept a donation of labor or services, gift, grant, donation, bequest, or devise of money or other property on behalf of the county, including a donation under Chapter 38, Government Code, for the purpose of performing a function conferred by law on the county or a county officer."). *See also Anderson v. Wood*, 152 S.W.2d 1084, 1085 (Tex. 1941) ("[The Commissioners Court] is the general business and contracting agency of the county, and it alone has authority to make contracts binding on the county, unless otherwise specifically provided by statute."). *Accord* Tex. Att'y Gen. Op. GA-0229, 2004 WL 1787814; Tex. Att'y Gen. Op. KP-0003, 2015 WL 1003694. *See generally* Texas Constitution, art. V, § 18(b).
[62] *See* https://harriscountytx. legistar.com/Legislation.aspx (search for, e.g., "canine").

45

259.    Indeed, County records indicate that Precinct 1 took physical possession of K-9 Jeck at least a month before it requested County approval, by which time Jeck was already in Defendant Johnson's custody.[63]

260.    On information and belief, Precinct 1 may have taken physical possession of Jeck as early as January 2017[64]—eight months prior to requesting County approval.[65]

261.    The Commissioners' Court adopted a policy in 2004 entitled, "Harris County Policy for Retirement of K-9, Rescue, and Service Dogs" [hereinafter "K-9 Retirement Policy"].

262.    In its K-9 Retirement Policy, Harris County acknowledged its duty to ensure that County K-9s are adequately trained and that "these highly trained dogs do not fall into the hands of persons who are not qualified to control them or who might misuse them."

263.    Despite its acknowledgement of the dangers of police K-9s falling into the wrong hands, Harris County policy regulates only what happens when a K-9 is "retired" from a police force— not the matter in which K-9s are acquired, trained, assigned, utilized, monitored, or evaluated.

264.    Specifically, County policy provides that upon a K-9's retirement, either the K-9's handler or another suitable person will assume ownership of the K-9.

---

[63] Precinct 1 records clearly show Jeck was in the Precinct's possession by August 2017, when Defendant Johnson reported training and performance issues to Jeck's veterinarian. The Precinct did not request the County's approval until September 2017, with the Commissioners' Court ultimately approving the donation in October 2017.

[64] County records show that Jeck received certain tests and vaccinations in January 2017, but it is unclear whether Jeck was in the Precinct's possession at that time, or if the January 2017 records were transferred from Jeck's prior custodian (which is, presumably, K9s4COPs).

[65] This delay raises questions about whether Precinct 1 is infringing on the exclusive powers of the Commissioners' Court to accept donations of county equipment. *Cf.* Tex. Atty. Gen. Op., No. KP-0003 (2015), 2015 WL 1003694 ("[P]ursuant to section 81.032, the Legislature intended the commissioners court to be the proper body to receive and accept donations on the county's behalf. To the extent that members of the public send donations to the sheriff, the sheriff should immediately forward those funds to the commissioners court for proper handling.") (cleaned up).

265.    However, County policy does not address how and when a K-9 should be deemed ready for retirement.

266.    Harris County acknowledges that K-9s sometimes need to be removed from patrol duties due to "failing abilities."

267.    However, as a matter of custom or policy, the County does not issue any guidance or criteria for making that determination.

268.    Moreover, as a matter of custom or policy, Harris County does not maintain any enforcement mechanism to ensure that a K-9 with failing abilities is removed from the force and does not continue to put the public at risk, as evidenced by the failure to timely remove Jeck from the force after he repeatedly caused harm to community members and County employees.

269.    As a matter of custom or policy, Harris County does not inquire about whether K-9s acquired through private parties—whether through donation or purchase—are fit to assist with county policing in a constitutionally compliant manner.

270.    As a matter of custom or policy, Harris County does not ensure that K-9s are screened or trained for patrol operations and suspect apprehensions.

