**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| KERRY LEE THOMAS, | |
| Plaintiff, | |
| v. | Case No. 4:23-cv-00662 |
| ERIC M. BRUSS,<br>WAYNE SHULTZ,<br>and KEITH MORRIS, in his capacity as<br>Temporary Defendant Administrator of the<br>Estate of Robert Johnson, | |
| Defendants. | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL
DEFENDANTS AND FOR DEFAULT JUDGMENT AGAINST KEITH MORRIS, IN HIS
CAPACITY AS TEMPORARY DEPENDENT ADMINISTRATOR FOR THE ESTATE
OF ROBERT JOHNSON[1]**

---

[1] Plaintiff also respectfully seeks leave to exceed the 25-page page limit for the instant motion, to allow for adequate treatment of all material facts in support of summary judgment, and avoid the redundancy of restating overlapping facts in a separate motion for default judgment. Plaintiff's Counsel has conferred with Counsel for Defendants Bruss and Schultz and they do not oppose Plaintiff exceeding the page limit.

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................................3

**NATURE AND STAGE OF THE PROCEEDING** ..........................................................5

**QUESTIONS PRESENTED** .............................................................................................6

**SUMMARY OF FACTS** ...................................................................................................6

**LEGAL STANDARD** .......................................................................................................9

    I. Summary Judgment. ......................................................................................................9

    II. Default Judgment. .......................................................................................................10

**SUMMARY OF THE ARGUMENT** ..............................................................................11

**ARGUMENT** ....................................................................................................................15

    I. All material facts revealed in discovery confirm that, as this Court has already ruled, Defendant Johnson had no lawful basis to use K9 force, Defendant Bruss and Schultz failed to intervene despite ample opportunity, and qualified immunity does not shield them from liability. ....................................................................................................................................15

        A. Defendant Schultz, a seasoned police officer who spent more than thirty years in Harris County law enforcement, was able and well-positioned to intervene. ...................16

        B. Defendant Bruss, a K9 handler and trainer with more than a decade of experience, was able and well-positioned to intervene. ...................................................................................18

        C. Precinct 1 policy makes clear that officers are not permitted to use K9 force against a subject who does not pose an immediate threat, is not actively resisting arrest, and is not attempting to evade arrest by flight. Precinct 1 policy also makes clear that officers have a duty to intervene in excessive force, regardless of rank, and regardless of the type of force being used. ...................................................................................................................20

        D. Defendants Bruss and Schultz's testimony, alongside Precinct 1's policies, confirm that their failure to intervene in Johnson's use of force was unreasonable, and that they had fair warning it would subject them to liability. ...........................................................22

        E. Defendant Bruss's uncorroborated, self-serving statements do not create a genuine dispute of material fact because: (1) they are contradicted by all objective evidence; and (2) even if dispatch had communicated that the suspects were armed, Defendants' use of force would still have been excessive under the totality of the circumstances.................23

    II. There is good cause to grant default judgment against Defendant Keith Morris, in his capacity as temporary defendant administrator for the Estate of Robert Johnson..................26

        A. Default judgment is procedurally warranted...........................................................27

        B. Default judgment is substantively warranted, and the Court should hold an evidentiary hearing to determine the amount of damages. .................................................................29

**CONCLUSION** ................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Hays*,
  65 F.4th 736 (5th Cir. 2023) ................................................................. 25

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986) .......................................................................... 9, 10

*Autin v. City of Baytown*,
  174 F.App'x 183 (5th Cir. 2005) .......................................................... 22

*Banks v. Herbrich*,
  90 F.4th 407 (5th Cir. 2024) .......................................................... 13, 23

*Bonanza Int'l v. Corceller*,
  480 F.2d 613 (5th Cir. 1973) ............................................................... 11

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................... 9, 12

*Clem v. Corbeau*,
  284 F.3d 543 (4th Cir. 2002) ............................................................... 26

*Cole Est. of Richards v. Hutchins*,
  959 F.3d 1127 (8th Cir. 2020) ............................................................. 25

*Cooper v. Brown*,
  844 F.3d 517 (5th Cir. 2016) .......................................................... 15, 22

*Deville v. Marcantel*,
  567 F.3d 156 (5th Cir. 2009) .......................................................... 15, 22

*DIRECTV, Inc. v. Budden*,
  420 F.3d 521 (5th Cir. 2005) ............................................................... 25

*Graham v. Connor*,
  490 U.S. 386 (1989) ............................................................................ 13

*Groh v. Ramirez*,
  540 U.S. 551 (2004) ............................................................................ 23

*Hale v. Townley*,
  45 F.3d 914 (5th Cir. 1995) .......................................................... 18, 20

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ............................................................................ 22

*In re Dierschke*,
  975 F.2d 181 (5th Cir. 1992) ............................................................... 29

*Joseph ex rel. Est. of Joseph v. Bartlett*,
  981 F.3d 319 (5th Cir. 2020) .......................................................... 15, 22

*Lacy v. Sitel Corp.*,
  227 F.3d 290 (5th Cir. 2000) ............................................................... 10

*Lindsey v. Prive Corp.*,
  161 F.3d 886 (5th Cir. 1998) .................................................... 11, 27, 28

*Mason v. Lister*,
  562 F.2d 343 (5th Cir. 1977) ............................................................... 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .............................................................................. 9

*Moreno v. LG Elecs.*,
   800 F.3d 692 (5th Cir. 2015) ................................................................................ 29

*New York Life Ins. Co. v. Brown*,
   84 F.3d 137 (5th Cir. 1996) .................................................................................. 10

*Nishimatsu Constr. Co. v. Hous. Nat'l Bank*,
   515 F.2d 1200 (5th Cir. 1975) .............................................................. 11, 28, 29, 30

*Perez v. Suszczynski*,
   809 F.3d 1213 (11th Cir. 2016) ............................................................................ 25

*Recio v. Vasquez*,
   2023 WL 2144300 (N.D. Tex. Feb. 2, 2023) ................................................ 27, 28, 29

*Scott v. Harris*,
   550 U.S. 372 (2007) ............................................................................... 10, 13, 25

*Stroik v. Ponseti*,
   35 F.3d 155 (5th Cir. 1994) .................................................................................. 22

*Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*,
   874 F.2d 274 (5th Cir. 1989) ................................................................................ 11

*Timpa v. Dillard*,
   20 F.4th 1020 (5th Cir. 2021) ............................................................................... 20

*Trammell v. Fruge*,
   868 F.3d 332 (5th Cir. 2017) ........................................................................... 15, 22

