# Plaintiff's Statement of Material Facts

THOMAS v. BRUSS et. al., 4:23-cv-00662

---

## EXHIBIT G COVER SHEET

**RECORDS HEREIN:**

Expert report of Thomas J. Tiderington.

KERRY LEE THOMAS,

*Plaintiff*

*v.*

ROBERT JOHNSON,
ERIC M. BRUSS,
WAYNE SCHULTZ,
and KEITH MORRIS, in his capacity as
Temporary Defendant Administrator of the
Estate of Robert Johnson,

*Defendants.*

Case No. 4:23-cv-00662

EXPERT REPORT OF

THOMAS J. TIDERINGTON
(Thomas J. Tiderington & Associates-LLC)
March 21, 2025

EXECUTIVE SUMMARY ............................................................................................ 4

    Officer Dispatch.................................................................................................................. 4

    Arrival on Scene ................................................................................................................ 5

    Initial Detention of Mr. Thomas ...................................................................................... 6

    Use of Force and Canine Deployment .............................................................................. 7

        Graham Standard ......................................................................................................... 7

        Precinct 1 Policy ......................................................................................................... 8

    Prolonged Harm and Failure to Intervene........................................................................ 9

    Post-Force Care................................................................................................................ 10

    Reporting.......................................................................................................................... 10

    Key Findings .................................................................................................................... 11

INTRODUCTION .................................................................................................................. 13

SUMMARY OF QUALIFICATIONS – THOMAS J. TIDERINGTON .................................. 13

METHODOLOGY ................................................................................................................. 14

RULE 26 DISCLOSURES ...................................................................................................... 16

SUMMARY OF FACTS RELATED TO THIS INCIDENT ..................................................... 17

DEFENDANTS' INCIDENT REPORTS................................................................................. 28

    Sergeant R. Johnson's Report ........................................................................................ 28

OPINIONS AND ANALYSES ............................................................................................... 39

EXPERT OPINIONS AND ANALYSES ................................................................................ 39

    OPINION 1. ...................................................................................................................... 39

    ANALYSIS. ...................................................................................................................... 40

        Graham v. Connor........................................................................................................ 40

            Severity of the Crime Alleged. ................................................................................ 41

            Whether There Was An Immediate Threat to the Safety of Officers or Others. .............. 42

            Whether the Subject was Actively Resisting or Attempting to Evade By Flight. ............ 42

        Precinct 1 Canine Policy............................................................................................. 42

        Precinct 1 Policy on the Use of Force......................................................................... 43

    OPINION 2. ...................................................................................................................... 43

    ANALYSIS. ...................................................................................................................... 43

        Relevant National and State Policies and Standards........................................................ 44

        Precinct 1 Policy on the Duty to Intervene. ................................................................ 45

    OPINION 3. ...................................................................................................................... 45

    ANALYSIS. ...................................................................................................................... 46

Deposition Testimony.................................................................................................................46

Detailed Findings.....................................................................................................................47

OPINION 4. ...............................................................................................................................48

ANALYSIS....................................................................................................................................48

Deposition Testimony.................................................................................................................48

Detailed Findings.....................................................................................................................50

CONCLUSION .................................................................................................................................51

# EXECUTIVE SUMMARY

This report summarizes my expert opinion and analysis of a use of force incident that occurred on February 22, 2021, involving Defendants Eric Bruss and Robert Johnson, both of whom were Sergeants with Harris County Constable Precinct 1 at the time, as well as Defendant Wayne Schultz who was then a Corporal with Precinct 1. The incident involved the deployment of a police canine ("K9") to bite Plaintiff Kerry Lee Thomas during what would otherwise have been a routine call for service. Mr. Thomas was unarmed. At the time Defendant Johnson released the K-9, Mr. Thomas had been lying prone on the ground with his hands outstretched and empty for nearly three minutes—just as Defendants Johnson and Schultz had ordered him to do.

As further detailed below, Defendant Johnson's use of force was a substantial deviation from Precinct 1 policy, as well as from widely accepted police practices and procedures. Defendants Bruss and Schultz made no attempt to intervene in Johnson's use of force, which is itself a clear violation of Precinct 1 policy and of widely accepted police practices and procedures. My review of the bodyworn camera footage ("BWC") and other evidence shows that both Bruss and Schultz had many opportunities to intervene, whether verbally or physically. Indeed, Defendant Bruss would have been even better positioned to intervene than the average deputy, as he was a longtime K-9 handler and trainer himself, who had been working with police K9s for 15 years, and who often worked alongside Defendant Johnson. Defendant Schultz, who was standing just a few feet behind Defendant Johnson at all relevant times, also had many opportunities to intervene.

Defendants Johnson, Bruss, and Schultz deviated repeatedly and substantially from clear Precinct 1 policy and widely accepted law enforcement practices during the course of their interaction with Mr. Thomas. Defendants' actions also deviated substantially from what a reasonably prudent officer in their positions should have known and done. These deviations resulted in substantial and unnecessary harm to a civilian, as evidenced by the BWC and the photographs in Defendants' incident reports.

My analysis is based on a thorough evaluation of available evidence in this case, including BWC and dashboard camera ("dashcam") footage; the dispatch report; Defendants' incident reports and supplements; the testimony of all witnesses who appeared for depositions, including Defendants Bruss and Schultz and Lieutenant Moncrief, the supervisor who responded to the scene; Precinct 1 policies on K9s, the use of force, and the duty to intervene; and widely accepted police best practices.

**Officer Dispatch**

Defendants were dispatched to a Houston residence after a 911 caller reported a disturbance involving two unidentified men who were reportedly yelling on the street outside their home. The homeowner informed the dispatcher that he had his weapon out. Audio captured from Defendants' BWCs and dashcam footage confirms that the dispatcher informed Defendants that it was the

homeowner (rather than either of the unidentified men) who was armed. Defendant Johnson's BWC footage captures Defendant Johnson receiving this information. It then captures Defendant Johnson responding by instructing the dispatcher to tell the homeowner to secure his weapon. This is further corroborated by the written dispatch report.

Notably, the BWC and dashcam footage directly contradict the written incident reports of Defendants Johnson and Bruss, which alleged that dispatch had advised that the "suspects" had firearms, referring to Mr. Thomas and the driver, Raphael Gray. No other evidence supports this claim. Rather, the BWC and dashcam footage, along with the dispatch report, clearly establishes that Defendants Johnson, Bruss, and Schultz knew or should have known that Mr. Thomas and Mr. Gray were unarmed.

Furthermore, the information provided by dispatch suggests that Defendants knew or should have known that there was no basis to believe that Mr. Thomas had committed any arrestable offense to begin with. A reasonably prudent officer would have considered this information in the course of their dispatch for a disturbance. At a minimum, a reasonably prudent officer would have gathered more information about the nature of the disturbance before releasing a K-9, trained to bite, on a civilian who was lying prone on the ground, in compliance with Defendants' orders.

Indeed, even *if* Defendants had any reasonable law enforcement basis to conclude that Mr. Thomas or Mr. Gray were armed—and it is my opinion, based on extensive evidence, that they had no such basis—their actions would *still* constitute clear violations of Precinct 1 policy and substantial departures from widely accepted police practices. The reason is simple: releasing a highly aggressive K9 on a man who is not resisting, and indeed, who has been lying prone on the ground for nearly three minutes, as ordered, does not serve any legitimate law enforcement purpose. Indeed, when Defendant Johnson released his K-9, Mr. Gray had already been handcuffed and taken into custody, further neutralizing any perceived threat.

**Arrival on Scene**

Defendants' actions after they arrived on scene do not comport with their stated belief that Mr. Thomas and Mr. Gray were armed and that they posed an immediate or imminent threat to the deputies' safety.

Sergeant Johnson made no effort to coordinate a tactical response to an individual he claimed to believe was armed. A reasonably prudent officer faced with the circumstances as he reported them to be would have taken protective measures, including waiting for backup deputies to arrive and coordinating their positioning before confronting Mr. Thomas and Mr. Gray. A reasonably prudent officer would have also ensured he had adequate cover from potential gunfire by, for example, positioning himself behind the open door of his police vehicle.

While issuing commands, Defendants were observed to be standing in the open—in front of or to the side of their vehicles—rather than using them for cover or concealment, which is the widely accepted practice when confronting a suspect believed to be armed and dangerous. If they believed Mr. Thomas or Mr. Gray were armed or posed an imminent threat, their actions deviated from widely accepted police practices and training standards, which emphasize that officers should assume cover behind their vehicles and maintain distance from the suspect.

**Initial Detention of Mr. Thomas**

When Defendant Johnson first arrived on the scene, Mr. Thomas and Mr. Gray were sitting in a maroon sedan. As Johnson pulled up, Mr. Thomas exited from the passenger side of the vehicle and immediately raised his hands above his head in a commonly recognized "don't shoot me" or surrender position. Defendant Johnson began shouting commands at Mr. Thomas, repeatedly screaming at him to "get in the fucking car." Moments later, Defendants Bruss and Schultz arrived and began yelling conflicting commands, demanding Mr. Thomas get *out* of the car and "show me your fucking hands." Mr. Thomas stood uncertain as Johnson's K9 "Jeck", barked and growled while in a "ready" or "attack" position.

When ordered by Defendant Johnson to "get on the ground," Mr. Thomas immediately complied, carefully lowering himself to the ground and keeping his hands over his head and away from his body, where Defendants could see them. At that time, Defendant Bruss gave numerous conflicting and confusing commands to Mr. Gray, including "get down," "get up," "start walking," and "don't move." Despite this dangerous recipe for confusion, Bruss took Mr. Gray into custody without force.

As Mr. Gray was handcuffed, Mr. Thomas remained in a prone position, lying face down in the grass. During this time, Defendant Schultz began utilizing a laser-equipped weapon—presumably a TASER or firearm—and directed the beam around Mr. Thomas's head and eyes, potentially disorienting him and risking eye injury. Reasonably trained deputies know that lasers, if directed into someone's eyes, can cause temporary eye injury and even permanent damage or blindness. Law enforcement training emphasizes that lasers be used for aiming purposes only and should not be used to threaten or harm individuals. When asked if it is appropriate to aim a laser at a suspect's head or eyes, Schultz acknowledged that it is not appropriate, admitting that, "In fact, we are taught not to do that."

Schultz's dangerous and threatening use of a laser sight on Mr. Thomas, as he remained compliant through Defendants conflicting directives, was unwarranted, unprofessional, and departed from widely accepted established police practices and procedures.

Contrary to claims made in Sergeant Johnson's incident report, no evidence indicates that Mr. Thomas or Mr. Gray ever attempted to walk away from the scene. Rather, the BWC and dashcam

footage demonstrate that both Mr. Thomas and Mr. Gray immediately raised their arms and complied with orders throughout the incident.

**Use of Force and Canine Deployment**

After shining his laser at Mr. Thomas's eyes, Defendant Schultz began shouting commands at Mr. Thomas for the first time, ordering him to "step up" from his prone position. Mr. Thomas does not appear to register this command immediately, as he remains prone on the ground. Defendant Johnson then warned Mr. Thomas, "this is your last chance or I'm going to send the dog after you." Eleven seconds later, Mr. Thomas slowly began lifting himself from his position on the ground to comply with Johnson's order but was knocked back down when Defendant Johnson released his K9. The K9 grabbed hold of Mr. Thomas's right arm, yanking on it with its teeth. The defendants allowed the dog to continue biting Mr. Thomas's right bicep for some 45 seconds.

<u>Graham Standard</u>

In determining whether a use of force is reasonable, law enforcement bodies commonly teach and abide by the *Graham* standard, which involves an objective balancing test that considers the severity of the crime, whether the individual posed an immediate threat, and whether there was active resistance or attempts to flee. My review of the evidence reveals that Defendants' use of force in this case did not comport with the *Graham* standard as it is widely taught and understood by law enforcement professionals.

First, the evidence clearly contradicts the Defendants' assertions that they were acting on information from dispatch that Mr. Thomas or Mr. Gray were armed. As Mr. Thomas raised his hands above his head in a "don't shoot" or surrender position, a reasonably prudent officer could discern there was no firearm in his waistband area or visible from his pockets. Even if Defendants had misinterpreted the dispatcher's clear statement that it was the "reportee" (in this case, the homeowner) who was armed, Defendants' use of force would still have been a departure from widely accepted police standards. Defendants did not have even enough evidence to establish probable cause that Mr. Thomas committed an arrestable offense, let alone a "severe" one that would heighten the need for K9-inflicted force.

Second, Defendants' incident reports and supplements asserted that because Mr. Thomas was not searched and was allegedly reported to have a firearm, Defendants were concerned about the risk Mr. Thomas posed to the public if he decided to evade on foot. Again, dispatch never stated that anyone other than the homeowner was armed, and Mr. Thomas made no attempt to evade or flee. Given that Mr. Thomas remained in a prone position on the ground with multiple weapons pointed at him and was compliant with orders, a reasonably prudent officer would have deemed it highly improbable that he would attempt to escape.

Third, Defendants claimed in their incident reports and supplements that Mr. Thomas "failed all verbal commands" and attempted to walk away from the vehicle "several times." The BWC clearly contradicts this account, showing that Mr. Thomas remained compliant with officers despite their repeatedly conflicting and confusing orders. The BWC further shows that Mr. Thomas made no attempt to walk away from the scene or otherwise evade police custody or control.

Finally, Defendant Bruss testified during his deposition that Mr. Thomas's alleged failure to comply was an attempt to "lure" the deputies from a position of cover and expose them to an unsearched car that may have concealed a hidden threat. This, too, is in tension with the video evidence and with widely accepted police practices and procedures. There is no video evidence that corroborates Defendant Bruss's theory about being "lured" in. Reasonably trained and prudent officers do not rely on unsubstantiated speculation about hidden danger; they rely on the actual evidence and circumstances they are confronted with. Moreover, had Defendants believed that an armed or otherwise threatening individual remained hidden inside the car, their actions of holstering their weapons, positioning themselves beside and in front of their vehicles (rather than using their vehicles for cover), and approaching and engaging with the suspects before clearing the car deviated from widely accepted police practices and procedures.

Precinct 1 Policy

According to Precinct 1's Use of Force Policy, a K9 should only be used in high-risk situations involving assaultive behavior, meaning actions that pose an imminent threat of physical harm. Here, Mr. Thomas was unarmed, compliant, and in a prone position on the ground. Defendants had multiple weapons directed at Mr. Thomas and the threat of a police K9 nearby, all of which provide ample deterrents for resistant suspects, let alone compliant ones lying prone on the ground. Thus, a reasonably prudent and trained officer would have refrained from any use of force against Mr. Thomas. Instead, a reasonable officer would have proceeded with handcuffing Mr. Thomas if there existed probable cause to arrest him and, if not, would have proceeded with further investigation to determine if such an arrest was warranted.

**

In sum, Defendant Johnson's decision to release an attack K9 on Mr. Thomas—ultimately allowing the K9 to bite him for approximately 45 seconds—substantially departed from widely accepted police standards and practices as well as Precinct 1 policy. Defendant Bruss and Defendant Schultz also substantially departed from both Precinct 1 policy and widely accepted police standards and practices when they chose not to intervene in Johnson's use of force.

