IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KERRY LEE THOMAS, | § | |
| *Plaintiff*, | § | |
| | § | |
| V. | § | Civil Action No. 4:23-cv-00662 |
| | § | |
| ROBERT JOHNSON, | § | |
| ERIC M. BRUSS, | § | |
| WAYNE SCHULTZ, | § | |
| And THE ESTATE OF ROBERT JOHNSON | § | |
| *Defendants*. | | |

---

**DEFENDANTS BRUSS AND SCHULTZ'S
MOTION FOR FINAL SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. iii

NATURE AND STAGE OF PROCEEDINGING ....................................................................... 1

ISSUES PRESENTED ................................................................................................................. 1

SUMMARY OF THE ARGUMENT ........................................................................................... 1

SUMMARY JUDGMENT STANDARD ..................................................................................... 2

UNDISPUTED MATERIAL FACTS .......................................................................................... 3

ARGUMENTS AND AUTHORITIES ........................................................................................ 8

    A.  Plaintiff cannot satisfy the elements required under bystander liability
        and the Court should grant this motion for summary judgment ......................... 8

        1.     No violation of Plaintiff's constitutional rights .......................................... 8
              (i)      Severity of the Crime .................................................................. 10
              (ii)     Threat of Safety to the Officers or Others ................................... 11
              (iii)    Suspects were actively resisting or attempting to evade. ............. 12

        2.     Bruss and Schultz did not know Johnson's use of force was unreasonable
              and, therefore, had no reasonable opportunity to intervene .................... 14

    B.  Bruss and Schultz are Entitled to Qualified Immunity for Plaintiff's bystander
        liability claims because the alleged violation of rights was not clearly established.............. 16

CONCLUSION .............................................................................................................................. 20

CERTIFICATE OF SERVICE ........................................................................ ..................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Eeds,*
    392 F.3d 138 (5th Cir. 2004) ................................................................................17

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ...............................................................................................17, 18

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...........................................................................................2, 3, 19

*Ashcroft v. Al-Kidd,*
    563 U.S. 731 (2011) ................................................................................................17

*Ballard v. Hedwig Vill. Police Dep't,*
    2009 WL 2900737 (S.D. Tex. Sept. 2, 2009), *aff'd,* 408 F. App'x 844 (5th Cir.
    2011) ......................................................................................................................15

*Barnes v. City of El Paso,*
    677 F. Supp. 3d 594 (W.D. Tex. 2023)...................................................................14

*Barnes v. Felix,*
    145 S. Ct. 1353 (2025)......................................................................................10, 13

*Batyukova v. Doege,*
    994 F.3d 717 (5th Cir. 2021) ..................................................................................9

*Brothers v. Zoss,*
    837 F.3d 513 (5th Cir. 2016) ..................................................................................9

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...........................................................................................2, 3

*Darden v. City of Fort Worth, Tex.,*
    880 F.3d 722 (5th Cir. 2018) ................................................................................19

*First Nat'l Bank of Ariz, v. Cities Service Co. Gostin v. Nelson,*
    363 F.2d 371 (3d Cir. 1966)...................................................................................3

*Foster v. City of Lake Jackson,*
    28 F.3d 425 (5th Cir. 1994) ..................................................................................18

*Garza v. Briones*,
943 F.3d 740 (5th Cir. 2019) ..........................................................................9

*Graham v. Connor*,
490 U.S. 386, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989) ..............................9

*Griffin v. City of Sugarland, Tex.*,
787 F. App'x 244 (5th Cir. 2019) .................................................................14

*Hanks v. Rogers*,
853 F.3d 738 (5th Cir. 2017) ..........................................................................9

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ......................................................................................17

*Harmon v. City of Arlington, Tex.*,
16 F.4th 1159 (5th Cir. 2021) .........................................................................9

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) ........................................................................................9

*Kovacic v. Villareal*,
628 F.3d 209 (5th Cir. 2010) ........................................................................17

*Lujan v. Nat'.*,
497 U.S. 871 (1990) ........................................................................................2

*Malone v. City of Fort Worth, Tex.*,
No. 4:09-CV-634-Y, 2014 WL 5781001 (N.D. Tex. Nov. 6, 2014) ............15

*Manis v. Lawson*,
585 F.3d 839 (5th Cir. 2009) ........................................................................10

*Matsushita Elec. Indus, v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ....................................................................................2, 3

*McClendon v. City of Columbia*,
305 F.3d 314 (5th Cir. 2002) (en banc) .......................................................18

*Morgan v. Swanson*,
659 F. 3d 359 (5th Cir. 2011) (en banc) .......................................................19

*Mullenix v. Luna*
136 S. Ct. 305 (2015) ...............................................................................18, 19

*of Est. of Joseph v. Bartlett*,
981 F.3d 319 (5th Cir. 2020) ..........................................................................9

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ................................................................................ 17

*Perdomo v. City of League City,*
    765 F. Supp. 3d 613 (S.D. Tex. 2025) ..................................................... 14

*Pierce v. Smith,*
    117 F.3d 866 (5th Cir. 1997) ............................................................. 18, 19

*Poole v. City of Shreveport,*
    13 F.4th 420 (5th Cir. 2021) ...................................................................... 9

*Poole v. City of Shreveport,*
    691 F.3d 624 (5th Cir. 2012) ............................................................. 10, 18

*Ramirez v. Martinez,*
    716 F.3d 369 (5th Cir. 2013) ................................................................. 18

*Siegert v. Gilley,*
    500 U.S. 226 (1991) ......................................................................... 17, 18

