# Exhibit 16

Federal Rule of Civil Procedure, Rule 26

Disclosure of expert Testimony

**Case:**     KERRY LEE THOMAS, Plaintiff, v.  ROBERT JOHNSON,

ERIC M. BRUSS, WAYNE SCHULTZ and THE ESTATE OF ROBERT JOHNSON, Defendants.

Civil Action: Case No. 4:23-cv-00662

**Name:**     Terry Anderson

**Company:**     Keli's K9's LLC

1566 County Road 4510 Hillister, Texas 77624

I, Terry Anderson, have been retained as an expert witness for Eric Bruss and Wayne Shultz. I have been asked to consider the facts in this case and form opinions regarding the allegation:

***The defendants deprived the Plaintiff of his civil rights under the Fourth and Fourteenth Amendment with excessive use of force. After reviewing the materials below, I have formed several opinions regarding the use of force, in particular Sgt. Johnson and Canine Jeck, Deputy Bruss, and Deputy Shultz, based upon the facts in this case.***

**I.**    **Experts Background and Experience**

- I am the Trainer/Handler for Keli's K9's LLC. We train single purpose and dual-purpose canines for Law Enforcement (LE) Agencies. I also train dogs for private citizens in Basic, Intermediate and Advance Obedience.
- We work our own service dogs in the private sector searching for narcotics and explosives.

1

- We provide Training for LE agencies regarding all areas of police service dogs and tactics.
- I began my career in 1988 at the Pasadena Police Department (PPD) where I worked until I retired as a Sgt. in 2013. I became a certified instructor through the State of Texas Commission on Law Enforcement Standards in 1989.
- I became a canine handler in 1991 and attended numerous canine training schools. I became a certified canine trainer in 1994 and head trainer for PPD that same year. I remained the head trainer for PPD canine Program until just prior to my retirement in 2013. I was responsible for canine procurement, testing and evaluations, budgets, weekly unit training, selection of handlers, handler training programs, monthly departmental reports, medical consultations, policy and procedures, mission specific training and operational deployments, and personnel evaluations as well as proficiency assessments.
- I was elected President of the National Police Canine Association (NPCA) in 2004, a position that I continue to retain as I have been reelected. I spent three years on the Standards Committee (SC) for NPCA. The SC was responsible for developing certification standards for NPCA. I oversee a 1400-member organization with an annual budget exceeding $200,000.00, where we provide training and certifications to LE entities. I annually attend a Legal update class that we provide to our members, as well as teach all disciplines related to canine training to our members.
- I also was a member of the PPD SWAT team from 1994-2013. I remained on SWAT following my promotion and was moved to PPD Special Operations Division Sergeant and was responsible for forty operators in Canine, SWAT and Explosive Ordinance Division (EOD). This responsibility entailed overseeing unit training of all three units, budgets, procurement of equipment, personnel selections, and operational deployments.
- I am employed as an instructor for Swat K9 Interacting During Deployments (SKIDDS) and travel all over the United States teaching SWAT operators and canines how to interact during tactical deployments.

2

- During my career I have testified in City, State and Federal Courts and have been retained previously as an expert witness and consultant where I have provided opinions, depositions, and testimony on canine related issues such as proper utilization of detection canines and patrol deployments.
- I am on six Federal Boards which are responsible for developing industry best practices. I was on the Executive Board for Scientific Working Group on Dogs and Orthogonal (SWGDOG) and National Explosive Detector Canine Advisory Board (NEDCAB). Previously I was one of 25 members for the Organization of Scientific Area Committees (OSAC); however, due to demanding schedules in our business I chose to move to an affiliate position on OSAC.
- I have been employed for the Department of Homeland Security since 2019 as a subject matter expert/evaluator in the field of Explosive Detection canines and The Limited integration of explosive canine teams in an Active Shooter Situation.

II.   <u>**Below are the documents I considered in forming my opinions:**</u>

1. 2102-00266 Deputy R. Johnson BWC 2-22-21
2. 2102-00266 Deputy R. Johnson Dashcam 2-22-21
3. Complaint and Demand for Jury Trial
4. 111 - (2019-06) Canine Policy
5. 111 - (2023-04) Canine Department Policy
6. 121 - (2019-04) Mental Health Operations-Policy
7. 500 - (2019-12) Use of Force
8. 500 - (2020-07) Use of Force
9. 500 - (2020-07)[02-2021] Use of Force
10. 500 - (2021-02) Use of Force
11. 500 - (2021-12) Use of Force
12. 500 - (2022-11) Use of Force
13. 500 - (2023-04) Use of Force Policy
14. 500 - (2023-12) Response to Resistance
15. 501 - (2020-03) Less Lethal Use of Force Options & Restraints
16. 501 - (2023-12) Less Lethal Force Options & Restraints
17. 502 - (2022-11) Reporting-Policy
18. 702 - (2023-04) Pursuits-Policy

3

19. 2021.02.22 Bruss Dashcam.wmv – Shortcut
20. -36383_05132025_Stuart Red_CERTIFIED.pdf 2
21. -36954_06052025_Thomas Tiderington_CERTIFIED
22. -36954_06052025_Thomas Tiderington_CERTIFIED-CT
23. 01242025_JAMES C. MONCRIEF_CERTIFIED_32639.pdf – Shortcut
24. -02192025_CARL SHAW_CERTIFIED_33645
25. -04292025_STUART RED_CERTIFIED_35587.pdf 1
26. 210200266 Pct 1 Incident Report
27. 210200266_Nathaniel.Vital_20210222_193846_1w
28. Bite Photos from Complaint
29. Bruss BWC after dog bite
30. Bruss BWC arrive to scene
31. Bruss lawsuit records
32. Bruss personnel 001338 – 001509
33. Bruss TCOLE file 001317 – 001337
34. Bruss, Eric - 934577 - depo2
35. Bruss, Eric - 934577 - Final_full
36. CAD Report, dispatch call slip
37. Expert Report of Thomas J. Tiderington.pdf
38. Jeck records 002680-002714
39. Jeck retirement records 002328 – 002341
40. Jeck utilization report, training 000201 – 000598
41. qca00637_20210223014241e0_20210223014241_01_000p -
    Photo of Thomas after bite
42. qca00637_20210223014244e0_20210223014244_01_000p -
    Photo of Thomas after bite
43. qca00637_20210223014248e0_20210223014248_01_000p -
    Photo of Thomas after bite
44. qca00637_20210223014252e0_20210223014252_01_000p -
    Photo of Thomas after bite
45. qca00637_20210223021434e0_20210223021434_01_000p -
    Narcan Nasal before
46. qca00637_20210223021441e0_20210223021441_01_000p -
    Narcan Nasal after
47. Schultz BWC after dog bite
48. Schultz BWC arrive to scene
49. Schultz IAD file 002342 – 002390

4

50. Schultz personnel 001531 – 001623
51. Schultz TCOLE file 001510-001530
52. Schultz, Wayne Depo - 936289 - FINAL_full
53. Thomas, Kerry Lee - 939531 Final_full
54. THOMAS000000000006242
55. THOMAS000000000006307
56. Defendants' Bruss and Schultz Motion to Dismiss 4862-2690-5702 v.1

III.   **Incident Summary: Here are the facts represented to me upon which my opinions are based**

**Primary Participants:**

**Deputy  Sgt. Robert Johnson:** Sgt. Johnson (Deceased) was a Deputy (Sgt.) with the Harris County Precinct 1 Constables Office. (HCCO PCT1) At the time of this deployment Sgt. Johnson was assigned to the canine unit with his canine Jeck.

