# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| KERRY LEE THOMAS,<br><br>                   Plaintiff,<br><br>v.<br><br>ERIC M. BRUSS,<br>WAYNE SCHULTZ,<br>and KEITH MORRIS, in his capacity as Temporary Defendant Administrator of the Estate of Robert Johnson,<br><br><br><br>                  Defendants. | Case No. 4:23-cv-00662 |

---

## PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE TERRY ANDERSON'S EXPERT REPORT AND TESTIMONY AND LIMIT STUART RED'S EXPERT TESTIMONY

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................2

TABLE OF AUTHORITIES .....................................................................................3

INTRODUCTION......................................................................................................4

FACTS .......................................................................................................................4

LEGAL STANDARD ................................................................................................5

SUMMARY OF ARGUMENT..................................................................................6

ARGUMENT .............................................................................................................7

    I. Anderson's expert report and testimony should be excluded because his clear bias in favor of police officers infected his methodology and made it unreliable. .........................................7

        A. Anderson's bias in favor of police officers leads him to assume their statements as true and prevents him from testifying against them. .............................................................8

        B. Anderson's methodology is unreliable because he: (1) misapplied the Graham standard by considering and crediting Defendants' subjective reports over contemporaneous objective evidence; and (2) is unable to analyze or apply the independent Graham factors to the use of force underlying this litigation. ...................................................................10

        C. Anderson's methodology is unreliable because he excluded and disregarded any aspect of relevant Precinct 1 policies that contradicted Defendants' theories.............................14

    II. Anderson's expert report and testimony should be excluded because his opinions amount to legal conclusions...........................................................................................................18

    III. Red's opinions and testimony regarding the case at hand should be limited because his testimony is not based on sufficient facts, he did not reliably apply expert methodology, and he considers subjective evidence in evaluating uses of force. ...................................................21

    IV. Red's Testimony should be limited to exclude legal conclusions. ...................................23

    V. To the extent Anderson's and Red's testimony is admitted, it should be limited to their areas of expertise...................................................................................................................24

    VI. This Court should limit both Anderson's and Red's testimony to the same extent it limits Chief Tiderington's testimony. ............................................................................................25

CONCLUSION ........................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Autin v. City of Baytown*, 174 F. App'x. 183 (5th Cir. 2005) ....................................................... 11

*Barnett v. City of Laurel*, No. 2:18-CV-92-KS-MTP, 2019 WL 5788312 (S.D. Miss. November 6, 2019) ............................................................................................................................................ 7

*Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016) ........................................................................ 11

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...................................................... 6

*Est. of Baker by & through Baker v. Castro*, No. CV H-15-3495, 2018 WL 11355141 (S.D. Tex. Sept. 7, 2018) ......................................................................................................................... 14

*Graham v. Connor*, 490 U.S. 386 (1989) ........................................................................... passim

*Moore v. Ashland Chem. Inc.*, 151 F.3d 269 (5th Cir. 1998) .................................................. 7, 19

*Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383 (5th Cir. 2009) ........................................... 7

*Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016) ............................................................... 11

*Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2021 WL 1131721 (W.D. Tex. Mar. 24, 2021). ........................................................................................................................................... passim

*Renfroe v. Parker*, 974 F.3d 594 (5th Cir. 2020) ...................................................................... 22

*Schott v. Bexar Cnty.*, No. 5:23-CV-00706, 2025 WL 2375649 (W.D. Tex. Aug. 14, 2025) ...... 21

*U.S. v. Williams*, 343 F.3d 423 (5th Cir. 2003) ........................................................ 7, 8, 19, 25

*United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007) ......................................................... 9

**Rules**

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) ................................................................. 8

Fed. R. Civ. P. 26(a)(2)(B) ........................................................................................................ 21

Fed. R. Evid. 702 ................................................................................................. 6, 8, 22, 24

Fed. R. Evid. 704(a) ............................................................................................................. 7, 19

*Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999) ............................................................. 8, 25

**Other Authorities**

Jeffrey Selbin, *Suicide By Cop? How Junk Science and Bad Law Undermine Accountability for Killings by Police*, 113 Cal. L.R. (forthcoming 2025) ........................................................... 26

# INTRODUCTION

Defendants have offered two expert witnesses in this case: Terry Anderson and Stuart Red. Because both experts apply flawed methodologies, offer legal conclusions, and intend to testify outside of their areas of expertise, Mr. Thomas brings this motion to exclude or limit their testimony.

# FACTS

Terry Anderson is Defendants' retained expert witness. He is a former police officer, canine handler, and canine trainer. Exhibit 1, Anderson Expert Report at 1–2. His expert report offers three opinions about the facts in this case:

1. "Opinion #1[:] In my professional opinion the utilization of Canine Jeck as a less than lethal use of force to apprehend and arrest Thomas was reasonable, lawful, and consistent with modern police practices, industry standards and in accordance with State and Federal Law, the Harris County Constable Office, Precinct 1, (HCCO PCT1) General orders, Use of Force Policy and Canine Policy. Sgt. Jonson's utilization of Canine Jeck as a less than lethal force option is justified. Therefore, Sgt. Johnson is **NOT** responsible for violating or depriving the Plaintiff's civil rights of excessive use of force. (refer to: *Byrd v. City of Bossier*, No. 14-30809, 2015 WL 5259961. At \*1)" Ex. 1 at 10 (italics removed).

2. "Opinion #2[:] It is my expert opinion in the totality of the circumstances Sgt. Johnson's utilization of Canine Jeck was objectively reasonable. It was justified, lawful and in accordance with State and Federal Laws, HCCO Pct 1 Canine Policy / Use of Force Policy, and Industry Standard. Therefore, Deputy Bruss and Deputy Shultz did **NOT** violate the plaintiff's Constitutional Rights by Subjecting Him to Excessive and Unreasonable Force in Violation of the Fourth and Fourteenth Amendments." Ex. 1 at 27 (italics removed).

