United States District Court
Southern District of Texas
**ENTERED**
December 02, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|                          |   |                              |
|--------------------------|---|------------------------------|
| KERRY LEE THOMAS,        | § |                              |
|                          | § |                              |
| Plaintiff,               | § |                              |
| v.                       | § | CIVIL ACTION NO. H-23-662    |
|                          | § |                              |
| ERIC M. BRUSS, *et al.*, | § |                              |
|                          | § |                              |
| Defendants.              | § |                              |

**MEMORANDUM AND OPINION**

On February 22, 2021, Robert Johnson, a sergeant in the Harris County Constable's Office, ordered his police dog to attack Kerry Lee Thomas. While the dog attacked Thomas, Eric Bruss and Wayne Schultz, a deputy and a sergeant in the same office, stood by. Thomas sued Bruss, Schultz, and Johnson's estate for allegedly violating Thomas's constitutional right to be free from excessive force. The parties have cross-moved for summary judgment. Thomas has moved for partial summary judgment against Bruss and Schultz and for default judgment against Johnson's estate. (Docket Entry No. 115). Bruss and Schultz have moved for summary judgment on Thomas's claims, including on the qualified immunity defense. (Docket Entry No. 118).[1]

Based on the record, the parties' briefs and arguments, and the relevant law, the court denies the cross-motions for summary judgment and Thomas's motion for default judgment. The reasons for these rulings are set forth below.

---

[1] The parties have also cross-moved to exclude the opinions and testimony of each side's experts. (Docket Entry No. 116, 126). The court does not address these motions now because they are not material to its resolution of the cross-motions for summary judgment.

I.    **Background**

On February 22, 2021, at 19:15 hours (7:15 p.m.), Harris County Constable's Office Precinct One police dispatch received a 911 call reporting a "disturbance with a weapon." (*See* Docket Entry No. 118-1 at 1).[2]  Robert Johnson, Eric M. Bruss, and Wayne Schultz were sent to the scene, a residence at 10923 Capstone Dr., Houston, Texas. (*See id.* at 5).  The 911 caller reported to dispatch that two black males were in front of his home screaming and yelling for the second time, and that the 911 caller had a weapon. (*See id.*).  Dispatch relayed this information to the officers heading to the scene. (*See id.*; Docket Entry No. 118-2).

Johnson confirmed to dispatch that he was on his way to the scene and activated his body camera at 19:19:10. (Docket Entry No. 118-3).  Bruss told dispatch he was on the way at 19:19:55. (Docket Entry No. 118-1).  Johnson's body camera recorded the dispatcher saying, "Update: reportee has his weapon out." (Docket Entry No. 118-3 at 19:20:47).  Johnson understood the dispatch to confirm that the "reportee . . . had his firearm in his possession." (Docket Entry No. 118-2 at 5).  Again, the "reportee" was identified as having the firearm, not the suspect, the two men in front of the house.  Johnson asked dispatch, "Are the suspects still there? If they're not still there, tell him [the reportee] to put away his weapon." (Docket Entry No. 118-3 at 19:20:52).  The dispatcher responds, "The suspects are still at that location in front of the address." (*Id.* at 19:21:20).  Approximately 30 seconds later, Johnson arrives.  He stops his car, immediately opens the door, draws his firearm, and shouts, "Put your hands up, now!  Put your fucking hands up, both of you!  Driver, put your hands up!  Put your hands up!  Do not move!" (*Id.* at 19:21:54).

---

[2] This opinion uses military time to be consistent with the timestamps on the body-camera and dashboard-camera videos.  Times in citations to videos refer to the start of the quoted language or described event, are approximate, and are taken from the timestamp in the upper-left corner of the video frame.

At this point, Thomas is visible on the body camera and dash camera of Johnson's car. Thomas got out of the passenger side door of a vehicle, raised his hands, and stood next to the door. (Docket Entry No. 118-10 at 19:22:09; Docket Entry No. 118-3 at 19:22:10). The distance between Thomas and Johnson appears to be approximately two car lengths. Johnson says, "Driver put your—stay in the car! Stay in the car!" (Docket Entry No. 118-3 at 19:22:10). Thomas stayed where he was, outside the passenger side door. Johnson turned to let his dog out from his car's back seat. (*Id.* at 19:22:14). Johnson shines his gun and flashlight at Thomas. Johnson said, "Get your ass back in the car! Have a seat!" (*Id.* at 19:22:21). The dog is plainly excited and appears to struggle against Johnson's grip on its collar. Johnson shouts, "Get back in the car and have seat, or else I'm gonna sic my dog at you!" (*Id.* at 19:22:27). Thomas begins to say, "I don't want to—" before Johnson cuts him off and again shouts, "Stay in the car!" Thomas asks, "Are you gonna shoot me?" (*Id.* at 19:22:38).

At this point, the car's driver, later identified as Rapheal Gray, has opened the door and appears to be getting out of the car. Johnson shouts again, "Stay in the car! Get in the fucking car now!" (*Id.* at 19:22:31). In response, Gray sits back down in the driver's seat. (*Id.* at 19:22:34). Thomas continues to speak to Johnson, telling Johnson to kill him, stating that "black lives matter, all lives matter," telling Johnson, "You're my brother!," and praying, "Please, Father, help me God, In Jesus name!" (*Id.* at 19:22:56–23:51). Throughout, the dog is whining and starting toward Thomas and Gray. Johnson radios, "He's not complying. Suspect's saying, "he wants to die, shoot him." (*Id.* at 19:22:43). During this exchange, Gray grabbed Thomas's shirt and tried to pull him back inside the car. (Docket Entry No. 118-10 at 19:22:35–22:43). Johnson shouts again: "Get back in the car, now." (Docket Entry No. 118-3 at 19:22:50). Then, about a second later, "Driver, stay in the vehicle!" (*Id.* at 19:22:51). Gray, wearing what appears to be a blue plaid shirt,

had stepped out of the car, but retreats inside when Johnson orders him to stay in the car.  (*Id.*).
Johnson shouts, "Do not get out again." (*Id.* at 19:22:54).

Bruss arrived at the scene at 19:23:26.  (Docket Entry No. 118-11 at 19:23:26).  While
Thomas shouts "all lives matter," Johnson tells Bruss, "Driver's not complying." (Docket Entry
No. 118-3 at 19:23:35).  Johnson then shouts, "Stop fucking reaching!"  Thomas has not moved
his arms.  Thomas shouts, "I'm reaching in the air! I'm reaching to God!" (*Id.* at 19:23:39).
Johnson says, twice, "Let's get the passenger first." (*Id.* at 19:23:42).  Bruss then took over issuing
verbal commands, with Johnson stating: "I'll let you give the command, ok?" (*Id.* at 19:23:49).
Johnson still shouts, "Driver, stay inside! Stay in the fucking car!" (*Id.* at 19:23:52).  Bruss told
Gray to show his hands; Thomas told Gray to do so as well.  (Docket Entry No. 118-4 at 19:23:57;
Docket Entry No. 118-8 ¶ 9).