271.    As a matter of custom or policy, Harris County does not regulate the manner in which K-9 handlers are screened, trained, supervised, or disciplined regarding their K-9 duties.

272.    As a matter of custom or policy, Harris County does not regulate how officers who are not K-9 handlers are trained to interact with and make use of K-9 units for patrol operations.

273.     This includes the questions of whether and when a K-9 unit should be called to a scene in the first place and whether and when a fellow officer should intervene to prevent the unconstitutional use of a K-9 by its handler.[66]

274.     These policies and customs, individually and in tandem with the other policies and customs described herein, caused and exacerbated Mr. Thomas's injuries.

   **ii.  Harris County Blocked Its Eight Constables' Precincts From Implementing a Unified Use of Force Policy—Despite Its Awareness that Such a Policy Was Necessary to Prevent Excessive Force Violations.**

275.     Harris County blocked its eight Constables' precincts from implementing a unified policy governing the use of force and the duty to intervene, despite its awareness that such a policy was necessary to consistently and equally protect community members from excessive force.

276.     Both the County Commissioners' Court and Constable Rosen acknowledged the need for such a policy nearly a year before the K-9 attack on Mr. Thomas.

277.     On May 25, 2020, Minneapolis Police Officer Derek Chauvin murdered Houston-native George Floyd. Mr. Floyd's death triggered overwhelming public protest and outcry against police-perpetrated violence nationwide.

278.     In response, municipalities across the country were called upon to examine how their own policies and customs enable police forces to brutalize Black and Brown people with impunity.

279.     Harris County was among those that publicly committed to take action. On June 9, 2020, the Commissioners' Court convened to discuss the County's policing practices.

---

[66] A K-9 "Unit" is comprised of both a K-9 and its handler. As a matter of Precinct 1's written policy, any supervisor, regardless of whether or not they have K-9 training, has the authority to call for a K-9 Unit. As a matter of custom or policy, supervisors do not receive K-9 training unless they are K-9 handlers.

280.    At that convening, the Commissioners' Court unanimously called for a unified use of force policy that would be binding on all eight Constables' Precincts and the Sheriff's Department, and for additional training concerning de-escalation and the duty to intervene.

281.    The following day, the Head Constables for all eight precincts ("the Head Constables") met to craft policies responsive to the mandate set by the Commissioners' Court.

282.    Constable Alan Rosen of Precinct 1 was thus aware of the need to set and enforce comprehensive policies on the use of force, de-escalation, and the duty to intervene, and to provide training, supervision, and discipline on these matters.

283.    A year later, on July 27, 2021, the Head Constables held a joint press conference to announce they had agreed on a proposed countywide use of force policy that covered both de-escalation and the duty to intervene.

284.    Constable Rosen was at the forefront of this public effort.

285.    Based on these public announcements, near-final drafts of this policy were likely completed prior to July 2021, and perhaps even prior to the K-9 attack at issue in this case.

286.    The proposed policy was sent to the Harris County Attorneys' Office ("HCAO") for review in 2021.

287.    On information and belief—as indicated by the fact that the proposed policy has not been released and has not gone into effect—HCAO, acting as a legal advisor to the Commissioners' Court, advised the Commissioners Court not to adopt it.

288.    As a result, no countywide use of force policy has gone into effect—despite the decision of the Commissioners' Court and the consensus of all Head Constables that such a policy was necessary to protect community members from excessive force.

289.    On information and belief, Harris County has made no further step towards implementing the Head Constables' proposed policy, nor any other countywide use of force policy, despite the County's awareness that such a policy is necessary to prevent future constitutional violations like those that the Deputy Defendants inflicted on Mr. Thomas

290.    Had HCAO advised the Commissioners' Court to adopt the proposed policy, it would be far more straightforward for victims of police violence to establish liability on the part of Harris County for constitutional violations committed by deputy constables.[67]

291.    For years, victims of police violence in Harris County have been caught in a legal paradox that makes it incredibly challenging to hold the County accountable for its acquiescence to misconduct by the Constables and their deputies.