*Travelers Cas. & Sur. Co. of Am. v. HighMark Constr. Co., LLC,* 7:16-cv-00255,
   2018 WL 4334016 (S.D. Tex. May 5, 2018) ........................................................... 30

*United States v. 1998 Freightliner Vin #: 1FUYCZYB3WP886986*,
   548 F. Supp. 2d 381 (W.D. Tex. 2008) ............................................................ 11, 30

*Wooten v. McDonald Transit Assocs.*,
   788 F.3d 490 (5th Cir. 2015) ...................................................................... 11, 27, 30

**Rules**

Fed. R. Civ. P. 55(a) ............................................................................................... 10
Fed. R. Civ. P. 56(c) ................................................................................................ 9
Fed. R. Civ. Pro. 55(b)(2) .......................................................................... 11, 27, 30

## NATURE AND STAGE OF THE PROCEEDING

On February 22, 2023, Plaintiff Kerry Lee Thomas filed this civil rights lawsuit against Robert Johnson, Eric M. Bruss, and Wayne Schultz. Defendants are three officers (or former officers) of the Harris County Constable's Office, Precinct 1, who, two years prior, subjected Mr. Thomas to an unprovoked police K9 attack in violation of his Fourth Amendment rights. Mr. Thomas, who was visibly unarmed and suspected only of trespassing, had been lying prone on the ground for nearly three minutes when Johnson released his K9. At no point did Mr. Thomas attempt to flee, fight, or resist arrest. Despite the total lack of justification for Johnson's use of K9 force, Defendants Bruss and Schultz made no attempt to prevent or mitigate the harm to Mr. Thomas.

In an August 15, 2023 opinion denying Bruss and Schultz's motion to dismiss, this Court concluded that Johnson had used excessive force, Doc. 24 at 9, and that qualified immunity did not shield Bruss and Schultz from bystander liability for their failure to intervene, *id.* at 13, 15. The facts undergirding this Court's opinion came from its own review of bodyworn camera footage capturing the entirety of the incident. Doc. 24 at 1–2. Discovery has only confirmed that this Court made the right decision the first time and that Mr. Thomas's claims are grounded in well-established facts not subject to reasonable dispute.

When deposed, Defendants did not dispute that they had the opportunity to intervene and had numerous means of doing so. Instead, Defendants took issue with this Court's *legal* conclusion that Johnson's force was excessive in the first instance. No new evidence that would complicate this Court's prior ruling—or create a triable issue of fact—has come to light. Accordingly, Mr. Thomas respectfully moves this Court to enter summary judgment on liability against all three Defendants. Additionally, or in the alternative, Mr. Thomas seeks default judgment against Keith

5

Morris, in his capacity as temporary dependent administrator for Estate of Robert Johnson, because no answer has been filed and there is no meritorious defense for Johnson's conduct.[2]

## QUESTIONS PRESENTED

(1) Whether there is any genuine issue of material fact that would preclude a summary judgment finding of liability against Defendants—three officers of the Harris County Constable's Office who subjected Plaintiff Kerry Lee Thomas to an unconstitutional police K9 attack while he was compliant, prone, and visibly unarmed.

(2) Whether default judgment is warranted against Keith Morris, in his capacity as temporary dependent administrator for the Estate of Robert Johnson, because no answer has been filed and there is no meritorious defense for Johnson's conduct.

## SUMMARY OF FACTS[3]

On February 22, 2021, at approximately 7:15 p.m., Defendants Robert Johnson, Eric M. Bruss, and Wayne Schultz of the Harris County Constable's Office (Precinct 1) were dispatched

---

[2] For ease of reference, when describing Johnson's conduct, Mr. Thomas sometimes refers to him as "Defendant Johnson." The circumstances of Defendant Johnson's death were, tragically, tied to other misconduct at Precinct 1. In May of 2021, Johnson confessed to sexually abusing multiple children, at least one of whom he reportedly drugged, in coordination with a fellow Precinct 1 officer and a dispatcher. Jessica Wiley, *Deputy's Dying Confession Leads to Child Sex Crime Charges Against 2 Colleagues*, ABC 13 (May 24, 2021), https://abc13.com/deputy-suicide-harris-county-precinct-1-sgt-accused-of-sex-assault-child-abuse-allegations/10673478/. Days later, after a six-hour standoff with police, Johnson killed himself. *Id.* This was not the first time Johnson was involved in sexual misconduct. He joined the Constable's Office only after being fired by the Harris County Sheriff's Office following allegations that he engaged in an inappropriate sexual relationship with a participant in the Citizen's Police Academy. Mike Glenn, *Deputies Fired Over Sexual Misconduct*, Chron (Feb. 6, 2013), https://www.chron.com/news/houston-texas/houston/article/Deputies-fired-over-sexual-misconduct-4258117.php.

[3] Mr. Thomas has included a more fulsome statement of material facts underlying the incident in a separate document. Pl's Statement of Material Facts ("SOMF"). Additional facts supporting Mr. Thomas's motion for default judgment are also included in a separate Declaration In Support of Plaintiff's Motion for Default Judgment, and summarized in Section II of the Argument, *infra*.

to a disturbance outside of a home at 10923 Capstone Drive in Houston. The dispatcher stated over the radio that the suspects were two Black males, one wearing a brown shirt over black pants and white shoes, and the other with an unknown clothing description. The dispatcher also informed Defendants that the reporting party had his weapon out. Johnson responded, "That's clear," followed by, "Are the suspects still there? If they're not still there, tell him to put away his weapon." Another responding officer twice asked whether it was the reporting party or the suspects who had a weapon. Dispatch stated for the second time that it was the reporting party (or "reportee"), not the suspects, who was armed.

Johnson was the first to arrive at the scene, where Plaintiff Kerry Lee Thomas was sitting in the passenger seat of a PT Cruiser with his friend, Rapheal Gray, who was in the driver's seat. Both the passenger and driver side doors were open. Johnson shouted, "Put your fucking hands up!" Mr. Thomas did so immediately, raising his arms high above his head in surrender. Mr. Gray followed suit. Mr. Thomas then stepped out of the car and stood facing Johnson in the surrender position, with his hands raised high above his head, so that Johnson could see he was unarmed and posed no threat. Mr. Thomas, who was visibly frightened, then made a series of distressed statements, at some points saying, "Kill me," punctuated by pleas to God for help: "Please, Father, help me God, In Jesus name!" Mr. Thomas also pleaded with Johnson directly, exclaiming, "All lives matter!", a phrase he repeated several times. He then told Johnson, "You're my brother!"