**Prolonged Harm and Failure to Intervene**

With the K9 still attached to Mr. Thomas's right bicep, Johnson straddled Mr. Thomas and ordered him to put his hands behind his back and stop moving. A reasonably prudent officer would understand that an individual struggling under the assault of an attack K9 would find it nearly impossible to remain completely still.

Defendants ultimately allowed the K9 to maul Mr. Thomas for approximately 45 seconds, inflicting unnecessary pain and injury on a civilian. Even after Thomas was handcuffed, Defendant Johnson either permitted or failed to prevent K9 Jeck from biting Mr. Thomas a second time. Law enforcement training and standards require that once a suspect is subdued and no longer poses a threat, officers will cease the use of force. Widely accepted police practices and standards emphasize that all force must be reasonable, necessary, and proportionate under the circumstances. Even when faced with resistance or threat, widely accepted police practices and standards dictate that reduced resistance must be met with commensurate reductions in the type and amount of force used. Given that Mr. Thomas gave no threat, exhibited no resistance, and was under the Defendants' complete control, the defendant officers' use of force was a substantial departure from these widely accepted practices and standards.

As Mr. Thomas was being subject to this K9 attack, Defendants Bruss and Schultz stood by passively, making no attempt to intervene to prevent or lessen the harm to Mr. Thomas. Bruss can be heard instructing Thomas to stop moving around, and to "roll over on your stomach, you ain't seen nothing yet." To Johnson, he later noted, "You can take him off the bite," indicating that he had the ability to issue instructions to Johnson and could have reasonably intervened to prevent or stop the use of force. Schultz stood nearby, pointing his TASER at Mr. Thomas as the K9 continued to bite him. After Defendant Johnson finally removed his K9 from the bite, Bruss and Johnson can be heard cheering.

Under widely accepted police practices and procedures, officers are trained to intervene when witnessing unnecessary force or other types of misconduct by their colleagues. The International Association of Chiefs of Police (IACP) Model Policy emphasizes that "officers have a duty to intervene to prevent or stop wrongdoing by another officer when it is safe and reasonable to do so." Similarly, the Texas Commission on Law Enforcement (TCOLE) Model Policies require that officers, regardless of rank, intervene in cases of excessive force and report such incidents. In Harris County, Precinct 1 policy also requires intervention if an officer's use of force exceeds what is objectively reasonable, particularly when a deputy observes his fellow law enforcement officer using force against a restrained or subdued subject. Schultz and Bruss violated widely accepted police practices and department policy by neglecting to intervene in Sergeant Johnson's unreasonable and unnecessary use of force and actively participating in the ongoing abuse. Schultz and Bruss admitted that they had the opportunity to intervene at multiple points in the incident– when they witnessed the canine in an "attack position," when canine deployment was threatened,

and at any point when taking into consideration that Mr. Thomas was unarmed–but failed to do so.

Indeed, Defendant Bruss, a K9 handler with 15 years of experience, acknowledged that police K9s may be likely to bite someone's head or face and that, in some instances, their attacks are fatal. He also acknowledged he was aware that K9 Jeck had bit his previous handlers, including Defendant Johnson. Defendant Schultz acknowledged the same. These acknowledgements make clear that Defendants knew or should have known of the risks and dangers associated with deploying a K9, and particularly the dangers posed by Jeck. Defendants knew or should have known that these risks should not be taken lightly.

**Post-Force Care**

In the aftermath of Johnson's unsanctioned K9 deployment, Defendants failed to provide adequate medical assistance. Instead, Defendants forced Mr. Thomas, who was clearly suffering from severe pain and K9-inflicted injury, to remain lying on the ground with his hands cuffed behind his back until EMS arrived. Rather than assessing or administering proper field treatment for Mr. Thomas' open wounds, or releasing Mr. Thomas in the absence of probable cause to arrest him, Defendant Bruss instructed Thomas to roll over onto his side and apply pressure to the wound in the grass and dirt to stop the bleeding. This was a departure from widely accepted police practices and standards.

Defendant Bruss further departed from law enforcement standards by forcing Mr. Thomas to keep his severely injured arm handcuffed behind his back. Despite the absence of probable cause, any arrestable offense, or any indication that Mr. Thomas posed any threat to officer or public safety, Defendant Bruss continued to detain Mr. Thomas. Defendant Bruss only agreed to reposition Mr. Thomas' handcuffs after being instructed to do so by medical technicians.

**Reporting**

Defendants Bruss and Schultz should have promptly reported Sergeant Johnson's clear violations of Precinct 1 policy. Despite their respective experience and training—Schultz holding the rank of Corporal and Bruss an experienced Deputy with 15 years of specialized K9 training and experience—each failed to adhere to Precinct 1 policy and widely accepted police practices and standards. Per the TCOLE Model Policies, every officer, regardless of rank, has a duty to promptly report any use of excessive force to a supervisor. Schultz and Bruss had a clear duty to promptly report Johnson's use of force. Their failure to do so diverges from what a reasonably trained and prudent officer should have known and done in that situation.

Finally, Defendant Schultz conveyed clearly inaccurate information to the Assistant District Attorney in an apparent attempt to charge Mr. Thomas with a more serious offense. Schultz's

claims that Mr. Thomas attempted to flee and failed to comply with officer directives are inconsistent with his own BWC footage and other available evidence.

As noted, Defendants' incident reports and supplements, as well as statements at deposition contradicted available video and audio evidence in several ways. These inaccuracies included claims that dispatch said "the suspects" were armed, as well as claims that Mr. Thomas and Mr. Gray tried to walk away from the scene, were non-compliant, or acted in a manner that could reasonably be considered a threat to public or officer safety. Despite Defendants' claims otherwise, the dispatch records along with the BWC and dashcam footage clearly show that dispatch never said that the suspects were armed, that Mr. Thomas and Mr. Gray made no attempt to flee, and that Mr. Thomas was compliant with orders and posed no threat throughout the encounter.

## Key Findings

1. Defendants knew or should have known that the basis for their dispatch was a "disturbance" and that, based on information provided from the dispatcher and the officers' observations on scene, there was not any basis to believe Mr. Thomas had committed a crime.
2. Defendants knew or should have known, based on information provided from the dispatcher, that the homeowner/reportee was armed but that there was no evidence to suggest that Mr. Thomas or Mr. Gray were armed.
3. Defendants' stated belief that Mr. Thomas or Mr. Gray to be armed is inconsistent with their failure to maintain distances from the suspects and take appropriate cover behind their police vehicles, as required by standard police practices and procedures.
4. Defendants were aware or should have been aware that Mr. Thomas immediately placed his hands in a position of "surrender" upon their arrival, and that he complied with their orders, despite hearing repeatedly conflicting directives.
5. Based on Mr. Thomas's "don't shoot" stance and a lack of visible weapon in his waistband or pockets, Defendants knew or should have known that Mr. Thomas was not armed.
6. Defendants knew or should have known that Mr. Thomas did not present a reasonable threat or danger to officer or public safety, let alone one warranting K9-inflicted force, based on the facts that, prior to the K9 deployment, (i) Mr. Thomas was prone position, with his arms fully extended away from his body, (ii) Mr. Gray had already been taken into custody without incident, and (iii) Mr. Thomas was outnumbered and overpowered by the presence of multiple armed police officers, several of whom had their weapons aimed on him, along with a visibly aggressive K9 at the ready.
7. Defendants knew or should have known that Mr. Thomas made no attempt to walk away from the scene, flee, or resist.
8. Defendant Schultz's targeted use of a laser-equipped weapon in a manner likely to intimidate and threaten Mr. Thomas, circling his head and face as he lay on the ground, departed from widely accepted police practices and procedures. Schultz's actions risked serious eye injury to

Mr. Thomas and potentially disoriented him. Schultz admitted that this action was inappropriate and contrary to his training.

9. Defendants knew or should have known that Mr. Thomas had committed no arrestable offense, was fully compliant, and never attempted to flee from custody.

10. Widely accepted police practices and standards emphasize that all force must be reasonable, necessary, and proportionate under the circumstances. Even when faced with resistance or threat, widely accepted police practices and standards dictate that reduced resistance must be met with commensurate reductions in the type and amount of force used. Given that Mr. Thomas gave no threat, exhibited no resistance, and was under Defendants' complete control, the defendant officers' use of force was a substantial departure from these widely accepted practices and standards and served no legitimate law enforcement purpose. Rather, the use of K9-inflicted force exposed Defendants and Mr. Thomas to unnecessary risk and, in the case of Mr. Thomas, serious injury.

11. After Mr. Thomas was handcuffed, Defendant Johnson either permitted or failed to control his K9 from attacking Thomas a second time. This suggests that either the K9 was not properly or adequately trained to release upon command, that Johnson was unable to control the K9, or that Johnson knowingly and intentionally allowed the canine to continue attacking Mr. Thomas as he lay injured and restrained.

12. Police policy and training standards require that officers intervene in instances where the use of force is unreasonable or otherwise departs from policy, and report such cases to their superiors. Schultz and Bruss stood by passively as Johnson released his Precinct 1 K9 on a civilian who immediately surrendered to Defendants' show of authority—despite the absence of probable cause to arrest him—and was lying prone on the ground. Defendants Bruss and Schultz allowed the Precinct 1 K9 to attack Mr. Thomas for an extended period of time, making no attempt to intervene and prevent the K9 from inflicting serious injury to Mr. Thomas. By failing to intervene, Defendants actively participated in the ongoing abuse against Mr. Thomas and failed to subsequently report it.

13. Following the attack, Defendant Bruss neglected to assess Thomas's wounds or administer medical assistance. Rather, Bruss instructed Mr. Thomas to place his open wound in dirt and risked exacerbating his injuries by forcing Mr. Thomas to keep his wounded arm handcuffed behind his back.

14. Defendants' reporting on this incident contradicted available video and audio evidence in several ways. Accurate reporting suggests that Defendants' conduct substantially and repeatedly deviated from both Precinct 1 policy and widely accepted police practices and standards.

15. A reasonable officer on the scene would not have resorted to K9-inflicted force against an unarmed suspect lying prone on the ground, particularly after the only other reported suspect was already in custody.

# INTRODUCTION

I was retained by Attorneys Shirley LaVarco and Brittany Francis, who are representing the plaintiff in this matter. I was asked to analyze the case and provide assessments and conclusions regarding the conduct of the defendant officers with reference to the relevant law enforcement standards, policies, and procedures.

# SUMMARY OF QUALIFICATIONS – THOMAS J. TIDERINGTON

For the past forty-five years, including twenty years as Chief of Police (retired June 2022), I have served as a full-time law enforcement deputy with three different police departments, as well as a Group Supervisor for the United States Drug Enforcement Administration's South Florida Regional Task Force.  I have trained over 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations. For over 30 years, I have been an instructor at numerous regional, national, and international law enforcement training events and have lectured on a wide variety of police practices and criminal investigations.

Over the last six years, I have been engaged as a criminal justice consultant, trainer, case reviewer, and expert witness in law enforcement-related matters. As a recently retired police chief of twenty-plus years, I have reviewed and approved policies and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police deputies, and officer training, supervision, and discipline. I am currently an active life member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), and a life member of the Michigan Association of Chiefs of Police (MACP).

Throughout my law enforcement career, I have frequently worked and interacted with federal agencies such as the Federal Bureau of Investigation (FBI), the Department of Homeland Security Investigations (HSI), the Internal Revenue Service (IRS), the Secret Service, the United States Marshals Service (USMS), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Office of the Inspector General (DOJ-OIG), and the Drug Enforcement Administration (DEA). I have also trained and worked cooperatively with numerous state and local police agencies throughout the country.

Throughout my 45-year career in law enforcement, I have been responsible for the review and processing of hundreds of disciplinary actions up to and including suspensions and terminations. I have also managed and supervised the accreditation process for both the Fort Lauderdale and Plymouth Township Police Departments. The accreditation process furthers an agency's professional development and ensures that its methods, policies, procedures, and daily operations

follow the law enforcement professional standards and best practices.

Over the last 25 years, I have also been actively engaged as a consultant, trainer, case reviewer, and expert witness in law enforcement-related matters. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants. My areas of expertise in policing include but are not limited to police use of force, suspect pursuits, criminal investigations, police administration and operations, officer training and discipline, undercover operations, interviews and interrogations, civil rights violations and investigations, internal/administrative investigations, citizen complaints, and law enforcement policies and procedures.

Of Specific Relevance to this Case:

- I have supervised thousands of law enforcement officers during my career and have reviewed their compliance with agency policies relating to criminal investigations both as a supervisor and later in command and executive management positions. I have reviewed hundreds of internal investigations involving allegations of violations of agency policy. I have been responsible for reviewing and processing hundreds of officer disciplinary actions up to and including termination when appropriate.
- I have examined hundreds of use-of-force incidents to assess compliance with policy, legal requirements, and the appropriateness of the level of force employed. I have undertaken these reviews in various capacities, including as an instructor, supervisor, and Chief of Police.
- I have extensive supervisory, management, administrative, investigative, and operational experience in law enforcement, supplemented by practical and formal education, and specialized training in law enforcement.
- I have participated in over 4,800 hours of specialized and professional training in nearly all areas of law enforcement, with a particular emphasis in the areas of investigations, arrests, use of force, and policies and procedures. I have been involved in and responsible for the development and updating of police policies and procedures for over 25 years during my law enforcement career.
- Throughout my law enforcement career, I oversaw, supervised, and managed K-9 units within my departments, where I oversaw training, policy formulation, and use of force reviews.
- I have managed and supervised the police department's accreditation process with the Commission on Accreditation for Law Enforcement Agencies (CALEA) and the Michigan Law Enforcement Accreditation Commission (MLEAC), which underscores identifying and adopting nationwide standards and best practices in law enforcement.
- I have been recognized as an expert witness in numerous cases pertaining to law enforcement actions and practices in both state and federal courts.

## METHODOLOGY

My role in presenting this report and any subsequent depositions and trial testimony is to assist the trier of facts in reaching its conclusions. Any opinions expressed herein are held to a reasonable

degree of professional certainty. In forming my opinions, I relied on the materials provided to me by Plaintiff's Counsel along with the information reasonably relied upon in my fields of expertise. This includes standards established in model policies promulgated by professional organizations such as the International Association of Chiefs of Police (IACP)[1] and the Commission on Accreditation for Law Enforcement (CALEA).[2] These practices have also been consistently reinforced by research-based organizations such as the Police Executive Resource Forum (PERF).[3] In forming my opinions, I also considered publications from IACP, PERF, and the Department of Justice (DOJ) as further objective guidance on widely accepted police standards and practices. In particular, I considered the following:

- IACP - Patrol Canine Guide (2015).

- IACP - Model Policy Arrests and Investigations (September 2019).

- Department of Justice - Use of Force by Police (Overview of National and Local Data).

- IACP - Model Policy Arrests and Investigations (September 2019).