*Stefanoff v. Hays County,*
    154 F.3d 523 (5th Cir. 1998) ................................................................. 19

*Tarver v. City of Edna,*
    410 F.3d 745 (5th Cir. 2005) ................................................................. 19

*West v. Atkins,*
    487 U.S. 42 (1988) ................................................................................. 17

*White v. Calvert,*
    *No.* CV H-20-4029, 2021 WL 6112791 (S.D. Tex. Dec. 27, 2021) ........ 16

*White v. Pauly,*
    137 S. Ct. 548 (2017) (per curiam) ....................................................... 18

*Whitley v. Hanna,*
    726 F.3d 631 (5th Cir. 2013), *cert. denied*, 527 U.S. 1087 (2014) .......... 8, 16

*Williams v. Kaufman Cnty.,*
    352 F.3d 994 (5th Cir. 2003) ................................................................. 18

**Statutes**

42 U.S.C. § 1983 ............................................................................................. 17, 19

**Other Authorities**

Fourth Amendment .................................................................................................................1

FED. R. CIV. P. 56(a) ...........................................................................................................2

FRCP 56(e) ..........................................................................................................................3

## MOTION FOR FINAL SUMMARY JUDGMENT

Defendants Eric M. Bruss and Wayne Schultz move for final summary judgment on Plaintiff Kerry Lee Thomas' claims as follows:

### NATURE AND STAGE OF PROCEEDING

Plaintiff, Kerry Lee Thomas ("Thomas") filed suit against the Estate of Robert Johnson, Eric Bruss ("Bruss") and Wayne Schultz ("Schultz") for injuries he sustained when Robert Johnson ("Johnson") unleashed his canine that caused injury to Thomas. Thomas claims that Bruss and Schultz violated Thomas' Fourth Amendment rights by failing to intervene in Johnson's alleged unconstitutionally excessive use of force. Many of Thomas's incorrect, conclusory and sensationalized claims[1] have been debunked during the discovery process. Bruss and Schultz now move for summary judgment on all claims asserted against them in Plaintiff's Amended Complaint.

### ISSUES PRESENTED

1. Whether Thomas can create a genuine issue of material fact as to his bystander claims against Bruss and Schultz given that the totality of the circumstances does not support that the force that Johnson used was clearly excessive.

2. Whether Thomas can create a genuine issue of material fact as to his bystander claims against Bruss and Schultz given that neither Bruss nor Schultz witnessed the full encounter between Thomas and Johnson.

3. Whether Bruss and Schultz are entitled to qualified immunity for Thomas's bystander claims since it was not clearly established that Bruss and Schultz had a duty to intervene in Johnson's alleged use of excessive force.

### SUMMARY OF THE ARGUMENT

Thomas's claims against Bruss and Schultz fail as a matter of law because the undisputed facts do not show that Johnson's use of force was clearly excessive or clearly unreasonable. Johnson's use

---

[1] Among other false assertions, Thomas pled in his Original Complaint the following allegations that were inaccurate: 1) Bruss and Schultz assisted Johnson in pointing their guns at him, taunting and levying threats; 2) the deputies were aware the suspects were unarmed; 3) Plaintiff was fully compliant with the officer's orders; 4) Bruss and Schultz encouraged and assisted Johnon when he released the dog; 5) the officers were called to a noise complaint. [*See* Dkt. 1]

of his canine to subdue a non-compliant and threatening suspect at the scene of a weapons disturbance was not clearly excessive. Even assuming the evidence establishes that Johnson's use of force was excessive, the undisputed facts do not support Thomas's claims for bystander liability against Bruss and Schultz. Bystander liability cannot be justified by merely showing that an officer is at the scene when excessive force is used by another officer. The summary judgment evidence must show that Bruss and Schultz *knew* that Johnson's conduct was unconstitutional, and that each had a *reasonable opportunity* to intervene. Given that Bruss and Schultz arrived at the scene after Johnson, and based on Thomas's actions at the scene, Thomas cannot meet his burden. Furthermore, even if this Court determines that Thomas's bystander liability claims survive summary judgment, Bruss and Schultz are nevertheless entitled to qualified immunity because there was no clearly established duty to intervene in Johnson's use of force.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(a) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met this burden, the burden then shifts to the non-moving party. The non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus, v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). *Lujan v. Nat'.,* 497 U.S. 871, 888 (1990) (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972); *First Nat'l Bank of Ariz, v. Cities Service Co. Gostin v. Nelson*, 363 F.2d 371 (3d Cir. 1966). Rather, the non-moving party must set forth **specific facts**

showing that there is a genuine issue for trial. [FRCP 56(e)]. *See Matsushita Elec. Indus.*, 475 U.S. at 587 (emphasis added).

Although the facts and inferences drawn therefrom are to be viewed in the light most favorable to the non-moving party, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247.

A genuine issue of material fact exists and the non-moving party can avoid summary judgment only if the evidence presented would enable a reasonable jury to return a verdict for the non-movant. *Id.* at 249. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.* The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(e).