**Deputy Eric M. Bruss:** Deputy Bruss was a Deputy with the HCCO PCT1. At the time of this deployment Deputy Bruss was assigned to the canine unit.

**Deputy Wayne Schultz:** Deputy Schultz was assigned to HCCO PCT1 patrol division at the time of this incident.

**Gashi, Mevlude and Gashi Avni:** reportee, and victims of Criminal Trespass at their residence located at 10923 Capstone Dr., Houston, Texas. The victim, Mevlude, advised that two subjects were on his property screaming and yelling and refused to leave. They had been there the night before and came back looking for a phone. The reportee advised he was in possession of his firearm.

**Kerry Lee Thomas:** b/m 07-22-86, suspect involved in a Criminal Offense, at the victim's residence located at 10923 Capstone.

5

**Rapheal Landon Gray Jr:** b/m 09-24-86, suspect (driver) involved in a Criminal Offense, at the victim's residence located at 10923 Capstone.

**Plaintiff's Complaint:**

*I have reviewed the Plaintiff's Complaint as part of my background investigation.*

**Defendants' Incident Report:**

1. At 19:15, HCCO PCT1 police dispatch received a transfer 911 call from Harris County Sheriff's Office regarding a "disturbance with a weapon". (Communication Event report)
2. This call was dispatched at 19:18 for responding units.
3. Sgt R. Johnson and his canine partner Jeck along with Deputy Bruss and Deputy Schultz responded to the scene.
4. Sgt. Johnson and canine Jeck arrived on the scene first at 19:21 and observed two b/m's sitting in a maroon Pt Cruiser (HMT 5364)
5. Sgt. Johnson exited his police unit and drew his firearm as he verbally confronted both suspects.
6.  He immediately began giving loud verbal commands to the occupants to put their hands up.
7. Following multiple commands to put their hands up and their failure to comply with his lawful commands, Thomas exited the car on his own and raised his hands and stood in the doorway of the passenger side of the car.
8. Sgt. Johnson began clearly giving verbal commands for Thomas to stay in the car.
9. Thomas refused to comply with Sgt. Johnson's multiple lawful command to stay in the car.
10. Not knowing Thomas's intent, Sgt. Johnson immediately removed canine Jeck from his unit.
11. With canine Jeck out of the unit and Sgt. Johnson by himself confronting both suspects, he continued to give verbal commands to both suspects to stay in the car.
12. Thomas refused Sg. Johnson's command to get back in the car while Gray began exiting the driver's door.

6

13. Sgt. Johnson immediately gave commands to Gray to get back in the car which he complied with and re-entered their car.

14. During this exchange Thomas stood in the passenger doorway and began telling Sgt. Johnson to "shoot me", "kill me".

15. Sgt. Johnson is controlling canine Jeck, holsters his firearm and advises dispatch that the suspects are not complying and then passenger is telling him to shoot him.

16. Thomas continued yelling irrational statements like "black lives matter, all lives matter" and began "praying to GOD" all the while refusing to comply and get back inside the car.

17. Gray grabbed Thomas's shirt and began trying to gently pull him back inside the car, but Thomas refused to move.

18. While inside the car Gray moved his hands several times where Sgt. Johnson could not see them.

19. Sgt. Johnson gave Gray commands to keep his hands up where he could see them, he complied for a few moments and then moved his hands out of sight again.

20. Thomas continued talking irrationally and speaking very concerning statements regarding "killing him".

21. Sgt. Johnson, in a concealed location beside his unit waited for backup while just observing their actions.

22. Deputy Bruss arrived on the scene and as communication between the deputies began Gray again started to exit the car.

23. Sgt. Johnson immediately commanded Gray to stay in the car and keep his hands where they could be seen.

24. Gray complied and got back inside the car, Sgt. Johnson passed commands over to Deputy Bruss.

25. Gray, back inside the car and Thomas still standing outside of the car continually making irrational statements, Sgt. Johnson suggested they get control of Thomas first.

26. Just prior to Deputy Bruss taking over verbal commands, the driver was sitting inside the car with his hands not visible, so Sgt. Johnson issued commands for the driver to show his hands.

27. The driver, Gray, complied.

28. Deputy Bruss took over verbal command but switched to secured Gray first.

7

29. Following Deputy Bruss's commands Gray stood up from the car and began stepping out of the driver side door area.

30. Simultaneously, Thomas stepped out from the cover of the passenger door and began walking towards the deputies.

31. To this point Thomas has failed to obey lawful commands given by the deputies and has acted on his own.

32. Immediately Sgt. Johnson reacted to this change and began yelling at Thomas to stop.

33. Thomas took a few more steps and stopped. Thomas continued telling the deputies to shoot him.

34. Deputy Bruss had Gray stand up and exit the car, then turn away from him.

35. Deputy Bruss told Gray to get down on the ground and turn his head away from him and extend his arms out away from his body.

36. Gray complied by lying prone on the ground with his head up looking towards Deputy Bruss and his arms stretched out in front of him.

37. Deputy Bruss gave several more commands to Gray to look away from him and put his arms out to his side.

38. Gray refused to comply with those commands until Sgt. Johnson brought canine Jeck into Gray's sight and threatened to send him to bite.

39. While looking at Sgt. Johnson and canine Jeck, Gray complied with Bruss's commands.

40. Sgt. Johnson moved back to the driver's side of his patrol unit.

41. Sgt. Johnson told Thomas to get down on the ground.

42. Thomas slowly complied and lay face down on the ground near the front passenger side of the car.

43. Deputy Bruss then explained to Gray they were advised the suspects had weapons, and both suspects had not been searched.

44. Until they determined otherwise this was the situation they were in, and he needed to comply with their commands.

45. Deputy Bruss then began ordering Gray to stand up and walk backwards to him.

46. Gray did walk backwards towards Deputy Bruss but kept looking back over his shoulder.

8

47. Deputy Bruss ordered Gray to his knees at which time Deputy Tuzun approached and handcuffed Gray.

48. While Deputy Tuzun was handcuffing Gray Deputy Bruss advised her to "search him real good".

49. Once Gray was detained/secured in a patrol unit communication switched from Deputy Bruss to Deputy Shultz and Sgt. Johnson.