3. "Opinion #3[:] It is my expert opinion that Deputy Bruss and Deputy Schultz did not fail to intervene in a violation of Thomas's constitutional rights. To state claim [sic] for failing to prevent another officer's violation of a constitutional right, Plaintiff must allege facts capable of establishing that the deputies (i) knew that Deputy Johnson was violating Plaintiff's constitutional rights, (ii) had a reasonable opportunity to prevent the violation, and (iii)chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013), cert. denied, 527 U.S. 1087 (2014) (citing *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995))." Ex. 1 at 30.

Lieutenant Stuart Red was designated as a "non-retained expert witness." *See* Exhibit 2, Defendants' Disclosure of Expert Witnesses. Defendants' Disclosure stated that he may offer the following opinions:

1. Lt. Red may testify based on his training and experience regarding proper police procedures when interacting with a suspect and responding to a weapons disturbance.
2. Lt. Red may testify based on his training and experience, regarding proper police procedure when releasing a canine.
3. Specifically, Lt. Red may testify that Bruss and Schultz acted reasonably and in compliance with Pct. 1 policy in their interactions with Mr. Thomas.
4. Lt. Red may also testify that Robert Johnson did not use unreasonable excessive force against Mr. Thomas.
5. Lt. Red may also testify that based on his training and experience as a canine handler and a review of the incident report and video recordings, Eric Bruss and Wayne Schultz should not have and could not have known that Robert Johnson was using unreasonable excessive force against Mr. Thomas.
6. Lt. Red may also testify that it was not clearly established that Eric Bruss and Wayne Schultz should have intervened in Robert Johnson's use of force against Mr. Thomas.

Ex. 2 at 2 (numbers added).

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony and provides that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion." Fed. R. Evid. 702. Courts have a "gatekeeping" responsibility to ensure only qualified experts are admitted to testify. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Experts are qualified to testify where:

(a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; *and* (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 (emphasis added).

Accordingly, expert testimony must be excluded if it is not the product of a reliable methodology. "[A]ny step [in the analysis] that renders [it] unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 n.10 (5th Cir. 1998) (emphasis removed). Further, expert testimony must be supported by "more than subjective belief or unsupported speculation." *Barnett v. City of Laurel*, No. 2:18-CV-92-KS-MTP, 2019 WL 5788312 at *3 (S.D. Miss. November 6, 2019) (citing *Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009)). Federal Rule of Evidence 704(a) "does not allow a[n expert] witness to give legal conclusions." *U.S. v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003) (holding that admitting police officer testimony about the reasonableness of a use of force was error because "[r]easonableness under the Fourth Amendment or Due Process Clause is a legal conclusion").

## SUMMARY OF ARGUMENT

Anderson's testimony and report must be excluded in their entirety because his strong bias in favor of police officers resulted in a methodology that was unreliable in two critical ways. First, he incorrectly applied the *Graham* standard by relying on subjective—as opposed to objective—evidence, crediting post-hoc testimony over real-time footage and audio. He was also unable to analyze the independent *Graham* factors. These methodological errors alone warrant exclusion. *See Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2021 WL 1131721 at *21 (W.D. Tex. Mar. 24, 2021). Second, in determining whether Defendants' actions complied with applicable policing standards and policies, Anderson excluded and disregarded any aspects of applicable Precinct 1 policies that contradicted his opinions. He accordingly did not apply a reliable methodology in analyzing whether Defendants' conduct conformed to such policies. *See Moore*, 151 F.3d at 279

n.10. Finally, even if Anderson's testimony and report were the product of a reliably-applied methodology, they must be excluded because they amount to legal conclusions. *Williams*, 343 F.3d at 435.

Red's opinions and testimony must be limited because, by only performing a cursory review of the materials available to him, Red rendered opinions premised on insufficient facts and, therefore, did not properly apply a reliable methodology. Fed. R. Evid. 702. Accordingly, Red's opinions and testimony should be limited to general police practices, and should not extend to the facts of this case. Moreover, Red must be prohibited from offering legal conclusions.

Additionally, both experts should be prohibited from testifying outside of their areas of expertise. *See Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999). Both should be prohibited from testifying about "suicide by cop" (an amorphously defined concept that neither are sufficiently trained in) and the medical causes and implications of Mr. Thomas' injuries from the dog bite. Anderson should also be prohibited from testifying about proper police practices concerning tasers, given his lack of training in the area. Finally, both experts' testimony should be subject to any limitations the Court places on Chief Tiderington's expert testimony.

## ARGUMENT

**I.**     <u>**Anderson's expert report and testimony should be excluded because his clear bias in favor of police officers infected his methodology and made it unreliable.**</u>

Although bias generally goes to weight of the expert's testimony, rather than admissibility, "under certain circumstances, a district court, in order to discharge its fact-finding responsibility under Rule 104(a), may need to evaluate an expert's general credibility as part of the Rule 702 reliability inquiry." *Elcock v. Kmart Corp.*, 233 F.3d 734, 751 n.8 (3d Cir. 2000). This is because at times, "the credibility evidence at issue relates to the methodology before the court." *Id.*

**A. Anderson's bias in favor of police officers leads him to assume their statements as true and prevents him from testifying against them.**

Here, Anderson's bias in favor of police officers is palpable. As an initial matter, Anderson testified that he views after-the-fact recollections as objective evidence if they are shared by a police officer, but not if they are shared by a civilian. When asked whether a person describing an event after-the-fact was subjective evidence or objective evidence, Anderson testified:

> A: If they're a policeman recounting the incident and this is what they say, then that's objective evidence.
> Q: What if it's not a police officer?
> A: I don't know. I guess you'd have to use your best skills as a policeman to determine whether they're telling the truth or lying.

Exhibit 3, Anderson Deposition Transcript at 82:11–25. Indeed, Anderson assumes the truth of police officer statements, rather than looking at the objective evidence:

> Q: If a police officer says it, you assume that it's true?
> A: Yes.