As Bruss is shouting orders at Gray, the dog, still frantically whining, jumps up in front of
Johnson's camera and appears to put its paws on the hood of the squad car.  As the dog gets off
the hood of the car, Johnson appears to lower his pistol, placing it across his body, slightly
obscuring the camera but leaving Thomas visible.  Bruss orders Gray, "Walk towards me."
Johnson raises his weapon again and points it at Thomas, who has begun moving from behind the
door into a position adjacent to it, but not any closer to Johnson. (Docket Entry No. 118-3 at
19:24:03).  Johnson commands, "Passenger, stop!"  Thomas stops, and shouts, "Kill me!" (*Id.* at
19:24:14).

While Johnson has his weapon and flashlight pointed at Thomas, who has not moved, Bruss
gives commands to Gray, who is out of the car with his hands up and is complying with Bruss's
commands.  Bruss orders Gray to "lay down on the ground!"  Gray complies.  Bruss shouts, "If
you try anything funny, you're getting dog bit." (*Id.* at 19:24:23).  Bruss tells the now-prone Gray,

4

"Put your hands out to your sides," which Gray does.  (*Id.* at 19:24:27).  Bruss then tells Johnson, "I've got the driver at gun point."  (*Id.* at 19:24:31).

Johnson moves back to the driver's side of his patrol car and shouts at Thomas, "Go to the ground. Go to the ground, now!  Face down.  Keep your arms away from your thighs."  (*Id.* at 19:24:35).  Thomas complies.  Gray is still prone with his arms outstretched, but his head is slightly raised.  Bruss tells him to put his head down and stop moving, although Gray's body is not moving. Bruss yells, "This isn't a game my man.  This is how bad things happen.  You need to comply with what I'm telling you to do.  We've been told you've got a gun.  Until we determine that you don't, this is what's going to happen.  You're going to follow my directions."  (*Id.* at 19:24:53).

The dog is still agitated and whining loudly.  Johnson says to the dog, "Watch him, watch him, watch him!"  (*Id.* at 19:25:11).  Thomas has not moved.  Bruss tells Gray that he will be bitten unless he places his hands at his sides.  Gray's hands appear to be in front of him.  (*Id.* at 19:25:28). Johnson shouts, "Put your fucking hands to your sides, now!"  (*Id.* at 19:25:34).  The dog lunges, pulling Johnson forward.  (*Id.* at 19:25:36).  Johnson says, "Fucking do it! Try me, try me, motherfucker!"  (*Id.*).  The dog then struggles further, turning Johnson away from both suspects and to the side of his own squad car.  After a few seconds, Johnson regains his position facing the suspects' car.  (*Id.* at 19:25:42).  Bruss again yells at Gray that he needs to comply with the officers' orders until they confirm he does not have a gun.  (Docket Entry No. 118-4 at 19:25:41).

Johnson directs Bruss to take Gray into custody.  Gray complies with Bruss's instructions; he stands, turns away from the officers, and walks backwards until he is ordered to get on his knees in front of Bruss and another officer, Deputy Asli Tuzun.  The dog lunges indiscriminately. (Docket Entry No. 118-3 at 19:26:40).  While Tuzun was handcuffing Gray, Bruss directed Tuzun to "search him real good."  (Docket Entry No. 118-4 at 19:26:39).

5

Schultz arrived on the scene at 19:25:25 and positioned himself behind Johnson. (Docket Entry No. 118-12 at 19:25:25; Docket Entry No. 118-5 at 19:25:39). Schultz pointed his taser gun at Thomas. (Docket Entry No. 118-5 at 19:25:49). Thomas has not said anything further throughout this process and remains face down on the ground with his arms outstretched. Schultz shouts, "You in the gray [Thomas], step up, do it now!" (Docket Entry No. 118-3 at 19:27:03). Schultz repeats his order. Johnson shouts, "This is your last chance, or I'm gonna send the dog after you." (*Id.* at 19:27:11). Thomas begins to raise his head. The officers shout their orders again. Thomas appears to move his lower body slightly. (*Id.* at 19:27:16). Johnson shouts, "Last warning or I'm gonna send the dog." (*Id.* at 19:27:20).

A few seconds later, Johnson lets the dog go. The dog immediately races to Thomas, who is still face down on the ground, and latches onto his outstretched arm. (*Id.* at 19:27:25). Johnson approaches, yelling, "Think you're fucking around, don't you." (*Id.*). Although Thomas's arm is in the dog's clamped jaws, Johnson commands him to put his hands behind his back. Schultz remained behind Johnson. (Docket Entry No. 118-5 at 19:27:24). Bruss moved to check the car for weapons or other threats. (Docket Entry No. 118-4 at 19:27:26; Docket Entry No. 118-8 ¶ 14). At 19:27:37, Bruss concluded that the vehicle was clear. (Docket Entry No. 118-4 at 19:27:37). Bruss then watches the dog bite Thomas for the next twenty seconds, before commenting, "As soon as he gets you handcuffed, he'll get the dog off you." (*Id.* at 19:28:01). Johnson succeeds in cuffing Thomas and gets the dog to release the bite. (Docket Entry No. 118-3 at 19:28:06). Bruss told Johnson to take the dog off the bite. (Docket Entry No. 118-4 at 19:28:06–28:11). Bruss orders the now-handcuffed Thomas to "roll onto your stomach; you ain't seen nothing yet," and Johnson compliments the dog, secures the dog inside his car, and gives a jubilant cry. (*Id.* at 19:28:13).

Schultz contacted the police dispatch to request an ambulance for a dog bite.  (Docket Entry No. 118-5 at 19:28:27).  Johnson then searched the car for a gun.  (Docket Entry No. 118-3 at 19:29:08).  Johnson asked Bruss to ask Thomas where the gun was; Schultz repeated Johnson's request to Bruss; and Johnson talked to Tuzun about how dispatch acquired information about a gun on the scene.  (*Id.* at 19:29:08–30:56; Docket Entry No. 118-5 at 19:29:26).  Tuzun responded that it was a dispatch miscommunication because the reportee "said they [the suspects] never brandished the weapon."  (Docket Entry No. 118-3 at 19:30:59).  Johnson asked Bruss to confirm that dispatch said the suspects were armed, and Bruss replied, "I specifically asked, she said the suspects."  (*Id.* at 19:31:29).  Bruss's body camera does not capture him asking dispatch whether the suspects were armed.  (Docket Entry No. 118-4 at 19:19:23–23:25).