292.    On the one hand, plaintiffs generally cannot sue an individual constable's precinct because each precinct is deemed a subdivision of the county in which it sits and, as a matter of state law, cannot be subject to suit without that county's authorization.[68]

---

[67] Eric Dexheimer, Mike Morris, Neena Satija, Caroline Ghisolfi & Matt deGrood, *Unchecked Forces: Want to sue a Harris County constable's office for violating your rights? You can't*, Houston Chronicle, Mar. 19, 2024, https://www.houstonchronicle.com/projects/unchecked-forces/constables-civil-rights-lawsuits; Eric Dexheimer, Mike Morris, Neena Satija, Caroline Ghisolfi & Matt deGrood, *Unchecked Forces: How unchecked police agencies became a political powerhouse in Harris County*, Houston Chronicle, Mar. 25, 2024, https://www.houstonchronicle.com/projects/unchecked-forces/harris-county-constables-power/.
[68] Gipson v. Harris Cnty., No. 4:19-CV-2591, 2020 WL 6550543 (S.D. Tex. Oct. 15, 2020), report and recommendation adopted sub nom. *Gipson v. Harris Cnty. Sheriff's Off.*, No. 4:19-CV-2591, 2020 WL 6544826 (S.D. Tex. Nov. 6, 2020) at *3–4.

293.    On the other hand, the County tends to argue that the Constable is not a final policymaker, despite the fact that each precinct sets its own law enforcement policy for its deputies, who are all County employees.[69]

294.    Harris County cannot have it both ways. Either the County is directly responsible for setting policing policy that is binding on deputy constables or the Constables are responsible for setting such policy on the County's behalf.

295.    Harris County's failure to adopt a countywide use of force policy covering both de-escalation and the duty to intervene—despite its awareness of the need for such a policy to prevent its police officers from using unconstitutionally excessive force—illustrates its deliberate indifference to the known risk of constitutional violations.

296.    Harris County's deliberate indifference caused and exacerbated Mr. Thomas's injuries.

## CLAIMS FOR RELIEF

**I.    Count One: Defendant Johnson Violated Mr. Thomas's Constitutional Rights by Subjecting Him to Excessive Force in Violation of the Fourth Amendment.**

297.    Mr. Thomas realleges and incorporates by reference the allegations set forth in paragraphs 1–296, *supra*.

298.    By holding a prostrate Mr. Thomas at gunpoint, unleashing his highly agitated attack dog on Mr. Thomas, and directing the dog to attack Mr. Thomas as he lay prone on the ground, Defendant Johnson violated Mr. Thomas's Fourth Amendment right to be free from excessive force, as incorporated to the states through the Fourteenth Amendment.

299.    No reasonable officer could conclude that Defendant Johnson's level of force was necessary where Mr. Thomas was unarmed; compliant with orders; had his hands outstretched

---

[69] Rhode v. Denson, 776 F.2d 107, 109–10 (5th Cir. 1985). *But see supra* Section V.A(ii) for an account of how Harris County expressly delegated its policymaking authority to its elected officials and other Department Heads, including the Head Constable for each precinct.

and visible throughout the entire encounter; made no sudden movements; and made no attempt to flee, resist arrest, or harm Defendant Johnson or any other person.

300.    Moreover, Defendant Johnson violated Mr. Thomas's Fourth Amendment right to be free from excessive force by permitting K-9 Jeck to continue biting Mr. Thomas while he remained on the ground, as well as by neglecting to remove the dog and stop it from mauling Mr. Thomas for approximately 43 seconds. This includes 20 seconds during which Johnson allowed K-9 Jeck to continue biting Mr. Thomas *after he was already handcuffed*.