Defendant Bruss arrived shortly thereafter, parking his car on the opposite side of the street from Johnson. Bruss and Johnson proceeded to give Mr. Thomas and Mr. Gray a series of conflicting commands, at times mixing up the "passenger" and "driver" designations they were using to distinguish commands. Defendants repeatedly cursed at Mr. Thomas and Mr. Gray, often levying threats of violence. Bruss threatened to shoot them if they did not comply. Johnson

threatened that he would "sic [his] dog" at them. Even so, Johnson seemed unable to control his K9, which whined and struggled incessantly against Johnson's grip on its collar.

Despite Defendants' chaotic approach, when ordered to get on the ground, both Mr. Thomas and Mr. Gray complied. Mr. Thomas lay quietly on the ground in the prone position, with his arms stretched out in front of him, his head on the ground, and his face resting on one side. Meanwhile, Defendant Schultz arrived, standing directly behind Johnson, and Deputy Asli Tuzun arrived, standing by Defendant Bruss. Defendant Schultz told Johnson, "I'm right here, Sarge, right here. Let me know what you want me to do." Shortly thereafter, Defendant Bruss took Mr. Gray into custody without incident, first ordering him to get up from his prone position and then ordering him to walk backwards until he reached Deputy Tuzun, who was waiting with handcuffs.

After Mr. Gray was handcuffed and detained in the back of a police car, Defendant Schultz, who was standing behind Johnson and his K9, shouted, "Step up, man, you in the gray, step up, do it now!" By that point, Mr. Thomas had been lying prone on the ground for nearly three minutes, with his face resting on the grass and his arms out to his sides. He did not resist, whether verbally or physically. He made no attempt to flee or evade Defendants' authority. However, Mr. Thomas did not immediately register that Schultz's commands were being directed at him, likely because, until that point, Johnson and Bruss were the only ones giving any orders. Only when Johnson chimed in did it appear to register to Mr. Thomas that Defendants were speaking to him. As Johnson shouted, "this is your last chance, or I'm gonna send the dog after you!", Mr. Thomas lifted his head from the ground for the first time. Schultz continued shouting commands to "step up". In response, Mr. Thomas began to move his lower body, readying himself to get up. Johnson then said, "Last warning, or I'm gonna send the dog!", before releasing his K9 to bite Mr. Thomas. Defendants had given Mr. Thomas mere seconds to comply.

8

Johnson's K9 charged at Mr. Thomas and bit into his right arm, pulling and yanking at it as Mr. Thomas cried out in pain. Johnson said, "You think we're fucking around, don't you?" Meanwhile, Defendant Schultz stood just steps away, pointing his taser at Mr. Thomas as he cried out in pain. Bruss glanced briefly into the passenger compartment of the PT Cruiser for approximately five seconds before announcing, "Vehicle's clear!" He then joined Schultz to continue observing the ongoing K9 attack on Mr. Thomas.

When Mr. Thomas cried out in pain, Johnson told Mr. Thomas to "shut up." Bruss told Mr. Thomas, "As soon as he gets you handcuffed, he'll get the dog off you." Although Mr. Thomas's legs appeared, at times, to move involuntarily from the pain, he did not struggle against Johnson or prevent him from placing handcuffs on his wrists, even as Johnson's K9 continued to tear at his arm. Despite Mr. Thomas's total lack of resistance, Defendants allowed the K9 to continue biting him for some 45 seconds. After Johnson finally removed the K9, Bruss threatened Mr. Thomas with the words, "You ain't seen nothing yet."

## LEGAL STANDARD

### I.    Summary Judgment.

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986). In other words, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

When the material facts underlying a Fourth Amendment claim are captured on video, the Supreme Court's decision in *Scott v. Harris* controls: Factual disputes are to be construed "in the light depicted by the videotape." 550 U.S. 372, 381 (2007). The Court explained: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. In an excessive force case, once factual disputes have been resolved in this manner, the reasonableness of the defendant's actions "is a pure question of law." *Id.* at 381 n.8.

## II.    Default Judgment.

Rule 55(a) authorizes default judgment when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend" the lawsuit. Fed. R. Civ. P. 55(a); *see also New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). A default judgment, while not favored, is within the trial court's sound discretion. *Mason v. Lister*, 562 F.2d 343, 345 (5th Cir. 1977) (citing 10A Wright & Miller's Federal Practice & Procedure § 2685). In cases of willful default, the district court's entry of judgment is not subject to appellate reversal. *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) ("A finding of willful default ends the inquiry [of whether good cause to set aside a default exists], for when the court finds an intentional failure of responsive pleadings there need be no other finding") (internal quotations and footnote omitted).

Default judgment is appropriate where "the adversary process has been halted because of an essentially unresponsive party." *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989) (internal citation omitted). Courts apply a three-step process to determine whether default judgment against a party is appropriate. *United States v. 1998 Freightliner Vin #: 1FUYCZYB3WP886986*, 548 F. Supp. 2d 381 (W.D. Tex. 2008). First, a factors test is applied to determine if default judgment is procedurally warranted. *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). Second, courts analyze the merits of the plaintiff's claims to determine if they "establish a valid cause of action." *Freightliner*, 548 F. Supp. 2d at 385 (citing *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). Lastly, courts assess the type of relief that should be granted. *See id.* at 386. Where the plaintiff's claim is for unliquidated damages, the appropriate amount is to be determined at an evidentiary hearing, whether conducted by the Court or referred to a magistrate judge. *See* Fed. R. Civ. Pro. 55(b)(2); *Wooten v. McDonald Transit Assocs.*, 788 F.3d 490, 496 (5th Cir. 2015). If damages are awarded in the default judgment and the defendant does not appear at the hearing on damages, the defendant cannot question the damages for the first time on appeal. *See Bonanza Int'l v. Corceller*, 480 F.2d 613, 614 (5th Cir. 1973).

## SUMMARY OF THE ARGUMENT

On August 15, 2023, this Court denied Bruss and Schultz's motion to dismiss based on the bodyworn camera footage attached to Mr. Thomas's Complaint. Doc. 24. The Court concluded that Johnson used excessive force, that Bruss and Johnson had the opportunity to intervene but failed to do so, and that qualified immunity would not shield them from suit.

Discovery has only confirmed that this Court made the right decision the first time and that Mr. Thomas's claims are grounded in well-established facts not subject to reasonable dispute. The

11

additional video evidence and dispatch records Mr. Thomas received are completely consistent with the footage this Court has already reviewed, revealing no new facts that would have justified K9 force. Moreover, Defendants Bruss and Schultz admitted during their depositions that they were aware of the duty to intervene and that they could have done so here. They chose not to because they felt that Johnson's use of force was justified—force this Court has already deemed unconstitutional. There is accordingly no genuine issue of material fact. *See Celotex*, 477 U.S. at 322.