- Center for Police Research and Policy - DE-ESCALATION: Guidelines for how to begin evaluating your agency's de-escalation practices (2020).

- IACP Employee Misconduct Policy (2019).

---

[1] The International Association of Chiefs of Police (IACP) is the world's largest and most influential professional association for police leaders. With more than 32,000 members in over 170 countries, the IACP is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. Since 1893, the association has been serving communities by speaking out on behalf of law enforcement and advancing leadership and professionalism in policing worldwide.

[2] The Commission on Accreditation for Law Enforcement Agencies (CALEA) was created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations: International Association of Chiefs of Police (IACP), National Organization of Black Law Enforcement Executives (NOBLE), National Sheriffs' Association (NSA), Police Executive Research Forum (PERF). The CALEA Accreditation programs provide public safety agencies with an opportunity to voluntarily meet an established set of professional standards, which require comprehensive and uniform written directives that clearly define officer authority, performance standards, and responsibilities, and which allow police executives to make informed management decisions.

[3] Founded in 1976 as a nonprofit organization, the Police Executive Research Forum (PERF) is a police research and policy organization and a provider of management services, technical assistance, and executive-level education to support law enforcement agencies. PERF helps to improve the delivery of police services through the exercise of strong national leadership, public debate of police and criminal justice issues, and research and policy development.

There is a substantial body of knowledge and literature about the practices and standards that modern, reasonably-managed, and administered police agencies across the United States should follow and apply to their operations. These generally accepted standards and practices have developed over time to encourage and assist police agencies in delivering police services to communities in a professional, reasonable, effective, and lawful manner. Much of the available guidance stems from law enforcement's critical analysis of field incidents and examinations of incidents reported to lead to police liability, deficiencies, and employee misconduct.

In addition, in forming my expert opinions, I rely upon my training and education in the field of police practices, consultations with peers, review of professional articles, and my decades of law enforcement experience.  Of course, if any new material is provided to me related to this matter, or my opinions set forth here, I will consider it. I, therefore, reserve the right to alter or supplement my opinions when faced with new information.

TERMINOLOGY: At times my opinions may include terminology that resembles legal terms or standards. My use of this terminology is not intended to draw legal conclusions or subvert the function of the court, or inappropriately influence triers of the fact. The use of certain terms such as "reasonable," "reckless," "negligent," "unreasonable," and "foreseeable" are commonly used in my field of expertise. These terms and others form the basis of my understanding of the subject matter and are commonly used in the field. Nonetheless, where possible, I have chosen other language to mitigate any potential confusion about whether I am using judicial versus law enforcement terminology.

In addition, I avoid determining the credibility of the various parties and witnesses or choosing between disputed accounts, as that is outside the purview of my work and remains within the provenance of the factfinder.  My opinions and the facts upon which I base my opinions are discussed in greater detail below.

# RULE 26 DISCLOSURES

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report. A list of my court and deposition testimony in the last four years is attached to this report. I am being compensated for my time at the rate of $350.00 per hour. My compensation is not contingent on the outcome of this litigation nor on the opinions rendered.

I declare, in compliance with Rule 26 of the Federal Rules of Civil Procedure that the following statements represent a complete statement of all opinions to a reasonable degree of professional certainty that I will express and the basis and reasons for them, the facts or data considered in forming them, any exhibits that will be used to summarize or support them. If called to testify in this matter, I will express the opinions contained in this report unless provided with materials that

change my opinions.

**Attachments to this report include the following:**
A.  Listing of testimony and publications.
B.  My rate of compensation.
C.  Complete and detailed Curriculum Vitae.

Materials reviewed are provided separately, as exhibits.

Excerpts taken from reports and documents contained within the case file are indicated through the use of *italics*. My opinions are interspersed throughout this report and are not limited to the specifically identified opinions.

## SUMMARY OF FACTS RELATED TO THIS INCIDENT

The following summary of facts is based on a thorough review of available evidence in this case, including BWC and dashboard camera ("dashcam") footage; the dispatch report; Defendants' incident reports and supplements; the testimony of all witnesses who appeared for depositions, including Defendants Bruss and Schultz, and Lieutenant Moncrief, the supervisor who responded to the scene; Precinct 1 policies on K9s, the use of force, and the duty to intervene; and widely accepted police best practices.

I have documented my comments and observations in the text boxes following the numbered paragraph for ease of reference.

1.  On February 22, 2021, the defendant deputies, including Sergeant R. Johnson and his department canine, were dispatched to the residence of Mevlude and Avni Gashi at 10923 Capstone Drive. The homeowners had dialed 911 to report a disturbance involving two unidentified males at their residence. Unfortunately, Precinct 1 did not retain the actual 911 call recording, thus it has not been provided for my review. However, Precinct 1 did retain the Computer Aided Dispatch ("CAD") Report, the contents of which are further corroborated by my review of Defendants' BWC and dashcam footage. The CAD Report recounts the following dispatch communications, with the left column representing the raw report language and the right column providing a plain language translation I have generated for the benefit of the factfinder:

| Event Notes Addendum | Plain Language Translation |
|---|---|
| *CRPT 2BM INFRONT OF HOME SCREAMING AND YELLING/RPT ADV THIS SECOND TIME CAME TO LOC /RPT HAS WEAPON OUT/* | Caller reports 2bm in front of home screaming and yelling/reportee advised this is the second time suspects came to location…. Reportee has weapon out/ |
| *BM DRIVING RED DODGE CHRYSLER/* | Black male driving red Dodge Chrysler/… |

| | |
|---|---|
| *RPT ADV DOES NOT KNOW BMS/POSS MHI* | Reportee advised dispatch that he does not know the black males… |
| *MLS HEARD IN BACKGROUND YELLING/* | Males heard in background yelling. |
| *DOES SUSP HAVE WEAPON OUT OR REP?* | Does the suspect have weapon out or reportee? |
| *BM BROWN SHIRT BLK PANTS WHI SHOES/2BM UNK OF CLOTHING DESCRIPTION* | Black male brown shirt black pants white shoes/ 2 black males unknown of clothing description… |
| *RPT HAS WEAPON OUT.* | Advises that the reportee has a weapon out. |
| *CALLED BACK 2X GOING TO VM* | Called back 2 times going to voicemail. |
| *DOES SUSP HAVE WEAPON OUT OR REP?* | Does suspect have weapon out or reportee? |
| *30 SECONDS OUT* | Deputy telling dispatch that he was 30 seconds from the location. |
| *SUSP ON LOC?* | Deputy asking dispatch if the suspects are still at the location. |
| *YES STILL ON LOC IN FRONT OF HOME* | Suspects are still at the location. |
| *HAVE REP SECURE WEAPON/DEPUTY ARRIVING* | Deputy asking dispatcher to tell the Reportee to secure his weapon. |
| *CHANNEL HELD* | No radio traffic allowed other than the responding Deputies. |
| *RPT SECURING WEAPON* | Dispatch tells Deputies that the reportee is securing his firearm. |

After examining the BWC and dashcam footage, it is evident that the dispatcher informed the responding deputies that it was the homeowner that possessed a weapon, and not the Plaintiff. Furthermore, there is audio evidence of Defendant Johnson instructing the dispatcher to tell the homeowner to *secure the handgun*, as captured in Johnson's BWC footage (19:20hrs.). This audio captured confirmation strongly suggests that Sergeant Johnson and the other defendant Deputies knew or should have known that it was Mr. Gashi who was in possession of a weapon, rather than Mr. Thomas or his friend Rapheal Gray.

This is important as it establishes the type of response that reasonably trained and prudent Deputies would undertake given the information available to them as they responded to a call for service. A police response to a suspect brandishing and threatening a homeowner with a firearm is much different than a police response to a disturbance, suspicious incident, or a noise complaint reported by an armed homeowner.

2. Sergeant Johnson's actions are documented and captured on his BWC and dashcam as he responds to the 911 call. He is seen driving aggressively at a high speed and using profanity towards motorists who appear to be obstructing his path. At 19:22hrs, Sergeant Johnson arrived on the scene and parked his marked police vehicle in front of a small red vehicle that Mr.

Thomas and Gray were sitting in. Immediately upon seeing the marked police vehicle, Mr. Thomas exits the red vehicle on the passenger side and immediately raises his arms in the air, as illustrated in the photograph below. Defendant Johnson can be heard yelling and cursing at Mr. Thomas to get back inside the car, repeatedly shouting at him to *"get in the fucking car now!"*

> I observed that Johnson's behavior both en route and upon arriving at the scene was unprofessional and a departure from widely accepted police practices and standards. Furthermore, I also observed and noted that Sergeant Johnson failed to adequately coordinate the tactical response to a purportedly armed individual, assuming, as he put in his incident report, that he believed they were armed. A proper tactical response would have entailed waiting for backup Deputies to arrive and coordinating their positioning before confronting the suspects.

3. Mr. Thomas appears to be uncertain about Defendant Johnson's commands but keeps his hands extended above his head in a posture commonly recognized as a surrender or "don't shoot me" position.[4] Sergeant Johnson can be seen standing outside of his vehicle with his police canine poised in what is commonly known as a "ready" or "attack" position. Moments later, Defendants Bruss and Schultz arrive and exit their vehicles nearby Johnson's patrol car.

Bruss and Schultz can be heard shouting commands at Mr. Thomas and Mr. Gray to get *out*

---

[4] A "don't shoot me" position, often referred to as a "surrender" or "hands up" position, is a non-verbal gesture made by raising one's hands, typically with open palms, above the head. This posture is a universal symbol of surrender, submission, or compliance, often used by individuals to signal to law enforcement or others that they do not pose a threat and are not armed.

of the car while Johnson is yelling for them to get back *inside* the car and to "show me *your fucking hands.*" In addition to the conflicting orders and commands, the BWC captures Johnson's K9 barking and growling at Mr. Thomas and Mr. Gray.

4. Johnson orders Mr. Thomas to *get on the ground.* Mr. Thomas immediately complies with Johnson's command, while keeping his hands over his head and away from his body. Meanwhile, Defendant Bruss is giving commands to Mr. Gray. These commands included yelling and shouting the following: *Get down, get up, show me your fucking hands, turn around, face away from me, walk towards me, kneel down, start walking, standup, don't move,* and *step back.*

I noted that the Deputies were not standing in a position of cover or concealment while addressing Mr. Thomas and Mr. Gray. Rather, they were standing in the open in front of or to the side of their vehicles. If the defendants believed that the suspects were armed and posed an immediate or imminent threat to their safety, it constituted a departure from acceptable police practices and training standards not to assume positions of cover behind their vehicles. This practice is commonly employed during "felony stops" involving potentially armed or dangerous individuals.

Police departments across the nation emphasize the importance of "distance and cover" to provide Deputies with tactical options when confronting potential dangers. By maintaining a safe distance, staying behind cover, and using the vehicle as a shield, Deputies can more effectively assess the situation and make tactically sound decisions. As illustrated in the photographs below, Deputy Tuzun and another Deputy had their firearms holstered and were standing/walking in front of the marked patrol vehicles. Had the Deputies been concerned about a hidden threat inside the red vehicle, I would have expected them to continue directing Mr. Gray to walk backwards until he was behind the parked police vehicles. This would have afforded the Deputies the ability to take Mr. Gray into custody while still maintaining their cover and safety from any potential hidden threat. Instead, they left their positions of cover by walking in front of their vehicles, exposing themselves to any additional suspects they feared may have been "hidden" inside the car.

In my opinion, the defendant Deputies appeared to lack concern about a potential hidden threat inside the red car, or if they did have concerns, they departed from acceptable police practices and tactical standards by holstering their weapons and jeopardizing their own safety, rather than staying behind cover or concealment. Moreover, the evidence does not reveal any exigent circumstances that might have justified such a departure.



5.  The video evidence further demonstrates that while Mr. Gray was being handcuffed and placed under arrest, Mr. Thomas remained on the ground in a prone position, with his arms fully extended away from his body, in clear adherence to the instructions given to him by the defendant Deputies.

> It's important to note that a reasonably trained Deputy, when presented with the same facts and information, would have recognized that there was not a valid reason to believe that Thomas or Gray had committed an arrestable offense.
>
> Based on established law enforcement training and best practices, a reasonably trained Deputy—when presented with the same set of facts and circumstances—would have recognized that neither Mr. Thomas nor Mr. Gray exhibited conduct that constituted a valid basis for an arrestable offense. Standard police procedures require that an officer establish probable cause before effectuating an arrest. In this instance, the absence of articulable facts suggesting criminal activity should have led a properly trained Deputy to conclude that there was no lawful justification to detain or arrest either individual.
>
> Additionally, the defendant Deputies failed to contact the reportee—the individual who initially made the complaint—to gather additional information or verify the nature and credibility of the alleged concern. In law enforcement, it is a fundamental investigative step to make reasonable efforts to interview the reporting party to clarify the basis for the call, assess the validity of the information, and determine whether a crime has actually occurred. The failure to do so resulted in a lack of critical context that may have influenced their decision-making. By neglecting this essential procedure, the Deputies acted on incomplete or potentially unreliable information, increasing the likelihood of an unjustified detention and wrongful arrest.
>
> This omission not only deviates from sound policing practices but also undermines the principles of reasonable suspicion and probable cause, both of which are required to justify a lawful detention or arrest. Their actions raise significant concerns about the adequacy of their investigative efforts, their adherence to constitutional policing standards, and their overall decision-making in this encounter.

6. With Mr. Gray now handcuffed and secured in the rear of a marked police vehicle, under the watch of Deputy Asli Tuzun, all three Defendant Deputies focused their attention on Mr. Thomas, who remained motionless in a prone position lying face down in the grass. The BWC demonstrates that Defendant Schultz was directing the green laser beam of his firearm or TASER in circular motions around Thomas's head and face as Mr. Thomas laid motionless on the ground.[5] As Mr. Thomas was attempting to stand up to comply with the Defendants'

---

[5] The primary purpose of TASER- and firearm-mounted lasers is to provide a precise aiming point. When a Deputy activates the laser, a visible or infrared (IR) beam projects onto the target, helping the Deputy to align their firearm accurately.

directives, the laser beam was pointed directly into his eyes, possibly disorientating and confusing Mr. Thomas.

> Reasonably trained Deputies know and understand that these lasers produce intense and concentrated beams of light that, if directed into someone's eyes, can cause eye injury. The severity of the injury can range from temporary visual disturbances, such as flash blindness or glare, to permanent damage, including retinal damage or even blindness. To mitigate these risks, law enforcement Deputies are typically trained to use laser sights responsibly and avoid shining them into people's eyes intentionally. Proper training emphasizes keeping the laser beam on the target area and using it as an aiming reference, not as a means to threaten or harm individuals as appears to be the case here. When asked during his deposition if it is appropriate to aim a laser at a suspect's head or eyes, Schultz acknowledged that it is not appropriate, admitting that, "In fact, we are taught not to do that." Aiming the laser in Mr. Thomas's eyes and circling around Mr. Thomas's head was unprofessional, unwarranted, and departed from well-established police practices and standards.