To avoid dismissal of claims on a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of *[every] element essential to that party's case*, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

<u>**UNDISPUTED MATERIAL FACTS**</u>

On February 22, 2021, at 19:15 hours (7:15 p.m.), Harris County Constable's Office Precinct One ("HCCO PCT1") police dispatch received a 911 call regarding a "disturbance with a weapon." [**Exhibit 1, Dispatch Call Slip**]. At 19:18, this call was dispatched for responding units to a residence at 10923 Capstone Dr., Houston, Texas ("scene"). [*Id.*] The 911 caller ("Reportee") reported to dispatch that two black males were in front of his home screaming and yelling for the second time, and that he had his weapon out. [*Id.*] This information was relayed over the radio by dispatch to HCCO PCT 1 deputies. [**Exhibit 2, Incident Report**]. At 19:18:32, HCCO PCT1 Sergeant Robert Johnson, advised dispatch he was enroute. [Ex. 1]. Johnson activated his body worn camera ("BWC")

at 19:19:10. [**Exhibit 3, Johnson BWC**] Bruss informed dispatch he was in enroute at 19:19:55 [Ex. 1]. At 19:20:00, dispatch relayed over the radio a description of the suspects including a description of what the suspects were wearing. [Ex. 1]. Johnson and Bruss each believed that dispatch initially reported that the suspects were armed. [Ex. 2, **at pp. 6,10**; Ex. 3, **at** 19:29:08–31:29; **Exhibit 4, Bruss BWC at** 19:31:34; **Exhibit 6, Bruss Deposition** at 214:20-25; 215:1-2; **Exhibit 8, Bruss Declaration** at ¶ 7]. At 19:20:31, Johnson asked dispatch for an update. [Ex. 3]. At 19:20:47, dispatch can be heard on Johnson's BWC, saying "update, reportee has his weapon out." [*Id.*] At 19:21:22, dispatch relayed that the suspects were still at the location. [*Id.*]. Johnson arrived at the scene with his canine, Jeck, at 19:21:48. [**Exhibit 10, Johnson Dashcam**]. Johnson exited his patrol car and drew his firearm as he verbally confronted the suspects. [Ex. 3 at 19:21:56]. Johnson immediately gave loud verbal commands to the suspects to put their hands up and to not move. [*Id.*] Despite being told not to move, Thomas, the passenger of the vehicle, exited the car on his own and raised his hands and stood in the door of the passenger side of the car. [Ex. 10 at 19:22:09]. Johnson instructed Thomas to stay in the car. [Ex. 3 at 19:22:11]. Johnson instructed Thomas to stay in the car three times, but Thomas did not comply and continued to stand outside the vehicle while the driver remained seated in the vehicle [*Id.* at 19:22:15]. At this point, Johnson removed Jeck from his patrol vehicle and continued to tell Thomas to get back in the car. [*Id.* at 19:22:16]. Johnson then warned Thomas that he would send his dog if Thomas did not get back in the car and have a seat. [*Id.* at 19:22:28]. While Johnson was commanding Thomas to get back in the vehicle, the driver, Raphael Gray ("Gray") started to exit the vehicle. [*Id.* at 19:22:30]. Johnson immediately instructed Gray to get back in the vehicle. [*Id.*].

During this exchange, Thomas stood in the passenger doorway and repeatedly told Johnson to "shoot me", "kill me". [*Id.* at 19:22:42]. After commanding the suspects to stay in the car eight times, Johnson reported over dispatch that the suspects were not complying, and that one is saying he

is ready to die and to shoot him. [*Id.* at 19:22:42]. Thomas continued to yell irrational statements like "kill me," and "black lives matter, all lives matter," and he also prayed to God and asked God to take him away from earth, all the while refusing to comply and get back inside the vehicle. [*Id.* at 19:22:56–23:51]. Gray grabbed Thomas's shirt and tried to pull Thomas back inside the car, but Thomas refused to move. [Ex. 10 at 19:22:35–22:43]. Gray also attempted to exit the car but immediately got back in the car when Johnson instructed him to. [Ex. 3 at 19:22:52–22:56]. Johnson gave Gray commands to keep his hands up where he could see them. [*Id.* at 19:23:14].

Bruss arrived at the scene at 19:23:26. [**Exhibit 11, Bruss Dashcam** at 19:23:26]. Johnson immediately told Bruss that Gray was not complying. [Ex. 3 at 19:23:36]. At this time, Thomas was still outside the car making irrational statements. [*Id.*]. Johnson suggested to Bruss that they get control of Thomas first. [*Id.* at 19:23:42]. Gray then attempted to exit the car, and Johnson instructed him to get back in the car. [*Id.* at 19:23:52–23:55]. Gray complied. [*Id.*]. Bruss took over verbal commands and told Gray to stop reaching and to show him his hands. [Ex. 4 at 19:23:49]. Thomas also told Gray to "show him your hands." [*Id.* at 19:23:57; Ex. 8 at ¶9]. Following Bruss's commands, Gray stood up from the car and stepped out of the driver side door area. [Ex. 4 at 19:24:04]. Simultaneously, Thomas stepped out from the cover of the passenger door and began walking towards the deputies. [*Id.*]. To this point, Thomas had failed to obey lawful commands given to him by the deputies and had acted on his own. Immediately, Johnson reacted to this change and yelled at Thomas to stop. [Ex. 3 at 19:24:04]. Thomas took a few more steps and stopped. [*Id.* at 19:24:09]. Thomas continued to tell the deputies to kill him. [*Id.* 19:24:15]. Bruss had Gray stand up and exit the car, then turn away from him. [Ex. 4 at 19:24:06–24:14.]. Bruss then told Gray to get down on the ground and turn his head away from him and extend his arms out away from his body. [*Id.* at 19:24:17]. While looking at Johnson and canine Jeck, Gray complied with Bruss's commands and lay prone on the ground. [*Id.* at 19:24:28].