50. Deputy Shultz then began giving loud verbal commands for Thomas to stand up.

51. Deputy Shultz gave multiple commands for Thomas to stand up which he failed to comply with.

52. Sgt. Johnson also gave several verbal commands along with an ultimatum that he would be dog bit if he didn't comply.

53. Thomas looks up in their direction one time and puts his head back down.

54. Simultaneously, when he looked up, he moved his left leg and then put it back down but made no effort to stand up.

55. Because of his failure to comply with their lawful orders Sgt. Johnson sent canine Jeck to apprehend Thomas.

56. Upon Jeck's contact with Thomas, they rolled very close to the front of the car and Sgt. Johnson immediately approached them and secured Thomas's right wrist with handcuffs.

57. Deputy Bruss moved up to the vehicle and cleared the car for any other possible threats.

58. Deputy Bruss then moved to a position to the front of the car to assist in securing Thomas if needed.

59. Deputy Shultz moved to a position behind Sgt. Johnson and remained in that position.

60. Sgt. Johnson straddled Thomas to gain control of Thomas's left hand and handcuff it; however, he struggled to gain control and had to physically pull that arm out from under Thomas.

61. Once both hands were handcuffed Sgt. Johnson moved to a position behind Jeck's head so he could safely control Jeck as he removed him from his bite.

62. Once canine Jeck was removed from this bite Sgt. Johnson secured him inside his unit.

63. Deputy Shultz immediately contacted the police dispatch and requested an ambulance for a dog bite.

9

IV.     **Professional Opinion:**

The following are my professional and expert opinions, which I will offer in this case, and the basis and reason for those opinions. My professional and expert opinions are based on the information I reviewed as well as my training, experience, expertise, education, and familiarization with professional publications. If I receive other materials, I reserve the right to supplement my report. It is my opinion that:

### *Opinion #1*

*In my professional opinion the utilization of Canine Jeck as a less than lethal use of force to apprehend and arrest Thomas was reasonable, lawful, and consistent with modern police practices, industry standards and in accordance with State and Federal Law, the Harris County Constable Office, Precinct 1,* (HCCO PCT1) *General orders, Use of Force Policy and Canine Policy. Sgt. Jonson's utilization of Canine Jeck as a less than lethal force option is justified. Therefore, Sgt. Johnson is **NOT** responsible for violating or depriving the Plaintiff's civil rights of excessive use of force**.** (refer to: Byrd v. City of Bossier, No. 14-30809, 2015 WL 5259961. At \*1)*

Police Service Dogs have a significant role in Law Enforcement. Their role is multi-faceted and encompasses responsibilities from public relations, education, detection of hidden odors, a static presence of deterrence and use of force options. State and Federal Laws, individual departmental policies and procedures and departmental guidelines govern how police service dogs are utilized on the streets and in industry.

Industry standards are observed by agencies that utilize canine teams in Law Enforcement. Canines are commonly deployed to detect hidden human odors as well as other illegal substances or dangerous items such as explosives.

Their intelligence, willingness to learn and proven ability to accept and obey commands provides officers with another tool to successfully complete

10

their tasks. Their physical capabilities such as agility, speed, temperament, and inherent character traits improve officers' ability to locate hidden criminals, and increase the safety of officers, the person they are searching for and citizens.

The force used by the K9 handler must be reasonable under the facts and circumstances of each incident, based on the reasonable officer standard outlined in the United States Supreme Court decision of *Graham v. Connor, 490 U.S. 386, 394 (1989).*

The operative question in this analysis is whether the K9 officer's actions were "objectively reasonable" considering the facts and circumstances confronting him. To answer that question, officers are taught they must balance the amount of K9 force applied against the need for that force.

The law enforcement industry standard is to make sure the use of any force is measured by examining three core Graham factors as well as the totality of the circumstances: a) The severity of the crime at issue; b) Whether the suspect poses an immediate threat to the safety of the officers or others; and c) Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Any peace officer who has reasonable cause to believe that the person to be investigated or arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape, or to overcome resistance. The objective for using appropriate and reasonable force in any situation is to gain compliance and maintain control of the person and the situation.

Officers must make split-second decisions without the benefit of 20/20 hindsight. Unfortunately, officers encounter people who present a dangerous situation and will not surrender or comply no matter what the officer says or does.

HCCO Pct 1 dispatch received a transferred call from the Harris County Sheriff's Office regarding a disturbance with weapons at 10923 Capstone Dr., Houston, Texas.

11

Dispatch advised, two suspects were outside Mr. Gashi's home yelling and screaming. Mr. Gashi, the reportee, advised that the suspects had been at their home the night before looking for a phone. He stated the suspects were looking into his home through the windows and wanted to go into his yard to look for the phone.

Mr. Gashi told them he did not have their phone, and they needed to leave his residence. Both suspects left but returned the next night. He stated he confronted them again outside his home and because he didn't know their intent, he had his firearm to protect himself and his family. He advised his wife to call the police. HCCO Pct 1 dispatch received the transfer call from the Harris County Sheriff's Office of a disturbance with weapons and sent deputies from HCCO Pct 1 to respond to that residence.

Sgt. Johnson and canine Jeck, Deputy Bruss and Deputy Shultz responded to 10923 Capstone Dr. While enroute, Sgt. Johnson asked dispatch for "an update" and was advised by dispatch that the reportee had his weapon out. He asked, "if the suspects were still there, if not have him put away his weapon". *(refer Sgt. Johnson BWC)*

Sgt. Johnson arrived on the scene and parked his patrol unit in front of the residence facing the suspect vehicle. Utilizing his emergency equipment to light up the suspect vehicle he observed two b/m sitting inside a Maroon PT Cruiser (Tx HMT 5364) with both front doors open. He exited his unit and began giving commands to "let me see your hands".

Immediately he was outnumbered and confronted with a call of disturbance with weapons. He knew the reportee was armed with a firearm and must assume the suspects were possibly in possession of weapons until proven otherwise. For his safety, the safety of the reportee, and other people that were in proximity, his priority is to secure the scene and make it safe for everyone including the suspects.

*NOTE: This call is a disturbance with weapons not a shot fired call. A reasonable and prudent officer would not wait for other officers to arrive on the scene before contacting the suspects. Officers have a duty to protect the community they serve. Waiting and coordinating their positioning with*

12

*other deputies before contacting the suspects is not a widely accepted*
*police practice. (refer to Tiderington's deposition )*

Sgt. Johnson exited his patrol unit and drew his firearm as he began giving
commands for the suspects to show their hands. As he gave multiple
commands to show their hands the driver complied, however, the
passenger did not comply. Thomas exited the car and raised his hands and
stood inside the passenger side door area. *(refer Sgt. Johnson BWC)*

Thomas's actions created a more dangerous situation for Sgt. Johnson. Sgt.
Johnson immediately recognized Thomas's actions as an elevated threat
level and began yelling for Thomas to stay in the car. It was impossible for
Sgt. Johnson to know what Thomas's intent was for not complying with his
commands; nevertheless, he had to prepare for Thomas to attack, run or
retrieve a weapon. Thomas's actions created a potentially lethal
confrontation.