*Id*. at 83:1–3. This blanket endorsement of police credibility is improper. *Ramirez*, 2021 WL 1131721 at *24 ("expert testimony may not be used to bolster the credibility of fact witnesses") (quoting *United States v. Lombardozzi*, 491 F.3d 61, 77–78 (2d Cir. 2007)).

Anderson's bias in favor of police officers affects how he conducts business as an expert witness. In previous cases, Anderson has testified that he would not serve as an expert against a police canine handler, and would only serve as an expert if he was retained to testify that the officer "was in the right." When asked if he had ever reviewed a case or served as an expert for a plaintiff who had been injured by a police K-9, he testified as follows:

> A: No, sir.
> Q: Would you ever do that?
> A: I would review it, yes, sir.
> Q: And would you if you saw that there was a violation would you write a report for them?

**A: If that officer was in the right and he was wrong, yes, sir, I would.**

Exhibit 4, *Coley* Deposition Testimony at 45:14–46:1 (emphasis added). It is no surprise then that Anderson has never served as an expert for a plaintiff alleging excessive force. Ex. 3 at 55:11–16. Anderson also made clear that he would not take a case against an officer who was a member of the National Police Canine Association, the organization that Anderson is the president of:

> Q: So if a plaintiff whose [sic] been injured by a K-9 … comes to you requesting you to review the case and provide an expert report and the offending K-9 belongs to an agency that is a member of [N]PCA, are you telling me that you would under take [sic] that case or that you would not?
> A: Would not.
> Q: And is that because you may have a conflict of interest?
> A: Absolutely
> …
> Q: Is it accurate to say that you as the president of the [N]PCA would not provide an expert opinion that a member of your organization violated any individual's Constitutional Rights?
> A: I'm not going to get involved with that at all, no, sir. I will not.

Ex. 4 at 46:19–47:2, 48:1–5. Importantly, Defendant Bruss has been certified by the NPCA, underscoring the conflict of interest Anderson has in this case. *See* Doc. 118-8, Declaration of Eric Bruss para. 3. Notably, when Anderson was questioned about whether Defendant Bruss had ever been certified by the NPCA, Anderson incorrectly stated that Bruss had never been certified by the NPCA, perhaps attempting to obscure the conflict of interest. *See* Ex. 3 at 35–36.

Anderson's testimony makes clear his strong bias in favor of police officers, but ultimately, bias may only be used to exclude an expert if the bias affects their methodology. Here, Anderson's bias permeates his analysis and results in two fundamental flaws in his methodology: (1) a misapplication of the *Graham* standard wherein he not only considers Defendants' subjective reports, but credits those reports over objective contemporaneous evidence; and (2) a selective

application of relevant policing policies and standards that ignores all guidance that hurts Defendants' case.[1]

**B.    Anderson's methodology is unreliable because he: (1) misapplied the *Graham* standard by considering and crediting Defendants' subjective reports over contemporaneous objective evidence; and (2) is unable to analyze or apply the independent *Graham* factors to the use of force underlying this litigation.**

""[T]he 'reasonableness' inquiry in an excessive force case is an objective one." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Whether a use of force is excessive depends on "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Graham*, 490 U.S. at 396). Courts must determine whether the use of force was justified based on the objective facts confronting the officer, "not whether the force was justified based on [the officer's] claimed interpretation of the situation at the time." *Autin v. City of Baytown*, 174 F. App'x. 183, 185 (5th Cir. 2005) (citing *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994); *see also Perez v. Suszczynski*, 809 F.3d 1213, 1219–20 (11th Cir. 2016) (noting that the "reasonable officer standard does not mean [courts] give the challenged officer's self-serving testimony more weight" than testimony of other witnesses or that courts must accept an officer's subjective beliefs).

Despite the relevant legal and policing standard being an *objective* inquiry focused on the *objective* facts, Anderson's report and testimony frequently draw conclusions from Defendants' *subjective* beliefs. This error and misapplication of the *Graham* standard—which Anderson

---

[1] These methodological errors would require exclusion even if they were not the result of bias.

himself recognizes as "the most important national policing standard regarding use of force," Ex. 3 at 232:7–8—requires exclusion of Anderson's report and testimony.

In a case similar to this one, *Ramirez v. Escajeda*, the court was faced with a motion to exclude a police practices expert who had improperly applied the *Graham* standard by relying on subjective evidence. 2021 WL 1131721 at *21. In *Ramirez*, the defendant's expert opined that, based on what the Defendant officer "believed he heard dispatch describe . . . [, he believed] the plaintiff was armed with a weapon." *Id*. at *21. The court found error in the methodology because the expert did not "identify the objective facts [he based his opinion on]—namely, the contents of the actual dispatch that [the defendant] heard." *Id*. Just as the excluded expert did in *Ramirez*, here, Anderson repeatedly credited the Defendants' purported belief that Mr. Thomas was armed while discrediting objective evidence—the CAD report, bodyworn camera footage, and dashcam audio—capturing the contents of the "actual dispatch" that Defendants heard.[2] *Id*. Anderson ignored the fact that the dispatch call defendants heard in no way suggested Mr. Thomas or Mr. Gray were armed. *See* Ex. 3 at 105:4–14 (Anderson acknowledging that dispatch did not tell Bruss or Johnson that the suspects had a weapon); *see also id*. at 104 ("I did not hear dispatch saying that [the suspect had a weapon]. I heard that Deputy Bruss [said] that is what they told him."). Accordingly, he failed to evaluate in an objective manner what a similarly-situated officer should have concluded given the known facts.