## II.     The Legal Standards

### A.     Motion for Summary Judgment

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it 'might affect the outcome of the suit.'"  *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).  When considering a motion for summary judgment, the court "must consider all facts and evidence in the light most favorable to the nonmoving party" and "must draw all reasonable inferences in favor of the nonmoving party."  *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and pointing to record evidence demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c). "When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is a dispute of material fact warranting trial.'" *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration adopted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

"Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quotation marks and quoting reference omitted). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation marks and quoting reference omitted). Rather, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which that evidence supports [its] claim." *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (alteration adopted) (quotation marks and quoting reference omitted).

The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. But "[i]f 'reasonable minds could differ'

8

on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson*, 477 U.S. at 250).

### B.    Motion for Default Judgment

To obtain a default judgment under Federal Rule of Civil Procedure 55(b), "the plaintiff must submit evidence showing that the defendant has been properly served with the summons, complaint, and the default judgment motion." *Harris Cnty. Water Control v. Philadelphia Indem. Ins. Co.*, No. H-19-cv-1755, 2019 WL 5191129, at *1 (S.D. Tex. Oct. 15, 2019); *see James Avery Craftsman, Inc. v. Sam Moon Trading Enters., Ltd.,* No. 16-CV-463, 2018 WL 4688778, at *3 (W.D. Tex. July 5, 2018) (citing *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649–51 (5th Cir. 1988)); *Hazim v. Schiel & Denver Book Grp.*, No. H-12-1286, 2013 WL 2152109, at *1 (S.D. Tex. May 16, 2013); S.D. Tex. Local R. 5.5 (requiring that a default judgment motion "must be served on the defendant-respondent by certified mail (return receipt requested)"). Absent proper service, a district court does not have personal jurisdiction over the defendant, and no valid default judgment can issue. *See Recreational Props., Inc. v. Sw. Mortg. Serv. Corp.*, 804 F.2d 311, 314 (5th Cir. 1986).

"A default judgment is unassailable on the merits but only so far as it is supported by the well-pleaded allegations, assumed to be true." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015) (quoting *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). "There must be a sufficient basis in the pleadings for the judgment entered." *Nishimatsu*, 515 F.2d at 1206. For the court to enter default judgment, the complaint must satisfy Federal Rule of Civil Procedure 8. *See Wooten*, 788 F.3d at 497–98. "On appeal, the defendant, although he may not challenge the sufficiency of the evidence, is entitled to contest the sufficiency of the complaint and its allegations to support the judgment." *Nishimatsu*, 515 F.2d at

1206.  "Generally, the entry of default judgment is committed to the discretion of the district judge."  *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001) (quoting *Mason v. Lister*, 562 F.2d 343, 344 (5th Cir. 1977)).

### III.    Analysis

As explained in detail below, the court denies summary judgment as to all parties because there are genuine factual disputes material to determining qualified immunity.  Thomas's motion for default judgment is denied without prejudice because he failed to comply with the district's local rules for serving a default-judgment motion.

### A.    Motions for Summary Judgment

This court previously denied the defendants' motion to dismiss based on a review of a video captured by Johnson's bodycam.  (Docket Entry No. 24).  Based on that review, this court concluded that Thomas had sufficiently alleged that Bruss and Schultz were liable under 18 U.S.C. § 1983 because they took no action to stop Johnson's instruction to "a police dog to attack a person suspected of making excessive noise, lying on the ground, with his hands extended before him and without visible access to any weapon."  (*See id.* at 15).  The question on these cross-motions for summary judgment is whether, after discovery, there are undisputed facts in the record that entitles either party to judgment as a matter of law.  The parties' motions, their briefs, and a review of the record show that genuine factual disputes material to determining qualified immunity preclude summary judgment for any party.

To prevail on a claim for damages against state officials for violations of constitutional rights under § 1983, a plaintiff must prove that the defendant (1) violated a constitutional right (2) that was "clearly established" at the time of the alleged misconduct.  *Sligh v. City of Conroe*, 87 F.4th 290, 298 (5th Cir. 2023) (per curiam) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

This court has discretion to skip directly to the "clearly established" inquiry.  *See Pearson*, 555 U.S. at 242; *Trent v. Wade*, 776 F.3d 368, 377 (5th Cir. 2015).  "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014).  "Three limitations on the legal authorities that plaintiffs may use to advance their claims ensure that the governing law is, in fact, 'clearly established' before a plaintiff may avoid a qualified-immunity defense: the substance of the law on which the plaintiff may rely, the jurisdiction of the case law the plaintiff may invoke, and the timing of the issuance of that case law."  *Gervin v. Florence*, 139 F.4th 1236, 1260–61 (11th Cir. 2025).

First, a plaintiff must rely on (1) favorable case law with materially indistinguishable facts; (2) a broad, legal principle sufficiently applicable to the facts of the case to place the statutory or constitutional question beyond debate; or (3) conduct so egregious and obviously illegal that no case law is needed.  *See Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016); *see also Gervin*, 139 F.4th at 1261.  Second, the plaintiff must rely on case law from controlling authority, such as the U.S. Supreme Court or the Fifth Circuit, or a robust consensus of cases of persuasive authority. *Morgan v. Swanson*, 659 F.3d 359, 382–83 & n.11 (5th Cir. 2011) (en banc); *Cooper*, 844 F.3d at 524.  Third, the plaintiff must rely on cases issued before the alleged misconduct occurred—here, February 2021.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (explaining that courts must assess "whether that law was clearly established at the time an action occurred").

In this case, the relevant principles were clearly established before the alleged misconduct. Bystander officers are liable if they "knew [their] fellow officer was violating an individual's constitutional rights."  *Joseph ex rel. Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020); *see*

*Austin v. City of Pasadena*, 74 F.4th 312, 331 (5th Cir. 2023) (confirming that "clearly established law . . . provides fair notice to officers of their duty to intervene, rather than to acquiesce, in the unconstitutional conduct of others" (citing *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995))). The Fifth Circuit frames this test as having four elements, explaining that an officer is "liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph*, 981 F.3d at 343 (citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013)).

There are genuine disputes of material fact that preclude summary judgment for any party.