**II.    Count Two: Defendants Bruss and Schultz Violated Mr. Thomas's Constitutional Rights by Subjecting Him to Excessive Force in Violation of the Fourth Amendment.**

301.    Mr. Thomas realleges and incorporates by reference the allegations set forth in paragraphs 1–296, *supra*.

302.    By failing to protect Mr. Thomas from Defendant Johnson's unconstitutionally excessive use of force, despite being physically present, aware of Defendant Johnson's constitutional violations, and having ample opportunity to intervene, Defendants Bruss and Schultz violated Mr. Thomas's right to be free from unconstitutionally excessive force.

303.    Not only did Defendants Bruss and Schultz refuse to take reasonable measures to intervene, they also acquiesced in and ratified Defendant Johnson's excessive use of force both before and after Defendant Johnson unleashed K-9 Jeck by, *inter alia*, standing steps away and watching while Defendant Johnson carried out and unnecessarily prolonged the attack, aiming a weapon at Mr. Thomas, threatening Mr. Thomas, and lying to cover up the unlawful attack.

**III.    Count Three: Defendants Johnson, Bruss, Schultz, and Moncrief Conspired to Fabricate Evidence Against Mr. Thomas to Cover Up Their Excessive Force, in Violation of Mr. Thomas's Fourteenth Amendment Right to Due Process.**

304.    Mr. Thomas realleges and incorporates by reference the allegations set forth in paragraphs 1–296, *supra*.

305.     Defendants' Johnson, Bruss, Schultz, and Moncrief conspired to fabricate evidence against Mr. Thomas for the purpose of concealing and justifying their excessive force violations. Defendants' fabrication efforts included, *inter alia*, a falsified probable cause affidavit, falsified incident reports and supplements, and false verbal statements, including to the Harris County District Attorney's Office.

306.     Through their conspiracy and fabrication, Defendants also violated Mr. Thomas's procedural due process rights under the Fourteenth Amendment.

307.     In addition, Defendants' conspiracy and fabrication is so offensive to basic concepts of liberty, justice, and democracy that it "shocks the conscience" and violates Mr. Thomas's substantive due process rights under the Fourteenth Amendment.

**IV.     Count Four: By Failing to Supervise Robert Johnson and Precinct 1's K-9 Operations, Precinct 1 Leadership Caused Mr. Thomas to Be Deprived of His Fourth and Fourteenth Amendment Rights.**

308.     Mr. Thomas realleges and incorporates by reference the allegations set forth in paragraphs 1–296, *supra*.

309.     Constable Rosen, Assistant Chief Harrison, Captain Bender, and Lieutenant Moncrief failed to supervise Robert Johnson and the rest of Precinct 1's K-9 Operations, despite the known risk of resulting constitutional violations.

310.     These failures, individually and in tandem, caused and exacerbated the unlawful K-9 attack on Mr. Thomas and Defendants' subsequent conspiracy and cover-up.

311.     Indeed, Constable Rosen knew that Robert Johnson came to Precinct 1 only after being fired for misconduct from the Harris County Sheriff's Office, following an internal affairs investigation for conduct evincing a lack of sound judgment and professionalism—some of the very same qualities essential to Precinct 1's K-9 Operations.

312.    Despite this knowledge, neither Constable Rosen nor the rest of Precinct 1 leadership prevented Johnson's assignment to K-9 Operations, nor did they adequately supervise him once he was assigned there to ensure he was carrying out his duties in a constitutionally compliant manner.

313.    Indeed, once Johnson became a K-9 handler, he routinely reported K-9 deployments that should have put Precinct 1 leadership on notice that he was violating community members' Fourth Amendment rights long before the attack on Mr. Thomas.

314.    However, Precinct 1 leadership failed to take corrective action, such as reprimanding, disciplining, retraining, or removing Robert Johnson from K-9 Operations or patrol duties.

315.    Additionally, or in the alternative, Precinct 1 leadership was on notice of numerous probable Fourth Amendment violations by Robert Johnson but failed to investigate or take corrective action.