In Defendants' view, Johnson's use of force was constitutional because Mr. Thomas was too slow to get off the ground and because Defendants could not be certain Mr. Thomas was unarmed. This Court has already dispensed with Defendants' arguments about Mr. Thomas's pace, concluding that K9 force was unwarranted given that there was no immediate threat, mere seconds had passed since the initial order for Mr. Thomas to stand up, and Mr. Thomas was in the process of complying when Johnson released his dog. Doc. 24 at 9–10. Defendants' impatience and, in Johnson's case, apparent eagerness to use K9 force, cannot justify their violence against a suspect who was compliant, or at most, passively resisting. *Id.* at 9 ("Even if the court was to agree with the defendants' contention that Thomas's slowness in responding to the command to stand up from a prone position with his arms held away from his body amounted to 'resistance,' that would not license the use of force shown here.") (citing cases).

As to Defendants' second contention about possible weapon possession, all objective evidence demonstrates they had no reasonable basis to believe that Mr. Thomas was armed. Dispatch records and video evidence show that dispatch specifically advised that the reporting party—not the suspects—was armed. Defendant Schultz confirmed this fact during his deposition, testifying that "the only positive information we had was that the homeowner did have a weapon."

When asked whether dispatch provided any "positive information" that "the suspects" also had a weapon, Schultz responded, "Nope. Just like the other millions of calls we were on. We don't know until we get there."

Despite the overwhelming evidence showing that dispatch did *not* communicate that Mr. Thomas or Mr. Gray was armed, Defendant Bruss maintains otherwise. However, Bruss's self-serving statements are insufficient to create a genuine factual dispute. *See, e.g.*, *Scott*, 550 U.S. at 381 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Moreover, Bruss's quarrel with the objective evidence in this case is immaterial, because K9 force would have been unjustified even if dispatch *had* stated that Mr. Thomas and Mr. Gray were armed.

The Fourth Amendment does not abide police officers inflicting arbitrary force based on mere hunches unsupported by particularized facts; "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Longstanding Fifth Circuit precedent clearly establishes that it is unconstitutional to use K9 force against a suspect who is compliant or, at most, passively resisting, and that officers who witness excessive force cannot stand idly by and allow it to happen. Precinct 1 policy says no different, further establishing that Defendants had fair warning. *Banks v. Herbrich*, 90 F.4th 407, 416 (5th Cir. 2024) ("Under our current caselaw, violations of internal procedures or policies are insufficient to give rise to constitutional violations. But when properly supported by precedent, these internal procedures bolster a finding that defendants had 'fair and clear warning' of the clearly established right at issue.") (internal citations omitted). The operative Precinct 1 policies Mr. Thomas received in discovery make clear that officers are prohibited from

using K9 force on a subject who poses no immediate threat—let alone one who is visibly unarmed and prone on the ground. Moreover, Precinct 1 officers are required to intervene in and report any unreasonable use of force. Not only did Defendants fail to abide by Fifth Circuit precedent; they also plainly violated their own Precinct's policies.

In sum, no material facts have emerged in discovery that complicate or undercut this Court's prior ruling. Precinct 1 policy and training confirms that Defendants knew or should have known that use of K9 force in these circumstances was unlawful, and that Bruss and Schultz had a duty to intervene. Moreover, by their own admission, Bruss and Schultz had the opportunity to do so—they simply chose not to. Accordingly, Mr. Thomas respectfully moves this Court to enter an order for summary judgment against all three Defendants as to liability.

Additionally, or in the alternative, as to the Estate of Robert Johnson, Mr. Thomas seeks an order for default judgment. On November 22, 2023, this Court substituted Keith Morris for Defendant Johnson, his capacity as temporary dependent administrator of Johnson's Estate. Mr. Thomas's expectation was that, after Mr. Thomas had cleared the necessary procedural hurdles to have an administrator appointed and substituted, the Harris County Attorney's Office ("HCAO") would assign counsel to represent Johnson's Estate—just as it did for Bruss and Schultz. Unfortunately, HCAO refused to furnish Mr. Morris with counsel and, Mr. Morris—having no relation to Johnson and no knowledge of the facts underlying this lawsuit—has been left with no means of defending the suit. As a result, Mr. Morris has not filed an answer or otherwise appeared to defend Johnson's Estate.

## ARGUMENT

I.  **All material facts revealed in discovery confirm that, as this Court has already ruled, Defendant Johnson had no lawful basis to use K9 force, Defendant Bruss and Schultz failed to intervene despite ample opportunity, and qualified immunity does not shield them from liability.**

In denying Defendants' motion to dismiss, this Court concluded that: (1) "Johnson used excessive force" when he released his K9 on Mr. Thomas, "who had been compliant, prone, and visibly unarmed" for several minutes, Doc. 24. at 8–9; (2) Bruss and Schultz "made no attempt to deescalate the situation, even after the [only other suspect] had been taken into custody and Thomas was lying face down on the ground," *id.* at 12; (3) this failure to deescalate or otherwise intervene supported a claim for bystander liability against Bruss and Schultz, *id.* at 12–13; and (4) qualified immunity cannot shield Defendants from suit insofar as their conduct was objectively unreasonable, *id.* at 15.[4]

In fairness to Defendants, the Court noted that while the video supported Mr. Thomas's allegations, "[n]o discovery ha[d] been conducted that would allow the court to understand what Bruss and Schultz believed about the situation." *Id.* at 16–17. We now have that information, and nothing revealed in discovery excuses Defendants' conduct. All of the undisputed material facts establish that Defendants had no reasonable basis to believe that Mr. Thomas posed an immediate threat. Moreover, these same facts establish that Defendants had the ability and opportunity to intervene, but chose not to do so because they felt Johnson's use of force was justified.

---

[4] *Accord* Doc. 24 at 9–10 (applying *Joseph ex rel. Est. of Joseph v. Bartlett,* 981 F.3d 319 (5th Cir. 2020), *Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017); *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016); and *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009)).

**A. Defendant Schultz, a seasoned police officer who spent more than thirty years in Harris County law enforcement, was able and well-positioned to intervene.**

Defendant Schultz was a seasoned police officer who had been working for various law enforcement agencies since 1991—thirty years at the time of the K9 attack at issue here. SOMF ¶ 118. Much of this time was at nearby Precinct 4 of the Harris County Constable's Office, where he was promoted several times, including to the rank of Lieutenant. SOMF ¶ 119. In that role, Schultz sat on the Precinct's complaint review board, where he oversaw investigations into reports of excessive force and other alleged misconduct. SOMF ¶ 120.