7. Defendant Schultz positioned himself behind Defendant Johnson, who was holding his unleashed K9 in a "ready to attack" position. Schultz then took over the responsibility of issuing commands to Thomas and is heard yelling, *"You in the gray step up, step up, do it now!"* It appears to take Mr. Thomas some time to register that Schultz' commands are being directed at him because, up until then, he had been receiving commands from Defendant Johnson. Moments later, Defendant Johnson shouted, "*This is your last chance or I'm going to send the dog after you*!"

8. Approximately 10 seconds after Johnson issued this command, Mr. Thomas began to carefully lift himself from the prone position, slowly raising his head and beginning to lift and bend his left leg. It is apparent from the BWC that Mr. Thomas is trying to stand up to comply with

Defendants' latest directives. At this time, Johnson released his K9 and commanded it to attack and bite Mr. Thomas. Just 19 seconds had passed between Schultz's first order for Mr. Thomas to "get up" and Johnson's release of his K9. During these 19 seconds, Mr. Thomas remained facedown on the ground, as previously ordered, and there was no evidence that he posed any threat or flight risk.[6]

Video demonstrates that Mr. Thomas was lying prone on the ground with his arms outstretched as Johnson released and directed his K9 to attack and bite Thomas.

---

[6] Mr. Thomas alleges in his complaint that because he had been receiving orders primarily from Defendant Johnson, "it took him a few seconds to register that this command was directed at him. During those few seconds, he stayed prone on the ground, with his arms remaining outstretched and still. Defendant Johnson then joined in Defendant Schultz's commands, shouting, "This is your last chance or I'm going to send the dog after you." Upon hearing Defendant Johnson's voice, Mr. Thomas lifted his head from the ground.

9. Defendant Johnson's K9 attacked as Mr. Thomas laid motionless on the ground, viciously biting, holding, and shaking Thomas's right arm as Thomas cried out in pain.

10. Defendant Johnson approached Mr. Thomas and stated, "*You think we are fucking around don't ya?*" He then straddled Mr. Thomas as the K9 continued to bite him. Johnson told Mr. Thomas, "*Put your hands behind your fucking back," and, "Stop moving around.*"

> Instructing Mr. Thomas to place his hand behind his back and remain still while an attack-trained canine was inflicting harm on his arm is fundamentally irrational. It has been my experience that the more a suspect resists the K9, the more aggressive the K9 becomes. Naturally, a person would struggle when under attack by a canine. Expecting Mr. Thomas to be able to place his hands behind his back during such an attack is illogical, which the defendant officers either knew or should have known. A reasonably prudent officer would understand that an individual struggling under the assault of an attack K9 would find it nearly impossible to remain completely still.

11. In response to Mr. Thomas grimacing in pain as the canine continued to bite and tear his flesh, Johnson told Thomas to "*shut up.*"

12. While the department canine was attacking and biting Mr. Thomas, defendants Bruss and Schultz stood passively nearby, simply watching the attack. Seconds after the K9 attacked, Johnson and Bruss can both be seen holstering their firearms. Bruss is instructed by Johnson to "clear the car." Bruss unholstered his firearm and peered into the vehicle. He then returned and stood just a few feet away with his hands on his hips, watching as the K9 continued to attack Mr. Thomas.

13. Defendant Schultz stood a few feet behind Johnson pointing his yellow TASER at Thomas and simply watched as the canine attacked Mr. Thomas.

14. As Mr. Thomas is being attacked, Bruss can be heard telling him, "*As soon as he gets you handcuffed he will get the dog off you*" (19:28:01). Bruss also told Thomas to "*stop moving around*," before adding, "*He still hasn't been searched so…*" seemingly as justification for the K9 to continue biting Mr. Thomas. Bruss than told Johnson, "*You can take him off the bite*." The seriously injured Thomas is then told to "*roll over on your stomach,*" followed by an apparent threat of "*you ain't seen nothing yet.*"

> This is further evidence that Bruss had the ability to issue commands and instructions to Johnson and that he could have and should have intervened to prevent the needless use of the department K9, or at the very least could have intervened to reduce the duration of time that the K9 was allowed to continue to bite and attack Mr. Thomas. Instead, Bruss and Schultz did nothing other than standby and watch as Mr. Thomas was subjected to unnecessary K9-inflicted force in the absence of any resistance, flight, or threat. By failing to intervene, Defendants' Bruss and Schultz departed from both Precinct 1 policy and widely accepted police practices and standards.

15. After Johnson finally, after some 45 seconds, removed the K9 from its hold on Mr. Thomas's arm, Defendants' BWC captured Bruss and Johnson laughing, cheering, and praising the K9 with exclamations of "*good boy, good boy!*"

16. After the K9 attack, Defendants failed to provide adequate medical assistance. Instead, Defendants forced Mr. Thomas, who was clearly suffering from severe pain and K9-inflicted injury, to remain lying on the ground with his hands cuffed behind his back until EMS arrived. Rather than assessing or administering proper field treatment for Mr. Thomas' open wounds, or releasing Mr. Thomas in the absence of probable cause to arrest him, Defendant Bruss instructed Thomas to roll over onto his side and apply pressure to the wound with the grass and dirt to stop the bleeding. This was a departure from widely accepted police practices and standards.

17. Defendant Bruss further departed from law enforcement standards by forcing Mr. Thomas to keep his severely injured arm handcuffed behind his back. Despite the absence of probable cause, any arrestable offense, or any indication that Mr. Thomas posed any threat to officer or public safety, Defendant Bruss continued to detain Mr. Thomas. Defendant Bruss only agreed to reposition Mr. Thomas' handcuffs after being instructed to do so by medical technicians.

> Rather than instructing Thomas to place his open wound in the dirt to stem the bleeding, Bruss and the other defendant officers should have provided initial medical assistance. Furthermore, upon confirming with the reportee (i.e., the homeowner) that neither Mr. Thomas nor Mr. Gray were armed with a firearm or any other weapon, and that the only weapon reported to dispatch was the one in the *reportee's* possession, the defendant officers should have promptly removed the handcuffs from Thomas, given the extent of his injuries, the absence of any arrestable offense, and the absence of any indication that Thomas posed a threat to officer or public safety.

# DEFENDANTS' INCIDENT REPORTS

In addition to the BWC and dashcam footage, I thoroughly reviewed the incident reports and supplements written by Defendants Johnson, Bruss, and Schultz. I compared their accounts to the recorded video evidence available in this case. Although body-worn cameras and dashboard cameras may not capture every nuanced detail of an incident, video footage of incidents often serves as an unbiased eyewitness perspective, which is frequently used by police administrators when evaluating use of force incidents such as this. Excerpts of Defendants' reports are indicated by italics. My comments and observations are in the text boxes following each excerpt.

**Sergeant R. Johnson's Report**

*On Monday, February 22, 2021, I, Sergeant R. Johnson, unit 8172, and my canine partner "K9-Jeck", of the Harris County Precinct One Constable's Office, were assigned to the Patrol Division, located in North Houston, Harris County, Texas, as an evening shift Patrol Supervisor.*

*At approximately 1915 hours, I was dispatched to the residence located at 10923 Capstone Drive, in reference to a Weapons Disturbance. The dispatched call for service advised the following: The reportee said two black males were at his residence for the second time. The dispatcher could hear yelling and screaming in the background. The reportee said he had his firearm in his possession (see call slip #20210582057).*

*While responding to the location, dispatch advised the suspects also had firearms. Deputy E. Bruss, unit 7, asked dispatch again if it was the suspects or reportee who had the firearm. Dispatch advised the suspects had the firearms and were inside of a maroon Chrysler.*

> None of the available evidence corroborates Defendants' claim that the dispatcher informed them that "the suspects" were armed. In reply to Defendants' inquiry about the individual with the firearm, the dispatcher informed the responding deputies that the *caller*, i.e., the homeowner, was armed. This information was further corroborated when Defendant Johnson instructed dispatch to advise the reporting party to secure their weapon if the suspects were no longer present at the scene. Additionally, adequately trained officers understand the importance of gathering as much information as possible from their dispatchers before responding to or arriving at a call for service for several important reasons. The information provided by dispatchers serves as a critical foundation upon which officers build their response strategy. It helps them make informed decisions, protect themselves and others, and ensure the most appropriate and lawful handling of each situation they encounter. The defendants in this case failed to adequately inquire as to the incident and failed to ask the most basic of questions. Questions such as, "What type of weapon?" and, "Did the suspects threaten anyone with a weapon?" would have cleared up any alleged confusion about who was armed. Similarly, Defendants failed to conduct any on-scene investigation before resorting to

> the extreme measure of releasing an attack-trained K9 on a prone, compliant suspect.
>
> Moreover, Texas is an "open carry" state. Reasonably trained officers know and understand that they must take due care and caution when responding to a complaint involving an individual in possession of a firearm. The mere fact that someone is in possession of a firearm is not necessarily illegal, and it is incumbent upon the responding officers to determine if any person was actually brandishing or threatening anyone with a weapon. The Defendants here failed to do so.

*Upon arrival, I observed a marron [sic] Chrysler PT Cruiser parked in the north bound lane of Capstone Drive. The two described suspects were seated in the driver seat and front right passenger's seat. I immediately activated the emergency lighting equipment to my patrol vehicle to identify myself as law enforcement and illumined [sic] the vehicle with the spot light.*

*I immediately exited my patrol vehicle and gave loud verbal commands to both suspects to place their arms in the air. The front right passenger exited the vehicle and placed his arms in the air. The driver refused to comply and exited the vehicle in an attempt to walk away. Due to having two suspects that were reported to be causing a disturbance and the possibility of a firearm being used, I removed K9-Jeck from my patrol vehicle for apprehension support.*

> None of the available evidence indicates that either one of the suspects attempted to walk away. The video evidence demonstrates that both Thomas and Gray raised their arms in the air when confronted by the defendants and that Thomas remained passive and compliant throughout the entire encounter.

*I continued to give loud verbal commands to both suspects to enter the vehicle. I ordered the suspects in the vehicle to have a more controlled environment. If the two suspects were allowed to exit the vehicle and walk in different directions, this would have been an immediate Deputy safety issue and a safety issue for the general public. The operator walked back to the vehicle and sat in the driver's seat. The passenger refused to comply and stood outside the vehicle with his arms in the air. While standing outside the vehicle , the passenger continued to scream for me to shoot him and he was ready to die. This statement was concerning in nature due to the fact that the passenger just admitted he was ready to die.*

> The video evidence speaks for itself, and I anticipate that the fact-finders will carefully analyze not only the statements made by the defendant officers but also those made by Mr. Thomas and Mr. Gray. Upon reviewing the footage, I can clearly discern Mr. Thomas making statements such as "Don't shoot me" and, "All lives matter"—phrases that could not reasonably be interpreted as threats. Given that Mr. Thomas had his hands raised in the air from the moment the defendant officers arrived on the scene, it defies logic to suggest that his words or actions

posed any threat to officer safety. A reasonably prudent officer, trained in threat assessment and de-escalation, would not have perceived these statements as aggressive or threatening in nature. Indeed, Johnson's suggestion to the contrary is troubling to me as a former Police Chief given Mr. Thomas's cries for help and mercy as depicted in the video evidence.

Moreover, the defendant officers' actions—or lack thereof—further indicate that they did not actually believe there was a legitimate threat. Sound police tactics dictate that when officers genuinely perceive a credible danger, they take steps to protect themselves, such as seeking cover or creating distance. However, in this case, the officers failed to take any tactically sound precautions, such as positioning themselves behind available cover or issuing clear commands from a position of safety. Instead, their behavior suggests either irrational decision-making or a fundamental lack of belief that they were facing an actual threat. This contradiction between their actions and their purported fear undermines any claim that their response was based on a reasonable assessment of danger.

Furthermore, I did not detect any remarks from either Mr. Thomas or Mr. Gray that could reasonably be construed as a verbal threat toward the officers or anyone else. The absence of threatening behavior, coupled with the officers' failure to adhere to basic tactical principles, strongly suggests that their response was unjustified and inconsistent with generally accepted law enforcement standards.

*I continued to give loud verbal commands to stay inside of the vehicle and to keep their arms in the air. The passenger refused to enter the vehicle and now the driver exited again. Although the driver sat back inside the vehicle after being ordered, he continued to reach towards the floorboard and refused to show his hands. This was a continued behavior until responding deputies arrived.*

The video evidence clearly shows that both Thomas and Gray had their arms raised in the air when initially confronted by Defendant Johnson. Following the initial interaction Mr. Thomas stepped out of the vehicle with his arms raised over his head.

*Upon Deputy Bruss's arrival, I advised of the situation and allowed him to take primary of the giving of orders. allowed Deputy Bruss to take over on commands due to having no compliance when I was giving the commands. I also wanted to focus on the possible deployment of K9-Jeck. As Deputy Bruss was giving verbal commands to the driver, the passenger attempted to walk away. I had to order the passenger numerous times to stop.*

I have not seen any video evidence that supports Johnson's claim that Mr. Thomas attempted to walk away from the vehicle. On the contrary, the video evidence shows that Mr. Thomas remained next to the car with his arms raised high above his head in a commonly recognized gesture of surrender until defendants ordered him to the ground, after which he remained in a prone position with his arms raised above his head. There was nothing to suggest he posed a flight risk or threat and to report otherwise was a substantial departure from both Precinct 1 policy and widely accepted police practices and standards.

*Once the driver was lying face down on the ground with his arms away from his side , I ordered the passenger to the ground. The passenger complied with the order. Prior to giving the driver any orders, he made the decision to place his arms by his head. This was not an ordered movement and it was considered a threat due to not being searched. Deputy Bruss and I both gave the driver orders to move his arms away from his body. When the driver refused, I took approximately ten steps towards his direction with K9-Jeck. This was affective [sic] and the driver immediately placed his arms away from his body.*

The defendant deputies were shouting profanities and loudly issuing conflicting commands that most people would find confusing, particularly when they have a gun pointed at them and an attack-trained K9 barking and growling nearby. With my experience in participating in and reviewing hundreds of felony takedowns, I am aware that it is not uncommon for suspects to become disoriented by police instructions, particularly when given conflicting orders. There is no evidence to suggest that Thomas or Gray posed an immediate threat necessitating the use of force, and certainly not the dangerous level of force generated by a police K9. Moreover, the movement Defendant Johnson takes issue with in his report—moving one's arms over one's head—resulted in an inherently *less* risky posture because it would make it more difficult for Mr. Gray to reach into his pockets. A reasonably trained and prudent officer would have recognized all of this. Defendants' decision to represent otherwise in their written reports was a substantial departure from both Precinct 1 policy and widely accepted police practices and standards.