Johnson moved back to the driver's side of his patrol unit and Johnson told Thomas to get down on the ground. [Ex. 3 at 19:24:35].

Thomas slowly complied and lay face down on the ground near the front passenger side of the vehicle. [*Id.* at 19:24:36]. Bruss then explained to Gray that they were advised the suspects had weapons and both suspects had not been searched. [Ex. 4 at 19:25:00]. Until they determined otherwise, he needed to comply with their commands. [*Id.*]. Thomas can then be heard saying "that is a good dog"—presumably referring to Jeck. [Ex. 3 at 19:25:18]. Bruss then informed Johnson that he had Gray at gun point to signal to Johnson that he had eyes on Gray so Johnson could handle Thomas. [Ex. 4 at 19:24:32; Ex. 8 at ¶ 10]. Bruss then warned Gray to keep his hands off to his side and that he would get dog bit if he did not comply. [Ex. 4 at 19:25:25]. Bruss again told Gray that he is an unsearched suspect and until he knows he does not have a gun, Gray needs to comply. [*Id.* at 19:25:41]. Johnson then told Bruss to get Gray first and call him into custody. [Ex. 3 at 19:25:54]. Bruss then ordered Gray to stand up and walk backwards to him. [Ex. 4 at 19:25:57]. Gray walked backwards towards Bruss. [*Id.* at 19:26:14]. Bruss ordered Gray to his knees, at which time Deputy Tuzun approached and handcuffed Gray. [*Id.* at 19:26:34]. While Deputy Tuzun was handcuffing Gray, Bruss advised her to "search him real good". [*Id.* at 19:26:39].

Schultz arrived on the scene at 19:25:25 and positioned himself behind Johnson. [**Exhibit 12, Schultz Dashcam** at 19:25:25; **Exhibit 5, Schultz BWC** at 19:25:39]. From behind Johnson, Schultz pointed his taser gun at Thomas. [Ex. 5 at 19:25:49]. After Gray was placed into custody, Schultz gave loud verbal commands for Thomas to stand up. [Ex. 5 at 19:59]. After eight verbal commands from Schultz to stand up, Thomas still did not comply. [*Id.* at 19:26:59–19:27:17]. Johnson also warned Thomas that this was his last chance, or he was going to send his dog after him. [*Id.* at 19:27:10]. Thomas looked up in the deputies' direction and put his head back down. [Ex. 5 at 19:27:12]. Thomas

then moved his left leg and put it back down but made no effort to stand up. [Ex. 3 at 19:27:19]. Johnson then warned Thomas one more time that if he did not comply, he was going to send his dog. [*Id.* at 19:27:20]. Thomas still did not comply, so Johnson sent canine Jeck to apprehend Thomas. [*Id.* at 19:27:23].

Upon Jeck's contact with Thomas, Johnson immediately approached Thomas to attempt to handcuff him. [*Id.* at 19:27:25–27:29]. Schultz remained behind Johnson to provide cover as needed. [Ex. 5 at 19:27:24]. Bruss then immediately moved to check the car for other possible threats. [Ex. 4 at 19:27:26; Ex. 8 at ¶14]. Bruss determined the vehicle was clear at 19:27:37. [*Id.*]. Bruss then informed Thomas that as soon as he was handcuffed, Johnson would take the dog off the bite. [*Id.* at 19:27:59]. Johnson initially struggled to gain control over Thomas but finished handcuffing him at 19:28:02 and then positioned himself behind Jeck to remove Jeck from his bite. [Ex. 3 at 19:28:02–19:29:06]. Jeck came off the bite at 19:28:06. [Ex. 3 at 19:28:06]. This was not visible to Bruss, so at 19:28:11, Bruss told Johnson to take Jeck off the bite. [Ex. 4 at 19:28:06-28:11]. Once Johnson removed Jeck from the bite, Johnson secured him inside his unit. [*Id.*]. Schultz contacted the police dispatch and requested an ambulance for a dog bite at 19:28:27. [Ex. 5 at 19:28:27].

While Bruss got Thomas into custody, Johnson searched the car for a gun. [Ex. 3 at 19:29:08]. He then asked Bruss to ask Thomas where the gun was. [*Id.*]. Schultz repeated Johnson's request and asked Bruss to ask Thomas where the gun was. [Ex. 5 at 19:29:26]. Johnson then talked to Deputy Tuzun and asked her how dispatch got the information that the suspects had a gun. [Ex. 3 at 19:30:56]. Deputy Tuzun responded that it was a dispatch miscommunication. [*Id.* at 19:30:59]. Johnson then asked Bruss to confirm that dispatch said the suspects were armed, and Bruss stated, "I specifically asked, she said the suspects." [Ex. 4 at 19:31:29].

Bruss later noticed that Thomas was nonresponsive, which indicated he was possibly under the influence of narcotics. [Ex. 8 at ¶ 14]. He therefore administered a dose of Narcan to Thomas through his nose and Thomas immediately became coherent, which confirmed Thomas was under the influence of narcotics. [*Id.*; Ex. 4 at 19:37:06–37:19]. This was also corroborated by the discharge paperwork when Thomas was released from the hospital the day after the dog bite indicating that Thomas was positive for cocaine, PCP, cannabinoids, and amphetamines on February 22, 2021. **[Exhibit 9, Plaintiff's Discharge Summary Report]**[2] EMS arrived on the scene at 19:43:00. [Ex. 10].