As he continued giving Thomas commands to stay in the car, Thomas
refused to comply, Sgt. Johnson retrieved canine Jeck from his unit. Sgt.
Johnson was facing an unsafe situation with two suspects by himself and
had to prepare to react quickly.

Sgt. Johnson continued giving verbal commands to both suspects as he
brought canine Jeck out of his unit. He utilized his unit's lights to provided
concealment for them. Canine Jeck began barking at the suspects as Sgt.
Johnson prepared himself and canine Jeck to respond if necessary.

*Note: Some people are inherently afraid of dogs, so the dog's mere presence*
*can be a show of force to create compliance. A barking dog elevates their*
*presence and further stresses compliance. (**In my Training and Personal**
**experience as a canine handler and trainer.)***

Thomas immediately began making irrational and very concerning
statements. These statements, "shoot me, kill me, black lives matter all
lives matter, take me home, praying to GOD" along with other unintelligible
comments created a higher threat level for Sgt. Johnson. These irrational
statements could mean that Thomas wanted to force Sgt. Johnson to use

13

deadly force and kill him. *NOTE: Thomas was wearing multiple layers of clothes that could easily conceal a firearm or other weapon.*

Thomas's failure to comply created an uncertain and tense situation for Sgt. Johnson. Sgt. Johnson responded by giving multiple commands for both suspects "stay in the car, get in the car, keep your hands up, quit reaching". Thomas refused to get back inside the car.

While listening to Thomas's irrational comments and waiting for backup deputies to arrive Sgt Johnson waited carefully watching both suspects.

Deputy Bruss and Deputy Shultz arrived on the scene. Deputy Bruss parked on the passenger side of Sgt. Johnson's unit and initiated his unit's lights to additionally illuminate the suspects. Deputy Bruss had his firearm out and was able to assist in securing both suspects. Deputy Shultz approached Sgt. Johnson's position from behind and was prepared to utilize his Taser if the situation presented itself.

Sgt. Johnson calmly and clearly told Deputy Bruss he wanted to secure the passenger first. Thomas was still standing in the passenger side door area and Gray was sitting in the driver's seat. *(In my training and experience this was a tactically sound plan. The deputies could clearly see Thomas, but part of Gray was concealed inside the car).*

Prior to Deputy Bruss issuing commands to Thomas, Gray started to exit the car. Sgt. Johnson reacted to Gray's movement and yelled at him to sit back down and keep his hands up. Gray complied.

Deviating from their original plan to secure Thomas first, Deputy Bruss addressed Gray instead. He gave commands for him to stand up and keep his hands visible. He told Gray to turn away from him and start walking to him.

Thomas, in the passenger side doorway, immediately began walking towards the deputies. His movement created a significant threat for the deputies, not knowing Thomas's intent with this reaction of unauthorized movement; Neverthelss, Thomas demonstrated that he could hear the commands that were being issued but failed to comply with any of them.

14

Thomas walked around the passenger side open door, turned and started walking towards Deputy Bruss. Reacting to Thomas's movement, Sgt. Johnson ordered Thomas to stop and get on the ground.  Thomas stopped and slowly laid down on the ground. Thomas demonstrated that he could understand and selectively comply with their lawful commands.

While Thomas lay on the ground near the front passenger side of the car Deputy Bruss continued the process of detaining/securing Gray. While attempting to detain Gray, Deputy Bruss issued several instructions that Gray ignored refusing to comply.

Because Gray refused to comply, Sgt Johnson gave up his concealment behind his patrol unit and stood in the light with canine Jeck. The visual display of canine Jeck barking and Sgt. Johnson pointing his firearm at Gray while threatening to release canine Jeck if he didn't comply compelled Gray to comply.

Sgt. Johnson, giving up his cover/concealment by moving to this position, accomplished several tasks.

1. The visual display created compliance from Gray
2. Preventing Gray from attempting to flee
3. This visual deterrence kept the deputies from having to use force

Once Gray complied, Deputy Bruss professionally explained to Gray why they were conducting this investigation. He advised Gray they were told this was a weapons disturbance and they had not been searched for weapons. Deputy Bruss clearly explained for their safety and his safety he needed to comply, so he didn't get dog bit.

Deputy Bruss gave commands for Gray to get up, look away from them and walk backwards to them. While this was occurring, Thomas can be heard making more irrational comments consisting of "that's a good dog" as he lay face down on the ground.

Gray was guided back by Deputy Bruss and directed to get on his knees. Gray complied and was detained and secured in a patrol unit by Deputy Tuzun.

15

The deputy's attention then turned to detain/secure Thomas. At the direction of Sgt. Johnson, Deputy Shultz then described Thomas's clothing and gave lawful commands for him to stand up.

Following multiple commands to stand up Thomas raised his head and looked in the direction of the deputies then put his head back down on the ground. He also momentarily moved his left leg but made no physical attempt to comply with the lawful orders to stand up. Sgt. Johnson also gave several warnings to stand up or he would be bit.

There was vehicle traffic and innocent bystanders in the area watching this incident as it transpired. For the safety of everyone, including the suspects and deputies, the officers had an obligation to detain the suspects and safely secure this incident as soon as reasonably possible. Once both suspects were detained/secured the deputies could complete their investigation. At that time their investigation would determine if a criminal offense had occurred.

Thomas refused all their commands to comply except to stop walking and to lay on the ground. His failure to comply forced the deputies to use force to safely secure him.

Sgt. Johnson deployed canine Jeck to apprehend Thomas. Canine Jeck did bite Thomas as they rolled towards the front of the car.

*NOTE: Canine Jeck bit and held his bite on Thomas's upper right arm area until Sgt. Johnson removed Jeck from the bite. There was no other transfer bite or injury to Thomas. (refer to injury photos)*

Upon release of canine Jeck to apprehend Thomas, Sgt Johnson drew his firearm and approached Thomas and canine Jeck. Once on the bite canine Jeck and Thomas were positioned right up against the front passenger side corner of the car. Sgt. Johnson approached them and secured his firearm so he could go hands on and handcuff Thomas.

Sgt. Johnson immediately cuffed Thomas's right wrist but struggled to get control of his left hand. Thomas's left hand was under his body initially, which made it difficult for Sgt. Johnson to access. Sgt. Johnson gave several commands, "let me see your hand". As he gained control of Thomas's left

16

hand he struggled with securing it in handcuffs. Sgt. Johnson had to forceable move Thomas's body to secure his hands in cuffs. The delays in removing canine Jeck from the bite were positional not intentional or based on evil intent. It was due to the difficulty in securing the handcuffs.