Tellingly, when Plaintiff's counsel informed Anderson that the 911 caller was captured on bodyworn camera footage saying he never told dispatch Mr. Thomas was armed, Anderson said

---

[2] Anderson also credited Officer Bruss's subjective statement in the body-worn camera footage that he had been told Mr. Thomas and Mr. Gray were armed, see Ex. 1 at 15, while failing to credit objective evidence that showed that dispatch never communicated that Mr. Thomas was armed.

this fact wouldn't affect his opinion in the case, because it didn't bear on what officers reasonably

believed.

> Q: Does what the 911 caller told dispatch bear on what the officers reasonably believed?
> A: Not particularly.

Ex. 3 at 74:13–15; *see also id.* at 72–74.

Similarly, when it became apparent during Anderson's deposition that he had not fully

reviewed the CAD Report—a report that documents exactly what information dispatch shared with

the officers, Anderson stated that he had not reviewed the report because, "it was so trivial," *id.* at

186:6–13, and that the information in the report would not change his opinion. He said as much

even before he had read the report:

> Q: …so I just want to clarify, you know [the CAD report is] not going to change your opinion even though you haven't read it line by line?
> A: That is correct.

*Id.* at 265:17–20.

Indeed, Anderson made clear that he "doesn't see how [an expert] could exclude" from his

analysis "what a particular officer believed in evaluating the lawfulness of their use of force." Ex.

3 at 89:22–4 (emphasis added). This misunderstanding of the *Graham* standard permeates

Anderson's report and is so extreme that Anderson even claims to know (and weigh) the mindset

and intentions of deceased Defendant Johnson:

- "Johnson *immediately recognized* Thomas's actions [of exiting the car and raising his hands] as an elevated threat level and began yelling for Thomas to stay in the car." Ex. 1 at 13 (emphasis added).
- "The delays in removing canine Jeck from the bite were positional not intentional or based on evil intent" Ex. 1 at 17.[3]

---

[3] *But see Graham*, 490 U.S. 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force, nor will an officer's good intentions make an objectively unreasonable use of force constitutional.")

- "Sgt. Johnson arrived and observed two b/m sitting in the car, *knowing* he was now outnumbered." Ex. 1 at 25 (emphasis added).
- "[Johnson did] [n]ot *know*[] if [Mr. Thomas's exit from the car with his hands raised] was an attempt to current or distract the deputy so he could flee, brandish a firearm or lure the deputy into a false sense of security" Ex. 1 at 26 (emphasis added).
- "[Mr. Thomas's] irrational comments and failure to comply further elevated the deputies' concern for everyone's safety." Ex. 1 at 29.
- "Deputy Bruss and Deputy Schultz *believed* the use of force was reasonable based on the information they had." Ex. 1 at 32 (emphasis added).

It is no surprise that Anderson repeatedly misapplied the relevant methodology, given that he was unable to explain how the *Graham* factors bore on Mr. Thomas's case.[4] While Anderson stated the factors that support the *Graham* standard in his expert report, his report did not analyze the individual factors as applied to the facts at hand. *Compare* Ex. 1 at 11 *with* Exhibit 5, Tiderington Report at 40–42 (applying the *Graham* factors to the facts of this case). Nor was Anderson capable of applying the *Graham* factors to the incident underlying this lawsuit during his deposition.

When asked how he would determine whether a crime was severe enough to warrant a use of force, Anderson repeatedly and nonsensically spoke about non-severe crimes transforming into severe crimes. Ex. 3 at 234:4–8; *id*. at 236 (describing how a shoplifting could turn into an aggravated robbery); *id*. at 238:24–239:3 (describing how "a misdemeanor can turn into a felony"); *id*. at 238:21–240:10 (describing how criminal trespass can be a severe crime "because it can turn into something more serious"). Later in the deposition, he similarly relied on this reasoning. *See* Ex. 3 at 216:6–10 ("Q: …Do you agree that a violent crime is more likely to warrant force than a

---

[4] Application of the *Graham* factors is not testimony relating to a legal conclusion because "*Graham* is a part of the police standards contained in officer trainings . . . [and testimony on the factors is] a reference point for the jury to understand the way that officers are trained and how incidents are investigated." *Est. of Baker by & through Baker v. Castro*, No. CV H-15-3495, 2018 WL 11355141 at *4 (S.D. Tex. Sept. 7, 2018).

non-violent crime? A: I'm not going to - - I can't answer that. It would all depend on what happens because a jaywalker could turn into a murder suspect."). Similarly, in assessing the degree of threat posed to officers, Anderson repeatedly spoke about non-threatening situations escalating into threatening ones. *See* Ex. 3 at 245:13–23 (describing shoplifting escalating into deadly force contact).

Most damning of all, Anderson shared his incorrect opinion that not all of the three *Graham* factors have to be weighed in determining whether a use of force was reasonable. *See* Ex. 3 at 247 (disagreeing that "police supervisors should consider []each of the[] three factors individually and then make a determination based on how they fit together"); *id.* at 248:14–25; *id.* at 249 (Q: The degree of threat doesn't make an impact on whether the force is reasonable? A: Not necessarily.").

In sum, Anderson applied a standard of a *subjective* reasonableness instead of *objective* reasonableness in evaluating Defendants' conduct in this case, and was unable to articulate how the *Graham* standard would apply in this case. This misapplication and inability to reliably apply the relevant standard warrants exclusion of Anderson's report and anticipated testimony. *See Ramirez*, 2021 WL 1131721 at *21.

C. **Anderson's methodology is unreliable because he excluded and disregarded any aspect of relevant Precinct 1 policies that contradicted Defendants' theories.**

Anderson's application of a subjective as opposed to objective standard alone is fatal and warrants his exclusion. But Anderson's methodology is also flawed because he cherry-picked language from relevant Precinct 1 policies and standards to highlight language supporting his pro-police biases, and he excluded language contradicting them. Accordingly, Anderson cannot reliably testify as to whether Defendants' conduct conformed with standard police policies and practices.

Anderson's practice of excluding or ignoring unfavorable policy language is so pervasive that describing every instance in detail would make this brief unwieldy and overlength. Accordingly, Mr. Thomas provides a set of illustrative examples herein, but is prepared to supplement this list should the Court desire.