### 1. Knowledge of Johnson's Use of Excessive Force and Presence at the Scene

A reasonable jury could conclude either that Bruss and Schultz knew, or that they did not know, that Johnson was violating Thomas's constitutional right to be free of excessive force under clearly established law. The record is clear that Johnson used constitutionally excessive force on Thomas. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (identifying the factors used to assess whether an officer used excessive force). The court's conclusion at the motion to dismiss stage that the pleadings sufficiently alleged that Johnson used clearly excessive force is supported by the summary-judgment record. (Docket Entry No. 24 at 12). Thomas was not suspected of committing a serious crime, but only of making noise in front of a house. The complainant's call to dispatch reported that two men were screaming and yelling in front of his home; it was the complainant who had the firearm. (Docket Entry No. 118-1 at 5). When Johnson released his dog, Thomas posed no threat to any officer. He was prone, with his arms outstretched, trying to comply with officers' shouted commands, with no sign of access to a firearm. The Fifth Circuit has "consistently held that a suspect does not pose an immediate threat where he unambiguously

12

surrenders by, for example, placing his hands in the air and complying with the officers'
commands." *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018). Thomas was lying prone and
still on the ground throughout the entire encounter, with his hands and legs spread, with no visible
access to a weapon, and without making any visible attempt to access any potentially hidden
weapon.

The parties dispute whether Thomas was immediately complying with the officer's request
to stand up. But the officers' response was to escalate the situation by screaming at Thomas,
despite no evidence of active resistance or access to a firearm. At most, Thomas passively resisted
the officers' order, which is not a license to use physical force. *See, e.g.*, *Joseph*, 981 F.3d at 333–
42 (resorting to a taser or nightstick without attempting to use physical skill, negotiation, or even
commands is excessive); *Cooper*, 844 F.3d at 523 (holding that a suspect who placed both his
hands on his head rather than raise them as the officer commanded could "hardly be characterized
as 'active resistance'"); *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) (holding that "it
was objectively unreasonable for several officers to tackle an individual who was not fleeing, not
violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp"). The
summary judgment record did not change the underlying fact that "Thomas had been silently
laying on the ground—as he was instructed to do—for several minutes" before the defendants
asked him stand up and Johnson released the dog to attack him. (Docket Entry No. 24 at 12; *see*
Docket Entry No. 118-3 at 19:27:03–27:24 (showing that Johnson released the dog twenty seconds
after the officers ordered Thomas to stand up from his prone position and he did not immediately
comply)).

Bruss and Schultz knew these facts. Bruss arrived at the scene at 19:23:26, four minutes
before Johnson released the dog. (Docket Entry No. 118-11 at 19:23:26; Docket Entry No. 118-3

at 19:27:24). Schultz arrived on the scene at 19:25:25, two minutes before Johnson released the dog. Schultz positioned himself behind Johnson, holding an armed taser. He saw Thomas lying prone, with his arms outstretched. (Docket Entry No. 118-12 at 19:25:25; Docket Entry No. 118-5 at 19:25:39). A reasonable jury could find that the officers had enough time to realize that using a police dog to attack a passively resisting suspect, clearly not in a position to or attempting to flee or shoot, was clearly excessive. For example, in *Austin*, the Fifth Circuit denied qualified immunity on a bystander-liability claim because when the defendant officer entered the jail cell, he "immediately began assisting the officers in restraining [the victim] in a prone position . . . without first determining the facts from [his] supervisor." *Austin*, 74 F.4th at 331.[3] Or in *Timpa*, the court held that a bystander officer who earlier left the scene but "was observing [a suspect] for the critical half-minute when [the suspect] suddenly lost consciousness" could be held liable on a bystander basis. *Timpa v. Dillard*, 20 F.4th 1020, 1039 (5th Cir. 2021).[4] Arriving late to a scene does not, under clearly-established law, automatically relieve an officer of bystander liability. Even if Bruss and Schultz did not know what had occurred before or just after Thomas got on the ground, a reasonable jury could find that, after seeing Thomas prone, weaponless, and at most passively resisting, the officers saw enough to know that releasing the attack dog to bite Thomas was excessive force under clearly-established law.

Bruss and Schultz respond with arguments that either Johnson did not use excessive force under clearly-established law or that Bruss and Schultz knew different facts and therefore did not

---

[3] Although *Austin* was issued in 2023, it held that a jury could find that the officer's 2019 conduct violated clearly established law from 1995 and 2013. *See* 74 F.4th at 319–20, 331–32. Thomas may rely on *Austin* to defeat summary judgment on qualified immunity in this case.

[4] Although *Timpa* was issued in December 2021, it held that a jury could find that officers' 2016 conduct violated clearly established law from 1995. *See* 20 F.4th at 1025, 1038–39. Thomas may rely on *Timpa* to defeat summary judgment on qualified immunity in this case.

know Johnson was using excessive force. None warrant summary judgment because they at most create genuine factual disputes material to determining qualified immunity.

First, Bruss and Schultz argue that canine force was reasonably necessary to secure Thomas, who was a flight risk. (Docket Entry No. 124 at 12). This argument is based on Schwartz's testimony that Thomas appeared to "see directionally where he was at and what his surroundings were and where we were" so that he could "look for a way to get away." (Docket Entry No. 124-2 at 362:15–63:1). But the video footage and other summary-judgment evidence create a dispute as to what Schwartz saw and whether his conclusion that Thomas was looking for a way to escape rather than looking to see where the officers were located was objectively reasonable. The defendants also argued that Thomas stated that he would not get up, (Docket Entry No. 124-2 at 366:13–17), and Thomas testified that he could not get up, (Docket Entry No. 124-3 at 75:18–77:12). A jury could watch the video footage, review the balance of the summary-judgment testimony, and discount Schwartz's theory.

A jury could conclude that Thomas was not a flight risk; the video footage showed him lying in a prone position with his arms outstretched, making it hard for him even to get to a standing position. The officers testified that Thomas was not trying to stand up from his prone position. A jury could also view the video and find that Thomas was not attempting to ascertain his surroundings in an attempt to escape. Thomas is prone for several minutes and made little to no movement during that time. He only began to move once the officers commanded him aggressively and under the threat of a dog attack to stand. A jury could find that the officers could not reasonably view Thomas as a flight risk.

Second, the defendants argue that Thomas posed a threat to the officers because he made several incoherent statements, including some about wanting the police to kill him. (Docket Entry

15

No. 124 at 4; Docket Entry No. 128 at 5). But a suspect's mental instability or apparent suicidal intent does not automatically make that suspect a threat to officers or the public. In *Cole*, the Fifth Circuit denied qualified immunity because a reasonable jury could have found that the suspect, a suicidal teenager with a gun, "made no threatening or provocative gesture to the officers and posed no immediate threat to them." *Cole v. Carson*, 935 F.3d 444, 455 (5th Cir. 2019) (en banc). Summary judgment was not appropriate even though the officers knew that the suspect had "already encountered fellow officers and walked away from them with his gun to his head, non-responsive, but without aggressive action." *Id.* By comparison, Thomas posed much less of a threat. The defendants' timeline concedes that Thomas last made any allegedly threatening or disconcerting statements more than two minutes before Johnson released his dog to attack Thomas. (Docket Entry No. 124 at 4). Thomas was silent and prone for the two minutes before he was attacked. To be sure, Thomas did not immediately comply with the officers' request to stand in the twenty seconds before Johnson released his dog to attack Thomas.[5] But as discussed, such passive resistance does not justify the use of canine force. *See, e.g.*, *Joseph*, 981 F.3d at 333–42; *Trammell*, 868 F.3d at 341; *Cooper*, 844 F.3d at 523.