316.    Precinct 1 leadership knew or should have known that K-9 Jeck had a documented history of uncontrolled aggression and other performance issues, dating back to at least 2017—four years before the Jeck was unleashed on Mr. Thomas.

317.    Indeed, Precinct 1 leadership knew or should have known of multiple occasions on which other County K-9s exhibited uncontrolled aggression that put community members at risk.

318.    Precinct 1 leadership nonetheless failed to take corrective action, even though Precinct 1's written policy expressly provides that any supervisor has the authority to remove a K-9 from active duty.

319.    Precinct 1 leadership's acts and omissions, despite the known risk that K-9 Jeck posed to the public, caused and exacerbated the unlawful K-9 attack on Mr. Thomas.

**V.   Count Five: By Maintaining Policies and Customs of Acquiescence, Ratification, and Non-Regulation, Harris County Caused Mr. Thomas to Be Deprived of His Fourth Amendment Rights.**

320.    Mr. Thomas realleges and incorporates by reference the allegations set forth in paragraphs 1–296, *supra*.

321.    As a matter of custom or policy, Harris County does not meaningfully regulate the use of K-9s or the conduct of its K-9 handlers.

322.    Years before the unlawful K-9 attack on Mr. Thomas, Harris County publicly acknowledged its duty to ensure County K-9s are adequately trained and the resulting dangers when County K-9s fall into the wrong hands.

323.    Despite this acknowledgement, Harris County maintains various policies and customs of non-regulation, ratification, and acquiescence to the excessive use of force and other constitutional violations involving K-9s, at the hands of Precinct 1 deputy constables.

324.    Through its policies and customs, Harris County has demonstrated a deliberate indifference to the risk of excessive force violations involving Precinct 1 deputy constables.

325.    Additionally, or in the alternative, Constable Alan Rosen is a final policymaker for Harris County regarding Precinct 1's policing functions, as well as the hiring, firing, supervision, training, and discipline of Precinct 1 deputy constables.

326.    As an exercise of Constable Rosen's inherent or delegated policymaking authority, Constable Rosen maintains various policies and customs of non-regulation, ratification, and acquiescence to the excessive use of force and other constitutional violations involving K-9s, at the hands of Precinct 1 deputy constables.

327.    Through his policies and customs, Constable Rosen has demonstrated a deliberate indifference to the risk of excessive force violations involving Precinct 1 deputy constables.

**REQUEST FOR RELIEF**

328.    Defendants' flagrant disregard for Mr. Thomas's constitutional rights—and indeed, his humanity—subjected Mr. Thomas to agonizing pain, fear, severe and ongoing physical and emotional injuries, and material costs. Mr. Thomas now asks the Court to enter a judgment confirming that Defendants are not above the laws they enforce.

329.    WHEREFORE, on the basis of the foregoing, Mr. Thomas demands a jury trial for all issues so triable pursuant to the Seventh Amendment of the United States Constitution and Federal Rules of Civil Procedure, and requests that this Court issue the following relief:

    i.   Declare that Defendants violated Mr. Thomas's constitutional rights;

    ii.  Issue an injunction to prevent these same violations from recurring;

    iii. Award compensatory damages against Defendants in an amount to be determined by a jury at trial;

    iv.  Award punitive damages against Defendants for their willful and egregious violations of the law in an amount to be determined by a jury at trial;

    v.   Award reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and

    vi.  Award such other relief as the Court deems just and proper.

Respectfully submitted this 20th day of September, 2024,


/s/ Shirley LaVarco
Shirley LaVarco (*pro hac vice*)*
shirley@civilrightscorps.org
Brittany Francis†‡
brittany@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Telephone: (202) 844-4975
* Admitted to practice in the District of Columbia (Bar No. 90005167).
† Admitted to practice in Texas (Bar No. 24141616), New York (Bar No. 5337555), and the District of Columbia (Bar No. 90008960).
‡ Attorney-in-Charge.