Regarding the use of force at issue here, Defendant Schultz stood directly behind or beside Johnson throughout the encounter—both before and during the K9 attack. SOMF ¶¶ 61, 77, 78, 95. Schultz was the officer who gave Mr. Thomas the initial orders to stand up and was thus well-positioned to ask Johnson to hold off on releasing his K9. SOMF ¶ 78. Schultz understood that force must be used only in proportion to the level of resistance faced. For example, he testified as follows:

> Q:    So what factors do law enforcement officers consider before using force on a suspect?
> A:    I would say -- again, it depends on what force is being employed -- or deployed on you. If I've got someone just being verbally aggressive and not complying with me asking him to comply, I might try a hard-hand technique first before I go to a Taser.
>
> SOMF ¶ 121.

Even so, Schultz testified that he prefers to deescalate whenever possible:

> A:    I have learned over my 32 years of doing the career that I was able to de-escalate with just talking to people way more than I was ever needing to put hands on people. Ever.
>
> SOMF ¶ 122.

Schultz also understood that, when force *is* necessary, a taser is less likely to cause serious injury than a K9:

> Q:      Would you say that either a Taser or a K-9 is more likely to cause severe injury to a suspect?
> MS. VINSON: Object to form.
> Q:      Is the question you're asking which is more likely to cause injury to a suspect?
> Q:      Yes. That's right.
> A:      I would say without a doubt the K-9 would cause more damage, depending on what the suspect is doing when the apprehension is made.
>
> SOMF ¶ 123.

Schultz even acknowledged that—had there been a need to use force against Mr. Thomas—he had his taser available as a viable alternative to K9 force:

> Q:      Were there any other viable options before releasing the K-9 on Mr. Thomas?
> A:      At that point, I could have tased him.[5]
>
> SOMF ¶ 125.

Finally, when asked whether Johnson should have done anything differently, Schultz testified that Johnson could have waited longer before releasing his K9:

> Q:      He might have waited a little bit longer [before releasing the K9]. Maybe a couple seconds. A few seconds more.
>
> SOMF ¶ 127.

Despite a clear understanding of the risk of unnecessary force—and the likely severity of the resulting harm—Schultz made no effort to intervene. SOMF ¶¶ 121–25, 129. He did not ask Johnson to slow down. SOMF ¶ 129. He did not tell Johnson that they could afford to give Mr.

---

[5] Schultz further testified that the taser option became unavailable once Johnson released his K9: "At that point, I could have tased him. But, again, that would have put me in close proximity of the vehicle, and Johnson released his dog. So [after Johnson released the K9] I did not -- I did not have another viable option." SOMF ¶ 125.

Thomas a few more seconds to get off the ground. *Id*. He did not tell Johnson that, if necessary, they could use the taser instead of the K9. *Id*. Moreover, he did not make any effort to stop the attack once it began, instead standing directly beside Johnson, saying and doing nothing, while Mr. Thomas cried out in pain for the duration of the 45-second attack. SOMF ¶¶ 86–104. Schultz did not take any of these steps—despite acknowledging during his deposition that he had an opportunity to do so—because he did not subjectively believe that Johnson "was doing anything he didn't need to be doing." SOMF ¶¶ 126, 128–29.

"[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force" can be held liable under Section 1983. *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). By Schultz's own admission, Defendants had other viable options available—including simply waiting a few more seconds for Mr. Thomas to get off the ground. SOMF ¶¶ 125–27. His failure to prevent Johnson from releasing his K9, despite the opportunity to do so, was unreasonable under the circumstances.

**B. Defendant Bruss, a K9 handler and trainer with more than a decade of experience, was able and well-positioned to intervene.**

Defendant Bruss testified he is both a K9 handler and a K9 trainer. SOMF ¶ 112. He estimated that he has trained "hundreds" of K9 handlers. *Id*. At the time of the attack at issue here, he had been working with police K9s for more than a decade. SOMF ¶ 113. Thus, in addition to being in close physical proximity to Johnson before he released his K9, Bruss was well-positioned to intervene due to his training and experience. He testified unequivocally that he could have intervened, but chose not to do so.

> Q:    Did you have the opportunity to direct Mr. Johnson to take his dog off the bite?
> A:    Sure I had an opportunity.
> Q:    Did you have an opportunity to tell him not to release the dog?
> A:    I        had        an        opportunity        for        that,        too.

> Q:    And that was after Mr. Gray was in custody that the dog was released?
> A:    Yes.
> Q:    Did you have an opportunity to tell Johnson to put the dog back in the car?
> A:    Yes,              I              could              have.
> Q:    Did you have an opportunity to tell Johnson to remove the dog from the bite while        you        were        standing        over        him?
> A:    Yes.            I            think            I            did.
> .                                    .                                    .
> Q:    So when you saw Robert Johnson straddling Mr. Thomas, did you have an opportunity    to    tell    him    to    release    the    dog    from    the    bite?
> A:    Sure, I had the opportunity.

SOMF ¶ 115.

Despite ample opportunity to intervene in any of these ways, Bruss chose to let Johnson carry out his gratuitous K9 attack because he subjectively believed Johnson's use of force was lawful. SOMF ¶ 116 ("I have a duty to intervene when I believe that something is unlawful. At that particular point, I didn't have the hindsight of watching these videos. *And even at this point, I don't believe it was unlawful*." (emphasis added)); *see also id.* (describing the use of force as justified based on "[Mr. Thomas's] noncompliance. He [was] an un-searched suspect on a weapons call.").[6] Indeed, Bruss had so little regard for Mr. Thomas's pain that he cracked jokes about it after the fact. SOMF ¶¶ 108–09. When Johnson called Bruss over to confirm the spelling of Mr. Thomas's first name (Kerry), Johnson asked whether it was the "common spelling?" *Id*. Laughing to himself, Bruss replied, "I don't know, the way he's yelling, it could be K-E-R-R-I"—referring to the more common spelling of the name when it is used for women. *Id*.

Defendant Bruss unequivocally admits that he had the opportunity to intervene, whether by directing Johnson not to release his K9 or by telling him to remove the K9 from the bite. SOMF ¶ 115. He simply chose not to do so. Instead, he stood by and allowed the attack to continue

---

[6] As discussed *infra* Section I.E., dispatch made clear that the complaining witness or "reportee" was the only person reported to have a gun, and Bruss had no reasonable basis to believe otherwise.

for 45 seconds. SOMF ¶¶ 86–104. Moreover, as Mr. Thomas groaned in pain from the K9 bite, Bruss threatened Mr. Thomas with the words, "You ain't seen nothing yet." SOMF ¶ 106. This threat, coupled with his joke at Mr. Thomas's expense, "support[s] an inference of acquiescence" in Johnson's excessive use of force. *See Timpa v. Dillard*, 20 F.4th 1020, 1039 (5th Cir. 2021) (recounting the facts of *Hale v. Townley*, in which the Fifth Circuit found that the bystander defendants "stood by and laughed" while another officer assaulted the plaintiff, and concluded that this "supported an inference of acquiescence"). By failing to intervene in—and, in fact, openly supporting—Johnson's excessive use of force, Bruss violated Mr. Thomas's Fourth Amendment rights. *Hale*, 45 F.3d at 919.