*The driver was ordered to his feet and was guided backwards to our patrol vehicles. The driver was detained in handcuffs without incident and was secured in the rear of Deputy A. Tuzun, unit 1N87, patrol vehicle. After the driver was no longer a threat and secured, the passenger was given orders to stand to his feet. Corporal W. Schultz, unit 1H42, took over the commands of the passenger.*

*The passenger continued to refuse to stand to his feet. The passenger did acknowledge that orders were being given to him by lifting his head and looking at us. During the course of the detainment of the driver and attempted detainment of the passenger, I provided two canine announcements and Deputy Bruss provided three. Due to the suspect not complying, I made the decision to utilize K9-Jeck as an apprehension tool.*

As elaborated upon in other sections of my report, it is evident that Mr. Thomas was adhering to defendants' directives when the department's canine was released. Even if Thomas had not been complying with their instructions, which he was, it is evident that Thomas did not pose a threat to the officers' safety, nor was there any urgency in apprehending him. At the moment the K9 force was employed, Mr. Thomas lay motionless and face down on the ground with his arms extended above his head. Furthermore, there were at least four, possibly five, deputies near Mr. Thomas, and one deputy (Schultz) was using a laser-equipped TASER or firearm to outline Mr. Thomas's head and face, with both weapons at the ready. To suggest that Thomas presented an immediate threat to the defendants or the public is incongruent with the video evidence in this case. Defendants' decision to represent otherwise in their written reports was a substantial departure from both Precinct 1 policy and widely accepted police practices and standards.

*A taser was not utilized due to the distance from the suspect and the angle. If the taser probes could not reach the passenger or failed to penetrate due to the angle, we risked the passenger making the decision to evade or physically fight. If either of these two options happened, the vehicle was still a threat, due to not knowing if there was a third person hiding inside of it with the firearm.*

Unlike an unleashed police K9, a TASER can be immediately activated and deactivated in response to the level of resistance exhibited by the suspect. Johnson's stated rationale for not using the TASER, which has the potential to be significantly less harmful to the suspect than a K9, appears to be flawed and inconsistent with the available evidence in this case. There is no evidence that Mr. Thomas engaged in physical resistance of any kind or that he attempted to flee from the Defendant Deputies. Mr. Thomas complied with the deputies' instructions and kept his arms and hands raised in a gesture of surrender. Furthermore, Mr. Thomas was positioned face down on the ground with several firearms pointed in his direction and a laser circling his face.

Defendant Johnson claimed that he was concerned about the possibility of a third person hiding inside the parked red car. Defendant Bruss repeated this in his own report. However, any officer who is reasonably trained understands that the use of force should not be based on unfounded hunches or unverified suspicions. None of the evidence available would lead a reasonable officer on the scene to believe a third suspect, possibly armed, was concealed inside the car. To begin with, both the passenger and driver's seats were occupied by Thomas and Gray until they were instructed to exit the vehicle, and both car doors were open.

Moreover, as illustrated in the dashboard camera footage and detailed in his report, Johnson advanced ten steps towards Gray, completely exposing himself to any presumed concealed threat from within the PT Cruiser. Additionally, I noted that from this viewpoint, Johnson had a clear line of sight into the vehicle's interior and would have been able to ascertain that no one was inside.

*When the driver refused, I took approximately ten steps towards his direction with K9-Jeck. This was affective [sic] and the driver immediately placed his arms away from his body.*

As they approached, both Johnson and Bruss holstered their firearms, further demonstrating an apparent lack of concern for a threat from inside the vehicle. After holstering his weapon, Johnson physically engages Thomas; climbing onto his back and handcuffing him.

While the department canine was engaged in the attack on Thomas, Deputy Johnson instructed Bruss to "clear the car." Subsequently, Bruss drew his weapon and checked for any other occupants inside the vehicle. It is crucial to note that these actions took place after the Defendants had already exposed themselves to what they claimed was a "possible" threat. This appeared to be an afterthought as Bruss had momentarily holstered his weapon as he approached.

*(Bruss's Dash Cam Footage of gun being holstered)*

In my opinion, none of the Defendants actions were reasonable or in line with sound tactical practices. If the Defendants genuinely believed that an armed individual was concealed in the vehicle, purportedly attempting to "*lure them in*," then the Defendants' actions of holstering their weapons and leaving their relative positions of cover deviated from acceptable police practices and standards. Under the logic presented by the Defendants, the use of the canine to attack Thomas was premised primarily on the assumption of a hidden gunman inside the parked red car. Assessing this logic, their actions were unreasonable and inconsistent with how reasonably trained officers would have responded and acted if faced with the same facts and circumstances.

If the Defendants perceived the primary threat to originate from an unidentified occupant concealed in the backseat of the vehicle, a reasonably trained and tactically proficient Deputy would have prioritized maintaining a position of safety and cover. Their focus should have been on thoroughly inspecting and "clearing" the vehicle before approaching Mr. Thomas, who was lying prone and not exhibiting any signs of threatening or aggressive behavior.

I also considered other tactical alternatives available to the Defendants. They certainly had the option to approach the vehicle from a safer distance, utilizing nearby parked cars as cover to determine whether the vehicle was occupied. Once the vehicle was "cleared" it would have been tactically reasonable for the Defendants to approach Mr. Thomas from the rear and simply handcuff him while he remained on the ground.

*I believe by utilizing K9-Jeck for the apprehension, this was the safest option for everyone involved. Due to no compliance by the passenger, force had to be utilized to gain control of the situation. K9-Jeck is currently certified through the National Narcotic Detector Dog Association (NNDDA). K9-Jeck is certified in narcotics (certification #59421) and police service dog (certification #8927).*

> As previously stated, Mr. Thomas was in full compliance, lying face down on the ground with his arms outstretched and did not present a threat to the Defendants, and certainly not one justifying the use of their police canine to attack and bite Mr. Thomas. The K-9 attack here was both unnecessary and a substantial departure from both Precinct 1 policy and widely accepted police practices and standards.

**********Canine Deployment Factors** (from Police Report) **********

1.      *The severity of the crime: It was reported that both suspects were at the reportee's residence with firearms and the reportee did not know who they were.*

> As previously stated, the evidence contradicts the assertion that the Defendants were informed that Thomas and Gray were present at the reportee's residence and armed with firearms. When analyzing the case's details and the Defendants' actions, I considered the possibility that the Defendants might have misinterpreted or been unclear about who was armed. However, even when considering the most favorable version of events for Defendants, their conduct was a substantial departure from both Precinct 1 policy and widely accepted police practices and standards. Additionally, I have not seen any evidence that Defendants had probable cause to believe Mr. Thomas committed a crime.

2.      *Does the suspect pose a threat to the safety of law enforcement or the general public: The suspect was not searched and was reported to have a firearm. If suspect decided to evade on foot, the citizens outside watching would be at risk.*

> The reasoning presented by Defendants Johnson and Bruss contradicts the available evidence, as previously explained, because according to the audio recordings and dispatch report, dispatch never said the suspects were armed.
>
> Nor did the video evidence show any attempt by Thomas to evade or flee. For completeness, I considered the possibility that Mr. Thomas would attempt to "flee," a scenario which any reasonable officer would consider highly improbable given that he was already in a prone position on the ground, with multiple firearms and a TASER

directed at him, and he had not shown any intention to flee or escape. Officers with adequate training understand that employing canine force is not permissible when dealing with a compliant subject, nor is it permissible based on speculative future actions like the remote possibility of flight in this case.

*3.*      Was the suspect actively resisting or attempting to evade: *The suspect failed all verbal commands and canine announcements. The suspect also tried to walk away from the vehicle several times.*

Defendant Johnson's written report contradicts my examination and analysis of the provided video evidence. I have not seen any evidence that substantiates Johnson's assertion that Mr. Thomas attempted to *walk away multiple times*.

Additionally, a reasonably trained and prudent officer would have likely assessed that Mr. Thomas was unarmed, considering the visible evidence that, when he raised his arms above his head, the Defendants could discern that there was no firearm in his waistband area, and his pockets did not exhibit any bulges indicative of a weapon's presence. I also noted that Thomas was wearing very loose-fitting sweatpants that would make it highly unlikely for a firearm to be concealed.

*I provided the passenger one last warning before deploying K9-Jeck . When the passenger refused to comply, I gave K9-Jeck the apprehension command and released my grip of his collar. K9-Jeck approached and engaged the passenger.  K9-Jeck bit the passenger's right arm and held his bite. I climbed on top of the suspect and attempted to place both arms behind his back. I had to forcefully pull back the passenger' s left arm to place both arms in handcuffs. Once the passenger was detained in handcuffs, K9-Jeck was immediately removed from the bite.*

As outlined earlier in my report, a reasonably trained Deputy would have refrained from using force against Mr. Thomas, given the fact that he was compliant, unarmed, and was in a prone position on the ground while four to five Deputies pointed their weapons at him and an attack trained canine was feet away growling and barking.

Reasonably trained officers would have approached and simply handcuffed Thomas if they had sufficient grounds/probable cause to arrest and/or detain him. Instead of opting for reasonable and logical measures, the defendants opted to release their attack-trained canine, which they knew or should have known had the capability to inflict serious and lasting injuries.

It is apparent that the Defendants did not grasp—or otherwise disregarded—the fundamental principle that any use of force must be reasonable and proportionate to the threat and resistance exhibited by the suspect. Law enforcement officers throughout the country know and are trained to understand that they cannot persist in using force once a suspect is subdued and no longer poses a threat. In my opinion, the Defendants in this case never should have released an attack-trained canine on Mr. Thomas, a compliant suspect. Moreover, they never should have allowed the canine to continue to maul Mr. Thomas for approximately 45 seconds, causing unnecessary pain and injury.

Even after Thomas was handcuffed, Defendant Johnson either permitted or failed to prevent/control the department canine from biting and attacking Thomas a second time, as depicted in the photograph below. This indicates that a) the department canine was not properly and adequately trained to release and retreat upon command, in which case the Defendants should have known that it was not safe to release it, let alone on a compliant suspect; b) Johnson was unable to effectively control the canine; or c) the Defendants knowingly and deliberately allowed the canine to attack Thomas while he was injured and restrained.

*Harris County Emergency Corps was requested to the location for medical treatment. The passenger was transported to the Houston Northwest Hospital for medical treatment. Corporal Schultz took photographs of the passenger's injuries. I downloaded the photographs to this report.*

*The passenger was identified as Kerry Lee Thomas. Mr. Thomas is a documented 59 Bounty Hunter Blood which is known as a criminal street gang.*

> Kerry Lee Thomas's criminal record and possible gang involvement did not factor into my use of force analysis as the Defendants in this case did not know Mr. Thomas's identity and possible gang affiliation until well after Thomas was taken into custody and handcuffed. Law enforcement training emphasizes, based on Supreme Court precedent, that information learned after an officer has already used force cannot factor into the analysis of whether the force was reasonable.

*On Tuesday, February 23, I contacted the Harris County Animal Control and advised of the incident. I was issued case #B2 l l-43211 to this bite.*

*On Tuesday, February 23, the Houston Police Department was dispatched to Mr. Thomas's residence in reference to him being suicidal. Mr. Thomas was committed on an Emergency Detention Order under HPD case number.*

## OPINIONS AND ANALYSES

Defendants substantially deviated from widely accepted law enforcement practices in both their investigation and their use of force against Mr. Thomas. The extensive record in this case shows numerous significant departures from established and reasonable police standards and protocols, including Precinct 1 policy. These deviations served no legitimate law enforcement purpose.

## EXPERT OPINIONS AND ANALYSES

### OPINION 1.

Harris County Constables Deputies Eric Bruss, Wayne Schultz, and Sergeant Robert Johnson subjected Mr. Thomas to a needless and violent K-9 attack, under the command, control, and authority of Sergeant Johnson. Defendant Johnson's decision to unleash the K-9 on Mr. Thomas while he lay prone on the ground was a substantial departure from well-established police policies and standards. Defendants Bruss and Schultz either knew or should have known that Sergeant Johnson's deployment of the department's canine was unjustified, yet they took no action to

prevent, terminate, or intervene in the unjust attack, resulting in severe harm and injury to Mr. Thomas. Moreover, the application and duration of canine force by the defendant Deputies diverged from both Precinct 1 policy and widely accepted police practices and procedures and did not serve any valid law enforcement purpose.

The available evidence suggests that, contrary to what the Defendants wrote in their reports, dispatch never stated that Thomas and Gray were armed. On the contrary, dispatch clearly said that it was the homeowner who was armed. Based on the dispatch records and the dispatch communications captured on the Defendants' bodyworn camera and dashcam footage, a reasonable officer would have understood this. However, even if the Defendants *did* have good cause to believe Thomas and Gray were armed, the conduct of the Deputies and their use of force was a substantial deviation from widely acceptable police practices and standards as outlined above. In other words, even considering the version of facts most favorable to the Defendants, their use of a K-9 to attack a prone, compliant suspect served no legitimate law enforcement purpose.

## ANALYSIS.

### Graham v. Connor.

In analyzing and assessing the actions of the defendant Deputies, I considered that police officers are trained that the U.S. Supreme Court, in its landmark decision *Graham v. Connor*, held that to determine whether the force used to affect a particular seizure is reasonable, one must balance the nature and quality of the intrusion on the individual's rights against the countervailing government interests at stake. Deputies are also trained to comprehensively assess the use of force by considering the specific facts known to them at the time of the incident and taking into account the totality of the circumstances. This balancing test is achieved by the application of what the Court labeled the objective reasonableness test. The following factors form the basis for evaluating the reasonableness of the force used here.

(1) **the severity of the crime involved,**
(2) **whether Thomas presented an immediate threat to the safety of the Deputies or others, and**
(3) **whether Thomas was actively resisting arrest or attempting to evade arrest by flight.**

Whether one's actions were objectively reasonable cannot be considered in a vacuum, but must be considered with the totality of the circumstances. The standard for evaluating the unreasonable use

of force reflects deference to the fact that peace officers are often forced to make split-second judgments in tense circumstances concerning the amount of force required. The reasonableness of a particular use of force must be judged from the perspective of a reasonable Deputy on the scene, rather than with the 20/20 vision of hindsight.[7]

In analyzing this case, I thoroughly examined each of the factors that constitute the foundation for evaluating the reasonableness of the defendant Deputies' actions in this matter. My analysis of these factors is from the perspective of a law enforcement officer, administrator, and police chief with over four decades of experience applying these factors to make and assess tactical decisions in the field. It is intended solely to aid the trier of fact in understanding the evidence. My analysis is not intended as a substitute for a judicial analysis of these factors, which rests solely with the trial judge in this case.

### *Severity of the Crime Alleged.*

The severity of the crime committed by an individual plays a crucial role in assessing the appropriateness of the force utilized. In this instance, the situation did not pertain to a grave criminal offense. In fact, the evidence indicates that Mr. Thomas and Gray were at the residence trying to recover Gray's lost or stolen cell phone. At most, Mr. Thomas and his friend Raphael Gray may have been involved in a misdemeanor offense related to trespassing. Notably, the defendant deputies employed significant force (canine) and restrained Mr. Thomas in handcuffs before conducting any investigation to ascertain whether a crime had indeed even occurred.