## ARGUMENTS AND AUTHORITIES

**A. Plaintiff cannot satisfy the elements required under bystander liability and the Court should grant this motion for summary judgment.**

To prevail on a bystander liability claim, Thomas must allege facts capable of establishing that Bruss and Schultz (i) knew that Johnson was violating Thomas's constitutional rights, (ii) had a reasonable opportunity to prevent the violation, and (iii) chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013), *cert. denied*, 527 U.S. 1087 (2014) (citing *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)).

**1. No violation of Plaintiff's constitutional rights.**

To determine whether the force used on a suspect was excessive, the reasonableness of an officer's conduct depends on the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989). Objective reasonableness

---

[2] This exhibit is being filed under seal per the parties Confidentiality Order.

turns on the "facts and circumstances of each particular case." *Id.* The Court is to adopt "the perspective of a reasonable officer on the scene, rather than [judge] with the 20/20 vision of hindsight." *Id.*

Factors such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," as well as other relevant circumstances, "may bear on the reasonableness or unreasonableness of the force used." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Since Graham, Fifth Circuit decisions have emphasized other factors courts are to consider, including: the speed with which an officer resorts to using force rather than verbal commands and/or negotiations; the amount of time that an officer has to decide the type and amount of force to use; whether the officer responds with "measured and ascending" actions corresponding with the plaintiff's "escalating verbal and physical resistance" or aggression; whether the plaintiff has ignored the officer's prior command(s); whether the plaintiff has a weapon and/or acts in a manner suggesting intended use of a visible—or hidden—weapon; whether the plaintiff moves outside the officer's line of vision; whether the plaintiff acts in an erratic, unexplained manner; and whether the plaintiff moves toward or away from an officer. *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1164–65 (5th Cir. 2021); *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021); *Batyukova v. Doege*, 994 F.3d 717, 726–29 (5th Cir. 2021); *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 339 (5th Cir. 2020); *Garza v. Briones*, 943 F.3d 740, 746 (5th Cir. 2019); *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017); *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016); *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012); *Manis v. Lawson*, 585 F.3d 839, 844–46 (5th Cir. 2009); *Reese*, 926 F.2d at 500–01.

The Supreme Court recently held that in evaluating claims for excessive force, courts must look beyond the "moment of threat" to consider whether earlier facts and circumstances may have influenced a reasonable officer's actions at the time of the use of deadly force. *See Barnes v. Felix*, 145 S. Ct. 1353 (2025). The court noted that the "totality of the circumstances" inquiry into a use of force has no time limit and "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.* at 1358. Considering the facts relevant to determination of whether an officer's use of force was excessive, Johnson's decision to release the canine to subdue Thomas was not clearly unreasonable.

**(i) Severity of the Crime**

The first Graham factor, the severity of the crime, weighs in favor of Bruss and Schultz. Contrary to what Thomas alleged in his Amended Complaint, the HCCO PCT1 deputies were <u>not</u> dispatched to a "report of two men making noise outside a home." [See Doc. 86 ¶ 18] The undisputed facts show that the deputies were called to a priority one weapons disturbance at 7:15 pm. [Ex. 1]. The Reportee stated that two men were at his home and refused to leave. [*Id.*] The Reportee further reported that the men had been there the night before and that he had his weapon out. [*Id.*].

A priority one call is the highest level of response that officers are called to. [Ex. 8 at ¶ 6]. In fact, officers respond to 911 calls by homeowners with a heightened concern and urgency. [Ex. 8 at ¶ 6; **Exhibit 13, Tiderington Deposition**, at 105:18-106:15]. The fact that the homeowner was armed made the situation more dangerous. [**Exhibit 7, Schultz Deposition** at 291:9-25; **Exhibit 14, Anderson Deposition**, at 282:18-21]. Johnson and Bruss heard dispatch initially report that the suspects were armed. [Ex. 2 at pp. 6, 10; Ex. 3 at 19:29:08–31:29; Ex. 4 at 19:31:34; Ex. 6 at 214:20-25; 215:1-2; Ex. 8 at ¶ 7].

Additionally, criminal trespass of a habitation is a serious offense that has a higher penalty range than a regular criminal trespass. [Ex. 14 at 285:5-286:25; **Exhibit 15, Red Declaration**, at ¶ 7]. Criminal trespass of a habitation is enhanced from a Class B misdemeanor to a Class A misdemeanor, indicating the Texas Legislature regarded trespass of a habitation as more severe than trespass on other property.

It is undisputed that the deputies considered the Reportee's call serious and that they responded with urgency to the scene. This is demonstrated by their dash cam videos and the fact that multiple officers arrived to the scene. Furthermore, the fact that weapons were present at the scene undoubtedly caused the situation to be serious and potentially dangerous for the officers and others at the scene.

**(ii)    Threat of Safety to the Officers or Others.**

The undisputed facts show that Thomas and Gray posed a threat of safety to the officers, themselves, and others. First, the fact that the homeowner felt compelled to pull out his firearm indicates that the homeowner felt unsafe. Second, from the moment that Johnson arrived at the scene, Thomas and Gray refused to comply and made threatening and concerning statements and movements.