Due to Thomas's multi layered clothing and his potential access to concealed weapons on his person, the irrational statements he made, "kill me, shoot me" it was reasonable to handcuff him before removing Jeck from the bite. According to Deputy Buss, it is HCCO Pct 1 canine training to secure a suspect in handcuffs prior to removing the canine from his bite for their safety. *(It is reasonable to leave dog on bite until the suspect was handcuffed based upon the suspect's verbal threats and access to a weapon, Escobar v. Montee, 895 F.3d 387,394 (5th Cir. 2018) (refer to Bruss deposition)*

While Sgt. Johnson approached Thomas and canine Jeck, Deputy Bruss, with firearm drawn and presented down range in the direction of the threats (Thomas and the car) he approached them from the front of the car.

As Deputy Bruss approached Thomas, canine Jeck and Sgt. Johnson's position he immediately/momentarily transitioned to "guns down" so as not to create a crossfire with Sgt. Johnson's. Deputy Bruss turned his attention to clear the car of any unknown threats, in or behind it.

Deputy Bruss cleared the car while Sgt. Johnson struggled to get Thomas secured. Deputy Bruss now back at the front of the car observed Sgt. Johnson struggling to gain control of Thomas's left hand. Deputy Bruss told Thomas to quit struggling so he could handcuff him and take the dog off the bite. *(refer to Bruss and Johnson's BWC)*

Sgt. Johnson was able to secure Thomas in hand cuffs and moved to a better position to removed Jeck from his bite. This position was right up against the car.

Deputy Shultz also moved up behind Sgt. Johnson as he approached Thomas and canine Jeck. He had his Taser at the ready, directly behind them at some distance.

17

Sgt. Johnson removed canine Jeck from the bite with no verbal commands just hands on to secure the tactical out. Canine Jeck released the bite with no issues but grabbed Thomas's pant leg. This grab of clothing did not contact Thomas and is not a "re-bite" because there was no physical contact with Thomas.

Sgt. Johnson then went and secured canine Jeck in his patrol unit. Deputy Shultz immediately called for an ambulance while Deputy Bruss stayed with Thomas.

Thomas, still lying prone on the ground handcuffed, passed out. Deputy Bruss assessed his breathing and continued talking with him. Assuming he had just passed out due to an intoxicant of an unknown substance, he decided it would be prudent to administer NARCAN.

Deputy Bruss retrieved a NARCAN nasal spray and administered it to Thomas. Immediately, Thomas responded and began talking to them. During that short conversation Thomas has no idea what has just transpired. Thomas asked if he had been shot but Deputy Bruss gave him a short synopsis of his noncompliance which resulted in a dog bite. *(refer to Bruss BWC)*

After detaining /securing both Thomas and Gray the investigation concluded a criminal offense had occurred. Gray was transported to jail and charged with Criminal Trespass. Thomas was transported via an ambulance to a hospital for treatment. He was released that same day and HCCO Pct 1 filed a "To-Be" warrant and arrested him several weeks later. *(refer to Thomas deposition)*

The International Association of Chief of Police says "*officers may not be aware of the mental state or condition of an individual, but even when this information is available it may be necessary to deploy a canine when the severity of the crime warrants this action and alternative measures are either not available or inadequate to gain control of the individual*" (IACP Law Enforcement Policy Center – Patrol Canines Revised May 2015).

The International Associations of Chiefs of Police also says "*K9 bites typically cause injury to suspect but sometimes the injury is needed in order to gain*

18

*compliance*". Deputies did not know Thomas's intentions or if he was under the influence of alcohol, on drugs, or mentally ill. The actions of the HCCO Pct 1 deputies were dictated by Thomas creating a dangerous situation by resisting commands and non-compliance.

Thomas's failure to comply with lawful orders elevated the threat for the deputies. *The use of a trained police dog in biting a suspect to assist in arrest is not deadly force as applied under Tennessee v. Garner. The use of the dog is not limited to circumstances where the suspect has to be an imminent life threat to others.* (*Vera Cruz v. City of Escondido, 139 F.3d 659, 663 (9th Cir. 1998)-*

Police officers are taught that the potential for violence exists until the suspect has been detained /secured with handcuffs or otherwise rendered safe. Officers are trained on a continuing basis to evaluate each situation as it presents itself as any event could escalate into a deadly force utilization.

Officers are provided with training as well as General Orders and Operating Procedures to guide them through situations they will encounter. Their training includes laws updates, and policies on departmental Use of Force , Canine and other related policies.

*I have reviewed the HCCO Pct 1 Use of Force Police Policy and their Canine Policy. Its policies are like ones I have previously reviewed from other police departments. The HCCO Pct 1 Use of Force and* Canine *policy meets the industry standards for such policies based on Law Enforcement standards, K9 industry standards, best practices, and case law for agencies throughout the United States.*

Below is HCCO Pct 1 Use of force and Canine policies:

| Use of Force | | 500 | 23 |
|---|---|---|---|

**I.    Policy**

19

The highest priority of the Department is safeguarding the life, dignity, and liberty of all persons while serving the public interests of our diverse community.   Employees shall demonstrate this principle in their daily interactions with the community they are sworn to protect  and  serve. The  Law  Enforcement  Code  of  Ethics  requires  all  sworn  law enforcement officers to carry out their duties with courtesy, respect, professionalism, and to never employ unnecessary force.  These are key factors in maintaining legitimacy with the community and earning the public's trust.

There  are  times  when  our  personnel  are  required  to  respond  to resistance  to  uphold  the  law,  protect  the  citizens  we  serve,  and  to protect themselves.  This policy serves to guide an employee's decisions regarding the reasonable use and application of force to ensure such applications are used only to effect arrests and / or lawful detentions or to bring a situation under appropriate control.  No policy or procedure can  define  or  anticipate  every  possible  situation  or  extraordinary circumstance  which  an  employee  might  face.   In  all  circumstances, peace  officers  are  expected  to  exercise  sound  judgement  and  critical decision making when resorting to force options.  Each situation will be ultimately judged by  the  specific  facts  and  circumstances  of  the incident  as  viewed  objectively  and  reasonably.   In  every  situation, the actions of all employees shall fully comply with all applicable state and federal constitutions and laws.

This policy applies equally to sworn Texas Peace Officers and all employees.

Peace officers shall only use physical force when no other viable option is  reasonably  available  for  resolving  an  incident  without  using  force, or when other non-physical options have  proven  ineffective.   In  every instance,  peace  officers  must  distinguish  between  incidents  which require  immediate  and  decisive  law  enforcement  action  and  those incidents  which  do  not  require  an  immediate  resolution.   When  safe and  feasible,  peace  officers  should  allow  a  subject  sufficient  time  to comply with lawful orders and should employ de- escalation techniques consistent  with  his / her  training  in  an  effort  to  avoid  using  force unnecessarily.   Peace  officers  shall  attempt  to  slow  down  or  stabilize

the situation to potentially provide more time, options and resources for incident resolution. When safe and reasonable to do so, efforts should be made to calm the subject and promote rational decision making.