First, Anderson quoted a paragraph from the International Association of Chiefs of Police's (IACP) policy on Patrol Canines that could be read to support Defendants' decision to sic a canine on Mr. Thomas, but ignored language in the same paragraph urging officers to exercise "additional caution in canine deployment" where officers believe an individual is affected by mental illness or is under the influence of drugs or alcohol. *See* Ex. 3 at 93–96. The relevant portion of the policy reads as follows, but Anderson only included the underlined portion below in his report and analysis:

> [I]t is worth mentioning that when officers are aware that an individual is affected by mental illness, is under the severe influence of drugs or alcohol, or has a developmental disorder such as autism spectrum disorder, some additional caution in canine deployment should be considered, where reasonably possible. These individuals may not have the ability to comprehend the threat associated with the deployment of a law enforcement canine against them, may fail to comply with orders or not fully understand orders of the canine handler, or may act in an inappropriate or bizarre manner that serves as a signal to the canine to take or continue aggressive action beyond that which would be typically necessary. Officers may not be aware of the mental state or condition of an individual, but, even when this information is available, it may be necessary to deploy a canine when the severity of the crime warrants this action and alternative measures are either not available or inadequate to gain control of the individual.

Exhibit 6, IACP Canine Policy at 7. Anderson also ignored the policy's explanation that individuals with mental illness or who are under the influence "may not have the ability to comprehend the threat associated with the deployment of a law enforcement canine against them, may fail to comply with orders or not fully understand orders of the canine handler, or may act in an inappropriate or bizarre manner that serves as a signal to the canine to take or continue

aggressive action beyond that which would typically be necessary." *See id.; see also* Ex. 3 at 98:16–18 (stating that this portion of the policy was not "relevant").

These elements of the policy were obviously relevant to the analysis in this case: Anderson himself describes Mr. Thomas's behaviors throughout his report as "irrational," which, under the IACP Canine Policy, warranted consideration of whether Mr. Thomas was experiencing mental health issues or was under the influence of drugs. *See* Ex. 1 at 7, 13, 14, 15, 17, 26, 29. And Defendants themselves claim that Mr. Thomas was under the influence of narcotics. *See* Doc. 118 at 14.[5] Under the policy that Anderson relied on, Defendants should have considered "some additional caution in canine deployment," but because Anderson excluded and disregarded this portion of the policy, his expert analysis did not properly consider whether Defendants' behavior conformed with police practices and policies.

Anderson also omitted and disregarded sections of Precinct 1's use of force policy indicating that releasing a canine on Mr. Thomas was against policy and therefore unreasonable. Anderson excluded from his report a paragraph[6] that directed officers to determine, before using force, whether a subject was willfully refusing or was unable to comply due to other factors—such as physical limitation, mental impairment or drug interaction—because he "didn't think that it really applied to this particular situation." Ex. 3 at 189:25–190:1; *see also id. at* 188–189 (discussing the omitted language). This policy certainly would have applied here, since the canine was released when Mr. Thomas was laying face down on the ground, was ordered to stand up, and

---

[5] The page numbers of Defendants' motion do not match the ECF page numbers. For ease of reference, Mr. Thomas cites to the ECF page numbers.

[6] The paragraph reads, "Prior to responding to a subject's resistance, and when safe and reasonable to do so, peace officers should determine whether the subject's behavior constitutes willful refusal to comply with lawful orders or an inability to comply based upon other factors, such as medical conditions, mental impairment, developmental disability, physical limitation, language barrier, drug interaction, etc." *See* Exhibit 7, Precinct 1 Use of Force Policy at 1–2.

was attempting to do so. Accordingly, by disregarding this part of Precinct 1 policy, Anderson again failed to offer an accurate opinion on whether Defendants conformed with Precinct 1 policy.

Similarly, Anderson omitted key parts of Precinct 1's Canine Policy that incorporate elements of the *Graham* standard. The omitted section of the policy makes clear that prior to releasing a canine, an officer should consider the nature of the suspected offense, the degree of resistance, the potential for escape, and the potential for injuries to the public or deputies if a Canine is not used. *See* Ex. 3 at 210–11; *see* Exhibit 8, Precinct 1 Canine Policy at 16. While Anderson claimed to have relied on this policy during his deposition, *see* Ex. 3 at 210–12, he was unable to articulate *how* the individual factors weighed into his analysis, just as he struggled to explain what each factor was meant to evaluate. *See id.* at 213–16. For example, Anderson was unable to articulate how the nature of the suspected offense weighed into canine deployment under Precinct 1 policy:

> Q: So I'm asking how this factor, the nature of the suspected offense weighed in the calculation.
> A: It's just part of it. It's part of the factor.
> Q: And did that factor make it more likely that a canine should be released or less likely that a canine should be released?
> A: Again, it was totality of the situation. It wasn't just one thing.
> Q: I understand it's not just one thing, but when considering this one thing in the bigger picture, does this one thing make it more likely or less likely that a canine should be used?
> A: Depends on the situation.
> Q: In this situation, does the nature of the suspected offense make it more likely or less likely that a canine should be used?
> A: It was the totality of the situation. It's not just one element.
> [Q:] Objecting. Non-responsive. . . . In considering this element in the evaluation of the totality of the circumstance, does this evaluation make it more likely or less likely that a canine should be used?
> MS. VINSON: Objection. Form.
> THE WITNESS: Can't answer that. I wasn't there. I wasn't in this situation.

*Id.* at 213–14. Application of this element of Precinct 1's Canine policy, which is derived from the *Graham* standard, is crucial to an analysis of whether the officer's actions complied with Precinct

1 policy. Nevertheless, Anderson not only entirely excluded it from the excerpts in his report, but also was unable to apply the policy to the facts at hand.