Third, the officers argue that they reasonably believed that Thomas had a gun, justifying the use of canine force. Even if a gun had been visible and within Thomas's access, "merely having a gun in one's hand does not *per se* equate to dangerousness or a threat." *Rainwater v.*

---

[5] There is a factual dispute as to whether Thomas outright refused to comply with the officers' orders to stand or whether he was trying to comply but ultimately did not or could not do so. The defense argues that Thomas can be heard saying that he would not get off the ground. (Docket Entry No. 118-3 at 19:27:14). The officers argue that their understanding was that Thomas was outright refusing to comply with their order. (Docket Entry No. 124-2 at 366:13–17, 369:2–5). Thomas testified in his deposition that he was saying he could not stand up because he had injured his leg playing basketball and wanted assistance standing. (Docket Entry No. 124-3 at 75:18–77:12). Whatever the resolution of this dispute, Thomas's refusal to stand was at most passive resistance that did not justify canine force in response.

*Sikes*, 2018 WL 1916566, at \*4 (N.D. Tex. Apr. 23, 2018) (citing *Graves v. Zachary*, 277 F. App'x 344, 348 (5th Cir. 2008));[6] *see, e.g.*, *Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) (denying summary judgment in a deadly-force suit because of factual disputes over whether the officer ever saw the suspect holding a gun, and, if so, whether the suspect ever pointed the gun at the officer or turned to face the officer); *Cole*, 935 F.3d at 455 (similar).  And Thomas did not even have a gun in his hand; he was prone "in a surrender position" and "stood stationary in the officers' line of sight."  *Amador v. Vasquez*, 961 F.3d 721, 729 (5th Cir. 2020) (concluding that qualified immunity was inappropriate for a deadly-force claim because a jury could find that the suspect was not a threat).

There is a genuine factual dispute as to whether it was reasonable for the officers to believe that Thomas had a firearm.  The video footage and incident logs show that dispatch told the officers that the reportee, not the suspects, had a firearm.  (*See, e.g.*, Docket Entry No. 118-3 at 19:20:47 ("Update: reportee has his weapon out."); Docket Entry No. 118-2 at 5 ("reportee . . . had his firearm in his possession"); Docket Entry No. 118-7 at 291:9–10 ("It was confirmed that the homeowner had a weapon by the homeowner."); Docket Entry No. 115-3 at 5 (confirming twice that "RPT HAS WEAPON OUT")).  The officers did not see a gun on Thomas's person or, when he was lying face down on the ground, within his access.  The officers did not find a gun on Thomas or Gray or in their car.  (*See* Docket Entry No. 118-2 at 10–11 (reporting that the car was cleared and the suspects were secured)).  There is some evidence that the officers reasonably believed that Thomas had a gun.  Bruss gave deposition testimony that dispatch had reported to him that the suspects had a gun; Bruss repeated at the scene his belief that the suspects had a gun;

---

[6] *Graves* recites legal principles that were clearly established in 2008.  *Roque v. Harvel*, 993 F.3d 325, 337–38 (5th Cir. 2021).

and the person who called dispatch had pulled his own weapon. (Docket Entry No. 118-4 at 19:25:00; Docket Entry No. 118-6 at 214:20–15:2; Docket Entry No. 118-7 at 291:24–25 ("Why else would the homeowner pull a weapon on them?")).[7]

A jury could credit, or decline to credit, each circumstance. Bruss's body camera footage includes no statement from dispatch that the suspects had weapons; Bruss heard only that the complainant's weapon was out and later secured. (Docket Entry No. 118-4 at 19:19:23–23:25; Docket Entry No. 118-11 at 19:19:20–23:25). If a jury found that Bruss was never told that the suspects were armed, as the video evidence reflects, the jury could also find that Bruss lacked a reasonable basis to believe that Thomas had a firearm. The fact that the person who called 911 had brandished his gun and then put it away does not support a reasonable inference that the suspects had weapons. *See Cooper*, 844 F.3d at 523 n.2 (holding that, although a suspect being "unsearched" may "sometimes be a relevant fact—for example, where a plaintiff is suspected of committing a violent crime—it is not enough, standing alone, to permit a reasonable officer to characterize a suspect as an immediate threat").

On the summary judgment record, a reasonable jury could find (or not find) that Bruss and Schultz knew that Johnson was violating Thomas's right to be free of excessive force. *McWashington v. Rodgers* is instructive. No. 4:24-cv-2153, 2025 WL 1124752, at *7–8 (S.D.

---

[7] The defendants rely on two additional pieces of evidence in support of their reading of the record: Johnson's case supplemental report that says dispatch reported that the suspects had weapons and dispatch's designation of the case as a priority-one weapon disturbance. These facts do not alter the genuine dispute of fact on the reasonableness of the officer's belief that Thomas had a weapon. Johnson entered his case supplemental report the next day, (Docket Entry No. 118-2 at 7), and a jury could find that Johnson only thought that the suspects had weapons because Bruss said so, (Docket Entry No. 118-3 at 19:29:08–30:56; Docket Entry No. 118-4 at 19:31:29), without a reasonable basis to say so, (*id.* at 19:19:23–23:25). The dispatch's designation is equally equivocal because the officers did not have access to that information, *Cole*, 935 F.3d at 456, and because the designation was entered after dispatch reported that the reportee, not the suspects, had a gun, (*Compare* Docket Entry No. 115-3 at 2 (logging a "disturbance weapon" at 19:17:43), *with id.* at 5 (logging "RPT HAS WEAPON OUT" at 19:16:58)).

Tex. Apr. 15, 2025).  In that case, the court denied qualified immunity and concluded that the bystander officers knew that the primary officer "allowed the dog to thrash at Plaintiff's arm for roughly thirty seconds; all the while, Plaintiff remained still and silent with nothing visibly in his hands."  *Id.* at *7.  The plaintiff was suspected of a DUI at worst and a minor traffic violation at most.  *Id.*  The officers had some reason for concern because the plaintiff was in the car at the time of the dog attack and could have accessed a weapon that the officers could not see.  *Id.*  But the officers had seen the plaintiff's hands at an earlier point and knew that he did not have a weapon.  *Id.*  Clearly established law held bystander officers liable for failing to intervene as a police dog was "continuously bit[ing]" the plaintiff "even though" he "was not actively resisting."  *Id.* at *9.