**C. Precinct 1 policy makes clear that officers are not permitted to use K9 force against a subject who does not pose an immediate threat, is not actively resisting arrest, and is not attempting to evade arrest by flight. Precinct 1 policy also makes clear that officers have a duty to intervene in excessive force, regardless of rank, and regardless of the type of force being used.**

Precinct 1 policy on the use of force emphasizes restraint, de-escalation, and proportionality. SOMF ¶ 130. It repeatedly directs officers to use only that force which is necessary to overcome resistance or aggression on the part of the subject. *Id*. The policy also repeatedly states that once resistance has been overcome or reduced, force must be stopped or reduced proportionally. SOMF ¶ 141. Indeed, the policy emphasizes this principle in all caps, with bolded and underlined font: "**WHEN RESISTANCE STOPS, RESPONSE TO RESISTANCE MUST IMMEDIATELY STOP.**" *Id*.

Under Precinct 1 policy, K9 force cannot be used against a suspect who is compliant or only passively resisting. SOMF ¶¶ 138–40. The examples of passive resistance provided include, "standing stationary and not moving upon lawful direction" or becoming a "dead weight." SOMF ¶ 133. Lieutenant Moncrief—Johnson's supervisor at the time of the attack at issue—

testified as follows when asked to define passive resistance: "[I]f I'm telling you, hey, get up, and you're just sitting there like a slug on a log, you know, you're not, you know, making movements towards a possible concealed weapon in your pants or in your jacket. You're just sitting there motionless." SOMF ¶ 137. Sergeant Red—testifying on behalf of Precinct 1 as a 30(b)(6) witness—made clear that the difference between passive and active resistance is whether a subject is "physically fleeing or fighting." SOMF ¶ 139.

Precinct 1's K9 policy offers further instruction, emphasizing that the use of K9 force must be proportional to the level of "*physical* resistan[ce]" or other "immediate threat" posed by the subject. SOMF ¶ 143. Specifically, the policy directs that a K9 should not be used to apprehend a suspect unless the suspect: (1) poses "an *immediate* threat of violence or serious harm" to the officer or others; (2) is "*physically* resisting arrest," such that K9 force is "*necessary* to overcome such resistance"; or (3) is "hiding or evading" in an area where the officer cannot enter without risk to his safety or that of the public. SOMF ¶¶ 143–44. Precinct 1's K9 policy further notes that while every apprehension context is different, when in doubt, a standard of reasonableness controls. SOMF ¶¶ 143, 145.

Finally, Precinct 1's use of force policy expressly requires officers to intervene when they see another officer using excessive force. SOMF ¶ 146. This policy applies regardless of rank, and regardless of the type of force being used. *Id*. Sergeant Red—who testified both as Precinct 1's 30(b)(6) witness and one of Defendants' experts—put it simply: "[I]f you see someone getting ready to do something wrong, you have to stop them before they do something wrong." SOMF ¶ 150.

**D. Defendants Bruss and Schultz's testimony, alongside Precinct 1's policies, confirm that their failure to intervene in Johnson's use of force was unreasonable, and that they had fair warning it would subject them to liability.**

This Court has already held that Defendant Johnson used excessive force and that Defendants Bruss and Schultz failed to intervene, in violation of the Fourth Amendment. Doc. 24 at 8–9, 12–13. The Court also concluded that Defendants had fair warning, through Fifth Circuit precedent, that their conduct and omissions subjected them to liability. *See also* Doc. 24 at 15 ("The court believes that the many decisions from the Fifth Circuit, cited above, offered ample notice to the officers that it is unconstitutional to use physical force sufficient to severely injure a suspect when that suspect is compliant or has been at most passively resisting.); *id.* at 9–10 (applying *Joseph ex rel. Est. of Joseph,* 981 F.3d 319, *Trammell*, 868 F.3d 332; *Cooper*, 844 F.3d 517; and *Deville*, 567 F.3d 156).

Discovery has only confirmed that Johnson's conduct was plainly unconstitutional, and that Bruss and Schultz were on notice of this fact and of their duty to intervene—they simply chose not to. The relevant inquiry is not what the Defendants subjectively believed (or claimed to have believed), but rather what a reasonable officer would have objectively believed given the facts and circumstances known to them. *See Autin v. City of Baytown*, 174 F.App'x 183, 185 (5th Cir. 2005) ("The question is whether the use of force was objectively reasonable under the circumstances . . . , not whether the force was justified based on [Defendant's] claimed interpretation of the situation at the time." (citing *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994)). Qualified immunity provides a shield only "'insofar as [an officer's] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *See Joseph ex rel. Est. of Joseph*, 981 F.3d at 328 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

While, on their own, violations of internal policies and procedures do not create a constitutional violation, "when properly supported by precedent," they can "bolster a finding that defendants had 'fair and clear warning' of the clearly established right at issue." *Banks*, 90 F.4th at 416. *Accord Groh v. Ramirez*, 540 U.S. 551, 564 (2004) ("[T]he guidelines of petitioner's own department placed him on notice that he might be liable.").

Defendants' deposition testimony about their decision not to intervene, coupled with their own department's policies, should eliminate any doubt that: (1) Defendants' conduct was unreasonable under the circumstances, and (2) Defendants had fair warning that they were violating Mr. Thomas's constitutional rights.

**E. Defendant Bruss's uncorroborated, self-serving statements do not create a genuine dispute of material fact because: (1) they are contradicted by all objective evidence; and (2) even if dispatch *had* communicated that the suspects were armed, Defendants' use of force would still have been excessive under the totality of the circumstances.**

Defendant Bruss contends that dispatch told him the suspects were armed. SOMF ¶ 117. However, this claim is contradicted by all other evidence, as well as by the testimony of Defendant Schultz. SOMF ¶¶ 3, 5–13, 93, 110–11. The audio from Defendants' bodyworn and dashboard cameras capture nearly all of the communications between Defendants and dispatch. The remaining dispatch communications were captured in a Computer Aided Dispatch ("CAD") Report.