Upon assessing the situation following the use of force and the handcuffing of Thomas and Gray, the Defendant Deputies appeared to be in a state of confusion and uncertainty regarding the potential commission of a crime and which charges, if any, should be brought. During an interview with Mr. Gray, conducted while he was handcuffed in the back of a police vehicle, Defendant Schultz obtained information that shed light on the circumstances. Gray explained that he and Thomas were at the residence on Capstone Drive in an effort to retrieve Gray's lost or stolen cellphone. Using a "find my phone" app, Gray had tracked his missing phone to this location and had gone to the house to attempt to locate it. While outside the residence, Gray asserted that Mr. Mevlude Gashi brandished a firearm and made threats to shoot both he and Thomas. A verbal altercation ensued, leading Thomas and Gray to return to Gray's parked PT Cruiser.

After the use of force and the handcuffing of Thomas, Defendant Schultz can be heard and seen talking on his cell phone discussing the incident and potential charges with an Assistant District Attorney. Schultz expressed his desire to charge Thomas with "interference" and elaborated that Thomas had allegedly attempted to flee and was non-compliant. Despite Schultz's attempts to pursue more severe charges against Thomas and Gray, he was apparently informed that "trespassing was the best that they could do."

---

[7] *Graham v. Connor*, 490 U.S. 386 (1989).

***Whether There Was An Immediate Threat to the Safety of Officers or Others.***

Each of the defendant Deputies was equipped with department-issued body-worn cameras (BWCs) that recorded the entire incident from multiple angles and positions. The ample BWC and dashcam footage of this incident enables a thorough examination, encompassing not only the deputies' perspectives but also recording their corresponding verbal communications. For the reasons outlined previously in my report it is evident that Mr. Thomas did not pose a threat to the safety of the Deputies or others.

***Whether the Subject was Actively Resisting or Attempting to Evade By Flight.***

It is evident based on the abundance of video evidence in this case that Mr. Thomas never attempted to evade arrest by running or fleeing nor did he actively resist the Defendant Deputies.

Precinct 1 Canine Policy.

Johnson's decision to release his canine and command it to attack Mr. Thomas also violated Precinct 1's Department Canine Policy.

Precinct 1 policy requires that a canine only be used to apprehend an individual if the canine handler "reasonably believes that the individual has either committed or is about to commit any offense" and at least one of the following circumstances applies:

1. "Reasonable belief that the individual poses an immediate threat of violence or serious harm to the public, any peace officer, or himself/herself"
2. "The individual is physically resisting arrest" or
3. The individual is "actively hiding or evading in an area where entry by law enforcement…would pose a threat." (See Department Canine Policy at 3.)

At the time Johnson released his canine on Mr. Thomas, the Defendants had no facts or information to suggest that Mr. Thomas had committed an arrestable offense.

Upon Defendant Johnson's arrival, Mr. Thomas immediately raised his hands and exited Mr. Gray's car—putting his body in physical view of Johnson and signaling that he did not intend to flee. When Johnson ordered Thomas to get on the ground, he immediately complied, while keeping his hands over his head and away from his body.

When Johnson ordered Thomas back to standing, the video evidence shows Thomas attempted to comply and began to lift himself off the ground. Before he could do so, Johnson released his canine and commanded him to attack. At no point in the altercation did Thomas pose or appear to pose an "immediate threat of violence" to officers nor did he "physically resist arrest," or "actively hid[e] or evad[e]."

Precinct 1 deputies are directed to use the "lowest response to resistance that is *immediately necessary*" to effect an arrest. (*See* Use of Force Policy at 4-5.) Thus, a canine ought only be deployed in situations where a suspect's actions are "assaultive/high risk." (*See* Use of Force Policy at 23.)

The Constable's Office describes assaultive/high risk actions as "displays the intent to harm any person and prevent the peace officer from placing them in custody…may verbally or physically display an intent to assault any person… punching, kicking, attacking with weapons or committing other actions which present an imminent threat of physical harm to any person." (*Id.* at 6-7.)

As explained above and captured in the video evidence, when Johnson decided to release his K-9 on Mr. Thomas, Mr. Thomas was prone on the ground. He posed no threat to the officers or any other person and took no actions that could be considered assaultive, threatening, or high risk.

## OPINION 2.

Corporal Schultz and Deputy Bruss each violated widely accepted police practices and standards by neglecting to intervene and prevent Sergeant Johnson from employing unreasonable and unnecessary force against Mr. Thomas. Both Schultz and Bruss had the opportunity to prevent the unnecessary use of force but failed to act accordingly. In fact, they not only neglected to intervene, but they also actively participated in the abuse.

**Failure to Intervene:**  It is my opinion that Bruss and Schultz, who were both experienced and seasoned police veterans, should have recognized that Johnson should not have used canine force against Thomas and should have immediately intervened to stop or attempt to stop Johnson from unreasonably deploying his canine. Both Bruss and Schultz should have intervened by immediately verbally directing Johnson not to deploy his canine. Both Bruss and Schultz had the opportunity to intervene but failed to do so.In addition to failing to direct Johnson not to release the canine, Bruss and Schultz failed to intervene to mitigate the harm once the K9 was already released.

## ANALYSIS.

It is long recognized that officers have a constitutional duty to intervene on behalf of a citizen when they observe excessive force being used by an officer in their presence. As a result, police officers are trained to intervene in unconstitutional or illegal conduct by their fellow officers, and the failure to do so is a violation of widely accepted police standards, as well as a violation of their oath of office to uphold the Constitution as well as state and federal law. Officers may not ignore the duty imposed by their oath of office and must stop or attempt to stop other officers from using excessive force or from engaging in unconstitutional conduct when they have a reasonable

opportunity to prevent excessive force or unconstitutional conduct. Here, Bruss and Schultz failed to intervene to stop Johnson's conduct.

The defendants in this case claim that the canine use of force was reasonable and necessary as Mr. Thomas was "failing to comply" with their directives. Reasonable officers know that even non-compliance with police directions and non-violent physical resistance do not necessarily create a threat to an officer's safety, particularly not one justifying the use of K-9 force. In this case, it is evident that there were five armed police officers, with weapons, with numerical superiority, training, and advantage over one unarmed individual who was lying face down on the ground with his arms outstretched; this must be taken into consideration when considering the defendants' decisions to use force, in light of the fact that Mr. Thomas did not have the ability to cause harm to the officers.

<u>Relevant National and State Policies and Standards.</u>

Officers throughout the United States are trained to understand that they are required to intervene when they believe another officer is about to use excessive or unnecessary force, or when they witness colleagues using excessive or unnecessary force or engaging in other misconduct. As further guidance on this matter, I considered the IACP Model Policy – Standards of Conduct (2019) which states in part: *Officers have a duty to intervene to prevent or stop wrongdoing by another officer when it is safe and reasonable to do so.*

I also considered the Texas Commission on Law Enforcement (TCOLE) Model Policies which recommends that departments adopt: *written directive that requires every officer, regardless of rank, to have a duty and responsibility to intervene with any other officer's use of force that clearly exceeds agency directives and training regarding what is objectively reasonable under the circumstances. The agency's written directive must also clearly state that all officers, regardless of rank, have a duty and responsibility to prevent the use of excessive force, and to report, in writing, any use of excessive force to a supervisor or the agency's governing body, as applicable. This directive will be included in the annual Use of Force training. This directive applies to both sworn and non-sworn.*

*Officers shall promptly report those observations to a supervisor. If not done initially, the report to a supervisor shall be done in writing as well. The obligation to report remains in place even if the officer is successful in intervening in the use of force. Any failure to intervene and/or failure to report improper use of force shall be grounds for discipline, up to and including termination.*[8]

---

[8] The TCOLE Commission sets policy, approves rules and procedures formulated by the Executive Director and staff, and takes formal disciplinary actions against licensees on the recommendation of the Executive Director and state Administrative Law Judges. https://www.tcole.texas.gov/content/model-policies.

<u>Precinct 1 Policy on the Duty to Intervene.</u>

In addition, I considered the department policies in place at Precinct 1 of the Harris County Constable's Office. Precinct 1's Use of Force policy expressly requires its deputies (regardless of rank) to intervene when they see another officer using unreasonable or excessive force. In particular, it spells out that a deputy must intervene when they observe a fellow deputy "using force against a restrained or subdued subject." This duty to intervene is further detailed in the excerpt below (p. 8):

*Any officer present and observing another officer, regardless of rank, using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, safely intervene to prevent the use of excessive force. Examples of force that would require an officer's intervention may include, but are not limited to: use of choke holds [in any situation where deadly force would not be authorized]; using force against a restrained or subdued subject; leaving a secured subject in a prone position in any fashion that restricts breathing or blood flow; any use of force in violation of this department's policy. Officers shall promptly report those observations to a supervisor. The obligation to report remains in place even if the officer is successful in intervening in the use of force. Any failure to intervene and/or failure to report improper use of force shall be grounds for discipline up to and including termination.*

Schultz and Bruss are both experienced Deputies; Schultz held the rank of Corporal, while Bruss had approximately 15 years of experience as a K9 handler and trainer. Both Defendants knew or should have known that they had an affirmative duty to intervene to protect the constitutional rights of Mr. Thomas and to prevent Johnson from using their department's canine to attack and inflict serious and unnecessary injuries to Mr. Thomas. Both failed to do so, and failed to report Johnson's violations after the fact.

In deposition, Bruss and Schultz affirmed what the video evidence shows: Thomas did not threaten or take aggressive action towards the officers. *See* Bruss deposition at 233, 266; Schultz deposition at 311-315. Moreover, both Bruss and Schultz confirmed they had the ability to intervene and stop Johnson from using excessive force—at multiple points during the encounter—but they decided not to. *See* Bruss deposition at 271-272; Schultz deposition at 370-371.

**OPINION 3.**

Corporal Schultz's perspectives on the use of force diverge significantly from the widely recognized and taught standards of reasonableness, commonly known as the Graham Standard. Schultz described (inaccurately) a use of force continuum, which provides a procedural and mechanical approach to decision-making in real-time situations (akin to "if you observe X, then do Y") as opposed to assessing each use of force decision from the perspective of reasonableness,

as is required by the Graham Standard. For example, a use of force continuum approach would counsel officers that if a suspect is armed with a knife, the use of a firearm is presumptively justified. In contrast, assessing a use of force decision from the perspective of reasonableness looks at the totality of circumstances, including the severity of the suspected offense, whether the suspect is actively resisting or attempting to flee, and whether the suspect poses any immediate threat to the safety of the officer or others. This inquiry is a fact-intensive one unlike the mechanical approach that Defendant Schultz described.

**ANALYSIS.**

Deposition Testimony.

In addition to the evidence described above, I reviewed and considered the deposition testimony of Deputy Schultz who testified (in part):

a) He is an experienced police officer having served with the Brazos County Sheriff's Office, the Harris County Sheriff's Office and as a corporal at the Constables Office (pg. 29-32).

b) He carried a laser equipped TASER that emitted both "red and green" laser beams and clarified that it would be a violation of policy to point the laser into someone's head, eyes or face…. "in fact, we're taught not to do that."… further explaining that it "could actually cause damage to the eye.." (pg. 90-91).

c) It is not uncommon for suspects to become confused by directions of police officers… and have to be redirected. (pg. 120).

d) It would be for a suspect to have a handgun concealed while wearing sweatpants, without the use of a clip (holster) the handgun would "fall down my pants…." (129-130).

e) He had his TASER laser "trained" on Thomas.. (pg. 282). He aimed his laser/TASER at Thomas's head (pg. 357) which is a violation of widely accepted police training and policies.

f) Discussed a "new thing where the handler had to take the suspect into custody (pg. 282) and the "dog was still on the bite…" This is evidence that Schultz knew and understood that the K9 was continuing to bite and injure Thomas while Johnson was attempting to handcuff him.

g) After Thomas was injured Schultz learned the it was the "homeowner that was armed and not Thomas…" (pg. 285). I noted that this was information that the officers could have obtained prior to using force, by simply sending one of the four or five officers on the scene to talk with the homeowners.

h) Testified that the information provided by the dispatcher was that it was the homeowner had a weapon and not the suspects (pg. 291-293).

i) The only non-compliance by Thomas was that he did not stand up when ordered to do so and he remained on the ground in a prone position. (pg. 298).

j) "Thomas was not resisting apprehension physically in any way"… (pg. 303).

k) Schultz testified that…. *"he hoped he would have got up and been detained so we could have found out what the situation was. And he might have gone home. I don't know…"* (pg. 303).

l) That it was purportedly not within his authority to make any suggestions concerning the use of the department K9 to inflict pain and injury to Thomas who was lying prone on the ground in a non-threatening manner (pgs. 305-306), and that he did not have enough information or

understanding of the use of a K9 to make an informed decision on the appropriateness of the force used.  (pg. 310).

m) Thomas was not a threat while Johnson was straddling him, although the K9 continued to inflict pain and physical damage to Mr. Thomas. (pg. 370).

n) It would not be realistic or practical to expect a person to lie still while being attacked by a K9 (pg. 378-379).

o) The use of force principles that guides his use of force decisions is based on the *use of force continuum stuff.. (pg. 44 & 47))* . Further explaining the various steps to be used when considering use of force, he stated "they actually teach you in training that you may use one force above whatever they are using against you.  That's what I was always taught." (pg. 97 & 98).


Detailed Findings.

Instead of verbally and/or physically intervening to prevent Johnson from unnecessarily releasing his attack canine, Schultz participated in the unwarranted abuse of Mr. Thomas in the following ways:

1. Schultz knew or should have known that the basis for the 911 response was due to a disturbance and that the responding Deputies were told that the homeowner was armed, not Thomas or Gray.

2. Schultz knew or should have known that based on the provided information from his dispatcher there was not any basis to believe that Thomas had committed a crime or an arrestable offense.

3. Schultz knew or should have known that the aggressive and unprofessional actions (shouting profanities) by Defendant Johnson and others was unnecessary and unreasonable based on the facts known to the Deputies.

4. Employing his laser-equipped weapons  in a manner likely to intimidate and threaten Mr. Thomas, continuously circling Thomas's head and face with the laser beam from his firearm and TASER as Thomas lay on the ground. As Thomas endeavored to comply with the Defendants' directive to stand up, Schultz unreasonably and needlessly aimed the laser into Thomas's eye, potentially disorienting him and risking injury to his eyes. This served no legitimate law enforcement purpose, as Mr. Thomas was in full compliance and did not present a reasonable threat or danger.

5. Schultz watched as Sergeant Johnson struggled to maintain control over the department's unleashed canine, at one point losing control when the dog lurched and twisted; which apparently caused injury to Johnson's hand (he later claimed that the injury to his hand was caused by Thomas which appears to be inconsistent with the video evidence in this case).

6. Schultz was aware or should have been aware that Thomas was fully compliant and never attempted to run or flee from the Deputies. Furthermore, Schultz knew or should have known that the Deputies could safely approach and handcuff Thomas without the necessity of deploying the attacking canine, which served no legitimate law enforcement purpose and did not enhance the Deputies' safety in any way.