Because Johnson was alone when he arrived, he attempted to keep the suspects together and inside the vehicle. Until a scene involving multiple suspects is fully secured, the safety of bystanders and officers is always at risk. [Ex, 15. ¶ 8] Regardless of whether the officers were told the Reportee and the suspects were armed, or just that the Reportee was armed, the fact is that weapons were involved and Thomas refused to stay in the vehicle despite Johnson's orders. Gray tried to pull Thomas back into the vehicle and he could not control Thomas. [*Id.* at 19:22:35–22:43] Thomas's actions created a more dangerous and threatening situation for Johnson, for the suspects and any

bystanders. [**Exhibit 16, Anderson Report**, p 13]. Even after Johnson got his canine out of his vehicle, Thomas continued to say he was "ready to die" and to "take me home." These statements were irrational and very concerning as officers could consider these statements to be "suicide by police." [Ex. 15 at ¶ 5]. Thomas's statement could mean that Thomas wanted to force Johnson to use deadly force and kill him. [Ex. 16 at p. 14]. This created an uncertain and tense situation for Johnson. [Id.]

Johnson continued to order the suspects to get in the car and to keep their hands up. Johnson yelled for the driver to quit reaching. The fact that Johnson could not see the driver's hands created a threat of safety for Johnson and others. [Ex. 13 at 162:10-19]. Even if dispatch did not report that the suspects were armed, the deputies could not know if they were armed until they were searched. [Ex. 13, 96:8-97:2] Both suspects were wearing layered clothing and could conceal a weapon in their clothing. [*Id.* at 68:8-15; Ex. 16 at p. 29]. Therefore, it was not unreasonable for the officers to respond as if the suspects were armed.

Thomas and Gray's actions threatened the safety of the officers, themselves, and others at the scene. This factor weighs in favor of finding that Johnson did not use unreasonable excessive force in releasing his canine.

**(iii) Suspects were actively resisting or attempting to evade.**

As demonstrated above, Thomas and Gray were actively resisting from the beginning of the confrontation with Johnson to the moment Thomas refused to stand up while lying prone on the ground. The canine was not released for over six minutes while Johnson, Bruss and Schultz attempted to gain compliance from the suspects. Thomas walked straight towards Johnson contrary to his orders to stay in the vehicle.

Johnson repeatedly threatened to release his canine, which is a common tactic that dog handlers use to deescalate a situation. [Ex. 14 at 205:18-206:9; **Exhibit 17, Red Deposition**, at 48:23-49:1]. This is also in compliance with HCCO PCT1 Canine Policy [**Exhibit 18**] and Use of Force policy [**Exhibit 19**] in effect at the time of the incident [Ex. 18 at p. 4].

Bruss gave clear and slow instructions to Gray to get him into custody. This resulted in Gray being apprehended without the use of force. Meanwhile, Thomas was still making irrational statements and concerning and erratic movements. To deescalate the situation, Bruss informed the suspects that they thought they were armed and that is why they were operating the way they were. When Johnson and Schultz attempted to get Thomas into custody just as Bruss had gotten the driver into custody, Thomas refused their orders. Schultz and Johnson gave repeated orders to Thomas to stand, but Thomas refused. This is the type of 'measured and ascending" force in the face of "escalating verbal and physical resistance" that the Fifth Circuit has approved.

Instead of standing, Thomas raised his head and the officers interpreted this as not only Thomas hearing and understanding their orders but a possible attempt to flee. [Ex. 8 at ¶ 10]. Despite the fact that Thomas was lying prone on the ground when the canine was released, Thomas's earlier actions bear on how a reasonable officer would have responded to Thomas. *See Barnes*, 145 S. Ct. 1353 (2025).

In sum, the following undisputed facts show that Johnson's use of force was not excessive and, therefore, Thomas's constitutional rights were not violated:

1) The security problem at issue was serious;

2) There was a report of weapons at the scene;

3) There were multiple suspects involved;

4) There was a vehicle that could conceal weapons and other passengers;

5) Thomas' statements that he was ready to die were a threat to officers, himself and others;

6) Thomas and Gray were actively resisting the officers' commands;

7) Johnson waited over six minutes before releasing his canine, thereby, responding with measured and ascending actions;

8) The deputies gave several warnings before Johnson released his canine in an effort to deescalate the scene;

9) Thomas acted erratically through his words and actions; and

10) Gray did not initially comply with the officer's commands.

Because Thomas cannot create a fact issue as to whether Johnson's use of force was excessive, his bystander claims against Bruss and Schultz must be dismissed. *See e.g. Barnes v. City of El Paso*, 677 F. Supp. 3d 594, 605 (W.D. Tex. 2023); *Griffin v. City of Sugarland, Tex.*, 787 F. App'x 244 (5th Cir. 2019); *Perdomo v. City of League City*, 765 F. Supp. 3d 613, 624 (S.D. Tex. 2025).

**2. Bruss and Schultz did not know Johnson's use of force was unreasonable and, therefore, had no reasonable opportunity to intervene.**

Even if Thomas can demonstrate a fact issue as to whether or not Johnson's use of force was excessive, the summary judgment evidence establishes an absence of genuine issues of material facts with respect to whether Bruss and Schultz had a reasonable opportunity to realize the excessive nature of the force and intervene.

Johnson was the first officer to arrive to the scene and observe Thomas and Gray's behavior. The information Bruss and Schultz had came from dispatch and from Johnson who reported over dispatch that the suspects were not complying and that one of them was saying he wanted to die. When Bruss arrived several minutes after Johnson, he was tasked with taking the driver into custody. Bruss had his attention focused on Gray while Johnson had his attention focused on Thomas. [Ex. 8

at ¶16]. Bruss was also focused on the unsearched vehicle and checked the vehicle for any threats before he came to Thomas and Jeck.