This policy supports the progressive and reasonable escalation and de-escalation of officer-applied force in proportional response to the actions and level of resistance offered by the subject. The level of response is based upon the situation encountered and the actions of the subject in response to the officer's commands. Subjects may move more rapidly from a low level of resistance to a higher level of resistance or may immediately threaten at a high level of resistance, including the use of lethal force. The officer's use of force is in response to the resistance from the subject to lawful police control.

The response to resistance by law enforcement personnel is a matter of critical concern both to the public and the law enforcement community. The Department is dedicated to upholding lawful, professional, and ethical standards through assertive leadership and supervision before, during, and after all force incidents. This includes, but is not limited to, proper training, prevention efforts, effective tactics utilized during an incident, objective review, and analysis of all use of force incidents.

J. **Reasonable Force**: An objective standard of force viewed from the perspective of a reasonable officer, without the benefit of 20/20 hindsight, and based on the totality of the circumstances known to or perceived by the officer at the time.

**Determining Objectively Reasonable Force**

The legal standard used to determine the lawfulness of a use of force is the Fourth Amendment to the United States Constitution. This policy builds on the United States Supreme Court's principles in *Graham v. Connor (1989) 490 U.S. 386*. Graham states, in part, "The objective reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances

that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation. The test of reasonableness is not capable of precise definition or mechanical application." The force must be reasonable under the circumstances known to the officer at the time the force was used. Therefore, the HCCO1 examines all uses of force from an objective standard rather than a subjective standard.

**Considerations Governing Use of Force**

**C.**    Response to resistance must be for a lawful purpose.   Peace officers  may  use reasonable force options in the performance of their duties for the following reasons:

    1.     To effect a lawful arrest, detention, or search;

    2.     To overcome resistance;

    3.     To prevent escape from a lawful arrest, detention, or search;

    4.     To prevent the commission of an offense within view;

    5.     In defense of others or in self-defense;

    6.     To gain compliance with a lawful order; or

    7.     To prevent a person from injuring himself / herself.

D. Peace officers may be confronted with a wide variety of situations in which he or she must make split second decisions whether response to resistance is  immediately necessary, and if so, what is the appropriate level of response required to overcome a subject's non-compliance.   In determining the appropriate level of force, peace officers shall evaluate the facts and circumstances of each unique situation, and his or her evaluation shall be guided by his or her training and experience.

**Levels of Resistance**

B. <u>Passive Resistance:</u>  The subject is not complying with a peace officer's direction and is uncooperative, but is taking only minimal physical action to prevent a peace officer from placing the subject in custody and taking control.  Examples includes: standing stationary and not moving upon lawful direction, falling limply and refusing to use their own power to move (becoming "dead weight"), holding onto a fixed object, or locking arms to another during a protest or demonstration.

C. <u>Active Resistance:</u>  The subject's physical actions are intended to prevent a peace officer from placing the subject in custody and taking control, but does appear to be Aggressive or Assaultive Resistance.  Examples include: walking or running away, breaking the peace officer's grip, evasive movements to defeat a peace officer's attempt to control, physically signaling an intention to avoid or prevent being taken
into or retained in custody.

**Use of Force**

    D.    Force Used to Effect an Arrest and / or Search

- The peace officer reasonably believes the arrest or search is lawful, or,

- The arrest or search is made under warrant and the peace officer reasonably believes the warrant is valid, and

- Before responding to resistance, the peace officer states the purpose of arrest or search and identifies himself as a peace officer unless he
/ she reasonably believes the purpose and identity are already known by the person to be arrested *[Texas Penal Code, Section 9.51(a) (2)]*.

| SUBJECT: | POLICY #: | # of Pages |
|---|---|---|
| **DEPARTMENT CANINE POLICY** | **111** | **30** |

    C.  POLICE SERVICE CANINE PROGRAM

23

The police service canine program's mission is to provide a reliable patrol canine capability, through the employment of trained Canine Handler teams to aid in law enforcement operations. The primary task of the canine team is to search for human odor. A police service canine may be used to apprehend an individual, if the Handler reasonably believes that the individual has either committed or is about to commit any offense; and if any of the following conditions exist:

1.    There is a reasonable belief that the individual poses an immediate threat of violence or serious harm to the public, any peace officer, or himself/herself.

2.    The individual is physically resisting arrest and the use of the police service canine appears necessary to overcome such resistance.

3.    The individual(s) is believed to be actively hiding or evading in an area where entry by law enforcement or other persons would pose a threat to the safety of officers or the public.

4.    It is recognized that situations may arise which, may not fall within the provisions set forth in this policy. In any such case, a standard of reasonableness shall be used for the decision to use a police service canine in view of the totality of the circumstances.

e. Prior to the use of a police service canine to search for or apprehend any individual, the Canine Handler at the scene shall carefully consider all pertinent information reasonably available at the time

2.    This information shall include, but is not limited to:

24

- The nature of the suspected offense involved, i.e. the seriousness of the offense and the threat of future violence if apprehension is not imminent.

As a matter of law, an officer need not use the least intrusive means of force available so long as the force used is reasonable. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation.

Police officers have a duty to act reasonably in effecting an arrest, and the force used must be limited to that required under the totality of the circumstances. The reasonableness of an officer's use of force depends upon the totality of the facts and circumstances in each case. *(Hall v. City of Shreveport, 45,205 (La. App. 2 Cir. 4/28/10), 36 So. 3d 419).*

When considering the totality of the circumstances confronted by HCCO Pct 1 deputies here are the facts they had to consider:

1. Transfer call of a disturbance with weapons
2. Reportee stated he was in possession of a firearm
3. Two unknown b/m suspects yelling and screaming in front of his residence
4. The suspects were there doing the same thing the previous day
5. The suspects refused to leave his home when he confronted them
6. The suspects were driving a maroon PT Cruiser
7. According to Sgt. Johnson and Deputy Bruss dispatch advised the suspects were armed with a firearm *(refer to Bruss depo and Bruss's BWC)*
8. Sgt. Johnson arrived and observed two b/m sitting in the car, knowing he was now outnumbered
9. The car itself was a threat as they had no way of knowing if a third suspect was inside or hiding behind the car
10. When verbally confronting them to show their hands one complied and the other b/m exited the car and raised his hands.