At times, Anderson not only *ignored* relevant Precinct 1 policies, but actively made statements about standard police practices that directly contradicted those policies. For example, Anderson included an excerpt of Precinct 1 policy entitled "Considerations Governing Use of Force," but excluded language from that section stating that officers must "use the lowest response to resistance that is immediately necessary." Ex. 3 at 191:21–192:11. Instead, Anderson's expert report incorrectly stated, "As a matter of law, an officer need not use the least intrusive means of force available so long as the force used is reasonable." Ex. 1 at 25.

In sum, Anderson's report and testimony either omit crucial Precinct 1 policy, directly contradict Precinct 1 policy, or otherwise reveal an inability to apply relevant policies and standards to the case at hand. These errors demonstrate that Anderson has not applied a reliable methodology to the facts of this  case.  His report and testimony must be excluded because "any step [in the analysis] that renders [it] unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Moore*, 151 F.3d at 278 n.10.

## II. Anderson's expert report and testimony should be excluded because his opinions amount to legal conclusions.

Even if Anderson's expert opinions were based on reliable methodology, they would be inadmissible because they amount to legal conclusions. Rule 704(a) "does not allow a witness to give legal conclusions." *Williams,* 343 F.3d at 435 (citing Rule 704(a)) (holding that admitting police officer testimony about the reasonableness of a use of force was error because "[r]easonableness under the Fourth Amendment or Due Process Clause is a legal conclusion"). Nevertheless, throughout his report and deposition testimony, Anderson makes explicit legal

conclusions about the reasonableness of the Defendants' actions. This is clear on the face of his three proffered opinions:

- "Opinion #1: In my professional opinion the utilization of Canine Jeck as a less than lethal use of force to apprehend and arrest Thomas was **reasonable, lawful**, and consistent with modern police practices, industry standards and in accordance with State and Federal Law, the Harris County Constable Office, Precinct 1, (HCCO PCT 1) General orders, Use of Force Policy and Canine Policy. Sgt. Johnson is **NOT responsible for violating or depriving the Plaintiff's civil rights** of excessive use of force. (refer to Byrd v. City of Bossier, No. 14-30809, 2015 WL 5259961. At *1)" Ex. 1 at 10 (emphasis added).
- "Opinion #2: It is my expert opinion in the totality of the circumstances Sgt. Johnson's utilization of Canine Jeck was objectively **reasonable**. It was justified, **lawful and in accordance with State and Federal Laws**, HCCO Pct 1 Canine Policy/ Use of Force Policy, and Industry Standard. Therefore Deputy Bruss and Deputy Schultz did **NOT violate the plaintiff's Constitutional Rights** by Subjecting Him to Excessive and Unreasonable Force in Violation of the Fourth and Fourteenth Amendments." Ex. 1 at 27 (emphasis added).
- "Opinion #3: It is my expert opinion that Deputy Bruss and Deputy Schultz **did not fail to intervene in a violation of Thomas's constitutional rights**. To state a claim for failing to prevent another officer's violation of a constitutional right, Plaintiff must allege facts capable of establishing that the deputies (i) knew that Deputy Johnson was violating Plaintiff's constitutional rights, (ii) had a reasonable opportunity to prevent the violation, and (iii)chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013), *cert. denied*, 527 U.S. 1087 (2014) (citing *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995))." Ex. 1 at 30 (emphasis added)

In fact, Opinion #3 is *entirely* a legal conclusion, with no mention of policy practices and standards, and open reliance on caselaw. Accordingly, even if this Court were to limit Anderson's testimony to police practices and policies, Anderson would not be able to testify about whether Defendants Bruss and Schultz failed to intervene because this opinion is not based on police practices and policies.[7] And as Anderson made clear, he does not have any opinions to offer in this case besides those in his report. See Ex. 3 at 71:10–13 ("Q: Do you have any opinions about this

---

[7] As argued *supra* Section I.C, Anderson's testimony on police practices and policies as applied to this case should be excluded as unreliable because they are based on a flawed methodology.

case besides the opinions in your expert report? A: No. My opinions in this case are what I wrote down.").

Even if Anderson had additional opinions, an expert must be "limited to the opinions in his report." *Schott v. Bexar Cnty.*, No. 5:23-CV-00706, 2025 WL 2375649 at *3 (W.D. Tex. Aug. 14, 2025). "An expert witness's report produced pursuant to Rule 26 must contain 'a complete statement of all opinions the witness will express and the basis and reasons for them[.]'" *Id.* (citing Fed. R. Civ. P. 26(a)(2)(B)). Since Anderson's opinion on Bruss and Schultz's duty to intervene is based not in standard police practices and policies, but on caselaw he is unfamiliar with and unequipped to opine on, this opinion should be excluded in its entirety.

Anderson's legal conclusions are reflected not only in the summaries of his opinions, but in his explanations and in his deposition testimony:

- "Sgt. Johnson's deployment of canine Jeck was *lawful*." Ex. 1 at 30 (emphasis added).
- "After a thorough review of the materials, Sgt. Johnson, Deputy Bruss and Deputy Schultz [sic] actions were *entirely reasonable* . . . [and] consistent with . . . state and federal law." Ex. 1 at 30 (emphasis added).
- "Even if Johnson's use of force is found to be unreasonable, Bruss and Schultz did not have a *reasonable* opportunity to intervene." Ex. 1 at 32 (emphasis added)
- "Because in my opinion, there was not excessive use of force. There was - - their actions was objectively - - *objectively reasonable* under the circumstances they were faced with." Ex. 3 at 203:23–204:1 (emphasis added).
- "That their *objectable* [sic] *reasonable* - - *reasonableness* in utilizing Canine Jeck to apprehend Thomas because he was failing to comply, because he could - - he caused a potential threat to the deputies or anybody else involved." Ex. 3 at 212:4–8 (emphasis added).