The facts here are similar.  Johnson's dog bit Thomas's arm for about fifty seconds, longer than the thirty seconds in *McWashington*.  Thomas was lying on the ground, face down, with arms outstretched both before and after the dog bit him, similar to the lack of resistance in *McWashington*.  Although Thomas was suspected at most of making loud noises while holding a weapon, a jury could reasonably find that Thomas did not have a weapon and was merely making too much noise outside a home.  Such a nuisance is similar in severity to the plaintiff's traffic violation in *McWashington*.  As in *McWashington*, a jury could find that the officers knew that Thomas did not pose a threat because they were not told he had a gun, had little circumstantial evidence to believe he had a gun, and, at the time of the dog bite, knew that he had been lying face down on the ground with his arms outstretched for several minutes.  In both cases, the underlying principle in *Cooper*—that a prolonged dog bite after a suspect submitted and posed no threat is excessive—clearly established for each officer at the scene their knowledge of a constitutional violation.  *See McWashington*, 2025 WL 1124752, at *7–9 (citing *Cooper*, 844 F.3d at 521–24).

The defendants argue that this court's and *McWashington*'s reliance on *Cooper* is inappropriate because the Fifth Circuit held in *Sligh* that *Cooper* cannot clearly establish bystander liability. (Docket Entry No. 124 at 13). The defendant's maximalist reading of *Sligh* is not persuasive. In *Sligh*, the Fifth Circuit rejected the plaintiff's attempt to establish bystander liability through *Cooper*, calling the case "wholly inapplicable to a bystander liability theory" because it "concerned only the conduct of the specific officer who controlled the dog." 87 F.4th at 301. Although the panel used expansive language in rejecting the plaintiff's argument, the holding is more precise. The panel held that *Cooper* did not apply to bystander liability because there was "no discussion in *Cooper* of whether another officer on site would be required to intervene as a bystander." *Id.* The focus on whether the bystander officer would be required to intervene, as opposed to whether the bystander officer knew that the dog handler was using excessive force, suggests that *Cooper* cannot be used to clearly establish that the officers violated the third and fourth elements of a bystander-liability claim: that the bystander "had a reasonable opportunity to prevent the harm" but "chose not to act." *Joseph*, 981 F.3d at 345. *Sligh* does not foreclose a plaintiff's reliance on *Cooper* to establish the first two elements: that the bystander officers knew that the officer handling the police dog violated the plaintiff's constitutional rights because the bystanders were at the scene when the constitutional violation occurred. *See id.*

Adopting the officers' reading of *Sligh* would conflict with other Fifth Circuit cases. The Fifth Circuit has repeatedly allowed plaintiffs to establish the first element of a bystander-liability claim by assessing whether the primary officer violated clearly-established law and whether the bystander officer knew the facts material to the primary officer's clearly-established constitutional violation. *See, e.g.*, *Hale*, 45 F.3d at 919; *Timpa*, 20 F.4th at 1035–39; *Austin*, 74 F.4th at 330–32. In this case, Johnson violated *Cooper*'s recitation of clearly-established legal principles on the

use of excessive force, and a jury could conclude that Schultz and Bruss witnessed enough at the scene to know that Johnson violated *Cooper*.

This court's and *McWashington*'s reliance on *Cooper* for the limited purpose of showing the first two elements of Thomas's bystander-liability claim is consistent with both *Sligh* and other Fifth Circuit precedent.  Genuine factual disputes material to determining the first two elements of the bystander-liability claim preclude summary judgment.

### 2.    Reasonable Opportunity to Intervene and Choice Not To Intervene

Thomas can prove the third and fourth prongs of a bystander-liability claim on this record under clearly-established law.  Following *Sligh*, this court cannot presume that officers had a duty to intervene solely based on the fact that the officer controlling the dog used excessive force.  87 F.4th at 301.  Liability depends on whether the bystander officers had a reasonable opportunity to intervene but chose not to do so.  *White v. Calvert*, No. H-20-cv-4029, 2021 WL 6112791, at *17 (S.D. Tex. Dec. 27, 2021) (citing *Whitley*, 726 F.3d at 646).  Fifth Circuit case law clearly establishes three principles that guide a court's determination as to whether a bystander officer had a reasonable opportunity to intervene.

First, liability will attach to bystander officers who witness a constitutional violation and acquiesce in that violation, encourage it to continue, or assist in its execution.  In *Austin*, the bystander officers were liable for helping other officers use excessive force in tasing and restraining a seizing detainee, 74 F.4th at 331; in *Hale*, the bystander officers were liable because they "stood by and laughed" as the offending officer used excessive force, 45 F.3d at 919; and in *Timpa*, the bystanders were liable because they "observed Timpa suddenly lose consciousness, expressed surprise, and then made jesting comments," 20 F.4th at 1039.

21

Second, liability will attach if a bystander officer can, but does not, object to the unconstitutional conduct. In *Austin*, the court held that clearly established law allowed a jury to find that officers who tased and restrained a seizing detainee "acquiesced in the constitutional violations, both by not objecting and by participating in similar conduct." 74 F.4th at 331. Similarly, in *Timpa*, the court held that a jury could find that a bystanding officer violated Timpa's clearly-established constitutional rights, even though the officer returned to his patrol car to check Timpa's license, because the bystanding officer "was observing Timpa for the critical half-minute when Timpa suddenly lost consciousness." 20 F.4th at 1039. Officers have more than a duty to physically intervene.

Third, an officer's admission that he or she had an opportunity to intervene, but did not do so, can establish a genuine factual dispute material to determining a summary-judgment motion. In *Timpa*, the court concluded that bystander officers had a reasonable opportunity to intervene in part because they conceded that they had the opportunity to do so. S*ee* 20 F.4th at 1039 ("The Officers do not contend that Vasquez or Dominguez lacked reasonable opportunity to intervene."). And in *Carroll v. Ellington*, the Fifth Circuit concluded that there was a genuine factual dispute material to determining whether the bystander officer had the opportunity to intervene to prevent continued strikes on a detainee because that officer admitted "at trial that he made the call to emergency medical services in which he stated" that the detainee was unresponsive on the floor. 800 F.3d 154, 177–78 (5th Cir. 2015). Under clearly-established law, whether an officer has a reasonable opportunity to intervene is a fact-intensive question, on which officers' admissions are highly probative.

Applying these principles to Thomas's case leads to three conclusions. First, neither bystander officer is responsible for Johnson's initial decision to let the dog loose to attack Thomas.