The CAD Report reflects that dispatch described the suspects as two Black males and informed Defendants that the *reporting party* (also called the "reportee") had his weapon out. SOMF ¶ 3. Dispatch never stated or suggested that the suspects also had weapons, even when directly asked by Defendants. SOMF ¶¶ 5–7. The CAD Report shows that a responding officer twice asked whether it was the reporting party or the suspects who had a weapon out. Dispatch responded that it was the reporting party—not the suspects. *Id*.

While the officer's question—"DOES SUSP HAVE WEAPON OUT OR REP?"—is not captured in the video evidence, the response from dispatch *is* captured in Defendants' bodyworn camera footage: "Updated: reporting has his weapon out." *Id*. This mirrors the transcription in the CAD Report: "RPT HAS WEAPON OUT." *Id*. As captured on video, Johnson then confirmed he understood, telling dispatch: "That's clear. Are the suspects still there? If they're not there, tell him to put away his weapon." SOMF ¶ 8. Following the arrest of Mr. Thomas and Mr. Gray, Deputy Tuzun spoke with the reportee, who confirmed that he never saw Mr. Thomas or Mr. Gray brandish a weapon and that he never told dispatch that either of them had a weapon. SOMF ¶¶ 110–11.

In sum, there is no indication or corroboration in the CAD Report—nor in the audio from any of the officer's bodyworn or dashboard cameras—that dispatch ever stated the suspects were armed. Critically, Schultz declined to cosign Bruss's story. When asked about the dispatch communications, Schultz testified as follows:

> Q:    Did anybody ask over dispatch -- did you hear anyone ask over dispatch whether it was the suspects or the homeowners who had the weapon?
> A:    I seem to recall Bruss -- I want to say Bruss asked over the air, and they did advise that the homeowner did have a weapon. But that still didn't confirm whether or not the suspects had a weapon also.
> Q:    Did you hear anyone ask for confirmation about whether the suspects had a weapon?

A:    Yes, and the only positive information they had was that the homeowner did have a weapon.

Q:    So there was no positive information from dispatch, to your recollection, that the suspects also had a weapon?

A:    Nope. Just like the other millions of calls we were on. We don't know until we get there.

SOMF ¶ 11

Given the total absence of corroboration, Bruss's conclusory, self-serving statements do not create a genuine dispute of fact. *E.g.*, *Scott*, 550 U.S. at 381 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005) ("[Plaintiff's] attempt to create a fact issue as to his knowledge by relying on a conclusory and self-serving affidavit is on unsteady ground.").

Moreover, Bruss's quarrel with the objective evidence in this case is immaterial, because K9 force would have been unjustified *even if* dispatch had stated that Mr. Thomas and Mr. Gray were armed. "[T]he mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit." *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016); *Cole Est. of Richards v. Hutchins*, 959 F.3d 1127, 1134–35 (8th Cir. 2020) (collecting cases from various circuits) ("[A]n individual does not pose an immediate threat of serious physical harm to others when, although that person is seemingly in possession of a gun, he does not raise it toward another or otherwise appear 'ready to shoot' in the moment."). "Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." *Perez*, 809 F.3d at 1220. Accordingly, "an officer cannot escape liability any time he claims he saw a gun," *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023).

25

It matters that, here, from the moment Johnson arrived on the scene until the moment he released his K9, Mr. Thomas kept his hands away from his body, empty, and visible in a clear gesture of surrender. SOMF ¶¶ 18–85. It matters that the officers never saw a gun, let alone one in Mr. Thomas's reach. SOMF ¶¶ 12–13. It matters that no officer ever saw a weapon in anyone's hands, in their visible waistbands, or elsewhere on their person. *Id*. It matters that Mr. Gray was taken into custody without incident and that Mr. Thomas followed Defendants' instructions to get on the ground and keep his hands away from his body. SOMF ¶¶ 49–52, 75. "[W]hatever [Bruss] thought he heard [dispatch] say . . . , there is considerable evidence that a reasonable officer in [Bruss's] position could not have perceived that [Mr. Thomas] was, in fact, armed." *Clem v. Corbeau*, 284 F.3d 543, 551 (4th Cir. 2002). The law makes clear that these circumstances did not justify Defendants' use of force. For these reasons, Defendant Bruss's claims about dispatch do not create a genuine dispute of material fact.

***

In sum, no facts revealed in discovery undercut this Court's prior ruling. On the contrary, discovery has only confirmed that Johnson's conduct was plainly unconstitutional, and that Bruss and Schultz could have intervened to stop it, but simply chose not to. Johnson's conduct renders his Estate liable to Mr. Thomas for excessive force as a matter of law, and Bruss and Schultz are liable for their failure to intervene.

## II.   There is good cause to grant default judgment against Defendant Keith Morris, in his capacity as temporary defendant administrator for the Estate of Robert Johnson.

Nearly two years have passed since Keith Morris—an attorney specializing in probate law—was appointed as temporary dependent administrator for the Estate of Robert Johnson, substituted as a defendant for Johnson in this lawsuit, and served with the summons and complaint. LaVarco Declaration in Support of Default Judgment ("Declaration") ¶¶ 13–18. Mr. Thomas's

expectation was that, after Mr. Thomas had cleared the necessary procedural hurdles to have an administrator appointed and substituted, the Harris County Attorney's Office ("HCAO") would assign counsel to represent Johnson's Estate—just as it did for Bruss and Schultz. Declaration ¶¶ 21–22. Unfortunately, HCAO refused to furnish Mr. Morris with counsel and, Mr. Morris—having no relation to Johnson and no knowledge of the facts underlying this lawsuit—has been left with no means of defending the suit. Declaration ¶¶ 20, 24. As a result, Mr. Morris has not filed an answer or otherwise appeared to defend Johnson's Estate. Declaration ¶ 25.

Because no one has filed an answer to defend Johnson's conduct, or otherwise appeared in Court to defend Johnson's Estate, Mr. Thomas now seeks default judgment against Mr. Morris, in his capacity as temporary dependent administrator of Johnson's Estate. To determine whether default judgment is appropriate, courts engage in three inquiries: Whether default is procedurally warranted, whether default is substantively warranted, and what the appropriate remedy is. Courts apply a three-step process to determine whether default judgment against a party is appropriate. *Recio v. Vasquez*, No. 5:18-CV-00264-C, 2023 WL 2144300, at *2 (N.D. Tex. Feb. 2, 2023), report and recommendation adopted, No. 5:18-CV-264-C, 2023 WL 2142984 (N.D. Tex. Feb. 21, 2023). Here, default judgment is both procedurally and substantively warranted, and, as Mr. Thomas's claim is for unliquidated damages, the Court should hold a hearing to determine the appropriate relief. *See* Fed. R. Civ. Pro. 55(b)(2); *Wooten*, 788 F.3d at 496.