7. Schultz  knew or should have known that Johnson intended to release the canine yet made no attempt verbal or otherwise to prevent him from doing so.
8. Schultz stood passively by and watched as the department canine attacked Mr. Thomas for an extended period and made no attempt (verbal or otherwise) to stop the canine from inflicting serious injuries to Thomas.
9. Schultz inaccurately conveyed information to the ADA in an unsuccessful attempt to charge Thomas with a more serious offense. Schultz's statements to the ADA that Thomas attempted to flee and did not comply with the Deputies' directives contradicts the evidence available in this case. Additionally, Schultz neglected to inform or report the inappropriate use of force to the ADA or his supervisors, despite his duty to intervene and report misconduct.
10. Schultz knew or should have known that the arrest of Mr. Thomas (and Mr. Gray) was unjustified based on the totality of circumstances.
11. Schultz neglected to investigate the potential theft of Gray's cell phone and the reported aggravated assault, where the homeowner allegedly aimed a firearm at Thomas and Gray, threatening to shoot them.

## OPINION 4.

Rather than verbally or physically intervening to stop Johnson from unnecessarily deploying his attack canine, Bruss actively participated in the unjustified mistreatment of Thomas. Like Sergeant Johnson, Deputy Bruss was trained and experienced in handling canines, and therefore should have been fully aware of the potential harm and serious injuries that can result from their use. By not intervening and partaking in the abuse, Bruss not only failed to prevent the unjustified use of force but also directly contributed to it. This highlights a failure in his duty to uphold proper conduct and to intervene to protect the rights of individuals he is interacting with.

## ANALYSIS.

Deposition Testimony.

Deputy Bruss: In addition to the evidence described above, I reviewed and considered the deposition testimony of Deputy Bruss, who testified (in part):

a) Deputy Bruss is an experienced canine handler with "15 years of experience working with canines (pgs. 65-66). Bruss acknowledged that K9's are trained to "bite on what they can get ahold of…and they are likely to bite someone's head or face (pg. 126-127). This fact should have been considered prior to Johnson's release of the department K9. Bruss also acknowledged that there have been rare circumstances where K9 bites have been fatal (pg. 130).

b) Bruss testified that the use of K9 force was justified as Thomas purportedly failed to comply and was an "unsearched suspect on a weapons call". ""He was told multiple times stay in the car; he failed to stay in the car. He was told to get up; he refused to get up. All those things trying to lure us from a position of cover to move up on a vehicle

that is un-searched and I don't know if there's another suspect in there."" (pg. 214)  I noted that the video evidence does not support Bruss's testimony as Thomas was in fact compliant and did not exhibit any behavior that could reasonably been considered a threat to the safety of the Deputies.

c) Bruss claims that the dispatcher advised that the suspects were armed yet the evidence demonstrates that the dispatcher advised that it was the homeowner that was armed. (pg. 215).

> A. During the response, dispatch updated and said that the homeowner had their gun out. But at no point was – was I told that the suspects no longer had guns. So all I thought in response was that the suspect had guns and the homeowner had a gun. So now there's more than a couple of guns on scene.
>
> Q. (BY MS. LaVARCO) So at that point you think that both the suspects who are described as two black men, and the homeowners, who have no description, are potentially armed?
>
> Q. So there are at least two instances in this communications report where someone asks whether the suspect had the weapon out?
>
> A. Correct.
>
> Q. And what was the response?
>
> A. "Reportee has weapon out."

d) Bruss reviewed the videotape evidence during his deposition and acknowledged and admitted that he did not observe Thomas offer any physical resistance, "just noncompliance." (pg. 243).

> Q. (BY Ms. LaVARCO) From the time he was on the floor in a prone position, between the time he was ordered to get on the floor in a prone position and the time the dog was released, did he fail to comply with any order other than to stand up?
>
> A. On this video, no. He just didn't stand up.
>
> Q. He just didn't stand up?
>
> A. Again, I didn't deploy the dog. (254)

e) Bruss testified that K9s are trained to maintain their bite and attack until a suspect is securely handcuffed before ordering the K9 to release, claiming "…for the reason you don't want the dog to have to reengage if they decide to fight again."  I noted that there is no evidence to support the contention that Mr. Thomas was "fighting or resisting" in any  way prior to being attacked by the K9 and any reasonably trained officer would not have allowed their K9 to continue to bite and inflict pain upon Thomas who was not resisting. (257-258)

f) Bruss acknowledged that K9s are trained to continue to bite if the "subject continues to move around, the dog thinks my job is not done.  That's just how dogs are trained."

> A. It is. Better than that, the – the problem is the dogs are trained to respond to resistance. And so when a subject continues to move around, the dog thinks "My job is not done." That's just how the dogs are trained. (258)

g) When asked about efforts to intervene and/or de-escalate the situation Bruss testified,

> Q. What about before Johnson took the dog off the bite, did you take any steps to intervene or de-escalate?
> A. I told him to stop moving around. I told him what would happen, that he needed to stop moving around."
> Q. In your experience are suspects ever – are suspects able to stop moving around?
>     MS. VINSON: Objects to form
> A. I mean, I've had suspects stop moving around when they're instructed by the police. I don't – I don't know what he – I – I can't tell you what Mr. Thomas – I can't tell you that. (259)

h) Bruss testified that while he did have the opportunity to instruct Johnson to release the dog from the bite, he felt it would have been inappropriate and against his training to do so. He added, "that's not my job."(pg. 273)

> A. I have a duty to intervene when I believe that something is unlawful. At that particular point, I didn't have the hindsight of watching these videos. And even at this point, I don't believe it was unlawful. So I wouldn't stop that use of force because that officer with his angle and his experience and his – chose to utilize that. (pg. 273)

i) Deputy Bruss testified that he was aware that K9 Jeck's had in the past bitten his K9 handlers including Sgt. Johnson and Jeck's new handler Kourtney Kuehn. (pg. 278.).

Detailed Findings.

Bruss engaged and participated in the unjustified use of force and mistreatment of Mr. Thomas by doing the following:

1. Bruss knew or should have known that the basis for the 911 response was due to a disturbance and the responding Deputies were told that the homeowner was armed, not Thomas or Gray.
2. Bruss knew or should have known that based on the provided information from his dispatcher there was not any basis to believe that Thomas had committed a crime or an arrestable offense.
3. Bruss threatened to use the canine against Thomas knowing that it was inappropriate based on the known facts to utilize the department canine.
4. Bruss failed to verbally or physically prevent Johnson from deploying his canine although he was aware that the attack was imminent as the canine was "off leash" and was being held by Johnson in a ready to attack posture.
5. Bruss stood by passively and observed the canine biting and attacking Mr. Thomas. At one point, he instructed Thomas to stop moving while the canine was tearing into his flesh, which he knew or should have known was illogical and nearly impossible. Bruss also assured Thomas that once he was handcuffed, the dog would be called off. Bruss either knew or should have known that Thomas was entirely under the control of Sergeant Johnson and posed no threat to the Deputies. However, he stood by and did nothing as the canine continued to attack Thomas.

Additionally, Bruss's decision to holster his weapon and stand with his hands on his hips during the attack further indicates that he recognized Thomas was not a threat.

6. Shortly after attacking Mr. Thomas with their department canine and handcuffing him, the defendants received confirmation from witnesses that neither Thomas nor Gray were reported to be armed. In fact, following the Deputies' discussions with the homeowners and their interview with Mr. Gray, a reasonably trained Deputy would have questioned the justification for arresting and charging Mr. Thomas. To exacerbate the situation, rather than releasing Thomas and acknowledging the absence of probable cause, they persisted in causing additional pain and suffering by keeping Thomas severely injured arm handcuffed behind his back. They only agreed to reposition the handcuffs when prompted by medical technicians.

## <u>CONCLUSION</u>

I have provided my opinions based on my training, experience, and my review of thousands of pages of records and hours of video footage in this case. I applied generally accepted police management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty and based on longstanding and well-accepted law enforcement practices. If additional information is presented to me, I am happy to consider it. I reserve the right to supplement or modify this report and my opinions expressed in the report.

*Thomas J. Tiderington*

<u>/s/Thomas J. Tiderington</u>

## List of Deposition and Trial Testimony:
(as of 03-20-2025)

| Date Testified | Testimony | Court | Case Name & Number: | Attorney |
|---|---|---|---|---|
| March 2025 | Trial | United States District Court Eastern District of Wisconsin | Trevor v Allen 21-cv-565 | Richard Student |
| March 2025 | Deposition | Jefferson Circuit Court Louisville, Kentucky | Paul Paris v Louisville Metro PD 21-ci-00-4809 | Sam Aguiar Sara Collins Lonita Baker |
| Jan. 2025 | Deposition | United States District Court Northern Illinois | 18-cv-2342 Maysonet v City of Chicago | Bonjean Law Group Jennifer Bonjean Ashley Cohen |
| Nov. 2024 | Deposition | In the United States District Court For the Eastern District of Kentucky | 5:22-CV-300-KKC LaDuke v. Horton | Jonathan B. Fannin |
| Nov. 2024 | Deposition | District Court, Chaffee County, Colorado | 23-cv-30010 Athanas v Orth/Horton | Kevin Mehr Mehr Law PLLC |
| August 2024 | Deposition | United States District Court of Texas Austin Division | 1:21-cv-00374- Watsky v. Williamson | Lamar Treadwell |
| June 2024 | Deposition | United States District Court Southern District of Ohio | 2:19-cv-00849 M.A. v. Wyndham | Matt Schultz Chris Tisi Levin Papantonio Rafferty |

| | | | | |
|---|---|---|---|---|
| March 2024 | Deposition | Circuit Court- Seventh Circuit- Volusia County | Jarvis v City of Daytona | Arthur A. Huggins |
| March 2024 | Deposition | United States District Court Western District of Michigan | 1:22-cv-00277-PLM Phillips v. City of Lansing | Johnson Law Aristidi D. Papaioannou |
| March 2024 | Deposition | United States District Court- Northern Illinois | 1:20-CV-02977 Ochoa v City of Chicago | Bonjean Law Group Jennifer Bonjean Ashley Cohen |
| February 2024 | Deposition | United States District Court Northern Illinois | 18-cv-2342 Maysonet v City of Chicago | Bonjean Law Group Jennifer Bonjean Ashley Cohen |
| Sept. 2023 | Deposition | United States District Court Northern Illinois Eastern Division | 1:20-CV-04156 Johnson v City of Chicago | Loevy & Loevy Anand Swaminathan |
| **August 2023** | Deposition | United States District Court Northern Illinois Eastern Division | 1:18-cv-03335 Gomez v City of Chicago | Loevy & Loevy Sean Starr |
| August 2023 | Deposition | United States District Court Northern Illinois Eastern Division | 1:17-cv-00204 Savory v City of Peoria | Loevy & Loevy Megan Pierce Steven Art |

| August 2023 | Deposition | United States District Court Western District of Kentucky Louisville Division | 3:22-CV-00218-GNS-LLK Sterusky v Cooper | Sam Aguiar Sara E. Collins Nicholaus P. Wilson |
|---|---|---|---|---|
| June 2023 | Deposition | United States District Court District of Nevada | 2:20-cv-01743-RFB-DJA Jesus v City of Las Vegas | Michael J. Mcavoy Timothy E. Revero |
| April 2023 | Deposition | United States District Court Northern Illinois | 18-cv-2342 Maysonet v City of Chicago | Bonjean Law Group Jennifer Bonjean Ashley Cohen |
| March 2023 | Deposition | United States District Court Eastern District of Arkansas | 4:21-cv-00879-JM | Laux Law Group Mike J. Laux |
| March 2023 | Trial Testimony | Broward County FL 17th Judicial Circuit | 18-006079 | Hamilton, Miller Jerry Hamilton Derrick Kelley |
| Feb. 2023 | Deposition | United States District Court Northern Illinois | 1:19-cv-6508 Inglesias v City of Chicago | Loevy & Loevy Rachal Brady Anand Swaminathan |
| Feb. 2023 | Deposition | United States District Court Eastern District of Arkansas | 4:21-cv-00763 Davis v City of Little Rock | Laux Law Group Mike J. Laux |
| Dec. 2022 | Deposition | United States District Court Northern Illinois | 1:18-cv-03029 Sierra v City of Chicago | Loevy & Loevy Anand Swaminathan |

| Oct. 2022 | Deposition | United States District Court Northern Illinois | 1:18-cv-1028, 1:18-cv-2312 Reyes v City of Chicago | Loevy & Loevy Anand Swaminathan |
|---|---|---|---|---|
| | | | | |
| Aug. 2022 | Trial | United States District Court Northern Georgia | 1:19-cv-02047-SCJ Blasingame v Grubb | Johnson Law Ven Johnson |
| | | | | |
| May 2022 | Deposition | United States District Court Western District of Texas | SA-20-CV00466-XR Bailey v Ramos | Grable Grimshaw Mora PLLC Brandon Grable |
| | | | | |
| April 2022 | Deposition/ Hearing | Fifth Judicial Circuit Citrus County, Florida | 21-CF-253 State of FL v Waite | Law Offices of Michael Graves Alexei V. Lizanich |
| | | | | |
| Jan. 2022 | Deposition | United States District Court Southern District of Florida | 9:21-CV-80873-DMM Jane Doe v Love Hotel | Newsome-Melton Law Firm Maegen Peek-Luka |
| | | | | |
| **July 2022** | Deposition | United States District Court Eastern District of Wisconsin | 21-cv-565 Trevor v Allen | Richard Student |
| | | | | |
| Oct. 2021 | Deposition | United States District Court Arizona | CV-19-05216-PHX-MTL | Goodwin Law BRETT M. SCHUMAN |
| | | | | |
| | | | | |

# Thomas J. Tiderington & Associates, LLC

Law Enforcement Training / Case Consultant / Expert Witness

Fort Lauderdale, Florida / Plymouth, Michigan

ttiderington@aol.com  -  734 231-2305

**Fee Schedule:**

(effective 2024)

**Retainer Agreement:**          4,500.00

**Case Review & Expert Report:**     350.00

**Deposition Testimony:**          2000.00 (per half day/4 hrs.)

**Trial Testimony:**              3,500.00



## Thomas J. Tiderington
### Chief of Police
(Retired 2022)

Law Enforcement Training / Case Consultant / Expert Witness

Fort Lauderdale, Florida / Plymouth, Michigan

ttiderington@aol.com - 734 231-2305

## EXPERIENCE OVERVIEW:

- Chief of Police with over forty-four years of experience with four law enforcement agencies.   Responsible for personnel, budgeting, crime reduction, internal affairs, investigations, policies, training, and overall department leadership.
- Police Training Instructor and Adjunct College Instructor-Criminal Justice Courses.
- Commissioner – Michigan's Human Trafficking Commission 2015 – 2019.
- Southeast Florida Regional DEA Task Force - Supervisor
- Graduate of the Southern Police Institute (SPI).
- Bachelor's Degree in Police Administration.
- Police practices and procedures expert witness.
- Case Consultant (civil and criminal).

**Chief Thomas J. Tiderington** is an expert witness and consultant in police policies and practices, criminal investigations, use of force, search warrants, and arrest procedures. He has helped attorneys secure over 100 million dollars in settlements and judgments and has likewise defended the actions of law enforcement officers and federal agents. As a police officer for over 44 years with four different police agencies, he has extensive practical experience as a street cop and detective, and served as police chief for over twenty years; he has consulted on over 100 cases in state and federal courts.