Schultz arrived to the scene four minutes after Johnson and did not have the opportunity to second guess or make any conclusions regarding Johnson's use of force. Schultz was backup for Johnson and was absent during the majority of the encounter with Thomas and Gray. There are no material facts to show that Schultz was in a position to determine the reasonableness of Johson's use of force. *See Malone v. City of Fort Worth, Tex.*, No. 4:09-CV-634-Y, 2014 WL 5781001, at *17-18 (N.D. Tex. Nov. 6, 2014) (finding that officers who arrived over a minute after the plaintiff was first approached were not liable as bystander officers). As Johnson and Schultz were attempting to gain compliance from Thomas, Johnson threatened to release his canine, which is a common deescalation tactic used by canine handlers. [Ex. 8; Ex, 17 at 170:12-171-7; Ex. 16 at p. 13] Even Plaintiff's expert agreed that this is a common tactic by canine handlers. [Ex. 13, 156:14-17]. There was no way for Bruss and Schultz to know when or if Johnson would release his canine. After he did, Bruss and Schultz observed Johnson immediately attempt to handcuff the unsearched Thomas. There are no facts indicating that Johnson purposely delayed his attempt to handcuff Thomas and remove Jeck from the bite. Johnson is not available to provide context to what was happening at the time he was trying to handcuff Thomas or what he based his actions on, but that fact should not be held against Bruss and Schultz. It is up to Thomas to point to facts that establish that Bruss and Schultz *knew* Johnson's use of force was excessive and that they had the opportunity to intervene and failed to do so.

Given the short time frame, Bruss and Schultz did not have a reasonable opportunity to ascertain that there was a need to intervene. *See e.g., Ballard v. Hedwig Vill. Police Dep't*, 2009 WL 2900737, at *10 (S.D. Tex. Sept. 2, 2009), *aff'd,* 408 F. App'x 844 (5th Cir. 2011). Furthermore, Bruss

and Schultz had no opportunity to *safely* intervene in the use of force. Bystander liability applies when an officer "knows that a fellow officer is violating an individual's constitutional rights" **and** has a "reasonable opportunity to prevent the harm.". *Whitley*, 726 F.3D at 646.

Prior to releasing the canine, Bruss and Schultz had no way of knowing when or if Johnson would actually deploy Jeck. When Johnson did release Jeck, Jeck was removed from the bite within 43 seconds. [Ex. 3]. During this time, Johnson was straddled over Thomas attempting to handcuff him. Bruss and Schultz were not in a position to physically get between Johnson and the canine and Thomas's own expert testified that it would have been unsafe for them to do so. [Ex. 13, 190:4-16]. As far as verbally intervening, Schultz was not a dog handler. [Ex. 7 at 151:11-17]. It is not enough that Schultz *could have* told Johnson to remove the dog. Bruss did verbally intervene and told Johson to get the dog off the bite at [Ex. 4 at 19:28:11]. Prior to that, Bruss informed Thomas that as soon as he was handcuffed they would remove the dog. [Ex. 4 at 19:27:59]. Thomas cannot point to any material facts to establish that Bruss and Schultz had an opportunity to safely intervene in the use of force by Johnson and failed to. As such, Thomas's bystander claims against Bruss and Schultz should be dismissed.

**B. Bruss and Schultz are Entitled to Qualified Immunity for Plaintiff's bystander liability claims because the alleged violation of rights was not clearly established.**

Thomas cannot overcome the Defendants qualified immunity because he cannot show that Bruss and Schultz's duty to intervene in Johnson's alleged use of excessive force was clearly established. *White v. Calvert, No.* CV H-20-4029, 2021 WL 6112791, at *15 (S.D. Tex. Dec. 27, 2021). To prevail on a claim for a constitutional violation by a government official under 42 U.S.C. § 1983, a plaintiff must establish that (i) the official acted under color of state law; and (ii) while acting under color of state law, the official deprived the plaintiff of a federal constitutional right. *See West v. Atkins*, 487 U.S. 42, 48 (1988). However, the Supreme Court has long held that public servants are immune from suit

unless their conduct violated "clearly established" federal law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The availability of immunity is a question of law. *Siegert v. Gilley*, 500 U.S. 226, 231–32 (1991). Courts must determine (i) whether the plaintiff has described a violation of a constitutional right; and (ii) whether the right was "clearly established" at the time of the official's conduct. *Pearson v. Callahan*, 555 U.S. 223, 223–24 (2009). Courts may decide which of the two prongs should be decided first. *Id.* at 225. The plaintiff bears the burden of showing that the official violated clearly established law. *Kovacic v. Villareal*, 628 F.3d 209, 212 (5th Cir. 2010). The plaintiff must identify the violation of a "particularized" right. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). And, the plaintiff must show that the "contours" of the right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Alexander v. Eeds*, 392 F.3d 138, 146 (5th Cir. 2004). This means that "existing precedent" must have placed the constitutional question "beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011).

Qualified immunity protects government officials performing discretionary functions from suit and liability for civil damages to the extent their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. [*Id.* at 818] Determining whether a government official is entitled to qualified immunity involves a two-part question of law: (i) would a constitutional right have been violated based on the facts alleged?, and (ii) was that right "clearly established?"[3] *Siegert v. Gilley*, 500 U.S. 226, 232–33 (1991); *McClendon v. City of Columbia*, 305

---

[3] "A right is clearly established when it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"—not merely that the conduct was otherwise improper. *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (internal citations and quotations omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994). Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense, so that it is apparent to the official that his actions are unlawful in light of pre-existing law. *Anderson*, 483 U.S. at 640; *Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997).