25

11. Not knowing if this was an attempt to surrender or distract the deputy so he could flee, brandish a firearm or lure the deputy into a false sense of security
12. Multiple commands for him to get back in the car, no compliance
13. b/m standing outside the car raised his hands and began talking irrationally telling him to shoot him, suggesting suicide by cop
14. Sgt. Johnson now faced an elevated threat alone.
15. b/m standing outside the car was wearing multiple layers of clothes that could easily conceal a firearm or other weapon
16. repeated lawful commands for driver to stop reaching
17. plan to secure passenger first then driver
18. prior to issuing commands for the passenger, the driver began exiting the car on his own
19. The driver was commanded to stay in the car and show his hands
20. Deputy Bruss changed their plan and began issuing directions for the driver to exit the car and walk towards him
21. Immediately the passenger on his own began walking towards Deputy Bruss
22. Not knowing his intent but moving without being directed created another threat to the deputies.
23. Sgt, Johnson ordered the passenger to stop and he complied
24. While securing the driver the passenger continued with irrational statements
25. Deputy Bruss continued the process of securing the driver.
26. The driver was handcuffed and secured in a patrol unit.
27. Deputy Shultz then gave multiple commands for the passenger to stand up, no compliance
28. The passenger raised his head once and put it back down. He also moved his left leg but made no attempt to stand up and comply to with the lawful orders.
29. Sgt. Johnson also gave multiple commands for the passenger to stand up or he would be dog bit.
30. No compliance resulted in a use of force to secure the passenger.

Following this incident Lt Moncrief was on the scene and later approved the reports submitted in this case. In his review and deposition, he stated that there was no Internal Affairs investigation into this incident and found no

26

policy violations. Sgt. Johnson's use of force was justified. (*Refer to Lt Moncrief's deposition*)

Lt Stewart Red reviewed this case and advised that the totality of the circumstances justified the use of force in this incident. *(refer to Stewart Red's Deposition)*

Carl Shaw interviewed multiple deputies regarding this incident including Sgt. Royal. Sgt. Royal was over the HCCO Pct 1 canine unit and the head trainer for the department. After interviewing the deputies regarding this incident, he found collectively they agreed it was a justified use of force and no policy violations had occurred. *(refer to Carl Shaw's Deposition)*

### *Opinion #2*

> It is my expert opinion in the totality of the circumstances Sgt. Johnson's utilization of Canine Jeck was objectively reasonable. It was justified, lawful and in accordance with State and Federal Laws, HCCO Pct 1 Canine Policy / Use of Force Policy, and Industry Standard. Therefore, Deputy Bruss and Deputy Shultz did **NOT** violate the plaintiff's Constitutional Rights by Subjecting Him to Excessive and Unreasonable Force in Violation of the Fourth and Fourteenth Amendments.

This call was a disturbance with weapons which automatically put the officer in a heightened state of awareness. The deputies were advised that the reportee was in possession of his firearm. A prudent and experienced officer knows to assume everyone is armed until proven otherwise.
*(Terry v. Ohio 392 U.S 1(1968) it is constitutional for American police to "stop and Frisk" a person they reasonably suspect to be armed and involved in a crime*)

The plaintiffs allege that the deputies should have known that the reportee was armed and not the suspects. *(refer to Tiderington's deposition )*

While enroute to this incident both Sgt. Johnson and Deputy Bruss stated HCCO Pct 1 dispatch advised that the suspects were armed with firearms.

27

Deputy Bruss independently contacted dispatch and confirmed that they advised the suspects were armed. *(refer to Bruss depo and Bruss's BWC)*

Officers are taught to secure the scene first then complete the investigation. If the scene is not safe people could get seriously injured or killed. This is common sense and an industry standard.

Upon their arrival and contact with the suspects the officers had been provided with very little details regarding this incident. The deputies had to protect themselves and others while trying to secure the scene.

During their contact with the suspects, they encountered resistance to their lawful commands. Sgt. Johnson responded to their resistance at times with sharp, hard language. His forceful language changed most of Gray's resistance and he complied; however, it had no influence on Thomas.

At one point Gray was prone on the ground but continually failed to comply with Deputy Bruss's command. Sgt. Johnson's response, with the assistance of canine Jeck, created compliance from Gray. Ultimately, because Gray complied, he was detained and secured with no use of force.

Thomas was completely different. The plaintiff alleges that Thomas was compliant and not a threat. *(refer to Tiderington's deposition )*

In my training and experience compliance is doing what the officers tell you to do. At the same time, non-compliance is not doing what the officers tell you to do.

NON-Compliance is defined as: *failure or refusal to act in accordance with a wish or command.* Thomas demonstrated throughout their contact non-compliance.

The result of Thomas's failure to comply created a dangerous situation for him, the bystanders, the reportee and the deputies.
After Gray was safely detained /secured in a patrol unit, the deputies focused on detaining Thomas. Thomas wore multiple layers of clothing including two pairs of sweat type pants. The outer pair sagged down clearly

28

showing the under pair. The pair closest to his body did not sag down and had an elastic type of band. His clothing provided significant opportunities to conceal a firearm or other type of weapon.

Thomas lay on the ground near the front passenger corner of the car. The car itself presented a danger for the deputies because it could contain another suspect inside of it or behind it. Thomas's failure to comply could have been an act to lure the deputies into an ambush. His irrational comments and failure to comply further elevated the deputies' concern for everyone's safety.

The deputies had a duty to act and the first obligation to that duty was to detain/secure both suspects and make the scene safe. The safest way to complete that task was to have Thomas stand up and walk to them. After he was detained/secured, they could move up and clear the car.

Deputy Shultz gave multiple commands for Thomas to stand up which he refused to comply. Sgt. Johnson clearly advised him several times if he didn't stand up he would get bit. Thomas moved his head and leg but made no obvious attempt to comply and stand up.

His non-compliance resulted in canine Jeck apprehending him. After canine Jeck apprehended him, Thomas rolled even closer to the car, which obviously limited physical access to them. Securing Thomas's hands was Sgt. Johnson's priority. Securing the car for any other possible suspects was Deputy Bruss's priority.

The plaintiffs allege that the deputies could see from a distance that Thomas was not armed; however, without physically searching him for weapons that assumption is deadly. His multi layers of clothing certainly could have allowed him to conceal any type of weapon. Thomas created a dangerous situation for the deputies and was non-compliant.

The allegations that Deputy Bruss and Deputy Shultz had a duty to intervene during his arrest are imperceptive. The utilization of canine Jeck to apprehend a dangerous, non-compliant suspect was lawful. *(Law Enforcements use of a canine to apprehend a dangerous and non-compliant*

29

*subject is lawful and an industry standard. Case law clearly agrees that canines can be used on dangerous, non-compliant suspects; <u>Jay v. Hendershott, 579 F. App'x948, 951-52 (11th Cir. 2014):</u>*

Sgt. Johnson's deployment of canine Jeck was lawful. Deputy Bruss and Deputy Shultz had no reason to interfere with the lawful use of force during Thomas's apprehension by canine Jeck.