As Anderson admits, he is not a legal expert. *See* Ex. 3 at 57:5–6. Nevertheless, his report is littered with caselaw, most of which comes directly from Defendant's motion to dismiss and which Anderson admitted he "probably [would] not have" included in his report, had he not seen the cases in the motion. Ex. 3 at 75:15–18, 76:14–17; *see also* Ex. 1 at 10, 17, 19, 25, 27, 30.

The errors in Anderson's report, deposition testimony, and analysis are not new to this case; Anderson has previously been limited "from testifying that [the] Defendant's actions were legal and that [the] Defendant did not use excessive force, as such testimony constitutes impermissible expert opinions on ultimate issues of law." Exhibit 9, *Tegart v. Rumsley* Opinion at 5. Instead, Anderson was only permitted to testify "regarding standard police practices and procedures in the context of the use of police canines, as well as whether Defendant's conduct was consistent with [those practices]."

Here, full exclusion, rather than the above limitation, is warranted, because Anderson has not applied a reliable methodology to his analysis of compliance with police practices and procedures: he has neither grappled with all of the relevant police practices and policies at hand, nor accurately analyzed how they relate to the use of force at hand. *See supra* section I.C. Accordingly, Anderson's testimony must be excluded in its entirety. This is in line with Fifth Circuit precedent: where an expert's opinions relate to whether force was reasonable, it is proper for a court to exclude them. *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) (affirming a district court's exclusion of an expert's report at the summary judgment stage because it opined on whether a use of force was reasonable).

III.  **Red's opinions and testimony regarding the case at hand should be limited because his testimony is not based on sufficient facts, he did not reliably apply expert methodology, and he considers subjective evidence in evaluating uses of force.**

Federal Rule of Evidence 702 requires that an expert's opinion be based on "sufficient facts," "reliable principles and methods," and a "reliable application of the principles and methods to the facts of the case." Here, Red's disclosure and testimony reveal that he has not founded his opinions on sufficient or complete facts and that he has not reliably applied his principles and methodologies to the facts of this case.

Red's disclosure claims that he based his opinions off of "the video recordings of the incident involving Mr. Thomas, the dispatch call report, the incident report and deposition testimony taken in this case." *See* Ex. 2 at 2. However, Red's deposition testimony made clear that he did not adequately review these materials in order to form his opinions, meaning his opinions are not based on "sufficient facts." Red acknowledged that under the typical methodology for a use of force review, an expert "look[s] at *all* the information you have available." Exhibit 10, Red Deposition Transcript (August 6, 2025) at 103:13–14. (emphasis added). But Red did *not* look at all the information available to him.

To start, Red testified that he spent a *maximum* of two hours on the most time-consuming aspect of his evidentiary review: watching video footage relevant to this case.[8] Ex. 10 at 80:8–17. This included "fast-forward[ing]" through portions of the footage—including the officers' drives to the scene, which included communications with dispatch—and not watching the entirety of the video footage. *Id*. at 75. In this case, Red's failure to watch and listen to the communications between the officers and dispatch while driving to the scene is a glaring omission. Defendant Bruss claims that dispatch communicated that the suspects were armed and relies on this to justify Johnson's use of force. Doc. 118 at 10. Red even acknowledged that footage from the drive to the scene "could have" included information relevant to the case and that it was important *who* dispatch stated had a weapon. Ex. 10 at 76:13–77:2, 118:18–25. Nevertheless, Red could not remember what information dispatch communicated to the officers during the deposition (which he testified he spent a maximum of fifteen minutes preparing for), in part, because he fast-forwarded through key video footage. Ex. 10 at 73:14–16, 77:3–6, 77:21–25. Red's cursory review

---

[8] In contrast, Anderson said he spent "way more" than 20 hours reviewing the materials in this case and writing his report. Ex. 3 at 64:13–16.

of the bodyworn camera footage led him to misremember other key facts about the incident. For example, he incorrectly claimed that Mr. Thomas tried to walk away, and had to correct himself after being shown the footage. *Id*. at 122–25.

Additionally, Red did not review key materials that other experts in this case reviewed. Red did not review the deposition transcripts of Officers Bruss, Schultz, or Moncrief;   the bodyworn camera footage from Officers Moncrief, Tuzun, or Vital; or any of the motions filed in this case. Ex. 10 at 74, 86, 94–95. Accordingly, he failed to follow the generally accepted industry-wide practice (and his own methodology) of "look[ing] at all the information . . . available." *Id*. at 103:13–14. Because Red did not "reliabl[y] appl[y] the principles and methods to the facts of the case" and his opinion is not based on "sufficient facts," his testimony must be excluded. Rule 702.

Finally, like Anderson, Red admitted that he considers subjective evidence in evaluating uses of force, rendering his methodology flawed. Red stated that "an officers' subjective experiences" are "something to consider" when "evaluating . . . a use of force." Ex. 10 at 106:2–6. This is inappropriate and untrue. *See Ramirez*, 2021 WL 1131721 at *24. Accordingly, Red should be barred from testifying as to the appropriateness of the use of force.

Mr. Thomas takes no issue with Red testifying to general police practices and policies so long as he does not attempt to tie them or apply them to the facts of this case.[9]

## IV.    <u>Red's Testimony should be limited to exclude legal conclusions.</u>

Similarly to Anderson's expert report, Defendants' expert disclosure reveals that Red plans to testify to legal conclusions. Specifically, the disclosure sets forth the following areas of testimony:

---

[9] Red was also designated in a 30(b)(6) deposition in this case as a witness for Precinct 1 on Precinct 1's policies. Mr. Thomas does not object to his general testimony about Precinct 1 policies, but rather their application to the specific facts of this case.