The record shows that Bruss and Schultz could have reasonably believed that Johnson was threatening to release his dog as a scare and de-escalation tactic, but that Johnson did not intend to do so unless Thomas tried to resist arrest or flee. Both experts testified that such threats are normal canine tactics. (Docket Entry No. 118-17 at 171:2–71:7; Docket Entry No. 118-16 at 13; Docket Entry No. 118-13 at 156:14–25). Based on that reasonable belief, it was also reasonable for Bruss and Schultz not to object to Johnson's threat to release the dog. Although Johnson's decision to release the dog was a clear constitutional violation, (*see* Docket Entry No. 24 at 9–12, 15), Bruss and Schultz may not have reasonably anticipated that Johnson would decide to make good on his threats to have the dog attack Thomas.[8] The facts are similar to *White v. Calvert*, in which this court found no bystander liability under clearly-established law, because the bystander officer who requested canine assistance could not have anticipated that the dog would bite the plaintiff, much less do so for an unreasonable period of time. 2021 WL 6112791, at *15.

Second, a jury could find (or not find) Bruss liable for acquiescing to and encouraging the dog to keep his bite hold on Thomas while he was clearly subdued and unable to flee or resist, for almost forty seconds. "Under the facts in this record, permitting a dog to continue biting a compliant and non-threatening arrestee is objectively unreasonable." *Cooper*, 844 F.3d at 524; *accord Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018); *White*, 2021 WL 6112791, at *11–13; *McWashington*, 2025 WL 1124752, at *7–8. In such a case, an officer may not wait "to release the [dog] bite until after he [] finishe[s] handcuffing" an already subdued

---

[8] Bruss testified that he had a reasonable opportunity to tell Johnson to not release the dog or to put the dog away. (Docket Entry No. 115-5 at 271:15–23). Although this concession is probative of Bruss's ability to intervene, the undisputed facts in the record support finding that it was reasonable for Bruss to believe that Johnson was threatening Thomas with canine force to frighten Thomas into compliance, but that Johnson did not intend to carry out that threat. *See, e.g.*, *Muniz v. Davis*, No. 13-cv-666-LY, 2014 WL 4259385, at *7 (W.D. Tex. Aug. 27, 2014) (finding that the threatened use of a taser, without actual use, does not constitute excessive force); *Trevino v. Avalos*, No. 1:24-cv-046, 2025 WL 1393961, at *4 (S.D. Tex. May 14, 2025) (same).

individual. *Cooper*, 844 F.3d at 521, 524–25. A jury could find that Bruss acquiesced in or encouraged such conduct. *See, e.g.*, *Austin*, 74 F.4th at 331; *Hale*, 45 F.3d at 919. Bruss saw Johnson subdue and restrain Thomas at 19:27:31, nearly 45 seconds before Johnson told the dog to release his bite. (Docket Entry No. 118-4 at 19:27:31–28:15).

The defendants respond that Bruss did not have an opportunity to intervene because he went to check the vehicle for other suspects. (Docket Entry No. 118 at 15; Docket Entry No. 128 at 9). But in his deposition, Bruss admitted that he had a reasonable opportunity to tell Johnson to remove the dog from the bite once Thomas had been subdued. (Docket Entry No. 115-5 at 271:9–72:22). At a minimum, a reasonable jury could find that Bruss stood by and witnessed the "critical half-minute when" the dog continued biting the subdued Thomas. *Timpa*, 20 F.4th at 1039. After clearing the vehicle, Bruss articulated the clearly incorrect legal rule: "As soon as he gets you handcuffed, he'll get the dog off you." (Docket Entry No. 118-4 at 19:27:58). Bruss stood by, even after he had cleared the car, for about 14 to 20 seconds, during which Johnson was on top of Thomas and the dog continued to bite and pull at Thomas's arm. (*Id.* at 19:28:12). Only after Thomas was handcuffed did Bruss instruct Johnson to take the dog off the bite. (*Id.* at 19:28:11). Bruss immediately followed his comment with a taunt, telling a handcuffed Thomas, still lying on his back and side, that he had to roll over to his stomach because he "ain't seen nothing yet." (*Id.* at 19:28:17). On these facts, a jury could find (or not find) that Bruss not just failed to object to, but participated in, *Austin*, 74 F.4th at 331, encouraged, or even jeered at a clear constitutional violation, *Hale*, 45 F.3d at 919, despite an admission that he a had a reasonable opportunity to prevent the violation, *Timpa*, 20 F.4th at 1039.

Third, a jury could find (or not find) Schultz liable for acquiescing to the dog's excessively long bite of Thomas. Schultz, like Bruss, admitted that he had the opportunity to object to the

24

prolonged bite. *See, e.g.*, *Timpa*, 20 F.4th at 1039; *Carroll*, 800 F.3d at 177–78. Schultz testified in his deposition that he could have objected and asked Johnson to remove the dog from the bite. (Docket Entry No. 115-6 at 307:14–18 ("Q: Could you have asked or suggested that Robert Johnson at any point remove the dog from the bite? A: If you're asking could I have, yes, absolutely I could have.")). Video footage corroborates Schultz's admission. Schultz stood behind Johnson and "saw what [Johnson] saw." *McWashington*, 2025 WL 1124752 at *9. Schultz stood mere feet away for the approximately 45 seconds that the dog was biting Thomas and the 40 seconds that Johnson was straddling the subdued Thomas while the dog continued to bite and pull at his arm. (Docket Entry No. 118-5 at 19:27:19–27:26, 19:27:19–28:08).

Schwartz responds that he did not have enough experience with canines to know how to handle them or to second-guess Thomas's decision to release the dog. (Docket Entry No. 124 at 6; *see also* Docket Entry No. 115-6 at 306:17–23, 307:14–24). But "when the law is clearly established, a defendant cannot utilize his lack of knowledge to establish immunity to liability. Lack of knowledge of the law and good faith do not preclude liability." *Dean v. Thomas*, 933 F. Supp. 600, 609 (S.D. Miss. 1996); *see Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001) ("[A] particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity."); *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015) ("[T]he defendants' actual state of mind or knowledge of the law is irrelevant to whether the asserted conduct would have been legally reasonable."). Although Schultz did not have a reasonable opportunity to safely pull the dog off Thomas, *see White*, 2021 WL 6112791, at *15, Schultz admitted that he could have "object[ed]" to the prolonged bite and told Johnson to remove

25

the dog, *see Austin*, 74 F.4th at 331. Schultz's claimed lack of experience with canines does not relieve him of his clearly established obligation to recognize excessive force and object to it.[9]

The defendants' final response argues that three cases—*Sligh*, *Walton*, and *White*—compel finding qualified immunity here. (Docket Entry No. 124 at 11–13). These cases do not support that result. (*See* Docket Entry No. 24 at 15–18 (distinguishing *White*)).