**A. Default judgment is procedurally warranted.**

To determine whether default judgment is procedurally warranted, courts first consider the six factor balancing test set out in *Lindsey v. Prive Corp.*: (1) "whether material issues of fact are at issue," (2) "whether there has been substantial prejudice," (3) "whether the grounds for default are clearly established," (4) "whether the default was caused by a good faith mistake or excusable

27

neglect," (5) "the harshness of a default judgment," and (6) "whether the court would think itself obliged to set aside the default on the defendant's motion." 161 F.3d at 893.

Applying these factors to Mr. Morris, default judgment is procedurally warranted. First, when a defendant fails to answer the complaint, he consequently "admits the plaintiff's well-pleaded allegations of fact." *Nishimatsu*, 515 F.2d at 1206. Here, the Court has already concluded that Mr. Thomas's allegations are well-pleaded, and—based on the incontrovertible video evidence attached to his Complaint—that "Johnson used excessive force." Doc. 24 at 9. Moreover, because there has been no responsive pleading, there can be no material facts to dispute. *See Nishimatsu*, 515 F.2d at 1206.

As to the second factor, a plaintiff is prejudiced when the denial of a default judgment would leave the plaintiff without a proper remedy. *Recio*, 2023 WL 2144300 at *3. Here, Mr. Thomas would certainly suffer prejudice in the absence of default judgment, as he would be prevented from recovering against Johnson at all.

Third, the grounds for default are clearly established. Mr. Thomas effected service more than 18 months ago and no one has filed a responsive motion or pleading to defend Johnson's Estate. Declaration ¶¶ 13–18, 25.

Fourth, nothing in the record indicates that the absence of a responsive pleading is the result of a "good faith mistake or excusable neglect." *See Lindsey*, 161 F.3d at 893. Plaintiff's Counsel put HCAO and Mr. Morris on notice of the deadline for filing an answer in an email dated December 11, 2023. HCAO has contracted with counsel to represent the other Defendants in this case, but have willfully refused to do so for Mr. Morris, in his capacity as temporary dependent administrator for Johnson's Estate.

As to the fifth factor, when a defendant "fail[s] to engage in the litigation process without reason, courts continuously find that entering default judgment against defendants is not a harsh result." *Recio*, 2023 WL 2144300 at *3.

Lastly, a court may consider whether it would later be obliged to set aside a default judgment. A default judgment should be upheld where "the default was willful, the plaintiff will be prejudiced, *or* the defendant has no meritorious defense." *Moreno v. LG Elecs.*, 800 F.3d 692, 698 (5th Cir. 2015) (citing *In re Dierschke*, 975 F.2d 181, 183–84 (5th Cir. 1992) (emphasis added)). Here, where only one is required, all three conditions are met. As discussed above, there is no evidence that the failure to respond was the result of a good faith mistake or excusable neglect. Moreover, without a default judgment, Mr. Thomas would be without remedy for Johnson's misconduct. And if the Court were to set aside default judgment after first entering it, Mr. Thomas would be required to reprise at least some portion of the lengthy discovery process he has already undergone with Defendants Bruss and Schultz, delaying trial. Finally, The Court has already concluded that Johnson violated Mr. Thomas's clearly established Fourth Amendment rights based on uncontrovertible video evidence of the K9 attack at issue. Doc. 24 at 9. Claims for excessive force are assessed based on an objective standard, and qualified immunity is unavailable where the rights at issue were clearly established at the time of the violation. Thus, there is no meritorious defense for Johnson's misconduct.

For these reasons, based on the factors enumerated in *Lindsey*, default judgment is procedurally warranted.

**B. Default judgment is substantively warranted, and the Court should hold an evidentiary hearing to determine the amount of damages.**

A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true, *Nishimatsu*, 515 F.2d at 1206, that "establish a valid cause

of action," *Freightliner*, 548 F. Supp. 2d at 385. As discussed above, a defendant who fails to answer a lawsuit is deemed to have admitted the plaintiff's well-pleaded factual allegations. *Nishimatsu*, 515 F.2d at 1206. Here, the Court has already determined that Mr. Thomas's allegations are well-pleaded, and indeed, were sufficiently supported through video evidence to conclude that Johnson used excessive force. Doc. 24 at 9. Discovery has only confirmed that this Court made the right decision the first time and that Mr. Thomas's claims are grounded in well-established facts not subject to genuine dispute. For these reasons, default judgment is substantively warranted.

The only question remaining is what relief is appropriate. *Travelers Cas. & Sur. Co. of Am. v. HighMark Constr. Co., LLC*, No. 7:16-cv-00255, 2018 WL 4334016, at *2 (S.D. Tex. May 5, 2018). Where the plaintiff's claim is for unliquidated damages, the appropriate amount is to be determined at an evidentiary hearing, whether conducted by the Court or referred to a magistrate judge. *See* Fed. R. Civ. Pro. 55(b)(2); *Wooten*, 788 F.3d at 496. Mr. Thomas seeks a declaratory judgment, compensatory and punitive damages, and attorneys' fees, and Mr. Thomas respectfully requests that the Court set an evidentiary hearing to determine the appropriate amount.

## CONCLUSION

For the foregoing reasons, Mr. Thomas respectfully moves this Court to enter summary judgment against all three Defendants as to liability. Additionally or in the alternative, Mr. Thomas respectfully moves for default judgment against Keith Morris, in his capacity as temporary dependent administrator for the Estate of Robert Johnson, with the appropriate amount of damages to be determined at an evidentiary hearing.

Respectfully submitted this 22nd day of August, 2025,

/s/ **Shirley LaVarco**
Shirley LaVarco (S.D. Tex. Bar No. 3837906)
shirley@peoplescounsel.org
Brittany Francis*
brittany@peoplescounsel.org
Peoples' Counsel
1900 W. Gray Street
P.O. Box 130442
Houston, TX 77219
Telephone: (713) 487-9809
* Attorney-in-Charge. Admitted to practice in Texas (Bar No. 24141616), New York (Bar No. 5337555), and the District of Columbia (Bar No. 90008960).

Alessandro Clark-Ansani (*pro hac vice*)†
alessandro@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Telephone: (202) 844-4975
alessandro@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Telephone: (202) 844-4975

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on August 22, 2025, a true and correct copy of this document was properly served on counsel of record via electronic filing in accordance with the United States District Court for the Southern District of Texas Procedures for Electronic Filing.

/s/ Shirley LaVarco
*Counsel for Plaintiff*