Throughout his law enforcement career, he has been a highly sought-after police instructor and lecturer training tens of thousands of state, local, and federal law enforcement agencies, both nationally and internationally, on a variety of topics, including (but not limited to) criminal investigations, human trafficking, use of force, international drug investigations, money laundering, undercover operations, and police-involved shootings.   He is knowledgeable in all

aspects of law enforcement operations, including policing best practices, policy, procedures, use of force, risk mitigation, police training, and defensive tactics, including the use of K9s and CEWs (TASER).

During his forty-four-year law enforcement career, he served eight years as an undercover agent assigned to the department's Organized Crime Division, where he was an undercover operative in hundreds of cases.  As an undercover agent, he infiltrated and investigated Colombia-based international cocaine smuggling cartels. One investigation resulted in the seizure of over 3000 kilograms of cocaine and the arrest and conviction of notorious drug smuggler George Jung. This extensive undercover operation formed the basis for the book and major motion picture, **"BLOW."**

For over five years, he was assigned to the United States Drug Enforcement Administration (DEA) as the Group Supervisor-in-Charge of the South Florida Regional Drug Task Force. Under his leadership, the "Task Force" conducted one of the most sophisticated and successful international money laundering investigations (Operation Princess) to date.  This operation resulted in the seizure of more than 100 million dollars in cash worldwide and over 5 tons of cocaine. Chief Tiderington is prominently featured in a second book, authored by New York Times bestselling writer Bruce Porter, which details this global investigation and the abduction of his informant in Colombia, South America. The true story titled **"SNATCHED"** was published by St. Martin's Press in April of 2016, and the book has been optioned by Leonardo DiCaprio's movie production company, Appian Way.

Before retiring in 2022, he served as Chief of Police for over 20 years and is one of the longest-serving police chiefs in the United States.   Chief Tiderington is extremely knowledgeable in all aspects of law enforcement operations, including policing best practices, policy, procedures, use of force, risk mitigation, accreditation, police liability, active shooters in schools, police training, investigations, and emergency management planning, to name a few.    As Police Chief, his duties included the overall operation and management of the Plymouth Township Police Department and the multi-agency Plymouth Communications Center and Prisoner Lock-Up Facility (PCC).

**For over 35 years Chief Tiderington served as a law enforcement trainer:**

| Partial Listing of Training Classes Taught: | |
|---|---|
| • Undercover Survival/Raids/Informants-developed and presented training since 1987- over 10,000 state, local & federal officers have attended this training. | • Instructor- DEA-State & Local Training Programs – (Throughout the US since 1987). |
| • Lead Instructor – Nevada HIDTA Training – Undercover Operations/Informants/Raids. | • Schoolcraft College – Criminal Justice / Adjunct Instructor (since 2005). |
| • Keynote Speaker - Entrepreneurs' Organization – Detroit Chapter (2011) | • United States Coast Guard – Criminal Investigations (Miami/Key West, Florida) |
| • Young Presidents Organization (YPO) - Barcelona, Spain – Guest Speaker (2010) | • Michigan State Police – Criminal Investigations - Lead Instructor, Drug Unit Commanders School, Detroit, MI. |
| • Michigan State Police – Undercover Survival Training – Houghton Lake, MI. | • National Alliance of State Drug Enforcement Agencies (NASDEA), Mackinaw Island- Lead Instructor. |
| • Strategic Vice Investigations – Lead Instructor | • Broward Intelligence Group, Money Laundering Investigations, Key West, Florida. |
| • International Money Laundering Investigations Conference – Presenter on behalf of the Department of Justice (DOJ) - Rome, Italy. | • Florida Department of Law Enforcement, Money Laundering Investigations. |
| • NARC RAIDS – Developed and presented training since 1990-over 10,000 officers have attended. | • Narcotics Instructor. Broward Criminal Justice Institute (since 1985). |
| • Narcotics Instructor, Investigators Drug School (since 1985) | • Gwinnett, Georgia – Undercover Survival & Police Raids |
| • International Narcotics Enforcement – Speaker – Madrid, Spain (1992). | • Director and lead instructor, Drug Enforcement Seminars, Ft. Lauderdale, FL (since 1984) |
| • Drug Interdiction Instructor, United States Coast Guard, Tactical Law Enforcement Team (smuggling investigations). | • Minnesota State Association of Narcotics Investigators (M.S.A.N.I.) - Undercover Survival |
| • Indiana Drug Enforcement Association Annual Conference, (1998). | • Southeastern Public Safety Institute-St. Petersburg Junior College- Criminal Investigations. |
| • Tallahassee Police Department-In-Service Training- Informant Handling/ Raids | • International Association of Chiefs of Police (IACP)- Orlando, Florida - Use of Force. |
| • National Intelligence Academy, Coral Springs, FL | • Michigan State Police, Street Level Lieutenant's Conference – Undercover Operations / Raids/Search Warrants/Informants/VICE. |
| • Presenter Department of Defense (DOD)- United States Navy- USS Theodore Roosevelt, *While Underway* - Atlantic Ocean/International Waters | • In-Service Police Training Instructor, Rio Rancho Department of Public Safety, New Mexico. |

| | |
|---|---|
| • Charlotte-Mecklenburg Police Institute, Charlotte, NC (since 1997). | • Lead Presenter – Human Trafficking Investigations- Ft. Lauderdale, FL (2014). |
| • Michigan Association of Chiefs of Police – 2015 Winter Training Conference - Police Policy and Practices – Presenter. | • Undercover Survival & NARC Raid – Raleigh, NC. |
| • National Summit on Human Trafficking and the State Courts- New York City (2015). | • St. Louis County and Municipal Police Academy, St. Louis, MO- Police Raids/Undercover. |
| • Michigan Association of Chiefs of Police – Human Trafficking & Prostitution Investigations 2017 Summer Conference- Presenter | • Columbus Ohio Regional Police Academy – Undercover Survival & Narc Raids Training. |
| • Young Presidents Organization (YPO) - International Drug Trafficking (2019). | • Broward Crime Commission – Presenter (2020). |
| • Certified Law Enforcement Instructor (MCOLES & FDLE). | • Broward County Police Academy classes. |

## Areas of Instruction/Topics Provided by Thomas J. Tiderington:

(Partial List)

| | |
|---|---|
| Undercover Operations | Human Trafficking |
| Use and Management of Confidential Informants. | Prostitution Investigations-Hotel/Motel Investigations |
| High-Risk Warrant Service | "Sneak & Peek" Warrants" |
| Coercive Deception | Use of Hidden Cameras |
| Alternatives to Dynamic Entries. | International Cartels and Criminal Organizations * Fugitives and Arrest Warrants |
| Search Warrants/Warrantless Entries | Conspiracy Investigations |
| Dangers of using "boilerplate" affidavits | Money Laundering |
| Narcotics Investigations | High-Risk Police Tactics |
| Criminal Cartels | Use of Deadly Force |
| Wrong Door Raids | Developing Probable Cause |
| Controlled Drug Deliveries | Kidnapping Investigations |
| Drug Identification | SWAT- use and policies. |
| Drug Interdiction and Smuggling Operations | Medical Marijuana and the use of force |

| | |
|---|---|
| Task Force Operations | Risk and Threat Assessment |
| Use of Force Policy and Procedures | Police Ethics |
| Firearms Use and Policy | Vehicle Pursuit Procedures |
| Less than lethal options (CEW/TASER) | Mistaken Identity Shootings |
| Concepts of Evidence/rules of evidence | Traffic Stop and Procedures |
| Community Policing and Crime Statistics | Handcuffing policy and procedures |
| Threat Assessment & Risk Avoidance in Tactical Operations | Interview and Interrogation Techniques |
| SWAT Operations | Internal Investigations |

## **Professional Law Enforcement Experience**

### **Chief of Police**
Plymouth Township Police Department (2001-2022)
Michigan

- A "seasoned" executive experienced in all aspects of police operations, policy development/implementation, labor relations, internal affairs, and community involvement.
- One of the longest-serving police chiefs in the country.
- Led the accreditation process.
- Effective leadership skills in personnel selection, training, and reorganizing staff into cohesive motivated teams.
- Introduced and managed community policing strategies to address strengthening police-community relations.

### **Police Officer/Supervisor/Senior Management**
Fort Lauderdale Police Department (1981–2001)
Florida

- Broward Police Academy (comparative compliance program).
- Patrol Division – a highly diverse population of 250,000 residents and millions of visitors each year.  Assigned to all areas of the city in every patrol assignment.
- Organized Crime Bureau (OCB) – Detective charged with investigating international crime cartels.

- Supervisor and Management Positions – Served in a variety of progressively responsible leadership executive positions.
- Administrative Services Captain – Budget, Purchasing, CALEA Manager. Accreditation Management, Grants and Planning, Training.
- Patrol Captain – In charge of crime prevention initiatives as well as the delivery of police uniformed patrol services.
- Captain / Special Investigations Division – Management and oversight of over fifty detectives charged with conducting specialized investigations targeting criminal organizations. Units included: VICE/Human Trafficking, Criminal Investigations, Narcotics, Task Force Operations, Technical Support, Nuisance Abatement Board, Street Crimes, and Major Narcotics.

**United States Drug Enforcement Administration (DEA)**
Southeast Florida Regional Task Force (1990-1996)

Group Supervisor in Charge of the South Florida Regional Task Force Initiative – HIDTA Task Force charged with the responsibility of identifying and dismantling international criminal cartels and organizations. Supervised and managed one of the most sophisticated and successful worldwide money laundering investigations (Operation Princess). Seizing more than 100 million dollars in cash and over 5 tons of cocaine.

**Detroit Police Department (1978 -1980):**
Diverse uniformed patrol and investigative assignments

- Detroit Police Academy.
- Patrol Experience
- Community Policing – Detroit Police Sub-Station Program.
- Motorcycle Training
- Pistol Team

*1980 – One of 1500 police officers was laid off due to budget reductions.*

## Education:

- Mercy College of Detroit – Criminal Justice/associate degree
- Florida Atlantic University – Police Administration/bachelor's degree
- University of Louisville/Southern Police Institute – Command Officers Development Course (CODC)
- Detroit Police Academy (Class 78K)
- In-Service Police Training - over 4800 hours of advanced police training and leadership classes.

**Secondary Teaching Experience:**

- Broward Community College – Adjunct Faculty
- Schoolcraft College – Adjunct Faculty|

**Expert Witness and Consulting Experience:**

Chief Tiderington has been retained as an expert witness or case consultant in over one hundred (100) cases throughout the United States. His considerable expertise involves meticulous case review, enabling him to deliver comprehensive reports and opinions to the Court. Furthermore, he has extensive experience in providing testimony during depositions and trials in both state and federal courts.  He has been retained by the Department of Justice to examine and review the investigative actions of agents with the Federal Bureau of Investigation (FBI), the US Marshall's Service, and the US Customs and Border Protection (CBP).

**Provides consulting and expert witness services on a wide range of law enforcement issues including, but not limited to:**

| | |
|---|---|
| Police Use of Force | Wrongful Convictions |
| Standard operating procedures, policies, and rules and regulations of police agencies. | Selection, retention, supervision, discipline, and training of law enforcement officers. |
| Internal Investigations | Police Administration |
| Police Procedures and Investigations | Pursuits (vehicle & foot) |
| Police Corruption | Human Trafficking/Prostitution |
| Criminal Investigations | Interviews and Interrogations |
| Police Arbitration Cases | Accidental Police Shootings/Mistaken Identity |
| Civil Rights Violations | Immigration Issues |
| Police recognition of and reaction to emotionally disturbed persons. | Workplace Violence and Harassment |
| 911 and Police Dispatch Operations | Homicide & Violent Crime Investigations |
| Police Response to an Active Shooter | Raid Planning and Execution |
| Adult Entertainment Establishments | "Wrong-Door" Raids & Search Warrants |
| Search Warrants & Affidavits | Use of Hidden Cameras & Surveillance |
| Use of Anticipatory Warrants | Controlled Delivery Investigations |
| Domestic and International Narcotics Trafficking and Enforcement. | Fugitives / Arrest Warrants (Domestic & Foreign) |
| Premises Liability (Human Trafficking) | Crime Prevention Techniques |
| Handcuffing Techniques | Police Use of K9s |
| Police Use of CEW's (TASER) | Use and Management of Informants |
| Police Shootings | Extradition Issues |
| International Investigations | Monell Claims |
| | |

**PRIVATE SECURITY EXPERIENCE**

Provides guidance to commercial property owners and served as a security consultant for bars, hotels, and commercial business establishments. Offers advice and expertise in crime prevention strategies and employee training pertaining to security concerns, particularly addressing criminal activity on or near their properties.


**TRAINING COURSES ATTENDED**

Received over 4,800 hours of specialized and professional training in nearly all areas of law enforcement including particular emphasis in criminal investigations, arrests, use of force, and policies and procedures.

## PROFESSIONAL ACTIVITIES:

**Human Trafficking Commissioner - Appointed by Michigan Governor Rick Snyder (2015 – 2019).**

The mission of the Human Trafficking Commission:

1. Designed to identify sources for grants that will assist in examining and countering human trafficking.
2. Fund research programs to determine the extent and nature of human trafficking in the state of Michigan, and provide information and training to police officers, prosecutors, court personnel, social services personnel, and other individuals.
3. Collect and analyze information regarding human trafficking in this state, identify state and local agencies within this state and other states, as well as, within the federal government, that are involved with issues relating to human trafficking.
4. Coordinate the dissemination of information regarding human trafficking in the state of Michigan to those agencies, review the existing services available to assist victims of human trafficking, including crime victim assistance, health care, and legal assistance, and establish a program to make those victims better aware of the services that are available to them.
5. Establish a program to improve public awareness of human trafficking review existing state laws and administrative rules relating to human trafficking and make recommendations to the legislature to improve those laws and rules to address human trafficking violations in this state.

**Western Wayne Criminal Investigations:  Board of Directors / Chairman**

A Multi-Agency Task Force consortium (Federal, State & Local Agencies) designed to provide the benefit of regional criminal investigative teams.  Includes the Western Wayne County Community Response Team (CRT).

**Western Wayne Special Operations Team (SWAT):**
Board of Directors / Chairman


<u>**Professional Affiliations:**</u>
(either current or at one time affiliated with)

Wayne County Police Chiefs Association
Western Wayne Chiefs Association
Southeast Michigan Chiefs of Police Association
Fraternal Order of Police/Florida
Police Executive Research Forum (PERF)
International Narcotics Enforcement Officers Association
State Certified Law Enforcement Instructor (Florida)
Southern Police Institute (SPI)-Alumnus
International Association of Chiefs of Police (IACP) – Life Member
National Drug Enforcement Officers Association (NDEA)
International Law Enforcement Educators and Trainers Association (ILEETA)
Michigan Association of Chiefs of Police (MACP)
Western Wayne Special Operation Team – Board of Director
National Tactical Officers Association (NTOA)
International Crime Scene Investigators Association (ICSIA)
Michigan Municipal Risk Management Authority (MMRMA)
Michigan's Human Trafficking Commission