F.3d 314, 322–23 (5th Cir. 2002) (en banc) (quoting *Saucier v. Katz,* 533 U.S. 194 (2001)); *see also Williams v. Kaufman Cnty.*, 352 F.3d 994, 1002 (5th Cir. 2003).

Although normally an affirmative defense, the plaintiff has the burden to negate the defense of qualified immunity once it is raised. *Poole v. City of Shreveport,* 691 F.3d 624, 627 (5th Cir. 2012) A plaintiff bears the burden "to demonstrate the inapplicability of the defense." *McClendon v. City of Columbi*a, 305 F.3d 314, 323 (5th Cir. 2002). "In order to overcome a qualified immunity defense, a plaintiff must allege a violation of a constitutional right, and then must show that the right was clearly established **in light of the specific context of the case**." *Pratt v. Harris Cnty.*, Tex. 822 F.3d 174, 181 (5th Cir. 2016) (emphasis removed and added) (citation and internal quotation marks omitted).

The United States Supreme Court has reiterated on multiple occasions "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *See White v. Pauly,* 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *al-Kidd*, 563 U.S. at 742); *Mullenix v. Luna* 136 S. Ct. 305, 308 (2015). Moreover, a clearly established law "must be 'particularized' to the facts of the case." *White,* 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) Additionally, any such existing precedent "must have placed the statutory or constitutional question **beyond debate**." *Mullenix*, 136 S. Ct. At 308 (quoting *al-Kidd*, 563 U.S. at 741) (emphasis added)). Ultimately, for an official to lose qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Pierce*, 117 F.3d at 882; *Stefanoff v. Hays County*, 154 F.3d 523, 525 (5th Cir. 1998).

Additionally, where multiple defendants are alleged to have committed constitutional violations, the plaintiff must allege with specificity what *each* defendant did to commit those violations, and the court should analyze *each* claim of qualified immunity separately. *Babb*, 33 F.3d at 479; *see also*

*Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 731 (5th Cir. 2018) ("In cases where the defendants have not acted in unison, qualified immunity claims should be addressed separately for each individual defendant.") (internal citations and quotations omitted). Because vicarious liability or *respondent superior* liability is impermissible under Section 1983, the plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *see also James*, 535 F.3d at 373 (to state a personal-capacity claim under Section 1983, a plaintiff must allege that the individual defendant was personally involved in the constitutional deprivation, or that their wrongful actions were causally connected to such a deprivation).

As such, qualified immunity protects police officers from civil damages liability when their actions could at the very least "reasonably have been believed to be legal." *Morgan v. Swanson,* 659 F. 3d 359, 370 (5th Cir. 2011) (en banc). This protection extends to all police officers, except for the plainly incompetent or those who knowingly violate the law. *Mullenix*, 136 S. Ct. At 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986). When determining whether a defendant's acts were objectively reasonable, a court must consider the facts the defendant possessed at the time of the action. *Anderson,* 483 U.S. at 641., "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). Not every like-minded reasonable government agent agrees that Johnson's use of force was excessive or that Bruss and Schultz failed to intervene in violation of Thomas's constitutional rights. The use of force incident was reviewed and investigated by Johnson's supervisors at HCCO PCT1 and it was determined that there was no unreasonable use of force. [Shaw Declaration] Terry Anderson, a certified canine handler and the President of National Police Canine Association concluded that Johnson's use of force did not violate Thomas's constitutional rights. [Anderson report]. Lieutenant Stuart Red, an officer for over 40 years and a canine handler, reviewed

the evidence and his opinion was that Johnson's use of force was justified. [Red Resume; Red 8/6/2025 Depo, 140:6-10]

Even assuming *arguendo* that Bruss and Schultz's failure to intervene violated Thomas's constitutional rights, which is denied, the law was not so clearly and unambiguously established that every reasonable official would understand that failing to intervene on a 43 second dog bite initiated on a suspect who was non-compliant and who was acting erratically while the canine handler was attempting to handcuff him was unconstitutional. It is certainly not "beyond debate" that Bruss and Schultz standing by for the forty seconds that Johnson handcuffed Thomas violated Thomas's constitutional rights.

Thomas has not and cannot identify a case in the Fifth Circuit that applies bystander liability in the context that Plaintiff attempts to apply it. Because there is no clearly established law that would have put Bruss and Schutlz on notice that their failure to intervene was a violation of Thomas's constitutional rights, Thomas's claims should be dismissed.

<u>CONCLUSION</u>

For the forgoing reasons, Defendants respectfully request that the Court enter a final summary judgment in favor of the Defendants Bruss and Schultz on Plaintiff's claims against them. Defendants also request all such other and further relief, both at law and in equity, to which they may be entitled.

Respectfully submitted,

**Thompson & Horton LLP**

By:  */s/ Celena Vinson*
     Celena Vinson
     State Bar No. 24037651
     cvinson@thompsonhorton.com
     Alexa Gould
     State Bar No. 24109940
     agould@thompsonhorton.com

3200 Southwest Freeway, Suite 2000
Houston, Texas 77027
Telephone: (713) 554-6742
Fax: (713) 583-5295

**ATTORNEYS FOR DEFENDANTS
BRUSS AND SCHULTZ**

## CERTIFICATE OF SERVICE

On August 22, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States District Court for the Southern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have served counsel and/or pro se parties of record electronically using the CM/ECF filing system or by any other manner authorized by Federal Rule of Civil Procedure 5(b)(2).

     */s/ Celena Vinson*
     Celena Vinson

4899-8804-2338, v. 1