Furthermore, Lt. Moncrief, Lt. Stewart Red and Carl Shaw's reviews of this incident found it to be lawful and in accordance with HCCO Pct 1 policies.

After a thorough review of the materials, Sgt. Johnson, Deputy Bruss and Deputy Shultz actions were entirely reasonable, consistent with accepted police practices, and consistent with nationally recognized standards and state and federal law. I did not find any evidence that would support allegations that the deputies' actions, HCCO Pct 1 policies and procedures, are unreasonable and not within the K9 industry standards, customs, and practices. Overall, based upon my review of this case, the evidence shows that Sgt. Johnson, Deputy Bruss and Deputy Shultz acted entirely reasonably, consistent with accepted K9 practices and procedures, department policy, and consistent with state and federal law.

### *Opinion #3*

It is my expert opinion that Deputy Bruss and Deputy Schultz did not fail to intervene in a violation of Thomas's constitutional rights.
To state claim for failing to prevent another officer's violation of a constitutional right, Plaintiff must allege facts capable of establishing that the deputies (i) knew that Deputy Johnson was violating Plaintiff's constitutional rights, (ii) had a reasonable opportunity to prevent the violation, and (iii)chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013), *cert. denied*, 527 U.S. 1087 (2014) (citing *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)).

Reviewing the materials provided in this case the only "Use of Force" was conducted by Sgt. Johnson when he deployed canine Jeck to apprehend a dangerous and non-compliant suspect involved in a criminal offense.

30

Deputy Bruss and Deputy Shultz were involved in securing both suspects; however, neither of them is responsible for any use of force.

Sgt. Johnson, in his training and experience, was aware of the totality of the circumstances in this incident and alone decided to use canine Jeck to apprehend Thomas. During numerous searches or arresting indents Sgt. Johnson utilized canine Jeck to apprehend two suspects. These records reflect minimal use of force incidents for this team.

Following Thomas's apprehension, Deputy Bruss cleared the car for any possible threats and moved back to assist in securing Thomas. The MVR recordings from Sgt. Johnson and Deputy Bruss, confirm Deputy Bruss approached Thomas, canine Jeck and Sgt Johnson, with his firearm secured in his holster. Clearly, he did not continue to point his firearm at them. *(refer to Sgt. Johnson and Bruss's MVR)*

Deputy Shultz approached Sgt. Johnson and Thomas from behind while canine Jeck was engaged in biting. He stood behind Sgt. Johnson pointing his Tazer in their direction. Deputy Shultz holstered his Tazer and never removed his firearm from his holster. *(refer to Shultz BWC)*

Deputy Bruss, an experienced canine handler, has extensive knowledge regarding canine training and utilizations. He also has been trained in department policies regarding Use of Force and Canine as well as current applicable state and federal laws. *(refer to Bruss training records and depo)*

Deputy Shultz had no knowledge of canine handling, training, operations or canine policies. He advised he has worked around canine teams previously but not regularly. In reviewing his deposition, he had been trained regularly regarding department policies, current state and federal laws. *(refer to Deputy Schultz Depo)*

Following the apprehension of Thomas, Deputy Bruss tactically moved up and cleared the car. Deputy Shultz moves to a position behind Sgt. Johnson, Thomas and canine Jeck. When Sgt Johnson had handcuffs on Thomas, Bruss tells Sgt Johnson to get the dog off the bite. Between their tactical

responsibilities, the proximity to the car and the short duration of the apprehension there was no reasonable time for them to intervene sooner.

Both Deputy Bruss and Deputy Shultz knew Thomas was a potentially armed and non-compliant suspect. Given the totality of the circumstances, Bruss and Shultz could not have known that the deployment of canine Jeck was an unreasonable use of force.

It is my opinion Sgt. Johnson's deployment of canine Jeck on a dangerous non-compliant suspect was reasonable. Deputy Bruss and Deputy Shultz believed the use of force was reasonable based on the information they had; therefore, they were under no lawful obligation to intervene. Even if Johnson's use of force is found to be unreasonable, Bruss and Schultz did not have a reasonable opportunity to intervene.

**V. The compensation I will receive for my study and testimony in this matter is:**

SCHEDULE OF FEES-Terry Anderson-2025

>   a. All Case Preparation: $200.00/hour

>   b. Any Deposition: $450.00 per hour, with a two-hour minimum paid in advance of deposition.

>   c. Travel Time is billed at $100.00 per hour plus 70 cents per mile billed after completion of the deposition.

>   d. Court Room Charges: standby waiting for expert testimony will be billed at $200.00 per hour. If not released from court post testimony hours will be billed at $200.00 per hour.

>   e. No charges accrue once called to testify. Charges do accrue for pre-testimony and post testimony if not released from court.

>   f. Consulting Fee: $250.00/hour

>   g. Travel Time: $100.00/hour Plus 70 cents per mile.

h. Retainer fee is $3,000 and not deducted from total hours billed. The retainer fee is NON- refundable. No retainer fee will be charged on any additional or future cases after the initial retainer fee has been paid for the originating agency.

i. Non-disclosed Case Analyst Work: $250.00/hour

## VI.    I have testified as an expert witness at trial or deposition in the preceding 6 years.

2021   Solomon Coley and Arshakne Hall vs. City of Bossier City No. 5:17-cv-01553-EEF-MLH, Canine Use of Force, report, and deposition.

2022   Allen Woodard v. Deputy Eddie Carol, Deputy Hall, Unknown Deputy, Sheriff Tony Mancuso, Calcasieu Parish Sheriff's Department Civil Action: USDC, WDLA, No: 2:21CV00059-TAD-KK Active case, report, deposition.

2022   United States v. Davis et al., United States District Court for the Eastern District of Pennsylvania, Crim. No. 19-636: United States District Court Qualified as an expert in Law Enforcement Canine Handling, Training and Certification, Including Narcotic Detection. (Covington Case)

2023   Notice of Appeal of Termination of Dereck Frasier ADPS, Plaintiff. Reviewed case and testified in Administrative Hearing.

2023   Julian Valenzuela (Plaintiff) v. The City of Las Cruces, and Officer Mathew Dollar (Defendant) Case no. D-307-CV-2022-01147, reviewed case. Report, Depo Testimony

2024   Erick Lopes (Plaintiff) v. The City of Las Cruces and Officer Dollar (Defendant) Case no. : D-307-CV-2023-00780, reviewed case. Report, Depo Testimony, court room testimony

2025   Vigil (Plaintiff) v K9 services, disclosure and Depo Testimony

33

I am prepared to testify to the opinions expressed in this report in deposition or at trial under the penalty of perjury under the laws of the United States and the State of Texas if called upon to do so. I may have additional opinions if I am provided with further documentation for review, and I reserve the right to augment my report in the event I am asked to provide additional opinions.

Date: 6/21/25

Terry Anderson – Keli's K9's