- Specifically, Lt. Red may testify that Bruss and Schultz acted **reasonably** and in compliance with Pct. 1 policy in their interactions with Mr. Thomas.
- Lt. Red may also testify that Robert Johnson **did not use unreasonable excessive force** against Mr. Thomas.
- Lt. Red may also testify that based on his training and experience as a canine handler and a review of the incident report and video recordings, Eric Bruss and Wayne Schultz **should not have and could not have known that Robert Johnson was using unreasonable excessive force** against Mr. Thomas.
- Lt. Red may also testify that **it was not clearly established** that Eric Bruss and Wayne Schultz should have intervened in Robert Johnson's use of force against Mr. Thomas.

Ex. 2 (emphasis added). All of these opinions amount to legal conclusions. The first three opine on the reasonableness of Defendant's conduct, and must therefore be excluded. *See Williams*, 343 F.3d at 435. The final opinion focuses exclusively on a qualified immunity analysis, which even Defendants' counsel recognizes is a legal conclusion. Ex. 10 at 143:11–21.

V.    **To the extent Anderson's and Red's testimony is admitted, it should be limited to their areas of expertise.**

To the extent that Anderson's and Red's testimony is admitted, they should not be permitted to testify beyond their areas of expertise. *See Tanner*, 174 F.3d at 548 (experts cannot testify to areas they do not have a background in). Specifically, they both should be prohibited from testifying about "suicide by cop" and the medical implications of a dog bite, and Anderson should be prohibited from testifying about police practices and policies surrounding tasers.

Neither Anderson nor Red have any specialized training in "suicide by cop." Anderson has *never* received training or certifications on how to respond to someone attempting "suicide by cop." Ex. 3 at 185:2–11, 187:1–3. Unsurprisingly, then, he has also never led any trainings on "suicide by cop." *Id.* at 187:4–6. Despite experience in writing police policies and leading trainings, Red has not assisted in writing policies about "suicide by cop," and has not led any training concerning "suicide by cop" since the 1900s. Ex. 10 at 33:2–4, 47–48. Moreover, expert evidence about "suicide by cop" already stands on shaky grounds given: the lack of uniformity in definitions; the methodological flaws in empirical research studies on the topic; the fact that "the

indicators of suicide by cop proposed by researchers have not been tested for validity (accuracy) and are often not tested for reliability (consistency);" and the fact that existing studies do not adequately examine the intent of the person allegedly committing "suicide by cop." Jeffrey Selbin, *Suicide By Cop? How Junk Science and Bad Law Undermine Accountability for Killings by Police*, 113 Cal. L.R. (forthcoming 2025) (manuscript at 133–34), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4913593. Since Anderson and Red are not even familiar with—let alone experts in—"suicide by cop," they should be prohibited from testifying about it.

Similarly, neither Anderson nor Red are medical experts. *See* Ex. 3 at 59:6–8; *see also* Ex. 10 at 116:9–10. Accordingly, they should be prohibited from testifying about the medical causes and implications of Mr. Thomas' injuries from the dog bite or from the incident more broadly.

Finally, Anderson should be prohibited from testifying about tasers because he has not received sufficient training on using a taser, and, accordingly, stated that he was unable to answer questions about their use in his deposition. Ex. 3 at 159:22–23 ("I never went through a Taser class, so I don't know the ins and outs about Taser."). This prohibition should extend to testimony about policies and practices concerning taser usage, how Defendant Schultz's use of a taser could have affected Mr. Thomas, and whether using a taser was an available alternative to releasing a canine. *See id.*; *see also id.* at 193.

## VI. This Court should limit both Anderson's and Red's testimony to the same extent it limits Chief Tiderington's testimony.

Defendants have filed a motion to limit the testimony of Plaintiff's expert, Chief Thomas Tiderington, arguing that he should be prohibited from offering legal conclusions, interpreting bodyworn camera, testifying about what Defendants "knew or should have known," and commenting on the proximate cause of Mr. Thomas's injuries, among other matters. *See* Doc. 116.

Mr. Thomas filed an opposition explaining why Defendants' attempts to limit Chief Tiderington's testimony are meritless. *See* Doc. 122. Nevertheless, in the event this Court decides to limit Chief Tiderington's testimony, Mr. Thomas asks that the same limitations be applied to Anderson and Red. Both Anderson and Red plan to testify to the reasonableness of the officers' actions, as explained above. Both Anderson and Red rely on and interpret the video footage in forming their expert opinions. And, finally, both Anderson and Red comment about what the officers knew or could/should have known. *See* Ex. 1 at 12, 25, 32; *see also* Ex. 10 at 87, 129–31. Accordingly, if the Court puts any limitations on Chief Tiderington's testimony, these limitations should apply with full force to Anderson's and Red's testimony as well.

**CONCLUSION**

For the foregoing reasons, Mr. Thomas respectfully asks this Court to deny Defendants' Motion to exclude parts of Chief Tiderington's testimony.

Respectfully submitted this 19th day of September, 2025,

**/s/ Alessandro Clark-Ansani**

Alessandro Clark-Ansani (*pro hac vice*)†
alessandro@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Telephone: (202) 844-4975
alessandro@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Telephone: (202) 844-4975
† Admitted to practice in the District of Columbia (Bar No. 90018563).

Shirley LaVarco (S.D. Tex. Bar No. 3837906)
shirley@peoplescounsel.org
Brittany Francis*
brittany@peoplescounsel.org
Peoples' Counsel
1900 W. Gray Street
P.O. Box 130442
Houston, TX 77219
Telephone: (713) 487-9809
* Attorney-in-Charge. Admitted to practice in Texas (Bar No. 24141616), New York (Bar No. 5337555), and the District of Columbia (Bar No. 90008960).

*Counsel for Plaintiff*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on September 19, 2025, I communicated with opposing counsel regarding this Motion. Counsel indicated that Defendants are opposed to the relief sought.

/s/ Alessandro Clark-Ansani
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on September 19, 2025, a true and correct copy of this document was properly served on counsel of record via electronic filing in accordance with the United States District Court for the Southern District of Texas Procedures for Electronic Filing.

/s/ Alessandro Clark-Ansani
*Counsel for Plaintiff*