*Sligh* does not compel finding qualified immunity on the present record. *Sligh*'s legal ruling on the scope of bystander liability in dog-bite cases was limited by the plaintiff's failure to adequately argue the issue. The plaintiff in *Sligh* pointed only to *Cooper*, not to any other case addressing when a bystander officer has an opportunity to intervene. *See* 87 F.4th at 301 ("Sligh points to no other case clearly establishing the law on this issue."). In addition, the facts of *Sligh* are distinguishable. The primary officer ordered the dog to release the bite about eight seconds after the initial bite command. *Id.* The bite incident was so short that, even if Sligh had cited and applied the Fifth Circuit's bystander-liability case law, the bystander officers in that case likely did not have a reasonable opportunity to intervene. The court distinguished *Cooper*, and case law relating to prolonged dog bites, in part for this reason. *See id.* at 300–01. By contrast, Thomas cites and applies clearly-established case law on when and how bystander officers have a duty to intervene. (Docket Entry No. 115 at 19–20; Docket Entry No. 123 at 21–24; Docket Entry No. 125 at 7–13). That case law, separate from *Cooper* and *Sligh*, clearly established the duty to intervene on this record.

---

[9] Schultz's responses are also subject to a genuine dispute of fact to the extent they are relevant. Schultz has been a police officer for about 30 years. (Docket Entry No. 115-6 at 31:9–35:1). He sat on the complaint review board that investigates reports of excessive force. (*Id.* at 165:23–66:4). He knew of his duties to intervene to stop force that is clearly beyond what is objectively reasonable under the circumstances. (*Id.* at 389:9–19).

*Walton v. Tunica County*, 648 F. Supp. 3d 780, 795 (N.D. Miss. 2023), is also distinguishable on the facts. The court in *Walton* noted "at the outset that" the plaintiff's briefing did "a poor job of making specific factual allegations as to what Captain French's opportunity to intervene to stop the attack was and how he failed in this regard." *Id.* at 795. The court added that the plaintiff failed to cite case law on when officers have a reasonable opportunity to intervene, relying instead on the generic elements of a bystander liability claim and case law on a police dog handler's liability. *See id.* at 796–97. In short, the *Walton* plaintiff and the *Sligh* plaintiff made similar errors. The bystander officer in *Walton* was also at his patrol unit speaking on the phone when the incident occurred. *See id.* at 795. The bystander officer did not witness the alleged constitutional violation and could not have been liable as a bystander. *Walton* is materially distinguishable from the case before this court.

The defendant cites *Walton* for its concluding explanation that no case law established whether an individual has a "duty to intervene when a dog who should be under the control of a K9 officer attacks a suspect." *Id.* at 797. The court's ruling was a function of the plaintiff's arguments, which focused on whether the officer had a duty to physically intervene. *See id.* (explaining that it was unclear whether the bystanding officer "should intervene personally" and "try to remove the dog"). The officer handling the dog testified that it would have been unsafe to remove the dog once his bite had latched onto the suspect. *See id.* This record is much different. Bruss testified that he could have removed the dog from the bite. (Docket Entry No. 115-5 at 271:9–72:22). Both officers testified that they could have told Johnson to remove the dog after Thomas was subdued. (*Id.*; Docket Entry No. 115-6 at 307:14–18). There is also testimony that the bystander officers could have told Johnson not to release the dog or urged a swifter effort to get the dog to release its bite. Johnson's supervisor testified in his deposition that if a canine

officer was "using excessive force," he would "tell" the officer "to get his dog under control and have his dog . . . detained or secure," (Docket Entry No. 115-12 at 204:23–205:3), including by telling the canine handler to "pull the dog off the bite," (*id.* at 206:12–15). On this record, a jury could find that the officers failed discharge their clearly-established duty to "object[]" to clearly unconstitutional conduct. *Austin*, 74 F.4th at 331; *see Timpa*, 20 F.4th at 1039.

*White* is similar. In *White*, the plaintiff sought to hold the bystander officer liable "for failing to intervene *before*" the primary officer "even used excessive force" and for requesting canine assistance when the officer reasonably believed that the dog would assist in detaining the suspect without biting and without the officer having to use other force. 2021 WL 6112791, at *17. This court further explained that there was no case law establishing that an officer had a duty to intervene personally or physically "to remove a biting canine from a suspect" when the dog would not "respond to verbal commands from any officer other than its handler." *Id.* But the scope of the plaintiff's claims and the record in *White* did not raise the issue of whether the officer had the opportunity to verbally intervene or object to the handler's behavior, as this case does. *White* does not undermine the clearly-established principles from *Austin* and *Timpa* that apply on this record. Nor does it undermine the conclusion that a jury could find that Bruss had not just failed to intervene, but had encouraged Johnson's excessive use of force, a principle that *White* found wholly inapplicable on its facts. *See id.* at *16 (distinguishing *Hale* and *Timpa*).

There are genuine factual disputes material to determining whether, under clearly established law, Bruss and Schultz had a reasonable opportunity to intervene to stop the dog bite after Thomas was subdued. The defendants are not entitled to qualified immunity at this stage of the proceedings.

### B.    Motion for Default Judgment

Thomas moves for default judgment under Rule 55(b) against Johnson's estate.  (Docket Entry No. 115 at 26–30; Docket Entry No. 115-2).  Two years ago, Keith Morris, a probate attorney, was appointed as temporary dependent administrator for the Estate of Robert Johnson, who was substituted as a defendant after Johnson's death.  (Docket Entry Nos. 36, 38).  Summons was issued to Morris shortly after his appointment.  (Docket Entry No. 40).  Since then, Morris has not filed an answer or otherwise appeared to defend Johnson's estate.  (Docket Entry No. 115-2 ¶ 25).  Thomas argues that default judgment is now appropriate.

Thomas's motion for default judgment is procedurally premature.  Local rules require that a party moving for default judgment serve the defendant with "the summons, complaint, *and the default judgment motion*."  *Harris Cnty. Water Control*, 2019 WL 5191129, at *1 (emphasis added); S.D. Tex. Local R. 5.5 ("Motions for default judgment must be served on the defendant-respondent by certified mail (return receipt requested).").  Neither Thomas's motion for default judgment nor his declaration in support of his motion for default judgment includes proof that he served Morris by certified mail with his motion.  His motion for default judgment is premature and denied without prejudice.

## IV.     Conclusion

Thomas's motion for summary judgment, (Docket Entry No. 115), is denied.  Thomas's motion for default judgment, (Docket Entry No. 115), is denied without prejudice.  Bruss's and Schultz's motion for summary judgment, (Docket Entry No. 118), is denied.  The parties' cross-motions to exclude expert testimony, (Docket Entry No. 116, 126), remain under advisement.

SIGNED on December 2, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge